**TempReass, APPEAL**

# U.S. Bankruptcy Court
## Eastern District of New York (Brooklyn)
## Bankruptcy Petition #: 1−18−47256−reg

|  |  |
|---|---|
| | *Date filed:* 12/20/2018 |
| *Assigned to:* Robert E. Grossman | *Plan confirmed:* 07/30/2019 |
| Chapter 11 | *341 meeting:* 03/19/2019 |
| Voluntary | *Deadline for filing claims:* 04/05/2019 |
| Asset | *Deadline for filing claims (govt.):* 06/25/2019 |

| **Debtor** | |
|---|---|
| **4921 12th Avenue LLC** | represented by **Joseph Y. Balisok** |
| 4921 12th Avenue | Balisok & Kaufman PLLC |
| Brooklyn, NY 11219 | 251 Troy Avenue |
| KINGS−NY | Brooklyn, NY 11213 |
| Tax ID / EIN: 20−0581630 | (718) 928−9607 |
| | Fax : 718−534−9747 |
| | Email: bankruptcy@lawbalisok.com |

**Karamvir Dahiya**
Dahiya Law Offices, LLC
75 Maiden Lane
Suite 506
New York, NY 10038
(212)766−8000
Fax : (212)766−8001
Email: karam@bankruptcypundit.com

**J Ted Donovan**
Goldberg Weprin Finkel Goldstein LLP
1501 Broadway
22nd Floor
New York, NY 10036
(212)−301−6943
Fax : (212)−422−6836
Email: Tdonovan@gwflaw.com

**Alla Kachan**
3099 Coney Island Avenue
3rd Floor
Brooklyn, NY 11235
(718) 513−3145
Fax : (347) 342−3156
Email: alla@kachanlaw.com

**U.S. Trustee**
**Office of the United States Trustee**
Eastern District of NY (Brooklyn Office)
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, NY 10014
(212) 510−0500

| Filing Date | # | Docket Text |
|---|---|---|

| | | | |
|---|---|---|---|
| 05/01/2019 | | 51 | Chapter 11 Plan 4/30/2019 Filed by Mark A. Frankel on behalf of Galster Funding LLC (RE: related document(s)1 Voluntary Petition (Chapter 11) filed by Debtor 4921 12th Avenue LLC). (Frankel, Mark) (Entered: 05/01/2019) |
| 05/01/2019 | | 52 | Disclosure Statement Filed by Mark A. Frankel on behalf of Galster Funding LLC (RE: related document(s)1 Voluntary Petition (Chapter 11) filed by Debtor 4921 12th Avenue LLC). (Frankel, Mark) (Entered: 05/01/2019) |
| 05/01/2019 | | 53 | Notice of Hearing on Disclosure Statement Filed by Mark A. Frankel on behalf of Galster Funding LLC (RE: related document(s)52 Disclosure Statement filed by Creditor Galster Funding LLC) Hearing scheduled for 5/29/2019 at 03:00 PM at Courtroom 3529 (Judge Craig), Brooklyn, NY. (Frankel, Mark) (Entered: 05/01/2019) |
| 05/03/2019 | | 56 | Affidavit/Certificate of Service Filed by Mark A. Frankel on behalf of Galster Funding LLC (RE: related document(s)53 Notice of Hearing on Disclosure Statement filed by Creditor Galster Funding LLC) (Frankel, Mark) (Entered: 05/03/2019) |
| 06/10/2019 | | 76 | Order Approving Disclosure Statement. It is Ordered that the Disclosure Statement is approved and any objections to the Disclosure Statement are OVERRULED. July 8, 2019 at 5:00 p.m. is fixed as the last day for submitting written acceptances or rejections to the Plan referred to above, and ballots indicating acceptance or rejection of the Plan must be received by Backenroth Frankel & Krinsky, LLP on or before July 8, 2019, at 5:00 p.m. July 8, 2019 at 5:00 p.m. is fixed as the last day for filing and serving written objections to confirmation of the Plan (RE: related document(RE: related document(s)52 Disclosure Statement filed by Creditor Galster Funding LLC). Signed on 6/10/2019. Hearing on Confirmation of the Plan to be held on 7/17/2019 at 03:00 PM at Courtroom 3529 (Judge Craig), Brooklyn, NY. Last day to Object to Confirmation 7/8/2019. Ballots due by 7/8/2019 @ 5:00 p.m. ((1) Exhibit) (rjl) . 51 Chapter 11 Plan filed by Creditor Galster Funding LLC. (rjl). (Entered: 06/11/2019) |
| 06/12/2019 | | 79 | Affidavit/Certificate of Service Filed by Mark A. Frankel on behalf of Galster Funding LLC (RE: related document(s)51 Chapter 11 Plan filed by Creditor Galster Funding LLC, 52 Disclosure Statement filed by Creditor Galster Funding LLC, 76 Order Approving Disclosure Statement) (Frankel, Mark) (Entered: 06/12/2019) |
| 07/03/2019 | | 81 | Transcript & Notice regarding the hearing held on 05/29/19. Pursuant to the new policy adopted by the Judicial Conference, transcripts are available for inspection only at the Office of the Clerk or may be purchased from the court transcriber. [Please see the court's website for contact information for the Transcription Service Agency].. Notice of Intent to Request Redaction Due By 07/10/2019. Redaction Request Due By 07/24/2019. Redacted Transcript Submission Due By 08/5/2019. TRANSCRIPT ACCESS WILL BE ELECTRONICALLY RESTRICTED THROUGH 10/1/2019 AND MAY BE VIEWED AT THE OFFICE OF THE CLERK. (Associated Reporters International, Inc). Related document(s) 2 Order Scheduling Initial Case Management Conference, 19 Motion to Dismiss Case, 49 Order to Show Cause (Generic), 50 Order, 52 Disclosure Statement filed by Creditor Galster Funding LLC, 53 Notice of Hearing on Disclosure Statement filed by Creditor Galster Funding LLC. Modified on 7/8/2019 (ads). (Entered: 07/03/2019) |

2

| 07/15/2019 | | 86 | Statement *in Support of Plan Confirmation* Filed by Mark A. Frankel on behalf of Galster Funding LLC (Frankel, Mark) (Entered: 07/15/2019) |
|---|---|---|---|
| 07/30/2019 | | 91 | Order Confirming Mortgagee's Plan of Reorganization. (RE: related document(s)51 Chapter 11 Plan filed by Creditor Galster Funding LLC,. Signed on 7/30/2019. Final Decree due by 10/28/2019. (Exhibit) (rjl) (Entered: 07/30/2019) |
| 08/01/2019 | | 92 | Affidavit/Certificate of Service Filed by Mark A. Frankel on behalf of Galster Funding LLC (RE: related document(s)91 Order Confirming Chapter 11 Plan) (Frankel, Mark) (Entered: 08/01/2019) |
| 08/06/2019 | | 94 | Transcript & Notice regarding the hearing held on 07/17/2019. Pursuant to the new policy adopted by the Judicial Conference, transcripts are available for inspection only at the Office of the Clerk or may be purchased from the court transcriber. [Please see the court's website for contact information for the Transcription Service Agency]. (RE: related document(s) 2 Order Scheduling Initial Case Management Conference, 19 Motion to Dismiss Case, 53 Notice of Hearing on Disclosure Statement). Notice of Intent to Request Redaction Due By 08/13/2019. Redaction Request Due By 08/27/2019. Redacted Transcript Submission Due By 09/6/2019. TRANSCRIPT ACCESS WILL BE ELECTRONICALLY RESTRICTED THROUGH 11/4/2019 AND MAY BE VIEWED AT THE OFFICE OF THE CLERK. (TypeWrite Word Processing Service) (Entered: 08/06/2019) |
| 12/27/2019 | | 110 | Motion to Authorize/Direct *Plan Administrator to Evict Tenants and Retain Managing Agent to Manage Property* Filed by Mark A. Frankel on behalf of Mark Frankel as Plan Adminstrator for 4921 12th Avenue LLC. Hearing scheduled for 1/22/2020 at 03:00 PM at Courtroom 3529 (Judge Craig), Brooklyn, NY. (Frankel, Mark) (Entered: 12/27/2019) |
| 12/30/2019 | | 111 | Affidavit/Certificate of Service Filed by Mark A. Frankel on behalf of Mark Frankel as Plan Adminstrator for 4921 12th Avenue LLC (RE: related document(s)110 Motion to Authorize/Direct filed by Other Prof. Mark Frankel as Plan Adminstrator for 4921 12th Avenue LLC) (Frankel, Mark) (Entered: 12/30/2019) |
| 01/03/2020 | | 112 | Transcript & Notice regarding the hearing held on 11/13/19. Pursuant to the new policy adopted by the Judicial Conference, transcripts are available for inspection only at the Office of the Clerk or may be purchased from the court transcriber. [Please see the court's website for contact information for the Transcription Service Agency). (RE: related document(s) 2 Order Scheduling Initial Case Management Conference). Notice of Intent to Request Redaction Due By 01/10/2020. Redaction Request Due By 01/24/2020. Redacted Transcript Submission Due By 02/3/2020. TRANSCRIPT ACCESS WILL BE ELECTRONICALLY RESTRICTED THROUGH 04/2/2020 AND MAY BE VIEWED AT THE OFFICE OF THE CLERK. (J&J Court Transcribers Inc) (Entered: 01/03/2020) |
| 01/17/2020 | | 114 | Affirmation in Opposition Filed by Karamvir Dahiya on behalf of 4921 12th Avenue LLC (RE: related document(s)110 Motion to Authorize/Direct filed by Other Prof. Mark Frankel as Plan Adminstrator for 4921 12th Avenue LLC) (Dahiya, Karamvir) (Entered: 01/17/2020) |
| 01/17/2020 | | 115 | Exhibit *Email and Lease* Filed by Karamvir Dahiya on behalf of 4921 12th Avenue LLC (RE: related document(s)114 Affirmation in Opposition filed by Debtor 4921 12th Avenue LLC) (Dahiya, Karamvir) |

3

| | | | |
|---|---|---|---|
| | | | (Entered: 01/17/2020) |
| 01/17/2020 | | <u>116</u> | Affidavit/Certificate of Service Filed by Karamvir Dahiya on behalf of 4921 12th Avenue LLC (RE: related document(s)<u>114</u> Affirmation in Opposition filed by Debtor 4921 12th Avenue LLC) (Dahiya, Karamvir) (Entered: 01/17/2020) |
| 02/21/2020 | | <u>118</u> | Notice of Settlement of Proposed Order; Order to be settled for 3/9/2020 Filed by Mark A. Frankel on behalf of Mark Frankel as Plan Administrator for 4921 12th Avenue LLC (RE: related document(s)<u>110</u> Motion to Authorize/Direct filed by Other Prof. Mark Frankel as Plan Administrator for 4921 12th Avenue LLC) (Frankel, Mark) (Entered: 02/21/2020) |
| 02/24/2020 | | <u>121</u> | Affidavit/Certificate of Service Filed by Mark A. Frankel on behalf of Mark Frankel as Plan Adminstrator for 4921 12th Avenue LLC (RE: related document(s)<u>117</u> Motion to Borrow filed by Other Prof. Mark Frankel as Plan Administrator for 4921 12th Avenue LLC, <u>118</u> Notice of Settlement of Proposed Order filed by Other Prof. Mark Frankel as Plan Administrator for 4921 12th Avenue LLC, <u>119</u> Notice of Settlement of Proposed Order filed by Other Prof. Mark Frankel as Plan Adminstrator for 4921 12th Avenue LLC, <u>120</u> Letter of Adjournment filed by Other Prof. Mark Frankel as Plan Administrator for 4921 12th Avenue LLC) (Frankel, Mark) (Entered: 02/24/2020) |
| 09/21/2020 | | <u>145</u> | Affirmation in Opposition *to Ultimate Oppurtunities LLC a/k/a/ Ultimate Opportunities LLC's motion to vacate order (ECF 128)* Filed by David K. Fiveson on behalf of Old Republic National Title Insurance Company (Attachments: # <u>1</u> Exhibit A # <u>2</u> Exhibit B # <u>3</u> Exhibit C # <u>4</u> Exhibit D # <u>5</u> Exhibit F # <u>6</u> Exhibit H # <u>7</u> Exhibit J # <u>8</u> Exhibit K # <u>9</u> Exhibit L # <u>10</u> Exhibit M # <u>11</u> Exhibit P # <u>12</u> Exhibit Q) (Fiveson, David) (Entered: 09/21/2020) |
| 09/21/2020 | | <u>146</u> | Objection Filed by Mark A. Frankel on behalf of Mark Frankel as Plan Administrator for 4921 12th Avenue LLC (RE: related document(s)<u>139</u> Motion to Vacate Order filed by Interested Party Ultimate Opportunities, LLC) (Attachments: # <u>1</u> Exhibits A − C # <u>2</u> Exhibits D−H) (Frankel, Mark) (Entered: 09/21/2020) |
| 10/14/2020 | | <u>156</u> | Notice to Parties of requirements, deadlines (RE: related document(s)<u>152</u> Notice of Appeal filed by Interested Party Ultimate Opportunities, LLC) (amp) (Entered: 10/14/2020) |

4

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re                                                            Chapter 11

      4921 12th Avenue, LLC                          Case no.  18-47256

                  Debtor.
-----------------------------------------------------------x


## PLAN OF REORGANIZATION


Mark A. Frankel
BACKENROTH FRANKEL & KRINSKY, LLP
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544


ATTORNEYS FOR THE PROPONENT

## INTRODUCTION

Galster Funding LLC ("Proponent"), proposes this Plan of Reorganization for 4921 12th Avenue, LLC (the "Debtor"). UPON CONFIRMATION, THIS PLAN SHALL BE A BINDING OBLIGATION BETWEEN AND AMONG THE DEBTOR AND EACH OF THE DEBTOR'S CREDITORS (AS SUCH TERMS ARE DEFINED BELOW).

## DEFINITIONS

1.      "Administrative Expense" Any cost or expense of administration of the Bankruptcy Case entitled to priority under section 507(a)(1) and allowed under section 503(b) of the Bankruptcy Code, and any fees or charges assessed against the Debtor's Estate under Chapter 123, Title 28, United States Code.

2.      "Administrative Claims Bar Date" shall mean the last day to file requests for payment of Administrative Claims (except for Professional Fee Claims), which requests shall be filed and served on counsel for the Debtor and Proponent no later than the Confirmation Hearing, other than those Administrative Claims expressly excluded therefrom pursuant to prior order of the Bankruptcy Court.

3.      "Administrative Expense Claim" shall mean claim for payment of an Administrative Expense.

4.      "Allowed Amount" shall mean the amount of an "Allowed Claim."

5.      "Allowance Date" shall mean the date which a Disputed Claim becomes an Allowed Claim by Final Order.

2

6.       "Allowed Claim" shall mean a Claim: (a) to the extent that a Proof of Claim is filed timely or, with leave of the Court late filed as to which (i) no party in interest files an objection or (ii) which is allowed by a Final Order; or (b) which is listed on the Proponent's schedules or any amendments thereto but which is not listed therein as disputed, unliquidated or contingent.

7.       "Allowed Secured Claim" shall mean a Secured Claim to the extent it is an Allowed Claim.

8.       "Allowed Unsecured Claim" shall mean an Unsecured Claim to the extent it is an Allowed Claim.

9.       "Assets" shall mean any and all of the respective real or personal property of any nature of the Debtor, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, accounts, chattel paper, Cash, deposit accounts, reserves, deposits, contractual rights, intellectual property rights, claims, Causes of Action and any other general intangibles of Debtor, of any nature whatsoever, including, without limitation, the property of the estate pursuant to section 541 of the Bankruptcy Code.

10.       "Avoidance Actions" shall mean all claims and causes of action which the Debtor has or had the power to assert pursuant to any or all of sections 510, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code.

11.       "Bankruptcy Case" shall mean this Chapter 11 bankruptcy case.

12.     "Bankruptcy Code" shall mean Title 11 of the United States Code (11. U.S.C. § 101 et. seq.

13.     "Bankruptcy Court" shall mean the Court as defined below.

14.     "Bankruptcy Rule(s)" shall mean the Federal Rules of Bankruptcy Procedure as applicable to cases under the Bankruptcy Code, together with all amendments and modifications made from time to time thereto.

15.     "Bar Date" shall mean April 4, 2019.

16.     "BCG" and "BCG Mortgagee" means Beis Chasidi Gorlitz.

17.     "BCG Mortgages" means those certain mortgages on the Property pertaining to the notes in the original principal amounts of $1,200,000 and $1,300,000 made by the Debtor in favor of BCG, and subsequently assigned Old Republic.

18.     "Cash" shall mean all cash and cash equivalents which evidence immediately available funds in United States dollars.

19.     "Causes of Action" shall mean any and all claims and causes of action of, and remedies granted to, the Debtor against any third party, including, without limitation, any avoidance claims or causes of action pursuant to sections 502, 506, 510, 541 through 545, 547 through 551, and/or 553 of the Bankruptcy Code and any claims pursuant to any other statutory or common law.

20.     "Claim" shall mean a right to payment as set forth in § 101(5) of the Bankruptcy Code.

21.     "Claimant" shall mean the holder of a Claim.

4

22.    "Confirmation Date" shall mean the date of the entry of the Confirmation Order.

23.    "Confirmation Hearing" shall mean the hearing pursuant to the Bankruptcy Code Section 1128 before the Bankruptcy Court regarding the proposed confirmation of the Plan.

24.    "Confirmation Order" shall mean the order of the Court confirming the Plan.

25.    "Court" shall mean the United States Bankruptcy Court for the EASTERN District of New York.

26.    "Creditor" shall mean any entity that holds a Claim against the Debtor.

27.    "Debtor" shall mean 4921 12th Avenue, LLC.

28.    "Disbursing Agent" shall mean the Proponent.

29.    "Disclosure Statement" shall mean the disclosure statement filed by the Proponent with respect to this Plan.

30.    "Disputed Claim" shall mean the whole or any portion of any claim against a Proponent to which an objection is timely filed as to which a Final Order has not been entered allowing or disallowing such Claim or any portion thereof.

31.    "Effective Date" "Effective Date" shall mean the first business day after the closing of the sale of the Property.

32.    "Estate" shall mean the estate of the Debtor created upon the commencement of the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

33.     "Executory Contracts" shall mean "executory contracts" and "unexpired leases" as such terms are used within Section 365 of the Bankruptcy Code.

34.     "Final Order" shall mean an order of the Court that has not been reversed, modified, amended or stayed, and as to which the time to appeal or to seek review or certiorari thereof has expired, and as to which no appeal, review or rehearing is pending.

35.     "Galster Judgment" means the Galster Funding LLC judgment of foreclosure and sale dated March 28, 2018 in the Supreme Court of Kings County, Index no. 519469/2016.

36.     "Galster" and "Galster Mortgagee" shall mean Galster Funding LLC.

37.     "Interest" shall mean an existing ownership interest in the Debtor.

38.     "Interest Holder" shall mean a holder and owner of an existing Interest in the Debtor.

39.     "Legal Rate" shall mean the applicable interest rate as set forth in 28 U.S.C. §1961 as of the Petition Date.

40.     "Lien" shall mean a charge against or interest in property to secure payment of a debt or performance of an obligation.

41.     "Petition Date" shall mean December 20, 2018.

42.     "Plan" shall mean this Plan of Reorganization, and any and all modifications and/or amendments hereto.

43.     "Plan Administrator" shall mean Mark Frankel.

6

44.    "Plan Administrator Fund" shall mean $30,000 to be set aside from the Property Sale Proceeds, and then from the proceeds of Causes of Action to the extent necessary to pay fees and expenses of the Plan Administrator.

45.    "Professional(s)" shall mean any entity or person employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, or 1103 of the Bankruptcy Code and to be compensated for services rendered pursuant to sections 327, 328, 329, 330 and/or 331 of the Bankruptcy Code.

46.    "Professional Fee Claim" shall mean those fees and expenses claimed by a Professional pursuant to sections 330, 331 and/or 503 of the Bankruptcy Code.

47.    "Professional Fee Claim Bar Date" shall mean the last day for a Professional to file a Professional Fee Claim, which shall be no later than thirty (30) days after the Confirmation Date.

48.    "Property" shall mean the real property at 4917 12th Avenue, Brooklyn, New York 11219.

49.    "Property Sale Proceeds" shall mean the proceeds of sale of the Property, less all charges to be incurred in connection with the marketing, negotiation, documentation, execution, and closing of the sale of the Property, including, without limitation, any fees and expenses paid to retain an auctioneer, real estate broker, and/or special real estate counsel.

50.    "Proponent" shall mean Galster Funding LLC.

51.    "Purchaser" shall mean the purchaser of the Property pursuant to the Plan.

52.     "Reorganized Debtor" shall mean the Debtor on and after the Effective Date.

53.     "Secured Claim" shall mean a Claim secured by a Lien on property included within the Debtor's Estate.

54.     "Secured Creditor" shall mean the owner or holder of a Secured Claim.

55.     "Unsecured Claim" shall mean a claim for which the Claimant does not hold (a) a valid, perfected and enforceable Lien, security interest or other interest in or encumbrance against Debtor or the Debtor's Estate; or (b) a right to setoff to secure the payment of such Claim.  An Unsecured Claim includes, but is not limited to, a Claim for damages resulting from rejection of any Executory Contract pursuant to Section 365 of the Bankruptcy Code and does not include administrative of priority claims.

56.     "Unsecured Creditor" shall mean the owner or holder of an Unsecured Claim.

### CLAIMS CLASSIFICATION AND TREATMENT

### Class 1

57.     **Classification** –  New York City real estate tax, water, sewer and other liens.   Claims total approximately $0.00.

58.     **Treatment** – Payment in full in Cash of Allowed Amount on the Effective Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

59.     **Voting** --  Unimpaired and deemed to have accepted the Plan

8

## Class 2

60.     **Classification** – Galster Funding LLC  Claim totals approximately $9,480,175 as of the filing date.

61.     **Treatment** – Payment of available Cash up to Allowed Amount of Class 2 Claim, after payment of Administrative Expenses, priority tax Claims, Class 1 Claims and Class 4 Claims.  If the Property Sale Proceeds are insufficient to pay the Claim in full, the deficiency amount shall be treated as a Class 5 Claim.

**Voting** –   Impaired and entitled to vote to accept or reject the Plan.

## Class 3

62.     **Classification** – Old Republic.  Claim totals approximately $13,500,000 as of the filing date.

63.     **Treatment** – Payment of available Cash up to Allowed Amount of the Class 3 Claim, after payment of Administrative Expenses, priority tax Claims, Class 1 Claims, Class 2 Claims and Class 4 Claims.  If the Property Sale Proceeds are insufficient to pay the Claim in full, the deficiency amount shall be treated as a Class 5 Claim.

64.     **Voting** –   Impaired and entitled to vote to accept or reject the Plan.

## Class 4

65.     **Classification** –   Priority Claims under Sections 507(a)(2), (3), (4), (5), (6), and (7) of the Bankruptcy Code.  Claims total approximately $0.

66. **Treatment** – Payment in full in Cash of Allowed Amount on the Effective Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

67. **Voting** -- Unimpaired and deemed to have accepted the Plan

### Class 5

68. **Classification** – General Unsecured Claims. Claims total approximately $12,480,175

69. **Treatment** – Payment of available Cash up to Allowed Amount of Class 5 Claims, after payment of Administrative Expenses, priority tax Claims, Class 1, 2, 3, and 4 Claims.

70. **Voting** – Impaired and entitled to vote to accept or reject the Plan.

### Class 6

71. **Classification** – Interests .

72. **Treatment** – Payment of available Cash after payment of Administrative Expenses, priority tax Claims, Class 1, 2, 3, 4 and 5 Claims.

73. **Voting** – Impaired and entitled to vote to accept or reject the Plan.

### ADMINISTRATIVE EXPENSES

74. Allowed Administrative Expenses shall be paid in full, in cash on the Effective Date, or the date such Administrative Expense becomes Allowed or as soon as practicable thereafter, except to the extent that the holder of an Allowed Administrative Expense

10

agrees to a different treatment; provided, however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtor shall be paid in full or performed by the Debtor in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.  As of the Confirmation Date, unpaid Chapter 11 professional fees will total an amount to be determined for Debtor's counsel subject to Bankruptcy Court approval.

75.     Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Professional Fee Claims) must be filed and served on counsel for the Debtor and Proponent by no later than the Confirmation Hearing (the "Administrative Claims Bar Date"). Any Person that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such request shall be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. Objections to requests for payment of Administrative Claims (except for Professional Fee Claims and Administrative Claims incurred in the ordinary course of the Debtor's business) must be filed and served on counsel for the Debtor, Proponent, and the party requesting payment of an Administrative Claim within thirty (30) days of the date such request for payment has been filed.

76.     Unless otherwise ordered by the Bankruptcy Court, and subject to notice and a hearing under section 330 of the Bankruptcy Code, requests for payment of Professional Fee Claims incurred through the Confirmation Date must be filed and served no later than thirty (30) days after the Confirmation Date (the "Professional Fee Claims Bar Date"). The day prior to the Confirmation Date, each Professional shall provide counsel for the Debtor and counsel to the

11

15

Proponent with a written estimate of the total amount of compensation and expenses for which such Professional expects to seek final compensation and reimbursement pursuant to section 330 of the Bankruptcy Code. Such estimates shall include estimated sums for the preparation and prosecution of any application for final compensation.

77.     The Debtor shall pay from Cash in the Estate all fees payable due as of the Effective Date pursuant to section 1930 of title 28 of the United Sates Code. Thereafter, the Debtor shall pay from Cash in the Estate all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due under 31 U.S.C. § 3717, on all disbursements, including plan payments and disbursements in and outside of the ordinary course of business, until the earliest of the entry of a final decree closing the Chapter 11 Case, dismissal of the Chapter 11 Case, or conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

<u>**MEANS FOR IMPLEMENTATION**</u>

78.     **Source of Funds** – Payments under the Plan will be paid either from the Property Sale Proceeds or Cash to be contributed by Galster if Galster or its designee is Purchaser of the Property by credit bid.  The sale of the Property shall be implemented pursuant to the Bidding and Auction Procedures annexed as Exhibit "A" to the Plan. Prior to or on the Effective Date, the Property shall be sold to Purchaser free and clear of all Liens, Claims, and encumbrances, with any such Liens, Claims, and encumbrances to attach to the Property Sale Proceeds, and disbursed in accordance with the provisions of this Plan. Galster and BCG shall each have the right, but not the obligation, to provide for an assignment of its mortgage and an assumption by the Purchaser in connection with the sale of the Property under the Plan. In the event the Property Sale Proceeds are not sufficient to pay all Claims in full with interest from the

12

Petition Date, the proceeds of the prosecution of the Causes of Action by the Plan Administrator shall be an additional potential source of Cash to be distributed under the Plan, net of payment of Plan Administrator fees and expenses.  Such net proceeds of Causes of Action proceeds will first be used for unpaid Plan Administrator fees and expenses, then in the event Galster or its designee is Purchaser by credit bid, to reimburse Galster for Cash paid to fund the Plan, and then paid to Creditors in the order of priority provided for in the Plan.

79.    **Sale Approval** -- As part of the sale under the Plan, and in order to ensure consummation of the Plan, the Plan requires that  a post-confirmation sale order be entered containing the following findings of fact and conclusions of law: (a) that the terms and conditions of the sale are fair and reasonable, (b) that the Debtor's sale, and the purchaser's purchase, of the Property pursuant to the Plan, is non-collusive, fair and reasonable and was conducted openly and in good faith, (c) that the transfer of the Property to the purchaser represents an arm's-length transaction and was negotiated in good faith between the parties, (d) that the purchaser, as transferee of the Property, is a good faith purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e) the sale of the Property to the purchaser was not controlled by an agreement among potential purchasers, (f) that no cause of action exists against the Purchaser or with respect to the sale of the Property to the Purchaser under Bankruptcy Code § 363(n), and (g) that any claims under Bankruptcy Code § 363(n) or any other claims as against the Purchaser are hereby released, waived and discharged.

80.    **Release of Liens** -- Except as otherwise provided for in the Plan and in connection with the assumption and assignment of the Galster mortgage and the BCG mortgage,

13

on the Effective Date, (a) each holder of a Secured Claim, shall on the Effective Date (x) turn

over and release to the Proponent any and all Collateral that secures or purportedly secures such

Claim, as they pertain to the properties currently owned by the Debtor or such Lien shall

automatically, and without further action by the Debtor or the Proponent, be deemed released,

and (y) execute such documents and instruments as the Proponent requests to evidence such

Claim holder's release of such property or Lien.

      81.    **Stamp Tax** -- Pursuant to Bankruptcy Code § 1146(c), (a) the issuance,

transfer or exchange of any securities, instruments or documents, (b) the creation of any other

Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease

or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant

to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds,

bills of sale or assignments executed in connection with the purchase of the Property by the

Purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or

sale of any real or personal property of the Debtor pursuant to, in implementation of, or as

contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness

by such means, and the making, delivery or recording of any deed or other instrument of transfer

under, in furtherance of, or in connection with, the Plan, including, without limitation, the

Confirmation Order, shall not be subject any applicable document recording tax, stamp tax,

conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or

governmental assessment including without limitation New York City Real Property Transfer

Tax and New York State Documentary Tax.

82.     **Execution of Documents** -- Pursuant to section 1142 of the Bankruptcy Code, upon the Effective Date, the Plan Administrator, the Disbursing Agent, the Debtor and any necessary party thereto, are directed to execute, release, and deliver all documents reasonably necessary to consummate the transactions contemplated by the terms and conditions of the Plan. The Proponent shall be authorized to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

83.     **Recording Documents** -- Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transaction contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and the Confirmation Order.

84.     **Property Turnover at Closing**. The Debtor shall turnover possession of the Property at closing together with all files and records pertaining to construction documents, Department of Buildings building permits, violations, architectural plans, leases, repair invoices, and tenant correspondence. If the Debtor fails to turnover possession, Proponent shall be entitled to submit a writ of assistance for Bankruptcy Court approval to obtain the assistance of the United States Marshal to remove the Debtor and its affiliates from the Property and effectuate turnover of the Property and all related files and records pertaining to construction documents,

Department of Buildings building permits, violations, architectural plans, leases, repair invoices, and tenant correspondence.

85. **Property Marketing**. The Plan Administrator shall retain Aaron Jungreis Rosewood Realty Group to market the Property.  The Debtor shall cooperate with any broker, auctioneer, and/or real estate professional to permit reasonable access to the Property for marketing purposes.

86. **Corporate Action**. Upon the entry of the Confirmation Order, all matters provided under the Plan involving the corporate structure of the Debtor shall be deemed authorized and approved without any requirement of further action by the Debtor, the Debtor's members, or the Debtor's boards of directors, managers, and/or managing members.

87. **Manner of Payment**. Any payment of Cash made under the Plan may be made either by check drawn on a domestic bank, by wire transfer, or by automated clearing house transfer from a domestic bank, at the option of the Proponent.

88. **Vesting of Property**. On the Effective Date, title to and possession of any and all property of the estate, real or personal, shall be re-vested in the Reorganized Debtor free and clear of all liens, claims, interests and encumbrances of any kind, subject to and except as otherwise provided in this Plan and the Confirmation Order.

## MANAGEMENT OF THE DEBTOR

89. Post-confirmation management will remain unchanged, provided however, that the Plan shall be implemented by the Plan Administrator.

16

90.     The Plan Administrator shall be appointed on the Confirmation Date and the Plan Administrator, on behalf of the Debtor, shall take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan.

**(a)** Following the Confirmation Date, the Plan Administrator shall be responsible for the filing of all post-Confirmation reports required during such periods with the U.S. Trustee and payment of all post-Confirmation fees charged or assessed against the Estate under 28 U.S.C. § 1930 during such periods.

**(b)** The Plan Administrator shall be deemed a "party-in-interest" for purposes of filing and prosecuting objections to claims and Causes of Action.

**(c)** The Plan Administrator shall have the exclusive authority and duty to implement the sale of the Property and prosecution of Causes of Action under this Plan and accordingly shall exercise such rights and obligations of the Debtor in accordance with the Plan.

**(d)** The Plan Administrator and his professionals shall be compensated from the Plan Administrator Fund at a rate of $400 per hour. The Plan Administrator has agreed to retain Backenroth Frankel & Krinsky, LLP, as his bankruptcy counsel at a rate of $500 per hour, and may retain special litigation counsel at their customary rates. Professionals retained by the Plan Administrator shall not be required to file a fee application. The payment of the fees and expenses of the Plan Administrator and the Plan Administrator's retained professionals shall be made first from the Plan Administrator Fund, and then from the proceeds of Causes of Action.

**(e)** The Plan Administrator shall be authorized to obtain and pay for out of the Plan Administrator Fund all reasonably necessary insurance coverage for himself, his agents, representatives, employees, or other independent contractors, if necessary.

**(f)** The Plan Administrator may resign by giving not less than thirty (30) days' prior written notice to the Disbursing Agent. Such resignation shall become effective upon the Bankruptcy Court approval of a successor Plan Administrator.

**(g)** Upon the request of any party in interest, the Bankruptcy Court may remove the Plan Administrator for cause. For purposes of this paragraph, "cause" shall mean (I) an act of fraud, embezzlement or theft in connection with the Plan Administrator's duties or in the course of its engagement in such capacity, (ii) the intentional wrongful damage to the property of the Debtor, or (iii) gross neglect by the Plan Administrator of his duties under the Plan. Unless the Bankruptcy Court orders immediate removal, the Plan Administrator shall continue to serve until a successor Plan Administrator is appointed, and such appointment becomes effective, in accordance with the Plan.

17

**(h)** In the event of a vacancy by reason of the death, incapacity or immediate removal of the Plan Administrator or prospective vacancy by reason of resignation or removal, the Disbursing Agent shall appoint a successor Plan Administrator, which appointment shall be effective upon the approval of the Bankruptcy Court on not less than twenty (20) days' notice to parties who have filed a notice of appearance with the Bankruptcy Court during the chapter 11 case pursuant to Bankruptcy Rule 2002 and to all creditors of the Debtor, unless the Bankruptcy Court authorizes otherwise. Every successor Plan Administrator appointed hereunder shall execute, acknowledge, and file with the Bankruptcy Court an instrument accepting such appointment subject to the terms and provisions of the Plan. The successor Plan Administrator, without any further act, shall become vested with all the rights, powers, and duties of the Plan Administrator, provided, however, that no Plan Administrator shall be liable for the acts or omissions of any prior or later Plan Administrator.

**(i)** Unless otherwise ordered by the Bankruptcy Court, the death, resignation, or removal of the Plan Administrator shall not operate to terminate any agency or employment created by the Plan or invalidates any action theretofore taken by the Plan Administrator.

**(j)** The Plan Administrator shall have the right at any time to seek and rely upon instructions from the Bankruptcy Court concerning his duties under the Plan or any other document executed in connection therewith, and the Plan Administrator shall be entitled to rely upon such instructions in acting or failing to act and shall not be liable for any act taken or not taken in reliance thereon. In the absence of actual knowledge to the contrary, any person dealing with the Plan Administrator shall be entitled to rely on the authority of the Plan Administrator to act on behalf of the Debtor's estate and the Debtor, and shall have no obligation to inquire into the existence of such authority.

**(k)** After the Effective Date, the Plan Administrator shall maintain books and records but shall not be responsible for preparing and filing tax forms and returns as are required to be filed under applicable law. The Interest Holder shall bear sole responsibility for filing tax forms and returns required under applicable law.

**(l)** The Plan Administrator shall turnover to the Interest Holder all books, records, and files that shall have been delivered to or created by the Plan Administrator as needed for the filing of tax forms and returns, and when such books, records, and files are no longer required.

**(m)** The Plan Administrator's duties shall cease upon the closing of this Case.

91.     Neither the Proponent, Plan Administrator, Disbursing Agent, nor any of their employees, advisors, attorneys, accountants, financial consultants, contractors, agents, and their successors and assigns, shall have or incur any liability to any Holder of a Claim or Interest,

18

or to any other entity, for any act or omission in connection with, related to, or arising out of, the pursuit of confirmation consummation, or other administration of the Plan or the property to be distributed or otherwise dealt with under the Plan, except for gross negligence or willful misconduct, and in all respects the Proponent, Plan Administrator, Disbursing Agent and each of their employees, advisors, attorneys, accountants, financial consultants, contractors, and agents shall be entitled to rely upon the advice of counsel with respect to its duties and responsibilities under the Plan. No current Holder of a Claim or Interest, representative thereof, shall have or pursue any claim or cause of action against the Proponent, Plan Administrator, or Disbursing Agent for making payments in accordance with the Plan, or for implementing the provisions of the Plan. Neither the Proponent, Plan Administrator, Disbursing Agent shall not be liable for obligations relating to Allowed Claims to the extent that Allowed Claims are not paid in full, other than as a result of the Disbursing Agent's gross negligence or willful misconduct.

## PRESERVATION OF CLAIMS

92.    All Causes of Action, including rights pursuant to Sections 502, 544, 545 and 546 of the Bankruptcy Code, all preference claims pursuant to Section 547 of the Bankruptcy Code, all fraudulent transfer claim pursuant to Section 548 of the Bankruptcy Code, and all claims relating to post-petition transactions under Section 549 of the Bankruptcy Code shall be preserved for the benefit of the Debtor's estate, provided, however, that the Plan Administrator shall have sole authority for prosecuting any such claims.

## DISTRIBUTIONS TO CREDITORS

93.    The Proponent shall be disbursing agent under the Plan without a bond. The Plan Administrator shall have the sole and exclusive right to file objections to claims in the

event grounds exist to object to particular claims. Claims objections must be filed no later than

60 days after the Effective Date.  On the initial distribution date and on each distribution date as

may thereafter be necessary, the Proponent shall maintain an undetermined claims distribution

reserve for the holders of undetermined claims as of such date in a sum not less than the amount

required to pay each such undetermined claim if such claim was allowed in full.  To the extent

that an undetermined claim becomes an Allowed Claim, the distributions reserved for such

Allowed Claim, shall be released from the undetermined claims distribution reserve and paid to

the holder of such Allowed Claim.  After all the amounts of all undetermined claims have been

fixed, the balance of the undetermined claims distribution reserve shall thereafter be paid in

accordance with the Plan.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

94.     Any and all pre-petition leases or executory contracts (a) not previously

assumed or the subject of a motion to assume pending on the Confirmation Date and/or (b) not

designated prior to the Confirmation Date as pre-petition leases or executory contracts to be

assumed by the Proponent shall be deemed rejected by the Debtor.  In the event of a rejection

which results in damages a Proof of Claim for such damages must be filed by the damaged party

with the Court within thirty (30) days after the Effective Date.  All Allowed Claims arising from

the rejection of any Executory Contract or unexpired lease shall be treated as an Unsecured

Claim.  Any Claim arising from the rejection of any Executory Contract or unexpired lease not

filed with the Court within the time period provided in the preceding paragraph above shall be

deemed discharged and shall not be entitled to participate in any distribution under the Plan.

## RETENTION OF JURISDICTION

95.     Retention of Jurisdiction.  The Court shall have jurisdiction over all matters arising under, arising in, or relating to the Debtor's Bankruptcy Case including, but not limited to, proceedings: (a) to consider any modification of the Plan under section 1127 of the Bankruptcy Code; (b) to hear and determine all Claims, controversies, suits and disputes against the Debtor to the full extent permitted under 18 U.S.C. §1334 and 28 U.S.C. §157; (c) to hear, determine and enforce all Claims  and causes of action which may exist on behalf of the Debtor or the Debtor's estate, including, but not limited to, any right of the Debtor or the Debtor's Estate to recover assets pursuant to the provisions of the Bankruptcy Code; (d) to hear and determine all requests for compensation and/or reimbursement of expenses which may be made; (e) to value assets of the Estate; (f) To enforce the Confirmation Order, the final decree, and all injunctions therein; (g) to enter an order concluding and terminating the Bankruptcy Case; (h) to correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or the Confirmation Order; (i) to determine all questions and disputes regarding title to the assets of the Debtor; (j) to re-examine Claims which may have been allowed for purposes of voting, and (k) to determine objections which may be filed to any Claims.

## GENERAL PROVISIONS

96.     Headings.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the meaning of the Plan.

97.     Disputed Claims.  The Proponent shall hold in escrow the distribution that would be due on account of any Disputed Claim.  No Disputed Claims shall be paid, nor shall

distributions be made to a creditor holding a Disputed Claim, until such Claim becomes an

Allowed Claim.

       98.    Calculation of Time Periods.  Bankruptcy Rule 9006 is incorporated

herein for purposes of calculating the dates set forth herein.

       99.    Other Actions.  Nothing contained herein shall prevent the Proponent,

Debtor, Interest Holders, or Creditors from taking such actions as may be necessary to

consummate the Plan, although such actions may not specifically be provided for within the

Plan.

       100.    Modification of Plan.  The Proponent may seek amendments or

modifications to the Plan in accordance with section 1127 of the Bankruptcy Code at any time

prior to the Confirmation Date.  After the Confirmation Date, the Proponent may seek to remedy

any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order,

in such manner as may be necessary to carry out the purposes and intent of the Plan

## INJUNCTION AND PROPERTY OF THE ESTATE

       101.    Exculpation. Each of Proponent Disbursing Agent and Plan Administrator,

its agents (acting in such capacity), and any professional person employed by Proponent

Disbursing Agent and Plan Administrator shall not incur any liability to any Person and/or Entity

for any action taken or omitted to be taken in connection with or related to the formulation,

preparation, dissemination, confirmation, or consummation of this Plan, the Disclosure

Statement, or any other contract, instrument, release, or other agreement or document created or

entered into, or any other action taken or omitted to be taken in connection with the Chapter 11

Case or this Plan; provided, however, that the foregoing exculpation from liability will not apply

to actions or omissions taken in bad faith or as a result of gross negligence or willful misconduct. Nothing in this Plan shall limit the liability of any professionals to their respective clients for malpractice pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

102.     Confirmation Injunction. Other than such liabilities and obligations otherwise assumed or provided hereunder, and as set forth in the Confirmation Order (a) the rights afforded herein and the treatment of all Claims and Interests herein, shall be in exchange for and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtor or any of its Assets and properties, (b) on the Effective Date, all such Claims against the Debtor shall be satisfied and released in full, and (c) all Persons shall be precluded from asserting and shall be permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) against the Debtor, its Assets or property, based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

103.     Discharge. On the Effective Date, except as otherwise expressly provided in this Plan or the Confirmation Order, the Confirmation of this Plan shall as of the Effective Date: (i) discharge the Debtor, the Reorganized Debtor and any of its Assets from all Claims, demands, liabilities and other debts that arose on or before the Effective Date, including, without limitation, all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (A) a proof of claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (B) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, (C) a Claim based on such debt is or has been disallowed by order of the

23

Bankruptcy Court, or (D) the holder of a Claim based on such debt has accepted this Plan; and (ii) preclude all Entities from asserting against the Debtor, the Reorganized Debtor or any of its Assets any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections 524 and 1141 of the Bankruptcy Code. The discharge provided in this provision shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim. The Debtor shall be discharged from any Claims and agreements related to debts that arose on or before the Effective Date and such debts, Claims and agreements are deemed restructured and new as set forth in the Plan.

## CLOSING THE CASE

104.    Upon substantial consummation, the Debtor or the Proponent may move for a final decree to close the Bankruptcy Case and to request such other orders as may be just.

Dated: New York, New York
       April 30, 2019

                                              Galster Funding LLC
                                              Plan Proponent

By:    s/Robert Liner                                  

                                              BACKENROTH FRANKEL & KRINSKY, LLP
                                              Attorneys for Proponent

By:    s/Mark Frankel                                
                                              800 Third Avenue
                                              Floor 11
                                              New York, New York 10022
                                              (212) 593-1100

24

**EXHIBIT A to Plan**

**BIDDING AND AUCTION PROCEDURES**

These Terms and Conditions of Sale are promulgated in connection with the auction sale (the "Sale") of the real property located at 4917 12th Avenue, Brooklyn, New York 11219 (the "Property").

Time and Place of Sale:  The Sale will be held on _____, 2019 at ____ __ m. at the offices of Backenroth Frankel & Krinsky, LLP, 800 Third Avenue New York, New York 10022.

Sale Pursuant to Chapter 11 Plan:  The Seller of the Property is 4921 12th Avenue, LLC (the "Debtor").  The sale shall be conducted pursuant to Bankruptcy Code section 363 and the Chapter 11 Plan of Reorganization (the "Plan") proposed by Galster Funding LLC, the Plan proponent ("Proponent").

Sale free and Clear of Liens:  The Sale of the Property shall be conducted pursuant to the Proponent's Plan of Reorganization free and clear of liens, claims, commercial leases not assumed under the Plan, and encumbrances, with any such liens, claims and encumbrances to attach to the sale proceeds, and disbursed under the Plan.

Qualification to Bid:   In order to be qualified to bid on the Property, within seven days prior to the commencement of the Sale, each prospective bidder (except the Proponent's nominee) must deliver to the Proponent (a) a bank check in the amount of Five Hundred Thousand Dollars ($500,000) (the "Qualifying Deposit") payable to "Backenroth Frankel & Krinsky, LLC, as Attorneys" (b) evidence reasonably demonstrating such bidder's ability to consummate a sale on the terms proposed, and (c) a written offer to purchase substantially in the form annexed hereto. No later than one business day before the Sale, each bidder will be notified by the Proponent as to whether the Proponent deems such bidder qualified to bid at the Sale.

Bidding: Bidding shall be conducted openly at the Sale.  The opening bid shall be three million, two hundred fifty thousand dollars ($3,250,000).  Minimum bidding increments shall be Fifty Thousand Dollars ($50,000.00).  Proponent or its designee may credit bid its full claim.

Successful Bidder Additional Deposit: At the Sale, once a bidder is determined to have made the highest or best bid for the Property at the Sale (the "Successful Bidder"), bidding shall be deemed closed and no additional bids will be considered.  Within one business day after the Successful Bidder is determined, the Successful Bidder (except for the Proponent's nominee) shall be required to increase the Qualifying Deposit to an amount equal to ten percent of the winning bid, which amount shall serve as a good faith deposit against payment of the Purchase

Price.  At the conclusion of the Sale, the Proponent's counsel will return the Qualifying Deposits to all other bidders.

<u>Hearing to Approve Sale</u>:  A hearing will be conducted by the Bankruptcy Court on approval of the sale and on any issue that may exist as to which competing bid is higher or better,  before the honorable Carla E. Craig on the ___ day of _____, 2019 _____, at the United States Bankruptcy Court 271 Cadman Plaza East, Brooklyn, New York.

<u>Sale Approval Order</u>:  the sale approval order ("Sale Order") shall approve the Sale, and in connection therewith, the Sale Order shall contain the following findings of fact and conclusions of law: (a) that the Terms and Conditions of the Sale are fair and reasonable, (b) that the Sale and the Purchaser's purchase, of the Property pursuant to the Plan, is non-collusive, fair and reasonable and was conducted openly and in good faith, (c) that the transfer of the Property to the Purchaser represents an arm's-length transaction and was negotiated in good faith between the parties, (d) that the Purchaser, as transferee of the Property, is a good faith Purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e) the sale of the Property to the Purchaser was not controlled by an agreement among potential purchasers, (f) that no cause of action exists against the Purchaser or with respect to the sale of the Property to the Purchaser under Bankruptcy Code § 363(n), and (g) that any claims under Bankruptcy Code § 363(n) or any other claims as against the Purchaser are hereby released, waived and discharged.

<u>Closing</u>:  The Successful Bidder must pay the balance of the Purchase Price for the Property (the difference between the amount of the successful bid and the Qualifying Deposit) to the Proponent, by bank check, or wire transfer at the closing of title to the Property (the "Closing"). The Successful Bidder must close title to the Property at a date that is no more than fifteen (15) days after the Order by the Bankruptcy Court is entered, TIME BEING OF THE ESSENCE as to the Successful Bidder, although such date may be extended solely by the Proponent.

<u>Transfer Tax</u>:  Under the Plan, pursuant to section 1146(c) Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the Purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject any applicable document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental assessment including without limitation New York State Documentary Tax.

2

Damages for Failure to Close:  Time is of the Essence as Against the Successful Bidder and the failure of the Successful Bidder to either timely pay the additional Qualifying Deposit or timely close for any reason whatsoever (except as otherwise provided below) including its failure to pay the balance of the Purchase Price on the Closing Date, will result in the Proponent retaining the deposit as liquidated damages and the termination of the Successful Bidder's right to acquire the Property under these Terms and Conditions of Sale.  The Successful Bidder shall be obligated to close title to the Property and there is no contingency of any kind or nature that will permit the Successful Bidder to cancel or avoid its obligation under these Terms and Conditions of Sale other than the Debtor's inability to deliver a bargain and sale deed to the Property.  Expenses incurred by the Successful Bidder, or any competing bidder relating to any due diligence, such as obtaining title reports or environmental inspections, shall be the sole responsibility of such bidder, and under no circumstances shall the Proponent or the Proponent's professionals be responsible for, or pay, such expenses.

Backup Bidder:  In the event that the Successful Bidder for the Property fails to tender the payment of the balance of the Purchase Price on the Closing Date, or otherwise perform any of its obligations under these Terms and Conditions of Sale, the Proponent, at its sole option, shall be authorized to sell the Property to the Second Highest Bidder without any further notice without giving credit for the Deposit forfeited by the Successful Bidder, and upon such other terms and conditions as the Proponent deems appropriate.  Should the Second Highest Bidder fail to close on the Property, within such time as the parties may agree but not to exceed thirty (30) days after notice from the Proponent to the Second Highest Bidder, the Proponent shall be authorized to sell the Property to the next highest or best bidder, without the necessity of any further notice.  All bidders will be bound by these Terms and Conditions of Sale, including, without limitation, those items set forth in the paragraphs above, except that the Second Highest Bidder must close within thirty (30) days of notification that his bid is accepted.  TIME IS OF THE ESSENCE.

No Representations:  the Proponent, the Proponent's professional, the Debtor, and the Debtor's professionals have not made and do not make any representations as to the physical condition, rents, leases, expenses, operations, value of the land or buildings thereon, or any other matter or thing affecting or related to the Property or the Sale, which might be pertinent to the purchase of the Property, including, without limitation, (i) the current or future real estate tax liability, assessment or valuation of the Property; (ii) the potential qualification of the Property for any and all benefits conferred by or available under federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated; (iii) the compliance or non-compliance of the Property, in its current or any future state, with applicable present or future zoning ordinances or other land use law or regulation, or the ability to obtain a change in the zoning or use, or a variance in respect to the Property; (iv) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Property from any source, including, but not limited to, any state, city or federal government or institutional lender; (v) the current or future use of the

3

Property; (vi) the present and future condition and operating state of any and all machinery or equipment on the Property and the present or future structural and physical condition of any building thereon or its suitability for rehabilitation or renovation; (vii) the ownership or state of title of any personal property on the Property; (viii) the presence or absence of any laws, ordinances, rule or regulations issued by any governmental authority, agency or board and any violations thereof; (ix) any present or future issues concerning subdivision or non-subdivision of the Property; or (x) the compliance or non-compliance with environmental laws and the presence or absence of underground fuel storage tanks, any asbestos or other hazardous materials anywhere on the Property.  Each bidder shall be deemed to have agreed and acknowledged that no such representations have been made.  the Proponent is not liable or bound in any manner by expressed or implied warranties, guaranties, promises, statements, representations or information pertaining to the Property, made or furnished by the Proponent or Debtor or any real estate broker agent, employee, servant or other person or professional representing or purporting to represent the Proponent or Debtor unless such warranties, guaranties, promises, statements, representations or information are expressly and specifically set forth in writing by the Proponent.  For the avoidance of doubt, neither the Debtor nor the Debtor's professionals are authorized to provide any such warranties, guaranties, promises, statements, representations or information.

As Is Sale: The Property is being sold free and clear of all liens, claims, commercial leases not assumed under the Plan and encumbrances, with any such liens, claims and encumbrances to attach to the net proceeds of sale after deduction of any expenses of sale.  Furthermore, the Property is being sold "AS IS", "WHERE IS" "WITH ALL FAULTS", without any representations, covenants, guarantees or warranties of any kind or nature whatsoever and subject to, among other things, (a) any state of facts that an accurate survey may show; (b) any covenants, restrictions and easements of record; (c) any state of facts a physical inspection may show; (d) any building or zoning ordinances or other applicable municipal regulations and violations thereof; and (e) environmental conditions, including, without limitation, the Property's compliance (or lack of compliance) with environmental laws and the presence or absence of underground fuel storage tanks, any hazardous materials or asbestos anywhere on the Property. By delivering their respective Qualifying Deposits, each bidder is deemed to have acknowledged that it has had the opportunity to review and inspect the Property, the state of title thereof and laws, rules and regulations applicable thereto, and will rely solely thereon and on its own independent investigations and inspections of the Property in making its bid.  Neither the Proponent nor any of its representatives make any representations or warrantees with respect to the permissible uses of the Property, including but not limited to, the zoning of the Property.  All bidders are deemed to have acknowledged that they have conducted their own due diligence in connection with the Property, and are not relying on any information provided by the Debtor, Proponent or their professionals.

Deed:  The Debtor, or the Proponent acting on the Debtor's behalf, shall convey the Property by delivery of a bargain and sale deed without covenants against grantor's acts.

4

<u>Broker</u>:  Except Aaron Jungreis and Rosewood Realty Group, neither the Debtor nor the Proponent nor their professionals are liable or responsible for the payment of fees of any broker.

<u>Conduct of Sale</u>: These Terms and Conditions of Sale will be read into the record, or specifically incorporated by reference, at the Sale of the Property.  By making a bid for the Property, all bidders will be required to acknowledge these Terms and Conditions of Sale and agree to be bound by them.

<u>Failure to Close</u>:  If the Debtor, or the Proponent on the Debtor's behalf, is unable to deliver title to the Property in accordance with these Terms and Conditions of Sale for any reason whatsoever or in the event that the Bankruptcy Court refuses to approve the sale of the Property pursuant, the Proponent's only obligation will be to refund the Deposit, together with interest earned thereon, if any, to the Successful Bidder, and upon such refund, the Successful Bidder will have no claim or recourse against the Proponent, the Debtor or their professionals.

<u>Right to Withdraw Sale</u>:  The Proponent reserves its right to withdraw the Property from the Sale, either prior or subsequent to the Sale, for any reasonable reason, as the Proponent deems necessary or appropriate.

<u>Breakup Fee</u>: None

<u>Proponent's Designee</u>:  Notwithstanding anything to the contrary herein, the Proponent shall be entitled to name a designee or designees who shall be deemed qualified to bid without posting a Qualifying Deposit or complying with the other requirements otherwise necessary to bid, and, if the Successful Bidder and Purchaser, shall be entitled to purchase the Property subject to some or all of the Proponent's mortgage.

<u>Bankruptcy Court Jurisdiction</u>:  The Bankruptcy Court shall determine any disputes concerning the Sale of the Property.  By participating in the Sale, all bidders consent to the jurisdiction of the Bankruptcy Court to determine such disputes under the Debtor's pending case.

CONTRACT dated as of the ____ day of _____, 2019 (this "Contract") , between 4921 12th Avenue, LLC, (the "Seller" or "Debtor") and _____ having an address at _____ _____ ("Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

1. Sale of Property

Paragraph 1.01. Seller shall sell or cause to be sold to Purchaser, and Purchaser shall purchase, at the price and upon the terms and conditions set forth in this Contract: the real property located at 4917 12th Avenue, Brooklyn, New York 11219 (the "Property").  The sale of the Property includes (a) all of its appurtenances, including any estate, right, title, interest, property, claim and demand of Seller in and to all streets, alleys, rights-of-way, sidewalks, easements, any adjoining gores or strips of land and utility lines or agreements, including, without limitation, all development rights and "air rights"; (b) all improvements, buildings and structures located on or at the Property and the facilities located thereon, and any apparatus, equipment, appliances and fixtures incorporated therein and used exclusively in connection with the operation and occupancy thereof; (c)  all plans, specifications, budgets, schedules, surveys, drawings, reports and governmental applications, permits, approvals and licenses issued by any federal, state or local governmental authority or agency pertaining to the ownership, operation, maintenance, development, construction or use of  the Property, including, without limitation, the building plans approved by the City of New York,  Department of Buildings on June 26, 2014 (collectively, the "Plans and Permits"); and (d) all of its rights and licenses in and to use the Plans and Permits.

Paragraph 1.02.   Purchaser acknowledges that the Sale shall be conducted pursuant to the Chapter 11 plan ("Plan") confirmation order confirming the Plan proposed by Galster Funding LLC (the "Plan Proponent" or Mortgagee") in the Debtor's bankruptcy case in the United States Bankruptcy Court for the Eastern District of New York (hereinafter the "Bankruptcy Court"), Case No. 18-47256.  The "Bidding and Auction Procedures" (hereinafter the "Bidding Procedures") annexed to the Plan are deemed annexed to this Contract.

Paragraph 1.03. Purchaser acknowledges that this sale is further subject to and governed by (1) the Orders of the Bankruptcy Court including the Plan confirmation order, (2) the provisions of the United States Bankruptcy Code (hereinafter the "Code"), and (3) the laws of the State of New York, to the extent they do not conflict with (1) and (2), above.

2. Purchase Price, Acceptable Funds

Paragraph 2.01. The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Property is (      ) Dollars or such other bid by the Purchaser approved by the Bankruptcy Court, payable as follows:

(A) on the signing of this Contract, by Purchaser's check payable to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to Bidding Procedures as defined in Article 3 hereof (the "Down Payment").

(B) THIS CONTRACT IS "ALL CASH" AS KNOWN IN THE COMMON PARLANCE.  PURCHASER'S OBLIGATIONS UNDER THIS CONTRACT ARE NOT CONDITIONED UPON PURCHASER'S ABILITY TO SECURE FINANCING OF ANY KIND OR NATURE.

(C) The balance at Closing (as hereinafter defined) in accordance with Section 2.02 hereof (the "Cash Balance")

Paragraph 2.02. All monies payable under this Contract, unless otherwise specified herein, shall be paid by (a) certified checks of Purchaser drawn on any federally insured bank, savings bank, trust company or savings and loan association having a banking office in the City of New York; (b) official bank checks drawn by any such banking institution, payable to the order of Seller (or as Seller shall direct) and bearing no endorsements; or (c) wire transfer of immediately available federal funds.  Attorney's Escrow Checks of Purchaser payable to the order of Seller (or as Seller directs) up to the amount of $1,000.00 in the aggregate shall be acceptable for sums other than the Purchase Price payable to Seller at Closing.

3. Escrow of Down Payment

Paragraph 3.01. (a) The Down Payment shall be paid by check or checks drawn to the order of and delivered to Backenroth Frankel & Krinsky LLP ("Escrowee").  The Escrowee shall hold the Down Payment in escrow in a non-interest-bearing IOLA Account until the Closing or sooner termination of this Contract and shall pay over or apply the Down Payment in accordance with the terms of this section.  At the Closing, the Down Payment shall be paid by Escrowee in accordance with Bidding Procedures.  If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within 10 business days after the giving of such notice, Escrowee is hereby authorized to make such payment.  If Escrowee does receive such written objection within such 10-day period or if for any other reason Escrowee in good

2

faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this Contract or pursuant to an order of the Bankruptcy Court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest, if any, thereon, with the clerk of the Bankruptcy Court. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this Contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this Contractor involving gross negligence on the part of the Escrowee.

(c) Escrowee or any member of its firm shall be permitted to act as counsel for Galster Funding LLC (the "Proponent" or the "Mortgagee") in any dispute as to the disbursement of the Down Payment or any other dispute between the parties whether or not Escrowee is in possession of the Down Payment and continues to act as Escrowee.

(d) Escrowee acknowledges receipt of the Down Payment by certified, bank check subject to collection or wire transmission and Escrowee's agreement to these provisions by signing in the place indicated on the signature page of this contact.

4. The Closing

Paragraph 4.01. The conveyance of title to the Property by the Seller to Purchaser, and payment of the Cash Balance by Purchaser shall take place 15 days following the entry of an Order approving the Contract and the transaction embodied therein if that is a business day, and if not, the following business day (the "Closing"). The Closing is to be held at the office of the Escrowee, or such other location as designated by the Proponent within the Southern District of New York. Purchaser will have a one time right to adjourn the Closing for up to five Business Days from the original date (such adjourned date, "Purchaser's Mandatory Closing Date").  Time is of the essence with respect to Purchaser's obligations to close title in accordance with this Contract on or before Purchaser's Mandatory Closing Date.

5.   Acknowledgments and Representations of Purchaser

Purchaser acknowledges and represents that:

3

Paragraph 5.01. Purchaser has inspected the Property, made all appropriate inquiries into the previous ownership and uses of the Property, is fully familiar with the physical condition and state of repair thereof, and shall accept the Property "as is" and in their present condition, including, without limitation, the environmental conditions as reflected in the Terms of Sale annexed hereto, without any reduction of the Purchase Price for any change in such condition by any reason thereof subsequent to the date of this Contract.  The Terms of Sale set forth conditions which Purchaser agrees to accept, including any covenant, easement, and/or deed restriction, and any other future obligation relating thereto.

Paragraph 5.02. Before entering into this Contract, Purchaser has made such examination of the Property, the physical condition and state of repair thereof including the environmental conditions. Purchaser acknowledges that it is an experienced real estate owner/operator and is relying solely on its own expertise and investigations and inspections in entering into this Contract and has not been induced by and has not relied upon any representations, warranties, or statements, whether express or implied, made by Seller or any agent, employee, or other representative of Seller or by any other person representing or purporting to represent Seller or Proponent, which are not expressly set forth in this Contract, whether or not any such representations, warranties or statements were made in writing or orally.

Paragraph 5.03. In the event of any default by the Purchaser in the terms of this Contract, the damages which are due to the Seller, by reason of said default, shall be deemed liquidated in the amount of the Down Payment, as Seller's sole remedy, it being agreed that Seller's damages in case of such default might be impossible to ascertain with mathematical precision and that the Down Payment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

Paragraph 5.04. Purchaser represents that (a) it has the legal power, right and authority to enter into this Agreement and to consummate the transactions contemplated hereby and that all requisite action has been taken by Purchaser in connection with the entering into this Contract and the consummation of the transactions contemplated hereby;  (b) this Contract and all documents required hereby to be executed by Purchaser are and will be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms (c) Purchaser, and all direct or indirect beneficial owners of Purchaser, are in compliance with all applicable laws, statutes, rules and regulations of any federal, state or local governmental authority in the United States of America, including the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) (the "Order") and other similar requirements contained in the rules and regulations of the Office of Foreign Asset Control, Department of the Treasury ("OFAC") and in any related enabling legislation or other Executive Orders (collectively, the "Orders"). Neither Purchaser nor any of the direct or indirect beneficial owners of Purchaser  (i) is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "Lists") or is owned or controlled by, or acts for or on behalf

4

of, any Person on the Lists or who has been determined by competent authority to be subject to the prohibitions contained in the Orders; (ii) has been arrested for money laundering or for predicate crimes to money laundering, convicted or pled nolo contendere to charges involving money laundering or predicate crimes to money laundering; or (iii) has been determined by competent authority to be subject to the prohibitions contained in the Orders; (iv) is owned or controlled by, nor acts for or on behalf of, any natural person or entity (a "Person") on the Lists or any other Person who has been determined by competent authority to be subject to the prohibitions contained in the Orders; (v) will transfer or permit the transfer of any interest in Purchaser or such parties to any Person who is, or whose beneficial owners are, listed on the Lists; or (vi) will assign this Agreement or any interest herein, to any Person who is listed on the Lists or who is engaged in illegal activities.

6. Destruction, Damage or Condemnation

Paragraph 6.01. The provisions of Section 5-1311 of the General Obligations Law shall not apply to the sale and purchase provided for in this Contract and Purchaser agrees to close title to the Property regardless of any destruction, damage or condemnation that occurs after the execution and delivery of this Contract.

7. Seller's Closing Obligations

At the closing, Seller, or the Plan Proponent on the Seller's behalf, shall execute and/or deliver or cause to be executed and/or delivered to Purchaser the following:

Paragraph 7.01. A bargain and sale deed without covenants against grantor's acts, executed by the Debtor, or the Plan Proponent on the Debtor's behalf, in proper form for recording so as to convey to Purchaser the fee title to the Property, subject to recorded encumbrances and the other conditions of this Contract.

Paragraph 7.02. All required New York City and State transfer tax returns executed by the Debtor, or the Plan Proponent on the Debtor's behalf, to be issued at the Closing and delivered to the representative of Purchaser's title company for delivery to the appropriate public officers promptly after the Closing.

Paragraph 7.03. The right to possession of the Property in condition required by this Contract, subject to the provisions hereinabove and to the provisions of the Code and the laws of the State of New York governing the rights to possession upon the conveyance of the deed subject to any Order of the Bankruptcy Court and the Bidding Procedures. Seller shall not be obligated to bring any motion or proceeding for the purpose of obtaining possession of any part of the Property, or to remove any tenant or occupant therefrom after delivery of the Deed.

5

Paragraph 7.04. An assignment of all of Seller's right, title and interest in and to the Plans and Permits in the form attached hereto as Exhibit A executed by Seller, or the Plan Proponent on the Seller's behalf.

Paragraph 7.05.  Any other documents required by this Contract or by law to be delivered by Seller to consummate this transaction.

8.  Purchaser's Closing Obligations

At the Closing, Purchaser shall execute and/or deliver:

Paragraph 8.01.  The Cash Balance to the Mortgagee.

Paragraph 8.02.  All required New York City and State transfer tax returns, and cause all such returns to be issued at the Closing and delivered to the representative of Purchaser's title company for delivery to the appropriate public officers promptly after the Closing.  Purchaser will pay any and all applicable transfer taxes and recording fees.

Paragraph 8.03.  Any other documents required by this Contract or by law or reasonably required by Seller to be executed and/or delivered by Purchaser to consummate this transaction.

9.  Apportionments

Paragraph 9.01. The parties specifically acknowledge that there shall be no apportionments made as of the date of Closing, whether for taxes, water or sewer charges, emergency repair liens, assessments, rents, fuel, or any other matters relating hereto.

10.  Objections to Sale

Paragraph 10.01. This Contract shall automatically terminate if the Court rejects the Sale or if Seller shall be unable to cause title to the Property to be conveyed to Purchaser at the Closing Date or any adjournments thereof in accordance with the provisions of this Contract and the Bidding Procedures.  Purchaser nevertheless may elect either (i) to accept such title as Seller may be able to convey, but without any abatement of or other credit to the Purchase Price or liability on the part of Seller; or (ii) to terminate this Contract. The sole liability of Seller shall be to refund the Down Payment and interest thereon, if any, to the Purchaser and this Contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability. Neither Seller nor Mortgagee shall be required to bring any action or proceeding or to incur any expense to cure any title defect or to enable Seller otherwise to comply with the provisions of this Contract, except as may otherwise be provided in this Contract.

Paragraph 10.02. Purchaser shall take title to the Property "as is" and subject to: any state of facts an accurate survey may show; encroachments, covenants, easements, and restrictions of

6

39

record, if any; violations, fines, penalties, zoning regulations, and ordinances of the City of New York.  Purchaser is aware of and agrees to the Terms of Sale which are attached to this Contract and which are incorporated in this Contract by this reference as though fully set forth herein at length.

11.  Notices

Paragraph 11.01. All notices under this Contract shall be in writing and shall be delivered personally, by nationally recognized overnight courier, addressed to Mortgagee's Attorney, on behalf of the Seller, at the address set forth below, and to Purchaser addressed to Purchaser's Attorney at the address set forth below.

Mortgagee's attorneys, Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, New York, New York 10022.

Purchaser's Attorney:

12.  Limitations on Survival of Representations, Warranties, Covenants and other Obligations

Paragraph 12.01. Except as otherwise expressly set forth in this Contract, no representations, warranties, covenants or other obligations of Seller or Plan Proponent and/or Purchaser set forth herein shall survive the Closing except as specifically provided to survive, and no action based thereon shall be commenced after the Closing except as to such representations specifically provided to survive.

Paragraph 12.02. The delivery of the deed by the Seller and the acceptance thereof by Purchaser shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations, if any, of Seller which are expressly stated in this Contract to survive.

13.  Assignment of Contract

Paragraph 13.01.  Purchaser shall not assign this Contract or its rights hereunder without the prior written consent of the Proponent, whose consent will not be unreasonably withheld or delayed. Additionally, Purchaser may assign its rights under this Contract, but only immediately before the Closing and only simultaneously with the payment of the Cash Balance, to any wholly owned subsidiary of Purchaser, or to any entity in which Purchaser, or its principals, has an equity interest of at least fifty-one (51%) percent and control of management (a "Controlled Entity"), upon appropriate proof of same delivered to Proponent.  Any purported assignment without Proponent's consent or that is not to a Controlled Entity with proof of such relationship

7

given to Proponent shall be void. Any sale, transfer or assignment of any interests in Purchaser will be deemed an assignment of this Contract and is subject to the same conditions as an assignment of this Contract. Nevertheless, an assignment of Purchaser's rights under this Contract, if and when consented to by Proponent, shall not be effective unless and until an executed counterpart of the instrument of assignment and of an assumption agreement by the assignee shall have been delivered to Proponent.

Paragraph 13.02. Seller shall assign pending tax certiorari actions, if any, to Purchaser without any representations or warranties, and without any further obligation of Seller, except to execute such documents as may be necessary to effectuate such assignment.

14. Miscellaneous Provisions

Paragraph 14.01 THE PROVISIONS OF THE BIDDING PROCEDURES AND THE ORDERS OF THE COURT ARE A PART OF THIS CONTRACT. ANY CONFLICT WITH SUCH IN THIS CONTRACT WILL NOT BE DEEMED TO AMEND OR ALTER SAID PROCEDURES OR ORDERS.

Paragraph 14.02. Subject to the provisions of Paragraph 14.01, this Contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated hereby, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended, discharged, or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in such instrument.

Paragraph 14.03. This Contract shall be governed by, and construed in accordance with, the Code and the Orders of the Bankruptcy Court and, where it does not conflict with the Code or any Order of the Bankruptcy Court or the Bidding Procedures, the laws of the State of New York. The Bankruptcy Court shall have the exclusive jurisdiction to determine any disputes concerning the sale of the Property or any other matters under this Contract.

Paragraph 14.04. The captions in this Contract are inserted for convenience or reference only and in no way define, describe, or limit the scope or intent of this Contract or any of the provisions hereof.

Paragraph 14.05. This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

Paragraph 14.06. This Contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser, together with all amounts required to be paid pursuant to 2.0l (A) hereto. This Contract may be executed in counterparts each of which will constitute an original and all of which, when taken together, will constitute one and the same agreement. A

8

signed counterpart of this Contract delivered by electronic transmission will be treated as an original.

Paragraph 14.07. As used in this Contract, the masculine shall include the feminine and neuter, the singular shall include the plural, and the plural shall include the singular, as the context may require.

Paragraph 14.08. Subject to Paragraph 14.01, if the provisions of any schedule or rider to this Contract are inconsistent with the provisions of this Contract, the provisions of such schedule or rider shall prevail.

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the date first above written.

4921 12th Avenue, LLC, Seller                              Purchaser:


By: _____          By: _____
    Name:                                         Name:
    Title:                                         Title:
Backenroth Frankel & Krinsky, LLP, Escrowee:


By: _____
    Name:
    Title:

9

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re                                                     Chapter 11

        4921 12th Avenue, LLC                             Case no.  18-47256

                        Debtor.
-------------------------------------------------------------x

## DISCLOSURE STATEMENT

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY AFFECT
CREDITORS' DECISIONS TO ACCEPT OR REJECT THE PLAN OF
REORGANIZATION ANNEXED HERETO AS EXHIBIT A.  ALL CREDITORS ARE
URGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY.  ALL
CAPITALIZED TERMS CONTAINED IN THIS DISCLOSURE STATEMENT SHALL
HAVE THE SAME MEANING AS CAPITALIZED TERMS CONTAINED IN THE
PLAN OF REORGANIZATION.**

**COURT APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE
COURT APPROVAL OF THE TERMS OF THE PLAN.**

Mark A. Frankel
BACKENROTH FRANKEL & KRINSKY, LLP
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544

ATTORNEYS FOR THE PROPONENT

## INTRODUCTION

1.      Galster Funding LLC ("Proponent") submits this Disclosure Statement ("Disclosure Statement") in connection with the solicitation of acceptances of its Plan of Reorganization ("Plan") under Chapter 11 of the United States Bankruptcy Code.  A copy of the Plan is attached hereto as Exhibit "A".  All Creditors are urged to review the Plan, in addition to reviewing this Disclosure Statement.  All capitalized terms used but not defined herein shall have the meaning set forth in the Plan.

2.      This Disclosure Statement is not intended to replace a review and analysis of the Plan.  Rather, it is submitted as a review of the Plan in an effort to explain the terms and implications of the Plan.  Every effort has been made to fully explain the various aspects of the Plan as it affects all Creditors.  To the extent a Creditor has any questions, the Proponent urges you to contact its counsel and every effort will be made to assist you.  THE PROPONENT URGES YOU TO VOTE IN FAVOR OF THE PLAN. THE PROPONENT'S GOAL IS FOR ALL CREDITOR CLASSES TO ACCEPT THE PLAN.  IF ALL CREDITOR CLASSES DO NOT ACCEPT THE PLAN, THE PROPONENT INTENDS TO SEEK CRAMDOWN OF THE PLAN UNDER SECTION 1129(b) OF THE BANKRUPTCY CODE AS MAY BE NECESSARY TO EFFECT CONFIRMATION OF THE PLAN.

3.      On _____, after notice and a hearing, the Bankruptcy Court entered an order approving this Disclosure Statement as containing information of a kind and in sufficient detail, as far as is reasonably practicable, given the nature and history of the Debtor and the condition of the Debtor's books and records, to enable

Creditors whose votes are being solicited to make an informed judgment whether to accept or reject the Plan.

4.      Creditors should read this Disclosure Statement in its entirety before voting on the Plan.  No solicitation of votes may be made except under this Disclosure Statement.  EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT, NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS ASSETS, ITS PAST OR FUTURE OPERATIONS, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.  ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE PROPONENT.

5.      THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN SUPPLIED BY THE DEBTOR.  BASED UPON THE INFORMATION MADE AVAILABLE, PROPONENT'S COUNSEL HAS NO INFORMATION TO INDICATE THAT THE INFORMATION DISCLOSED HEREIN IS INACCURATE.  NEITHER THE PROPONENT NOR ITS COUNSEL, HOWEVER, IS ABLE TO STATE DEFINITIVELY THAT THERE IS NO INACCURACY HEREIN OR THAT FUTURE EVENTS MAY NOT RENDER THE INFORMATION CONTAINED HEREIN INACCURATE.

6.      After reviewing this Disclosure Statement indicate your vote to accept or to reject the Plan on the enclosed ballot and return the ballot to counsel for the Proponent to be received on or before _____, 2019.

7.      The Bankruptcy Court has entered an Order fixing _____, 2019, at __ .m., before the honorable Carla E. Craig at the United States Bankruptcy Court, 271 Cadman Plaza East, Brooklyn, New York, as the date, time and place for the final hearing on the Disclosure Statement, and for the hearing on confirmation of the Plan, and fixing _____, 2019, as the last date for filing any objections to the Disclosure Statement or confirmation of the Plan.

## **BACKGROUND**

8.      On December 20, 2018, the Debtor filed a Chapter 11 petition under Title 11 of the United States Code, 11 U.S.C. "101 et seq. (the "Bankruptcy Code").

9.      The Debtor owns the real property at 4917 12th Avenue, Brooklyn, New York 11219 (the "Property") pictured below:

4



10.     The value of the Property, as stated by the Debtor in its Chapter 11 schedules is $10,000,000.

11.     Galster Funding LLC (the "Galster Mortgagee") holds a judgment of foreclosure and sale entered on August 20, 2018 in an action entitled *Galster Funding LLC v. 4921 12th Avenue LLC; et al.* in the Supreme Court of the State of New York, County of Kings, Index No.: 500818/2017 (the "Galster Judgment").  The total amount due under the Galster Judgment as of the December 20, 2018 filing date is:

| | |
|---|---|
| Judgment Amount: | $8,929,916 |
| Interest from 5/31/18 to 08/20/18 @24% per judgment: | 350,973 |
| Interest from 8/21/18 to 12/20/18 @9% per judgment: | 193,931 |
| Costs and Disbursements with interest per judgment: | 1,855 |
| Attorneys' fees per judgment: | 3,500 |
| TOTAL: | $9,480,175 |

12.     The only other scheduled creditor is Beis Chasidi Gorlitz (the "BCG Mortgagee").  BCG filed a $13,500,000 mortgage lien claim.

13.     Based on the Galster Judgment and the BCG Mortgage claim, secured claims total $22,980,175.

14.     Absent any creditors except the two mortgagees, it appears that the Debtor filed this Chapter 11 on the eve of the foreclosure sale simply to delay the inevitable sale.

15.     The case has a long and unusual backstory.

16.     On or about August 30, 2016, the Galster Mortgagee loaned the Debtor $6,500,000, secured by a mortgage on the Property, which Property comprises two condominium units called C1 and R1.

17.     At that time, there were two mortgages of record against the Property held by the BCG Mortgagee, one for $1,200,000 and the other for $1,300,000 (the "BCG Mortgages").

18.     At the closing of the Galster Loan, the Debtor presented two (2) satisfactions of mortgages (the "Satisfactions") purportedly evidencing the satisfaction of the BCG Mortgages.

19.     Believing that its mortgage would have first priority, the Galster Mortgagee closed and disbursed the loan proceeds.

6

20.    Two months later on November 3, 2016, the BCG Mortgagee commenced a Kings Supreme Court action under index number 519469/2016. BCG produced an affidavit from the notary public on the Satisfactions attesting that the Satisfactions were forged and/or fraudulent. BCG alleged that the amount remaining due on the BCG Mortgages exceeded $5 million as of January 2016. BCG sought a declaration that the Satisfactions were void, that the BCG Mortgages remained valid liens, and that the Galster Mortgage was void. The same day, the Supreme Court enjoined the Debtor and Yehuda Salamon, its principal, from dissipating assets.

21.    When the Galster Mortgagee discovered the BCG action, it filed a Supreme Court case to enjoin disbursement of the amounts remaining of its $6,500,000 loan.

22.    The Debtor did not oppose either of the injunction applications. Instead, the Debtor essentially admitted that the Satisfactions were bogus and offered to vacate them.

23.    The requested injunctions were entered, the Debtor stopped paying the Galster mortgage, the Galster Mortgagee accelerated its loan, and the Galster Mortgagee commenced its foreclosure action.

24.    In the BCG case, BCG filed an affirmation alleging a pattern of Debtor misconduct including attempts to defraud BCG, the IRS, the Charities Bureau of the New York State Attorney General's office and the New York State Department of Taxation and Finance.

25.    The Debtor then sought to stay the Galster foreclosure arguing that the fraud allegations in the BCG case must be determined first. The ploy failed. The Supreme Court denied the Debtor's motion and appointed Gregory Laspina receiver by order signed on July 11, 2017. Mr. Laspina, however, never took possession.

7

26.     Later, the Supreme Court, by decision and order dated March 7, 2019, extinguished the bogus satisfactions as demanded by BCG.

27.     Galster had title insurance.  Old Republic, Galster's title insurance carrier, honored its obligation to represent Galster and Butler Fitzgerald was retained for that purpose.  Old Republic also acquired the BCG obligation and agreed to subordinate the BCG Mortgages to the Galster mortgage.

28.     The Foreclosure Judgment was entered August 20, 2018, and the sale scheduled for December 20, 2018.

29.     Meanwhile, since 2005, Yehuda Salamon, the Debtor's beneficial owner, was also beneficial owner of Yidel's grocery store, which occupies the first floor Property and, upon information and belief, Mr. Salamon has also permitted tenants to occupy the upstairs residential units.  The mortgages have been unpaid for years, but the Debtor had no money in its account upon filing this case.  This raises questions about whether rent has been collected and who has been collecting rent.  At the first meeting of creditors the Debtor could not answer a single question about the tenancies, despite repeated attempts by the United State Trustee and Galster's counsel.

30.     Unfortunately, the Debtor's principal has done nothing since filing this case to indicate that he shares the Mortgagee's sense of urgency regarding the eroding equity in the Property as judgment interest accrues every day.

31.     Absent an implausibly large and quick capital infusion relative to the value of the Property, the Debtor has no likelihood of confirming a plan except by a sale.

8

## PROPONENT'S PLAN OF REORGANIZATION

## CLASSIFICATION AND TREATMENT OF CLAIMS

### Class 1

32. **Classification** – New York City real estate tax, water, sewer and other liens. Claims total approximately $0.00.

33. **Treatment** – Payment in full in Cash of Allowed Amount on the Effective Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

34. **Voting** -- Unimpaired and deemed to have accepted the Plan

### Class 2

35. **Classification** – Galster Funding LLC  Claim totals approximately $9,480,175 as of the filing date.

36. **Treatment** – Payment of available Cash up to Allowed Amount of Class 2 Claim, after payment of Administrative Expenses, priority tax Claims, Class 1 Claims and Class 4 Claims.  If the Property Sale Proceeds are insufficient to pay the Claim in full, the deficiency amount shall be treated as a Class 5 Claim.

**Voting** – Impaired and entitled to vote to accept or reject the Plan.

### Class 3

37. **Classification** – Old Republic.  Claim totals approximately $13,500,000 as of the filing date.

9

38.    **Treatment** – Payment of available Cash up to Allowed Amount of the Class 3 Claim, after payment of Administrative Expenses, priority tax Claims, Class 1 Claims, Class 2 Claims and Class 4 Claims.  If the Property Sale Proceeds are insufficient to pay the Claim in full, the deficiency amount shall be treated as a Class 5 Claim.

39.    **Voting** –  Impaired and entitled to vote to accept or reject the Plan.

### Class 4

40.    **Classification** –   Priority Claims under Sections 507(a)(2), (3), (4), (5), (6), and (7) of the Bankruptcy Code.  Claims total approximately $0.

41.    **Treatment** – Payment in full in Cash of Allowed Amount on the Effective Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

42.    **Voting --** Unimpaired and deemed to have accepted the Plan

### Class 5

43.    **Classification** –  General Unsecured Claims.  Claims total approximately $12,480,175.

44.    **Treatment** – Payment of available Cash up to Allowed Amount of Class 5 Claims, after payment of Administrative Expenses, priority tax Claims, Class 1, 2, 3, and 4 Claims.

45.    **Voting** – Impaired and entitled to vote to accept or reject the Plan.

10

## Class 6

46.    **Classification** – Interests .

47.    **Treatment** – Payment of available Cash after payment of Administrative Expenses, priority tax Claims, Class 1, 2, 3, 4 and 5 Claims.

48.    **Voting** – Impaired and entitled to vote to accept or reject the Plan.

## UNCLASSIFIED PRIORITY TAX CLAIMS

49.    Priority tax Claims under Sections 507(a)(8) of the Bankruptcy Code total approximately 0 based on the Debtor's schedules and filed proofs of claim. The treatment of such Claims shall be payment in full in Cash of the Allowed Claim on the Effective Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

## ADMINISTRATIVE EXPENSES

50.    Allowed Administrative Expenses shall be paid in full, in cash on the Effective Date, or the date such Administrative Expense becomes Allowed or as soon as practicable thereafter, except to the extent that the holder of an Allowed Administrative Expense agrees to a different treatment; provided, however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtor shall be paid in full or performed by the Debtor in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.  As of the Confirmation Date, unpaid Chapter 11 professional fees will total an amount to be determined for Debtor's counsel subject to Bankruptcy Court approval.

11

51.     Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Professional Fee Claims) must be filed and served on counsel for the Debtor and Proponent by no later than the Confirmation Hearing (the "Administrative Claims Bar Date"). Any Person that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such request shall be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. Objections to requests for payment of Administrative Claims (except for Professional Fee Claims and Administrative Claims incurred in the ordinary course of the Debtor's business) must be filed and served on counsel for the Debtor, Proponent, and the party requesting payment of an Administrative Claim within thirty (30) days of the date such request for payment has been filed.

52.     Unless otherwise ordered by the Bankruptcy Court, and subject to notice and a hearing under section 330 of the Bankruptcy Code, requests for payment of Professional Fee Claims incurred through the Confirmation Date must be filed and served no later than thirty (30) days after the Confirmation Date (the "Professional Fee Claims Bar Date"). The day prior to the Confirmation Date, each Professional shall provide counsel for the Debtor and counsel to the Proponent with a written estimate of the total amount of compensation and expenses for which such Professional expects to seek final compensation and reimbursement pursuant to section 330 of the Bankruptcy Code. Such estimates shall include estimated sums for the preparation and prosecution of any application for final compensation.

53.     The Debtor shall pay from Cash in the Estate all fees payable due as of the Effective Date pursuant to section 1930 of title 28 of the United Sates Code. Thereafter, the

12

Debtor shall pay from Cash in the Estate all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due under 31 U.S.C. § 3717, on all disbursements, including plan payments and disbursements in and outside of the ordinary course of business, until the earliest of the entry of a final decree closing the Chapter 11 Case, dismissal of the Chapter 11 Case, or conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

## MEANS FOR IMPLEMENTATION

54.  **Source of Funds** – Payments under the Plan will be paid either from the Property Sale Proceeds or Cash to be contributed by Galster if Galster or its designee is Purchaser of the Property by credit bid.  The sale of the Property shall be implemented pursuant to the Bidding and Auction Procedures annexed as Exhibit "A" to the Plan. Prior to or on the Effective Date, the Property shall be sold to Purchaser free and clear of all Liens, Claims, and encumbrances, with any such Liens, Claims, and encumbrances to attach to the Property Sale Proceeds, and disbursed in accordance with the provisions of this Plan. Galster and BCG shall each have the right, but not the obligation, to provide for an assignment of its mortgage and an assumption by the Purchaser in connection with the sale of the Property under the Plan. In the event the Property Sale Proceeds are not sufficient to pay all Claims in full with interest from the Petition Date, the proceeds of the prosecution of the Causes of Action by the Plan Administrator shall be an additional potential source of Cash to be distributed under the Plan, net of payment of Plan Administrator fees and expenses.  Such net proceeds of Causes of Action proceeds will first be used for unpaid Plan Administrator fees and expenses, then in the event Galster or its designee is Purchaser by credit bid, to reimburse Galster for Cash paid to fund the Plan, and then paid to Creditors in the order of priority provided for in the Plan.

13

55.    **Sale Approval** -- As part of the sale under the Plan, and in order to ensure consummation of the Plan, the Plan requires that  a post-confirmation sale order be entered containing the following findings of fact and conclusions of law: (a) that the terms and conditions of the sale are fair and reasonable, (b) that the Debtor's sale, and the purchaser's purchase, of the Property pursuant to the Plan, is non-collusive, fair and reasonable and was conducted openly and in good faith, (c) that the transfer of the Property to the purchaser represents an arm's-length transaction and was negotiated in good faith between the parties, (d) that the purchaser, as transferee of the Property, is a good faith purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e) the sale of the Property to the purchaser was not controlled by an agreement among potential purchasers, (f) that no cause of action exists against the Purchaser or with respect to the sale of the Property to the Purchaser under Bankruptcy Code § 363(n), and (g) that any claims under Bankruptcy Code § 363(n) or any other claims as against the Purchaser are hereby released, waived and discharged.

56.    **Release of Liens** -- Except as otherwise provided for in the Plan and in connection with the assumption and assignment of the Galster mortgage and the BCG mortgage, on the Effective Date, (a) each holder of a Secured Claim, shall on the Effective Date (x) turn over and release to the Proponent any and all Collateral that secures or purportedly secures such Claim, as they pertain to the properties currently owned by the Debtor or such Lien shall automatically, and without further action by the Debtor or the Proponent, be deemed released, and (y) execute such documents and instruments as the Proponent requests to evidence such Claim holder's release of such property or Lien.

57.  **Stamp Tax** -- Pursuant to Bankruptcy Code § 1146(c), (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the Purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject any applicable document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental assessment including without limitation New York City Real Property Transfer Tax and New York State Documentary Tax.

58.  **Execution of Documents** -- Pursuant to section 1142 of the Bankruptcy Code, upon the Effective Date, the Plan Administrator, the Disbursing Agent, the Debtor and any necessary party thereto, are directed to execute, release, and deliver all documents reasonably necessary to consummate the transactions contemplated by the terms and conditions of the Plan. The Proponent shall be authorized to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

15

59.  **Recording Documents** -- Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transaction contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and the Confirmation Order.

60.  **Property Turnover at Closing**. The Debtor shall turnover possession of the Property at closing together with all files and records pertaining to construction documents, Department of Buildings building permits, violations, architectural plans, leases, repair invoices, and tenant correspondence. If the Debtor fails to turnover possession, Proponent shall be entitled to submit a writ of assistance for Bankruptcy Court approval to obtain the assistance of the United States Marshal to remove the Debtor and its affiliates from the Property and effectuate turnover of the Property and all related files and records pertaining to construction documents, Department of Buildings building permits, violations, architectural plans, leases, repair invoices, and tenant correspondence.

61.  **Property Marketing**. The Plan Administrator shall retain Aaron Jungreis and Rosewood Realty Group to market the Property.  The Debtor shall cooperate with any broker, auctioneer, and/or real estate professional to permit reasonable access to the Property for marketing purposes.

62.  **Corporate Action**. Upon the entry of the Confirmation Order, all matters provided under the Plan involving the corporate structure of the Debtor shall be deemed

authorized and approved without any requirement of further action by the Debtor, the Debtor's members, or the Debtor's boards of directors, managers, and/or managing members.

63.      **Manner of Payment**. Any payment of Cash made under the Plan may be made either by check drawn on a domestic bank, by wire transfer, or by automated clearing house transfer from a domestic bank, at the option of the Proponent.

64.      **Vesting of Property**. On the Effective Date, title to and possession of any and all property of the estate, real or personal, shall be re-vested in the Reorganized Debtor free and clear of all liens, claims, interests and encumbrances of any kind, subject to and except as otherwise provided in this Plan and the Confirmation Order.

## LIQUIDATION ANALYSIS

65.      In a liquidation under Chapter 7 of the Bankruptcy Code, the Debtor's assets would be sold and the sale proceeds distributed to creditors in their order of priority.  The Proponent believes that the Plan provides a far better return for the Debtor's estate than could be achieved in a liquidation.  Furthermore, a Chapter 7 Trustee represents an additional layer of administration legal expenses and commissions, which the Proponent estimates would total at least 10% of the sale proceeds.

## LITIGATION ANALYSIS

66.      Presently pending in the Bankruptcy Court is an adversary proceeding commenced by the Debtor seeking to hold the Proponent and counsel in contempt for prosecuting a State Court contempt proceeding after the Petition Date against the Debtor's beneficial owner.

17

67.     Presently pending in Supreme Court, Kings County are (a) the Proponent's foreclosure action, (b) the BCG complaint against the Debtor and other defendants (c) the BCG complaint for injunctive relief, and (d) various appeals pending in such actions.

68.     Based on pleadings filed, hearings held and Court decisions over the years, as well as the testimony at the first meeting of creditors in this case, Causes of Action may include claims against the Property tenants and the Debtor's principals and affiliates.  Those claims may include, but are not limited to, fraudulent conveyance actions arising from the disbursement of the Galster loan proceeds and the nonpayment and/or diversion of Property rental income.

69.     The Proponent believes that the Debtor may contest Plan confirmation. Although the Debtor has not made its intentions known in that regard, the Proponent will address any such issues at the confirmation hearing.

70.     Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Debtor shall retain any and all claims of the Debtor and its Estate including, without limitation, Causes of Action. On the Confirmation Date, the Plan Administrator shall have exclusive responsibility for (a) the litigation of all such claims, including the pending State Court actions and the Causes of Action on the Debtor's behalf and (b) the disbursement under the Plan of the proceeds of any such claims.

## PAYMENT OF CLAIMS AND OBJECTIONS TO CLAIMS

71.     The Proponent shall be disbursing agent under the Plan without a bond. The Plan Administrator shall have the sole and exclusive right to file objections to claims in the event grounds exist to object to particular claims. Claims objections must be filed no later than

18

60 days after the Effective Date.  On the initial distribution date and on each distribution date as may thereafter be necessary, the Proponent shall maintain an undetermined claims distribution reserve for the holders of undetermined claims as of such date in a sum not less than the amount required to pay each such undetermined claim if such claim was allowed in full.  To the extent that an undetermined claim becomes an Allowed Claim, the distributions reserved for such Allowed Claim, shall be released from the undetermined claims distribution reserve and paid to the holder of such Allowed Claim.  After all the amounts of all undetermined claims have been fixed, the balance of the undetermined claims distribution reserve shall thereafter be paid in accordance with the Plan.

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

72.     Any and all pre-petition leases or executory contracts (a) not previously assumed or the subject of a motion to assume pending on the Confirmation Date and/or (b) not designated prior to the Confirmation Date as pre-petition leases or executory contracts to be assumed by the Proponent shall be deemed rejected by the Debtor.  In the event of a rejection which results in damages a Proof of Claim for such damages must be filed by the damaged party with the Court within thirty (30) days after the Effective Date.  All Allowed Claims arising from the rejection of any Executory Contract or unexpired lease shall be treated as an Unsecured Claim.  Any Claim arising from the rejection of any Executory Contract or unexpired lease not filed with the Court within the time period provided in the preceding paragraph above shall be deemed discharged and shall not be entitled to participate in any distribution under the Plan.

19

## MANAGEMENT OF THE DEBTOR

73.     The Debtor appears to be managed by Yehuda Salamon.  Post-confirmation management will remain unchanged, provided however, that the Plan shall be implemented by the Plan Administrator.

74.     The Plan Administrator shall be appointed on the Confirmation Date and the Plan Administrator, on behalf of the Debtor, shall take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan.

(a) Following the Confirmation Date, the Plan Administrator shall be responsible for the filing of all post-Confirmation reports required during such periods with the U.S. Trustee and payment of all post-Confirmation fees charged or assessed against the Estate under 28 U.S.C. § 1930 during such periods.

(b) The Plan Administrator shall be deemed a "party-in-interest" for purposes of filing and prosecuting objections to claims and Causes of Action.

(c) The Plan Administrator shall have the exclusive authority and duty to implement the sale of the Property and prosecution of Causes of Action under this Plan and accordingly shall exercise such rights and obligations of the Debtor in accordance with the Plan.

(d) The Plan Administrator and his professionals shall be compensated from the Plan Administrator Fund at a rate of $400 per hour. The Plan Administrator has agreed to retain Backenroth Frankel & Krinsky, LLP, as his bankruptcy counsel at a rate of $500 per hour, and may retain special litigation counsel at their customary rates. Professionals retained by the Plan Administrator shall not be required to file a fee application. The payment of the fees and expenses of the Plan Administrator and the Plan Administrator's retained professionals shall be made first from the Plan Administrator Fund, and then from the proceeds of Causes of Action.

(e) The Plan Administrator shall be authorized to obtain and pay for out of the Plan Administrator Fund all reasonably necessary insurance coverage for himself, his agents, representatives, employees, or other independent contractors, if necessary.

(f) The Plan Administrator may resign by giving not less than thirty (30) days' prior written notice to the Disbursing Agent. Such resignation shall become effective upon the Bankruptcy Court approval of a successor Plan Administrator.

20

(g) Upon the request of any party in interest, the Bankruptcy Court may remove the Plan Administrator for cause. For purposes of this paragraph, "cause" shall mean (I) an act of fraud, embezzlement or theft in connection with the Plan Administrator's duties or in the course of its engagement in such capacity, (ii) the intentional wrongful damage to the property of the Debtor, or (iii) gross neglect by the Plan Administrator of his duties under the Plan. Unless the Bankruptcy Court orders immediate removal, the Plan Administrator shall continue to serve until a successor Plan Administrator is appointed, and such appointment becomes effective, in accordance with the Plan.

(h) In the event of a vacancy by reason of the death, incapacity or immediate removal of the Plan Administrator or prospective vacancy by reason of resignation or removal, the Disbursing Agent shall appoint a successor Plan Administrator, which appointment shall be effective upon the approval of the Bankruptcy Court on not less than twenty (20) days' notice to parties who have filed a notice of appearance with the Bankruptcy Court during the chapter 11 case pursuant to Bankruptcy Rule 2002 and to all creditors of the Debtor, unless the Bankruptcy Court authorizes otherwise. Every successor Plan Administrator appointed hereunder shall execute, acknowledge, and file with the Bankruptcy Court an instrument accepting such appointment subject to the terms and provisions of the Plan. The successor Plan Administrator, without any further act, shall become vested with all the rights, powers, and duties of the Plan Administrator, provided, however, that no Plan Administrator shall be liable for the acts or omissions of any prior or later Plan Administrator.

(i) Unless otherwise ordered by the Bankruptcy Court, the death, resignation, or removal of the Plan Administrator shall not operate to terminate any agency or employment created by the Plan or invalidates any action theretofore taken by the Plan Administrator.

(j) The Plan Administrator shall have the right at any time to seek and rely upon instructions from the Bankruptcy Court concerning his duties under the Plan or any other document executed in connection therewith, and the Plan Administrator shall be entitled to rely upon such instructions in acting or failing to act and shall not be liable for any act taken or not taken in reliance thereon. In the absence of actual knowledge to the contrary, any person dealing with the Plan Administrator shall be entitled to rely on the authority of the Plan Administrator to act on behalf of the Debtor's estate and the Debtor, and shall have no obligation to inquire into the existence of such authority.

(k) After the Effective Date, the Plan Administrator shall maintain books and records but shall not be responsible for preparing and filing tax forms and returns as are required to be filed under applicable law.  The Interest Holder shall bear sole responsibility for filing tax forms and returns required under applicable law.

(l) The Plan Administrator shall turnover to the Interest Holder all books, records, and files that shall have been delivered to or created by the Plan Administrator as needed for the filing of tax forms and returns, and when such books, records, and files are no longer required.

21

**(m)** The Plan Administrator's duties shall cease upon the closing of this Case.

75.     Neither the Proponent, Plan Administrator, Disbursing Agent, nor any of their employees, advisors, attorneys, accountants, financial consultants, contractors, agents, and their successors and assigns, shall have or incur any liability to any holder of a Claim or Interest, or to any other entity, for any act or omission in connection with, related to, or arising out of, the pursuit of confirmation consummation, or other administration of the Plan or the property to be distributed or otherwise dealt with under the Plan, except for gross negligence or willful misconduct, and in all respects the Proponent, Plan Administrator, Disbursing Agent and each of their employees, advisors, attorneys, accountants, financial consultants, contractors, and agents shall be entitled to rely upon the advice of counsel with respect to its duties and responsibilities under the Plan. No current Holder of a Claim or Equity Interest, representative thereof, shall have or pursue any claim or cause of action against the Proponent, Plan Administrator, or Disbursing Agent for making payments in accordance with the Plan, or for implementing the provisions of the Plan. Neither the Proponent, Plan Administrator, Disbursing Agent shall be liable for obligations relating to Allowed Claims to the extent that Allowed Claims are not paid in full, other than as a result of gross negligence or willful misconduct.

## TAX CONSEQUENCES

76.     The Proponent does not believe that there will be any negative tax consequences to the Debtor or to Creditors under the Plan.  To the extent that a creditor is not paid in full under the Plan, such creditor may be entitled to a bad debt deduction.  To the extent that a creditor has taken a bad debt deduction, Plan distributions may be taxable as income.

22

64

77.    THE PROPONENT DOES NOT PURPORT, THROUGH THIS DISCLOSURE STATEMENT, TO ADVISE THE CREDITORS OR INTEREST HOLDERS REGARDING THE TAX CONSEQUENCES OF THE TREATMENT OF THE CREDITORS AND INTEREST HOLDERS UNDER THE PLAN.  CREDITORS AND INTEREST HOLDER SHOULD SEEK INDEPENDENT COUNSEL CONCERNING THE TAX CONSEQUENCES OF THEIR TREATMENT UNDER THE PLAN.

## PLAN ALTERNATIVES

78.    Generally, the plan options for single asset real estate cases include selling, refinancing, recapitalizing or loan modification.  Given the Property value relative to the Claims, there appear to be no viable refinancing or recapitalization options.  Given the contentious litigation history, there are no loan modification options. In this case, therefore, the Proponent believes that selling the Property is the only viable alternative.

## VOTING PROCEDURES AND REQUIREMENTS

79.    A ballot to be used for voting to accept or reject the Plan is enclosed with this Disclosure Statement.  Each impaired creditor is entitled to execute the ballot and return it to the undersigned to be considered for voting purposes.  The Bankruptcy Court has directed that, in order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received no later than _____, 2019, at the following address:  Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, Floor 11, New York, New York 10022, Attn:  Mark A. Frankel, Esq.

23

80.     Each Creditor of the Debtor whose Claim is impaired under the Plan is entitled to vote, if either (i) its Claim has been scheduled by the Debtor, or (ii) it has filed a Proof of Claim on or before the last date set by the Bankruptcy Court for such filings.

81.      Any Claim as to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the Claim in an amount which it deems proper for the purpose of accepting or rejecting the Plan upon motion by a Creditor whose Claim is subject to an objection.  Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Court to confirm the Plan.

82.     A Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

83.     The Bankruptcy Code defines acceptance of a Plan by a class of Creditors as acceptance by holders of two-thirds in dollar amount and a majority in number of the Claims of that class which actually cast ballots for acceptance or rejection of the Plan.

84.     The Bankruptcy Code defines acceptance of a Plan by a class of Interests as acceptance by holders of two-thirds in amount of the allowed Interests of such class held by holders of such interests.

24

## CONFIRMATION OF THE PLAN

85.     Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy

Court, after notice, hold a hearing on confirmation of the Plan (the "Confirmation Hearing").

Section 1128(b) provides that any party in interest may object to confirmation of the Plan.

86.     By order of the Bankruptcy Court dated _____, 2018, the Confirmation

Hearing has been scheduled for _____, 2019, at ___ .m., in the Honorable Carla

E. Craig's Courtroom, 271 Cadman Plaza East, Brooklyn, New York.  The Confirmation

Hearing may be adjourned from time to time by the Bankruptcy Court without further notice

except for an announcement made at the Confirmation Hearing or any adjourned Confirmation

Hearing.  Any objection to confirmation of the Plan must be made in writing and filed with the

Bankruptcy Court with proof of service and served upon the following on or before

_____, 2019:  Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, Floor 11, New

York, New York 10022, Attn:  Mark A. Frankel, Esq.  Objections to confirmation of the Plan are

governed by Bankruptcy Rule 9014.

87.     At the Confirmation Hearing, the Bankruptcy Court will determine

whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied to enter an

order confirming the Plan.  The applicable requirements are as follows:  (a)  The Plan complies

with the applicable provisions of the Bankruptcy Code, (b) the Proponent has complied with the

applicable provisions of the Bankruptcy Code; (c) the Plan has been proposed in good faith and

not by any means forbidden by law, (d) any payment made or promised or by a person issuing

securities or acquiring property under the Plan, for services or for costs and expenses in, or in

connection with, the Bankruptcy Case, or in connection with the Plan and incident to the

25

Bankruptcy Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable, (e) the Proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a Plan with the Debtor, or a successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of Creditors and equity security holders and with public policy, and the Proponent has disclosed the identity of any insider that will be employed or retained by the reorganized Debtor, and the nature of any compensation for such insider, (f) with respect to each class of impaired Claims, either each holder of a Claim or interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or interest property of a value, as of the Effective Date of the Plan, an amount that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code, (g) each class of Claims or interests has either accepted the Plan or is not impaired under the Plan, (h) except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expenses and priority Claims will be paid in full on the Effective Date, (i) at least one class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such class, and (j) confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successors to the Debtor under the Plan unless such liquidation or reorganization is proposed in the Plan.

88.     The Proponent believes that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Proponent has complied or will have complied with all of the requirements of Chapter 11, and that the proposals contained in the Plan are made in good faith.

89.     The Proponent contends that holders of all Claims impaired under the Plan will receive payments under the Plan having a present value as of the Effective Date in amounts not less than the amounts likely to be received if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

## **CRAMDOWN**

90.      In the event that any impaired class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Proponent if, as to each impaired class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."

91.     The Proponent intends to invoke the cramdown provisions of section 1129(b) as to any impaired class that does not accept the plan.

92.     A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives less than it is legally entitled to receive for its Claims or equity interests.  "Fair and equitable" has different meanings for Secured and Unsecured Claims.

93.     With respect to a Secured Claim, "fair and equitable" means either: (a)  the impaired Secured Creditor retains its Liens to the extent of its Allowed Claim and receives

27

deferred cash payments at least equal to the allowed amount of its Claim with a present value as of the Effective Date at least equal to the value of such Creditor's interest in the property securing its Liens; (b) property subject to the Lien of the impaired Secured Creditor is sold free and clear of that Lien, with that Lien attaching to the proceeds of the sale; or  (c) the impaired Secured Creditor realizes the "indubitable equivalent" of its Claim under the Plan.

94.     With respect to an Unsecured Claim, "fair and equitable" means either: (a) each impaired Unsecured Creditor receives or retains property of a value equal to the amount of its Allowed Claim; or (b) the holders of Claims and Interests that are junior to the Claims of the dissenting class will not receive any property under the Plan.

95.     In the event one or more classes of impaired Claims rejects the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of Claims.

## CONCLUSION

96.     The Proponent urges the Debtor's Creditors to vote to accept the Plan and

to evidence such acceptance by returning their ballots so that they will be received no later than

_____.

Dated:  New York, New York
        April 30, 2019


                                        **BACKENROTH FRANKEL & KRINSKY, LLP**
                                        **Attorneys for Proponent**


                                        By:    s/Mark Frankel_____
                                               800 Third Avenue, Floor 11
                                               New York, New York 10022
                                               (212) 593-1100

29

Exhibit A

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re                                                         Chapter 11

      4921 12th Avenue, LLC                      Case no.  18-47256

                Debtor.
----------------------------------------------------------x


# **PLAN OF REORGANIZATION**


Mark A. Frankel
BACKENROTH FRANKEL & KRINSKY, LLP
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544


ATTORNEYS FOR THE PROPONENT

## INTRODUCTION

Galster Funding LLC ("Proponent"), proposes this Plan of Reorganization for 4921 12th Avenue, LLC (the "Debtor").  UPON CONFIRMATION, THIS PLAN SHALL BE A BINDING OBLIGATION BETWEEN AND AMONG THE DEBTOR AND EACH OF THE DEBTOR'S CREDITORS (AS SUCH TERMS ARE DEFINED BELOW).

## DEFINITIONS

1.      "Administrative Expense" Any cost or expense of administration of the Bankruptcy Case entitled to priority under section 507(a)(1) and allowed under section 503(b) of the Bankruptcy Code, and any fees or charges assessed against the Debtor's Estate under Chapter 123, Title 28, United States Code.

2.      "Administrative Claims Bar Date" shall mean the last day to file requests for payment of Administrative Claims (except for Professional Fee Claims), which requests shall be filed and served on counsel for the Debtor and Proponent no later than the Confirmation Hearing, other than those Administrative Claims expressly excluded therefrom pursuant to prior order of the Bankruptcy Court.

3.      "Administrative Expense Claim" shall mean claim for payment of an Administrative Expense.

4.      "Allowed Amount" shall mean the amount of an "Allowed Claim."

5.      "Allowance Date" shall mean the date which a Disputed Claim becomes an Allowed Claim by Final Order.

2

74

6.      "Allowed Claim" shall mean a Claim: (a) to the extent that a Proof of Claim is filed timely or, with leave of the Court late filed as to which (i) no party in interest files an objection or (ii) which is allowed by a Final Order; or (b) which is listed on the Proponent's schedules or any amendments thereto but which is not listed therein as disputed, unliquidated or contingent.

7.      "Allowed Secured Claim" shall mean a Secured Claim to the extent it is an Allowed Claim.

8.      "Allowed Unsecured Claim" shall mean an Unsecured Claim to the extent it is an Allowed Claim.

9.      "Assets" shall mean any and all of the respective real or personal property of any nature of the Debtor, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, accounts, chattel paper, Cash, deposit accounts, reserves, deposits, contractual rights, intellectual property rights, claims, Causes of Action and any other general intangibles of Debtor, of any nature whatsoever, including, without limitation, the property of the estate pursuant to section 541 of the Bankruptcy Code.

10.     "Avoidance Actions" shall mean all claims and causes of action which the Debtor has or had the power to assert pursuant to any or all of sections 510, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code.

11.     "Bankruptcy Case" shall mean this Chapter 11 bankruptcy case.

12. "Bankruptcy Code" shall mean Title 11 of the United States Code (11. U.S.C. § 101 et. seq.

13. "Bankruptcy Court" shall mean the Court as defined below.

14. "Bankruptcy Rule(s)" shall mean the Federal Rules of Bankruptcy Procedure as applicable to cases under the Bankruptcy Code, together with all amendments and modifications made from time to time thereto.

15. "Bar Date" shall mean April 4, 2019.

16. "BCG" and "BCG Mortgagee" means Beis Chasidi Gorlitz.

17. "BCG Mortgages" means those certain mortgages on the Property pertaining to the notes in the original principal amounts of $1,200,000 and $1,300,000 made by the Debtor in favor of BCG, and subsequently assigned Old Republic.

18. "Cash" shall mean all cash and cash equivalents which evidence immediately available funds in United States dollars.

19. "Causes of Action" shall mean any and all claims and causes of action of, and remedies granted to, the Debtor against any third party, including, without limitation, any avoidance claims or causes of action pursuant to sections 502, 506, 510, 541 through 545, 547 through 551, and/or 553 of the Bankruptcy Code and any claims pursuant to any other statutory or common law.

20. "Claim" shall mean a right to payment as set forth in § 101(5) of the Bankruptcy Code.

21. "Claimant" shall mean the holder of a Claim.

4

22.     "Confirmation Date" shall mean the date of the entry of the Confirmation Order.

23.     "Confirmation Hearing" shall mean the hearing pursuant to the Bankruptcy Code Section 1128 before the Bankruptcy Court regarding the proposed confirmation of the Plan.

24.     "Confirmation Order" shall mean the order of the Court confirming the Plan.

25.     "Court" shall mean the United States Bankruptcy Court for the EASTERN District of New York.

26.     "Creditor" shall mean any entity that holds a Claim against the Debtor.

27.     "Debtor" shall mean 4921 12th Avenue, LLC.

28.     "Disbursing Agent" shall mean the Proponent.

29.     "Disclosure Statement" shall mean the disclosure statement filed by the Proponent with respect to this Plan.

30.     "Disputed Claim" shall mean the whole or any portion of any claim against a Proponent to which an objection is timely filed as to which a Final Order has not been entered allowing or disallowing such Claim or any portion thereof.

31.     "Effective Date" "Effective Date" shall mean the first business day after the closing of the sale of the Property.

32.     "Estate" shall mean the estate of the Debtor created upon the commencement of the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

33.    "Executory Contracts" shall mean "executory contracts" and "unexpired leases" as such terms are used within Section 365 of the Bankruptcy Code.

34.    "Final Order" shall mean an order of the Court that has not been reversed, modified, amended or stayed, and as to which the time to appeal or to seek review or certiorari thereof has expired, and as to which no appeal, review or rehearing is pending.

35.    "Galster Judgment" means the Galster Funding LLC judgment of foreclosure and sale dated March 28, 2018 in the Supreme Court of Kings County, Index no. 519469/2016.

36.    "Galster" and "Galster Mortgagee" shall mean Galster Funding LLC.

37.    "Interest" shall mean an existing ownership interest in the Debtor.

38.    "Interest Holder" shall mean a holder and owner of an existing Interest in the Debtor.

39.    "Legal Rate" shall mean the applicable interest rate as set forth in 28 U.S.C. §1961 as of the Petition Date.

40.    "Lien" shall mean a charge against or interest in property to secure payment of a debt or performance of an obligation.

41.    "Petition Date" shall mean December 20, 2018.

42.    "Plan" shall mean this Plan of Reorganization, and any and all modifications and/or amendments hereto.

43.    "Plan Administrator" shall mean Mark Frankel.

6

44.     "Plan Administrator Fund" shall mean $30,000 to be set aside from the Property Sale Proceeds, and then from the proceeds of Causes of Action to the extent necessary to pay fees and expenses of the Plan Administrator.

45.     "Professional(s)" shall mean any entity or person employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, or 1103 of the Bankruptcy Code and to be compensated for services rendered pursuant to sections 327, 328, 329, 330 and/or 331 of the Bankruptcy Code.

46.      "Professional Fee Claim" shall mean those fees and expenses claimed by a Professional pursuant to sections 330, 331 and/or 503 of the Bankruptcy Code.

47.     "Professional Fee Claim Bar Date" shall mean the last day for a Professional to file a Professional Fee Claim, which shall be no later than thirty (30) days after the Confirmation Date.

48.     "Property" shall mean the real property at 4917 12th Avenue, Brooklyn, New York 11219.

49.     "Property Sale Proceeds" shall mean the proceeds of sale of the Property, less all charges to be incurred in connection with the marketing, negotiation, documentation, execution, and closing of the sale of the Property, including, without limitation, any fees and expenses paid to retain an auctioneer, real estate broker, and/or special real estate counsel.

50.     "Proponent" shall mean Galster Funding LLC.

51.     "Purchaser" shall mean the purchaser of the Property pursuant to the Plan.

7

52.     "Reorganized Debtor" shall mean the Debtor on and after the Effective Date.

53.     "Secured Claim" shall mean a Claim secured by a Lien on property included within the Debtor's Estate.

54.     "Secured Creditor" shall mean the owner or holder of a Secured Claim.

55.     "Unsecured Claim" shall mean a claim for which the Claimant does not hold (a) a valid, perfected and enforceable Lien, security interest or other interest in or encumbrance against Debtor or the Debtor's Estate; or (b) a right to setoff to secure the payment of such Claim.  An Unsecured Claim includes, but is not limited to, a Claim for damages resulting from rejection of any Executory Contract pursuant to Section 365 of the Bankruptcy Code and does not include administrative of priority claims.

56.     "Unsecured Creditor" shall mean the owner or holder of an Unsecured Claim.

### CLAIMS CLASSIFICATION AND TREATMENT

### Class 1

57.     **Classification** –  New York City real estate tax, water, sewer and other liens.   Claims total approximately $0.00.

58.     **Treatment** – Payment in full in Cash of Allowed Amount on the Effective Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

59.     **Voting** --  Unimpaired and deemed to have accepted the Plan

8

## Class 2

60.    **Classification** – Galster Funding LLC  Claim totals approximately $9,480,175 as of the filing date.

61.    **Treatment** – Payment of available Cash up to Allowed Amount of Class 2 Claim, after payment of Administrative Expenses, priority tax Claims, Class 1 Claims and Class 4 Claims.  If the Property Sale Proceeds are insufficient to pay the Claim in full, the deficiency amount shall be treated as a Class 5 Claim.

**Voting** –  Impaired and entitled to vote to accept or reject the Plan.

## Class 3

62.    **Classification** – Old Republic.  Claim totals approximately $13,500,000 as of the filing date.

63.    **Treatment** – Payment of available Cash up to Allowed Amount of the Class 3 Claim, after payment of Administrative Expenses, priority tax Claims, Class 1 Claims, Class 2 Claims and Class 4 Claims.  If the Property Sale Proceeds are insufficient to pay the Claim in full, the deficiency amount shall be treated as a Class 5 Claim.

64.    **Voting** –  Impaired and entitled to vote to accept or reject the Plan.

## Class 4

65.    **Classification** –  Priority Claims under Sections 507(a)(2), (3), (4), (5), (6), and (7) of the Bankruptcy Code.  Claims total approximately $0.

66.    **Treatment** – Payment in full in Cash of Allowed Amount on the Effective Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

67.    **Voting** -- Unimpaired and deemed to have accepted the Plan

**Class 5**

68.    **Classification** –  General Unsecured Claims.  Claims total approximately $12,480,175

69.    **Treatment** – Payment of available Cash up to Allowed Amount of Class 5 Claims, after payment of Administrative Expenses, priority tax Claims, Class 1, 2, 3, and 4 Claims.

70.    **Voting** – Impaired and entitled to vote to accept or reject the Plan.

**Class 6**

71.    **Classification** – Interests .

72.    **Treatment** – Payment of available Cash after payment of Administrative Expenses, priority tax Claims, Class 1, 2, 3, 4 and 5 Claims.

73.    **Voting** – Impaired and entitled to vote to accept or reject the Plan.

**ADMINISTRATIVE EXPENSES**

74.    Allowed Administrative Expenses shall be paid in full, in cash on the Effective Date, or the date such Administrative Expense becomes Allowed or as soon as practicable thereafter, except to the extent that the holder of an Allowed Administrative Expense

10

agrees to a different treatment; provided, however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtor shall be paid in full or performed by the Debtor in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.  As of the Confirmation Date, unpaid Chapter 11 professional fees will total an amount to be determined for Debtor's counsel subject to Bankruptcy Court approval.

75.     Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Professional Fee Claims) must be filed and served on counsel for the Debtor and Proponent by no later than the Confirmation Hearing (the "Administrative Claims Bar Date"). Any Person that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such request shall be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. Objections to requests for payment of Administrative Claims (except for Professional Fee Claims and Administrative Claims incurred in the ordinary course of the Debtor's business) must be filed and served on counsel for the Debtor, Proponent, and the party requesting payment of an Administrative Claim within thirty (30) days of the date such request for payment has been filed.

76.     Unless otherwise ordered by the Bankruptcy Court, and subject to notice and a hearing under section 330 of the Bankruptcy Code, requests for payment of Professional Fee Claims incurred through the Confirmation Date must be filed and served no later than thirty (30) days after the Confirmation Date (the "Professional Fee Claims Bar Date"). The day prior to the Confirmation Date, each Professional shall provide counsel for the Debtor and counsel to the

11

Proponent with a written estimate of the total amount of compensation and expenses for which

such Professional expects to seek final compensation and reimbursement pursuant to section 330

of the Bankruptcy Code. Such estimates shall include estimated sums for the preparation and

prosecution of any application for final compensation.

77.     The Debtor shall pay from Cash in the Estate all fees payable due as of the

Effective Date pursuant to section 1930 of title 28 of the United Sates Code. Thereafter, the

Debtor shall pay from Cash in the Estate all United States Trustee quarterly fees under 28 U.S.C.

§ 1930(a)(6), plus interest due under 31 U.S.C. § 3717, on all disbursements, including plan

payments and disbursements in and outside of the ordinary course of business, until the earliest

of the entry of a final decree closing the Chapter 11 Case, dismissal of the Chapter 11 Case, or

conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

### MEANS FOR IMPLEMENTATION

78.     **Source of Funds** – Payments under the Plan will be paid either from the

Property Sale Proceeds or Cash to be contributed by Galster if Galster or its designee is

Purchaser of the Property by credit bid.  The sale of the Property shall be implemented pursuant

to the Bidding and Auction Procedures annexed as Exhibit "A" to the Plan. Prior to or on the

Effective Date, the Property shall be sold to Purchaser free and clear of all Liens, Claims, and

encumbrances, with any such Liens, Claims, and encumbrances to attach to the Property Sale

Proceeds, and disbursed in accordance with the provisions of this Plan. Galster and BCG shall

each have the right, but not the obligation, to provide for an assignment of its mortgage and an

assumption by the Purchaser in connection with the sale of the Property under the Plan. In the

event the Property Sale Proceeds are not sufficient to pay all Claims in full with interest from the

Petition Date, the proceeds of the prosecution of the Causes of Action by the Plan Administrator shall be an additional potential source of Cash to be distributed under the Plan, net of payment of Plan Administrator fees and expenses.  Such net proceeds of Causes of Action proceeds will first be used for unpaid Plan Administrator fees and expenses, then in the event Galster or its designee is Purchaser by credit bid, to reimburse Galster for Cash paid to fund the Plan, and then paid to Creditors in the order of priority provided for in the Plan.

79.    **Sale Approval** -- As part of the sale under the Plan, and in order to ensure consummation of the Plan, the Plan requires that  a post-confirmation sale order be entered containing the following findings of fact and conclusions of law: (a) that the terms and conditions of the sale are fair and reasonable, (b) that the Debtor's sale, and the purchaser's purchase, of the Property pursuant to the Plan, is non-collusive, fair and reasonable and was conducted openly and in good faith, (c) that the transfer of the Property to the purchaser represents an arm's-length transaction and was negotiated in good faith between the parties, (d) that the purchaser, as transferee of the Property, is a good faith purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e) the sale of the Property to the purchaser was not controlled by an agreement among potential purchasers, (f) that no cause of action exists against the Purchaser or with respect to the sale of the Property to the Purchaser under Bankruptcy Code § 363(n), and (g) that any claims under Bankruptcy Code § 363(n) or any other claims as against the Purchaser are hereby released, waived and discharged.

80.    **Release of Liens** -- Except as otherwise provided for in the Plan and in connection with the assumption and assignment of the Galster mortgage and the BCG mortgage,

13

on the Effective Date, (a) each holder of a Secured Claim, shall on the Effective Date (x) turn

over and release to the Proponent any and all Collateral that secures or purportedly secures such

Claim, as they pertain to the properties currently owned by the Debtor or such Lien shall

automatically, and without further action by the Debtor or the Proponent, be deemed released,

and (y) execute such documents and instruments as the Proponent requests to evidence such

Claim holder's release of such property or Lien.

      81.    **Stamp Tax** -- Pursuant to Bankruptcy Code § 1146(c), (a) the issuance,

transfer or exchange of any securities, instruments or documents, (b) the creation of any other

Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease

or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant

to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds,

bills of sale or assignments executed in connection with the purchase of the Property by the

Purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or

sale of any real or personal property of the Debtor pursuant to, in implementation of, or as

contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness

by such means, and the making, delivery or recording of any deed or other instrument of transfer

under, in furtherance of, or in connection with, the Plan, including, without limitation, the

Confirmation Order, shall not be subject any applicable document recording tax, stamp tax,

conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or

governmental assessment including without limitation New York City Real Property Transfer

Tax and New York State Documentary Tax.

14

82.  **Execution of Documents** -- Pursuant to section 1142 of the Bankruptcy Code, upon the Effective Date, the Plan Administrator, the Disbursing Agent, the Debtor and any necessary party thereto, are directed to execute, release, and deliver all documents reasonably necessary to consummate the transactions contemplated by the terms and conditions of the Plan. The Proponent shall be authorized to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

83.  **Recording Documents** -- Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transaction contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and the Confirmation Order.

84.  **Property Turnover at Closing**. The Debtor shall turnover possession of the Property at closing together with all files and records pertaining to construction documents, Department of Buildings building permits, violations, architectural plans, leases, repair invoices, and tenant correspondence. If the Debtor fails to turnover possession, Proponent shall be entitled to submit a writ of assistance for Bankruptcy Court approval to obtain the assistance of the United States Marshal to remove the Debtor and its affiliates from the Property and effectuate turnover of the Property and all related files and records pertaining to construction documents,

Department of Buildings building permits, violations, architectural plans, leases, repair invoices, and tenant correspondence.

85.     **Property Marketing**. The Plan Administrator shall retain Aaron Jungreis Rosewood Realty Group to market the Property.  The Debtor shall cooperate with any broker, auctioneer, and/or real estate professional to permit reasonable access to the Property for marketing purposes.

86.     **Corporate Action**. Upon the entry of the Confirmation Order, all matters provided under the Plan involving the corporate structure of the Debtor shall be deemed authorized and approved without any requirement of further action by the Debtor, the Debtor's members, or the Debtor's boards of directors, managers, and/or managing members.

87.     **Manner of Payment**. Any payment of Cash made under the Plan may be made either by check drawn on a domestic bank, by wire transfer, or by automated clearing house transfer from a domestic bank, at the option of the Proponent.

88.     **Vesting of Property**. On the Effective Date, title to and possession of any and all property of the estate, real or personal, shall be re-vested in the Reorganized Debtor free and clear of all liens, claims, interests and encumbrances of any kind, subject to and except as otherwise provided in this Plan and the Confirmation Order.

## MANAGEMENT OF THE DEBTOR

89.     Post-confirmation management will remain unchanged, provided however, that the Plan shall be implemented by the Plan Administrator.

90.     The Plan Administrator shall be appointed on the Confirmation Date and the Plan Administrator, on behalf of the Debtor, shall take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan.

**(a)** Following the Confirmation Date, the Plan Administrator shall be responsible for the filing of all post-Confirmation reports required during such periods with the U.S. Trustee and payment of all post-Confirmation fees charged or assessed against the Estate under 28 U.S.C. § 1930 during such periods.

**(b)** The Plan Administrator shall be deemed a "party-in-interest" for purposes of filing and prosecuting objections to claims and Causes of Action.

**(c)** The Plan Administrator shall have the exclusive authority and duty to implement the sale of the Property and prosecution of Causes of Action under this Plan and accordingly shall exercise such rights and obligations of the Debtor in accordance with the Plan.

**(d)** The Plan Administrator and his professionals shall be compensated from the Plan Administrator Fund at a rate of $400 per hour. The Plan Administrator has agreed to retain Backenroth Frankel & Krinsky, LLP, as his bankruptcy counsel at a rate of $500 per hour, and may retain special litigation counsel at their customary rates. Professionals retained by the Plan Administrator shall not be required to file a fee application. The payment of the fees and expenses of the Plan Administrator and the Plan Administrator's retained professionals shall be made first from the Plan Administrator Fund, and then from the proceeds of Causes of Action.

**(e)** The Plan Administrator shall be authorized to obtain and pay for out of the Plan Administrator Fund all reasonably necessary insurance coverage for himself, his agents, representatives, employees, or other independent contractors, if necessary.

**(f)** The Plan Administrator may resign by giving not less than thirty (30) days' prior written notice to the Disbursing Agent. Such resignation shall become effective upon the Bankruptcy Court approval of a successor Plan Administrator.

**(g)** Upon the request of any party in interest, the Bankruptcy Court may remove the Plan Administrator for cause. For purposes of this paragraph, "cause" shall mean (I) an act of fraud, embezzlement or theft in connection with the Plan Administrator's duties or in the course of its engagement in such capacity, (ii) the intentional wrongful damage to the property of the Debtor, or (iii) gross neglect by the Plan Administrator of his duties under the Plan. Unless the Bankruptcy Court orders immediate removal, the Plan Administrator shall continue to serve until a successor Plan Administrator is appointed, and such appointment becomes effective, in accordance with the Plan.

**(h)** In the event of a vacancy by reason of the death, incapacity or immediate removal of the Plan Administrator or prospective vacancy by reason of resignation or removal, the Disbursing Agent shall appoint a successor Plan Administrator, which appointment shall be effective upon the approval of the Bankruptcy Court on not less than twenty (20) days' notice to parties who have filed a notice of appearance with the Bankruptcy Court during the chapter 11 case pursuant to Bankruptcy Rule 2002 and to all creditors of the Debtor, unless the Bankruptcy Court authorizes otherwise. Every successor Plan Administrator appointed hereunder shall execute, acknowledge, and file with the Bankruptcy Court an instrument accepting such appointment subject to the terms and provisions of the Plan. The successor Plan Administrator, without any further act, shall become vested with all the rights, powers, and duties of the Plan Administrator, provided, however, that no Plan Administrator shall be liable for the acts or omissions of any prior or later Plan Administrator.

**(i)** Unless otherwise ordered by the Bankruptcy Court, the death, resignation, or removal of the Plan Administrator shall not operate to terminate any agency or employment created by the Plan or invalidates any action theretofore taken by the Plan Administrator.

**(j)** The Plan Administrator shall have the right at any time to seek and rely upon instructions from the Bankruptcy Court concerning his duties under the Plan or any other document executed in connection therewith, and the Plan Administrator shall be entitled to rely upon such instructions in acting or failing to act and shall not be liable for any act taken or not taken in reliance thereon. In the absence of actual knowledge to the contrary, any person dealing with the Plan Administrator shall be entitled to rely on the authority of the Plan Administrator to act on behalf of the Debtor's estate and the Debtor, and shall have no obligation to inquire into the existence of such authority.

**(k)** After the Effective Date, the Plan Administrator shall maintain books and records but shall not be responsible for preparing and filing tax forms and returns as are required to be filed under applicable law.  The Interest Holder shall bear sole responsibility for filing tax forms and returns required under applicable law.

**(l)** The Plan Administrator shall turnover to the Interest Holder all books, records, and files that shall have been delivered to or created by the Plan Administrator as needed for the filing of tax forms and returns, and when such books, records, and files are no longer required.

**(m)** The Plan Administrator's duties shall cease upon the closing of this Case.

91.    Neither the Proponent, Plan Administrator, Disbursing Agent, nor any of their employees, advisors, attorneys, accountants, financial consultants, contractors, agents, and their successors and assigns, shall have or incur any liability to any Holder of a Claim or Interest,

18

or to any other entity, for any act or omission in connection with, related to, or arising out of, the pursuit of confirmation consummation, or other administration of the Plan or the property to be distributed or otherwise dealt with under the Plan, except for gross negligence or willful misconduct, and in all respects the Proponent, Plan Administrator, Disbursing Agent and each of their employees, advisors, attorneys, accountants, financial consultants, contractors, and agents shall be entitled to rely upon the advice of counsel with respect to its duties and responsibilities under the Plan. No current Holder of a Claim or Interest, representative thereof, shall have or pursue any claim or cause of action against the Proponent, Plan Administrator, or Disbursing Agent for making payments in accordance with the Plan, or for implementing the provisions of the Plan. Neither the Proponent, Plan Administrator, Disbursing Agent shall not be liable for obligations relating to Allowed Claims to the extent that Allowed Claims are not paid in full, other than as a result of the Disbursing Agent's gross negligence or willful misconduct.

## PRESERVATION OF CLAIMS

92.     All Causes of Action, including rights pursuant to Sections 502, 544, 545 and 546 of the Bankruptcy Code, all preference claims pursuant to Section 547 of the Bankruptcy Code, all fraudulent transfer claim pursuant to Section 548 of the Bankruptcy Code, and all claims relating to post-petition transactions under Section 549 of the Bankruptcy Code shall be preserved for the benefit of the Debtor's estate, provided, however, that the Plan Administrator shall have sole authority for prosecuting any such claims.

## DISTRIBUTIONS TO CREDITORS

93.     The Proponent shall be disbursing agent under the Plan without a bond. The Plan Administrator shall have the sole and exclusive right to file objections to claims in the

19

event grounds exist to object to particular claims. Claims objections must be filed no later than 60 days after the Effective Date.  On the initial distribution date and on each distribution date as may thereafter be necessary, the Proponent shall maintain an undetermined claims distribution reserve for the holders of undetermined claims as of such date in a sum not less than the amount required to pay each such undetermined claim if such claim was allowed in full.  To the extent that an undetermined claim becomes an Allowed Claim, the distributions reserved for such Allowed Claim, shall be released from the undetermined claims distribution reserve and paid to the holder of such Allowed Claim.  After all the amounts of all undetermined claims have been fixed, the balance of the undetermined claims distribution reserve shall thereafter be paid in accordance with the Plan.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

94.     Any and all pre-petition leases or executory contracts (a) not previously assumed or the subject of a motion to assume pending on the Confirmation Date and/or (b) not designated prior to the Confirmation Date as pre-petition leases or executory contracts to be assumed by the Proponent shall be deemed rejected by the Debtor.  In the event of a rejection which results in damages a Proof of Claim for such damages must be filed by the damaged party with the Court within thirty (30) days after the Effective Date.  All Allowed Claims arising from the rejection of any Executory Contract or unexpired lease shall be treated as an Unsecured Claim.  Any Claim arising from the rejection of any Executory Contract or unexpired lease not filed with the Court within the time period provided in the preceding paragraph above shall be deemed discharged and shall not be entitled to participate in any distribution under the Plan.

20

## RETENTION OF JURISDICTION

95.     Retention of Jurisdiction.  The Court shall have jurisdiction over all matters arising under, arising in, or relating to the Debtor's Bankruptcy Case including, but not limited to, proceedings: (a) to consider any modification of the Plan under section 1127 of the Bankruptcy Code; (b) to hear and determine all Claims, controversies, suits and disputes against the Debtor to the full extent permitted under 18 U.S.C. §1334 and 28 U.S.C. §157; (c) to hear, determine and enforce all Claims  and causes of action which may exist on behalf of the Debtor or the Debtor's estate, including, but not limited to, any right of the Debtor or the Debtor's Estate to recover assets pursuant to the provisions of the Bankruptcy Code; (d) to hear and determine all requests for compensation and/or reimbursement of expenses which may be made; (e) to value assets of the Estate; (f) To enforce the Confirmation Order, the final decree, and all injunctions therein; (g) to enter an order concluding and terminating the Bankruptcy Case; (h) to correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or the Confirmation Order; (i) to determine all questions and disputes regarding title to the assets of the Debtor; (j) to re-examine Claims which may have been allowed for purposes of voting, and (k) to determine objections which may be filed to any Claims.

## GENERAL PROVISIONS

96.     Headings.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the meaning of the Plan.

97.     Disputed Claims.  The Proponent shall hold in escrow the distribution that would be due on account of any Disputed Claim.  No Disputed Claims shall be paid, nor shall

distributions be made to a creditor holding a Disputed Claim, until such Claim becomes an Allowed Claim.

98.     Calculation of Time Periods.  Bankruptcy Rule 9006 is incorporated herein for purposes of calculating the dates set forth herein.

99.     Other Actions.  Nothing contained herein shall prevent the Proponent, Debtor, Interest Holders, or Creditors from taking such actions as may be necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan.

100.     Modification of Plan.  The Proponent may seek amendments or modifications to the Plan in accordance with section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date, the Proponent may seek to remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan

## INJUNCTION AND PROPERTY OF THE ESTATE

101.     Exculpation. Each of Proponent Disbursing Agent and Plan Administrator, its agents (acting in such capacity), and any professional person employed by Proponent Disbursing Agent and Plan Administrator shall not incur any liability to any Person and/or Entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, confirmation, or consummation of this Plan, the Disclosure Statement, or any other contract, instrument, release, or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Chapter 11 Case or this Plan; provided, however, that the foregoing exculpation from liability will not apply

22

to actions or omissions taken in bad faith or as a result of gross negligence or willful misconduct. Nothing in this Plan shall limit the liability of any professionals to their respective clients for malpractice pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

102.     Confirmation Injunction. Other than such liabilities and obligations otherwise assumed or provided hereunder, and as set forth in the Confirmation Order (a) the rights afforded herein and the treatment of all Claims and Interests herein, shall be in exchange for and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtor or any of its Assets and properties, (b) on the Effective Date, all such Claims against the Debtor shall be satisfied and released in full, and (c) all Persons shall be precluded from asserting and shall be permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) against the Debtor, its Assets or property, based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

103.     Discharge. On the Effective Date, except as otherwise expressly provided in this Plan or the Confirmation Order, the Confirmation of this Plan shall as of the Effective Date: (i) discharge the Debtor, the Reorganized Debtor and any of its Assets from all Claims, demands, liabilities and other debts that arose on or before the Effective Date, including, without limitation, all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (A) a proof of claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (B) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, (C) a Claim based on such debt is or has been disallowed by order of the

23

Bankruptcy Court, or (D) the holder of a Claim based on such debt has accepted this Plan; and (ii) preclude all Entities from asserting against the Debtor, the Reorganized Debtor or any of its Assets any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections 524 and 1141 of the Bankruptcy Code. The discharge provided in this provision shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim. The Debtor shall be discharged from any Claims and agreements related to debts that arose on or before the Effective Date and such debts, Claims and agreements are deemed restructured and new as set forth in the Plan.

## CLOSING THE CASE

104.    Upon substantial consummation, the Debtor or the Proponent may move for a final decree to close the Bankruptcy Case and to request such other orders as may be just.

Dated:  New York, New York
        April 30, 2019

Galster Funding LLC
Plan Proponent

By:     s/Robert Liner _____

BACKENROTH FRANKEL & KRINSKY, LLP
Attorneys for Proponent

By:     s/Mark Frankel _____
        800 Third Avenue
        Floor 11
        New York, New York 10022
        (212) 593-1100

24

## EXHIBIT A to Plan

## BIDDING AND AUCTION PROCEDURES

These Terms and Conditions of Sale are promulgated in connection with the auction sale (the "Sale") of the real property located at 4917 12th Avenue, Brooklyn, New York 11219 (the "Property").

Time and Place of Sale:  The Sale will be held on _____, 2019 at ____ __ m. at the offices of Backenroth Frankel & Krinsky, LLP, 800 Third Avenue New York, New York 10022.

Sale Pursuant to Chapter 11 Plan:  The Seller of the Property is 4921 12th Avenue, LLC (the "Debtor").  The sale shall be conducted pursuant to Bankruptcy Code section 363 and the Chapter 11 Plan of Reorganization (the "Plan") proposed by Galster Funding LLC, the Plan proponent ("Proponent").

Sale free and Clear of Liens:  The Sale of the Property shall be conducted pursuant to the Proponent's Plan of Reorganization free and clear of liens, claims, commercial leases not assumed under the Plan, and encumbrances, with any such liens, claims and encumbrances to attach to the sale proceeds, and disbursed under the Plan.

Qualification to Bid:   In order to be qualified to bid on the Property, within seven days prior to the commencement of the Sale, each prospective bidder (except the Proponent's nominee) must deliver to the Proponent (a) a bank check in the amount of Five Hundred Thousand Dollars ($500,000) (the "Qualifying Deposit") payable to "Backenroth Frankel & Krinsky, LLC, as Attorneys" (b) evidence reasonably demonstrating such bidder's ability to consummate a sale on the terms proposed, and (c) a written offer to purchase substantially in the form annexed hereto. No later than one business day before the Sale, each bidder will be notified by the Proponent as to whether the Proponent deems such bidder qualified to bid at the Sale.

Bidding: Bidding shall be conducted openly at the Sale.  The opening bid shall be three million, two hundred fifty thousand dollars ($3,250,000).  Minimum bidding increments shall be Fifty Thousand Dollars ($50,000.00).  Proponent or its designee may credit bid its full claim.

Successful Bidder Additional Deposit: At the Sale, once a bidder is determined to have made the highest or best bid for the Property at the Sale (the "Successful Bidder"), bidding shall be deemed closed and no additional bids will be considered.  Within one business day after the Successful Bidder is determined, the Successful Bidder (except for the Proponent's nominee) shall be required to increase the Qualifying Deposit to an amount equal to ten percent of the winning bid, which amount shall serve as a good faith deposit against payment of the Purchase

Price.  At the conclusion of the Sale, the Proponent's counsel will return the Qualifying Deposits to all other bidders.

Hearing to Approve Sale:  A hearing will be conducted by the Bankruptcy Court on approval of the sale and on any issue that may exist as to which competing bid is higher or better,  before the honorable Carla E. Craig on the ___ day of _____, 2019 _____, at the United States Bankruptcy Court 271 Cadman Plaza East, Brooklyn, New York.

Sale Approval Order:  the sale approval order ("Sale Order") shall approve the Sale, and in connection therewith, the Sale Order shall contain the following findings of fact and conclusions of law: (a) that the Terms and Conditions of the Sale are fair and reasonable, (b) that the Sale and the Purchaser's purchase, of the Property pursuant to the Plan, is non-collusive, fair and reasonable and was conducted openly and in good faith, (c) that the transfer of the Property to the Purchaser represents an arm's-length transaction and was negotiated in good faith between the parties, (d) that the Purchaser, as transferee of the Property, is a good faith Purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e) the sale of the Property to the Purchaser was not controlled by an agreement among potential purchasers, (f) that no cause of action exists against the Purchaser or with respect to the sale of the Property to the Purchaser under Bankruptcy Code § 363(n), and (g) that any claims under Bankruptcy Code § 363(n) or any other claims as against the Purchaser are hereby released, waived and discharged.

Closing:  The Successful Bidder must pay the balance of the Purchase Price for the Property (the difference between the amount of the successful bid and the Qualifying Deposit) to the Proponent, by bank check, or wire transfer at the closing of title to the Property (the "Closing"). The Successful Bidder must close title to the Property at a date that is no more than fifteen (15) days after the Order by the Bankruptcy Court is entered, TIME BEING OF THE ESSENCE as to the Successful Bidder, although such date may be extended solely by the Proponent.

Transfer Tax:  Under the Plan, pursuant to section 1146(c) Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the Purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject any applicable document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental assessment including without limitation New York State Documentary Tax.

2

Damages for Failure to Close:  Time is of the Essence as Against the Successful Bidder and the failure of the Successful Bidder to either timely pay the additional Qualifying Deposit or timely close for any reason whatsoever (except as otherwise provided below) including its failure to pay the balance of the Purchase Price on the Closing Date, will result in the Proponent retaining the deposit as liquidated damages and the termination of the Successful Bidder's right to acquire the Property under these Terms and Conditions of Sale.  The Successful Bidder shall be obligated to close title to the Property and there is no contingency of any kind or nature that will permit the Successful Bidder to cancel or avoid its obligation under these Terms and Conditions of Sale other than the Debtor's inability to deliver a bargain and sale deed to the Property.  Expenses incurred by the Successful Bidder, or any competing bidder relating to any due diligence, such as obtaining title reports or environmental inspections, shall be the sole responsibility of such bidder, and under no circumstances shall the Proponent or the Proponent's professionals be responsible for, or pay, such expenses.

Backup Bidder:  In the event that the Successful Bidder for the Property fails to tender the payment of the balance of the Purchase Price on the Closing Date, or otherwise perform any of its obligations under these Terms and Conditions of Sale, the Proponent, at its sole option, shall be authorized to sell the Property to the Second Highest Bidder without any further notice without giving credit for the Deposit forfeited by the Successful Bidder, and upon such other terms and conditions as the Proponent deems appropriate.  Should the Second Highest Bidder fail to close on the Property, within such time as the parties may agree but not to exceed thirty (30) days after notice from the Proponent to the Second Highest Bidder, the Proponent shall be authorized to sell the Property to the next highest or best bidder, without the necessity of any further notice.  All bidders will be bound by these Terms and Conditions of Sale, including, without limitation, those items set forth in the paragraphs above, except that the Second Highest Bidder must close within thirty (30) days of notification that his bid is accepted.  TIME IS OF THE ESSENCE.

No Representations:  the Proponent, the Proponent's professional, the Debtor, and the Debtor's professionals have not made and do not make any representations as to the physical condition, rents, leases, expenses, operations, value of the land or buildings thereon, or any other matter or thing affecting or related to the Property or the Sale, which might be pertinent to the purchase of the Property, including, without limitation, (i) the current or future real estate tax liability, assessment or valuation of the Property; (ii) the potential qualification of the Property for any and all benefits conferred by or available under federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated; (iii) the compliance or non-compliance of the Property, in its current or any future state, with applicable present or future zoning ordinances or other land use law or regulation, or the ability to obtain a change in the zoning or use, or a variance in respect to the Property; (iv) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Property from any source, including, but not limited to, any state, city or federal government or institutional lender; (v) the current or future use of the

3

Property; (vi) the present and future condition and operating state of any and all machinery or equipment on the Property and the present or future structural and physical condition of any building thereon or its suitability for rehabilitation or renovation; (vii) the ownership or state of title of any personal property on the Property; (viii) the presence or absence of any laws, ordinances, rule or regulations issued by any governmental authority, agency or board and any violations thereof; (ix) any present or future issues concerning subdivision or non-subdivision of the Property; or (x) the compliance or non-compliance with environmental laws and the presence or absence of underground fuel storage tanks, any asbestos or other hazardous materials anywhere on the Property.  Each bidder shall be deemed to have agreed and acknowledged that no such representations have been made.  the Proponent is not liable or bound in any manner by expressed or implied warranties, guaranties, promises, statements, representations or information pertaining to the Property, made or furnished by the Proponent or Debtor or any real estate broker agent, employee, servant or other person or professional representing or purporting to represent the Proponent or Debtor unless such warranties, guaranties, promises, statements, representations or information are expressly and specifically set forth in writing by the Proponent.  For the avoidance of doubt, neither the Debtor nor the Debtor's professionals are authorized to provide any such warranties, guaranties, promises, statements, representations or information.

<u>As Is Sale</u>: The Property is being sold free and clear of all liens, claims, commercial leases not assumed under the Plan and encumbrances, with any such liens, claims and encumbrances to attach to the net proceeds of sale after deduction of any expenses of sale.  Furthermore, the Property is being sold "AS IS", "WHERE IS" "WITH ALL FAULTS", without any representations, covenants, guarantees or warranties of any kind or nature whatsoever and subject to, among other things, (a) any state of facts that an accurate survey may show; (b) any covenants, restrictions and easements of record; (c) any state of facts a physical inspection may show; (d) any building or zoning ordinances or other applicable municipal regulations and violations thereof; and (e) environmental conditions, including, without limitation, the Property's compliance (or lack of compliance) with environmental laws and the presence or absence of underground fuel storage tanks, any hazardous materials or asbestos anywhere on the Property. By delivering their respective Qualifying Deposits, each bidder is deemed to have acknowledged that it has had the opportunity to review and inspect the Property, the state of title thereof and laws, rules and regulations applicable thereto, and will rely solely thereon and on its own independent investigations and inspections of the Property in making its bid.  Neither the Proponent nor any of its representatives make any representations or warrantees with respect to the permissible uses of the Property, including but not limited to, the zoning of the Property.  All bidders are deemed to have acknowledged that they have conducted their own due diligence in connection with the Property, and are not relying on any information provided by the Debtor, Proponent or their professionals.

<u>Deed</u>:  The Debtor, or the Proponent acting on the Debtor's behalf, shall convey the Property by delivery of a bargain and sale deed without covenants against grantor's acts.

4

Broker:  Except Aaron Jungreis and Rosewood Realty Group, neither the Debtor nor the Proponent nor their professionals are liable or responsible for the payment of fees of any broker.

Conduct of Sale: These Terms and Conditions of Sale will be read into the record, or specifically incorporated by reference, at the Sale of the Property.  By making a bid for the Property, all bidders will be required to acknowledge these Terms and Conditions of Sale and agree to be bound by them.

Failure to Close:  If the Debtor, or the Proponent on the Debtor's behalf, is unable to deliver title to the Property in accordance with these Terms and Conditions of Sale for any reason whatsoever or in the event that the Bankruptcy Court refuses to approve the sale of the Property pursuant, the Proponent's only obligation will be to refund the Deposit, together with interest earned thereon, if any, to the Successful Bidder, and upon such refund, the Successful Bidder will have no claim or recourse against the Proponent, the Debtor or their professionals.

Right to Withdraw Sale:  The Proponent reserves its right to withdraw the Property from the Sale, either prior or subsequent to the Sale, for any reasonable reason, as the Proponent deems necessary or appropriate.

Breakup Fee: None

Proponent's Designee:  Notwithstanding anything to the contrary herein, the Proponent shall be entitled to name a designee or designees who shall be deemed qualified to bid without posting a Qualifying Deposit or complying with the other requirements otherwise necessary to bid, and, if the Successful Bidder and Purchaser, shall be entitled to purchase the Property subject to some or all of the Proponent's mortgage.

Bankruptcy Court Jurisdiction:  The Bankruptcy Court shall determine any disputes concerning the Sale of the Property.  By participating in the Sale, all bidders consent to the jurisdiction of the Bankruptcy Court to determine such disputes under the Debtor's pending case.

5

CONTRACT dated as of the _____ day of _____, 2019 (this "Contract") , between 4921 12th Avenue, LLC, (the "Seller" or "Debtor") and _____ having an address at _____ _____ ("Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

1. Sale of Property

Paragraph 1.01. Seller shall sell or cause to be sold to Purchaser, and Purchaser shall purchase, at the price and upon the terms and conditions set forth in this Contract: the real property located at 4917 12th Avenue, Brooklyn, New York 11219 (the "Property").  The sale of the Property includes (a) all of its appurtenances, including any estate, right, title, interest, property, claim and demand of Seller in and to all streets, alleys, rights-of-way, sidewalks, easements, any adjoining gores or strips of land and utility lines or agreements, including, without limitation, all development rights and "air rights"; (b) all improvements, buildings and structures located on or at the Property and the facilities located thereon, and any apparatus, equipment, appliances and fixtures incorporated therein and used exclusively in connection with the operation and occupancy thereof; (c)  all plans, specifications, budgets, schedules, surveys, drawings, reports and governmental applications, permits, approvals and licenses issued by any federal, state or local governmental authority or agency pertaining to the ownership, operation, maintenance, development, construction or use of  the Property, including, without limitation, the building plans approved by the City of New York,  Department of Buildings on June 26, 2014 (collectively, the "Plans and Permits"); and (d) all of its rights and licenses in and to use the Plans and Permits.

Paragraph 1.02.   Purchaser acknowledges that the Sale shall be conducted pursuant to the Chapter 11 plan ("Plan") confirmation order confirming the Plan proposed by Galster Funding LLC (the "Plan Proponent" or Mortgagee") in the Debtor's bankruptcy case in the United States Bankruptcy Court for the Eastern District of New York (hereinafter the "Bankruptcy Court"), Case No. 18-47256.  The "Bidding and Auction Procedures" (hereinafter the "Bidding Procedures") annexed to the Plan are deemed annexed to this Contract.

Paragraph 1.03. Purchaser acknowledges that this sale is further subject to and governed by (1) the Orders of the Bankruptcy Court including the Plan confirmation order, (2) the provisions of the United States Bankruptcy Code (hereinafter the "Code"), and (3) the laws of the State of New York, to the extent they do not conflict with (1) and (2), above.

2. Purchase Price, Acceptable Funds

Paragraph 2.01. The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Property is (              ) Dollars or such other bid by the Purchaser approved by the Bankruptcy Court, payable as follows:

(A) on the signing of this Contract, by Purchaser's check payable to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to Bidding Procedures as defined in Article 3 hereof (the "Down Payment").

(B) THIS CONTRACT IS "ALL CASH" AS KNOWN IN THE COMMON PARLANCE.  PURCHASER'S OBLIGATIONS UNDER THIS CONTRACT ARE NOT CONDITIONED UPON PURCHASER'S ABILITY TO SECURE FINANCING OF ANY KIND OR NATURE.

(C) The balance at Closing (as hereinafter defined) in accordance with Section 2.02 hereof (the "Cash Balance")

Paragraph 2.02. All monies payable under this Contract, unless otherwise specified herein, shall be paid by (a) certified checks of Purchaser drawn on any federally insured bank, savings bank, trust company or savings and loan association having a banking office in the City of New York; (b) official bank checks drawn by any such banking institution, payable to the order of Seller (or as Seller shall direct) and bearing no endorsements; or (c) wire transfer of immediately available federal funds.  Attorney's Escrow Checks of Purchaser payable to the order of Seller (or as Seller directs) up to the amount of $1,000.00 in the aggregate shall be acceptable for sums other than the Purchase Price payable to Seller at Closing.

3. Escrow of Down Payment

Paragraph 3.01. (a) The Down Payment shall be paid by check or checks drawn to the order of and delivered to Backenroth Frankel & Krinsky LLP ("Escrowee").  The Escrowee shall hold the Down Payment in escrow in a non-interest-bearing IOLA Account until the Closing or sooner termination of this Contract and shall pay over or apply the Down Payment in accordance with the terms of this section.  At the Closing, the Down Payment shall be paid by Escrowee in accordance with Bidding Procedures.  If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within 10 business days after the giving of such notice, Escrowee is hereby authorized to make such payment.  If Escrowee does receive such written objection within such 10-day period or if for any other reason Escrowee in good

2

faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this Contract or pursuant to an order of the Bankruptcy Court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest, if any, thereon, with the clerk of the Bankruptcy Court. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this Contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this Contractor involving gross negligence on the part of the Escrowee.

(c) Escrowee or any member of its firm shall be permitted to act as counsel for Galster Funding LLC (the "Proponent" or the "Mortgagee") in any dispute as to the disbursement of the Down Payment or any other dispute between the parties whether or not Escrowee is in possession of the Down Payment and continues to act as Escrowee.

(d) Escrowee acknowledges receipt of the Down Payment by certified, bank check subject to collection or wire transmission and Escrowee's agreement to these provisions by signing in the place indicated on the signature page of this contact.

4. The Closing

Paragraph 4.01. The conveyance of title to the Property by the Seller to Purchaser, and payment of the Cash Balance by Purchaser shall take place 15 days following the entry of an Order approving the Contract and the transaction embodied therein if that is a business day, and if not, the following business day (the "Closing"). The Closing is to be held at the office of the Escrowee, or such other location as designated by the Proponent within the Southern District of New York. Purchaser will have a one time right to adjourn the Closing for up to five Business Days from the original date (such adjourned date, "Purchaser's Mandatory Closing Date"). Time is of the essence with respect to Purchaser's obligations to close title in accordance with this Contract on or before Purchaser's Mandatory Closing Date.

5.   Acknowledgments and Representations of Purchaser

Purchaser acknowledges and represents that:

3

Paragraph 5.01. Purchaser has inspected the Property, made all appropriate inquiries into the previous ownership and uses of the Property, is fully familiar with the physical condition and state of repair thereof, and shall accept the Property "as is" and in their present condition, including, without limitation, the environmental conditions as reflected in the Terms of Sale annexed hereto, without any reduction of the Purchase Price for any change in such condition by any reason thereof subsequent to the date of this Contract.  The Terms of Sale set forth conditions which Purchaser agrees to accept, including any covenant, easement, and/or deed restriction, and any other future obligation relating thereto.

Paragraph 5.02. Before entering into this Contract, Purchaser has made such examination of the Property, the physical condition and state of repair thereof including the environmental conditions. Purchaser acknowledges that it is an experienced real estate owner/operator and is relying solely on its own expertise and investigations and inspections in entering into this Contract and has not been induced by and has not relied upon any representations, warranties, or statements, whether express or implied, made by Seller or any agent, employee, or other representative of Seller or by any other person representing or purporting to represent Seller or Proponent, which are not expressly set forth in this Contract, whether or not any such representations, warranties or statements were made in writing or orally.

Paragraph 5.03. In the event of any default by the Purchaser in the terms of this Contract, the damages which are due to the Seller, by reason of said default, shall be deemed liquidated in the amount of the Down Payment, as Seller's sole remedy, it being agreed that Seller's damages in case of such default might be impossible to ascertain with mathematical precision and that the Down Payment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

Paragraph 5.04. Purchaser represents that (a) it has the legal power, right and authority to enter into this Agreement and to consummate the transactions contemplated hereby and that all requisite action has been taken by Purchaser in connection with the entering into this Contract and the consummation of the transactions contemplated hereby;  (b) this Contract and all documents required hereby to be executed by Purchaser are and will be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms (c) Purchaser, and all direct or indirect beneficial owners of Purchaser, are in compliance with all applicable laws, statutes, rules and regulations of any federal, state or local governmental authority in the United States of America, including the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) (the "Order") and other similar requirements contained in the rules and regulations of the Office of Foreign Asset Control, Department of the Treasury ("OFAC") and in any related enabling legislation or other Executive Orders (collectively, the "Orders"). Neither Purchaser nor any of the direct or indirect beneficial owners of Purchaser  (i) is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "Lists") or is owned or controlled by, or acts for or on behalf

of, any Person on the Lists or who has been determined by competent authority to be subject to the prohibitions contained in the Orders; (ii) has been arrested for money laundering or for predicate crimes to money laundering, convicted or pled nolo contendere to charges involving money laundering or predicate crimes to money laundering; or (iii) has been determined by competent authority to be subject to the prohibitions contained in the Orders; (iv) is owned or controlled by, nor acts for or on behalf of, any natural person or entity (a "Person") on the Lists or any other Person who has been determined by competent authority to be subject to the prohibitions contained in the Orders; (v) will transfer or permit the transfer of any interest in Purchaser or such parties to any Person who is, or whose beneficial owners are, listed on the Lists; or (vi) will assign this Agreement or any interest herein, to any Person who is listed on the Lists or who is engaged in illegal activities.

6.  Destruction, Damage or Condemnation

Paragraph 6.01. The provisions of Section 5-1311 of the General Obligations Law shall not apply to the sale and purchase provided for in this Contract and Purchaser agrees to close title to the Property regardless of any destruction, damage or condemnation that occurs after the execution and delivery of this Contract.

7.  Seller's Closing Obligations

At the closing, Seller, or the Plan Proponent on the Seller's behalf, shall execute and/or deliver or cause to be executed and/or delivered to Purchaser the following:

Paragraph 7.01. A bargain and sale deed without covenants against grantor's acts, executed by the Debtor, or the Plan Proponent on the Debtor's behalf, in proper form for recording so as to convey to Purchaser the fee title to the Property, subject to recorded encumbrances and the other conditions of this Contract.

Paragraph 7.02. All required New York City and State transfer tax returns executed by the Debtor, or the Plan Proponent on the Debtor's behalf, to be issued at the Closing and delivered to the representative of Purchaser's title company for delivery to the appropriate public officers promptly after the Closing.

Paragraph 7.03. The right to possession of the Property in condition required by this Contract, subject to the provisions hereinabove and to the provisions of the Code and the laws of the State of New York governing the rights to possession upon the conveyance of the deed subject to any Order of the Bankruptcy Court and the Bidding Procedures. Seller shall not be obligated to bring any motion or proceeding for the purpose of obtaining possession of any part of the Property, or to remove any tenant or occupant therefrom after delivery of the Deed.

5

Paragraph 7.04. An assignment of all of Seller's right, title and interest in and to the Plans and Permits in the form attached hereto as Exhibit A executed by Seller, or the Plan Proponent on the Seller's behalf.

Paragraph 7.05.  Any other documents required by this Contract or by law to be delivered by Seller to consummate this transaction.

8.  Purchaser's Closing Obligations

At the Closing, Purchaser shall execute and/or deliver:

Paragraph 8.01.  The Cash Balance to the Mortgagee.

Paragraph 8.02.  All required New York City and State transfer tax returns, and cause all such returns to be issued at the Closing and delivered to the representative of Purchaser's title company for delivery to the appropriate public officers promptly after the Closing.  Purchaser will pay any and all applicable transfer taxes and recording fees.

Paragraph 8.03.  Any other documents required by this Contract or by law or reasonably required by Seller to be executed and/or delivered by Purchaser to consummate this transaction.

9.  Apportionments

Paragraph 9.01. The parties specifically acknowledge that there shall be no apportionments made as of the date of Closing, whether for taxes, water or sewer charges, emergency repair liens, assessments, rents, fuel, or any other matters relating hereto.

10.  Objections to Sale

Paragraph 10.01. This Contract shall automatically terminate if the Court rejects the Sale or if Seller shall be unable to cause title to the Property to be conveyed to Purchaser at the Closing Date or any adjournments thereof in accordance with the provisions of this Contract and the Bidding Procedures.  Purchaser nevertheless may elect either (i) to accept such title as Seller may be able to convey, but without any abatement of or other credit to the Purchase Price or liability on the part of Seller; or (ii) to terminate this Contract. The sole liability of Seller shall be to refund the Down Payment and interest thereon, if any, to the Purchaser and this Contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability. Neither Seller nor Mortgagee shall be required to bring any action or proceeding or to incur any expense to cure any title defect or to enable Seller otherwise to comply with the provisions of this Contract, except as may otherwise be provided in this Contract.

Paragraph 10.02. Purchaser shall take title to the Property "as is" and subject to: any state of facts an accurate survey may show; encroachments, covenants, easements, and restrictions of

6

record, if any; violations, fines, penalties, zoning regulations, and ordinances of the City of New York.  Purchaser is aware of and agrees to the Terms of Sale which are attached to this Contract and which are incorporated in this Contract by this reference as though fully set forth herein at length.

11.  Notices

Paragraph 11.01. All notices under this Contract shall be in writing and shall be delivered personally, by nationally recognized overnight courier, addressed to Mortgagee's Attorney, on behalf of the Seller, at the address set forth below, and to Purchaser addressed to Purchaser's Attorney at the address set forth below.

Mortgagee's attorneys, Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, New York, New York 10022.

Purchaser's Attorney:

12.  Limitations on Survival of Representations, Warranties, Covenants and other Obligations

Paragraph 12.01. Except as otherwise expressly set forth in this Contract, no representations, warranties, covenants or other obligations of Seller or Plan Proponent and/or Purchaser set forth herein shall survive the Closing except as specifically provided to survive, and no action based thereon shall be commenced after the Closing except as to such representations specifically provided to survive.

Paragraph 12.02. The delivery of the deed by the Seller and the acceptance thereof by Purchaser shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations, if any, of Seller which are expressly stated in this Contract to survive.

13.  Assignment of Contract

Paragraph 13.01.  Purchaser shall not assign this Contract or its rights hereunder without the prior written consent of the Proponent, whose consent will not be unreasonably withheld or delayed. Additionally, Purchaser may assign its rights under this Contract, but only immediately before the Closing and only simultaneously with the payment of the Cash Balance, to any wholly owned subsidiary of Purchaser, or to any entity in which Purchaser, or its principals, has an equity interest of at least fifty-one (51%) percent and control of management (a "Controlled Entity"), upon appropriate proof of same delivered to Proponent.  Any purported assignment without Proponent's consent or that is not to a Controlled Entity with proof of such relationship

7

given to Proponent shall be void.  Any sale, transfer or assignment of any interests in Purchaser will be deemed an assignment of this Contract and is subject to the same conditions as an assignment of this Contract. Nevertheless, an assignment of Purchaser's rights under this Contract, if and when consented to by Proponent, shall not be effective unless and until an executed counterpart of the instrument of assignment and of an assumption agreement by the assignee shall have been delivered to Proponent.

Paragraph 13.02.  Seller shall assign pending tax certiorari actions, if any, to Purchaser without any representations or warranties, and without any further obligation of Seller, except to execute such documents as may be necessary to effectuate such assignment.

14.  Miscellaneous Provisions

Paragraph 14.01 THE PROVISIONS OF THE BIDDING PROCEDURES AND THE ORDERS OF THE COURT ARE A PART OF THIS CONTRACT. ANY CONFLICT WITH SUCH IN THIS CONTRACT WILL NOT BE DEEMED TO AMEND OR ALTER SAID PROCEDURES OR ORDERS.

Paragraph 14.02. Subject to the provisions of Paragraph 14.01, this Contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated hereby, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended, discharged, or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in such instrument.

Paragraph 14.03.  This Contract shall be governed by, and construed in accordance with, the Code and the Orders of the Bankruptcy Court and, where it does not conflict with the Code or any Order of the Bankruptcy Court or the Bidding Procedures, the laws of the State of New York. The Bankruptcy Court shall have the exclusive jurisdiction to determine any disputes concerning the sale of the Property or any other matters under this Contract.

Paragraph 14.04. The captions in this Contract are inserted for convenience or reference only and in no way define, describe, or limit the scope or intent of this Contract or any of the provisions hereof.

Paragraph 14.05. This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

Paragraph 14.06. This Contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser, together with all amounts required to be paid pursuant to 2.0l (A) hereto.  This Contract may be executed in counterparts each of which will constitute an original and all of which, when taken together, will constitute one and the same agreement.  A

8

signed counterpart of this Contract delivered by electronic transmission will be treated as an original.

Paragraph 14.07. As used in this Contract, the masculine shall include the feminine and neuter, the singular shall include the plural, and the plural shall include the singular, as the context may require.

Paragraph 14.08. Subject to Paragraph 14.01, if the provisions of any schedule or rider to this Contract are inconsistent with the provisions of this Contract, the provisions of such schedule or rider shall prevail.

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the date first above written.

4921 12th Avenue, LLC, Seller                                    Purchaser:


By: _____              By: _____
    Name:                                                         Name:
    Title:                                                          Title:
Backenroth Frankel & Krinsky, LLP, Escrowee:


By: _____
    Name:
    Title:

9

## EXHIBIT B to DISCLSOURE STATEMENT

## ASSETS AND LIABILITIES AS OF PETITION DATE

| Assets | |
|---|---|
| Real Property and misc. personal property | $10,000,000 |

| Liabilities | |
|---|---|
| Administration Claims | $500,000 |
| New York City real estate tax, water, sewer and other liens. | $0.00 |
| Galster Funding LLC | $9,480,175 |
| Old Republic | $19,825 |
| Priority Claims under Sections 507(a)(2), (3), (4), (5), (6), and (7) of the Bankruptcy Code. | 0 |
| General Unsecured Claims | $12,480,175 |
| **Total** | $10,000,000 |

## CHAPTER 7 LIQUIDATION ANALYSIS AS OF PETITION DATE

| Assets | |
|---|---|
| Real Property and misc. personal property | $10,000,000 |

| Liabilities | |
|---|---|
| Administration Claims | $1,200,000 |
| New York City real estate tax, water, sewer and other liens. | $0.00 |
| Galster Funding LLC | $8,800,000 |
| Priority Claims under Sections 507(a)(2), (3), (4), (5), (6), and (7) of the Bankruptcy Code. | 0 |
| General Unsecured Claims | 0 |
| Equity | 0 |
| **Total** | $10,000,000 |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re                                                              Chapter 11

      4921 12th Avenue, LLC                      Case no.  18-47256

                        Debtor.
---------------------------------------------------------x

## NOTICE OF HEARING ON DISCLOSURE STATEMENT APPROVAL

        PLEASE TAKE NOTICE, that upon the annexed scheduling order, a hearing will be held before the Honorable Carla E. Craig at the United States Bankruptcy Court, 271 Cadman Plaza East, Brooklyn, New York, on May 29, 2019 at 3:00 p.m., or as soon thereafter as counsel can be heard, to consider the application ("Application") of  Galster Funding LLC ("Proponent") for entry of an order substantially in the form annexed hereto, approving the Proponent's disclosure statement filed on April 30, 2019 ("Disclosure Statement") in the above-captioned case of 4921 12th Avenue, LLC (the "Debtor").

        PLEASE TAKE FURTHER NOTICE, that a copy of the Disclosure Statement is filed with the Clerk of the Bankruptcy Court and is also available upon request of the undersigned at mfrankel@bfklaw.com.

        PLEASE TAKE FURTHER NOTICE, that objections, if any, must be in writing, served upon the undersigned proposed Debtor's counsel, and filed with the Clerk of the Bankruptcy Court, 271 Cadman Plaza East, Brooklyn, New York, and served upon the undersigned so as to be received on or before May 22, 2019.


Dated: New York, New York
       April 30, 2019

                              BACKENROTH FRANKEL & KRINSKY, LLP
                              Attorneys for the Debtor

                              By: s/Mark A. Frankel
                                   800 Third Avenue
                                   New York, New York  10022
                                   (212) 593-1100

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re                                                                                    Chapter 11

      4921 12th Avenue, LLC                                  Case no.  18-47256

              Debtor.
--------------------------------------------------------x

## ORDER APPROVING DISCLOSURE STATEMENT

        A Disclosure Statement ("Disclosure Statement") under chapter 11 of the Bankruptcy Code having been filed by Galster Funding LLC ("Proponent") on April 30, 2019, referring to the Plan of Reorganization filed by the Proponent on April 30, 2019 ("Plan"); and it having been determined after hearing on notice that the Disclosure Statement contains adequate information;

        IT IS ORDERED, and notice is hereby given that:

      A.     The Disclosure Statement is approved.

      B.     _____, 2019 at 5:00 p.m. is fixed as the last day for submitting written acceptances or rejections to the Plan referred to above, and ballots indicating acceptance or rejection of the Plan must be received by Backenroth Frankel & Krinsky, LLP, at its offices located at 800 Third Avenue, New York, New York 10022, on or before _____, 2019, at 5:00 p.m. (EST), in order to be counted with regard to acceptance or rejection of the Plan.

      C.     Within 3 days after entry of this order, the Plan, the Disclosure Statement, and a ballot substantially in the form annexed hereto conforming to Official Form 14, shall be mailed to creditors, equity security holders and other parties in interest, and shall be transmitted to the United States Trustee as provided in Fed. R. Bankr. P. 3017(d).

      D.     _____, 2019 at _____ ____.m., or as soon thereafter as counsel may heard, is fixed for the hearing on confirmation of the Plan (the "Hearing"), before the Honorable Carla E. Craig at the United States Bankruptcy Court, 271 Cadman Plaza East, Brooklyn, New York

      E.     _____, 2019 at 5:00 p.m. (EST) is fixed as the last day for filing and serving written objections to confirmation of the Plan pursuant to Fed. R. Bankr. P. 3020(b)(1), which objections must be filed, served and received by the Proponent's attorneys and the Clerk of Court, with a courtesy copy to the Honorable Carla E. Craig at the United States Bankruptcy Court, 271 Cadman Plaza East, Brooklyn, New York

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x

In re                                                                 Chapter 11

       4921 12th Avenue, LLC                           Case no.  18-47256

                   Debtor.
---------------------------------------------------------x

## BALLOT FOR ACCEPTING OR REJECTING PLAN OF REORGANIZATION

       Galster Funding LLC ("Proponent") filed a Plan of Reorganization dated April ___, 2019 (the "Plan") for the Debtor.  The Court has provisionally approved the Proponent's Disclosure Statement with respect to the Plan (the "Disclosure Statement"). The Disclosure Statement provides information to assist you in deciding how to vote your ballot. If you do not have a Disclosure Statement, you may obtain a copy from Mark Frankel, Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, New York, New York, 10022, (212) 593-1100.  Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court.

       You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan. Your claim has been placed in class ___ under the Plan. If you hold claims or equity interests in more than one class, you will receive a ballot for each class in which you are entitled to vote.

       If your ballot is not received by Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, New York, New York, 10022 on or before _____, 2019 at 5:00 p.m., and such deadline is not extended, your vote will not count as either an acceptance or rejection of the Plan.

       If the Plan is confirmed by the Bankruptcy Court it will be binding on you whether or not you vote.

1

## <u>ACCEPTANCE OR REJECTION OF THE PLAN</u>

         The undersigned, the holder of a Class ___ claim against the Debtor in the unpaid

amount of Dollars ($_____)

(Check one box only)

[ ] ACCEPTS THE PLAN   [ ] REJECTS THE PLAN

Dated: _____

Print or type name of Creditor: _____

Signature: _____

Title (if corporation or partnership) _____

Address:

_____

_____

_____

_____

**Return this ballot so as to be received on or before _____, 2019 at 5:00 p.m. by Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, New York, New York 10022.**

2

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

IN RE:  4921 12TH AVENUE LLC

CASE NO: 18-47256

**DECLARATION OF MAILING
CERTIFICATE OF SERVICE**

Chapter: 11

On 5/1/2019, I did cause a copy of the following documents, described below,

Notice of Hearing

Disclosure Statement

to be served for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

I caused these documents to be served by utilizing the services of BK Attorney Services, LLC d/b/a certificateofservice.com, an Approved Bankruptcy Notice Provider authorized by the United States Courts Administrative Office, pursuant to Fed.R. Bankr.P. 9001(9) and 2002(g)(4).  A copy of the declaration of service is attached hereto and incorporated as if fully set forth herein.

Parties who are participants in the Courts Electronic Noticing System ("NEF"), if any, were denoted as having been served electronically with the documents described herein per the ECF/PACER system.

DATED: 5/1/2019

/s/ Mark Frankel
Mark Frankel  1989
Backenroth Frankel & Krinsky, LLP
800 Thrid Avenue
New York, NY  10022-0000
212 593 1100

116

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

IN RE:  4921 12TH AVENUE LLC

CASE NO: 18-47256

**CERTIFICATE OF SERVICE**
**DECLARATION OF MAILING**

Chapter: 11

On 5/1/2019, a copy of the following documents, described below,

Notice of Hearing

Disclosure Statement

were deposited for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

The undersigned does hereby declare under penalty of perjury of the laws of the United States that I have served the above referenced document (s) on the mailing list attached hereto in the manner shown and prepared the Declaration of Certificate of Service and that it is true and correct to the best of my knowledge, information, and belief.

DATED: 5/1/2019

Jay S. Jump
BK Attorney Services, LLC
d/b/a certificateofservice.com, for
Mark Frankel
Backenroth Frankel & Krinsky, LLP
800 Thrid Avenue
New York, NY  10022-0000

PARTIES DESIGNATED AS "EXCLUDED" WERE NOT SERVED VIA USPS FIRST CLASS MAIL SERVICE.
PARTIES WITH A '+' AND DESIGNATED AS "CM/ECF E-SERVICE" RECEIVED ELECTRONIC NOTICE THROUGH THE CM/ECF SYSTEM

CASE INFO
  LABEL MATRIX FOR LOCAL NOTICING
02071
CASE 1-18-47256-CEC
EASTERN DISTRICT OF NEW YORK
BROOKLYN
WED MAY 1 11-43-16 EDT 2019

DEBTOR
4921 12TH AVENUE LLC
4921 12TH AVENUE
BROOKLYN NY 11219-3040

OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPAN
521 5TH AVENUE
23RD FLOOR
NEW YORK NY 10175-2399

271 C CADMAN PLAZA EAST SUITE 1595
BROOKLYN NY 112011801

BEIS CHASIDEI GORLITZ
CO BERKMAN HENOCH ET AL
100 GARDEN CITY PLAZA
GARDEN CITY NY 11530-3203

BEIS CHASIDEI GORLITZ
CO HERRICK FEINSTEIN LLP
2 PARK AVENUE
NEW YORK NY 10016-5702

BUTLER FITZGERALD FIVESON  MCCARTHY PC
9 EAST 45TH STREET NINTH FLOOR
NEW YORK NEW YORK 10017-8456

GALSTER FUNDING LLC
9 EAST 45TH ST 9TH FLOOR
NEW YORK NY 10017-8456

GALSTER FUNDING LLC
9 EAST 45TH STREET NINTH FLOOR
NEW YORK NY 10017-2425

GALSTER FUNDING LLC
CO BACKENROTH FRANKEL  KRINKSY LLP
800 3RD AVE FL 11
NEW YORK NY 10022-7651

GALSTER FUNDING LLC
CO HARRY ZUBLI ESQ
1010 NORTHERN BOULEVARD SUITE 310
GREAT NECK NY 11021-5329

INTERNAL REVENUE SERVICE
PO BOX 7346
PHILADELPHIA PA 19101-7346

OFFICE OF THE UNITED STATES TRUSTEE
EASTERN DISTRICT OF NY BROOKLYN OFFICE
US FEDERAL OFFICE BUILDING
201 VARICK STREET SUITE 1006
NEW YORK NY 10014-9449

OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPAN
CO BUTLER FITZGERALD FIVESON
MCCARTHY PC
9 EAST 45TH STREET 9TH FLOOR
NEW YORK NEW YORK 10017-8456

OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPAN
A FLORIDA CORPORATION
CO BUTLER FITZGERALD FIVESON  MCCARTHY
NINE EAST 45TH STREET NINTH FLOOR
NEW YORK NY 10017-2425

J TED DONOVAN
GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
1501 BROADWAY
22ND FLOOR
NEW YORK NY 10036-5600

JOSEPH Y BALISOK
BALISOK  KAUFMAN PLLC
251 TROY AVENUE
BROOKLYN NY 11213-3601

MICHAEL LEVINE
LEVINE  ASSOCIATES PC
15 BARCLAY ROAD
SCARSDALE NY 10583-2707

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
In re                                                     Chapter 11

      4921 12th Avenue, LLC                             Case no.  18-47256

                Debtor.
---------------------------------------------------------x

## ORDER APPROVING DISCLOSURE STATEMENT

       A Disclosure Statement ("Disclosure Statement") under chapter 11 of the Bankruptcy Code having been filed by Galster Funding LLC ("Proponent") on ~~April 30~~, ***May 1, (CEC)*** 2019 (ECF Doc. No. 52), referring to the Plan of Reorganization filed by the Proponent on ~~April 30~~, ***May 1, (CEC)*** 2019 ("Plan") (ECF Doc. No. 51); and upon the objection filed by the Debtor filed on May 28, 2019 (ECF Doc. No. 74) (the "Objection"); and upon the hearing on the adequacy of the Disclosure Statement held on May 29, 2019 (the "Hearing); and the Court overruling the Objection at the Hearing; and it having been determined at the Hearing on notice that the Disclosure Statement contains adequate information;

       IT IS ORDERED, and notice is hereby given that:

       A.    The Disclosure Statement is approved and any objections to the Disclosure Statement are overruled.

       B.    July 8, 2019 at 5:00 p.m. is fixed as the last day for submitting written acceptances or rejections to the Plan referred to above, and ballots indicating acceptance or rejection of the Plan must be received by Backenroth Frankel & Krinsky, LLP, at its offices located at 800 Third Avenue, New York, New York 10022, on or before July 8, 2019, at 5:00 p.m. (EST), in order to be counted with regard to acceptance or rejection of the Plan.

       C.    Within 3 days after entry of this order, the Plan (ECF Doc. No. 51), the Disclosure Statement (ECF Doc. No. 52), and a ballot substantially in the form annexed hereto conforming to Official Form 14, shall be mailed to creditors, equity security holders and other parties in interest, and shall be transmitted to the United States Trustee as provided in Fed. R. Bankr. P. 3017(d).

       D.    July 17, 2019 at 3:00 p.m., or as soon thereafter as counsel may heard, is fixed for the hearing on confirmation of the Plan (the "Hearing"), before the Honorable Carla E. Craig at the United States Bankruptcy Court, 271 Cadman Plaza East, Brooklyn, New York

E.     July 8, 2019 at 5:00 p.m. is fixed as the last day for filing and serving written objections to confirmation of the Plan pursuant to Fed. R. Bankr. P. 3020(b)(1), which objections must be filed, served and received by the Proponent's attorneys and the Clerk of Court, with a courtesy copy to the Honorable Carla E. Craig at the United States Bankruptcy Court, 271 Cadman Plaza East, Brooklyn, New York



**Dated: Brooklyn, New York**
**June 10, 2019**

2

<u>_Carla E. Craig_</u>
**Carla E. Craig**
**United States Bankruptcy Judge**

120

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x

In re                                                                    Chapter 11

       4921 12th Avenue, LLC                              Case no.  18-47256

                       Debtor.
----------------------------------------------------------x

## BALLOT FOR ACCEPTING OR REJECTING PLAN OF REORGANIZATION

        Galster Funding LLC ("Proponent") filed a Plan of Reorganization dated April ___, 2019 (the "Plan") for the Debtor.  The Court has provisionally approved the Proponent's Disclosure Statement with respect to the Plan (the "Disclosure Statement"). The Disclosure Statement provides information to assist you in deciding how to vote your ballot. If you do not have a Disclosure Statement, you may obtain a copy from Mark Frankel, Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, New York, New York, 10022, (212) 593-1100.  Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court.

        You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan. Your claim has been placed in class ___ under the Plan. If you hold claims or equity interests in more than one class, you will receive a ballot for each class in which you are entitled to vote.

        If your ballot is not received by Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, New York, New York, 10022 on or before July 8, 2019 at 5:00 p.m., and such deadline is not extended, your vote will not count as either an acceptance or rejection of the Plan.

        If the Plan is confirmed by the Bankruptcy Court it will be binding on you whether or not you vote.

1

<u>**ACCEPTANCE OR REJECTION OF THE PLAN**</u>

        The undersigned, the holder of a Class ___ claim against the Debtor in the unpaid

amount of Dollars ($_____)

(Check one box only)

[ ] ACCEPTS THE PLAN   [ ] REJECTS THE PLAN

Dated: _____

Print or type name of Creditor: _____

Signature: _____

Title (if corporation or partnership) _____

Address:

_____

_____

_____

_____

**Return this ballot so as to be received on or before July 8, 2019 at 5:00 p.m. by Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, New York, New York 10022.**

2

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

IN RE:  4921 12TH AVENUE LLC

CASE NO: 18-47256

**DECLARATION OF MAILING**
**CERTIFICATE OF SERVICE**

Chapter: 11

On 6/11/2019, I did cause a copy of the following documents, described below,

Disclosure Statement and Plan

Ballot Class 3

Ballot Class 5

to be served for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

I caused these documents to be served by utilizing the services of BK Attorney Services, LLC d/b/a certificateofservice.com, an Approved Bankruptcy Notice Provider authorized by the United States Courts Administrative Office, pursuant to Fed.R. Bankr.P. 9001(9) and 2002(g)(4).  A copy of the declaration of service is attached hereto and incorporated as if fully set forth herein.

Parties who are participants in the Courts Electronic Noticing System ("NEF"), if any, were denoted as having been served electronically with the documents described herein per the ECF/PACER system.

DATED: 6/11/2019

/s/ Mark Frankel
Mark Frankel  1989
Backenroth Frankel & Krinsky, LLP
800 Thrid Avenue
New York, NY  10022-0000
212 593 1100

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

IN RE:  4921 12TH AVENUE LLC

CASE NO: 18-47256

**CERTIFICATE OF SERVICE**
**DECLARATION OF MAILING**

Chapter: 11

On 6/11/2019, a copy of the following documents, described below,

Disclosure Statement and Plan

Ballot Class 3

Ballot Class 5

were deposited for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

The undersigned does hereby declare under penalty of perjury of the laws of the United States that I have served the above referenced document (s) on the mailing list attached hereto in the manner shown and prepared the Declaration of Certificate of Service and that it is true and correct to the best of my knowledge, information, and belief.

DATED: 6/11/2019

Jay S. Jump
BK Attorney Services, LLC
d/b/a certificateofservice.com, for
Mark Frankel
Backenroth Frankel & Krinsky, LLP
800 Thrid Avenue
New York, NY  10022-0000

Case 1-18-47256-reg Doc 168 Filed 06/23/20 Entered 06/23/20 09:55:43

PARTIES DESIGNATED AS "EXCLUDE" WERE NOT SERVED VIA USPS FIRST CLASS MAIL.
PARTIES WITH A '+' AND DESIGNATED AS "CM/ECF E-SERVICE" RECEIVED ELECTRONIC NOTICE THROUGH THE CM/ECF SYSTEM

| | | |
|---|---|---|
| CASE INFO | DEBTOR | CULHANE MEADOWS PLLC |
| LABEL MATRIX FOR LOCAL NOTICING | 4921 12TH AVENUE LLC | 100 PARK AVENUE |
| 02071 | 4921 12TH AVENUE | 16TH FLOOR |
| CASE 1-18-47256-CEC | BROOKLYN NY 11219-3040 | NEW YORK NY 10017-5538 |
| EASTERN DISTRICT OF NEW YORK | | |
| BROOKLYN | | |
| TUE JUN 11 14-39-58 EDT 2019 | | |

| | | |
|---|---|---|
| OLD REPUBLIC NATIONAL TITLE INSURANCE COMPAN | 271 C CADMAN PLAZA EAST SUITE 1595 BROOKLYN NY 112011801 | BEIS CHASIDEI GORLITZ CO BERKMAN HENOCH ET AL |
| 521 5TH AVENUE | | 100 GARDEN CITY PLAZA |
| 23RD FLOOR | | GARDEN CITY NY 11530-3203 |
| NEW YORK NY 10175-2399 | | |

| | | |
|---|---|---|
| BEIS CHASIDEI GORLITZ | BUTLER FITZGERALD FIVESON MCCARTHY PC | GALSTER FUNDING LLC |
| CO HERRICK FEINSTEIN LLP | 9 EAST 45TH STREET NINTH FLOOR | 9 EAST 45TH ST 9TH FLOOR |
| 2 PARK AVENUE | NEW YORK NEW YORK 10017-8456 | NEW YORK NY 10017-8456 |
| NEW YORK NY 10016-5702 | | |

| | | |
|---|---|---|
| GALSTER FUNDING LLC | GALSTER FUNDING LLC | GALSTER FUNDING LLC |
| 9 EAST 45TH STREET NINTH FLOOR | CO BACKENROTH FRANKEL KRINKSY LLP | CO HARRY ZUBLI ESQ |
| NEW YORK NY 10017-2425 | 800 3RD AVE FL 11 | 1010 NORTHERN BOULEVARD SUITE 310 |
| | NEW YORK NY 10022-7651 | GREAT NECK NY 11021-5329 |

| | | |
|---|---|---|
| INTERNAL REVENUE SERVICE | OFFICE OF THE UNITED STATES TRUSTEE | OLD REPUBLIC NATIONAL TITLE INSURANCE COMPAN |
| PO BOX 7346 | EASTERN DISTRICT OF NY BROOKLYN OFFICE | CO BUTLER FITZGERALD FIVESON |
| PHILADELPHIA PA 19101-7346 | US FEDERAL OFFICE BUILDING | MCCARTHY PC |
| | 201 VARICK STREET SUITE 1006 | 9 EAST 45TH STREET 9TH FLOOR |
| | NEW YORK NY 10014-9449 | NEW YORK NEW YORK 10017-8456 |

| | | |
|---|---|---|
| OLD REPUBLIC NATIONAL TITLE INSURANCE COMPAN | ALLA KACHAN | J TED DONOVAN |
| A FLORIDA CORPORATION | 3099 CONEY ISLAND AVENUE | GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP |
| CO BUTLER FITZGERALD FIVESON MCCARTHY | 3RD FLOOR | 1501 BROADWAY |
| NINE EAST 45TH STREET NINTH FLOOR | BROOKLYN NY 11235-6305 | 22ND FLOOR |
| NEW YORK NY 10017-2425 | | NEW YORK NY 10036-5600 |

JOSEPH Y BALISOK
BALISOK KAUFMAN PLLC
251 TROY AVENUE
BROOKLYN NY 11213-3601

Case 1:18-47256-reeg   Doc 168   Filed 01/03/20   Entered 01/03/20 16:53:54
Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 126 of 552 PageID #: 404

1

```
 1           May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

 2                     UNITED STATES BANKRUPTCY COURT
                        EASTERN DISTRICT OF NEW YORK
 3
     4921 12TH AVENUE LLC            .   Case No. 18-47256
 4                                   .   Brooklyn, NY
     . . . . . . . . . . . . . . . . .   May 29, 2019
 5
                     BEFORE THE HONORABLE CARLA E. CRAIG
 6                     UNITED STATES BANKRUPTCY JUDGE

 7        [2] Order Scheduling Initial Case Management Conference
      [19] Motion of the United States Trustee to Dismiss Case Or, In the
 8         Alternative, to Convert Case to One Under Chapter Seven
         [50] Scheduling Order. ORDERED, that any proposed Disclosure
 9   Statement, proposed Plan, and Motion seeking approval of the proposed
        Disclosure Statement and it is further ORDERED, that a hearing to
10   consider approval of any proposed Disclosure Statement pursuant to 11
                   U.S.C. 1125 and Bankruptcy Rule 3017.
11        [50] Scheduling Order.  ORDERED, that any proposed Disclosure
     Statement, proposed Plan, and Motion seeking approval of the proposed
12    Disclosure Statement shall be filed on or before May 1, 2019; and it
         is further ORDERED, that a hearing to consider approval of any
13        proposed Disclosure Statement pursuant to 11 U.S.C. 1125 and
     Bankruptcy Rule 3017 will be held on May 29, 2019 at 3:00 p.m. and it
14    is further ORDERED, that any objection to the approval of a proposed
         Disclosure Statement shall be filed and served by May 22, 2019;
15                        Signed on 4/29/2019.
        [53] Notice of Hearing on Disclosure Statement Filed by Mark A
16    Frankel on behalf of Galstar Funding LLC (RE: related document(s)
      [52] Disclosure Statement filed by Creditor Galstar Funding LLC)
17
     APPEARANCES:
18   For U.S. Trustee                    RACHEL WOLF
                                         Office of the United
19                                       States Trustee
                                         Brooklyn Office, U.S.
20                                       Federal Office Building
                                         201 Varick Street
21                                       Suite 1006
                                         New York, NY  10014
22
     Transcription Service:             Associated Reporters Int'l.,   Inc.
23                                       P.O. Box 165
                                         Massena, New York 13662
24                                       (315) 769-6429

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
```

2

1                    May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2    For Plaintiff:                    DAVID C. TEMES
                                       Lynn, D'Elia, Temes & Stanczyk
3                                      100 Madison Street
                                       Tower I
4                                      Suite 1905
                                       Syracuse, NY  13202
5
     For 4921 12th Avenue, Debtor:     ALLA KACHAN
6                                      3099 Coney Island Avenue
                                       3rd Floor
7                                      Brooklyn, NY  11235

8    For Old Republic National         DAVID K FIVESON
     Title Insurance Company, Creditor Butler, Fitzgerald,
9                                      Fiveson & McCarthy
                                       36 West 44th Street
10                                     Suite 816
                                       New York, NY  10036
11
     For Galstar Funding LLC, Creditor MARK A FRANKEL
12                                     Backenroth, Frankel
                                       & Krinsky LLP
13                                     800 Third Avenue
                                       11th Floor
14                                     New York, NY  10022

15

16

17

18

19

20

21

22

23

24

25

```
 1            May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

 2                    THE COURT:  Okay.

 3                    THE COURT CLERK:  Appearances please?

 4                    MS. ALLA KACHAN:  Good afternoon, Your Honor.

 5    Alla Kachan, the proposed substitute attorney for the debtor.

 6                    MR. MARK FRANKEL:  Mark Frankel, Bachenroth,

 7    Frankel, and Krinsky, attorneys for Galster Funding.

 8                    MR. DAVID FIVESON:  Good afternoon, Your Honor.

 9    David Fiveson, attorneys for Old Republic as assignee for Beis

10    Gorlitz.

11                    MS. RACHEL WOLF:  Rachel Wolf on behalf of the

12    United States Trustee.

13                    THE COURT:  I never saw --.

14                    MR. FIVESON:  Your Honor, I also represent

15    Galstar Funding to the extent --

16                    THE COURT:  I didn't see the objection.

17                    MR. FIVESON:  -- there are two motions to

18    adjudge that party of contempt.

19                    THE COURT:  Okay.  I, you know, I'm just seeing

20    now that you filed an objection which I didn't see.

21                    MS. KACHAN:  Your Honor, we were not really

22    retained until Friday afternoon, so --

23                    THE COURT:  Well --

24                    MS. KACHAN:  -- we haven't had much time.

25                    THE COURT:  -- that's not -- that's not
```

128

4

1        May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2 anybody's fault but your clients.

3        MS. KACHAN:  I understand, Your Honor.  We've

4 done the best we can with the time we've had.

5        THE COURT:  Okay.  Okay.  This is -- this is a

6 -- this is a single asset case, so the time to file a Plan and

7 Disclosure Statement came and went at the ninetieth day.  This

8 is not a small business case.  This is a -- this is a --

9        MS. KACHAN:  Uh-huh.

10        THE COURT:  -- a -- just to -- to address your

11 first point about the small business deadline, this is a --

12 this is not a small business case.  It's a -- it's a single

13 asset case and this is a case that -- where there is no

14 possibility of the debtor confirming a plan without the

15 creditor's consent.

16        MS. KACHAN:  Your Honor, may I address that

17 just very briefly?

18        THE COURT:  Yes.

19        MS. KACHAN:  I did speak to it briefly in my

20 opposition, but in conversations with the debtor's principal,

21 Your Honor, and again, obviously their representation left a

22 lot to be desired up to this point, but at this point, I think,

23 you know, that's in the past.  What we have today is we do have

24 a viable way forward.

25        THE COURT:  What's that?

5

1              May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2                     MS. KACHAN:  Obviously we could -- a lump sum

3   infusion of funds which my -- my debtor's principal --

4                     THE COURT:  Is the lump sum -- is the lump sum

5   --

6                     MS. KACHAN:  -- can --.

7                     THE COURT:  -- infusion a -- is -- is it

8   twenty-two million dollars or --?

9                     MS. KACHAN:  Your Honor, the proposed -- the

10  proposed plan and the sale of this property, we have three

11  broker's opinion letters and we're -- we're getting an

12  appraisal now.

13                    THE COURT:  Okay.

14                    MS. KACHAN:  It's nowhere near twenty-two

15  thousand.

16                    THE COURT:  Okay.  But --

17                    MS. KACHAN:  So --

18                    THE COURT:  -- the point --

19                    MS. KACHAN:  -- add the property --.

20                    THE COURT:  -- the point here is these are

21  secured creditors.

22                    MS. KACHAN:  Yes, Your Honor.

23                    THE COURT:  There is no -- you have no

24  possibility of confirming a plan without the approval --

25  without the consent --

```
 1              May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

 2                   MS. KACHAN:  Absolutely.

 3                   THE COURT:  -- of both of them --

 4                   MS. KACHAN:  Absolutely, Your Honor.  We're

 5    just --

 6                   THE COURT:  -- and they --

 7                   MS. KACHAN:  -- saying we have a better option

 8    --

 9                   THE COURT:  -- and they are --.

10                   MS. KACHAN:  -- than what they've proposed.

11                   THE COURT:  But they don't want that.  They

12    want to sell the property.  They don't --

13                   MS. KACHAN:  Actually --.

14                   THE COURT:  -- you don't have the ability to

15    cram down a plan on them.

16                   MS. KACHAN:  We're not -- that's not what I'm

17    proposing at all, Your Honor.  Actually, they're all in the

18    Disclosure Statement.  They state that the only path forward

19    that they can see is either a lump sum infusion or -- in the

20    value of the property or a sale, so all I'm proposing is that

21    we have a chance to do that --

22                   THE COURT:  No.

23                   MS. KACHAN:  -- because my client can come up

24    with the money.

25                   THE COURT:  Well, this is -- this is, I'd say,
```

7

```
 1              May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC
 2    too little too late by a lot -- a lot too late --
 3                   MS. KACHAN:  Your Honor, this case was filed --
 4                   THE COURT:  -- and a lot too little.
 5                   MS. KACHAN:  -- at the end of December and --
 6                   THE COURT:  This -- this is a --
 7                   MS. KACHAN:  -- we're -- we're in May.
 8                   THE COURT:  -- single asset case.
 9                   MS. KACHAN:  I realize, Your Honor, but there
10    is also --
11                   THE COURT:  It is --.
12                   MS. KACHAN:  -- an attorney that was not
13    experienced in Chapter Eleven.
14                   THE COURT:  Well, that is not -- that is not my
15    problem and that is not their problem, and I voiced my concerns
16    about this attorney's ability early on, but for whatever
17    reason, the client chose to keep him on the case --
18                   MS. KACHAN:  Yes, Your Honor.
19                   THE COURT:  -- can't come in -- now they've
20    brought you in.  I don't know whether -- what you're going to
21    be able to do frankly that he couldn't do.  A lump sum infusion
22    -- if they want -- if they want to agree to a buyout, you can
23    pursue that --
24                   MS. KACHAN:  That's --
25                   THE COURT:  -- you know, all --.
```

132

8

1           May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2                   MS. KACHAN:  -- that's exactly what I'm

3    proposing.

4                   THE COURT:  Okay.  But that has nothing to do

5    with whether I'm going to approve this Disclosure Statement or

6    not.

7                   MS. KACHAN:  Your Honor, what -- all I was

8    looking to do and all I'm still looking to do is have a chance

9    to put in our plan.  We can do that very quickly --

10                  THE COURT:  Well, what would --

11                  MS. KACHAN:  -- and --.

12                  THE COURT:  -- but that makes -- this makes no

13   sense because the purpose of you putting in your plan would be

14   so there would be competing plans and then you'd have voting

15   and --

16                  MS. KACHAN:  Yes.

17                  THE COURT:  -- you'd decide -- and -- but --

18                  MS. KACHAN:  Your Honor, but --.

19                  THE COURT:  -- because voting is irrelevant

20   here because nothing that you are going to propose can be

21   confirmed unless they agree to it --

22                  MS. KACHAN:  Your Honor, so --

23                  THE COURT:  -- and so if you -- if you can

24   approach them with a deal that they agree to, that can -- that

25   could be agreed to at any point in time even after plan

1          May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2    confirmation you could do that.

3                    MS. KACHAN:  -- so that's what I'm looking to

4    do, Your Honor.

5                    THE COURT:  Okay.

6                    MS. KACHAN:  I would just need a little bit of

7    time to do it --

8                    THE COURT:  No, I'm not giving --

9                    MS. KACHAN:  -- more than three days.

10                   THE COURT:  -- I'm not giving you any time

11   because there's nothing you need -- you don't need any time.

12   There's nothing -- there's no reason for me to -- to delay the

13   progress of plan confirmation on their plan so that you can

14   come up with an offer that they might like better than their

15   plan because if you can do that, then go ahead and do it.

16   Nothing to stop you.

17                   MS. KACHAN:  That's -- that's what I'm going to

18   do.

19                   THE COURT:  Nobody is stopping you.

20                   MS. KACHAN:  Your Honor, I realize that.

21   That's what we intend to do.

22                   THE COURT:  Okay.

23                   MS. KACHAN:  That, you know --

24                   THE COURT:  Well, then go --

25                   MS. KACHAN:  -- we're --

1          May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2                    THE COURT:  -- have at it.

3                    MS. KACHAN:  -- a day -- a day and a half in

4     the case.

5                    THE COURT:  No, you know, I don't -- first of

6     all, I highly doubt your client is going to come up with the

7     kind of money that they would want.  I mean this is -- from

8     what I know of this case, there is a long and acrimonious

9     history --

10                   MS. KACHAN:  I'm aware, Your Honor.

11                   THE COURT:  -- amongst the parties, so that's -

12    - I'm highly skeptical about that if they -- if -- if the -- I

13    guess the title insurance company is really the main -- the

14    party in interest here, right, because they -- they're --

15    they're holding both -- they hold both claims at this point.

16                   MR. FRANKEL:  We're the subordinate mortgagee -

17    -

18                   MS. KACHAN:  They're subordinate.

19                   MR. FRANKEL:  -- and every day that this gets

20    delayed, Judge, I believe hopefully the -- our insured, the

21    primary creditor, is going to be paid.  We're not, so, you

22    know, this -- this building is worth ten million.

23                   THE COURT:  Right.

24                   MR. FRANKEL:  Every day this is delayed --

25                   THE COURT:  You're going to have to get --

11

```
1              May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2                    MR. FRANKEL:  -- it comes out of us.

3                    THE COURT:  -- you're going to get them to

4   agree.

5                    MS. KACHAN:  Your Honor, I am aware of that and

6   that's all we're saying just by looking, the brief history that

7   I've had with this case as I said several days, just looking at

8   it, Your Honor, I had some brokers look up some numbers and we

9   can definitely come up with the value of the building and

10  selling the building, they're not going to do much better than

11  that.  Their sale cost --.

12                   THE COURT:  Okay.  Well, how are you coming up

13  with the value of the building?  This is a property that hasn't

14  produced rent in a long time and so -- and it's got a probably

15  ninety percent loan to value ratio based upon the -- so in

16  other words, maybe you can, maybe you can't.  It's -- on the

17  face of it, highly implausible, but if you can do it, you can

18  approach them at any point in time in this process and --

19                   MS. KACHAN:  Your Honor --

20                   THE COURT:  -- if they're -- if they want to

21  take the -- your offer, they'll take your offer.  If they

22  don't, they won't.

23                   MS. KACHAN:  -- Your Honor, that's nothing we

24  haven't done before and we -- that's all we're looking for --

25                   THE COURT:  So -- so there's no --
```

1          May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2                    MS. KACHAN:  -- an opportunity to do.

3                    THE COURT:  -- there's no reason for me to

4     delay anything here.  It would be highly inappropriate for me

5     to delay anything here.

6                    MS. KACHAN:  Understood, Your Honor.  We can

7     proceed as the Disclosure Statement is approved.

8                    THE COURT:  Okay.  Is there anything else that

9     we need to hear about the Disclosure Statement?  Okay.  Any --

10    anything you want to say about the Disclosure Statement?

11                   MS. KACHAN:  Questions from me, Your Honor?

12                   THE COURT:  Anybody.  Does anybody have

13    anything you want to say about the Disclosure Statement?

14                   MR. FIVESON:  Your Honor, the Disclosure

15    Statement describes a garden variety liquidating plan.  We have

16    a broker who is going to be doing professional marketing.  It's

17    going to take a few months.  We want to get the highest and

18    best price.  The terms are going to have a low opening bid with

19    fifty thousand dollar increments for bidding and a five

20    hundred-thousand-dollar deposit because it's -- we want to do -

21    -

22                   THE COURT:  Is it going to be --?

23                   MR. FIVESON:  -- right and we want to get --.

24                   THE COURT:  Are you going to do it subject to

25    higher and better offers?

1              May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2                    MR. FIVESON:  Subject to higher and better

3    unless someone comes in with a really remarkably high offer

4    that justifies turning the courthouse upside down to get an

5    order that we don't have to, but that's only happened to me

6    once in the last thirty years.  The time that it's going to

7    take will be plenty of time for the debtor to make whatever --

8    debtor's principal to make whatever offers they want.  If they

9    want to pay off the, you know, or offer even a reduced payment

10   to the (unintelligible) Old Republic creditor, I'm sure they

11   would entertain it.  I just want to make sure though that I

12   didn't mislead counsel to the debtor in the Disclosure

13   Statement, in paragraph thirty-one, what I wrote was absent an

14   implausibly large and quick capital infusion relative to the

15   value of the property, the debtor has no likelihood of

16   confirming a plan except by a sale and what I meant was absent

17   a large capital infusion meaning large relative to the property

18   meaning it would exceed the property by -- by millions of

19   dollars not that if they came up with a broker's opinion of

20   value and gave us a check we would take it.  It would have to

21   be much more than -- than what would be rational and that's

22   what I meant by why the debtor's likelihood of confirming a

23   plan in -- is implausible and not that if they came up with a -

24   - the value of the property we would take it.  We want to test

25   the market and get the highest price at an auction sale hoping

1          May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2    for a bidding war or something.

3                    THE COURT:  Okay.

4                    MS. KACHAN:  May I, Your Honor?

5                    THE COURT:  Uh-huh.

6                    MS. KACHAN:  Your Honor, so in the short time

7    that we've had, I -- we have looked at the market and there's a

8    reason that I made the statement that I made.  Actually, again,

9    was -- the petition wasn't put together by me.  I can just

10   speak to what I found so far, and I can tell, Your Honor, that

11   the value of the property stated in the petition is not

12   supported by any of the four market opinions -- broker's

13   opinions that I've gotten or comparable values.  They're all

14   substantially lower and my client is willing --.

15                   THE COURT:  They're all lower than this.

16                   MS. KACHAN:  All lower.

17                   THE COURT:  Okay.

18                   MS. KACHAN:  Four.

19                   THE COURT:  Well, then I guess we'll find out.

20   We'll be testing the market.

21                   MS. KACHAN:  Precisely, Your Honor, so what --

22   what was just stated by counsel as -- as, you know, they would

23   have to go millions of dollars higher, well, actually what I

24   was talking about is millions of dollars higher than what's on

25   the market -- what the market is right now and --.

Case 1:18-cv-02586-reeg    Doc 163    Filed 01/03/20    Entered 01/03/20 16:53:54
Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 140 of 552 PageID #: 418

15

1    May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2              THE COURT:  But -- but they may not want your

3    client's money.  They may prefer to sell the property.  Maybe

4    they may not trust your client.  They may feel that for

5    probably a good and sufficient reason based upon what I've --

6    the record I've seen.  They may want to -- they may -- they may

7    feel that they want to test the market themselves and make sure

8    that they're getting what they consider to be the highest and

9    best price, so telling me that the property is actually worth

10   less than you think -- than they think it is, is not a reason

11   for me to -- to do anything other than approve the Disclosure

12   Statement.

13             MS. KACHAN:  Your Honor, just looking at the

14   face of the case, there is a lot of issues that I found that

15   obviously we haven't had the time to address --

16             THE COURT:  I don't know what you're talking

17   about.

18             MS. KACHAN:  -- coming in.  I'm talking about

19   the rents, Your Honor.  The rents are actually upon information

20   I believe being collected and --

21             THE COURT:  Well, they weren't prior to --.

22             MS. KACHAN:  -- and they're certainly not being

23   credited and that's one issue that we have.  I haven't seen --.

24             THE COURT:  Well, they're being collected by

25   your client, aren't they?

1              May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2                    MS. KACHAN:  No, Your Honor.  That's the

3    problem.  The only -- the only rent collected by my client is

4    the grocery rent.  Everything else has not been collected and

5    as far as I'm -- as I'm aware several years, but it was being

6    collected.

7                    THE COURT:  There's a judgment of foreclosure

8    here.  The --

9                    MS. KACHAN:  I'm aware, Your Honor.

10                    THE COURT:  -- the receiver was appointed for

11   your client.

12                    MS. KACHAN:  And never took --

13                    THE COURT:  Right, Mr. -- Mr. Frankel?

14                    MS. KACHAN:  -- and never took --.

15                    MR. FRANKEL:  The receiver -- the receiver

16   never took possession.  The operating reports show nothing, not

17   a penny, to post petition and this grocery store is like an ATM

18   machine.  I don't know where the money is going.

19                    THE COURT:  Right.  So nothing --.

20                    MS. KACHAN:  Well, we also don't know where the

21   rents are going and they're not going to my client --

22                    THE COURT:  Well, the -- the --

23                    MS. KACHAN:  -- and they're not being collected

24   by my client.

25                    THE COURT:  -- apparently, they're not being

1         May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2    collected by -- there's no receiver, so if there's -- then

3    somebody else is -- and they're not going to Galstar.

4              MR. FRANKEL:  The -- the grocery store is owned

5    by the same person who owns the debtor.

6              MS. KACHAN:  Once again, I'm talking about the

7    --

8              MR. FRANKEL:  I couldn't believe --

9              MS. KACHAN:  -- apartments, not the grocery --

10             MR. FRANKEL:  -- that the 541 meeting --

11             MS. KACHAN:  -- store.

12             MR. FRANKEL:  -- where he said he didn't know

13   where the money -- who's -- who's the tenant.  He -- he owns

14   the grocery store.  (unintelligible).  That's his name.

15             THE COURT:  Well, but -- it's not their fault

16   that your client isn't collecting rent from the -- the other --

17   the rest of the apartments in the building.  There are two

18   apartments I guess and -- and a -- and a grocery store.  Is

19   that right?  It's not --.

20             MS. KACHAN:  I believe there's three

21   apartments.

22             THE COURT:  Okay.  So there -- if there isn't

23   rent being collected from the -- from the apartments, this case

24   has been in bankruptcy now for -- there's never been a receiver

25   in possession and this case has been in bankruptcy for six

18

1           May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2    months, so that's -- that's even more of a problem.

3               MS. KACHAN:  No, actually, Your Honor, to my

4    client's understanding, B.C.G. was collecting the rents from

5    the apartments this whole time, not my client.

6               THE COURT:  B.C.G.?  What's -- who's --?

7               MR. FRANKEL:  B.C.G. had -- hold the initial

8    first notes that over public purchased in order to get Galstar.

9    These are -- these are misstatements, mis -- I've been

10   litigating with (unintelligible) --.

11              THE COURT:  I don't even care.  What difference

12   does that make?

13              MS. KACHAN:  Your Honor, all I'm saying is that

14   they -- there are issues here, but again, we -- my client --

15   the principal and my client made it very clear he's not looking

16   to (unintelligible) down.  We realize what our --

17              THE COURT:  It's not possible.

18              MS. KACHAN:  -- our limited options are here.

19   He is willing to propose a settlement if you will --

20              THE COURT:  Well, he can --

21              MS. KACHAN:  -- or a buyout.

22              THE COURT:  -- well, let him go ahead and do

23   that then.

24              MS. KACHAN:  That's why I'm here.

25              THE COURT:  Okay.  Is there anything -- what

143

Case 1:18-cv-02556-ECC   Doc 163   Filed 07/03/20   Entered 07/03/20 16:59:54
Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 144 of 552 PageID #: 422

19

```
 1        May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

 2   we're supposed to be talking about right now is the Disclosure

 3   Statement.  Is there anything -- anything else that you want to

 4   tell me about the Disclosure Statement?

 5             MS. KACHAN:  Your Honor, the only other thing

 6   is -- and again, I haven't seen so far is the assignment of the

 7   mortgages between Old Republic and B.C.G., Old Republic.  We

 8   don't see how the chain came about.  I -- from the papers that

 9   I've seen, I see absolutely nothing.  We just see these

10   remarkably high claims that graduated out of a two point five-

11   million-dollar claim and out of a five-million-dollar claim.

12   We see -- and I know all about judgment interest and all of

13   that and yet it still doesn't make sense and I haven't seen how

14   these numbers came about and I haven't seen how the -- the

15   chain came about.  No one speaks about it.  There's just vague

16   statements as to Mr. Solomon's [phonetic spelling] or the

17   debtor's --

18             THE COURT:  Okay.  Well, Galster is --

19             MS. KACHAN:  -- misconduct, but that -- that's

20   all it is is statements.

21             THE COURT:  -- Galster has a judgment of

22   foreclosure, so chain of title of the mortgage is not an issue

23   with that.

24             MS. KACHAN:  Not with that.

25             THE COURT:  As far as Old Republic is concerned
```

```
 1            May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC
 2   --
 3               MS. KACHAN:  I'm talking about Old Republic.
 4               THE COURT:  -- you have an assignment from --
 5   from --.
 6               MR. FRANKEL:  Yes, they're all -- they're all
 7   next to the proof of claim.  We purchased the notes.  We have
 8   the original notes.  We have the assignments of mortgage.  You
 9   have the assignments.  I think -- I prepared the proof of
10   claim.  It's been a while, but I believe they're all in
11   (unintelligible).  You can go on the claims register and see
12   them.
13               THE COURT:  Okay.
14               MS. KACHAN:  (unintelligible).
15               THE COURT:  Okay.  So I'm granting the
16   Application for Approval of the Disclosure Statement and you
17   can submit an order approving the Disclosure Statement and let
18   me set this down for a confirmation hearing.
19               MS. WOLF:  The U.S. Trustee does not oppose the
20   disclosure approval.  The (unintelligible) requests that the
21   Disclosure Statement -- order approving the Disclosure
22   Statement be circulated to our office.  Just on the
23   administrative side of things, the debtor has filed monthly
24   operating reports through April; however, no bank statements
25   are attached to the monthly operating reports and all the
```

1    May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2   monthly operating reports show zero dollars of income which is

3   inconsistent with previous -- previous statements by the debtor

4   that they were collecting nine thousand dollars a month in rent

5   from the commercial tenant.

6              THE COURT:  Exactly.  Exactly.

7              MS. KACHAN:  Well, we'll look into it, Your

8   Honor.

9              MS. WOLF:  And the U.S. Trustee requests that

10  the court carry the U.S. Trustee's motion to convert or dismiss

11  to the next adjourned hearing date.

12             THE COURT:  Okay.  So I'm granting this motion.

13  I'm going to give you -- can I give them July 17th for a

14  disclosure -- for a confirmation hearing?

15             THE COURT CLERK:  Yes.

16             THE COURT:  7/17 at -- at three o'clock or --

17             THE COURT CLERK:  Yes, ma'am.

18             THE COURT:  -- later?  You want to do it later?

19  Four o'clock?

20             THE COURT CLERK:  No, let me just double check.

21  Let me (unintelligible).

22             THE COURT:  Huh?

23             THE COURT CLERK:  Three o'clock is good.

24             THE COURT:  Okay.  7/17 at three for the -- for

25  the confirmation hearing and so you can submit your order.

1          May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2    Okay.  And now we have the -- the next issue is the -- this

3    motion for contempt.  Who wants to go forward on that?

4               MS. KACHAN:  Your Honor, that's the adversarial

5    for -- for violation of the stay.  Correct?

6               THE COURT:  Correct.

7               MS. KACHAN:  That was not -- that was filed

8    (unintelligible).  I'm not really --.

9               THE COURT:  What do you want me to do with it?

10              MS. KACHAN:  Your Honor, I think I would ask

11   the court to carry it or if need be, I don't think it's

12   relevant at this time.

13              MR. FRANKEL:  No, Your Honor.  I would -- I

14   would request that that motion be denied.  We have -- this

15   issue has been decided by Judge Nypal [phonetic spelling] -- an

16   issue -- a contempt proceeding against (unintelligible)

17   individually for monies that were borrowed by the debtor but

18   went into his -- his account that were transferred to his

19   entities.  Any contempt which is going to come down against Mr.

20   Solomon is as certain as I'm standing here.  It -- it has no

21   effect on the debtor.  Whatever acts he did were not in

22   furtherance of the debtor interest.  They were in furtherance

23   of his personal interest.

24              THE COURT:  Well, and -- and Mr. Solomon -- the

25   -- they're -- Mr. Solomon would have had to come to this court

1          May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2    and get this court to issue an order extending the stay under

3    Section one o five to protect him.

4              MR. FRANKEL:  And he did.

5              THE COURT:  He does not have the protection of

6    the automatic stay.

7              MR. FRANKEL:  The -- the next issue though,

8    there's a second motion, Your Honor, to adjudge Galster for

9    continuing with the state court action.  I mean there's --

10   there's multiple (unintelligible).

11             THE COURT:  Right, but I --

12             MR. FRANKEL:  I got a severance.

13             THE COURT:  -- which was severed.  Right.

14             MR. FRANKEL:  I got a severance.  I did not

15   take one step in that case against the debtor.  The only thing

16   I did was to ask Judge Nypal to sever it.  He severed it and

17   whatever is going -- we just did a deposition in that case, but

18   those claims against the debtor are severed, so there's no

19   contempt.  There's always been respect of this court's

20   automatic stay.  The motion should be denied respectfully.

21             THE COURT:  All right.  I'm prepared on this

22   motion -- on this record to deny the motion.

23             MR. FRANKEL:  There are two motions, Your

24   Honor.

25             THE COURT:  Aren't they -- weren't they --

24

1          May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2     weren't they two motions --

3                    MR. FRANKEL:  I don't know --.

4                    THE COURT:  -- under one heading or are they

5     two separate motions?

6                    MR. FRANKEL:  They seem to be -- one is filed

7     in the adversary and I believe one is filed on the main

8     bankruptcy.  It was somewhat confusing and then the court

9     ordered that we address both of them.  That's my recollection

10    and there are two oppositions.

11                   THE COURT:  All right.  Do we have two separate

12    -- let me see if we have two separate docket entries here.

13                   THE COURT CLERK:  Your Honor, (unintelligible).

14                   THE COURT:  Okay.  I'm going -- I will say that

15    -- that I don't believe that seeking severance violates the

16    automatic stay because then if that were the case then you

17    would effectively have the protection of the stay without

18    seeking it as -- a non-debtor would have the protection of the

19    stay without seeking the extension of it, so I don't think that

20    that's the case.  I think there's no violation of the stay in

21    seeking to sever, but I -- okay.  You can submit an order

22    denying both motions.

23                   MR. FRANKEL:  Your Honor, there is I believe

24    one last matter.

25                   I think there's a pre-trial conference on the

Case 1:18-cv-04526-reeg   Doc 163   Filed 01/03/20   Entered 01/03/20 16:53:54
Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 150 of 552 PageID #: 428

25

1          May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC

2     adversary on for today.  It was on last week when I got -- in

3     the initial summons and, you know, pleading, but I think it was

4     carried to -- I don't know if it was carried to today, but I

5     know it was on for last week.

6                    THE COURT:  Well, what --

7                    MR. FRANKEL:  I assumed it was carried to

8     today.

9                    THE COURT:  -- for whatever reason, it didn't

10    seem to make it onto the docket for today.

11                   MR. FRANKEL:  Yeah.

12                   THE COURT CLERK:  Right.  Because I wasn't sure

13    what was going on with it and I didn't have time to listen to

14    that hearing --

15                   THE COURT:  Okay.  So what do you want --

16                   THE COURT CLERK:  -- because nobody showed up.

17                   THE COURT:  -- to do with that?

18                   MR. FRANKEL:  Your Honor, that -- that

19    complaint is duplicative of the motion.  It's basically a

20    complaint that seeks the same relief that was sought in the --.

21                   THE COURT:  Why don't you -- why don't you --

22    Notice for Presentment an order dismissing the complaint in

23    that adversary proceeding?

24                   MR. FRANKEL:  Yes, Your Honor.

25                   THE COURT:  And you can make the date for a

26

```
 1          May 29, 2019 - Brooklyn, NY - 4921 12th Avenue LLC
 2   hearing on any objection the 7/17 date.
 3               MR. FRANKEL:  Okay.
 4               THE COURT CLERK:  And in the meantime, we'll
 5   put the adversarial for that date, 7/17?
 6               THE COURT:  Yes.
 7               THE COURT CLERK:  Okay.
 8               THE COURT:  Okay.  Anything else?
 9               MR. FRANKEL:  No, Your Honor.
10               THE COURT:  Okay.  Thank you.
11                MS. KACHAN:  Thank you, Your Honor.
12
13                         CERTIFICATE
14        I certify that the foregoing is a correct
15   transcript from the electronic sound recording of the
16   proceedings in the above-entitled matter.
17
18
19   _____
20
21   Judith Spriggs                    1 July 2019
     Transcriptionist                  Date
22
23
24
25
```

151

800.523.7887          5-29-2019, WORD INDEX, 4921 12th Avenue CASE          Associated Reporters Int'l., Inc.

Page 1

| A |
|---|

**ability** 6:13 7:15
**able** 7:20
**above-entitled** 26:16
**absent** 13:12,15
**absolutely** 6:1,3 19:8
**account** 22:17
**acrimonious** 10:7
**action** 23:8
**acts** 22:20
**add** 5:18
**address** 4:9,15 15:14 24:8
**adjourned** 21:10
**adjudge** 3:17 23:7
**administrative** 20:22
**adversarial** 22:3 26:4
**adversary** 24:6 25:1,22
**afternoon** 3:3,7,21
**agree** 7:21 8:20,23 11:3
**agreed** 8:24
**ahead** 9:14 18:21
**Alla** 2:5 3:3,4
**Alternative** 1:7
**anybody** 12:11,11
**anybody's** 4:1
**apartments** 17:8,16,17,20,22
 18:4
**apparently** 16:24
**Appearances** 1:17 3:2
**Application** 20:15
**appointed** 16:9
**appraisal** 5:11
**approach** 8:23 11:17
**approval** 1:8,9,11,12,13 5:23
 20:15,19
**approve** 8:4 15:10
**approved** 12:6
**approving** 20:16,20
**April** 20:23
**aren't** 15:24 23:24
**asset** 4:5,12 7:7
**assignee** 3:8
**assignment** 19:5 20:3
**assignments** 20:7,8
**Associated** 1:22
**assumed** 25:6
**ATM** 16:16
**attached** 20:24
**attorney** 3:4 7:11

**attorney's** 7:15
**attorneys** 3:6,8
**auction** 13:24
**automatic** 23:5,19 24:15
**Avenue** 1:3 2:5,5,12
**aware** 10:9 11:4 16:4,8

| B |
|---|

**B.C.G** 18:3,5,6 19:6
**Bachenroth** 3:5
**Backenroth** 2:11
**bank** 20:23
**bankruptcy** 1:1,5,10,13 17:23,24
 24:7
**based** 11:14 15:4
**basically** 25:18
**behalf** 1:15 3:10
**Beis** 3:8
**believe** 10:19 15:19 17:7,19
 20:9 24:6,14,22
**best** 4:3 12:17 15:8
**better** 6:6 9:13 11:9 12:24 13:1
**bid** 12:17
**bidding** 12:18 14:1
**bit** 9:5
**borrowed** 22:16
**Box** 1:22
**brief** 11:5
**briefly** 4:16,18
**broker** 12:15
**broker's** 5:10 13:18 14:11
**brokers** 11:7
**Brooklyn** 1:3,19 2:6
**brought** 7:19
**building** 1:19 10:21 11:8,9,12
 17:16
**business** 4:7,10,11
**Butler** 2:8
**buyout** 7:21 18:20

| C |
|---|

**C** 2:1
**can't** 7:18 11:15
**capital** 13:13,16
**care** 18:10
**CARLA** 1:5
**carried** 25:3,3,6
**carry** 21:9 22:10
**case** 1:3,6,7,7 4:5,7,11,12,12
 7:2,7,16 10:3,7 11:6 15:13

800.523.7887          5-29-2019, WORD INDEX, 4921 12th Avenue CASE          Associated Reporters Int'l., Inc.

Page 2

17:22,24 23:14,16 24:15,19
**certain** 22:19
**certainly** 15:21
**CERTIFICATE** 26:13
**certify** 26:14
**chain** 19:7,14,21
**chance** 6:20 8:7
**Chapter** 1:7 7:12
**check** 13:19 21:19
**chose** 7:16
**circulated** 20:21
**claim** 19:10,10 20:6,9
**claims** 10:14 19:9 20:10 23:17
**clear** 18:14
**CLERK** 3:2 21:14,16,19,22 24:12
  25:11,15 26:3,6
**client** 6:22 7:16 10:5 14:13
  15:3,24 16:2,10,20,23 17:15
  18:4,13,14
**client's** 15:2 18:3
**clients** 4:1
**collected** 15:19,23 16:2,3,5,22
  17:1,22
**collecting** 17:15 18:3 21:3
**come** 6:22 7:18 9:13 10:5 11:8
  22:18,24
**comes** 11:1 13:2
**coming** 11:11 15:17
**commercial** 21:4
**company** 2:8 10:12
**comparable** 14:12
**competing** 8:13
**complaint** 25:18,19,21
**concerned** 19:24
**concerns** 7:14
**Coney** 2:5
**conference** 1:6 24:24
**confirmation** 9:1,12 20:17 21:13
  21:24
**confirmed** 8:20
**confirming** 4:13 5:23 13:15,21
**confusing** 24:7
**consent** 4:14 5:24
**consider** 1:9,12 15:7
**contempt** 3:17 22:2,15,18 23:18
**continuing** 23:8
**conversations** 4:19
**convert** 1:7 21:9
**correct** 22:4,5 26:14
**cost** 11:10

**couldn't** 7:20 17:7
**counsel** 13:11 14:21
**court** 1:1 3:1,2,12,15,18,22,24
  4:4,9,17,24 5:3,6,12,15,17,19
  5:22 6:2,5,8,10,13,21,24 7:3
  7:5,7,10,13,18,24 8:3,9,11,16
  8:18,22 9:4,7,9,18,21,23 10:1
  10:4,10,22,24 11:2,11,19,24
  12:2,7,11,21,23 14:2,4,14,16
  14:18 15:1,15,20,23 16:6,9,12
  16:18,21,24 17:14,21 18:5,10
  18:16,19,21,24 19:17,20,24
  20:3,12,14 21:5,9,11,14,15,16
  21:17,19,21,22,23 22:5,8,10
  22:23,24 23:1,4,8,10,12,20,24
  24:3,7,10,12,13 25:5,8,11,14
  25:15,16,20,24 26:3,5,6,7,9
**court's** 23:18
**courthouse** 13:3
**CRAIG** 1:5
**cram** 6:14
**credited** 15:22
**creditor** 1:16 2:8,11 10:20 13:9
**creditor's** 4:14
**creditors** 5:20

**D**

**D'Elia** 2:2
**date** 21:10 25:24 26:1,4,21
**David** 2:1,7 3:7,8
**day** 4:6 10:2,2,18,23
**days** 9:8 11:6
**deadline** 4:10
**deal** 8:23
**debtor** 2:5 3:4 4:13 13:6,11,14
  17:4 20:22 21:2 22:16,20,21
  23:14,17
**debtor's** 4:19 5:2 13:7,21 19:16
**December** 7:4
**decide** 8:16
**decided** 22:14
**definitely** 11:8
**delay** 9:11 12:3,4
**delayed** 10:19,23
**denied** 22:13 23:19
**deny** 23:21
**denying** 24:21
**deposit** 12:19
**deposition** 23:16
**describes** 12:14

800.523.7887          5-29-2019, WORD INDEX, 4921 12th Avenue CASE          Associated Reporters Int'l., Inc.

Page 3

**desired** 4:21
**didn't** 3:15,19 13:11 17:11 25:8
  25:12
**difference** 18:10
**disclosure** 1:8,9,9,10,11,12,14
  1:15,16 4:6 6:17 8:4 12:6,8,9
  12:12,13 13:11 15:10 19:1,3
  20:15,16,19,20,20 21:13
**dismiss** 1:7 21:9
**dismissing** 25:21
**DISTRICT** 1:2
**docket** 24:11 25:9
**document(s)** 1:15
**doesn't** 19:12
**doing** 12:15
**dollar** 12:18
**dollars** 5:7 13:18 14:22,23 21:1
  21:3
**don't** 6:10,11,13 7:19 9:10 10:4
  11:21 13:4 15:15 16:17,19
  18:10 19:7 22:10 24:2,14,18
  25:3,20,20
**double** 21:19
**doubt** 10:5
**duplicative** 25:18

---

**E**

**E** 1:5
**early** 7:15
**EASTERN** 1:2
**effect** 22:20
**effectively** 24:16
**either** 6:18
**electronic** 1:24 26:15
**Eleven** 7:12
**entertain** 13:10
**entities** 22:18
**entries** 24:11
**exactly** 8:1 21:5,5
**exceed** 13:17
**experienced** 7:12
**extending** 23:1
**extension** 24:18
**extent** 3:14

---

**F**

**face** 11:16 15:13
**far** 14:9 16:4 19:5,24
**fault** 4:1 17:14
**Federal** 1:19

**feel** 15:3,6
**fifty** 12:18
**file** 4:5
**filed** 1:11,14,15,16 3:19 7:2
  20:22 22:6 24:5,6
**find** 14:18
**first** 4:10 10:4 18:7
**Fitzgerald** 2:8
**five** 12:18 23:2
**five-** 19:9
**five-million-dollar** 19:10
**Fiveson** 2:7,8 3:7,8,13,16 12:13
  12:22 13:1
**Floor** 2:6,13
**foreclosure** 16:6 19:21
**foregoing** 26:14
**forward** 4:23 6:17 22:2
**found** 14:9 15:13
**four** 14:11,17 21:18
**Frankel** 1:15 2:11,11 3:5,5,6
  10:15,18,23 11:1 16:12,14
  17:3,7,9,11 18:6 20:5 22:12
  23:3,6,11,13,22 24:2,5,22
  25:6,10,17,23 26:2,8
**frankly** 7:20
**Friday** 3:21
**Funding** 1:15,16 2:11 3:6,14
**funds** 5:2
**further** 1:9,12,13
**furtherance** 22:21,21

---

**G**

**Galstar** 1:15,16 2:11 3:14 17:2
  18:7
**Galster** 3:6 19:17,20 23:7
**garden** 12:14
**getting** 5:10 15:7
**give** 21:12,12
**giving** 9:7,9
**go** 9:14,23 14:22 18:21 20:10
  22:2
**going** 7:19 8:4,19 9:16 10:5,20
  10:24 11:2,9 12:15,16,17,21
  12:23 13:5 16:17,20,20 17:2
  21:12 22:18 23:16 24:13 25:12
**good** 3:3,7 15:4 21:22
**Gorlitz** 3:9
**gotten** 14:12
**graduated** 19:9
**granting** 20:14 21:11

800.523.7887          5-29-2019, WORD INDEX, 4921 12th Avenue CASE          Associated Reporters Int'l., Inc.

Page 4

**grocery** 16:3,16  17:3,8,13,17
**guess** 10:12  14:18  17:17

---
### H
**half** 10:2
**happened** 13:4
**hasn't** 11:12
**haven't** 3:23  11:23  15:14,22
  19:5,12,13
**he's** 18:14
**heading** 24:3
**hear** 12:8
**hearing** 1:9,12,15  20:17  21:10
  21:13,24  25:13  26:1
**held** 1:13
**high** 13:2  19:9
**higher** 12:24  13:1  14:22,23
**highest** 12:16  13:24  15:7
**highly** 10:5,11  11:16  12:3
**history** 10:8  11:5
**hold** 10:14  18:6
**holding** 10:14
**Honor** 3:3,7,13,20  4:2,15,20  5:8
  5:21  6:3,16  7:2,8,17  8:6,17
  8:21  9:3,19  10:9  11:4,7,18,22
  12:5,10,13  14:3,5,9,20  15:12
  15:18  16:1,8  18:2,12  19:4
  21:7  22:3,9,12  23:7,23  24:12
  24:22  25:17,23  26:8,10
**HONORABLE** 1:5
**hopefully** 10:19
**hoping** 13:24
**Huh** 21:21
**hundred-thousand-dollar** 12:19

---
### I
**I'd** 6:24
**I'm** 3:18  6:15,19  8:1,4,7  9:2,7
  9:9,16  10:9,11  13:9  15:17
  16:4,4,8  17:5  18:12,23  20:2
  20:14  21:11,12  22:7,19  23:20
  24:13
**I've** 11:6  14:12  15:4,5  18:8
  19:8
**implausible** 11:16  13:22
**implausibly** 13:13
**inappropriate** 12:3
**income** 21:1
**inconsistent** 21:2
**increments** 12:18

**individually** 22:16
**information** 15:18
**infusion** 5:2,6  6:18  7:20  13:13
  13:16
**initial** 1:6  18:6  25:2
**insurance** 2:8  10:12
**insured** 10:19
**Int'l** 1:22
**intend** 9:20
**interest** 10:13  19:11  22:21,22
**irrelevant** 8:18
**Island** 2:5
**isn't** 17:15,21
**issue** 15:22  19:21  22:1,14,15
  23:1,6
**issues** 15:13  18:13
**it's** 4:11,11  5:13  11:13,15
  12:15,19  13:5  17:14,18  18:16
  20:9  22:10  25:18

---
### J
**Judge** 1:5  10:19  22:14  23:15
**judgment** 16:6  19:11,20
**Judith** 26:20
**July** 21:12  26:20
**justifies** 13:3

---
### K
**K** 2:7
**Kachan** 2:5  3:3,4,20,23  4:2,8,15
  4:18  5:1,5,8,13,16,18,21  6:1
  6:3,6,9,12,15,22  7:2,4,6,8,11
  7:17,23  8:1,6,10,15,17,21  9:2
  9:5,8,16,19,22,24  10:2,9,17
  11:4,18,22  12:1,5,10  14:3,5
  14:15,17,20  15:12,17,21  16:1
  16:8,11,13,19,22  17:5,8,10,19
  18:2,12,17,20,23  19:4,18,23
  20:2,13  21:6  22:3,6,9  26:10
**keep** 7:16
**kind** 10:6
**know** 3:18  4:22  7:19,24  9:22
  10:4,7,21  13:8  14:21  15:15
  16:17,19  17:11  19:11  24:2
  25:2,3,4
**Krinsky** 2:12  3:6

---
### L
**large** 13:13,16,16
**late** 7:1,1

800.523.7887          5-29-2019, WORD INDEX, 4921 12th Avenue CASE          Associated Reporters Int'l., Inc.

Page 5

**left** 4:20
**letters** 5:10
**likelihood** 13:14,21
**limited** 18:17
**liquidating** 12:14
**listen** 25:12
**litigating** 18:9
**little** 7:1,3 9:5
**LLC** 1:3,15,16 2:11
**LLP** 2:12
**loan** 11:14
**long** 10:7 11:13
**look** 11:7 21:6
**looked** 14:6
**looking** 8:7,7 9:2 11:5,6,23
  15:12 18:14
**lot** 4:21 7:1,1,3 15:13
**low** 12:17
**lower** 14:13,14,15
**lump** 5:1,3,3 6:18 7:20
**Lynn** 2:2

**M**

**ma'am** 21:16
**machine** 16:17
**Madison** 2:2
**main** 10:12 24:6
**Management** 1:6
**Mark** 1:15 2:11 3:5,5
**market** 13:24 14:6,11,19,24,24
  15:6
**marketing** 12:15
**Massena** 1:23
**matter** 24:23 26:16
**McCarthy** 2:8
**mean** 10:6 23:8
**meaning** 13:16,17
**meant** 13:15,21
**meeting** 17:9
**million** 5:7 10:21
**million-dollar** 19:10
**millions** 13:17 14:22,23
**mis** 18:8
**misconduct** 19:18
**mislead** 13:11
**misstatements** 18:8
**money** 6:23 10:6 15:2 16:17
  17:12
**monies** 22:16
**month** 21:3

**monthly** 20:22,24 21:1
**months** 12:16 18:1
**mortgage** 19:21 20:7
**mortgagee** 10:15
**mortgages** 19:6
**motion** 1:7,8,11 21:9,11 22:2,13
  23:7,19,21,21 25:18
**motions** 3:16 23:22 24:1,4,21
**multiple** 23:9

**N**

**name** 17:13
**National** 2:7
**near** 5:13
**need** 9:5,10,10 12:8 22:10
**never** 3:12 16:11,13,15 17:23
**New** 1:2,21,23 2:10,13
**nine** 21:3
**ninetieth** 4:6
**ninety** 11:14
**non-debtor** 24:17
**notes** 18:7 20:6,7
**Notice** 1:15 25:21
**numbers** 11:7 19:13
**NY** 1:3,21 2:4,6,10,13
**Nypal** 22:14 23:15

**O**

**o** 23:2
**o'clock** 21:15,18,22
**objection** 1:13 3:15,19 26:1
**obviously** 4:20 5:1 15:14
**offer** 9:13 11:20,20 13:2,8
**offers** 12:24 13:7
**office** 1:18,19,19 20:21
**okay** 3:1,18 4:4,4 5:12,15 8:3
  9:4,21 11:11 12:7,8 14:2,16
  17:21 18:24 19:17 20:12,14
  21:11,23 22:1 24:13,20 25:14
  26:2,6,7,9
**Old** 2:7 3:8 13:9 19:6,6,24 20:2
**once** 13:5 17:5
**opening** 12:17
**operating** 16:15 20:23,24 21:1
**opinion** 5:10 13:18
**opinions** 14:11,12
**opportunity** 12:1
**oppose** 20:18
**opposition** 4:19
**oppositions** 24:9

800.523.7887          5-29-2019, WORD INDEX, 4921 12th Avenue CASE          Associated Reporters Int'l., Inc.

Page 6

**option** 6:6
**options** 18:17
**order** 1:6,8,10 13:4 18:7 20:16
  20:20 21:24 23:1 24:20 25:21
**ordered** 1:8,9,10,12,13 24:8
**original** 20:7
**owned** 17:3
**owns** 17:4,12

---
**P**

**p.m** 1:13
**P.O** 1:22
**paid** 10:20
**papers** 19:7
**paragraph** 13:12
**parties** 10:10
**party** 3:17 10:13
**path** 6:17
**pay** 13:8
**payment** 13:8
**penny** 16:16
**percent** 11:14
**person** 17:4
**personal** 22:22
**petition** 14:8,10 16:16
**phonetic** 19:15 22:14
**Plaintiff** 2:1
**plan** 1:8,11 4:5,13 5:9,23 6:14
  8:8,12,24 9:12,12,14 12:14
  13:15,22
**plans** 8:13
**pleading** 25:2
**please** 3:2
**plenty** 13:6
**point** 4:10,21,21 5:17,19 8:24
  10:14 11:17 19:9
**possession** 16:15 17:24
**possibility** 4:13 5:23
**possible** 18:16
**post** 16:16
**pre-trial** 24:24
**Precisely** 14:20
**prefer** 15:2
**prepared** 20:8 23:20
**Presentment** 25:21
**previous** 21:2,2
**price** 12:17 13:24 15:8
**primary** 10:20
**principal** 4:19 5:2 13:7 18:14
**prior** 15:20

**probably** 11:13 15:4
**problem** 7:14,14 16:2 18:1
**proceed** 12:6
**proceeding** 22:15 25:22
**proceedings** 1:24 26:16
**process** 11:17
**produced** 11:13
**professional** 12:15
**progress** 9:12
**proof** 20:6,8
**property** 5:9,18 6:11,19 11:12
  13:14,16,17,23 14:10 15:2,8
**propose** 8:19 18:18
**proposed** 1:8,8,8,9,10,11,11,12
  1:13 3:4 5:8,9 6:9
**proposing** 6:16,19 8:2
**protect** 23:2
**protection** 23:4 24:16,17
**public** 18:7
**purchased** 18:7 20:6
**purpose** 8:12
**pursuant** 1:9,12
**pursue** 7:22
**put** 8:8 14:8 26:4
**putting** 8:12

---
**Q**

**Questions** 12:10
**quick** 13:13
**quickly** 8:8

---
**R**

**Rachel** 1:17 3:10,10
**ratio** 11:14
**rational** 13:20
**realize** 7:8 9:19 18:15
**really** 3:20 10:12 13:2 22:7
**reason** 7:16 9:11 12:2 14:7 15:4
  15:9 25:8
**receiver** 16:9,14,14 17:1,23
**recollection** 24:8
**record** 15:5 23:21
**recorded** 1:24
**recording** 1:24 26:15
**reduced** 13:8
**register** 20:10
**related** 1:15
**relative** 13:13,16
**relevant** 22:11
**relief** 25:19

**remarkably** 13:2 19:9
**rent** 11:13 16:2,3 17:15,22 21:3
**rents** 15:18,18 16:20 18:3
**Reporters** 1:22
**reports** 16:15 20:23,24 21:1
**represent** 3:13
**representation** 4:20
**Republic** 2:7 3:8 13:9 19:6,6,24
   20:2
**request** 22:13
**requests** 20:19 21:8
**respect** 23:18
**respectfully** 23:19
**rest** 17:16
**retained** 3:21
**right** 10:13,22 12:22 14:24
   16:12,18 17:18 19:1 23:10,12
   23:20 24:11 25:11
**Rule** 1:10,13

---

**S**

**sale** 5:9 6:19 11:10 13:15,24
**saw** 3:12
**saying** 6:6 11:5 18:12
**Scheduling** 1:6,8,10
**second** 23:7
**Section** 23:2
**secured** 5:20
**see** 3:15,19 6:18 19:7,8,8,11
   20:10 24:11
**seeing** 3:18
**seeking** 1:8,11 24:14,17,18,20
**seeks** 25:19
**seen** 15:5,22 19:5,8,12,13
**sell** 6:11 15:2
**selling** 11:9
**sense** 8:12 19:12
**separate** 24:4,10,11
**served** 1:14
**Service** 1:22
**set** 20:17
**settlement** 18:18
**Seven** 1:7
**sever** 23:15 24:20
**severance** 23:11,13 24:14
**severed** 23:12,15,17
**short** 14:5
**show** 16:15 21:1
**showed** 25:15
**side** 20:22

**Signed** 1:14
**single** 4:5,11 7:7
**six** 17:24
**skeptical** 10:11
**small** 4:7,10,11
**Solomon** 22:19,23,24
**Solomon's** 19:15
**somebody** 17:2
**somewhat** 24:7
**sought** 25:19
**sound** 1:24 26:15
**speak** 4:18 14:9
**speaks** 19:14
**spelling** 19:15 22:14
**Spriggs** 26:20
**Stanczyk** 2:2
**standing** 22:19
**state** 6:17 23:8
**stated** 14:10,21
**statement** 1:8,9,9,11,11,12,14
   1:15,16 4:6 6:17 8:4 12:6,8,9
   12:12,14 13:12 14:7 15:11
   19:2,3 20:15,16,20,21
**statements** 19:15,19 20:23 21:2
**States** 1:1,5,7,18 3:11
**stay** 22:4 23:1,5,19 24:15,16,18
   24:19
**step** 23:14
**stop** 9:15
**stopping** 9:18
**store** 16:16 17:3,10,13,17
**Street** 1:20 2:2,9
**subject** 12:23 13:1
**submit** 20:16 21:24 24:20
**subordinate** 10:15,17
**substantially** 14:13
**substitute** 3:4
**sufficient** 15:4
**Suite** 1:20 2:3,9
**sum** 5:1,3,3 6:18 7:20
**summons** 25:2
**supported** 14:11
**supposed** 19:1
**sure** 13:9,10 15:6 25:11
**Syracuse** 2:4

---

**T**

**take** 11:20,20 12:16 13:6,19,23
   23:14
**talking** 14:23 15:15,17 17:5

800.523.7887          5-29-2019, WORD INDEX, 4921 12th Avenue CASE          Associated Reporters Int'l., Inc.

Page 8

19:1 20:2
**tell** 14:9 19:3
**telling** 15:8
**Temes** 2:1,2
**ten** 10:21
**tenant** 17:12 21:4
**terms** 12:17
**test** 13:23 15:6
**testing** 14:19
**Thank** 26:9,10
**that's** 3:24,24 4:22 6:15 7:23
  8:1 9:2,16,16,20 10:10 11:5
  11:22,23 13:4,20 15:22 16:1
  17:13 18:1,1,23 19:18 22:3
  24:8,19
**there's** 9:10,11,11 11:24 12:2
  14:6 16:6 17:1,1,19,23 19:14
  23:7,8,9,17,18 24:19,24
**they'll** 11:20
**they're** 6:16 10:13,14,17 11:9
  11:19 14:12,14 15:7,21,23
  16:20,22,24 17:2 20:5,5,9
  22:24
**they've** 6:9 7:18
**thing** 19:4 23:14
**things** 20:22
**think** 4:21 15:9,9 20:8 22:9,10
  24:18,19,24 25:2
**Third** 2:12
**thirty** 13:5
**thirty-one** 13:12
**thousand** 5:14 12:18 21:3
**three** 5:9 9:8 17:19 21:15,22,23
**time** 3:23 4:3,5 8:24 9:6,9,10
  11:13,17 13:5,6 14:5 15:14
  18:4 22:11 25:12
**title** 2:8 10:12 19:21
**today** 4:22 25:1,3,7,9
**Tower** 2:3
**transcript** 26:15
**Transcription** 1:22
**Transcriptionist** 26:21
**transferred** 22:17
**trust** 15:3
**Trustee** 1:7,17,18 3:11 20:18
  21:8
**Trustee's** 21:9
**turning** 13:3
**twenty-two** 5:7,13
**two** 3:16 17:16 19:9 23:22 24:1

24:4,9,10,11

| U |
| --- |

**U.S** 1:17,19 20:18 21:8,9
**U.S.C** 1:10,12
**Uh-huh** 4:8 14:4
**understand** 4:2
**understanding** 18:3
**Understood** 12:5
**unintelligible** 13:9 17:13 18:9
  18:15 20:10,13,19 21:20 22:7
  22:15 23:9 24:12
**United** 1:1,5,7,18 3:11
**upside** 13:3

| V |
| --- |

**vague** 19:14
**value** 6:19 11:8,12,14 13:14,19
  13:23 14:10
**values** 14:12
**Varick** 1:20
**variety** 12:14
**viable** 4:23
**violates** 24:14
**violation** 22:4 24:19
**voiced** 7:14
**voting** 8:13,18

| W |
| --- |

**want** 6:10,11 7:21,21 10:6 11:19
  12:9,12,16,19,22 13:7,8,10,23
  15:1,5,6 19:2 21:17 22:8
  25:14
**wants** 22:2
**war** 14:1
**wasn't** 14:8 25:11
**way** 4:23
**we'll** 14:18,19 21:6 26:3
**we're** 5:10,10 6:3,15 7:6,6 9:24
  10:15,20 11:5,23 19:1
**we've** 4:2,3 14:6
**week** 25:1,4
**went** 4:6 22:17
**weren't** 15:20 23:24 24:1
**West** 2:9
**what's** 4:24 14:23 18:5
**who's** 17:12,12 18:5
**willing** 14:13 18:18
**Wolf** 1:17 3:10,10 20:18 21:8
**won't** 11:21

800.523.7887          5-29-2019, WORD INDEX, 4921 12th Avenue CASE          Associated Reporters Int'l., Inc.

Page 9

**words** 11:15
**worth** 10:21 15:8
**wrote** 13:12

---
**X**
---

---
**Y**
---
**Yeah** 25:10
**years** 13:5 16:4
**York** 1:2,21,23 2:10,13
**you'd** 8:13,16
**you're** 7:19 10:24 11:2 15:15

---
**Z**
---
**zero** 21:1

---
**0**
---

---
**1**
---
**1** 1:11 26:20
**100** 2:2
**10014** 1:21
**10022** 2:13
**10036** 2:10
**1006** 1:20
**11** 1:9,12
**11235** 2:6
**1125** 1:10,12
**11th** 2:13
**12th** 1:3 2:5
**13202** 2:4
**13662** 1:23
**165** 1:22
**17th** 21:12
**18-47256** 1:3
**19** 1:7
**1905** 2:3

---
**2**
---
**2** 1:6
**201** 1:20
**2019** 1:4,11,13,14 26:20
**22** 1:14
**29** 1:4,13

---
**3**
---
**3:00** 1:13
**3017** 1:10,13
**3099** 2:5
**315** 1:23

**36** 2:9
**3rd** 2:6

---
**4**
---
**4/29/2019** 1:14
**44th** 2:9
**4921** 1:3 2:5

---
**5**
---
**50** 1:8,10
**52** 1:16
**53** 1:15
**541** 17:9

---
**6**
---

---
**7**
---
**7/17** 21:15,23 26:1,4
**769-6429** 1:23

---
**8**
---
**800** 2:12
**816** 2:9

---
**9**
---

| Information to identify the case: | | |
|---|---|---|
| Debtor | **4921 12th Avenue LLC** | EIN   **20−0581630** |
| | Name | |
| United States Bankruptcy Court   **Eastern District of New York** | | Date case filed for chapter   **11**   **12/20/18** |
| Case number:   **1−18−47256−cec** | | |

# NOTICE OF FILING OF TRANSCRIPT AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION

**NOTICE IS HEREBY GIVEN THAT:**

A transcript of the proceeding held on 5/29/19 was filed on 7/3/19.

The following deadlines apply:

The parties have until July 10, 2019 to file with the court a Notice of Intent to Request Redaction of this transcript. The deadline for filing a Transcript Redaction Request is July 24, 2019.

If a Transcript Redaction Request is filed, the redacted transcript is due August 5, 2019.

If no such Notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is October 1, 2019, unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber Associated Reporter Int'l. at 315−769−6429 or you may view the document at the public terminal at the Office of the Clerk.

Dated: July 8, 2019

For the Court, Robert A. Gavin, Jr., Clerk of Court

**BLnftrans2.jsp** [Notice of Filing Transcript and Deadlines to Restriction and Redaction rev. 02/01/17]

# Notice Recipients

District/Off: 0207−1                  User: adobson                    Date Created: 7/8/2019

Case: 1−18−47256−cec                  Form ID: 295                     Total: 7

**Recipients of Notice of Electronic Filing:**

aty        Alla Kachan          alla@kachanlaw.com
aty        J Ted Donovan        Tdonovan@gwfglaw.com
aty        Joseph Y. Balisok    balisoklawyers@gmail.com
aty        Mark A. Frankel      mfrankel@bfklaw.com

                                                                       TOTAL: 4

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

db         4921 12th Avenue LLC      4921 12th Avenue      Brooklyn, NY 11219
           DAVID K FIVESON        Butler, Fitzgerald,      Fiveson & McCarthy      36 West 44th Street, Suite
           816      New York, NY 10036
           DAVID C. TEMES       Lynn, DElia, Temes & Stanczyk      100 Madison Street, Tower I      Suite
           1905      Syracuse, NY 13202

                                                                       TOTAL: 3

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x

In re                                                    Chapter 11

      4921 12th Avenue, LLC                           Case no.  18-47256

                    Debtor.
----------------------------------------------------------x

## **DECLARATION IN SUPPORT OF PLAN CONFIRMATION**[1]

      Robert Liner, as managing member of Galster Funding LLC (the "Proponent" or

"Mortgagee"), the Proponent of the Amended Plan of Reorganization (the "Plan") in the case of

4921 12th Avenue, LLC ("Debtor"), states under penalty of perjury as follows:

      1.      On December 20, 2018, the Debtor filed a Chapter 11 petition under Title

11 of the United States Code, 11 U.S.C. "101 et seq. (the "Bankruptcy Code").

      2.      The Debtor owns the real property at 4917 12th Avenue, Brooklyn, New

York 11219 (the "Property") pictured below:

---

[1] Capitalized terms not defined herein shall have the same meaning as defined in the Plan.



      3.      The value of the Property, as stated by the Debtor in its Chapter 11 schedules is $10,000,000.

      4.      Galster Funding LLC (the "Galster Mortgagee") holds a judgment of foreclosure and sale entered on August 20, 2018 in an action entitled *Galster Funding LLC v. 4921 12th Avenue LLC; et al.* in the Supreme Court of the State of New York, County of Kings, Index No.: 500818/2017 (the "Galster Judgment").  The total amount due under the Galster Judgment as of the December 20, 2018 filing date is $9,480,175:

2

164

| | |
|---|---|
| Judgment Amount: | $8,929,916 |
| Interest from 5/31/18 to 08/20/18 @24% per judgment: | 350,973 |
| Interest from 8/21/18 to 12/20/18 @9% per judgment: | 193,931 |
| Costs and Disbursements with interest per judgment: | 1,855 |
| Attorneys' fees per judgment: | 3,500 |
| TOTAL: | $9,480,175 |

5.    The only other scheduled creditor is Beis Chasidi Gorlitz (the "BCG Mortgagee").  BCG filed a $13,500,000 mortgage lien claim.

6.    Based on the Galster Judgment and the BCG Mortgage claim, secured claims total $22,980,175.

7.    Absent any creditors except the two mortgagees, it appears that the Debtor filed this Chapter 11 on the eve of the foreclosure sale simply to delay the inevitable sale.

8.    The case has a long and unusual backstory.

9.    On or about August 30, 2016, the Galster Mortgagee loaned the Debtor $6,500,000, secured by a mortgage on the Property, which Property comprises two condominium units called C1 and R1.

10.    At that time, there were two mortgages of record against the Property held by the BCG Mortgagee, one for $1,200,000 and the other for $1,300,000 (the "BCG Mortgages").

11.    At closing the Galster Loan, the Debtor presented two (2) satisfactions of mortgages (the "Satisfactions") purportedly evidencing the satisfaction of the BCG Mortgages.

12.    Believing that its mortgage would have first priority, the Galster Mortgagee closed and disbursed the loan proceeds.

3

13.     Two months later on November 3, 2016, the BCG Mortgagee commenced a Kings Supreme Court action under index number 519469/2016.  BCG produced an affidavit from the notary public on the Satisfactions attesting that the Satisfactions were forged and/or fraudulent.  BCG alleged that the amount remaining due on the BCG Mortgages exceeded $5 million as of January 2016. BCG sought a declaration that the Satisfactions were void, that the BCG Mortgages remained valid liens, and that the Galster Mortgage was void.  The same day, the Supreme Court enjoined the Debtor and Yehuda Salamon, its principal, from dissipating assets.

14.     When the Galster Mortgagee discovered the BCG action, it filed a Supreme Court case to enjoin disbursement of the amounts remaining of its $6,500,000 loan.

15.     The Debtor did not oppose either of the injunction applications.  Instead, the Debtor essentially admitted that the Satisfactions were bogus and offered to vacate them.

16.     The requested injunctions were entered, the Debtor stopped paying the Galster mortgage, the Galster Mortgagee accelerated its loan, and the Galster Mortgagee commenced its foreclosure action.

17.     In the BCG case, BCG filed an affirmation alleging a pattern of Debtor misconduct including attempts to defraud BCG, the IRS, the Charities Bureau of the New York State Attorney General's office and the New York State Department of Taxation and Finance.

18.     The Debtor then sought to stay the Galster foreclosure arguing that the fraud allegations in the BCG case must be determined first.  The ploy failed.  The Supreme Court denied the Debtor's motion and appointed Gregory Laspina receiver by order signed on July 11, 2017.  Mr. Laspina, however, never took possession.

4

19.     Later, the Supreme Court, by decision and order dated March 7, 2019, extinguished the bogus satisfactions as demanded by BCG.

20.     Galster had title insurance.  Old Republic, Galster's title insurance carrier, honored its obligation to represent Galster and Butler Fitzgerald was retained for that purpose. Old Republic also acquired the BCG obligation and agreed to subordinate the BCG Mortgages to the Galster mortgage.

21.     The Foreclosure Judgment was entered August 20, 2018, and the sale scheduled for December 20, 2018.

22.     Meanwhile, since 2005, Yehuda Salamon, the Debtor's beneficial owner, was also beneficial owner of Yidel's grocery store, which occupies the first floor Property and, upon information and belief, Mr. Salamon has also permitted tenants to occupy the upstairs residential units.  The mortgages have been unpaid for years, but the Debtor had no money in its account upon filing this case.  This raises questions about whether rent has been collected and who has been collecting rent.  At the first meeting of creditors the Debtor could not answer a single question about the tenancies, despite repeated attempts by the United State Trustee and Galster's counsel.

23.     Unfortunately, the Debtor's principal has done nothing since filing this case to indicate that he shares the Mortgagee's sense of urgency regarding the eroding equity in the Property as judgment interest accrues every day.

24.     The Plan provides for sale of the Property.  The sale proceeds will be used (a) to pay pre-petition New York City real estate tax and other liens, if any, (b) administrative claims in an unliquidated amount, subject to Bankruptcy Court approval of Debtor's

5

professionals' fee applications, (c) Plan administration fees estimated to be approximately $25,000, (d) brokerage fees of 3% of the Purchase Price, (e) priority claims if any, and (f) the remainder to Creditors and Interest Holders in their order of priority.

25.    To ensure the Property is sold after reasonable exposure to the marketplace for the highest and best price, the Plan provides for professional marketing for at least 30 days, followed by an auction among qualified bidders.

26.    To effectuate the sale, the Confirmation Order, shall provide that on the Confirmation Date, the Plan Administrator shall be vested with all requisite rights and powers to exercise possession and control, including right of determination, over ( a) all of the Debtor's rights, title and interests in and to the Property, including all improvements, appurtenances and personal property associated therewith, and (b) the Debtor's Cash on hand for administration by the Plan Administrator.  On the Confirmation Date, the Plan Administrator shall take control of the Property and be responsible for the management and operation thereof until the Plan Administrator consummates a sale or other disposition of the Property under the terms of the Plan.

27.    In addition, on the Confirmation Date all of the Debtor's right, title and interests in and to any and all Causes of Action shall be deemed transferred to the Plan Administrator,

28.    Until the Property is sold under the Plan, the Plan Administrator shall provide periodic sale progress reports to parties in interest upon request.

29.    The Plan Administrator shall implement the Plan's Bidding and Auction Procedures within 14 days of the Confirmation Date, market for at least 30 days, and conduct an

6

auction sale and schedule a Bankruptcy Court hearing thereon within 75 days of the Confirmation Date, subject to reasonable extension of time in the Plan Administrator's discretion not to exceed 60 days, unless under Order of the Bankruptcy Court.  The sale shall be conducted by Rosewood Realty Group.  Absent a higher before the auction, the Proponent shall start the bidding with a $3,250,000 opening bid.

30.     Any fees, costs, or expenses incurred by the Plan Administrator in connection with the Plan and the marketing and sale of the Property, including any fees and/or commissions earned by the Broker, shall be paid from the net proceeds realized upon a sale of the Hotel Property.

31.     In addition, on the Confirmation Date, any right, claim or cause of action, belonging to the Debtor or its estate against any Person or Entity, including, without limitation, any claim to avoid a transfer under, inter alia, Sections 544, 547, 548, 549 or 553(b) of the Bankruptcy Code, shall be transferred, conveyed and assigned by the Debtor to the Plan Administrator for the benefit of the holders of Allowed Claims and Equity Interests in the order of their respective statutory priorities as provided for in the Plan.

32.     The distribution under the Plan will be greater than in a Chapter 7 case because a sale under the Plan avoids a layer of Chapter 7 Administrative Claims as well as stamp taxes. There would be no distribution in a Chapter 7 case given the shortfall between the estimated $10,000,000 purchase price and the $22,980,175 of Secured Claims.

33.     The Plan complies with the applicable provisions of the Bankruptcy Code, pursuant to section 1129(a)(1), such as compliance with the rules for classification of claims under section 1122 of the Code and the plan requirements under section 1123 of the Code.

7

34.     The Proponent has complied with the applicable provisions of the Bankruptcy Code pursuant to section 1129(a)(2) such as compliance with the disclosure and solicitation requirements of section 1125 and 1126 of the Code.

35.     The Plan has been proposed in good faith and not by any means forbidden by law pursuant to section 1129(a)(3) inasmuch as the plan is consistent with the general intent of the Code to permit the liquidation of a debtor's assets to maximize the return to creditors.

36.     Any payment made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the Bankruptcy Case, or in connection with the Plan and incident to the Bankruptcy Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable, pursuant to section 1129(a)(4).  This section is inapplicable herein.

37.     Post-confirmation management of the Debtor will remain unchanged. That is consistent with section 1129(a)(5) because management of the Debtor's assets will be transferred to the Plan Administrator on the Confirmation Date, and existing creditors will no longer be affected by the Debtor's remaining management post-confirmation.

38.     The Plan does not propose a rate change for which governmental regulatory commission approval is required, pursuant to section 1129(a)(6).

39.     The Class 2 Proponent, the Class 3 Claimant and Class 5 general unsecured creditors are impaired.  Each of those classes has voted to accept the Plan. Accordingly, the requirement under section 1129(a)(7) of the Bankruptcy Code is deemed

satisfied, i.e., with respect to each class of impaired Claims, either each holder of a Claim or interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or interest property of a value, as of the Effective Date of the Plan, in an amount that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code.

40.    The Class 6 Interest Holder appears to have voted to reject the Plan, but the Plan satisfies section 1129(a)(7) because the Class 6 Interest Holder will be paid no less than it would be entitled to under Chapter 7 of the Bankruptcy Code.

41.    Based upon the preceding paragraph, the requirement of section 1129(a)(8) is also deemed satisfied with respect to creditor classes, i.e., that each class has accepted the Plan, or is not impaired under the Plan.

42.    The Class 6 Interest Holder appears to have voted to reject the Plan.  The Proponent submits that the Bankruptcy Court may still confirm the Plan under section 1129(b)(2)(C) because, as to Interest Holders, the Plan "does not discriminate unfairly" and is "fair and equitable."

43.    Class 6 is entitled to a distribution from the sale proceeds consistent with its order of priority under the Bankruptcy Code.  The Plan, therefore, is fair and equitable because the Plan provides that each Interest Holder will receive or retain property of a value, as of the effective date of the plan, equal to the greatest of: (1) the allowed amount of any fixed liquidation preference to which the interest holder is entitled, (2) any fixed redemption price to which the interest holder is entitled or (3) the value of such interest.  In addition, the plan is fair

9

and equitable with respect to Class 6 because no holder of any interest that is junior to Class 6 will receive or retain property under the plan.

44.     Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that priority and administration claims will be paid in full on the Effective Date, or as soon thereafter as the Allowed Amounts of such Claims are determined, thereby satisfying section 1129(a)(9) of the Code.

45.     Classes 2, 3 and 5 are impaired and voted to accept the Plan.  Thus, the Debtor has satisfied the requirement of section 1129(a)(10) of the Code, that at least one class of impaired Claims has accepted the Plan.

46.     Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successors to the Debtor under the Plan pursuant to section 1129(a)(11), since the Debtor intends to liquidate the sale proceeds under the Plan.

47.     All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan pursuant to section 1129(a)(12).

48.     The Debtor does not have retirement benefits obligations, and, therefore, section 1129(a)(13) relating to retirement benefits does not apply to this case.

49.     Based upon the foregoing, the Debtor respectfully requests that the Court

confirm the Plan.

Dated: New York, New York
       July 15, 2019

                                              s/Robert Liner

11

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                                    Chapter 11

      4921 12th Avenue, LLC                              Case no.  18-47256

                              Debtor.
--------------------------------------------------------x

## <u>ORDER CONFIRMING MORTGAGEE'S PLAN OF REORGANIZATION[1]</u>

          Galster Funding LLC (the "Proponent" or the "Mortgagee") having proposed its

Plan of Reorganization (the "Plan") dated May 1, 2019 for debtor 4921 12th Avenue, LLC (the

"Debtor"); and the Disclosure Statement approved in connection with the Plan having been

transmitted to creditors and equity security holders, and upon the Declaration in Support of Plan

Confirmation of Robert Liner executed on  July 15, 2019, and upon the hearing held before this

Court on July 17, 2019 (the "Confirmation Hearing"), and upon the entire record of this case,

and the Court having found:  (a) that the requirements for confirmation of the Plan set forth in 11

U.S.C. 1129(a) have been satisfied at the Confirmation Hearing, and (b) that cause exists for the

Court to order that the stay under Bankruptcy Rule 3020(e) shall not apply to this Order; it is

          ORDERED, that pursuant to sections 1129 and 1141 of the Bankruptcy Code, the Plan

be, and it hereby is, confirmed; and it is further

          ORDERED, that in furtherance of the Plan, the Proponent and the Plan Administrator are

authorized and directed to take any and all actions contemplated to be taken by them under the

Plan; and it is further

---

[1] All terms not defined herein shall have the same meaning as in the Plan.

ORDERED, that in accordance with Section 1141(a) of the Bankruptcy Code, the provisions of the Plan and this Confirmation Order are binding on the Proponent, the Debtor, each Creditor, and every other party-in-interest in this case and each of their respective successors and assigns (whether or not such Creditors or parties-in-interest voted to accept the Plan, whether or not they are impaired under the Plan, and whether or not any such Holder has filed, or is deemed to have filed, a proof of Claim or proof of Interest), and any other Person giving, acquiring, or receiving property under the Plan, and any lessor or lessee of property to or from the Debtor. The rights afforded in the Plan and the treatment of all Claims and Interests therein shall be in exchange for and in complete satisfaction of all Claims and Interests of any nature whatsoever, known or unknown, including, except as expressly provided in the Plan, interest accrued on or expenses incurred in connection with such Claims from and after the Petition Date, against the Debtor or its property or interests in property; and it is further.

ORDERED, pursuant to Bankruptcy Code § 1146, the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the sale of the Property in accordance with the terms of the Plan, shall not be subject to any stamp, real estate transfer, documentary, registration, sales, added-value, mortgage release, mortgage recording, or similar tax; and it is further

ORDERED, that all entities holding Claims against or Interests in the Debtor that are treated under the Plan are hereby directed to execute, deliver, file, or record any document, and to take any action necessary to implement, consummate, and otherwise effect the Plan in accordance with their respective terms, and all such entities shall be bound by the terms and provisions of all documents executed and delivered by them in connection with the Plan; and it is further

ORDERED, In accordance with Section 1142 of the Bankruptcy Code, the Proponent and any other entity designated pursuant to the Plan, including, without limitation, the Plan

2

175

Administrator, are hereby authorized, empowered, and directed to issue, execute, deliver, file, and record any document, and to take any action necessary or appropriate to implement, consummate, and otherwise effectuate the Plan in accordance with its terms, and all such entities shall be bound by the terms and provisions of all documents issued, executed, and delivered by them as necessary or appropriate to implement or effectuate the transactions contemplated by the Plan; and it is further

ORDERED, that the Debtor shall provide the Plan Administrator with (a) access to and assistance in locating any books and records of the Debtor that may reasonably be requested and (b) access to and assistance from the Debtor regarding the Debtor's books and records or factual information relevant to any Causes of Action or objections to Claims that may be brought by the Plan Administrator; and it is further

ORDERED, that the Proponent shall be the disbursing agent under the Plan responsible for making distributions under the Plan, and shall file a disbursement report with the Bankruptcy Court upon making such distributions, and it is further

ORDERED, that the Plan Administrator shall file, within 45 days after the date of this Order, a status report detailing the actions taken by the Debtor and the progress made toward the consummation of the Plan; and it is further

ORDERED, that the Plan Administrator shall file status reports with the Court every January 15th, April 15th, July 15th, and October 15th until a final decree has been entered closing the Debtor's chapter 11 case; and it is further

ORDERED, that the Plan Administrator shall pay to the United States Trustee all fees due and payable by the Debtor, if any, under and pursuant to 28 U.S.C. § 1930, plus all applicable interest thereon, until the Debtor's chapter 11 case is either dismissed, converted to

3

chapter 7, or until a final decree is entered closing the Debtor's chapter 11 case, whichever is earlier; and it is further

ORDERED, the Proponent and any designee, its respective equity holders, directors, officers, employees, attorneys, financial advisors, investment bankers and other professionals have acted in good faith in connection with the Plan, this Chapter 11 Case, and the formulation and consummation of the Plan, and accordingly, has satisfied Section1125(e) of the Bankruptcy Code; and it is further

ORDERED, that except as otherwise expressly provided in the Plan, or any other Order of this Court, all persons or entities who have held, hold or may hold Claims against or Interests in the Debtor, along with their respective present and former employees, agents, officers, directors, principals and affiliates, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Proponent and/or the Debtor's assets and/or properties with respect to such Claim or Interest (other than actions brought to enforce any rights or obligations under the Plan):

a) commencing or continuing in any manner any action or other proceeding of any kind,

b) enforcing, attaching, collecting or recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree or order,

c) creating, perfecting, or enforcing, in any manner, directly or indirectly, any encumbrance of any kind,

d) asserting any right of setoff, subrogation or recoupment of any kind, or

e) pursuing any Claim released pursuant to the Plan;

and it is further

ORDERED, that except as otherwise provided in the Plan, such injunction shall extend to any successors of the Proponent, the Debtor, and their respective properties and interests in

4

177

properties. Additionally, upon the entry of this Confirmation Order, all holders of Claims and

Interests and other parties in interest, along with their respective present and former employees,

agents, officers, directors, principals and affiliates are hereby enjoined (from taking any actions

other than by or in connection with an appeal of this Confirmation Order) to interfere with the

implementation or consummation of the Plan. Unless otherwise provided in the Plan, this

Confirmation Order, or a separate order of the Court, all injunctions or stays arising under or

entered during the Chapter 11 cases under Sections 105 or 362 of the Bankruptcy Code, or

otherwise, and in existence on the date of this Confirmation Order shall remain in full force and

effect until the later of the Effective Date and the date indicated in the order providing for such

injunction or stay; provided, however, that on the Effective Date, the stay shall be replaced to the

extent provided in this Confirmation Order, with an injunction set forth in the Plan and/or

Sections 524 and 1141 of the Bankruptcy Code; and it is further

      ORDERED, that this Court hereby retains exclusive jurisdiction over this Order, and to

hear and to determine all controversies, suits and disputes, if any, as may arise in connection

with the consummation of the Plan; and it is further

      ORDERED, that this Order shall not be stayed under Bankruptcy Rule 3020(e).

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re                                                          Chapter 11

      4921 12th Avenue, LLC                      Case no.  18-47256-CEC

                        Debtor.
--------------------------------------------------------x

### ORDER CONFIRMING MORTGAGEE'S PLAN OF REORGANIZATION[1]

          Galster Funding LLC (the "Proponent" or the "Mortgagee") having proposed its Plan of Reorganization (the "Plan") dated May 1, 2019 for debtor 4921 12th Avenue, LLC (the "Debtor"); and the Disclosure Statement approved in connection with the Plan having been transmitted to creditors and equity security holders, and upon the Declaration in Support of Plan Confirmation of Robert Liner executed on  July 15, 2019, and upon the hearing held before this Court on July 17, 2019 (the "Confirmation Hearing"), and upon the entire record of this case, and the Court having found:  (a) that the requirements for confirmation of the Plan set forth in 11 U.S.C. 1129(a) have been satisfied at the Confirmation Hearing, and (b) that cause exists for the Court to order that the stay under Bankruptcy Rule 3020(e) shall not apply to this Order; it is

      ORDERED, that since the Debtor is a limited liability company and the Plan is a liquidating plan, paragraph 103 of the Plan providing for a discharge be, and it hereby is, deemed deleted; and it is further

      ORDERED, that paragraph 75 of the Plan is deemed amended as follows:
Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Professional Fee Claims) must be filed and served on counsel for the Debtor and Proponent by no later than ~~the Confirmation Hearing~~ thirty *five (CEC)* days after ~~this~~ *the Confirmation (CEC)* Order is entered (the "Administrative Claims Bar Date") and the Proponent shall serve*, within 3 days of entry of the Confirmation Order, (CEC)* a notice of Administrative Claims Bar Date on all parties in interest substantially in the form annexed ~~hereto~~ *to the Confirmation Order (CEC)*. Any Person that is required to file and serve a request for payment

---

[1] All terms not defined herein shall have the same meaning as in the Plan.

of an Administrative Claim and fails to timely file and serve such request shall be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. Objections to requests for payment of Administrative Claims (except for Professional Fee Claims and Administrative Claims incurred in the ordinary course of the Debtor's business) must be filed and served on counsel for the Debtor, Proponent, and the party requesting payment of an Administrative Claim within thirty (30) days of the date such request for payment has been filed.

ORDERED, that pursuant to sections 1129 and 1141 of the Bankruptcy Code, the Plan be, and it hereby is, confirmed; and it is further

ORDERED, that in furtherance of the Plan, the Proponent and the Plan Administrator are authorized and directed to take any and all actions contemplated to be taken by them under the Plan; and it is further

ORDERED, that in accordance with Section 1141(a) of the Bankruptcy Code, the provisions of the Plan and this Confirmation Order are binding on the Proponent, the Debtor, each Creditor, and every other party-in-interest in this case and each of their respective successors and assigns (whether or not such Creditors or parties-in-interest voted to accept the Plan, whether or not they are impaired under the Plan, and whether or not any such Holder has filed, or is deemed to have filed, a proof of Claim or proof of Interest), and any other Person giving, acquiring, or receiving property under the Plan, and any lessor or lessee of property to or from the Debtor. The rights afforded in the Plan and the treatment of all Claims and Interests therein shall be in exchange for and in complete satisfaction of all Claims and Interests of any nature whatsoever, known or unknown, including, except as expressly provided in the Plan, interest accrued on or expenses incurred in connection with such Claims from and after the Petition Date, against the Debtor or its property or interests in property; and it is further

ORDERED, pursuant to Bankruptcy Code § 1146, the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the sale of the Property in accordance with the terms of the Plan, shall not be subject to any stamp, real estate transfer, documentary, registration, sales, added-value, mortgage release, mortgage recording, or similar tax; and it is further

2

ORDERED, that all entities holding Claims against or Interests in the Debtor that are treated under the Plan are hereby directed to execute, deliver, file, or record any document, and to take any action necessary to implement, consummate, and otherwise effect the Plan in accordance with their respective terms, and all such entities shall be bound by the terms and provisions of all documents executed and delivered by them in connection with the Plan; and it is further

ORDERED, in accordance with Section 1142 of the Bankruptcy Code, the Proponent and any other entity designated pursuant to the Plan, including, without limitation, the Plan Administrator, are hereby authorized, empowered, and directed to issue, execute, deliver, file, and record any document, and to take any action necessary or appropriate to implement, consummate, and otherwise effectuate the Plan in accordance with its terms, and all such entities shall be bound by the terms and provisions of all documents issued, executed, and delivered by them as necessary or appropriate to implement or effectuate the transactions contemplated by the Plan; and it is further

ORDERED, that the Debtor shall provide the Plan Administrator with (a) access to and assistance in locating any books and records of the Debtor that may reasonably be requested and (b) access to and assistance from the Debtor regarding the Debtor's books and records or factual information relevant to any Causes of Action or objections to Claims that may be brought by the Plan Administrator; and it is further

ORDERED, that the Debtor shall cooperate with any broker, auctioneer, and/or real estate professional to permit reasonable access to the Property for marketing purposes; and it is further

ORDERED, that the Proponent shall be the disbursing agent under the Plan responsible for making distributions under the Plan, and shall file a disbursement report with the Bankruptcy Court upon making such distributions, and it is further

ORDERED, that the Plan Administrator shall file, within 45 days after the date of this Order, a status report detailing the actions taken by the Debtor and the progress made toward the consummation of the Plan; and it is further

3

ORDERED, that the Plan Administrator shall file status reports with the Court every January 15th, April 15th, July 15th, and October 15th until a final decree has been entered closing the Debtor's chapter 11 case; and it is further

ORDERED, that the Plan Administrator shall pay to the United States Trustee all fees due and payable by the Debtor, if any, under and pursuant to 28 U.S.C. § 1930, plus all applicable interest thereon, until the Debtor's chapter 11 case is either dismissed, converted to chapter 7, or until a final decree is entered closing the Debtor's chapter 11 case, whichever is earlier; and it is further

ORDERED, the Proponent and any designee, its respective equity holders, directors, officers, employees, attorneys, financial advisors, investment bankers and other professionals have acted in good faith in connection with the Plan, this Chapter 11 Case, and the formulation and consummation of the Plan, and accordingly, has satisfied Section1125(e) of the Bankruptcy Code; and it is further

ORDERED, that except as otherwise expressly provided in the Plan, or any other Order of this Court, all persons or entities who have held, hold or may hold Claims against or Interests in the Debtor, along with their respective present and former employees, agents, officers, directors, principals and affiliates, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Proponent and/or the Debtor's assets and/or properties with respect to such Claim or Interest (other than actions brought to enforce any rights or obligations under the Plan):

a) commencing or continuing in any manner any action or other proceeding of any kind,

b) enforcing, attaching, collecting or recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree or order,

c) creating, perfecting, or enforcing, in any manner, directly or indirectly, any encumbrance of any kind,

d) asserting any right of setoff, subrogation or recoupment of any kind, or

e) pursuing any Claim released pursuant to the Plan;

and it is further

4

ORDERED, that except as otherwise provided in the Plan, such injunction shall extend to any successors of the Proponent, the Debtor, and their respective properties and interests in properties. Additionally, upon the entry of this Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present and former employees, agents, officers, directors, principals and affiliates are hereby enjoined (from taking any actions other than by or in connection with an appeal of this Confirmation Order) to interfere with the implementation or consummation of the Plan. Unless otherwise provided in the Plan, this Confirmation Order, or a separate order of the Court, all injunctions or stays arising under or entered during the Chapter 11 cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the date of this Confirmation Order shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay; provided, however, that on the Effective Date, the stay shall be replaced to the extent provided in this Confirmation Order, with an injunction set forth in the Plan and/or Sections 524 and 1141 of the Bankruptcy Code; and it is further

ORDERED, that this Court hereby retains exclusive jurisdiction over this Order, and to hear and to determine all controversies, suits and disputes, if any, as may arise in connection with the consummation of the Plan; and it is further

ORDERED, that this Order shall not be stayed under Bankruptcy Rule 3020(e).



**Dated: Brooklyn, New York**
**July 30, 2019**

5

Carla E. Craig
**Carla E. Craig**
**United States Bankruptcy Judge**

183

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re                                                    Chapter 11

      4921 12th Avenue, LLC                         Case no.  18-47256-CEC

                      Debtor.
-----------------------------------------------------------x

**Notice Of Deadline Requiring Filing Of Administrative Proofs Of Claim On Or Before _____, 2019**

**To All Persons And Entities With Administrative Claims Against 4921 12th Avenue, LLC**

      The United States Bankruptcy Court for the Eastern District of New York has entered an Order establishing _____, 2019 at 5:00 p.m. Eastern Time (the "Administrative Claims Bar Date") as the last date for each person or entity (including individuals, partnerships, corporations, joint ventures, trusts and governmental units) to file a proof of claim against the debtor listed above (the "Debtor").

      The Administrative Claims Bar Date and the procedures set forth below for filing proofs of claim apply to all claims against the Debtor that arose after December 20, 2018, the date on which the Debtor commenced its case under Chapter 11 of the United States Bankruptcy Code, except for those holders of the claims listed in Section 4 below that are specifically excluded from the Administrative Claims Bar Date filing requirement.

1.    WHO MUST FILE A PROOF OF CLAIM

You MUST file a proof of claim to share in any potential distribution from the Debtor's bankruptcy as a holder of an Administrative Claim, if your Administrative Claim is not one of the types of claim described in Section 4 below. Claims for administrative expenses are specifically described in sections 503 and 507 of the Bankruptcy Code. Among other things, these sections provide that certain types of claims are entitled to administrative expense priority, including, without limitation: (i) the actual, necessary costs and expenses of preserving the estates, including wages, salaries, or commissions for services rendered after the commencement of the bankruptcy cases; (ii) certain taxes and penalties related thereto; (iii) compensation and reimbursement of certain professionals or officers; (iv) the actual, necessary expenses incurred by (a) certain creditors, (b) a creditor, an indenture trustee, an equity security holders, or a committee representing any such entities, in making a substantial contribution to a debtor's chapter 11 case, (c) a custodian, (d) members of certain committees if incurred in the performance of the duties of such committees; or (v) compensation for services rendered by an indenture trustee. Claims based on acts or omissions of the Debtor that occurred during the Chapter 11 Period must be filed on or prior to the Administrative Claims Bar Date, even if such claims are not now fixed, liquidated or certain or did not mature or become fixed, liquidated or certain during the Chapter 11 Period.

Under section 101(5) of the Bankruptcy Code and as used in this Notice, the word "claim" means: (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is

2

reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

2.    WHAT TO FILE

Proof of claim forms may be obtained at www.uscourts.gov/bkforms.  All proof of claim forms must be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant and must conform substantially to Form No. 10 of the Official Bankruptcy Forms. The proof of claim form must be written in English and be denominated in United States currency. You should attach to your completed proof of claim any documents on which the claim is based (if voluminous, attach a summary) or an explanation as to why the documents are not available.

Claimants may also file a proof of their assertion of an Administrative Claim on the electronic docket of the Debtor's bankruptcy case in the customary form for notice of such Administrative Claim, but no later than the Administrative Claims Bar Date, such professional must file an application for payment that complies with the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules and the Fee Guidelines promulgated by the United States Trustee by the Administrative Claims Bar Date together with a notice hearing on such application.

3.    WHEN AND WHERE TO FILE

Except as provided for herein, all proofs of Administrative Claim must be filed so as to be received on or before _____, 2019 at 5:00 p.m. Eastern Time at the following address: Clerk of Court, United States Bankruptcy Court, 271-C Cadman Plaza East, Brooklyn, NY 11201-1800, or entered electronically on the Court's electronic docket for the Debtor's case. Attorneys (with full access) and employees of institutional creditors (with limited

3

186

access accounts) should file proofs of claim electronically on the Court's Case Management/Electronic Case File ("CM/ECF") system.  Those without accounts to the CM/ECF system must file their proofs of claim by mailing or delivering the original proof of claim by hand to the United States Bankruptcy Court, 271 Cadman Plaza East, Brooklyn, New York.

Proofs of Administrative Claim will be deemed filed only when received by the Bankruptcy Court or entered on the Court's electronic docket for the Debtor's case on or before the Administrative Claims Bar Date. Proofs of Administrative Claims may not be delivered by facsimile, telecopy or electronic mail transmission.

4.    WHO NEED NOT FILE A PROOF OF CLAIM

You do not need to file a proof of claim on or prior to the Bar Date if you are:

(a)  A person or entity that has already filed a proof of Administrative Claim; against the Debtor in the form and manner set forth in this notice;

(b)  A holder of an Administrative Claim that has previously been allowed by order of the Court;

(c)  A holder of an Administrative Claim that has been paid in full by the Debtor; or

(d)  A holder of an Administrative Claim for which a specific deadline   has previously been fixed by this Court.

This Notice is being sent to many  persons and entities that have had some relationship with or have done business with the Debtor but may not have an unpaid Administrative Claim against the Debtor. The fact that you have received this Notice does not mean that you have a claim or that the Trustee, the Debtor or the Court believes that you have an Administrative Claim against the Debtor.

4

187

Any person or entity that holds an Administrative Claim that arises from the rejection of an executory contract or unexpired lease, as to which the order authorizing such rejection is dated on or before the date of entry of the Administrative Claims Bar Date Order, must file a proof of such Administrative Claim based on such rejection on or before the Administrative Claims Bar Date, and any person or entity that holds an Administrative Claim that arises from the rejection of an executory contract or unexpired lease, as to which an order authorizing such rejection is dated after the date of entry of the Administrative Claims Bar Date Order, must file a proof of such Administrative Claim on or before such date as the Court may fix in the applicable order authorizing such rejection.

Holders of equity security interests in the Debtor need not file proof of interest with respect to the ownership of such equity interests, provided, however, that if any such holder asserts an Administrative Claim against the Debtor (including a Chapter 11 Claim relating to an equity interest or the purchase or sale of such equity interest), a proof of such Administrative Claim must be filed on or prior to the Administrative Claims Bar Date pursuant to the procedures set forth herein.

5.  CONSEQUENCES OF FAILURE TO FILE A PROOF OF CLAIM BY THE ADMINISTRATIVE CLAIMS BAR DATE

ANY HOLDER OF AN ADMINISTRATIVE CLAIM THAT IS NOT EXCEPTED FROM THE REQUIREMENTS OF THIS ORDER, AS SET FORTH IN SECTION 4 ABOVE, AND THAT FAILS TO TIMELY FILE AN ADMINISTRATIVE PROOF OF CLAIM IN THE APPROPRIATE FORM WILL BE BARRED FROM ASSERTING SUCH

CLAIM AGAINST THE DEBTOR AND ITS ESTATE, AND FROM PARTICIPATING IN

ANY DISTRIBUTION IN THE DEBTOR'S CASE ON ACCOUNT OF SUCH CLAIM.

       A holder of a possible claim against the Debtor should consult an attorney

regarding any matters not covered by this notice, such as whether the holder should file a proof of

claim.

Dated: New York, New York
          _____, 2019

                              BY ORDER OF THE COURT

Backenroth Frankel & Krinsky, LLP,
800 Third Avenue
New York, New York 10022
(212) 593-1100
Attn: Mark Frankel

6

189

Case 1-18-47256-reg    Doc 162    Filed 11/30/19    Entered 11/30/19 14:35:43

**Information to identify the case:**

Debtor

    **4921 12th Avenue LLC**

    Name

    EIN  **20−0581630**

United States Bankruptcy Court  **Eastern District of New York**

Case number:  **1−18−47256−cec**

Date case filed for chapter  **11   12/20/18**

# NOTICE OF ENTRY OF ORDER CONFIRMING
# CHAPTER 11 PLAN OF REORGANIZATION

**NOTICE IS HEREBY GIVEN THAT:**

In accordance with Bankruptcy Rule 2002, an order was signed on 7/30/19 confirming the debtor's Chapter 11 Plan of Reorganization.

The Order Confirming the Plan of Reorganization is on file and available for inspection in the Clerk's Office at:

271−C Cadman Plaza East, Suite 1595
Brooklyn, NY 11201−1800

Dated: July 30, 2019

For the Court, Robert A. Gavin, Jr., Clerk of Court

**BLeoc1.jsp** [Notice Confirming Chapter 11 Plan rev. 02/01/17]

# Notice Recipients

District/Off: 0207−1      User: jlecky      Date Created: 7/30/2019

Case: 1−18−47256−cec      Form ID: 225      Total: 20

**Recipients of Notice of Electronic Filing:**

aty      Alla Kachan      alla@kachanlaw.com

aty      J Ted Donovan      Tdonovan@gwfglaw.com

aty      Joseph Y. Balisok      balisoklawyers@gmail.com

TOTAL: 3

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

db      4921 12th Avenue LLC      4921 12th Avenue      Brooklyn, NY 11219

smg      United States of America      Secretary of the Treasury      15th Street & Pennsylvania Ave. NW      Washington, DC 20220

smg      NYS Unemployment Insurance      Attn: Insolvency Unit      Bldg. #12, Room 256      Albany, NY 12240

smg      NYS Department of Taxation & Finance      Bankruptcy Unit      PO Box 5300      Albany, NY 12205

smg      Internal Revenue Service      PO Box 7346      Philadelphia, PA 19101−7346

smg      NYC Department of Finance      345 Adams Street      Office of Legal Affairs      Brooklyn, NY 11201−3719

smg      Office of the United States Trustee      Eastern District of NY (Brooklyn Office)      U.S. Federal Office Building      201 Varick Street, Suite 1006      New York, NY 10014

9424753      Beis Chasidei Gorlitz      c/o Berkman Henoch et al      100 Garden City Plaza      Garden City, NY 11530

9424751      Beis Chasidei Gorlitz      c/o Herrick Feinstein LLP      2 Park Avenue      New York, NY 10016

9451378      Butler, Fitzgerald, Fiveson & McCarthy, P.C.      9 East 45th Street, Ninth Floor      New York, New York 10017

9441887      Galster Funding LLC      9 East 45th St., 9th Floor      New York, NY 10017

9424754      Galster Funding LLC      9 East 45th Street, Ninth Floor      New York, NY 10017

9506301      Galster Funding LLC      c/o Backenroth Frankel & Krinksy, LLP      800 3rd Ave, Fl 11      New York, NY 10022

9424752      Galster Funding LLC      c/o Harry Zubli, Esq.      1010 Northern Boulevard, Suite 310      Great Neck, NY 11021

9451929      Internal Revenue Service      P.O. Box 7346      Philadelphia, PA 19101−7346

9478776      Old Republic National Title Insurance Company      c/o Butler, Fitzgerald, Fiveson & McCarthy, P.C.      9 East 45th Street, 9th Floor      New York, New York, 10017

9451377      Old Republic National Title Insurance Company,      a Florida Corporation      c/o Butler Fitzgerald Fiveson & McCarthy      Nine East 45th Street, Ninth Floor      New York, NY 10017

TOTAL: 17

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

IN RE:  4921 12TH AVENUE LLC

CASE NO: 18-47256

**DECLARATION OF MAILING**
**CERTIFICATE OF SERVICE**
Chapter: 11

On 7/31/2019, I did cause a copy of the following documents, described below,

Notice of Administrative Bar Date

to be served for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

I caused these documents to be served by utilizing the services of BK Attorney Services, LLC d/b/a certificateofservice.com, an Approved Bankruptcy Notice Provider authorized by the United States Courts Administrative Office, pursuant to Fed.R. Bankr.P. 9001(9) and 2002(g)(4).  A copy of the declaration of service is attached hereto and incorporated as if fully set forth herein.

Parties who are participants in the Courts Electronic Noticing System ("NEF"), if any, were denoted as having been served electronically with the documents described herein per the ECF/PACER system.

DATED: 7/31/2019

/s/ Mark Frankel
Mark Frankel  1989
Backenroth Frankel & Krinsky, LLP
800 Thrid Avenue
New York, NY  10022-0000
212 593 1100

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

IN RE:  4921 12TH AVENUE LLC

CASE NO: 18-47256

**CERTIFICATE OF SERVICE
DECLARATION OF MAILING**

Chapter: 11

On 7/31/2019, a copy of the following documents, described below,

Notice of Administrative Bar Date

were deposited for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

The undersigned does hereby declare under penalty of perjury of the laws of the United States that I have served the above referenced document (s) on the mailing list attached hereto in the manner shown and prepared the Declaration of Certificate of Service and that it is true and correct to the best of my knowledge, information, and belief.

DATED: 7/31/2019

Jay S. Jump
BK Attorney Services, LLC
d/b/a certificateofservice.com, for
Mark Frankel
Backenroth Frankel & Krinsky, LLP
800 Thrid Avenue
New York, NY  10022-0000

193

PARTIES DESIGNATED AS "CM/ECF NEF/U/O" DO NOT RECEIVE E-MAIL NOTICE
PARTIES WITH A '+' AND DESIGNATED AS "CM/ECF E-SERVICE" RECEIVED ELECTRONIC NOTICE THROUGH THE CM/ECF SYSTEM

| CASE INFO | DEBTOR | CULHANE MEADOWS PLLC |
|---|---|---|
| LABEL MATRIX FOR LOCAL NOTICING | 4921 12TH AVENUE LLC | 100 PARK AVENUE |
| 02071 | 4921 12TH AVENUE | 16TH FLOOR |
| CASE 1-18-47256-CEC | BROOKLYN NY 11219-3040 | NEW YORK NY 10017-5538 |
| EASTERN DISTRICT OF NEW YORK | | |
| BROOKLYN | | |
| WED JUL 31 12-09-39 EDT 2019 | | |

OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPAN
521 5TH AVENUE
23RD FLOOR
NEW YORK NY 10175-2399

271 C CADMAN PLAZA EAST SUITE 1595
BROOKLYN NY 112011801

BEIS CHASIDEI GORLITZ
CO BERKMAN HENOCH ET AL
100 GARDEN CITY PLAZA
GARDEN CITY NY 11530-3203

BEIS CHASIDEI GORLITZ
CO HERRICK FEINSTEIN LLP
2 PARK AVENUE
NEW YORK NY 10016-5702

BUTLER FITZGERALD FIVESON  MCCARTHY PC
9 EAST 45TH STREET NINTH FLOOR
NEW YORK NEW YORK 10017-8456

GALSTER FUNDING LLC
9 EAST 45TH ST 9TH FLOOR
NEW YORK NY 10017-8456

GALSTER FUNDING LLC
9 EAST 45TH STREET NINTH FLOOR
NEW YORK NY 10017-2425

GALSTER FUNDING LLC
CO BACKENROTH FRANKEL  KRINKSY LLP
800 3RD AVE FL 11
NEW YORK NY 10022-7651

GALSTER FUNDING LLC
CO HARRY ZUBLI ESQ
1010 NORTHERN BOULEVARD SUITE 310
GREAT NECK NY 11021-5329

INTERNAL REVENUE SERVICE
PO BOX 7346
PHILADELPHIA PA 19101-7346

OFFICE OF THE UNITED STATES TRUSTEE
EASTERN DISTRICT OF NY BROOKLYN OFFICE
US FEDERAL OFFICE BUILDING
201 VARICK STREET SUITE 1006
NEW YORK NY 10014-9449

OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPAN
CO BUTLER FITZGERALD FIVESON
MCCARTHY PC
9 EAST 45TH STREET 9TH FLOOR
NEW YORK NEW YORK 10017-8456

OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPAN
A FLORIDA CORPORATION
CO BUTLER FITZGERALD FIVESON  MCCARTHY
NINE EAST 45TH STREET NINTH FLOOR
NEW YORK NY 10017-2425

ALLA KACHAN
3099 CONEY ISLAND AVENUE
3RD FLOOR
BROOKLYN NY 11235-6305

J TED DONOVAN
GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
1501 BROADWAY
22ND FLOOR
NEW YORK NY 10036-5600

JOSEPH Y BALISOK
BALISOK  KAUFMAN PLLC
251 TROY AVENUE
BROOKLYN NY 11213-3601

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re                                                    Chapter 11

    4921 12th Avenue, LLC                           Case no.  18-47256

                            Debtor.
-----------------------------------------------------------x

**Notice Of Deadline Requiring Filing Of Administrative Proofs Of Claim On Or Before Spetember 3, 2019**

  **To All Persons And Entities With Administrative Claims Against 4921 12th Avenue, LLC**

The United States Bankruptcy Court for the Eastern District of New York has entered an Order establishing Spetember 3, 2019 at 5:00 p.m. Eastern Time (the " Administrative Claims Bar Date") as the last date for each person or entity (including individuals, partnerships, corporations, joint ventures, trusts and governmental units) to file a proof of claim against the debtor listed above (the "Debtor").

The Administrative Claims Bar Date and the procedures set forth below for filing proofs of claim apply to all claims against the Debtor that arose after December 20, 2018, the date on which the Debtor commenced its case under Chapter 11 of the United States Bankruptcy Code, except for those holders of the claims listed in Section 4 below that are specifically excluded from the Administrative Claims Bar Date filing requirement.

195

1.      WHO MUST FILE A PROOF OF CLAIM

You MUST file a proof of claim to share in any potential distribution from the Debtor's bankruptcy as a holder of an Administrative Claim, if your Administrative Claim is not one of the types of claim described in Section 4 below. Claims for administrative expenses are specifically described in sections 503 and 507 of the Bankruptcy Code. Among other things, these sections provide that certain types of claims are entitled to administrative expense priority, including, without limitation: (i) the actual, necessary costs and expenses of preserving the estates, including wages, salaries, or commissions for services rendered after the commencement of the bankruptcy cases; (ii) certain taxes and penalties related thereto; (iii) compensation and reimbursement of certain professionals or officers; (iv) the actual, necessary expenses incurred by (a) certain creditors, (b) a creditor, an indenture trustee, an equity security holders, or a committee representing any such entities, in making a substantial contribution to a debtor's chapter 11 case, (c) a custodian, (d) members of certain committees if incurred in the performance of the duties of such committees; or (v) compensation for services rendered by an indenture trustee. Claims based on acts or omissions of the Debtor that occurred during the Chapter 11 Period must be filed on or prior to the Administrative Claims Bar Date, even if such claims are not now fixed, liquidated or certain or did not mature or become fixed, liquidated or certain during the Chapter 11 Period.

Under section 101(5) of the Bankruptcy Code and as used in this Notice, the word "claim" means: (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is

2

196

reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

2.    WHAT TO FILE

Proof of claim forms may be obtained at www.uscourts.gov/bkforms.  All proof of claim forms must be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant and must conform substantially to Form No. 10 of the Official Bankruptcy Forms. The proof of claim form must be written in English and be denominated in United States currency. You should attach to your completed proof of claim any documents on which the claim is based (if voluminous, attach a summary) or an explanation as to why the documents are not available.

Claimants may also file a proof of their assertion of an Administrative Claim on the electronic docket of the Debtor's bankruptcy case in the customary form for notice of such Administrative Claim, but no later than the Administrative Claims Bar Date, such professional must file an application for payment that complies with the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules and the Fee Guidelines promulgated by the United States Trustee by the Administrative Claims Bar Date together with a notice hearing on such application.

3.    WHEN AND WHERE TO FILE

Except as provided for herein, all proofs of Administrative Claim must be filed so as to be received on or before **September 3, 2019** at 5:00 p.m. Eastern Time at the following address: Clerk of Court, United States Bankruptcy Court, 271-C Cadman Plaza East, Brooklyn, NY 11201-1800, or entered electronically on the Court's electronic docket for the Debtor's case. Attorneys (with full access) and employees of institutional creditors (with limited access accounts)

3

should file proofs of claim electronically on the Court's Case Management/Electronic Case File ("CM/ECF") system.  Those without accounts to the CM/ECF system must file their proofs of claim by mailing or delivering the original proof of claim by hand to the United States Bankruptcy Court, 271 Cadman Plaza East, Brooklyn, New York.

Proofs of Administrative Claim will be deemed filed only when received by the Bankruptcy Court or entered on the Court's electronic docket for the Debtor's case on or before the Administrative Claims Bar Date. Proofs of Administrative Claims may not be delivered by facsimile, telecopy or electronic mail transmission.

4.      WHO NEED NOT FILE A PROOF OF CLAIM

You do not need to file a proof of claim on or prior to the Bar Date if you are:

(a)  A person or entity that has already filed a proof of Administrative Claim; against the Debtor in the form and manner set forth in this notice;

(b)  A holder of an Administrative Claim that has previously been allowed by order of the Court;

(c)  A holder of an Administrative Claim that has been paid in full by the Debtor; or

(d)  A holder of an Administrative Claim for which a specific deadline   has previously been fixed by this Court.

This Notice is being sent to many  persons and entities that have had some relationship with or have done business with the Debtor but may not have an unpaid Administrative Claim against the Debtor. The fact that you have received this Notice does not mean that you have a claim or that the Trustee, the Debtor or the Court believes that you have an Administrative Claim against the Debtor.

4

Any person or entity that holds an Administrative Claim that arises from the rejection of an executory contract or unexpired lease, as to which the order authorizing such rejection is dated on or before the date of entry of the Administrative Claims Bar Date Order, must file a proof of such Administrative Claim based on such rejection on or before the Administrative Claims Bar Date, and any person or entity that holds an Administrative Claim that arises from the rejection of an executory contract or unexpired lease, as to which an order authorizing such rejection is dated after the date of entry of the Administrative Claims Bar Date Order, must file a proof of such Administrative Claim on or before such date as the Court may fix in the applicable order authorizing such rejection.

Holders of equity security interests in the Debtor need not file proof of interest with respect to the ownership of such equity interests, provided, however, that if any such holder asserts an Administrative Claim against the Debtor (including a Chapter 11 Claim relating to an equity interest or the purchase or sale of such equity interest), a proof of such Administrative Claim must be filed on or prior to the Administrative Claims Bar Date pursuant to the procedures set forth herein.

5.  CONSEQUENCES OF FAILURE TO FILE A PROOF OF CLAIM BY THE ADMINISTRATIVE CLAIMS BAR DATE

ANY HOLDER OF AN ADMINISTRATIVE CLAIM THAT IS NOT EXCEPTED FROM THE REQUIREMENTS OF THIS ORDER, AS SET FORTH IN SECTION 4 ABOVE, AND THAT FAILS TO TIMELY FILE AN ADMINISTRATIVE PROOF OF CLAIM IN THE APPROPRIATE FORM WILL BE BARRED FROM ASSERTING SUCH

5

CLAIM AGAINST THE DEBTOR AND ITS ESTATE, AND FROM PARTICIPATING IN

ANY DISTRIBUTION IN THE DEBTOR'S CASE ON ACCOUNT OF SUCH CLAIM.

A holder of a possible claim against the Debtor should consult an attorney

regarding any matters not covered by this notice, such as whether the holder should file a proof of

claim.

Dated: New York, New York
       July 31, 2019

                                        BY ORDER OF THE COURT


Backenroth Frankel & Krinsky, LLP,
800 Third Avenue
New York, New York 10022
(212) 593-1100
Attn: Mark Frankel

6

```
 1                  UNITED STATES BANKRUPTCY COURT
                    EASTERN DISTRICT OF NEW YORK
 2

 3  -----------------------------------X
                                       : 18-47256 (CEC)
 4  In re:                             :
                                       : 271-C Cadman Plaza East
 5      4921 12TH AVENUE LLC,          : Brooklyn, New York 11201
                                       :
 6              Debtor.                : July 17, 2019
    -----------------------------------X
 7  4921 12TH AVENUE LLC,              :
                                       :
 8              Plaintiff,             :
                                       : Adv. No. 19-01030 (CEC)
 9          v.                         :
                                       :
10  GALSTER FUNDING LLC,               :
                                       :
11              Defendant.             :
    -----------------------------------X
12
           TRANSCRIPT OF [2] ORDER SCHEDULING INITIAL CASE
13                   MANAGEMENT CONFERENCE;
        [19] MOTION OF THE UNITED STATES TRUSTEE TO DISMISS CASE
14          OR, IN THE ALTERNATIVE, TO CONVERT CASE
                    TO ONE UNDER CHAPTER 7;
15        [53] NOTICE OF HEARING ON DISCLOSURE STATEMENT
       (RE: RELATED DOCUMENT(S) [52] DISCLOSURE STATEMENT);
16                   CONFIRMATION HEARING;
     [1] COMPLAINT BY 4921 12TH AVENUE LLC AGAINST GALSTER FUNDING
17  LLC. - NATURE(S) OF SUIT: (72 (INJUNCTIVE RELIEF - OTHER)
              BEFORE THE HONORABLE CARLA E. CRAIG
18                UNITED STATES BANKRUPTCY JUDGE
              WEDNESDAY, JULY 17, 2019; 3:07 P.M.
19                    BROOKLYN, NEW YORK

20

21  APPEARANCES:

22
    For the Debtor:        ALLA KACHAN, ESQ.
23                         3099 Coney Island Avenue, 3rd Floor
                           3737 77th Street
24                         Brooklyn, New York 11235

25
                 [Appearances continue next page.]


    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service
```

2

APPEARANCES CONTINUED:

For Galster Funding:          MARK A. FRANKEL, ESQ.
                             Backenroth Frankel & Krinsky LLP
                             800 Third Avenue, 11th Floor
                             New York, New York 10022

For Old Republic:             DAVID K. FIVESON, ESQ.
                             Butler Fitzgerald Fiveson & McCarthy
                             9 East 45th Street, Ninth Floor
                             New York, New York 10017

For the US Trustee:           MARYLOU MARTIN, ESQ.
                             Office of the United States Trustee
                             201 Varick Street, Suite 1006
                             New York, New York 10014


Court Transcriber:            MARY GRECO
                             TypeWrite Word Processing Service
                             211 N. Milton Road
                             Saratoga Springs, New York 12866

3

1    (Proceedings began at 3:07 p.m.)

2            THE CLERK:  Calendar 40, 41, 42, 43, 44, and 45, 18-

3    47256, 4921 12th Avenue LLC.

4                     [Pause in proceedings.]

5            THE COURT:  Ms. Kachan is not here.  That's what

6       we're trying to figure out, when she's expected.

7            THE CLERK:  You want to give her to 3:30?

8            THE COURT:  Yes.  Why don't we give her till 3:30.

9       Okay.

10           THE CLERK:  All rise.

11   (Off the record at 3:09 p.m.)

12   (Back on the record at 3:24 p.m.)

13           THE CLERK:  Second call for calendar 41, through 45,

14      4921 12th Avenue, 18-47256.  May we start with

15      appearances, please?

16           MS. KACHAN:  Good afternoon, Your Honor.  Alla

17   Kachan on behalf of claimant 12th Avenue.

18           MR. FRANKEL:  Mark Frankel, Backenroth Frankel &

19   Krinsky, attorneys for Galster Funding LLC and Robert Liner

20   [Ph.], managing member of Galster Funding LLC is here as well.

21           MR. FIVESON:  Good afternoon --

22           MS. MARTIN:  Marylou -- I'm sorry.

23           MR. FIVESON:  Good afternoon, Your Honor.  David

24   Fiveson; Butler Fitzgerald Fiveson & McCarthy for Old Republic

25   National Title Insurance Company.

4

1          MS. MARTIN:  Marylou Martin representing the United

2  States Trustee.

3          THE COURT:  Okay.  So the main event here is the

4  confirmation hearing, so let's talk about that.

5          MR. FRANKEL:  Your Honor, we're here on confirmation

6  of Galster Funding LLC secured creditor plan of reorganization

7  filed on May 1st, Docket No. 52.  The Court approved the

8  disclosure statement by order dated June 10th, Docket No. 76

9  which scheduled a hearing for today.  Pursuant to the court's

10 order approving the disclosure statement, the plan proponent

11 Galster Funding served notice on all parties in interest and

12 an affidavit of service is filed with the Court, Docket No. 79

13 on June 12th indicating that all parties in interest were

14 served by mail with the disclosure statement and plan and

15 ballots.  Following that, ballots were submitted.  I filed a

16 certification of ballots on Monday, Docket No. 85, showing

17 that Class 2 Galster Funding voted to accept the plan.  Class

18 3 -- and no other Class 2 creditors voted.  Class 3, Old

19 Republic, voted to accept the plan.  No other Class 3

20 creditors.  Class 5 unsecured claims, Old Republic voted to

21 accept the plan.  There were no other Class 5 claimants voted.

22 And Class 6, which are interest holders, I received a ballot

23 that's attached to the certification, ballots which is a

24 little ambiguous, but I took it as a rejection.  And there

25 were no other ballots received.

204

5

1          So based upon the certification of ballots, the

2    debtor -- I mean the plan has been accepted by all classes of

3    creditors.  And on that basis we're prepared to proceed.

4          We filed also on Monday declaration of Robert Liner

5    which it's the background of the case and the means of

6    implementation and goes over the elements of Section 1129.

7    I'll just give you a couple of highlights.  It's a simple

8    liquidating plan.  There's going to be a sale of the debtor's

9    real property.  I have provided for myself as plan

10   administrator and we will be retaining a very prominent real

11   estate broker in the Brooklyn real estate community, Rosewood.

12   And according to Rosewood, they're going to need about 30 days

13   of intensive marketing because Rosewood already knows the

14   potential purchases for this property and they think that they

15   can corral them all within that time period.  So what I

16   provided for was within 14 days of entry of the confirmation

17   order marketing would start for 30 days.  And then within 75

18   days we would have a sale hearing in this court with a wiggle

19   room of 60 days to extend any of those time periods if it

20   looks like that will improve the bidding.  We obviously want

21   to get as high a price as possible because Galster Funding

22   itself believes that it may be underwater at this point.

23          THE COURT:  Galster Funding which holds the first

24   position.

25          MR. FRANKEL:  Yes.  And Old Republic is very

6

1   involved and is pushing very hard to get the highest price

2   possible so they can make a recovery as well.

3          The other asset that needs to be administered are

4   causes of action.  There are fraudulent conveyance causes of

5   action because the money that Galster Funding gave for its

6   mortgage never made it into the debtor's accounts and was used

7   for other purposes.  There are no rent payments having been

8   made in years and there's potential claims there as well.  So

9   there would be, as plan administer, there would be litigation

10  counsel retained to prosecute those claims on a contingency

11  basis.  And then all proceeds would be distributed in order of

12  priority except that Galster and Old Republic agree that

13  administrative claims and priority claims of which there

14  appear to be no priority claims would be paid off the top.

15         THE COURT:  Have taxes been paid?

16         MR. FRANKEL:  Real estate taxes appear to have been

17  paid.  And as far as other types of taxes --

18         THE COURT:  By one of the secured creditors or by

19  the debtor?  We don't know.  Don't know.

20         MR. FRANKEL:  I don't know.  If there are taxes,

21  obviously those are -- if it turns out that there are taxes

22  that are due and no proof of claim was filed, those are

23  allowed.  Those ride through and those will have to be paid at

24  closing.

25         THE COURT:  Okay.  So there has -- the debtor filed

7

1   an objection to whose claim?

2         MR. FRANKEL:  The debtor filed an objection to Old

3   Republic's claim.

4         THE COURT:  To Old Republic's claim.  Okay.  Which

5   is the BCG claim.

6         MR. FRANKEL:  Yes.

7         THE COURT:  Okay.  So that of course can be

8   determined post confirmation, correct?

9         MR. FRANKEL:  Yes.  It's scheduled for a hearing I

10  believe in September.

11        MR. FIVESON:  August 21.

12        MR. FRANKEL:  August.  I'm sorry.  Yeah.  That can

13  be --

14        THE COURT:  Okay.  Yes, that can be -- we don't have

15  to hold up confirmation for that.

16        MR. FRANKEL:  Right.

17        THE COURT:  Okay.  There was also, the debtor also

18  filed an objection to confirmation.  The first -- the main

19  objection was basically an objection to Old Republic's claim

20  which was not properly submitted as an objection to

21  confirmation but is properly teed up as an objection to claim.

22  So I don't, as we just discussed, I don't think that would

23  hold up confirmation.

24        THE COURT:  And this whole argument about

25  [indiscernible] collecting the rent, so forth, that would be

8

1   part of the claim objection, would it not?

2           MR. FRANKEL:  Yes.  And in addition, the debtor

3   asked to hold up confirmation so that the debtor could pursue

4   settlement negotiations.  There was an offer made and rejected

5   and no counteroffer.  So there are no settlement negotiations.

6   And since there is a built in time period before this property

7   is sold, the debtor is free to reopen that and try to redeem

8   the property and make a deal.  That doesn't go away just

9   because a plan is confirmed.  There are only three players

10  here; the debtor, Galster, and Old Republic.

11          THE COURT:  The title insurance company.  Yes.

12          MR. FRANKEL:  And they all -- my client and Old

13  Republic responds very quickly.

14          THE COURT:  Was the bar date order ever served?  The

15  bar order ever served?  I guess that wouldn't also

16  necessarily -- there are no other secured claims so you can

17  still have a bar date.

18          MR. FRANKEL:  There was a bar date.

19          THE COURT:  There was a bar order.  I don't know if

20  it was ever served.  My practice is to write the bar orders

21  and then counsel is supposed to serve them.  I don't know if

22  that --

23          MR. FRANKEL:  I believe it was served.  I got a copy

24  of it.

25          THE COURT:  Did you?  Okay.  No affidavit of service

9

1    I guess.  So maybe it was served.

2            MS. KACHAN:  That was before we were counsel.

3            THE COURT:  Hm?

4            MS. KACHAN:  That was before we were counsel on the

5    case.

6            THE COURT:  Yes.  Well, I don't know that that --

7    that might be something that we need to follow up on but I

8    don't think that would prevent confirmation of the plan

9    because the unsecured claims are probably out of the money

10   anyway but they would in any event be paid in order of

11   priority.

12           MR. FRANKEL:  Yes.  And according to the schedules,

13   again, there was nobody scheduled except for my client, BCG,

14   and the taxing authorities.

15           THE COURT:  Right.

16           MR. FRANKEL:  So --

17           THE COURT:  Who's going to file a claim if you serve

18   it on those three parties?  I don't know.

19           MR. FRANKEL:  The IRS filed a claim.  They filed it

20   as an unsecured claim.  It's a penalty claim for failure to

21   file tax returns.  So that's in the mix if there's a surplus.

22   They'll get their pro rata share.

23           THE COURT:  New York State?

24           MR. FRANKEL:  No.  No other claims except the IRS.

25           THE COURT:  And have they been -- what I'm wondering

10

1   is if New York State knows about this case.  But we'll see.  I

2   mean again, these are things that can be followed up on

3   afterwards because you need -- at one point you're going to

4   need an administrative claims bar date.  You said the

5   confirmation date is the administrative claims bar date but I

6   think you need a separate order setting an admin claims bar

7   date that you're going to -- that you disseminate in an

8   appropriate way.

9           MR. FRANKEL:  Okay.

10          THE COURT:  And also I think the plan -- does the

11  plan provide for the debtor to get a discharge?  Which

12  shouldn't be because it's a liquidating plan.  It's a

13  corporate debtor and a liquidating plan, so no discharge.

14          MR. FRANKEL:  I will put that in the confirmation

15  order.

16          MR. FIVESON:  If I just may, Your Honor, there are

17  fraudulent conveyance claims here so if the debtor is

18  discharged, that may impede the plan administrator's ability

19  to go --

20          THE COURT:  A corporate debtor does not get a

21  discharge in a liquidated case.  That's my point.  They're not

22  supposed to.  That was probably an artifact from some other

23  case that you were using as a model for the plan.

24          MR. FRANKEL:  It's part of the form.

25          THE COURT:  Yes.  Right.

11

1          MR. FRANKEL:  With that, Your Honor, I would proffer

2    that were Mr. Liner to testify, he would testify that all the

3    statements made in his declaration are true and correct and

4    ask the Court to confirm the plan.

5          THE COURT:  All right.  So I'll hear from Ms.

6    Kachan.

7          MS. KACHAN:  Your Honor, I believe there are a few

8    things that are relevant here that the issues do in fact

9    crisscross across the claim objection and the objection to

10   confirmation.  Your Honor, I want to point out at the outset,

11   obviously we came in as counsel very late in the game.

12   However, both claims of Galster and Old Republic Title are the

13   same so to speak interest, the same -- you know, when we hear

14   a proffer --

15         THE COURT:  Because Galster -- rather Old Republic

16   bought Galster -- was standing behind Galster because they're

17   the title insurance company.  Right?

18         MS. KACHAN:  In fact, I think that what Old Republic

19   is attempting to do is provide yet another creditor and yet

20   [indiscernible] insurance to this primary creditor --

21         THE COURT:  What does it matter whether there's one

22   or two creditors?

23         MS. KACHAN:  Your Honor, what matters is if we had a

24   claim objection to Old Republic's claims, and I believe it's a

25   very valid claim objection, we also have -- we have raised

12

1  what I believe are -- again, being counsel brought in very

2  late in the game, we haven't had the chance to, you know --

3          THE COURT:  Galster has the foreclosure judgment.

4          MS. KACHAN:  Yes, Your Honor.

5          THE COURT:  Okay.  So --

6          MS. KACHAN:  And we're not looking -- and that's why

7  we're not objecting to their judgment.  We're objecting to Old

8  Republic who has a magical number that arose out of nowhere

9  and that nobody had seen any backup for.

10          THE COURT:  You know, you can call it whatever you

11  want and I will determine the claim objection on the date that

12  it's scheduled to be heard.

13          MS. KACHAN:  Understood, Your Honor.  Your Honor,

14  besides --

15          THE COURT:  And I don't see how that affects the

16  ability to confirm this plan.  You've got Galster who is --

17  they have a judgment of foreclosure.  That's not the claim

18  that -- you're not going to get rid of both -- there's two

19  creditors and you're not going to get rid of both of them.

20          MS. KACHAN:  No, Your Honor.

21          THE COURT:  And they're the only --

22          MS. KACHAN:  We're not looking to get rid of both of

23  them.

24          THE COURT:  -- they're the only creditors.

25          MS. KACHAN:  Besides --

13

1          THE COURT:  And this property was worth less than
2  Galster's claim as far as we can tell.  So there's no prospect
3  of the debtor confirming a plan.
4          MS. KACHAN:  Your Honor, as a matter of fact, the
5  offer we made is more than the market value of the property --
6          THE COURT:  Well then you can --
7          MS. KACHAN:  -- and more than Galster's claim.
8          THE COURT:  -- you can make whatever offer you want
9  to make but they don't have to accept it.
10          MS. KACHAN:  No, they don't, Your Honor, but --
11          THE COURT:  And you don't have the ability to
12  confirm a plan unless they agree to it.
13          MS. KACHAN:  Your Honor, what I'm trying to get
14  across is that since we have two secured creditors on this and
15  we're hearing a proffer where counsel says well, you know,
16  Galster accepted the plan, Old Republic accepted the plan,
17  will first of all, Old Republic's claim is now in question as
18  it should have been from the beginning.
19          THE COURT:  Well, it's not.  You have filed an
20  objection to it but even if your objection is sustained, the
21  most you're going to do is maybe knock off part of it.  Even
22  if you got rid of all of it, you still got another claim.  And
23  you don't have any ability to confirm a plan without the
24  agreement of that party.
25          MS. KACHAN:  I understand that, Your Honor.

213

14

1          THE COURT:  Okay.

2          MS. KACHAN:  There are --

3          THE COURT:  So I do not understand where -- I don't

4  want -- I do not want to waste a lot of time on this, so why

5  don't you cut to the chase.  What's your objection?

6          MS. KACHAN:  Your Honor, my objection is that I

7  don't think that there are -- that the parties that are voting

8  for the plan given the issues that are now coming to light

9  with Old Republic title, I don't think that there is

10 substantial consent to the plan that --

11         THE COURT:  You've got two parties and both of them

12 consent to the plan.

13         MS. KACHAN:  Yes, Your Honor, but it's self-serving.

14         THE COURT:  Because they're the proponents of the

15 plan.  So --

16         MS. KACHAN:  Right.  And they're also the only

17 creditors and they're also holding the same claim restate

18 twice and inflated.

19         THE COURT:  So what's the problem with that?  It

20 just happens, it so happens that -- it so happens, and this is

21 all as a result of your client's activity, that you have a

22 title company that got involved because of the difficulties

23 with the satisfaction that was filed by your client and they

24 have -- they are making whole Galster and they have had the

25 second lien as well.  Now Galster is voting on its own behalf

15

1   and they have a -- okay.  So even if you say to me, Judge,

2   it's really just one claim and [indiscernible] the whole

3   thing, okay, even if that were true, okay, you still -- you

4   can't object to -- you've got no valid objection, no valid

5   basis that I would be able to see for objecting to Galster's

6   claim.  They have the judgment of foreclosure.  End of story

7   as far as I can see.  So you've got -- at a minimum you have

8   that claim and that claim voted in favor of this plan.  There

9   are no other creditors.  Even if you're successful in kicking

10  out the rest of the claims which I think is highly unlikely,

11  you would still have one creditor that voted in favor of the

12  plan and that's all you need.  And you have no basis for

13  knocking that claim out that has ever been suggested to me.

14          MS. KACHAN:  Your Honor --

15          THE COURT:  So it seems to me that's the end of the

16  story.

17          MS. KACHAN:  Your Honor, I think the two main issues

18  here that I think do stand --

19          THE COURT:  So you have no -- a basis for -- the

20  fact that you may be able to object to all or part of

21  Republic's claims is not a basis for me not to confirm this

22  plan.

23          MS. KACHAN:  It's not the only basis, Your Honor.

24          THE COURT:  Well, give me another and let's move

25  through this.

215

16

1          MS. KACHAN:  Your Honor, the reason that I talk

2   about self-serving interest here is besides the validity, or

3   contested validity of Old Republic's claims there's also --

4   Old Republic bought BCG's claim, correct?  Old Republic stands

5   [indiscernible] BCG.  BCG upon information and belief we have

6   reason that BCG has been receiving rents all along --

7          THE COURT:  Okay.  We talked --

8          MS. KACHAN:  -- and you have tenants --

9          THE COURT:  Okay, I'm cutting in here.  So we talked

10  about that when Mr. Frankel was making his proffer.  If you

11  think that there are rents that have been collected that have

12  not properly been credited to the mortgage amount, that can be

13  addressed in the context of your claim objection and that may

14  result in some adjustment to the amount of that claim.  But

15  that does not affect the ability to confirm this plan.  Next.

16          MS. KACHAN:  Your Honor, I believe that had we been

17  counsel from the outset what I --

18          THE COURT:  I don't [inaudible].  I don't want to

19  hear about what you would have done if you had been counsel

20  because you weren't and here we are at confirmation.

21          MS. KACHAN:  So I believe that the underlying

22  problem here does stand in the way of confirmation.

23          THE COURT:  What is the underlying problem?

24          MS. KACHAN:  The underlying problem is that I

25  believe that there is -- that this plan is a self-serving

17

1  plan, that there are two creditor --

2          THE COURT:  I don't know what self -- I don't know

3  what a self-serving plan is.

4          MS. KACHAN:  Your Honor, we have a creditor --

5          THE COURT:  This is a creditor -- excuse me.  This

6  is a creditor plan and it complies as far as I can see with

7  the provisions of the Bankruptcy Code.  So if you can point

8  out to me some provision in Section 1129 that is not complied

9  with here, then I'll listen to you.

10         MS. KACHAN:  Your Honor, what I'm talking about is

11 that there are evidentiary issues that should have been --

12         THE COURT:  About what?

13         MS. KACHAN:  About how the claims came about --

14         THE COURT:  What is the --

15         MS. KACHAN:  -- about the rent --

16         THE COURT:  At a minimum, I'm going to repeat

17 myself, you have a judgment of foreclosure in the amount of 9

18 million and change is it?  Is that right, Mr. Frankel?

19         MR. FRANKEL:  Yes.  About 9 million 480.

20         THE COURT:  Okay.  So you have a judgment of

21 foreclosure.  That is not subject to objection, subject to any

22 evidentiary dispute.  That's a given in this case.  Okay?  So

23 what other problems or alleged issues you may have with BCG's

24 claim we will deal with that on the 21st of August.  And if

25 that results in some adjustment to the amount of their claims,

18

1  that will be, so be it, and that will affect the amount that

2  has been distributed on that claim.  But it does not affect

3  the confirmability of this plan, nor does it affect your

4  ability to confirm a plan, your debtor's ability to confirm a

5  plan if they were to file a plan, which they never did,

6  because you still only have one or two creditors who are not

7  supporting any plan that the debtor is going to file.  So I do

8  not understand where you're coming from.

9             MS. KACHAN:  Your Honor, I think I set my position

10  forth.

11             THE COURT:  Okay.  All right.  Your objections are

12  respectfully overruled.

13             So is there any desire to cross examine the witness

14  who provided the affidavit in support of the plan?

15             MS. KACHAN:  No, Your Honor.

16             THE COURT:  Okay.  So with that I will confirm this

17  plan and you can submit a confirmation order.

18             MS. KACHAN:  Thank you, Your Honor.

19             MR. FIVESON:  Your Honor, there were also three

20  orders presented to -- of presentment denying two prior

21  motions by order to show cause to adjudge Old Republic in

22  contempt and one order dismissing the adversary proceeding.

23             THE COURT:  This was done by notice of presentment?

24             MR. FIVESON:  Yes, it was.  So I assume -- you know,

25  there's been no objection.  I assume in due order the Court

19

1   will sign it.

2           THE COURT:  Okay.

3           MS. KACHAN:  This is not our motion.

4           THE COURT:  Okay.  All right.  So since there's been

5   no objection to those they will be entertained.  And these

6   orders, one of the orders dismisses the --

7           MR. FIVESON:  The adversary.

8           THE COURT:  The adversary.  Okay.

9           MR. FIVESON:  And the two other orders, there were

10  two orders to show cause, one in the bankruptcy and one in the

11  adversary that were brought to hold Old Republic in contempt.

12  Those motions were denied from the bench last time we were

13  here.  Likewise, the Court sua sponte directed that the

14  adversary would be dismissed since the orders to show cause

15  where the primary purpose seeking the identical relief sought

16  in the adversary proceeding.  Thank you.

17          THE COURT:  All right.  Okay.  Thank you.

18          MR. FIVESON:  Thank you.

19          THE COURT:  Now I need to give you a post

20  confirmation status conference date.

21          THE CLERK:  9/4 and 9/11.

22          THE COURT:  I'll give you 9/4.  At what time?

23          THE CLERK:  2:30.

24          THE COURT:  At 2:30.  Well no, actually we'll do

25  8/21 because that's the date for the claim objection.  Okay.

20

1            MS. KACHAN:  3:30 then?

2            THE COURT:  At 3:30.

3            MR. FIVESON:  Thank you.

4            MS. KACHAN:  Thank you, Your Honor.

5                     [Pause in proceedings.]

6            THE COURT:  So let me just -- before we leave this

7    case, are you ever going to -- are you going to file a

8    retention application at some point?

9            MS. KACHAN:  I think that one was --

10           THE COURT:  Is that with the US Trustee's Office?

11           MS. MARTIN:  Give me one second, Your Honor.

12           THE COURT:  There's no application on the docket.

13   Normally you put it on the docket.

14           MS. KACHAN:  Your Honor, I'm pretty sure that we

15   forwarded one to --

16           THE COURT:  Yes, but normally you file your

17   retention application.

18           MS. MARTIN:  Never filed it.

19           MS. KACHAN:  Your Honor, I will follow up.

20           THE COURT:  Okay.  All right.  Thank you.

21           MS. KACHAN:  Thank you, Your Honor.

22   (Proceedings concluded at 3:48 p.m.)

23                     * * * * * *

24

25

21

1     I, Mary Greco, certify that the foregoing transcript is a

2   true and accurate record of the proceedings.

3

        *Mary Greco*

4   _____

5   Mary Greco

6   TypeWrite Word Processing Service

7   211 N. Milton Road

8   Saratoga Springs, New York 12866

9

10  Dated:  August 6, 2019

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| Information to identify the case: | | |
|---|---|---|
| Debtor | **4921 12th Avenue LLC** | EIN   **20−0581630** |
| | Name | |
| United States Bankruptcy Court   **Eastern District of New York** | | Date case filed for chapter   **11**   **12/20/18** |
| Case number:   **1−18−47256−cec** | | |

# NOTICE OF FILING OF TRANSCRIPT AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION

**NOTICE IS HEREBY GIVEN THAT:**

A transcript of the proceeding held on 7/17/19 was filed on 8/6/19.

The following deadlines apply:

The parties have until August 13, 2019 to file with the court a Notice of Intent to Request Redaction of this transcript. The deadline for filing a Transcript Redaction Request is August 27, 2019.

If a Transcript Redaction Request is filed, the redacted transcript is due September 6, 2019.

If no such Notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is November 4, 2019, unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber TypeWrite at 518−581−8973 or you may view the document at the public terminal at the Office of the Clerk.

Dated: August 7, 2019

For the Court, Robert A. Gavin, Jr., Clerk of Court

**BLnftrans2.jsp** [Notice of Filing Transcript and Deadlines to Restriction and Redaction rev. 02/01/17]

## Notice Recipients

District/Off: 0207−1                    User: jlecky                    Date Created: 8/7/2019

Case: 1−18−47256−cec                    Form ID: 295                    Total: 5

**Recipients of Notice of Electronic Filing:**

aty          Alla Kachan          alla@kachanlaw.com
aty          David K Fiveson          dfiveson@bffmlaw.com
aty          J Ted Donovan          Tdonovan@gwfglaw.com
aty          Joseph Y. Balisok          balisoklawyers@gmail.com

                                                                                    TOTAL: 4

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

db          4921 12th Avenue LLC          4921 12th Avenue          Brooklyn, NY 11219

                                                                                    TOTAL: 1

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re                                                          Chapter 11

      4921 12th Avenue, LLC                         Case no.  18-47256

                     Debtor.
--------------------------------------------------------x

## NOTICE OF HEARING

        PLEASE TAKE NOTICE, a hearing will be held on January 22, 2020 at 3:00 p.m. (the "Hearing") before the Honorable Carla E. Craig at the 271 Cadman Plaza East, Brooklyn, New York to consider the annexed application of Mark Frankel as plan administrator ("Plan Administrator") for the entry of an order under sections 105, 1127 and or 1142 of the Bankruptcy Code authorizing the Plan Administrator of the confirmed plan in the case of 4921 12th Avenue, LLC's to remove the occupants of the commercial space at the Debtor's property at 4921 12th Avenue, Brooklyn, New York ("Property") and to manage the Property pending the sale of the Property under the Plan.

        PLEASE TAKE FURTHER NOTICE, that objections must be in writing, served upon the undersigned, and filed with the Clerk of the Bankruptcy Court, with a courtesy copy to the Honorable Carla E. Craig 's chambers, so as to be received at least seven (7) days before the Hearing date.

Dated: New York, New York
      December 27, 2019

                             BACKENROTH FRANKEL & KRINSKY, LLP

             By:    s/ Mark Frankel
                   800 Third Avenue
                   New York, New York 10022
                   (212) 593-1100

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re                                                    Chapter 11

       4921 12th Avenue, LLC                        Case no.  18-47256

                        Debtor.
----------------------------------------------------------x

## **MOTION TO TERMINATE THE DEBTOR'S EXCLUSIVE PERIODS**

Mark Frankel ("Plan Administrator"), the Plan Administrator of the confirmed plan ("Plan") in the case of 4921 12th Avenue, LLC's (the "Debtor"), as and for his motion for an order under sections 105, 1127 and 1142 of the Bankruptcy Code authorizing and directing: (a) the eviction of the occupants of the commercial space at the Debtor's property at 4917 12th Avenue, Brooklyn, New York 11219 (the "Property"), (b) the United States Marshal for the Eastern District of New York (the "US Marshal") to assist the Plan Administrator with the eviction, and (c) authorizing the Plan Administrator to replace current management of the Property with a professional third party managing agent, respectfully represents as follows:

   **(a) During the bankruptcy case, the Debtor represented that there was no lease for the ground floor commercial space, but the space appears to have been occupied throughout by insiders operating a grocery store rent-free,**

   **(b) Bidding on the Property has been chilled by the presence of the ground floor occupant, and**

   **(c) The Debtor has allowed the insurance on the Property to lapse, has failed to report income and expenses, and has refused the Plan Administrator's request to review books and records.**

1

## BACKGROUND

1.      On December 20, 2018, the Debtor filed a Chapter 11 petition under Title

11 of the United States Code, 11 U.S.C. "101 et seq. (the "Bankruptcy Code").

2.      The Debtor owns the real property at 4917 12th Avenue, Brooklyn, New

York 11219 (the "Property") pictured below:



2

3.      The value of the Property, as stated by the Debtor in its Chapter 11 schedules is $10,000,000.

4.      Galster Funding LLC (the "Galster Mortgagee") holds a judgment of foreclosure and sale entered on August 20, 2018 in an action entitled *Galster Funding LLC v. 4921 12th Avenue LLC; et al.* in the Supreme Court of the State of New York, County of Kings, Index No.: 500818/2017 (the "Galster Judgment").  The total amount due under the Galster Judgment as of the December 20, 2018 filing date was:

| | |
|---|---|
| Judgment Amount: | $8,929,916 |
| Interest from 5/31/18 to 08/20/18 @24% per judgment: | 350,973 |
| Interest from 8/21/18 to 12/20/18 @9% per judgment: | 193,931 |
| Costs and Disbursements with interest per judgment: | 1,855 |
| Attorneys' fees per judgment: | 3,500 |
| TOTAL: | $9,480,175 |

5.      The only other scheduled creditor is Beis Chasidi Gorlitz (the "BCG Mortgagee").  BCG filed a $13,500,000 mortgage lien claim.

6.      Based on the Galster Judgment and the BCG Mortgage claim, secured claims totaled $22,980,175.

7.      The Debtor filed nothing in this case to explain the origin of its financial problems or any contemplated bankruptcy solution to those problems.  Absent any creditors except the two mortgagees, therefore, it appears that the Debtor filed this Chapter 11 on the eve of the foreclosure sale simply to delay the inevitable sale.

8.      The case has a long and unusual backstory.

3

9.     On or about August 30, 2016, the Galster Mortgagee loaned the Debtor $6,500,000, secured by a mortgage on the Property, which Property comprises two condominium units called C1 and R1.

10.     At that time, there were two mortgages of record against the Property held by the BCG Mortgagee, one for $1,200,000 and the other for $1,300,000 (the "BCG Mortgages").

11.     At the Galster Loan closing, the Debtor presented two (2) satisfactions of mortgages (the "Satisfactions") purportedly evidencing the satisfaction of the BCG Mortgages.

12.     Believing that its mortgage would have first priority, the Galster Mortgagee closed and disbursed the loan proceeds.

13.     Two months later on November 3, 2016, the BCG Mortgagee commenced a Kings Supreme Court action under index number 519469/2016.  BCG produced an affidavit from the notary public on the Satisfactions attesting that the Satisfactions were forged and/or fraudulent.  BCG alleged that the amount remaining due on the BCG Mortgages exceeded $5 million as of January 2016. BCG sought a declaration that the Satisfactions were void, that the BCG Mortgages remained valid liens, and that the Galster Mortgage was void.  The same day, the Supreme Court enjoined the Debtor and Yehuda Salamon, its principal, from dissipating assets.

14.     When the Galster Mortgagee discovered the BCG action, it filed a Supreme Court case to enjoin disbursement of the amounts remaining of its $6,500,000 loan.

4

15.    The Debtor did not oppose either of the injunction applications.  Instead, the Debtor essentially admitted that the Satisfactions were bogus and offered to vacate them.

16.    The requested injunctions were entered, the Debtor stopped paying the Galster mortgage, the Galster Mortgagee accelerated its loan, and the Galster Mortgagee commenced its foreclosure action.

17.    In the BCG case, BCG filed an affirmation alleging a pattern of Debtor misconduct including attempts to defraud BCG, the IRS, the Charities Bureau of the New York State Attorney General's office and the New York State Department of Taxation and Finance.

18.    The Debtor then sought to stay the Galster foreclosure arguing that the fraud allegations in the BCG case must be determined first.  The ploy failed.  The Supreme Court denied the Debtor's motion and appointed Gregory Laspina receiver by order signed on July 11, 2017.  Mr. Laspina, however, never took possession.

19.    Later, the Supreme Court, by decision and order dated March 7, 2019, extinguished the bogus satisfactions as demanded by BCG.

20.    Galster had title insurance.  Old Republic, Galster's title insurance carrier, honored its obligation to represent Galster and Butler Fitzgerald was retained for that purpose.  Old Republic also acquired the BCG obligation and agreed to subordinate the BCG Mortgages to the Galster mortgage.

21.    The Foreclosure Judgment was entered August 20, 2018, and the sale scheduled for December 20, 2018.

22.     Meanwhile, the Debtor violated the Supreme Court injunction and disbursed the Galster loan proceeds.  Old Republic followed the money.  $2,500,000 passed through a number of bank accounts to an entity named RS Old Mill LLC ("Old Mill"), also controlled by Yehuda Salamon.  Old Mill used the money to make a down payment on an $18 million purchase of real property owned by Novartis drug company in Rockland County.  When it needed more time to close on the Novartis purchase, Old Mill filed a Chapter 11 petition in White Plains.  The Debtor was not named as a creditor in the Old Mill case.

23.     Without the White Plain Bankruptcy Court's approval, Old Mill then transferred its rights under the Novartis contract to another entity.  That entity then flipped the Novartis sale contract to yet another entity.  The Novartis property was sold for $30,000,000, ostensibly a $12,000,000 profit for Old mill.

24.     Almost a year later, Salamon hired new lawyers for Old Mill who complained to the White Plains Bankruptcy Court that the Debtor's $12,000,000 profit on the Novartis flip had been stolen.  When the White Plains Bankruptcy Court discovered that the Debtor assigned the Novartis contract without Bankruptcy Court authority, the Court appointed Salvatore LaMonica as trustee.

25.     Since the Plan Administrator may have claims to the $2,500,000 transferred to Old Mill, the Plan Administrator filed a claim in the Old Mill case.  The Plan Administrator then entered into a settlement agreement of his potential claims in the Old Mill case with Old Republic and Mr. LaMonica.  That Settlement will result in a recovery acceptable

6

to Galster and Old Republic, the two creditors in this case.  Approval is pending in the White
Plains bankruptcy court.

26.     Meanwhile, since 2005, Yehuda Salamon, the Debtor's beneficial owner,
was also beneficial owner of Yidel's grocery store, which occupies the first floor Property and,
upon information and belief, Mr. Salamon has also permitted tenants to occupy the upstairs
residential units.  The mortgages have been unpaid for years, but the Debtor had no money in its
account upon filing this case and the limited information available indicates no income since the
filing.  This raises questions about whether rent has been collected and who has been collecting
rent.  At the first meeting of creditors the Debtor could not answer a single question about the
tenancies, despite repeated attempts by the United State Trustee and Galster's counsel. The
Debtor's schedules reflect no leases for the ground floor space.

27.     For a number of months, the Debtor filed operating reports for this case.
The reports, signed by Yehuda Salamon, show no income and no expenses. The Debtor,
however, has filed no operating reports nor provided any record of income or expenses since
April 2019.

28.     In November 2019, the undersigned was contacted by the Property's
insurance broker who stated that the Debtor had not responded to her communications regarding
the expiration of insurance coverage on the Property on December 1, 2019.  Debtor's counsel
was unresponsive.  The undersigned, therefore, prevailed on Galster to make a protective
advance to continue the insurance.

7

29.     The Plan Administrator retained Rosewood Realty, one of the leading Brooklyn real estate brokers with extensive of knowledge of the Property neighborhood, to sell the Property.  Rosewood reports that Mr. Salamon is well known in the community and bidding has been chilled because potential purchasers are unwilling to pay a fair market price since they fear Mr. Salamon will fail to vacate.

## RELIEF REQUESTED HEREIN

30.     By this Application, the Plan Administrator seeks an order of this Court providing for: (a) the eviction of the occupants of the commercial space at the Debtor's property at 4917 12th Avenue, Brooklyn, New York 11219 (the "Property"), (b) the United States Marshal for the Eastern District of New York (the "US Marshal") to assist the Plan Administrator with the eviction, and (c) the Plan Administrator to replace current management of the Property with a professional third party managing agent

31.     The Plan provides for sale of the Property.  The sale proceeds will be used (a) to pay pre-petition New York City real estate tax and other liens, if any, (b) administrative claims, if any, (c) Plan administration fees, (d) brokerage fees of 3% of the Purchase Price, (e) priority claims if any, and (f) the remainder to Creditors and Interest Holders in their order of priority.

32.     To ensure the Property is sold after reasonable exposure to the marketplace for the highest and best price, the Plan provides for professional marketing for at least 30 days, followed by an auction among qualified bidders.  The Plan provides further in the bidding and auction procedures that the sale is free and clear of commercial leases, and in

8

paragraph 84, the Plan provides that the Debtor must turnover possession of the Property at

closing.

        33.     To effectuate the sale, the Confirmation Order provides that the Plan

Administrator is authorized to take any action "necessary or appropriate to implement,

consummate and otherwise effectuate the Plan."

        34.     The Plan, in turn, provides at paragraph 90(c) that "The Plan

Administrator shall have the exclusive authority and duty to implement the sale of the Property

and prosecution of Causes of Action under this Plan and accordingly shall exercise such rights

and obligations of the Debtor in accordance with the Plan."  Under paragraph 19, "Causes of

Action" means "any and all claims and causes of action of, and remedies granted to, the Debtor

against any third party, including, without limitation, any avoidance claims or causes of action

pursuant to sections 502, 506, 510, 541 through 545, 547 through 551, and/or 553 of the

Bankruptcy Code and any claims pursuant to any other statutory or common law."

        35.     Under the Plan's broad grant of authority, the Plan Administrator has the

right to exercise the Debtor's claims and cause of action to evict the ground floor tenant since

there is no lease nor record of rent payment.  Similarly, the Plan administrator has the right to

exercise the Debtor's discretion to replace management with a third-party management company

who will collect rent, pay expenses and report operating results.

        36.     It is clear from the Debtor's post-confirmation actions and inaction that

the Debtor does not intend to cause the insider commercial occupants to vacate nor to pay rent,

nor does the Debtor intend to intend to provide effective property management services or reporting.

37.      The Plan Administrator expects that the assistance of the US Marshal will be necessary given the Debtor's and Mr. Salamon's past misconduct and litigious history.

38.      The Plan provides that the Debtor must cooperate with the Plan Administrator in implementing its terms.

39.      Section 1142 of the Bankruptcy Code authorizes this Court to enter orders to compel the Debtor to aid in implementation of the Plan.

40.      Absent the relief requested herein, the Plan Administrator submits that he cannot effectively market the Property, preserve and protect the Property pending sale, or comply with his obligations under the Plan and the Bankruptcy Code to report the Debtor's income and expenses, and assets and liabilities.

<u>CONCLUSION</u>

WHEREFORE, the Mortgagee respectfully requests that the Court grant the relief sought herein, that Court grant such other relief as may be just and proper.

Dated:  New York, New York
            December 27, 2019

**BACKENROTH FRANKEL & KRINSKY, LLP**
Attorneys for the Mortgagee

By:      s/Mark A. Frankel
            800 Third Avenue
            New York, New York 10022
            (212) 593-1100

10

234

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

IN RE:  4921 12TH AVENUE LLC

CASE NO: 18-47256

**DECLARATION OF MAILING**
**CERTIFICATE OF SERVICE**

Chapter: 11

On 12/27/2019, I did cause a copy of the following documents, described below,

Motion to Authorize/Direct Plan Administrator to Evict Tenants and Retain Managing Agent to Manage Property

to be served for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

I caused these documents to be served by utilizing the services of BK Attorney Services, LLC d/b/a certificateofservice.com, an Approved Bankruptcy Notice Provider authorized by the United States Courts Administrative Office, pursuant to Fed.R. Bankr.P. 9001(9) and 2002(g)(4).  A copy of the declaration of service is attached hereto and incorporated as if fully set forth herein.

Parties who are participants in the Courts Electronic Noticing System ("NEF"), if any, were denoted as having been served electronically with the documents described herein per the ECF/PACER system.

DATED: 12/27/2019

/s/ Mark Frankel
Mark Frankel  1989
Backenroth Frankel & Krinsky, LLP
800 Thrid Avenue
New York, NY  10022-0000
212 593 1100

235

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

IN RE:  4921 12TH AVENUE LLC

CASE NO: 18-47256

**CERTIFICATE OF SERVICE
DECLARATION OF MAILING**

Chapter: 11

On 12/27/2019, a copy of the following documents, described below,

Motion to Authorize/Direct Plan Administrator to Evict Tenants and Retain Managing Agent to Manage Property

were deposited for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

The undersigned does hereby declare under penalty of perjury of the laws of the United States that I have served the above referenced document (s) on the mailing list attached hereto in the manner shown and prepared the Declaration of Certificate of Service and that it is true and correct to the best of my knowledge, information, and belief.

DATED: 12/27/2019

Jay S. Jump
BK Attorney Services, LLC
d/b/a certificateofservice.com, for
Mark Frankel
Backenroth Frankel & Krinsky, LLP
800 Thrid Avenue
New York, NY  10022-0000

PARTIES DESIGNATED AS "EXCLUDE" WERE NOT SERVED VIA USPS FIRST CLASS MAIL
PARTIES WITH A '+' AND DESIGNATED AS "CM/ECF E-SERVICE" RECEIVED ELECTRONIC NOTICE THROUGH THE CM/ECF SYSTEM

| | | |
|---|---|---|
| CASE INFO | DEBTOR | |
| LABEL MATRIX FOR LOCAL NOTICING 02071 CASE 1-18-47256-CEC EASTERN DISTRICT OF NEW YORK BROOKLYN FRI DEC 27 10-31-32 EST 2019 | 4921 12TH AVENUE LLC 4921 12TH AVENUE BROOKLYN NY 11219-3040 | CULHANE MEADOWS PLLC 100 PARK AVENUE 16TH FLOOR NEW YORK NY 10017-5538 |
| OLD REPUBLIC NATIONAL TITLE INSURANCE COMPAN 521 5TH AVENUE 23RD FLOOR NEW YORK NY 10175-2399 | 271 C CADMAN PLAZA EAST SUITE 1595 BROOKLYN NY 11201-1800 | BEIS CHASIDEI GORLITZ CO BERKMAN HENOCH ET AL 100 GARDEN CITY PLAZA GARDEN CITY NY 11530-3203 |
| BEIS CHASIDEI GORLITZ CO HERRICK FEINSTEIN LLP 2 PARK AVENUE NEW YORK NY 10016-5702 | BUTLER FITZGERALD FIVESON  MCCARTHY PC 9 EAST 45TH STREET NINTH FLOOR NEW YORK NEW YORK 10017-8456 | GALSTER FUNDING LLC 9 EAST 45TH ST 9TH FLOOR NEW YORK NY 10017-8456 |
| GALSTER FUNDING LLC 9 EAST 45TH STREET NINTH FLOOR NEW YORK NY 10017-2425 | GALSTER FUNDING LLC CO BACKENROTH FRANKEL  KRINKSY LLP 800 3RD AVE FL 11 NEW YORK NY 10022-7651 | GALSTER FUNDING LLC CO HARRY ZUBLI ESQ 1010 NORTHERN BOULEVARD SUITE 310 GREAT NECK NY 11021-5329 |
| INTERNAL REVENUE SERVICE PO BOX 7346 PHILADELPHIA PA 19101-7346 | OFFICE OF THE UNITED STATES TRUSTEE EASTERN DISTRICT OF NY BROOKLYN OFFICE US FEDERAL OFFICE BUILDING 201 VARICK STREET SUITE 1006 NEW YORK NY 10014-4811 | OLD REPUBLIC NATIONAL TITLE INSURANCE COMPAN CO BUTLER FITZGERALD FIVESON MCCARTHY PC 9 EAST 45TH STREET 9TH FLOOR NEW YORK NEW YORK 10017-8456 |
| OLD REPUBLIC NATIONAL TITLE INSURANCE COMPAN A FLORIDA CORPORATION CO BUTLER FITZGERALD FIVESON  MCCARTHY NINE EAST 45TH STREET NINTH FLOOR NEW YORK NY 10017-2425 | YIDELS ONLINE FOOD STATION LLC ECOMMERCE EXPAND LLC CO DAHIYA LAW OFFICES LLC 75 MAIDEN LANE SUITE 506 NEW YORK NY 10038-4631 | ALLA KACHAN 3099 CONEY ISLAND AVENUE 3RD FLOOR BROOKLYN NY 11235-6305 |
| J TED DONOVAN GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP 1501 BROADWAY 22ND FLOOR NEW YORK NY 10036-5600 | JOSEPH Y BALISOK BALISOK  KAUFMAN PLLC 251 TROY AVENUE BROOKLYN NY 11213-3601 | |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

IN RE:                       .      Case No. 18-47256-bk (CEC)
                             .
4921 12th AVENUE, LLC,       .
                             .
         Debtor.             .
. . . . . . . . . . . . . ..
MARK FRANKEL AS PLAN         .      Adv. No. 19-01120(CEC)
ADMINISTRATOR FOR 4921       .
12th AVENUE, LLC,            .
                             .
         Plaintiff,          .
     v.                      .      Conrad B. Duberstein Courthouse
                             .      271-C Cadman Plaza East
YEHUDA SALAMON, et al.,      .      Brooklyn, NY 11201-1800
                             .
         Defendants.         .
                             .      November 13, 2019
. . . . . . . . . . . . . ..         4:13 p.m.

    TRANSCRIPT OF [2] ORDER SCHEDULING INITIAL CASE MANAGEMENT
CONFERENCE; [1] COMPLAINT BY MARK FRANKEL AGAINST YEHUDA I.
SALAMON, DAVID SALAMON, YIDEL'S SHOPPING CART, INC., E-COMMERCE
EXPAND, LLC, YIDEL'S ONLINE FOOD STATION, LLC, YIDEL'S SHOPPING
CART, INC. D/B/A/ RIVERSTONE GROUP, RIVERSTONE, USA, LLC, JOHN
DOE NO. 1 THROUGH JOHN DOE NO. 10, THE LAST TEN NAMES BEING
FICTITIOUS AND UNKNOWN TO PLAINTIFF, PERSONS OR PARTIES
INTENDED BEING PERSONS CORPORATIONS OR OTHERS BEING THE CURRENT
AND FORMER TE - NATURE(S) OF SUIT: (13) (RECOVERY OF
MONEY/PROPERTY - 548 FRAUDULENT TRANSFER.)

                BEFORE HONORABLE CARLA E. CRAIG,
        UNITED STATES BANKRUPTCY COURT CHIEF JUDGE


Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.
_____

                J&J COURT TRANSCRIBERS, INC.
                   268 Evergreen Avenue
                 Hamilton, New Jersey 08619
                 E-mail:  jjcourt@jjcourt.com

           (609) 586-2311   Fax No.  (609) 587-3599

APPEARANCES (Cont'd):


For the Debtor:            ALLA KACHAN, Pro See
                           3099 Coney Island Avenue
                           3rd Floor
                           Brooklyn, NY 11235

For the Creditor           Backenroth Frankel & Krinsky, LLP
Galster Funding, LLC:      By:  MARK A. FRANKEL, ESQ.
                           800 Third Avenue, 11th Floor
                           New York, NY  10022

For the Plan               Butler Fitzgerald Fiveson & McCarthy
Administrator              By:  DAVID K. FIVESON, ESQ.
Mark A. Frankel:           9 East 45th Street, Suite 900
                           New York, NY  10017

For the U.S. Trustee:      Office of the United States Trustee
                           By:  RACHEL WOLF, ESQ.
                               REEMA LATEEF, ESQ.
                           Brooklyn Office, U.S. Federal Office
                             Building
                           201 Varick Street, Suite 1006
                           New York, NY  10014

For the Defendants         Dayiya Law Offices, LLC
Yehuda I Salamon,          By:  KARAMVIR DAYIYA, ESQ.
Yidel's Shopping           75 Maiden Lane, Suite 506
Cart, Inc., et al.:        New York, NY  10017

For the Defendant          Law Office of Phillip Mahoney
Davida Salamon:            By:  PHILLIP MAHONEY, ESQ.
                           21-83 Steinway Street
                           Astoria, NY  11105

Audio Operator:            Juliet Lecky

                           - - -

3

1           COURTROOM DEPUTY:  Calendar 24 and 25, 4921 12th

2  Avenue, 18-47256 and Adversary 19-1120.

3           Appearances, please.

4           MR. FRANKEL:  Mark Frankel, Backenroth, Frankel and

5  Krinsky, plan administrator.

6           MR. FIVESON:  Good afternoon, Your Honor.  David

7  Fiveson of Butler, Fitzgerald, Fiveson, McCarthy for Mark

8  Frankel as plan administrator on the adversary proceeding.

9           MS. WOLF:  Rachel Wolf and Reema Lateef representing

10  the United States Trustee.

11           MR. DAHIYA:  Good afternoon, Your Honor.  Karamvir

12  Dahiya for Mr. Yehuda Salamon, Yidel's Shopping Cart, E-

13  Commerce and Yidel's Online Food Station, Yidel's Shopping Cart

14  and Riverstone Group, Riverstone, USA, LLC.

15           MS. KACHAN:  Good afternoon, Your Honor.  Alla Kachan

16  on behalf of the debtor 4921 12th Avenue, LLC.

17           MR. MAHONY:  Good afternoon, Your Honor.  Phillip

18  Mahony for the defendant David Salamon in the adversary

19  proceeding.

20           THE COURT:  Okay.  All right.

21           MR. FRANKEL:  Your Honor, this is Mark Frankel.  I

22  will start with the status if that's okay.

23           THE COURT:  Please.

1           MR. FRANKEL:  Your Honor, since the plan was

2   confirmed we have retained a broker and the property sale has

3   been moving forward, it was adjourned once and now it appears

4   that we will be conducting on sale on November 21st.

5           In terms of the administrative aspect, I still have

6   not gotten books and records from the debtor so we have not

7   been able to catch up on operating reports and pay whatever is

8   due on U.S. Trustee fees, nor have I gotten turnover of any

9   money that was in the debtor's accounts so that aspect of the

10  case is not moving.

11          The --

12          THE COURT:  So what are you going to do about that?

13          MR. FRANKEL:  I suppose I'm going to have to make a

14  motion for contempt.

15          THE COURT:  Well, it's -- these are things that he --

16  that the debtor was required to do pursuant to the plan?

17          MR. FRANKEL:  Yes.

18          THE COURT:  Or pursuant -- okay.

19          MR. FRANKEL:  And in terms of collecting assets, Mr.

20  Fiveson who is representing me has commenced an adversary

21  proceeding that will be heard when I sit down.  I have been

22  also working with Mr. Fiveson to collect money from a

23  bankruptcy estate in White Plains.

24          This case had a deeper story than we initially

25  presented to the Court, which Mr. Fiveson was able to track

5

1   down.   The sale proceeds -- not -- the finance proceeds that

2   were the subject of the case and led to the Galster foreclosure

3   judgment, when they left the debtor's account or control, two

4   and a half million of it was used as a down payment to purchase

5   property in Westchester.   And they needed more time to close so

6   they filed a bankruptcy in Westchester called RS Old Mill, and

7   in that case, very strange, the debtor appears to have set up

8   another entity that was not in bankruptcy, transferred the

9   rights to purchase the property to that entity without court

10  authority, then closed without court authority and the sale

11  proceeds from that sale disappeared.

12          All of this led to activity in the bankruptcy court

13  which left Judge Drain upset with everyone involved and invited

14  proofs of claim, since the 2.5 million that was initially

15  borrowed by 4921 ended up tied up in that transaction.   I filed

16  a proof of claim there and Mr. Fiveson, who was also involved

17  in that case because Old Republic again insured a transaction

18  that went sour, he has been working very hard to structure a

19  deal with Galster, the only other creditor in this case so that

20  they would get a very substantial return from the recovery in

21  White Plains without prejudicing Old Republic anymore than they

22  already are.   And we're trying to put together that deal so

23  that I don't have to litigate in White Plains and the only

24  other creditor in this case besides Mr. Fiveson's client gets a

25  premium on whatever recovery they would get had I litigated in

6

1  White Plains.

2          I know that's convoluted but this whole story became

3  very, very convoluted when we discovered what was going on in

4  the Old Mill case in front of Judge Drain.  But the whole point

5  of disclosing this was that I think as plan administrator, as

6  long as I have Galster and Old Republic's consent as the two

7  parties in interest for this money, I can go ahead and do that

8  without delaying Judge Drain's case by seeking approval in this

9  court for that transaction.

10         THE COURT:  All right.

11         MR. FRANKEL:  And with that, I will turn it over to

12 Mr. Fiveson to deal with the adversary proceeding.

13         THE COURT:  Okay.

14         MS. WOLF:  Your Honor, Rachel Wolf on behalf of the

15 U.S. Trustee, just want to report quickly on status.  The

16 debtor has not filed monthly operating reports at this point

17 for May, June, July, August and September 2019 and owes $977.13

18 in outstanding quarterly fees.

19         MR. FIVESON:  Good afternoon, Your Honor.  David

20 Fiveson --

21         THE COURT:  Okay.  Let me just -- excuse me.  Before

22 you go into that, Mr. Frankel, are you proposing to rectify

23 this?

24         MR. FRANKEL:  Yes, Judge.  And the fees are fairly

25 nominal and won't be a problem.  I think I can get Galster to

7

1    advance that.  The operating reports -- partially I'm going to

2    have to get from the debtor and I think that mostly this is

3    post-confirmation.  I can -- as long as -- I've been -- yeah,

4    from my point of view as plan administrator, nothing's been

5    disbursed and I can deal with that but I still need to get

6    records from the debtor.

7            THE COURT:  Okay.  All right.  Go ahead, Mr. Fiveson.

8            MR. FIVESON:  Yes, Your Honor.  I hope the Court

9    feels better.

10           THE COURT:  Thank you.

11           MR. FIVESON:  We represent Mr. Frankel as the plan

12   administrator.  The estate basically has two creditors that are

13   going all unsecured.  One is Old Republic, who filed the proof

14   of claim for about $13.5 million.  The debtor made a motion to

15   expunge that claim and that motion was denied.

16           The second creditor we will -- unsecured creditor we

17   anticipate will be Galster, who after the sale of the premises

18   later this month, we anticipate there being a substantial

19   deficiency on the monies owed on its note -- upwards of two or

20   three, maybe $4 million.  But we'll know November 21st when the

21   sale occurs.

22           We commenced an adversary proceeding against the

23   defendants, Mr. Salamon and his son and all his related shell

24   companies because in a related state court matter which I was

25   representing Galster to protect its first lien interest, we

8

1   disclosed and we got a lot of bank records that showed that not

2   one nickel of those loan proceeds of six and a half million

3   dollars, went into the debtor.  They went into Mr. Salamon's

4   shell companies, Yidel's, and then they were transferred out to

5   various companies.

6           And that was -- and I have those records and that was

7   the good faith basis for me to commence the action and we did

8   and they were served and they had until -- I granted an

9   extension of time to counsel -- about two days ago, and they

10  filed on the day to answer a motion to withdraw the reference

11  from the district to this bankruptcy court of the adversary

12  proceeding and a motion to dismiss for lack of subject matter

13  jurisdiction.

14          I am advised -- because we went on PACER earlier

15  today -- that that matter has been referred to District Judge

16  Carol Bagley Amon.  I don't have a motion date, but that motion

17  was filed and therefore I assume even though there's no motion

18  before this Court for a stay, I assume because they joined with

19  that motion to terminate the reference a motion to dismiss that

20  their time to answer is then adjourned.  And that's where we

21  are.

22          THE COURT:  Well, the filing of a motion to withdraw

23  the reference doesn't stay this case, so as far as I'm

24  concerned, we're moving forward with that.

25          MR. FIVESON:  Then I'd like to do discovery and after

9

1  discovery I anticipate making summary judgment motions.  I have

2  most of the records here.  And I know because I've been

3  litigating this in state court that the six and a half million

4  dollars never went to the debtor, it went to Mr. Salamon's

5  shells and then it goes out from there to the various

6  defendants and not one nickel went back into this debtor.  And

7  as the Court is aware, what happened is that Mr. Salamon

8  submitted forged satisfactions on which Galster lent six and a

9  half million dollars, those satisfactions were subsequently

10  reinstated by Judge Knipel of the Supreme Court.

11          Consequently, this property, which should have been

12  only one mortgage of six and a half million dollars granted to

13  Galster, now has three mortgages on it of which Galster's in

14  third position.  And like we advised the Court earlier, Old

15  Republic purchased the first two mortgages to put Galster in

16  first position and subordinated those mortgages behind Galster

17  which will result in an approximate 13 and a half million

18  dollar shortfall.  So that's where we are.  And that's what

19  happened here.

20          THE COURT:  Okay.

21          MR. FIVESON:  Thank you.

22          THE COURT:  Now, I think you should go ahead with any

23  discovery that you want to pursue.

24          MR. FIVESON:  Will do.  Your Honor, I'm going to pass

25  the microphone to my -- to other counsel.  Thank you.

1          THE COURT:  Yes.

2          MR. DAHIYA:  Good afternoon, Your Honor.  Karamvir

3   Dahiya for the defendants.  Your Honor has rightly pointed out

4   that pursuant to Rule 5011, there's no stay of the proceedings

5   here.  But, Your Honor, the question that this -- the motion

6   raises is the very subject matter jurisdiction of this Court,

7   one.

8          THE COURT:  I'm quite comfortable with the subject

9   matter jurisdiction that this is a -- there's certainly related

10  to jurisdiction because this is an action by a plan

11  administrator seeking to marshal assets of the estate for

12  distribution to creditors.  So, there's -- there is no -- and

13  it may even be arising under jurisdiction --

14         MR. DAHIYA:  Yes, Your Honor.

15         THE COURT:  -- or arising in jurisdiction, but

16  there's definitely related to, so there's clearly subject

17  matter jurisdiction.  Whether or not this is an action in which

18  a bankruptcy court can enter a final order is really not an

19  issue that has to be addressed at this juncture in the case.

20         So, in terms of -- but that's a whole separate

21  question from withdrawing the record -- withdrawing the

22  reference.  If the district court wishes to withdraw the

23  reference, they can do that, but --

24         MR. DAHIYA:  Yes.  Yes, Your Honor.

25         THE COURT:  -- I don't think there's any serious

1  question about there being subject matter jurisdiction.

2          MR. DAHIYA:  Your Honor, there were two reasons I

3  stated.  One was, of course, and I respectfully would disagree,

4  if this is an arising and pursuant to Rule Section 1334(b),

5  this is a related jurisdiction which has -- courts have taken a

6  very wide, wide --

7          THE COURT:  Okay.  This -- if it's --

8          MR. DAHIYA:  -- but the problem --

9          THE COURT:  -- if this is -- I'm sorry -- if this is

10 --

11         MR. DAHIYA:  Yeah.

12         THE COURT:  -- that this falls under related to

13 jurisdiction, that means there is subject matter jurisdiction

14 under the -- in the bankruptcy court.

15         MR. DAHIYA:  Your Honor --

16         THE COURT:  Maybe in -- whether or not the bankruptcy

17 court can enter a final order is a separate question.

18         MR. DAHIYA:  That is true, Your Honor.  We are not --

19 I agree with this, Your Honor, that non-core or even core

20 matters pursuant to Stern, if the matter deals with a state law

21 it has to be -- the final order has to be -- this Court can do

22 a proposed finding of fact but there's something else.

23         THE COURT:  But I do -- I'm not necessarily agreeing

24 with you in your characterization of this, but what I'm saying

25 is subject matter jurisdiction is not at issue.

12

1          MR. DAHIYA:  Your Honor, the second issue is the
2    plan.  The plan also -- the plan subsumes in a very nebulas
3    manner the claims that are being retained pursuant to the
4    confirmed plan.  The plan -- the -- in order for the Court to
5    have (indiscernible) jurisdiction to entertain a proceeding of
6    this nature, they should have amplified those claims in the
7    confirmed plan.  They didn't do that.
8          THE COURT:  Okay.  If you want to make that motion to
9    me you can, but in the absence of such a motion, I'm moving
10   forward with this case.
11         MR. DAHIYA:  Your Honor, respectfully, that happens
12   to be a part of our motions to dismiss this proceeding.  Is it
13   there --
14         THE COURT:  Okay.  Yes, except that -- except you
15   made that to the wrong court I think.
16         MR. DAHIYA:  Well, yes, Your Honor, pursuant to CFTC,
17   was to show Justice O'Connor writing for the majority, a known
18   debtor can invoke the right to be heard by an Article III
19   judge, and it is not only --
20         THE COURT:  But you don't have the right to be heard
21   on anything you feel like being heard on.  You have the right
22   to be heard -- you have the right to an Article III judge
23   entering a final order in your case maybe.
24         MR. DAHIYA:  Your -- I --
25         THE COURT:  Maybe.

1          MR. DAHIYA:  Yes, Your Honor, that is on the -- -- I
2    mean, the series of case law that has come after <u>Stern</u> like
3    <u>Sharif</u> case, <u>Wellness</u> case, I understand based on consent and
4    all.  Here, they have in a very explicit manner retained --
5    they say we don't consent to the jurisdiction --
6          THE COURT:  Okay.  It doesn't matter if they consent
7    or not --
8          MR. DAHIYA:  Yes, Your Honor.
9          THE COURT:  -- but the bankruptcy court can still
10   handle the case --
11         MR. DAHIYA:  This --
12         THE COURT:  -- whether or not they can enter a final
13   order.  At the -- as this case moves forward unless the
14   district court withdraws the reference --
15         MR. DAHIYA:  Yes, Your Honor.
16         THE COURT:  -- I will decide whether or not I agree
17   with you that this is a matter that -- where a final order must
18   entered by an Article III judge or if I don't agree with you --
19         MR. DAHIYA:  Yes, Your Honor.
20         THE COURT:  -- but if I don't -- if I agree with you
21   then I'll make a recommendation to the district court.  If not,
22   I will decide this myself and -- so -- and I will enter a final
23   order.  And you can appeal it to the district court.  But none
24   of this stops me from going ahead with this case while your
25   motion is pending before the district court.

14

1          MR. DAHIYA:  That is precisely true, Your Honor, that

2     pursuant to 5011 the Court continues to preside over

3     (indiscernible).  But the question here I raised was, one, they

4     invoke the right to be heard by an Article III Judge, second,

5     they don't consent to the jurisdiction of this Court.

6          THE COURT:  But you don't have to -- you're --

7          MR. DAHIYA:  Yeah, I understand.

8          THE COURT:  -- you don't have the right to -- you may

9     not consent to be heard through the entry of a final order, but

10    you don't have the right to chose whether you're going to be in

11    district court or bankruptcy court.

12         MR. DAHIYA:  Yes, Your Honor --

13         THE COURT:  Pursuing a case that is subject to

14    bankruptcy court jurisdiction.

15         MR. DAHIYA:  This is the sole issue that has never

16    found a conclusive determination, Your Honor.

17         THE COURT:  That is not -- you're not right.  That's

18    not correct.  It is patently clear what a bankruptcy court can

19    hear --

20         MR. DAHIYA:  Yes.

21         THE COURT:  -- can hear bankruptcy matters.

22         MR. DAHIYA:  Yes, Your Honor.  The last thing, Your

23    Honor, we would like to request, I don't know if you want us to

24    file a motion to stay these proceedings or if you could

25    consider my oral motion now, Your Honor, I have to request Your

15

1  Honor to kindly if you could stay these proceedings because we

2  feel pursuant to Rule Section 157, this matter is subject to

3  mandatory withdrawal of reference.  For example -- no, for --

4  the reason is simple, it deals with the interpretation of the

5  Bankruptcy Code as well as the institutional setup under

6  Article III, Your Honor.

7        So, I mean, I know this is not the right court for

8  the withdrawal of reference, but we wanted to request if you

9  can stay the proceedings for a month, two months so meanwhile

10  we can --

11        THE COURT:  Application denied.

12        MR. DAHIYA:  Yes, Your Honor.  Thank you, Your Honor.

13  So, Your Honor, since you've denied the application and we have

14  not scheduled the motion before this Court, we are in a little

15  precarious position now.  Do you want us to put a date for

16  return date of our motion to dismiss the -- dismiss this case?

17        THE COURT:  You can do whatever you want to do.  I'm

18  -- in the meantime, Mr. Fiveson's going to go ahead with his

19  discovery.

20        MR. DAHIYA:  Yeah, we can have a Rule 26 conference

21  with him, Your Honor.  Well -- that's not an issue.  Thank you,

22  Your Honor.

23        MR. FIVESON:  Judge?

24        THE COURT:  Mm-mm.

25        MR. FIVESON:  Your Honor, this is Mr. Fiveson again.

1   Thank you but since this action is not stayed before this

2   Court, they're in default.  And the defendants have not

3   answered.  Now I have no objection to giving them seven days to

4   allow them to submit an answer.  I'm not trying to play got you

5   here, but I need an answer before I can then get discovery

6   going and get the case moving.

7            THE COURT:  Actually, you don't need to have an

8   answer before you pursue discovery.

9            MR. FIVESON:  Okay.

10            THE COURT:  Not in federal court.

11            MR. FIVESON:  Okay.  Okay.  Thank you.

12            THE COURT:  But, you know, I don't -- but -- what is

13   your -- is your plan to answer?

14            MR. DAHIYA:  No, Your Honor.  The question was I

15   think I got in this little edgy state because, one, they want

16   to -- they wanted two relief; one was, withdrawal of reference,

17   second was, they wanted a district court judge to decide their

18   motion since they invoked the right to be heard by an Article

19   III Court.  But, the position gets a little difficult because

20   pursuant to Rule 5011, this proceeding doesn't stay.  So, I

21   think -- propose we will have to schedule a date for this

22   motion to dismiss the adversary proceeding in this court.

23            THE COURT:  Okay.  But, of course, that doesn't stay

24   any kind of discovery at all pending --

25            MR. DAHIYA:  No, it does not.  Rule 26 is -- Your

17

1   Honor, you control the docket and we are open now to have

2   conference with them, so we'll do it.

3           THE COURT:  Okay.

4           MR. DAHIYA:  Thank you, Your Honor.

5           THE COURT:  All right.  So, I'll give you one week to

6   file an answer or a motion.

7           MR. DAHIYA:  Yes, Your Honor.  Thank you, Your Honor.

8           THE COURT:  Okay.  Is there -- so, should I schedule

9   -- give you another conference date, Mr. Fiveson?

10          MR. FIVESON:  Yes, please.

11          THE COURT:  Okay.  I'm going to give you a date in

12  the -- in 2020.

13          MR. FIVESON:  Thank you.

14          THE COURT:  Okay.  Mrs. Leonard.

15          COURTROOM DEPUTY:  I'm sorry.  You said January?

16          THE COURT:  Right.

17          COURTROOM DEPUTY:  What about January 22nd?

18          THE COURT:  All right.

19          COURTROOM DEPUTY:  At --

20          THE COURT:  And what time?

21          COURTROOM DEPUTY:  -- three.

22                          (Laughter)

23          THE COURT:  Okay.

24          MR. FIVESON:  Thank you, Your Honor.

25          MR. DAHIYA:  Thank you, Your Honor.  Get well soon,

18

1  Your Honor.

2             THE COURT:  Thank you.

3             MR. FIVESON:  And, Judge, just so I'm clear, this is

4  Mr. Fiveson again, his making the motion to dismiss should he

5  do so within the week --

6             THE COURT:  Yes.

7             MR. FIVESON:  -- will not stay my discovery?

8             THE COURT:  Correct.

9             MR. FIVESON:  Thank you.

10            THE COURT:  A motion to dismiss doesn't stay

11  discovery in federal court.

12            MR. FIVESON:  Thank you, Judge.

13            MR. DAHIYA:  But --

14            THE COURT:  That happens in state court but not in

15  federal court.

16            MR. DAHIYA:  But, Your Honor, he has to confer with

17  me before he starts the discovery.  He'll have to -- Rule

18  26(a), you have to file the (indiscernible).

19            THE COURT:  Well, I guess that that would require you

20  to confer with him too.

21            MR. DAHIYA:  Yes, Your Honor.

22            THE COURT:  Okay.

23            MR. MAHONEY:  Your Honor -- sorry, Your Honor, it's

24  Phil Mahoney for the plaintiff David Salamon.  I also just want

25  to clarify one point.  We have one week to file an answer, Your

19

1  Honor?

2          THE COURT:  Answer or move.  To not be in default.

3          MR. DAHIYA:  Answer or motion.

4          MR. MAHONEY:  Correct.  Yeah.

5          MR. DAHIYA:  Same thing.

6          MR. MAHONEY:  Okay.  Yeah.  Thank you, Your Honor.

7          MR. DAHIYA:  Thank you, Your Honor.

8          UNIDENTIFIED SPEAKER:  Thank you.

9          MS. WOLF:  Thank you, Your Honor.

10         MR. DAHIYA:  I -- you want us to -- the return date

11 for the motions could be, Your Honor, same date?  January?

12         THE COURT:  If you like.

13         MR. DAHIYA:  Okay.

14         THE COURT:  Okay.  All right.  Next case, Mrs.

15 Leonard.

16                    *  *  *  *  *

17

18

19

20

21

22

23

24

25

20

1                    **C E R T I F I C A T I O N**

2              I, CINDY POST, court approved transcriber, certify

3    that the foregoing is a correct transcript from the official

4    electronic sound recording of the proceedings in the above-

5    entitled matter, and to the best of my ability.

6

7

8    /s/ Cindy Post

9    CINDY POST

10   J&J COURT TRANSCRIBERS, INC.        DATE:  January 3, 2020

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1-18-47256-cec   Doc 181   Filed 01/03/20   Entered 01/03/20 10:58:48

**Information to identify the case:**

Debtor

**4921 12th Avenue LLC**

Name

EIN  **20−0581630**

United States Bankruptcy Court  **Eastern District of New York**

Date case filed for chapter  **11**   **12/20/18**

Case number:  **1−18−47256−cec**

## NOTICE OF FILING OF TRANSCRIPT AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION

**NOTICE IS HEREBY GIVEN THAT:**

A transcript of the proceeding held on 11/13/19 was filed on 1/3/20.

The following deadlines apply:

The parties have until January 10, 2020 to file with the court a Notice of Intent to Request Redaction of this transcript. The deadline for filing a Transcript Redaction Request is January 24, 2020.

If a Transcript Redaction Request is filed, the redacted transcript is due February 3, 2020.

If no such Notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is April 2, 2020, unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber J&J Court Transcribers, Inc. at 609−586−2311 or you may view the document at the public terminal at the Office of the Clerk.

Dated: January 6, 2020

For the Court, Robert A. Gavin, Jr., Clerk of Court

**BLnftrans2.jsp** [Notice of Filing Transcript and Deadlines to Restriction and Redaction rev. 02/01/17]

258

## Notice Recipients

District/Off: 0207−1          User: jlecky          Date Created: 1/6/2020

Case: 1−18−47256−cec          Form ID: 295          Total: 8

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| aty | Alla Kachan | alla@kachanlaw.com |
| aty | David K. Fiveson | dfiveson@bffmlaw.com |
| aty | J Ted Donovan | Tdonovan@gwfglaw.com |
| aty | Joseph Y. Balisok | bankruptcy@lawbalisok.com |
| aty | Karamvir Dahiya | karam@bankruptcypundit.com |
| aty | Mark A. Frankel | mfrankel@bfklaw.com |

TOTAL: 6

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | | | |
|---|---|---|---|---|
| db | 4921 12th Avenue LLC | 4921 12th Avenue | Brooklyn, NY 11219 | |
| | Phillip Mahony | Law Office of Phillip Mahoney | 21−83 Steinway Street | Astoria, NY 11105 |

TOTAL: 2

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X CASE NO: 18-47256
IN RE:


 4921 12th Avenue, LLC,

                       Debtor.
-------------------------------------------------------X      CHAPTER 11

AFFIRMATION IN OPPOSITON TO THE PLAN ADMINISTRATOR
MOTION TO EVICT THE TENANTS AND TO REPLACE THE
MANAGEMENT

      On behalf of Yehuda Salamon, Dahiya Law Offices through the undersigned opposing the Plan Administrator's motion submit the following:

      The Plan Administrator, Mark Frankel ("Plan Administrator") of the confirmed plan ("Plan") in the case of 4921 12th Avenue, LLC's (the "Debtor"), wants now through his motion (the "Motion"), (1) the eviction of the occupants of the commercial space at the Debtor's property at 4917 12th Avenue, Brooklyn, New York 11219 (the "Property"), (2) the United States Marshal for the Eastern District of New York (the "US Marshal") to assist the Plan Administrator with the eviction, and (3) authorizing the Plan Administrator to replace current management of the Property with a professional third party managing agent.  He wants it all post facto.  In other words, rather than a liquidating plan, he wants to be an operating trustee running afoul of the Chapter 11 confirmed plan strictures.  The motion should be denied.  Yes, the Plan is drawn broadly. However, that broad grant of power saps the power of the plan and does not confer jurisdiction on this Court.
The plan administrator declares that,

> The Plan, in tum, provides at paragraph 90( c) that "The Plan Administrator shall have the exclusive authority and duty to implement the sale of the Property and prosecution of Causes of Action under this Plan and accordingly shall exercise such rights and obligations of the Debtor in accordance with the Plan." Under paragraph 19, "Causes of Action" means "any and all claims and causes of action of, and remedies granted to, the Debtor against any third party, including, without limitation, any avoidance claims or causes of action pursuant to sections 502,506,510,541

1

> through 545,547 through 551, and/or 553 of the
> Bankruptcy Code and any claims pursuant to any other
> statutory or common law."

Motion ¶ 34. Such wide swathes of jurisdictional arrogation does not lend any

teeth to this confirmed Plan. The whole motion reels around, "under the broad

grant of power," Motion ¶ 34. However, such is not the nature of legal

proceeding and or the forum powers, especially in the limited jurisdiction

functions of the federal courts. Jurisdiction is core aspect of adjudication.

"The plan cannot confer jurisdiction upon a bankruptcy court or a federal district

court ..., rather 28 U.S.C. § 1334 governs jurisdiction." It is universal and or

basic to the student of the federal jurisdiction. Federal district courts, thereby the

bankruptcy courts as auxiliary units to them, 28 U.S.C. 151, operate as courts of

limited jurisdiction in two respects: they may hear only the matters that Congress

has assigned to them and only to the extent permitted by the Constitution. Finding

the plan inclusive of the jurisdictional language is redundant. See *Zerand–Bernal

Group, Inc. v. Cox,* 23 F.3d 159, 164 (7th Cir.1994) (concluding that the

bankruptcy court lacked jurisdiction post-confirmation to adjudicate an

adversary proceeding concerning a bankruptcy sale, notwithstanding inclusion of

language purporting to retain jurisdiction in the order confirming the sale and in

the plan of reorganization). Simply put, the Debtor or the Plan administrator

cannot "*write its own jurisdictional ticket*." *Id.* Thus, the inquiry is if the court

will have jurisdiction independent of the content of the Chapter 11 plan.

The confirmed plan does not contemplate continued operations of the

debtor, rather it provides for the sale. It does not contemplate take over of the

Debtor's management, rather a sale of the underlying Debtor's asset. It also did

not provide for the eviction of the tenants, rather the property was being sold or to

be liquidated as is. None of the relief sought in this Motion have been preserved in

the confirmed plan.

The Court lacks jurisdiction--albeit a confirmed plan with sweeping

jurisdictional claim. This Court within the given statutory scheme, looks at the

district court jurisdictional grants, post The Bankruptcy Amendments and Federal

Judgeship Act of 1984 ("BAFJA"), which  was Congress' legislative response to

the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 87 (1982) (holding that the 1978 Reform Act "has impermissibly removed most, if not all, of the 'essential attributes of the judicial power' from the Art. III district court, and has vested those attributes in a non-Art. III adjunct. Such a grant of jurisdiction cannot be sustained as an exercise on Congress' power to create adjuncts to Art. III courts.").   District courts have "original and exclusive jurisdiction of all cases under title 11," and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a), (b).

Does the requisitioned relief arise under title 11, or arise in or related to cases under title 11?  The answer is No.  Why?  Because Plan Administrator is seeking two relief, one, the dispossession of the leased tenant and other the change over the management of the debtor. None was contemplated in the bankrupt plan, nor accomplished or initiated pre-confirmation.  The eviction proceeding is not something that is arising in Title 11, as it would not have an existence outside of bankruptcy.  *Bergstrom v. Dalkon Shield Claimants Trust* (*In re A.H. Robins Co.*), 86 F.3d 364, 372 (4th Cir.1996)). Similarly taking over the management of the company as a creditor is not thing that would not have existence out of bankruptcy case.  The claim of the creditor predates the bankruptcy cannot have arisen in the bankruptcy case.

**The Lease[1]**

The premises lease (with a term exceeding 20 years)  has neither been assumed nor rejected, despite the language in the confirmed Chapter 11 plan, ¶ 94 which says that "[a]ny  and all pre-petition leases or executory contracts (a) not previously assume or the subject of a motion to assume pending on the Confirmation Date . . .  shall be deemed rejected by the Debtor."  Id Plan at 20. The lessee had no knowledge about the proceeding, nor was it listed in the bankruptcy schedule.  Due process is violated by attacking the lessee now, asking for dispossession.

---

[1] I received a call and an email from the alleged tenant. Attached is the Lease. He claims that he had no knowledge about it.

**The management Issue**

The Plan Administrator is now vying for management control, which again was something that should have been done pre-confirmation of the plan.   Once the plan was confirmed.  Under 11 U.S.C. § 1141(b), "the confirmation of a plan vests all of the property of the estate in the debtor." See also  *In re Ice Cream Liquidation, Inc.,* 319 B.R. 324, 333 (Bankr.D.Conn.2005)(debtor-in-possession status, along with the relevant powers of a trustee, "ceases on the effective date of a confirmed plan").   No such power to change the management etc. was contemplated by the confirmed plan. "After confirmation of a plan, the ability of the [debtor] to enforce a claim once held by the estate is limited to that which has been retained in the plan." *In re Paramount Plastics, Inc.,* 172 B.R. 331, 333 (Bankr.W.D.Wash.1994); *see also In re Tex. Gen. Petrol. Corp.,* 52 F.3d 1330, 1335 n. 4 (5th Cir.1995) (citing *Harstad v. First American Bank,* 39 F.3d 898, 901–02 (8th Cir.1994).   The plan contemplated sale of the asset and no where did it contemplate that it is going to take over and run the place, as an operating trustee. "For a debtor to preserve a claim, "the plan must expressly retain the right to pursue such actions.  The reservation must be specific and unequivocal." *In re United Operating, LLC,* 540 F.3d 351, 355 (5th Cir. 2008) (quoting <u>*Harstad,*</u> 39 F.3d at 902).  If a debtor has not made an effective reservation, the debtor has no standing to pursue a claim that the estate owned before it was dissolved." *In re United Operating* at 355.

The plan is a liquidating plan. That is what the Plan Administrator do.  Now he wants to be an operating trustee to enhance the value of the estate etc.  The plan administrator also recites some assumptions and conjectures which are completely unrelated to the asked for relief. Based on the foregoing, it is respectfully submitted that the Court deny the motion of the Plan Administrator.

Dated: January 17, 2020
New York NY                                     /s/_____
                                                     Karamvir Dahiya

4

263

**Subject:** Ultimate Oppurtunities, LLC
**From:** Admor 770 <admor770@yahoo.com>
**Date:** 1/16/2020, 8:07 PM
**To:** "karam@dahiya.law" <karam@dahiya.law>

Mr. Karam:

Having spoken with you for two minutes today over the phone you seem to be a very nice person.  I am extremely
upset having heard late yesterday evening that the landlord is in bankruptcy and that his situation may affect the lease rights of
Ultimate Oppurtunities, LLC, the tenant.   Please notify the court ASAP that the tenant was never notified by anyone as to the Landlord's bankruptcy and submit any of the objections that are necessary.   I am today busy and trying to find a lawyer to represent the tenant's interest at the Bankruptcy Court.

As of today I did not retain any lawyer.

(The name of tenant is as is.  The typo in Oppurtunities is the way the company was filed.)

Thank you sincerely,

Uziel Frankel
(646) 832-8575

─ Attachments: ──────────────────────────────────────────

  Lease of Nov 1-2016.pdf                                    12.5 MB

LEASE dated November 1,2016, between 4921 12th Avenue, LLC  having a place of business at 4921 12th Avenue, Brooklyn, NY  (hereinafter called "Landlord"),and Ultimate Oppurtunities, LLC, an entity to be formed in New Jersey, a New York corporation having a place of business at 110 Chestnut Ridge Road, Montvale, NJ 07645 (hereinafter called "Tenant").

## W I T N E S S E T H :

1. <u>Demise of Premises, Term and Rent.</u>  Landlord does hereby lease and demise to Tenant, and Tenant does hereby hire and take from Landlord, subject to any ground leases and/or underlying leases and/or mortgages as hereinafter provided, and upon and subject to the covenants, agreements, term, provisions and conditions of this Lease for the term hereinafter stated, the portion of the store premises and the portion of the basement each more specifically shown, respectively, hatched and cross-hatched on the plans attached hereto as Exhibits "A" and "B", said demised premises, together with all fixtures, equipment, improvements, installations and appurtenances which at the commencement of or during the term of this Lease are thereto attached (except items not deemed to be included therein and removable by Tenant as provided in Article 4 of this Lease) are hereinafter called the "premises", and the plot of land on which the Building has been constructed is hereinafter called the "Land".

The term of this Lease shall commence on November 1, 2016 (subject to postponement of said specific date as provided in Article 2 hereof) or on such earlier date as Tenant shall occupy the premises or any part thereof with the consent of Landlord for the purpose of carrying on the normal functions of Tenant's business (such date for the commencement of the term hereof being hereinafter called the "term commencement date") and shall end on  or shall end on such earlier date upon which said term may expire or be terminated pursuant to any of the conditions of limitation or other provisions of this Lease or pursuant to law.

The premises shall be used for the following, but not for any other purpose, namely:

Landlord agrees that Landlord will not lease any other space in the Building which is subject to Landlord's control to any entity for any primary use which includes any use set forth in the preceding paragraph hereof but nothing contained herein shall preclude Landlord from leasing space where any such use referred to the preceding paragraph hereof is incidental to the primary or main use of the tenant, occupant or user thereof.

The rent reserved under this Lease for the term hereof shall be and consist of the following fixed rent, namely:

(a)  for and during the period commencing on November 1, 2016 and ending on October 31, 2026, ($108,000.00) Dollars per annum;

(b)  for and during the period commencing on November 1, 2026 and ending on October 31, 2036, ($120,000.00) Dollars per annum;

(c)  for and during the period commencing on November 1, 2036 and ending on October 31, 2046, ($132,000) Dollars per annum;

all such fixed rent being payable in equal monthly installments in advance, on the first day of each and every calendar month during said term (except that Tenant shall pay the monthly installment of fixed rent for the month of          on the execution hereof), plus such additional rent and other charges as shall become due and payable hereunder, which additional rent and other charges shall be payable as hereinafter provided; all to be paid to Landlord at is office, or such other place as Landlord may designate, in lawful money in the Untied States of America.  The monthly installments of fixed rent for the month during which the term commencement date occurs and the month during which the term hereof expires shall each be prorated.

In addition to the foregoing, and in further consideration of Landlord entering into this Lease, upon the execution of this Lease, Tenant shall also pay to Landlord the sum of $0.00.  If Tenant's check or checks for such sum, or the sum referred to in the immediately preceding paragraph hereof, shall not be honored by the bank upon which it or they are drawn for any reason of any kind or nature whatsoever, this Lease shall be, and shall be deemed to be, without notice, immediately cancelled and terminated and of no further force or effect and Landlord shall have no liability or obligation to Tenant under this Lease.

Provided Tenant shall not at any time be in default of any of the convents, agreements, terms, provisions or conditions of this Lease on its part to be kept, observed and performed, the monthly installments or part thereof of fixed rent payable by Tenant to Landlord for the period commencing on the term commencement date and ending on --- shall be abated; the twelve (12) monthly installments of fixed rent payable by Tenant to Landlord for the period beginning          and ending        shall each be abated by an amount equal to $---; and, the sixty (60) monthly installments of fixed rent payable by Tenant to Landlord for the period beginning --- and ending ----- shall each be abated by an amount equal to $0.00 .

Tenant does hereby covenant and agree promptly to pay the fixed rent, additional rent and other charges herein reserved as and when the same shall become due and payable, without demand therefor, and without any set-off or deduction whatsoever, and to keep and perform, and to permit no violation of, each and every of the covenants, agreements, terms provisions and conditions herein contained on the part and on behalf of Tenant to be kept and performed.

For default in payment of additional rent or other sums or charges herein reserved or payable by Tenant, Landlord shall have the same remedies as for a default by Tenant in the payment of fixed rent payable hereunder.

If Tenant shall fail to pay any installment of fixed rent or additional rent or other sums or charges within ten (10) days after the same shall be due then, Tenant shall pay a late charge of $0.00 for each $1.00 so unpaid.  Nothing herein contained shall be intended to violate any applicable law, code or regulation, and, in all instances, such late charge shall be automatically reduced to any maximum applicable legal rate or charge.  Such late charge shall be imposed monthly for each late payment and is in addition to all other rights and remedies available to Landlord and shall not be deemed to limit any such rights or remedies.

Tenants' obligations and responsibilities pursuant to any provision of this Lease, including the payment of any fixed rent or additional rent or the keeping, observance or performance of any covenant, agreement, term, provision or condition of this

Lease on Tenant's part to be kept, observed or performed, shall survive the expiration or termination of the term of this Lease.

2.  Underline: Occupancy.

(a) If the premises are not ready for Tenant's occupancy on the term commencement date, then this Lease shall not be affected thereby but, in such case, such specific date shall be deemed to be postponed until the date when the premises are ready for Tenant's occupancy and Tenant shall not have any claim against Landlord, and Landlord shall have no liability to Tenant, by reason of any such postponement of such specific date.  In the event the term commencement date shall be postponed, the expiration date of the term of this Lease set forth in Article 1 hereof shall be extended by the number of days equal to the number of days by which the term commencement date was so postponed and, in addition thereto, each date set forth in clause (a) through and including (c) of said Article 1 shall likewise be extended by said number of days.  In the event of the foregoing, Tenant will, at the request of Landlord, enter into an agreement setting forth the term commencement date and all other dates required to be modified by reason of such postponement.  The parties hereto agree that this Article 2 constitutes an express provision as to the time at which Landlord shall deliver possession of the premises to Tenant, and Tenant hereby waives any rights to rescind this Lease which Tenant might otherwise have pursuant to Section 223a of the Real Property Law of the State of New York or pursuant to any other law of like import now or hereafter in force.

(b)  Tenant understands, and covenants and agrees, that Landlord shall not be required to perform any work or there installations in or to the premises or the Building and Tenant further convents and agrees that the premises are leased to Tenant, and Tenant shall accept the premises, in its "as is" condition existing on the term commencement date; provided, however, Landlord shall deliver the premises to Tenant on the term commencement date vacant and in broom clean condition.  Tenant further understands and agrees that Landlord makes no representations as to the condition of the premises or the Building or the suitability thereof for the use permitted hereunder.  Landlord agrees that Tenant shall be permitted to use one of the two air conditioning compressors presently being used and designated by Landlord; provided, however, Landlord makes not warranty or representation with respect to the use or condition or suitability or feasibility of any such compressor and Landlord shall have no obligation, responsibility or liability of any kind or nature whatsoever in connection with the compressor so used by Tenant.

(c)  Subject to the provisions of this Lease, including, but not limited to, Article 6 hereof, Tenant, at Tenant's sole cost and expense, shall be permitted to install an air conditioning generator in the premises and Landlord will permit necessary duct work therefor to be installed in the portion of the Building presently occupied by Landlord.  Upon prior notice to Landlord, Tenant shall be permitted to enter the portion of the Building occupied by Landlord for the purpose of maintaining and servicing said generator provided any such entry shall be accomplished only in the presence of a representative of Landlord and shall not interfere with or affect Landlord or Landlord's use or occupancy of said portion so occupied by Landlord.

(d)  Tenant, by entering into occupancy of the premises, shall be conclusively deemed to have agreed that Landlord, up to the time of such occupancy, had performed all of its obligations hereunder and that the premises were in satisfactory condition as of the date of such occupancy.  Landlord shall not be responsible for latent defects in the Building or the premises.

(e)  Tenant covenants agrees that, subject to the covenants, agreements, terms, provisions and conditions of this Lease including, but not limited to, Article 6 hereof, Tenant, at Tenant's sole cost and expense, shall perform all work and other alterations and installations necessary in order to prepare the premises for Tenant's occupancy for the use permitted hereunder including, but not limited to, the construction of demising walls.

(f)  If, by reason of any of the provisions of this Lease, the fixed rent under this Lease shall commence on any day other than the first day of a calendar month, the fixed rent for such calendar month shall be prorated.

(g)  A copy of the Certificate of Occupancy covering the Building is attached hereto.

3.  Underline: Use of Premises.   Tenant shall not use the premises or any part thereof, or permit the premises or any part thereof to be used, for any purpose other than the use hereinabove specifically mentioned, subject, however, to all the covenants, agreements, terms, provisions and conditions of this Lease.  Those portions, if any, of the premises which on the plan(s) attached hereto are shown as toilets and utility areas shall be used by Tenant only for the purposes for which they are designed.  Tenant will not at any time use or occupy the premises or any part thereof, or permit the premises or any part thereof to be used or occupied, in violation of the certificate of occupancy (temporary or final) issued for the Building and/or the premises.

Tenant shall not sue or permit the use of the premises or any part thereof in any way which would violate any of the covenants, agreements, terms, provisions and conditions of this Lease or for any unlawful purposes or in any unlawful manner and Tenant shall not suffer or permit the premises or any part thereof to be used in any manner or anything to be done therein or suffer or permit anything to be brought into or kept in the premises which, in the judgment of Landlord, shall in any way impair or tend to impair the character, reputation or appearance of the Building as a first-class office building, impair or interfere with or tend to impair or interfere with any of the Building services or the proper and economic heating, cleaning, air conditioning or other servicing of the Building or the premises, or impair or interfere with or tend to impair or interfere with the use of any of the other areas of the Building by, or occasion discomfort, inconvenience or annoyance to, any of the other tenants or occupants of the Building.  Tenant shall not install any electrical or other equipment of any kind which, in the judgment of Landlord, might cause any such impairment, interference, discomfort, inconvenience or annoyance.

Except as set forth in Article 1 hereof, Tenant will not, and will not permit anyone to, sell or traffic in any spirituous liquors, wine, ale or beer in or from the premises or carry on any manufacturing in the premises.

If any governmental license or permit shall be required for the proper and lawful conduct of Tenant's business or other activity carried on it the premises, Tenant, at Tenant's expense, shall duly procure and thereafter maintain such license or permit and submit the same to inspection by Landlord.  Tenant, at Tenant's expense, shall, at all times, comply with the terms and

conditions of each license or permit.

4. <u>Fixtures, etc., Not to be Removed.</u>  All fixtures, equipment, improvements, installations and appurtenances attached to, or built into, the premises at the commencement of or during the term hereof, whether or not furnished and installed at the expense of Tenant or by Tenant, shall be and remain part of the premises and be deemed the property of Landlord and shall not be removed by Tenant, except as otherwise expressly provided in this Lease.  Without limiting the generality of the next preceding sentence, all electric, plumbing, heating, sprinkler, dumbwaiter, elevator, pneumatic tube, telephone, telegraph, communication, radio and television systems, fixtures and outlets, venetian blinds, partitions, railings, gates, doors, vaults, stairs, paneling (including, but not limited to, display cases and cupboards recessed in paneling), molding, shelving, radiator enclosures, cork rubber, linoleum and composition floors, and ventilating, silencing, air conditioning and cooling equipment shall be deemed to be included in such fixtures, equipment, improvements, installations and appurtenances, whether or not attached to or built into the premises.  Anything hereinbefore in this Article 4 contained to the contrary notwithstanding, any fixture, equipment, improvement, installation or appurtenance furnished and installed in any part of the premises (whether or not attached thereto or built therein) at the sole expense of Tenant (and with respect to which no credit or allowance shall have been granted to Tenant by Landlord and which was not furnished and installed in replacement of an item which Tenant would not be entitled to remove in accordance with this Article 4) may be removed from the Building by Tenant prior to the expiration of the term hereof and, if and to the extent requested by Landlord (either prior to or not more than 30 days after such expiration), shall be removed from the Building by Tenant prior to such expiration unless such request is made after such expiration (or is made prior to such expiration and Tenant acting with reasonable promptness is not able to remove same from the Building prior to such expiration), in which event the same shall be removed from the Building by Tenant with reasonable promptness after the receipt of such request.  The cost and expense of any such removal and the cost and expense of repairing any such damage to the premises or to the Building arising from such removal shall be paid by Tenant on demand.  If any fixtures, equipment, improvement, installation or appurtenances which as aforesaid may or is required to be removed from the Building by Tenant is not removed by Tenant from the Building within the time above specified therefor, then Landlord (in addition to all other rights and remedies to which Landlord may be entitled at any time) may at its election deem that the same has been abandoned by Tenant to Landlord, but not such election shall relieve Tenant of Tenant's obligation to pay the cost and expense of removing the same from the Building or the cost or repairing damage to the premises or to the Building arising from such removal.

All the perimeter wall of the premises, any balconies, terraces or roofs adjacent to the premises, and any space in and/or adjacent to the premises used for shafts, stacks, pipes, vertical conveyors, mail chutes, pneumatic tubes, conduits, ducts, electrical or other utilities, rooms containing elevator or air conditioning machines and equipment, sinks, or other similar or dissimilar Building facilities, and the use thereof, as well as access thereto through the premises for the purposes of such use and the operation, improvement, replacement, addition, repair, maintenance and decoration thereof, are expressly reserved to Landlord.

5. <u>Electric Energy and Water.</u>  Tenant, at Tenant's sole cost and expense, shall furnish through the transmission facilities initially installed in the Building, and supply to the premises, alternating electrical energy to be used by Tenant in the premises in such reasonable quantity as may be reasonably required by Tenant for the operation of Tenant's business from the premises.

Tenant covenants and agrees that at all times its use of electrical energy shall not exceed the capacity of existing feeders to the Building or the risers or wiring installations and Tenant may not use any electrical equipment which, in Landlord's sole and exclusive opinion, will overload any such installations or will interfere with the use thereof by other tenants or occupants of the Building or otherwise have a material or adverse effect on electrical energy service to the Building.

Landlord shall in no way be liable for any failure of or defect in the character or supply of electrical energy furnished to the premises except for actual damage suffered by Tenant by reason of any such defect or failure resulting from the willful gross negligence of Landlord.

In order that Landlord may at all times have all necessary information which it requires in order to maintain and protect its equipment, Tenant agrees that it will not make any alteration or addition to the electrical equipment and/or appliances in the premises without prior written consent of Landlord in each instance.

Tenant shall pay Landlord the cost for all water consumed in the premises and for any required pumping and heating thereof or other charges which may be imposed by the city or other governmental authority or agency thereof based on the quantity of water so used by Tenant and/or the charge therefor.

All meters necessary for the measurement of Tenant's consumption of electrical energy and water in the premises shall be installed, if required, and maintained by Tenant at Tenant's sole cost and expense.

6. <u>Various Covenants.</u>  Tenant covenants and agrees that Tenant will:

(a)  throughout the term, at Tenant's expense, make all repairs, restoration and replacements in, at and to the premises as and when the same are necessary in order to keep and maintain the premises and the fixtures and appurtenances therein in good order, condition and repair and pay to Landlord the cost of making good any injury, damage or breakage to the Building or the premises (including plate glass).

(b)  faithfully observe and comply with the rules and regulations annexed hereto and such additional rules and regulations as Landlord and "Owner" as such term is hereinafter defined hereafter at any time or from time to time may make and may communicate to Tenant, which, in the judgment of Landlord of Owner, shall be necessary or desirable for the

reputation, safety, care or appearance of the Building, or the preservation of good order therein, or the operation or maintenance of the Building, or the equipment thereof, or the comfort of tenants or others in the Building; provided, however, that in the case of any conflict between the provisions of this Lease and any such rules or regulations, the provisions of this Lease shall control, and provided further that nothing contained in this Lease shall be construed to impose upon Landlord any duty or obligation to enforce the rules and regulations or the terms, covenants or conditions in any other lease as against any other tenant and, provided further, that Landlord shall not be liable to Tenant for violation of the same by any other tenant, its servants, employees, agents, visitors, invitees, subtenants or licensees.

(c)   permit Landlord and any mortgagee of the Building or of the Building and the Land or of the interest of Landlord therein and any lessor under any ground or underlying lease, and their representatives, to enter the premises at all reasonable hours, for the purposes of inspection, or of making repairs, replacements or improvements in or to the premises or the Building or equipment, or of complying with all laws, orders and requirements of governmental or other authority or of exercising any right reserved to Landlord by this Lease (including the right, during the progress of any such repairs, replacements, or improvements or while performing work and furnishing materials in connection with compliance with any such laws, orders or requirements, to keep and store within the premises all necessary materials, tools and equipment).

(d)   make no claims against Landlord or any lessor under any ground or underlying lease for any injury or damage to Tenant or to any other person or for any damage to, or loss (by theft or otherwise) of, or loss of use of, any property of Tenant or of any other person irrespective of the cause of such injury, damage or loss, unless caused by the willful gross negligence of Landlord or Owner in the operation or maintenance of the Building, it being understood and agreed that no property other than such as might normally be brought upon or kept in the premises for the purposes herein specified will be brought upon or kept in the premises.

(e)   make no alterations, decorations, installations, repairs, additions, improvements or replacements including, but not limited to, demising walls, in, to or about the premises without Landlord's prior written consent, and then only by contractors or mechanics approved by Landlord which approval of contractors and mechanics Landlord agrees will not be unreasonably withheld or delayed.   Landlord, as a condition of such consent, may impose such requirements upon Tenant for the furnishing, by Tenant, at Tenant's sole cost and expense, of such insurance as Landlord shall determine necessary, appropriate and desirable including, but not limited to, personal liability, property damage and workers' compensation insurance and Landlord, any mortgagee or any ground or underlying lessor as shall be designated by Landlord shall be named as additional insured under any such insurance.   All such alterations, decorations, installations, repairs, additions, improvements or replacements shall be done at Tenant's sole expense and at such times and in such manner as Landlord may from time to time designate. Prior to the commencement of any such alterations, decorations, installations, repairs, additions, improvements or replacements, Tenant shall submit to Landlord, for Landlord's approval, plans and specifications (to be prepared by and at the expense of Tenant) of such proposed alterations, decorations, installations, repairs, additions, improvements or replacements, in detail, satisfactory to Landlord.   In no event shall any material or equipment be incorporated in or to the premises in connection with any such alteration, decoration, installation, repair, addition, improvement or replacement which is subject to any lien, security agreement, charge, mortgage or other encumbrance of any kind whatsoever or is subject to any conditional sale or other similar or dissimilar title retention agreement.   Any mechanic's lien field against the premises or the Building for work claimed to have been done for, or materials claimed to have been furnished to, Tenant shall be discharged by Tenant within 10 days thereafter, at Tenant's expense, by payment or filing the bond required by law.   All alterations, decorations, installations, repairs, additions, improvements, replacements or work done by Tenant shall at all times comply with (1) laws, rules, orders, and regulations of governmental authorities having jurisdiction thereof, including without limitation, the American's With Disabilities Act and all regulations issued thereunder and the Accessibility Guidelines for Buildings and Facilities issued pursuant thereto, (2) rules and regulations of Landlord, and (3) plans and specifications prepared by and at the expense of Tenant theretofore submitted to Landlord for Landlord's prior written approval and which Landlord shall have approved.   No structural alterations, installations, repairs, additions, improvements, replacements or work or any alterations, installations, repairs, additions, improvements, replacement or work to any utility system in or serving the Building or the premises shall be undertaken, started or begun by Tenant, its agents, servants or employees, until Landlord has approved such plans and specifications; and no amendments or additions to such plans and specifications shall be made without the prior written approval of Landlord; provided, however, Landlord's review and/or approval of such plans and specifications or amendments or additions thereto shall not constitute a determination or acknowledgement by Landlord that such plans and specifications comply with applicable laws, rules, orders and regulations of governmental authorities.   Tenant shall be entitled to make nonstructural alterations to the interior of the premises provided Tenant furnishes Landlord with plans and specifications therefor, including "as built" plans and specifications, and otherwise complies with the provisions of this Lease including this paragraph (e).   The construction of demising walls by Tenant shall be subject to the prior written consent of Landlord.   If Landlord provides hoist and/or elevator service to Tenant's contractors, such service shall be provided on the same terms and conditions as the same is provided to Landlord's contractors. Tenant agrees that it will not at any time prior to or during the term of this Lease, either directly or indirectly, use any contractors and/or labor and/or materials if the use of such contractors and/or labor and/or materials would or will create any difficulty with other contractors and/or labor engaged by Tenant of Landlord or others in the construction, maintenance and/or operation of the Building or any part thereof.

(f)   not violate, or permit the violation of, any condition imposed by the standard fire insurance policy issued for office buildings in the County of Kings, and not do anything or permit anything to be done, or keep anything or permit anything to be kept, in the premises, which would increase the fire or other casualty insurance rate on the Building or the property therein, or which would result in insurance companies of good standing refusing to insure the Building or any such property in amounts and

268

against risks as determined by Landlord.

(g)  permit Landlord, at reasonable times, to show the premises to any lessor under any ground or underlying lease, or any lessee or mortgagee, or any prospective purchaser, lessee, mortgagee, or assignee of any mortgage, of the Building and/or the Land or of Landlord's interest therein, and their representatives, and during the period of 12 months next preceding the date of expiration of the term hereof with respect to any part of the premises similarly show such part to any person contemplating the leasing of all or a portion of the same.

(h)  at the end of the term, quit and surrender to Landlord the premises broom-clean and in good order, condition and repair except for ordinary wear and tear.  If the last day of the term of this Lease falls on Sunday or a legal holiday, this Lease shall expire on the business day immediately preceding.

(i)  at any time and from time to time upon not less than 5 days' prior notice by Landlord to Tenant, execute, acknowledge and deliver to Landlord, or to anyone Landlord shall designate, a statement of Tenant (or if Tenant is a corporation, an appropriate officer of Tenant) in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect and as modified and stating the modifications), and the dates to which the fixed rent, additional rent, and other charges have been paid in advance, if any, and stating whether or not Landlord is in default in performance of any covenant, agreement, term, provision or condition contained in this Lease and, if so, specifying each such default, it being intended that any such statement delivered pursuant hereto may be relied upon by Landlord, any lessor under any ground or underlying lease, or any lessee or mortgagee, or any prospective purchaser, lessee, mortgagee, or assignee of any mortgage, of the Building and/or the Land or of Landlord's interest therein.

(j)  indemnify, and save harmless, Landlord and any mortgagee and any lessor any under ground or underlying lease, and their respective officers, directors, contractors, agents and employees, from and against any and all liability (statutory or otherwise), claims, suits, demands, damages, judgments, costs, interest and expenses (including, but not limited to, counsel fees and disbursements incurred in the defense of any action or proceeding), to which they may be subject or which they may suffer by reason of, or by reason of any claim for, any injury to, or death of, any person or persons or damage to property (including any loss of use thereof) or otherwise arising from or in connection with the use of or from any work, installation or thing whatsoever done (other than by Landlord or its contractors or the agents or employees of either) in the premises prior to, during, or subsequent to, the term of this Lease or arising from any condition of the premises due to or resulting from any default by Tenant in the performance of Tenant's obligations under this Lease or from any act, omission or negligence of Tenant or any of Tenant's officers, directors, agents, contractors, servants, employees, subtenants, licensees or invitees.

7.  Assignment, Mortgaging, Subletting, etc.

(a)  Tenant covenants and agrees, for Tenant and its successors, assigns and legal representatives, that neither this Lease nor the term and estate hereby granted, nor any part hereof of thereof, will be assigned, mortgaged, pledged, encumbered or otherwise transferred (whether voluntarily, involuntarily, by operation of law, or otherwise), and that neither the premises, nor any part thereof, will be encumbered in any manner by reason of any act or omission on the part of Tenant, or will be used or occupied, or permitted to be used or occupied, or utilized for desk space or for mailing privileges or as a concession, by anyone other than Tenant, or for any purpose other than as hereinbefore set forth, or will be sublet, without the prior written consent of Landlord in every case and any attempt thereat shall be void any of no force or effect.  For the purposes of this Lease, (i) the transfer or transferee or sale or sales (in either one or a series of transactions) of fifty (50%) percent or more of the capital stock of Tenant, if Tenant is a corporation or fifty (50%) percent or more of the ownership interests of Tenant, if Tenant is a partnership or (ii) a merger or consolidation of Tenant into or with an other corporation or business entity shall, in each instance referred to in the preceding clauses (i) and (ii), be deemed to be an assignment of this Lease requiring the prior written consent of Landlord as herein set forth.

If this Lease be assigned or if the premises or any part thereof by sublet or occupied by anybody other than Tenant, Landlord may, after default by Tenant, collect rent from the assignee, subtenant or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver or any of Tenant's covenants contained in this Article 7 or elsewhere in this Lease or the acceptance of the assignee, subtenant or occupant as Tenant, or a release of Tenant as sub-lessor or assignor from the further performance by Tenant of the covenants, agreements, terms, provisions and conditions of this Lease on the part of the tenant hereunder to be kept, performed or observed.  Tenant's liability under this Lease, in the event of an assignment, shall not at any time be released, relieved or discharged by reason of Landlord's consent to such assignment nor shall Tenant at any time be released, relieved or discharged of any such obligations of the parties to this Lease or by any stipulation extending any time for performance hereunder or Landlord's waiver of performance of any obligation hereunder or Landlord's failure to enforce any obligation set forth in this Lease.  If this Lease be assigned or if all or any portion of the premises be sublet, the assignee or subtenant, as the case may be, shall have no right, and shall not be entitled, to exercise any option contained in this Lease which may be exercised by Tenant.

(b)  Notwithstanding anything to the contrary contained in this Article 7, and so long as Tenant is not in default of any of the covenants, agreements, terms, provisions and conditions of this Lease on its part to be kept, observed and performed, Tenant may, in connection with (i) the sale of all of the capital stock of Tenant, if Tenant is a corporation, or of all of the ownership interests of Tenant, if Tenant is a partnership, or (ii) a merger or consolidation of Tenant into or with any other corporation or business entity or (iii) the sale of all or substantially all of the assets of Tenant, assign this Lease, with Landlord's prior written consent which shall not be unreasonably withheld or delayed, provided that:

(c)  Tenant shall furnish Landlord with the name and business address of the proposed assignee, a counterpart of the

269

proposed assignment agreement, and satisfactory information with respect to the nature and character of the business of the proposed assignee together with current financial information of the proposed assigned certified by a certified public accountant and references, including banking references, satisfactory to Landlord;

(d)  in the judgment of Landlord, the proposed assignee is financially responsible with respect to its proposed obligations under the proposed assignment agreement and is of a character and reputation, and engaged in a business, which is in keeping with the standards of the Building;

(e)  the premises shall be used only for the purpose set forth in Article 1 hereof;

(f)  an executed duplicate original, in form satisfactory to Landlord for review by Landlord's counsel, of such assignment agreement shall be delivered to Landlord at least thirty (30) days prior to the effective date thereof.  Tenant will also deliver to Landlord, at least thirty (30) days prior to the effective date thereof, an assumption agreement in form satisfactory to Landlord wherein the assignee agrees to assume all of the covenants, agreements, terms, provisions and conditions of this Lease to be kept, observed and performed by Tenant hereunder and which provides that Tenant named herein and such assignee shall, after the effective date of such assignment, be jointly and severally liable for the performance of all of the convents, agreements, terms, provisions and conditions of this Lease;

(g)  each assignment shall be subject and subordinate to all of the covenants, agreements, terms, provisions and conditions of this Lease and the "Prime Lease" as such term is hereinafter defined; and

(h)  Assignee shall deposit with Landlord an amount equal to --- (---) months of the fixed rent then in effect; and

(i)  Tenant covenants and agrees that, notwithstanding any assignment and/or the acceptance of rent or additional rent by Landlord from any assignee, Tenant shall and will remain fully liable for the payment of the rent and additional rent due and to become due hereunder and for the performance of all the covenants, agreements, terms, provisions and conditions contained in this Lease and Guaranty on the part of Tenant to be kept, observed and performed, ("Obligation") provided, however, that if Tenant shall timely have complied with all of the conditions set forth in this Article 7 and Landlord has approved (in writing) the proposed assignee, Tenant shall be released from said Obligations, effective upon the effective date of the assignment of this Lease.

The listing of any name other than that of Tenant, whether on the doors of the premises, on the Building directory, or otherwise, shall not operate to vest any right or interest in this Lease or in the premises or to be deemed to be the written consent of Landlord mentioned in this Article 7, it being expressly understood that any such listing is a privilege extended by Landlord revocable at will by written notice to Tenant.

8.  Changes or Alterations by Landlord.  Landlord reserves the right to make such changes, alterations, additions, improvements, repairs or replacements in or to the Building (including the premises) and the fixtures and equipment thereof, as well as in the street entrances, halls, passages, tunnels, elevators, escalators, stairways and other parts thereof, and to erect, maintain and use pipes, ducts and conduits in and through the premises, all as Landlord may deem necessary, appropriate or desirable; provided, however, that there be no unreasonable obstruction of the means of access to the premises or unreasonable interference with the use of the premises.  Nothing contained in this Article 8 shall be deemed to relieve Tenant of any duty, obligation or liability of Tenant with respect to making any repair, replacement or improvement or complying with any law, order or requirement or any governmental or other authority.  Landlord reserves the right to name the Building and to change the name or address of the Building at any time and from time to time.  Neither this Lease nor any use by Tenant shall give Tenant any right or easement to the use of any door or any passage or any tunnel or any concourse or any plaza connecting the Building with any other building or to any public convenience, and the use of such doors, passages, tunnels, concourses and Plazas and of such conveniences may without notice to Tenant be regulated or discontinued at any time and from time to time by Landlord without Landlord incurring any liability to Tenant therefor and without affecting the obligations of Tenant under this Lease.

If at any time any windows of the premises are darkened or obstructed incident to or by reason of repairs, replacements, maintenance and/or cleaning in, on, to or about the Building or any part or parts thereof or otherwise or are temporarily or permanently closed, Landlord shall not be liable for any damage Tenant may sustain thereby and Tenant shall not be entitled to any compensation therefor nor abatement of rent nor shall the same release Tenant from its obligations hereunder nor constitute an eviction.

There shall be no allowance to Tenant for a diminution of rental value and no liability on the part of Landlord by reason of inconvenience, annoyance or injury to business arising from Landlord, Tenant or others making any changes, alterations, additions, improvements, repairs or replacements in or to any portion of the Building or the premises, or in or to fixtures, appurtenances or equipment thereof, and no liability upon Landlord for failure of Landlord or others to make any changes, alterations, additions, improvements, repairs or replacements in or to any portion of the Building or the premises, or in or to the premises, or in or to the fixtures appurtenances or equipment thereof.

9.  Damage by Fire, etc.  If any part of the premises shall be damaged by fire or other casualty, Tenant shall give prompt written notice thereof to Landlord and Landlord shall proceed with reasonable diligence subsequent to the collection by Landlord of insurance proceeds, and in a manner consistent with the provisions of any underlying lease and any underlying mortgage, to repair such damage, and if any part of the premises shall be rendered untenantable by reason of such damage, the annual fixed rent payable hereunder, to the extent that such fixed rent relates to such part of the premises and such abatement is in excess of the annual rate of any other existing abatement of fixed rent relating thereto under any other covenant, agreement, term, provision or condition of this Lease, shall be abated for the period from the date of such damage to the date

when such part of the premises shall have been made tenantable or to such earlier date upon which the full term of this Lease with respect to such part of the premises shall expire or terminate, unless such fire or other casualty shall have resulted from the negligence of Tenant or the employees, licensees or invitees of Tenant. Landlord shall not be liable for any inconvenience or annoyance to Tenant or injury to the business of Tenant resulting in any way from such damage or the repair thereof. Tenant understands that Landlord will not carry insurance of any kind on Tenant's property, to wit, Tenant's goods, furniture or furnishings or any fixtures, equipment, improvements, installations or appurtenances removable by Tenant as provided in this Lease, and that the Landlord shall not be obligated to repair any damage thereto or replace the same.

If substantial alteration or reconstruction of the Building shall, in the opinion of Landlord, be required as a result of damage by fire or other casualty (whether or not the premises shall have been damaged by such fire or other casualty), then this Lease and the term and estate hereby granted may be terminated by Landlord giving to Tenant within 90 days after the date of such damage written notice specifying a date, not less than 30 days after the giving of such notice, for such termination. In the event of the giving of such notice of termination, this Lease and the term and estate hereby granted shall expire as of the date specified therefor in such notice with the same effect s if such date were the date hereinbefore specified for the expiration of the full term of this Lease, and the fixed rent and additional rent payable hereunder shall be apportioned as of such date of termination, subject to abatement, if any, as and to the extent above provided. In the event Landlord shall not give such notice of termination, Tenant's obligation to pay all rent and additional rent due and to become hereunder shall continue for so long as Tenant's rent insurance policy (as required under Article 10(b) below) shall be in effect or for the period of nine (9) months from the date of such damage, whichever is longer.

Notwithstanding anything to the contrary contained herein, if at the time of the damage or destruction the premises shall in the Tenant's opinion reasonably exercised be prospectively untenantable for 12 months or more, Tenant shall have the right, within 10 days after date of damage, to elect to cancel the Lease by giving written notice to Landlord, which notice shall specify the date of cancellation not earlier than 30 days following the giving of such notice. Such cancellation shall otherwise be of no effect upon the covenants and agreements of this Lease to be kept and observed by the Tenant, and Tenant shall not be released or relieved of any liability or obligation theretofore accrued or incurred or outstanding or unsatisfied as of the date of such cancellation.

Each party agrees to endeavor to include in each of its insurance policies (insuring the Building and Landlord's property therein, in the case of Landlord, and insuring Tenant's Property in the premises, in the case of Tenant, against loss, damage of destruction by fire or other casualty) a waiver of the insurer's right of subrogation against the other party and against all other tenants in the Building, or, if such waiver should be unobtainable or unenforceable, (a) an express agreement that such policy shall not be invalidated if the assured waives the right of recovery against any party responsible for a casualty covered by the policy before the casualty or  (b) any other form of permission for the release of the other party.  If such waiver, agreement or permission shall not be, or shall cease to be, obtainable (i) without additional charge, or (ii) at all, then the insured party shall so notify the other party promptly after learning thereof.  In case such waiver, agreement, or permission can be obtained at additional charge, if the party so notified shall so elect and shall pay the insurer's charge therefor, such waiver, agreement or permission shall be included in the policy.

Each party hereby releases the other party, and Tenant hereby releases all other tenants in the  Building, with respect to any claim (including a claim for negligence) which it might otherwise have against the other party (or, in the case of Tenant, against all such other tenants) for loss, damages with respect to its property occurring during the term of this Lease to the extent to which it is insured under a policy or policies containing a waiver of subrogation or permission to release liability, as provided in the preceding paragraph. If, notwithstanding the recovery of insurance proceeds by either party for loss, damage or destruction of its property, the other party is liable to the first party with respect thereto or is obligated under this Lease to make replacement, repair or restoration or payment, then, provided the first party's right of full recovery under its insurance policies is not thereby prejudiced or otherwise adversely affected, the amount of the net proceeds of the first party's insurance against such loss, damage or destruction shall be offset against the second party's liability to the first party therefor, or shall be made available to the second party to pay for replacement, repair of restoration, as the case may be.  Nothing contained in this paragraph shall be deemed to relieve either party of any duty imposed elsewhere in this Lease to repair, restore or rebuild or to nullify any abatement of rents provided for elsewhere in this Lease.

This Lease shall be considered an express agreement governing any case of damage to or destruction of the Building or any part thereof by fire or other casualty, and Section 227 of the Real Property Law of the State of New York providing for such a contingency in the absence of express agreement, and any other law of like import now or hereafter in force, shall have no application in such case.

10. <u>Insurance.</u>  Tenant, at its own expense, shall maintain, for the benefit of Landlord and Tenant and any mortgagee and any lessor under any ground or underlying lease:

(a)  insurance covering the premises and equipment therein against loss or damage by fire and such risks as are customarily included in extended coverage endorsements attached to fire insurance policies covering comparable property in the vicinity of the premises including vandalism and malicious mischief, war risk (when obtainable), atomic bomb (when obtainable), in an amount sufficient to prevent the assured from becoming a co-insurer within the terms of the applicable policies, but in any event in an amount not less than the full replacement value thereof, or the amount required under any mortgage to which this Lease is subject, whichever is greater,

(b)  rent insurance in an amount equal to the fixed net rent and additional rent payable under this Lease for as long as a period as Tenant is able to secure not to exceed one year, and

271

(c)  if required by Landlord or any mortgagee, such other or additional insurance in such amounts against other insurable hazards (including but not limited to war risk insurance when obtainable) as Landlord or such mortgagee shall determine.

The term "full replacement value", as use herein shall mean the cost of actual replacement (excluding foundation and excavation costs and cost of underground flues, pipes or drains) without provision for physical depreciation, and said "full replacement value" shall be determined from time to time, at Landlord's request, but at Tenant's expense, not more frequently than once every two years, by an appraiser for any of insurance companies issuing the policies referred to in subdivisions (a) or (c) hereinabove set forth.  Insurance in the amount set forth in subdivision (a) shall be carried if same is issued regularly for comparable buildings by licensed insurance companies in New York State and, if same is not so regularly issued, Tenant shall obtain the closest type of protective insurance then available or, at Landlord's sole election, Landlord may obtain such "full replacement value" coverage and Tenant shall pay any additional premium therefor.

Tenant shall not carry any separate insurance of the same character required by this Article unless Landlord and any mortgagee and any lessor under any ground or underlying lease shall be named as assureds with loss payable as interest may appear.  However, Tenant may carry insurance, solely for its own account and benefit, insuring against loss of all or part of its leasehold estate hereunder.

Tenant, at its own expense, shall maintain for the mutual benefit of Landlord, Tenant, Owner and any mortgagee and any lessor under any ground or underlying lease, general public liability insurance against claims for bodily injury, death or property damage occurring in, on or about the premises and any adjoining sidewalk, curb or vault (including, without limitation, bodily injury, death or property damage resulting directly or indirectly from any change, alteration, improvement or repair thereof) with such limits as Landlord from time to time may require for bodily injury or death to any one person and for bodily injury or death to any number of persons arising out of one accident and for property damage.

Tenant at its own expense, shall also maintain for the mutual benefit of Landlord, Tenant and any mortgagee and any lessor under any ground or underlying lease, single limit coverage of one hundred thousand dollars ($ 100,000.00) Dollars for bodily injury or death to any one person or any number of persons arising out of one accident and for property damage as of the date hereof.

The insurance required under this Article shall be effected by valid and enforceable policies issued by insurance companies licensed to do business in the State of New York and approved in writing by Landlord and shall set forth the indemnity referred to in paragraph (j) of Article 6 hereof.  Any insurance policy or policies under this Article shall cover only the premises and not any other properties owned, operated or leased by Tenant.

At the commencement of the term of this Lease and thereafter, not less than thirty (30) days prior to the expiration date or the expiring policies theretofore furnished pursuant to this Article, originals of such policies or renewal policies, as the case may be, shall be delivered by Tenant to Landlord with proof of payment of premium thereof.  However, if the premium under any policy is payable in installments, Tenant shall furnish, simultaneously with the delivery of the policy, proof of payment of the current installment, and thereafter Tenant shall furnish to Landlord proof of payment of each subsequent installment within five (5) days after it becomes due.  If the premiums are covered by a mortgage to which this Lease is subject, originals of the policies for the insurance required hereunder shall be delivered to the mortgagee, and, if obtainable, duplicates thereof, and if not obtainable, certificates thereof shall be delivered to Landlord.

All policies of insurance required under this Article shall name Landlord, Tenant and any mortgagee and any lessor under any ground or underlying lease, as the assureds, as their respective interests may appear, and the policies for the insurance required under subdivisions (a) and (c) hereinabove set forth also shall be payable, under a standard mortgage clause, without contribution, to the holder of any mortgage covering the premises.  Each policy of insurance required under this Article, to the extent obtainable, shall contain an agreement by the insurer that it will not be cancelled without at least thirty (30) days' prior written notice to Landlord and the insured holder of any mortgage covering the premises and that no act or omission of any insured party (including mortgagees) named therein shall serve to invalidate, cancel or release or relieve the insurer thereunder from any liability which it may have to any other insured party so named.  If such agreement cannot be obtained with respect to any policy, Tenant shall notify Landlord, in writing, to such effect and Tenant shall accept an insurer named by Landlord who will consent to include such agreement in like policy provided that the inclusion thereof does not require Tenant to pay any substantial additional premium.

The loss, if any, under policies provided for herein (other than a loss under the insurance required by subdivision (b) which shall be adjusted by and paid to Landlord) shall be adjusted by and paid to Landlord or any mortgagee.  All insurance policies, to the extent reasonably obtainable, shall provide that  the loss, if any thereunder, shall be adjusted and paid as provided in this Article.

11.  Condemnation.  In the event that the whole of the premises shall be lawfully condemned or taken in any manner for any public or quasi-public use, this Lease, and the term and estate hereby granted, shall forthwith cease and terminate as of the date of vesting of title.  In the event that only a part of the premises shall be so condemned or taken, then, effective as of the date of vesting of title, the fixed rent hereunder shall be abated in an amount thereof apportioned accordingly to the area of the premises so condemned or taken.  In the event that only a part of the Building shall be so condemned or taken, then (a) Landlord (whether or not the premises be affected) may, at Landlord's option, terminate this Lease and the term and estate hereby granted as of the date of such vesting of title by notifying Tenant in writing of such termination within 60 days following the date on which Landlord shall have received notice of vesting of title, or (b) if such condemnation or taking shall be of a substantial part of the premises, Tenant may, at Tenant's option, by delivery of notice in writing to Landlord within 60 days

272

following the date on which Tenant shall have received notice of vesting of title, terminate this Lease and the term and estate hereby granted as of the date of vesting of title; provided, however, if neither Landlord nor Tenant elects to terminate this Lease, as aforesaid, this Lease shall be and remain unaffected by such condemnation or taking, except that the fixed rent payable hereunder shall be abated to the extent, if any, hereinbefore provided in this Article 11. In the event that only a part of the premises shall be so condemned or taken and this Lease and the term and estate hereby granted are not terminated as herein before provided, Landlord will, with reasonable diligence and at its expense, restore the remaining portion of the premises as nearly as practicable to the same condition as it was in prior to such condemnation or taking.

In the event of their termination in any of the cases hereinbefore provided, this Lease and the term and estate hereby granted shall expire as of the date of such termination with the same effect as if that were the date hereinbefore set for the expiration of the term of this Lease, and the fixed rent and additional rent payable hereunder shall be apportioned as of such date.

In the event of any condemnation or taking hereinbefore mentioned of all or a part of the Building, Landlord shall be entitled to receive the entire award in the condemnation proceeding, including any award made for the value of the estate vested by this Lease in Tenant, and Tenant hereby expressly assigns to Landlord any and all right, title and interest of Tenant now or hereafter arising in or to any such award or any part thereof, and Tenant shall be entitled to receive no part of such award.

It is expressly understood and agreed that the provisions of this Article 11 shall not be applicable to any condemnation or taking for governmental occupancy for a limited period.

12. Compliance with Laws. Tenant, at Tenant's expense, shall comply with all laws and ordinances, and all rules, orders and regulations of all governmental authorities and of all insurance bodies, at any time duly issued or in force, applicable to the premises or any part thereof or to Tenant's use thereof (including, without limitation, the Americans With Disabilities Act and all regulations issued thereunder and the Accessibility Guidelines for Buildings and Facilities issued pursuant thereto), except that Tenant shall not hereby be under any obligation to comply with any law, ordinance, rule, order or regulation requiring any structural alteration of or in connection with the premises, unless such alteration is required by reason of a condition which has been created by, or at the instance of, Tenant, or is attributable, directly or indirectly, to the use or manner of use to which Tenant puts the premises, or is required by reason of a breach of any of Tenant's covenants and agreements hereunder. Where any structural alteration of or in connection with the premises is required by any such law, ordinance, rule, order or regulation, and, by reason of the express exception hereinabove contained, Tenant is not under any obligation to make such alteration, then Landlord shall have the option of making such alteration and paying the cost thereof, or of terminating this Lease and the term and estate hereby granted by giving to Tenant not less than 30 days' prior written notice of such termination; provided, however, that if within 15 days after the giving by Landlord of its notice of termination as aforesaid, Tenant shall give written notice to Landlord stating that Tenant elects to make such alteration at the expense of Tenant, then such notice of termination shall be ineffective provided that Tenant, at Tenant's expense, shall, concurrently with the giving of such notice to Landlord, execute and deliver to Landlord Tenant's written undertaking, with a surety and in form and substance satisfactory to Landlord, obligating Tenant to promptly and duly make such alteration in a manner satisfactory to Landlord and to save Landlord harmless from any and all costs, expenses, penalties and/or liabilities (including, but not limited to, accountants' and attorneys' fees) in connection therewith or by reason thereof; and Tenant covenants and agrees that, after so electing to make any such alteration, Tenant will, at Tenant's expense, and in compliance with all the covenants, agreements, terms, provisions and conditions of this Lease, including, but not limited to, subparagraph (e) of Article 6 hereof, make such alteration and Tenant, at Tenant's expense, will promptly and duly perform all covenants, conditions and provisions of such undertaking and that all such covenants, conditions, and provisions of such undertaking shall be deemed to constitute covenants, condition and provisions of this Lease to be kept or performed on the part of Tenant with the same force and effect as if the same had been set forth herein.

In the event that a notice of termination shall be given by the Landlord under the provisions of this Article 12 and such notice shall not become ineffective as hereinbefore provided, this Lease and the term and estate hereby granted shall expire as of the date specified therefor in such notice with the same effect as if that were the date hereinbefore set for the expiration of the term of this Lease, and the fixed rent and additional rent payable hereunder shall be apportioned as of such date of termination.

13. Accidents to Plumbing and Other Systems. Tenant shall give to Landlord prompt written notice of any damage to, or defective condition in, any part or appurtenance of the Building's plumbing, electrical, heating, air conditioning or other similar or dissimilar system serving, located in, or passing through, the premises and the damage or defective condition shall be remedied by Landlord with reasonable diligence, but if such damage or defective condition was caused by, or resulted from the use or manner of use by, Tenant or by the employees, licensees or invitees of Tenant, the cost of the remedy thereof shall be paid by Tenant as additional rent promptly upon receipt of Landlord's bill therefor. Tenant shall not be entitled to claim any damage arising from any such damage or defective condition unless the same shall have been caused by the willful gross negligence of Landlord in the operation or maintenance of the Building and the same shall not have been remedied by Landlord with reasonable diligence after written notice thereof from Tenant to Landlord; nor shall Tenant be entitled to claim any eviction by reason of any such damage or defective condition.

14. Subordination. (a) This Lease is subject and subordinate in all respects to all ground leases and/or underlying leases now or hereafter covering the real property of which the premises form a part and to all mortgages which may now or hereafter be placed on or affect such leases and/or real property, and/or Landlord's interest therein, and to each advance made and/or hereafter to be made under any such mortgages, and to all renewals, additions, modifications, consolidations,

replacements, spreaders and extensions thereof and all substitutions of and for such ground leases and/or underlying leases and/or mortgages.  This subparagraph (a) shall be self-operative and no further instrument of subordination shall be required.  In confirmation of such subordination, Tenant shall execute and deliver promptly any certificate that Landlord and/or mortgagee and/or the lessor under any ground or underlying lease and/or their respective successors in interest may request.  Tenant hereby constitutes and appoints Landlord and/or any mortgagee and/or the lessor under any ground or underlying lease and/or their respective successors in interest Tenant's attorney-in-fact to execute and deliver any such certificate or certificates for and on behalf of Tenant.

(b)  Without limitation of any of the provisions of this Lease, if at any time during the term of this Lease, Landlord shall be the holder of a leasehold estate covering the real property of which the premises form a part, and if such leasehold estate shall terminate or be terminated for any reason, Tenant agrees, at the election and upon demand of any owner of the real property of which the premises form a part, or of any mortgagee in possession thereof, or of any holder of a leasehold hereafter affecting the real property of which the premises form a part, to attorn, from time to time, to any such owner, mortgagee or holder, upon the terms and conditions set forth herein for the remainder of the term demised in this Lease.  The foregoing provisions shall inure to the benefit of any such owner, mortgagee or holder, shall apply to the tenancy of Tenant notwithstanding that this Lease may terminate upon the termination of any such leasehold estate, and shall be self-operative upon any such demand, without requiring any further instrument to give effect to said provisions.  Tenant, however, upon demand of any such owner, mortgagee or holder, agrees to execute, from time to time, an instrument in confirmation of the foregoing provisions, satisfy to such owner, mortgagee or holder, in which Tenant shall acknowledge such attornment and shall set forth the terms and conditions of its tenancy, which shall be the same as those set forth herein and shall apply for the remainder of the term originally demised in this Lease.  Nothing contained in this subparagraph (b) shall be construed to impair any right, privilege or option of any such owner, mortgagee or holder.

(c)  The term "mortgage(s)" as used in this Lease shall include any mortgage or any deed of trust.  The term "mortgagee(s)" as used in this Lease shall include any mortgagee or any trustee under a deed of trust.  The term "mortgagor(s)" as used in this Lease shall include any mortgagor or any grantor under a deed of trust.

15.  <u>Notices.</u>  Any notice, consent, approval, request, bill, demand or statement hereunder by either party to the other party shall be in writing and shall be deemed to have been duly given when mailed if sent by registered or certified mail. return receipt requested addressed to such other party, which address for Landlord shall be See Rider R.5 and for Tenant shall be the premises (or Tenant's address as hereinbefore set forth if mailed prior to Tenant's occupancy of the premises), or if the address of such other party for such notices, consents, approvals, requests, bills, demands or statements shall have been duly changed as hereinafter provided, if mailed, as aforesaid, to such other party at such changed address.  Either party may at any time change the address for such notices, consents, approvals, requests, bills, demands or statements by delivering or mailing, as aforesaid, to the other party a notice stating the change and setting forth the changed address.  If the term "Tenant" as used in this Lease refers to more than one person, any notice, consent, approval, request, bill, demand or statement given as aforesaid to any one of such persons shall be deemed to have been duly given to Tenant.  Notwithstanding the foregoing, bills and statements by Landlord to Tenant for fixed rent, additional rent or other sums or charges payable by Tenant to Landlord may be delivered personally or sent by regular mail.

16.  <u>Conditions of Limitation.</u>  This Lease and the term and estate hereby granted are subject to the limitation that:

(a)  in case Tenant shall make an assignment of its property for the benefit of creditors or shall file a voluntary petition under any bankruptcy or insolvency law, or an involuntary petition under any bankruptcy or insolvency law shall be filed against Tenant and such involuntary petition is not dismissed within 60 days after the filing thereof,

(b)  in case a petition is filed by or against Tenant under the Reorganization provisions of the United States Bankruptcy Act or under the provisions of any law of like import, unless such petitioner under said Reorganization provisions be one filed against Tenant which is dismissed within 60 days after its filing,

(c)  in case Tenant shall file a petition under the Arrangement provisions of the United States Bankruptcy Act or under the provisions of any law of like import,

(d)  in case a permanent receiver, trustee or liquidator shall be appointed for Tenant or of or for the property of Tenant, and such receiver, trustee or liquidator shall not have been discharged within 60 days from the date of his appointment,

(e)  in case Tenant shall default in the payment of any fixed rent or additional rent or any other sum or charge payable hereunder by Tenant to Landlord on any date upon which the same becomes due,

(f)  in case Tenant shall default in the due keeping, observing or performance of any covenant, agreement, term, provision or condition of this Lease on the part of Tenant to be kept, observed or performed (other than a default of the character referred to in subparagraph (e) of this Article 16), and if such default shall continue and shall not be remedied by Tenant within 10 days after Landlord shall have given to Tenant a written notice specifying the same, or, in the case of such a default which for causes beyond Tenant's control cannot with due diligence be cured within said period of 10 days, if Tenant (i) shall not, promptly upon the giving of such notice, advise Landlord in writing of Tenant's intention to duly institute all steps necessary to remedy such default, (ii) shall not duly institute and thereafter diligently prosecute to completion all steps necessary to remedy the same, or (iii) shall not remedy the same within a reasonable time after the date of the giving of said notice by Landlord,

(g)  in case any event shall occur or any contingency shall arise whereby this Lease or the estate hereby granted or the unexpired balance of the term hereof would, by operation of law or otherwise, devolve upon, or pass to, any person, firm, association or corporation other than Tenant except as expressly permitted under Article 7 hereof, or whenever Tenant shall

274

desert or abandon the premises or the same shall become vacant (whether the keys are surrendered or not an whether the rent be paid or not), or

(h)  in case any other lease held by Tenant from Landlord shall expire and terminate (whether or not the term thereof shall then have commenced) as a result of the default of Tenant thereunder or of the occurrence of an event as therein provided (other than by expiration of the fixed term thereof or pursuant to a cancellation or termination option therein contained), then in any of said cases Landlord may give to Tenant a notice of intention to end the term of this Lease at the expiration of 3 days from the date of the giving of such notice, and, in the event that such notice is given, this Lease and the term and estate hereby granted (whether or not the term shall theretofore have commenced) shall expire and terminate upon the expiration of said 3 days with the same effect as if that day were the date hereinbefore set for the expiration of the term of this Lease, but Tenant shall remain liable for damages as provided in Article 18 hereof.  If the term "Tenant", as used in this Lease, refers to more than one person, then, as used in subparagraphs (a), (b), (c), (d) and (h) of this Article 16, said term shall be deemed to include all of such persons or any one of them,; if any of the obligations of Tenant under this Lease is guaranteed, the term "Tenant", as used in said subparagraphs, shall be deemed to include also the guarantor or, if there be more than one guarantor, all or any one of them; and if this Lease shall have been assigned, the term "Tenant", as used in said subparagraphs, shall be deemed to include the assignee and the assignor or either of them under any such assignment unless Landlord shall, in connection with such assignment, release the assignor from any further liability under this Lease, in which event the term "Tenant", as used in said paragraph, shall not include the assignor so released.

17.  <u>Re-Entry by Landlord.</u>  If Tenant shall default in the payment of any fixed rent or additional rent or any other sum or charge payable hereunder by Tenant to Landlord on any date upon which the sum becomes due, or if this Lease shall expire as in Article 16 hereof provided, Landlord of Landlord's agents and servants may immediately, or at any time thereafter, re-enter into or upon the premises, or any part thereof, in the name of the whole, either by summary dispossess proceedings or by any suitable action or proceeding at law, or by force or otherwise, without being liable to indictment, prosecution or damages therefor, and may repossess the same, and may remove any persons therefrom, to the end that Landlord may have, hold and enjoy the premises again as and of its first estate and interest therein.  The words "re-enter", "re-entry" and "re-entered" as used in this Lease are not restricted to their technical legal meanings.  In the event of any termination of this Lease under the provisions of Article 16 hereof or in the event that Landlord shall re-enter the premises under the provisions of this Article 17 or in the event of the termination of this Lease (or of re-entry) by or under any summary dispossess or other proceeding or action or any provision of law, Tenant shall thereupon pay to Landlord the fixed rent, additional rent and any other sum or charge payable hereunder by Tenant to Landlord up to the time of such termination of this Lease, or of such recovery of possession of the premises by Landlord, as the case may be, and shall also pay to Landlord damages as provided in Article 18 hereof.

In the event of a breach of threatened breach on the part of the Tenant with respect to any of the covenants, agreements, terms, provisions or conditions on the part of or on behalf of Tenant to be kept, observed or performed, Landlord shall also have the right of injunction.  The specified remedies to which Landlord may resort hereunder are cumulative and are not intended to be exclusive of any other remedies or means of redress to which Landlord may lawfully be entitled at any time, and Landlord may invoke any remedy allowed at law or in equity as if specific remedies were not herein provided for.

In the event of (a) the termination of this Lease under the provisions of Article 16 hereof, (b) the re-entry of the premises by Landlord under the provisions of this Article 17, or (c) the termination of this Lease (or re-entry) by or under any summary dispossess or other proceeding or action or any provision of law by reason of default hereunder on the part of Tenant, Landlord shall be entitled to retain all monies, if any paid by Tenant to Landlord, whether as advance rent, security or otherwise, but such moneys shall be credited by Landlord against any fixed rent, additional rent or any other sum or charge due from Tenant at the time of such termination or re-entry or, at Landlord's option, against any damages payable by Tenant under Article 18 hereof or pursuant to law.

18.  <u>Damages.</u>  In the event of any termination of this Lease under the provisions of Article 16 hereof or in the event that Landlord shall re-enter the premises under the provisions of Article 17 hereof or in the event of the termination of this Lease (or of re-entry) by or under any summary dispossess or other proceeding or action or any provision of law), Tenant will pay to Landlord as damages, at the election of Landlord, either:

(a)  a sum at which at the time of such termination of this Lease or at the time of any such re-entry by Landlord, as the case may be, represents the then value of the excess, if any, of (1) the aggregate of the fixed rent and the additional rent under Article 24 hereof which would have been paid hereunder by Tenant had this Lease not so terminated, for the period commencing with such earlier termination of this Lease or the date of any such re-entry, as the case may be, and ending with the date hereinbefore set for the expiration of the full term granted, over (2) the aggregate rental value of the premises for the same period, or

(b)  sums equal to the aggregate of the fixed rent and the additional rent under Article 24 hereof (if any) which would have been payable by Tenant had this Lease not so terminated, or had Landlord not so re-entered the premises, payable upon the due dates therefor specified herein following such termination or such re-entry and until the date hereinbefore set for the expiration of the full term hereby granted; provided, however, that if Landlord (Landlord, however, not being obligated to do so) shall re-let all or any part of the premises for all or any part of said period, Landlord shall credit Tenant with the net rents actually received by Landlord from such re-letting, such net rents to be determined by first deducting from the gross rents as and when received by Landlord from such re-letting the expenses, including attorneys fees, incurred or paid by Landlord in terminating this Lease and/or of re-entering the premises and of securing possession thereof, as well as the expenses of re-letting, including

275

altering and preparing the premises for new tenants, brokers' commission, attorneys' fees and all other similar or dissimilar expenses properly chargeable against the premises and the rental therefrom in connection with such re-letting, it being understood that any such re-letting may be for a period equal to, less than or longer than the remaining term of this Lease; provided, further, that (i) in no event shall Tenant be entitled to receive any excess or such net rents over the sums payable by Tenant to Landlord hereunder, (ii) in no event shall Tenant be entitled in any suit for the collection of damages pursuant to this subparagraph (b) to a credit in respect of any net rents from a re-letting except to the extent that such net rents are actually received by Landlord prior to the commencement of such suit, and (iii) if the premises or any part thereof should be re-let in combination with other space, then proper apportionment on a square foot area basis shall be made of the rent received from such re-letting and of the expenses of re-letting.

For the purposes of subparagraph (a) of this Article 18, the amount of additional rent which would have been payable by Tenant under Article 24 hereof shall be deemed to be an amount equal to the amount of such additional rent payable by Tenant for the applicable period ending immediately preceding such termination of this Lease or such re-entry. Suit or suits for the recovery of such damages, or any installments thereof, may be brought by Landlord from time to time at its election, and nothing contained herein shall be deemed to require Landlord to postpone suit until the date when the term of this Lease would have expired if it had not been terminated under the provisions of Article 16 hereof, or under any provision of law, or had the Landlord not re-entered the premises.

Nothing herein contained shall be construed as limiting or precluding the recovery by Landlord against Tenant of any sums or damages to which, in addition to the damages particularly provided above, Landlord may lawfully be entitled by reason of any default hereunder on the part of Tenant.

19.  <u>Waiver by Tenant.</u>  Tenant, for Tenant, and on behalf of any and all persons, firms corporations and associations claiming through or under Tenant, including creditors of all kinds, does hereby waive and surrender all right and privilege which they or any of them might have under or by reason of any present or future law to redeem the premises or to have a continuance of this Lease for the term hereby demised after Tenant is dispossessed or ejected therefrom by process of law or under the terms of this Lease or after the expiration or termination of this Lease as herein provided or pursuant to law. Tenant also waives the provisions of any law relating to notice and/or delay in levy of execution in case of an eviction or dispossess of a tenant for non-payment of rent, and of any other law of like import now or hereafter in effect. It is further mutually agreed that in the event Landlord commences any summary proceeding, Tenant will not interpose any counterclaim of whatever nature or description in any such proceeding.

20.  <u>Waiver of Trial by Jury.</u>  It is mutually agreed by and between Landlord and Tenant that, except in the case of any action, proceeding or counterclaim brought by either of the parties against the other for personal injury or property damage, the respective parties hereto shall, and they hereby do, waive trial by jury in any action, arising out of or in any way connected with this Lease, the relationship of landlord and tenant, Tenant's use or occupancy of the premises, and/or any claim of injury or damage, and any emergency statutory or any other statutory remedy.

21.  <u>Cleaning, Heating, Air Conditioning, Services, Etc.</u>  Tenant understands, and covenants and agrees, that Landlord shall not be obligated to furnish any heating, air conditioning or other services, utility or otherwise, of any kind or nature whatsoever, in and to the premises or the Building and all such services shall be furnished by Tenant, at its sole cost and expense, and subject to the approval of Landlord as to the means and methods thereof.

Tenant, at Tenant's sole cost and expense, shall keep the premises and the sidewalks in front of the premises clean and neat and shall remove all refuse, rubbish, debris and snow therefrom. All refuse, rubbish and debris shall be deposited only in such receptacles and in such a manner as shall be designated or approved by Landlord.

It is understood that at any time or times all or any of the elevators in the Building, if any, at the option of the Landlord, be automatic elevators, and Landlord shall be under no obligation to furnish an elevator operator for any automatic elevator. If Landlord shall at any time or times furnish any elevator operator for any automatic elevator, Landlord may discontinue furnishing such elevator operator and there shall be no diminution, reduction or abatement of rent by reason thereof. Landlord agrees to maintain the automatic elevator that serves the basement to the first floor of the building.

Landlord reserves the right, without liability to Tenant and without constituting any claim of constructive eviction, to stop or interrupt any heating, elevator, escalator, lighting, ventilating, air conditioning, gas, steam, power, electricity, water, cleaning or other similar or dissimilar service and to stop or interrupt the use of any Building facilities at such times as may be necessary and for as long as may be reasonably be required by reasons of accidents, strikes, or the making of repairs, alterations or improvements, or inability to secure a proper supply of fuel, gas, steam, water, electricity, labor or supplies, or by the reason of any other similar or dissimilar cause beyond the reasonable control of Landlord. No such stoppage or interruption shall entitle Tenant to any diminution or abatement of rent or other compensation nor shall this Lease or any of the obligations of Tenant be affected or reduced by reason of any such stoppage or interruption. The provisions hereof do not, however, obligate Landlord to furnish any service or facility not otherwise specifically set forth in this Lease as an obligation on the part of Landlord.

22.  <u>Lease Contains All Agreements - No Waivers.</u>  This Lease contains all of the covenants, agreements, terms, provisions and conditions relating to the leasing of the premises hereunder, and Landlord has not made and is not making, and Tenant in executing and delivering this Lease is not relying upon, any warranties, representations, promises or statements, except to the extent that the same may expressly be set forth in this Lease.

The failure of Landlord to insist in any one or more instances upon the strict performance of any one of the covenants, agreements, terms, provisions or conditions of this Lease or to exercise any election herein contained shall not be construed as a waiver or relinquishment for the future of such covenant, agreement, term, provision, condition or election, but the same shall continue and remain in full force and effect. No waiver by Landlord of any covenant, agreement, term, provision or condition of this Lease shall be deemed to have been made unless expresses in writing and signed by Landlord. No surrender of the premises or of any remainder of the term of this Lease shall be valid unless accepted by Landlord in writing. No payment by Tenant or receipt by Landlord of a lesser amount than any installment or payment of any rent or additional rent due shall be deemed to be other than on account of the amount due, and no endorsement or statement on any check or payment of any rent or additional rent shall be deemed an accord and satisfaction. Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such installment or payment of any rent or additional rent, or pursue any remedy or remedies available to Landlord. The receipt and retention by Landlord of fixed fee or other sum or charge payable hereunder from anyone other than Tenant shall not be deemed a waiver of the breach by Tenant of any covenant, agreement, term, provision or condition herein contained, or the acceptance of such other person as a tenant, or a release of Tenant from the further performance by Tenant of the covenants, agreements, terms, provisions and conditions herein contained. The receipt and retention by Landlord of fixed rent, additional rent or other sum or charge with knowledge of the breach of any covenant, agreement, term, provision or condition herein contained shall not be deemed ma waiver of such breach. No executory agreement hereafter made between Landlord and Tenant shall be effective to change, modify, waive, release, discharge, terminate or effect an abandonment of this Lease, in whole or in part, unless such executory agreement is in writing, refers expressly to this Lease and is signed by the party against whom enforcement of the change, modification, waiver, release, discharge or termination or effectuation of the abandonment is sought.

The Lease shall not be binding upon Landlord unless and until it shall have been executed by Landlord and Tenant and a fully executed counterpart of this Lease shall have been delivered by Landlord to Tenant.

23. <u>Parties Bound.</u>  The covenants, agreements, terms, provisions and conditions of this Lease shall bind and benefit the respective successors, assigns and legal representatives of the parties hereto with the same effect as if mentioned in each instance where a party hereto is named or referred to, except that no violation of the provision of Article 7 hereof shall operate to vest any rights in any successor, assignee or legal representative of Tenant and that the provisions of this Article 23 shall not be construed as modifying the conditions of limitation contained in Article 16 hereof. It is understood and agreed, however, that the covenants and obligations on the part of Landlord under this Lease shall not be binding upon Landlord herein named with respect to any period subsequent to the transfer of its interest in the Building, that in the event of such transfer said covenants and obligations shall thereafter be binding upon each transferee of such interest of Landlord herein named, but only with respect to the period ending with a subsequent transfer of such interest, and that a lease of the entire interest shall be deemed a transfer within the meaning of this Article 23.

24. <u>Curing Tenant's Defaults - Additional Rent.</u>  If Tenant shall default in the performance of any covenant, agreement, term, provision or condition herein contained, Landlord, without thereby waiving such default, may perform the same for the account and at the expense of Tenant, without notice in a case of emergency, and in any other case if such default continues after 3 days from the date of giving by Landlord to Tenant of written notice of intention to do so. Bills for any expense incurred by Landlord in connection with any such performance by Landlord for the account of Tenant, and bills for all costs, expenses and disbursements of every kind and nature whatsoever, including, but not limited to, attorneys fees involved in collecting or endeavoring to collect the fixed rent or additional rent or other sum or charge or any part thereof or enforcing or endeavoring to enforce any rights against Tenant, under or in connection with this Lease, or pursuant to law, including (without being limited to) any such cost, expense and disbursement involved in instituting and prosecuting summary proceedings, as well as bills for any property, material, labor or services provided, furnished or rendered, or caused to be provided, furnished or rendered, by Landlord to Tenant including (without being limited to) electric lamps and other equipment, construction work done for the account of Tenant, water, ice, drinking water, drinking cups, towel and other services, as well as for any charges for any additional elevator, heating, air conditioning or cleaning services incurred under Article 21 hereof and any charges for other similar or dissimilar services incurred under this Lease, may be sent by Landlord to Tenant monthly, or immediately, at Landlord's option, and shall be due and payable in accordance with the terms of said bills, and if not paid when due, the amounts thereof shall immediately become due and payable as additional rent under this Lease. In the event that Tenant is in arrears in payment of fixed rent or additional rent, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Tenant agrees that Landlord may apply any payments made by Tenant to any items Landlord sees fit, irrespective of and not withstanding any designation or request by Tenant as to the items against which any such payments shall be credited. Landlord reserves the right, without liability to Tenant and without constituting any claim of eviction or constructive eviction, to suspend furnishing or rendering to Tenant any property, material, labor, utility or other service, wherever Landlord is obligated to furnish or render the same at expense of Tenant, in the event that (but only for so long as) Tenant is in arrears in paying Landlord therefor or Tenant is in default in the keeping, observance or performance of any covenant, agreement, term, provision and condition of this Lease.

25. Intentionally Omitted.

26. <u>Miscellaneous.</u>

(a)  Notwithstanding anything contained in this Lease to the contrary, Tenant covenants and agrees that Tenant will not use the premises or any part thereof, or permit the premises or any part thereof to be used as a restaurant and/or bar and/or for the use of confectionery and/or soda and/or beverages and/or sandwiches and/or ice cream and/or baked goods or for the preparation, dispensing or consumption of food or beverages in any manner whatsoever.

(b)  If, in connection with obtaining financing for the Building, a banking, insurance or other recognized institutional lender shall request reasonable modifications in and to this Lease as a condition to such financing, Tenant will consent thereto, provided that such modifications do not increase the financial obligations of Tenant hereunder pursuant to Article 1 and hereof, or materially and adversely affect the leasehold interest hereby created.

(c)  If, at any time during the last month of the term of this Lease, Tenant shall have removed all or substantially all of the Tenant's property from the premises, Landlord may, and Tenant hereby irrevocably grants to Landlord a license to, immediately enter and alter, renovate and redecorate the premises, without elimination, diminution or abatement of fixed or additional rent, or incurring liability to Tenant for any compensation, and such acts shall have no effect upon this Lease.

(d)  Tenant shall not place a load upon any floor of the premises exceeding the floor load per square foot which such floor was designated to carry and which is allowed by law.  landlord reserves the right to prescribe the weight and position of all safes which must be placed by Tenant, at Tenant's expense, so as to distribute the weight.  Business machines and mechanical equipment shall be placed and maintained by Tenant, at Tenant's expense, in settings sufficient in Landlord's judgment, to absorb and prevent vibration, noise and annoyance.

(e)  Without incurring any liability to Tenant, Landlord may permit access to the premises and open the same, whether or not Tenant shall be present, upon demand of any receiver, trustee, assignee for the benefit of creditors, sheriff, marshal or court officer entitled to, or reasonably purporting to be entitled to, such access for the purpose of taking possession of, or removing, Tenant's property or for any other lawful purpose (but this provision and any action by Landlord hereunder shall not be deemed a recognition by Landlord that the person or official making such demand has any right or interest in or to this Lease, or in or to the premises), or upon demand of any representative of the fire, police, building, sanitation or other department of any city, county, town, village, state or federal government.

(f)  Tenant shall not be entitled to exercise any right of termination or other option granted to it by this Lease at any time when Tenant is in default in the performance, observance or keeping of any of the covenants, agreements, terms, provisions or conditions on its part to be performed, observed or kept under this Lease.

(g)  Tenant shall not place or permit to be placed any vending machines in the premises, except with the prior written consent of Landlord in each instance.

(h)  Tenant shall not occupy any space in the Building (by assignment, sublease or otherwise) other than the premises hereby demised, except with the prior written consent of Landlord in each instance.

(i)  Tenant will not clean, nor require, permit, suffer or allow any window in the premises to be cleaned, from the outside in violation of Section 202 of the Labor Law or of the rules of any other board or body or governmental authority having or asserting jurisdiction.

(j)  If, pursuant to any provision of this Lease, Landlord shall withhold its consent or approval or permission to any thing or matter requested by Tenant, Tenant shall not be entitled to bring or institute any action or other proceeding for damages or for any other remedy of any kind or nature whatsoever (unless, as provided elsewhere in this Lease, Landlord has agreed that its consent or approval or permission will not be unreasonably withheld or delayed, in which instance Tenant may bring or institute an action or other proceeding solely for the purpose of compelling the granting of such consent or approval or permission) and Tenant agrees to waive, and does hereby waive, any rights that it may have to bring any such action or other proceeding (except as herein otherwise provided).

(k)  Tenant shall look solely to the estate and interest of Landlord, its successors and assigns in the Land and Building for the collection of a judgment or other judicial process requiring the payment of damages or money by Landlord or in the event of any default by Landlord hereunder and no other property or assets of Landlord (or, if Landlord is a partnership, of any partner of Landlord), shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under and with respect to this Lease, the relationship of Landlord and Tenant hereunder, Tenant's use and occupancy of the premises or otherwise.

27.  <u>Pornographic Uses Prohibited</u>.  Tenant agrees that the value of the premises and the reputation of Landlord will be seriously injured if the premises are used for any obscene or pornographic purposes or any form of commercial sex establishment.  Tenant agrees that Tenant will not bring or permit any obscene or pornographic material in, to or on the premises, and shall not permit or conduct any obscene, nude, or semi-nude live performances in or on the premises, nor permit use of the premises for nude modeling, rap sessions, or as a so-called rubber goods shops, or as a sex club of any sort, or as a "massage parlor".  Tenant agrees further that Tenant will not permit any of these uses by any subtenant of the premises or any assignee of this Lease.  This Article shall directly bind any successors in interest of Tenant.  Tenant agrees that if, at any time, Tenant violates any of the provisions of this Article, such violation shall be deemed a breach of a substantial obligation of the terms of this Lease and objectionable conduct.  Pornographic material is defined for purposes of this Article as any written or pictorial matter with prurient appeal or any objects of instrument that are primarily concerned with lewd or prurient sexual activity.  Obscene material is defined herein as it is in Penal law 235.00.

28.  <u>Business Conduct</u>.  Tenant, recognizing that the Building has been developed and is being maintained as a location for an outstanding type of business occupancy, and as a special inducement to Landlord to enter into this Lease,

covenants and agrees that at all times (i)  Tenant's use of the premises throughout the term will be consistent with the character and dignity of the Building, (ii)  the business to be conducted at, through and from the premises will be first-class quality and reputable in every respect, (iii)  the sales methods employed in said business, as well as all other elements of merchandising, display and advertising, will be dignified and in conformity with the highest standards of practice in Tenant's industry and (iv)  the appearance of the premises (including the lighting and other appearances thereto), the appearance and deportment of all personnel employed therein, and the appearance, number, location, nature and subject matter of all displays and exhibits placed or installed in or about the premises, and of any signs, lettering announcements, or any other kinds of forms of inscriptions displayed in or about the premises will be only such as meet with Landlord's approval, and if at any time disapproved by Landlord, Tenant shall remove the basis for such disapproval in such manner and within such time as may be specified by Landlord in a written notice given by it to Tenant for such purpose.

Tenant will, promptly after demand by Landlord, and as often as each such demand shall occur, forthwith discontinue selling, or offering for sale, or permitting to be sold, or otherwise dealing in, or exhibiting, or advertising, in the premises, or any part thereof, any article or merchandise to which Landlord may object.  Tenant will, promptly after demand by Landlord, and as often as each such demand shall occur, forthwith discontinue any advertisement, sign, notice, object, poster, exhibit and/or display in the premises, or any part thereof, to which Landlord may object.

Nothing contained in this Article or elsewhere in this Lease shall be construed to permit any use of the premises that is not within the permitted uses of the premises as specifically set forth in this Lease.

The violation by Tenant of any of the covenants, agreements, terms, provisions and conditions contained in this Article shall be deemed a material and substantial default by Tenant under the terms of this Lease.  Mention in this Article of any particular remedy shall not preclude Landlord from any other remedy in law or in equity.  Any demand or demands by Landlord pursuant to the provisions of this Article and compliance therewith by Tenant shall not impair this Lease or affect Tenant's liability hereunder, nor shall Tenant be entitled to any compensation or diminution or abatement of rent by reason thereof.

29.  <u>Hazardous Waste</u>.  Throughout the term of this Lease, Tenant shall not undertake or permit any Environmental Activity (as such term is hereinafter defined) other than (i) in compliance with all applicable laws and ordinances and all rules, orders and regulations, present or future, ordinary or extraordinary, foreseen or unforeseen) of any federal, state or local governmental authority (hereinafter collectively referred to as "Legal Requirements"), and (ii) in such a manner as shall keep the premises, the Building and the Land free from any lien imposed pursuant to any Legal Requirement in respect of such Environmental Activity.  Tenant shall take all necessary steps to ensure that any Environmental Activity undertaken or permitted at the premises is undertaken in a manner as to provide prudent safeguards against potential risks to human health or the environment.  Tenant shall notify Landlord within 24 hours of the release of any Hazardous Materials (as such term is hereinafter defined) from or at the premises which could form the basis of any claim, demand or action by any party.  Landlord shall have the right, from time to time, at Tenant's expense, to conduct an environmental audit or such other examinations, tests, inspections and reviews of the premises as Landlord, in its sole discretion, shall deem necessary, appropriate or desirable and Tenant shall cooperate in the conduct of any such environmental audit, examination, test, inspection or review.  If Tenant shall breach the covenants provided in this Article, then, in addition to any other rights and remedies which may be available to landlord pursuant to this Lease or otherwise at law, Landlord may require Tenant to take all actions, or to reimburse Landlord for the costs of any and all actions taken by Landlord, as are necessary, appropriate or desirable to cure such breach.  for purposes of this Article, the term "Environmental Activity" means any use, storage, installation, existence, release, threatened release, discharge, generation, abatement, removal, disposal, handling or transportation from, under, into or on the leased premises of (a) any "hazardous substance" as defined in any federal statute, (b) petroleum, crude oil or any fraction thereof, natural gas or synthetic gas used for fuel, and (c) any additional substances or materials which at such time are classified or considered to be hazardous or toxic under the laws of the State of New York or any other Legal Requirements the materials described in clauses (a) through (c) being collectively referred to as "Hazardous Materials".  The provisions of subparagraph (j) of Article 6 of this Lease shall be applicable to any failure by Tenant to comply with or keep or perform the provisions of this Article.  The obligations of Tenant under this Article shall survive the expiration or sooner termination of the term of this Lease.

30.  <u>Inability to Perform</u>.  This Lease and the obligations of Tenant to pay fixed rent, additional rent and all other sums and charge hereunder and perform, observe and keep all of the other covenants, agreements, terms, provisions and conditions hereunder on the part of Tenant to be performed, observed and kept shall in no wise be affected, impaired or excused because Landlord is unable to fulfill any of its obligations under this Lease or is unable to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make or is delayed in making any repairs, replacement, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Landlord is prevented or delayed from so doing by reason of strikes or labor troubles or any other similar or dissimilar cause whatsoever beyond Landlord's reasonable control, including, but not limited to, government preemption in connection with a national energy or by reason of any rule, order or regulation of any department or subdivision thereof of any governmental agency or by reason of the conditions of supply and demand which have been or are affected by war, hostilities or other similar or dissimilar emergency.

31.  <u>Adjacent Excavation - Shoring</u>.  If an excavation shall be made upon land adjacent to or under the Building, or shall be authorized or contemplated to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter upon the premises for the purpose of doing such work as said person shall deem necessary or desirable to preserve the Building from injury or damage and to support the same by proper foundations without any claim for damages or

indemnity against Landlord, or diminution or abatement of fixed rent, additional rent or any other sum or charge payable by Tenant hereunder.

32. <u>Broker.</u>  Tenant states, with respect to the terms, conditions and provisions of this Lease as set forth herein, that no real estate broker, agent or finder brought about the terms and conditions of this Lease.  The Landlord agrees that the Landlord shall be liable for the payment of brokerage commissions that are due, if any.

33. <u>ARTICLE HEADINGS.</u>  The Article headings of this Lease are for convenience only and are not to be considered in construing the same.

34. <u>Holdover.</u>   If Tenant shall hold over after the expiration of the term of this Lease, such holding over shall be deemed a month-to-month tenancy, which tenancy may be terminated pursuant to applicable law, and until Tenant has vacated the premises if agrees to pay the Landlord for the use and occupancy of the premises an amount equal to two and one-half times the total of the fixed rent and additional rent payable pursuant to Article 24 then being paid or payable by Tenant to Landlord.

35. <u>Security.</u>  Tenant has deposited with Landlord the sum of $9000.00 as security for the faithful performance and observance by tenant of the terms, provisions and conditions of this Lease.  In the event that Tenant is in default of any of the terms, conditions and provisions of this Lease, Landlord may, but is not obligated to, apply such amount of the Security to the payment of Rent and Additional Rent and the cost and expense of re-letting the demised premises whether or not incurred after summary proceedings are instituted.  In the case of the sale or transfer the Security Deposit to the successor owner/lessee. Tenant further covenants that Tenant shall not assign or encumber the Security Deposit and tat Landlord, its successors and assigns shall not be bound by any such act taken by Tenant.

36. <u>Landlord's Interest in Premises.</u>  Landlord's interest in the premises is derived pursuant to the terms of a certain lease (herein referred to as the "Prime Lease") dated as of           (as thereafter modified and amended) between           as landlord (herein referred to as "Owner"), and Landlord, as successor in interest to           , as tenant, covering certain commercial space in the Building as more specifically set forth thereon.  Accordingly, notwithstanding anything to the contrary contained in this Lease, this Lease is, in fact, a sublease.  For the purposes of this Lease, the Prime Lease shall be, and shall be deemed to be, included in the term "underlying lease" wherever it appears and Owner shall be, and shall be deemed to be, included as a "lessor under an underlying lease".

Tenant understands that, in order for Landlord to lease and demise the premises to Tenant for the term set forth in Article 1 hereof, Landlord is required to exercise certain options to extend the term of the Prime Lease as therein set forth. Landlord agrees that, so long as Tenant is not in default of any of the covenants, agreements, terms, provisions and conditions of this Lease on its part to be kept, observed and performed, beyond any applicable cure period, Landlord shall timely exercise such options to the intent and purposes that the term of this Lease shall be as set forth in said Article 1.

If, at anytime during the term of this Lease, Tenant shall claim that Landlord is in default or in breach of its obligations hereunder or is otherwise liable to Tenant and such default or breach or liability shall result from, or be attributable to, the default or failure of owner, Tenant agrees that Landlord shall not be liable or responsible to Tenant in connection therewith; provided, however, Landlord agrees to assign to Tenant any cause of action that Landlord may have against Owner as a result of such default or failure.

37. <u>Quiet Enjoyment.</u>  Landlord covenants that if, and so long as, Tenant keeps and performs each and every covenant, agreement, term, provision and condition herein contained on the part and on behalf of Tenant to be kept and performed, Tenant shall quietly enjoy the premises without hindrance or molestation by Landlord or by any other person lawful claiming the same, subject to the covenants, agreements, terms, provisions and conditions of this Lease and to the ground leases and/or underlying lease and/or mortgages to which this Lease is subject and subordinate as hereinbefore set forth.

38. <u>Tenant's Right to Cancel.</u>  At any time during the term hereof, Tenant, upon at least six (6) months prior written notice to Landlord, may elect to cancel and terminate this Lease and the term and estate hereby granted as of the date set forth in said notice by Tenant to Landlord (hereinafter referred to as the "Termination Date").  In the event (a) Tenant shall vacate and surrender the premises on or before the Termination Date and Tenant shall not otherwise be in default of any of the covenants, agreements, term, provisions and conditions of this Lease on its part to be kept, observed and performed hereunder and (b) Landlord shall have re-let the premise for a term commencing on the date immediately following the Termination Date, Landlord shall return to Tenant the $0.00 referred to in Article 1 hereof; provided, however, if, on the Termination Date, Landlord shall not have re-let the premises, Landlord shall be entitled to retain said $           until such time as Landlord shall have re-let the premises and at the time of such re-letting, Landlord shall only be obligated to return to Tenant an amount equal to $           less $           for each calendar month or part thereof occurring immediately after the expiration of the Termination Date during which Landlord did not re-let the premises.

39. <u>Sprinkler System Disclosure.</u>  The leased premises is  serviced by a maintained and operative sprinkler system that was last maintained on           and was last inspected on .

40. See Rider to this Lease is attached hereto.

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Lease as of the day and year first above written.

LANDLORD

BY YEHUDA SALUMON — MEMBER

acting for 4921 12 Ave LLC

Attest/Witness:

TENANT

UZIO FRANKER

By Uziel Frankel — Member

acting for Ultimate Opportunities, LLC

Attest/Witness:

# RIDER TO LEASE DATED NOVEMBER 1, 2016

## (CONSISTING OF 2 PAGES)

RIDER ANNEXED TO AND MADE PART OF LEASE,

DATED November 1, 2016,

BETWEEN 4921 12th Avenue, LLC, AS LANDLORD,

AND Ultimate Opportunities, LLC, AS TENANT

R.1    The Articles of this rider are intended to amplify and expand upon the Articles of the the Lease described above, but in the event any Article or Articles of this rider conflicts with any Article or Articles set forth in the Lease, the Article and/or Articles of this rider shall supersede and govern.  The Lease and this Rider shall collectively be referred to herein as this "Lease".  With exception to this Rider, there are no other attachments or Exhibits to this Lease.

R.2    In accordance with Article 1 of the Lease, the amount of fixed rent due monthly during the period commencing November 1, 2016 and ending on October 31, 2026, is set at $9,000.00; and the amount of fixed rent due monthly during the period commencing November 1, 2026 and ending on October 31, 2036, is set at $10,000.00; the amount of fixed rent due monthly during the period commencing November 1, 2036 and ending on October 31, 2046, is set at $11,000.00.

R.3    The demised premises includes the entire ground level store and storefront at 4921 12th Avenue, Brooklyn, New York, including the higher ceiling area and office located toward the back of store; and including the entire cellar/basement area together with the stairwell leading thereto located within the store, as well as the freight elevator entrance to basement located at sidewalk on the southwestern side of the premises or 50th Street side of the store.

R.4    The demised premises is to be used solely as a retail supermarket and/or other retail business.  Tenant has the full right to use the demised premises for the preparation and selling of cooked and/or baked products.

R.5    Any and all Notices required pursuant to the Lease to be sent to Landlord shall be addressed to same and sent to the mailing address 1152 53rd Street, Brooklyn, New York 11219; and any and all Notices required pursuant to the Lease to be sent to Tenant shall be



addressed to same and sent to mailing address 4921 12th Avenue, Brooklyn, New York 11219.

R.6    Nothing set forth in Article 10 of Lease shall be construed to imply that Tenant is obligated to insure any footage over and beyond the area leased herein.  Additionally, Tenant's obligations and responsibilities under the Lease does not exceed over and beyond the area of the demised premises, as described above in R.3.

R.7    Notwithstanding Article 7 in Lease, Tenant is hereby permitted to assign the full rights under the Lease to any New York State corporation or New York State entity dealing in retail sales. Tenant has the right to cancel Lease upon sixty-days notice to Landlord.

R.8    Landlord is the legal owner of the demised premises.  Article 36 is to be construed as deleted.

R.9    The demised premises contains a sprinkler system throughout. Same shall be maintained annually by Safety Fire Sprinkler located in Brooklyn, New York, or other licensed servicing company at the cost of Landlord.

R.10   The parties hereby agree, that notwithstanding anything stated within the Lease to the contrary, that in the event tenant is in default of any one or more rent payment(s), or other clauses stated herein, and where landlord wishes to commence eviction proceeding against tenant, that the parties will proceed to adjudicate before Beth Din Shar Hamishpat, located in Monsey, New York, under the auspices of Rabbai Abraham S.Y. Geshtetner, or in the alternative before a tripartite beth din tribunal, which shall operate and rule in accordance with Torah law.

R.11   Landlord acknowledges receipt of nine thousand dollars and other valuable consideration from tenant at the time of entering into Lease, and having entered into a binding transaction using a cloth, known as *kinyan suddar* under Torah Law.

DATED: November 1, 2016

LANDLORD
By Yehuda Salgano – Member

_____

Acting for: 4921 12TH Ave, LLC

TENANT
By Uziel Frankel – Member

_____

Acting for: Ultimate Oppurtunities, LLC

283

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X CASE NO: 18-47256
IN RE:


 4921 12th Avenue, LLC,


                        Debtor.
-------------------------------------------------------X        CHAPTER 11

AFFIDAVIT OF SERVICE OF AFFIRMATION IN OPPOSITON TO THE
PLAN ADMINISTRATOR MOTION TO EVICT THE TENANTS AND TO
REPLACE THE MANAGEMENT

Karamvir Dahiya of Dahiya Law Offices, LLC served on January 17, 2020, the
following parties via email with the notice of the filing of affirmation in
opposition with the attachment:

David K. Fiveson on behalf of Defendant Galster Funding LLC
dfiveson@bffmlaw.com

Mark A. Frankel on behalf of Other Prof. Mark Frankel as Plan Adminstrator for
4921 12th Avenue LLC
mfrankel@bfklaw.com


Dated: New York NY
January 17, 2020

                                /s/_____
                                    *Karamvir Dahiya*

Mark Frankel                                          Presentment Date and Time:
Backenroth Frankel & Krinsky, LLP                    March 9, 2020 10:00 a.m.
800 Third Avenue, Floor 11
New York, New York  10022
(212) 593-1100
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re                                                Chapter 11
      4921 12th Avenue, LLC,                        Case No.  18-47256 (CEC)

                Debtors.
--------------------------------------------------------x

## NOTICE OF PRESENTMENT

PLEASE TAKE NOTICE, PLEASE TAKE NOTICE that upon the hearing held on
January 22, 2020, the undersigned will present the attached proposed order to the Honorable Carla
E. Craig, United States Bankruptcy Judge, for signature on March 9, 2020, at 12:00 p.m.

PLEASE TAKE FURTHER NOTICE that unless a written objection to the proposed order,
with proof of service, is filed with the Clerk of the Court and a courtesy copy is delivered to the
Bankruptcy Judge's chambers at least three days before the date of presentment, there will not be a
hearing and the order may be signed.

PLEASE TAKE FURTHER NOTICE that if a written objection is timely filed, the Court
will conduct a hearing on March 18, 2020 2:30 p.m. at the United States Bankruptcy Court 271
Cadman Plaza East, Brooklyn, New York. The moving and objecting parties are required to attend
the hearing, and failure to attend in person or by counsel may result in relief being granted or
denied upon default.

PLEASE TAKE FURTHER NOTICE that the ECF docket number to which the filing
relates shall be included in the upper right-hand corner of the caption of all objections.

Dated:  New York, New York
      February 21, 2020

                BACKENROTH FRANKEL & KRINSKY, LLP
                Attorneys for Plan Administrator

                By: s/Mark A. Frankel
                    800 Third Avenue
                    New York, New York 10022
                    (212) 593-1100

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re                                                                    Chapter 11

      4921 12th Avenue, LLC                                   Case no.  18-47256

                       Debtor.
--------------------------------------------------------x

## WRIT OF ASSISTANCE

        Upon the motion of Mark Frankel as plan administrator ("Plan Administrator")

for the entry of an order under sections 105, 1127 and or 1142 of the Bankruptcy Code

authorizing, among other things, the Plan Administrator of the confirmed plan in the case of

4921 12th Avenue, LLC's to remove the occupants of the ground floor commercial space at the

Debtor's property at 4921 12th Avenue, Brooklyn, New York ("Property") through a writ of

assistance directing the United States Marshals Service (U.S. Marshal) to accompany the Plan

Administrator's representative to effectuate turnover of the Property pursuant to Rule 70 of the

Federal Rules of Civil Procedure; and upon the hearing held on January 22, 2020, and after due

deliberation and sufficient cause shown therefore, it is

        ORDERED, that, effective immediately, the US Marshal is authorized and

directed to assist the Plan Administrator and to take any and all necessary actions, including but

not limited to the use of reasonable force to enter and remain on the Property in order to (i) evict

the ground floor tenant and any other ground floor occupants of the ground floor of the Property-

(ii) remove any and all personal property of the ground floor tenant and/or occupant from the

ground floor of the Property and (iii) deliver possession of the Property to the Plan

Administrator; and, it is further

ORDERED, that the Plan Administrator on whose behalf the Court issues this

Order, will act as substitute custodian of any and all property seized pursuant to this Order and

shall hold harmless any and all of the Law Enforcement Agencies utilized in the enforcement of

this Order and the Eviction Order, and their employees from any and all claims, asserted in any

court or tribunal, arising from any acts, incidents, or occurrences in connection with the eviction

of and seizure and possess ion of the-property, including third-party claims; and, it is further

ORDERED, that the Plan Administrator on whose behalf the Court issues this

Order will account completely for all personal property and effects seized and removed pursuant

to this Order and the Eviction Order and shall compile a written inventory of all such property

and shall provide a copy to such any and all of the Law Enforcement Agencies utilized in the

enforcement of this Order and the Eviction Order, who shall include a copy with his return to the

Court; and, it is further

ORDERED, that anyone interfering with the execution of this Order is subject to

arrest by the U.S. Marshal or any other of the Law Enforcement Agencies utilized in the

enforcement of this Order and and/or its representative;

2

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

IN RE:  4921 12TH AVENUE LLC

CASE NO: 18-47256

**DECLARATION OF MAILING**
**CERTIFICATE OF SERVICE**

Chapter: 11

On 2/21/2020, I did cause a copy of the following documents, described below,

Notice of Adjournment

Notice of Presentment of Order Appointing Managing Agent

Notice of Presentment of Writ of Assistance

Notice of Presentment of Order Authorizing Borrowing

to be served for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

I caused these documents to be served by utilizing the services of BK Attorney Services, LLC d/b/a certificateofservice.com, an Approved Bankruptcy Notice Provider authorized by the United States Courts Administrative Office, pursuant to Fed.R. Bankr.P. 9001(9) and 2002(g)(4).  A copy of the declaration of service is attached hereto and incorporated as if fully set forth herein.

Parties who are participants in the Courts Electronic Noticing System ("NEF"), if any, were denoted as having been served electronically with the documents described herein per the ECF/PACER system.

DATED: 2/21/2020

/s/ Mark Frankel
Mark Frankel  1989
Backenroth Frankel & Krinsky, LLP
800 Thrid Avenue
New York, NY  10022-0000
212 593 1100

288

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

IN RE:  4921 12TH AVENUE LLC

CASE NO: 18-47256

**CERTIFICATE OF SERVICE**
**DECLARATION OF MAILING**

Chapter: 11

On 2/21/2020, a copy of the following documents, described below,

Notice of Adjournment

Notice of Presentment of Order Appointing Managing Agent

Notice of Presentment of Writ of Assistance

Notice of Presentment of Order Authorizing Borrowing

were deposited for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

The undersigned does hereby declare under penalty of perjury of the laws of the United States that I have served the above referenced document (s) on the mailing list attached hereto in the manner shown and prepared the Declaration of Certificate of Service and that it is true and correct to the best of my knowledge, information, and belief.

DATED: 2/21/2020

Jay S. Jump
BK Attorney Services, LLC
d/b/a certificateofservice.com, for
Mark Frankel
Backenroth Frankel & Krinsky, LLP
800 Thrid Avenue
New York, NY  10022-0000

PARTIES DESIGNATED AS "EXCLUDE" WERE NOT SERVED VIA USPS FIRST CLASS MAIL
PARTIES WITH A '+' AND DESIGNATED AS "CM/ECF E-SERVICE" RECEIVED ELECTRONIC NOTICE THROUGH THE CM/ECF SYSTEM

CASE INFO
  LABEL MATRIX FOR LOCAL NOTICING
02071
CASE 1-18-47256-CEC
EASTERN DISTRICT OF NEW YORK
BROOKLYN
FRI FEB 21 11-52-57 EST 2020

DEBTOR
4921 12TH AVENUE LLC
4921 12TH AVENUE
BROOKLYN NY 11219-3040

CULHANE MEADOWS PLLC
100 PARK AVENUE
16TH FLOOR
NEW YORK NY 10017-5538


OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPAN
521 5TH AVENUE
23RD FLOOR
NEW YORK NY 10175-2399

271 C CADMAN PLAZA EAST SUITE 1595
BROOKLYN NY 11201-1800

BEIS CHASIDEI GORLITZ
CO BERKMAN HENOCH ET AL
100 GARDEN CITY PLAZA
GARDEN CITY NY 11530-3203


BEIS CHASIDEI GORLITZ
CO HERRICK FEINSTEIN LLP
2 PARK AVENUE
NEW YORK NY 10016-5702

BUTLER FITZGERALD FIVESON  MCCARTHY PC
9 EAST 45TH STREET NINTH FLOOR
NEW YORK NEW YORK 10017-8456

GALSTER FUNDING LLC
9 EAST 45TH ST 9TH FLOOR
NEW YORK NY 10017-8456


GALSTER FUNDING LLC
9 EAST 45TH STREET NINTH FLOOR
NEW YORK NY 10017-2425

GALSTER FUNDING LLC
CO BACKENROTH FRANKEL  KRINKSY LLP
800 3RD AVE FL 11
NEW YORK NY 10022-7651

GALSTER FUNDING LLC
CO HARRY ZUBLI ESQ
1010 NORTHERN BOULEVARD SUITE 310
GREAT NECK NY 11021-5329


INTERNAL REVENUE SERVICE
PO BOX 7346
PHILADELPHIA PA 19101-7346

OFFICE OF THE UNITED STATES TRUSTEE
EASTERN DISTRICT OF NY BROOKLYN OFFICE
US FEDERAL OFFICE BUILDING
201 VARICK STREET SUITE 1006
NEW YORK NY 10014-4811

OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPAN
CO BUTLER FITZGERALD FIVESON
MCCARTHY PC
9 EAST 45TH STREET 9TH FLOOR
NEW YORK NEW YORK 10017-8456


OLD REPUBLIC NATIONAL TITLE INSURANCE
COMPAN
A FLORIDA CORPORATION
CO BUTLER FITZGERALD FIVESON  MCCARTHY
NINE EAST 45TH STREET NINTH FLOOR
NEW YORK NY 10017-2425

YIDELS ONLINE FOOD STATION LLC
ECOMMERCE EXPAND LLC
CO DAHIYA LAW OFFICES LLC
75 MAIDEN LANE SUITE 506
NEW YORK NY 10038-4631

ALLA KACHAN
3099 CONEY ISLAND AVENUE
3RD FLOOR
BROOKLYN NY 11235-6305


J TED DONOVAN
GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP
1501 BROADWAY
22ND FLOOR
NEW YORK NY 10036-5600

JOSEPH Y BALISOK
BALISOK  KAUFMAN PLLC
251 TROY AVENUE
BROOKLYN NY 11213-3601

KARAMVIR DAHIYA
DAHIYA LAW OFFICES LLC
75 MAIDEN LANE
SUITE 506
NEW YORK NY 10038-4631


ULTIMATE OPPORTUNITIES LLC
110 CHESTNUT RIDGE ROAD
MONTVALE NJ 07645

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
In re:                                                      Bankruptcy Case No.:
                                                                 1-18-47256-cec

    4921 12th Avenue LLC,

                          Debtor.                           Chapter 11

                                                            Assigned to:
                                                                 Judge Carla E. Craig

-------------------------------------------------------------------X

### AFFIRMATION IN OPPOSITION TO ULTIMATE
### OPPORTUNITIES LLC'S MOTION FOR RELIEF FROM
### ORDER REQUIRING VACANCY OF PREMISES

David K. Fiveson, an attorney duly admitted to practice before this Court, affirms

under the penalties of perjury as follows:

1.    I am a member of the Bar of this Court and principal of the firm Butler,

Fitzgerald, Fiveson & McCarthy, A Professional Corporation, attorneys for interested party Old

Republic National Title Insurance Company ("ORNTIC").  I have knowledge of the facts stated

herein based on my review of my file and my participation in the prior proceedings.  I therefore

believe the facts stated herein to be true and correct.   I make this affirmation in opposition to the

September 9, 2020 motion of Ultimate Oppurtunities, LLC a/k/a Ultimate Opportunities, LLC

("Ultimate LLC") filed as ECF 131, therein seeking: (1) to vacate an August 26, 2020 *Order*

*Directing Vacatur of Commercial Premises* (ECF 128), or alternatively (2) a *de novo* hearing on

the Plan Administrator's December 27, 2019 *Motion to Terminate the Debtor's Exclusive*

*Periods* (ECF 110).

2.    ORNTIC is an interested party in this proceeding, to the extent the sale

of the Premises[1] as vacant, will increases the sale price. Specifically, an increased sale price

will  increase  recovery  from  the  proceeds  of  the  sale  payable  to  Galster  Funding,  LLC

---

[1] "Premises" as used herein, refers to the real property located at 4921 12th Avenue, Brooklyn, New York.

("Galster Funding"), and therein decrease the amount of Galster Funding's unsecured claim. As a result, ORNTIC will have an increased recovery of its pro rata share of the unsecured claims, offsetting the total amount of its unsecured $13,500,000 claim.

3.     This motion is another effort of the Debtor's sole member, Yehuda Salamon, to perpetuate a fraud upon this Court through the use of a straw LLC (Ultimate LLC) in coordination with his known co-conspirator, Uziel Frankel – sole member of Ultimate LLC. As shown below, denial of this motion is warranted, as Ultimate LLC is not a legitimate arm's-length tenant of the Premises, but a straw entity to allow Yehuda Salamon to continue in possession.

## PROCEDURAL HISTORY

4.     This bankruptcy is related to the criminal fraud perpetrated by Yehuda Salamon, the principal of the Debtor, 4921 12th Avenue, LLC ("Debtor").   Yehuda Salamon forged two satisfactions of two prior mortgages securing loans in the principal amounts of $1.2 million and $1.3 million against the Premises.  In reliance on the forged satisfactions, on August 30, 2016 Galster Funding loaned the Debtor $6.5 million believing its loan would be fully secured as a first lien against the Premises.  The forged satisfactions were later vacated by Judge Knipel of the Kings County Supreme Court in the action entitled Beis Chasidei Gorlitz v. 4921 12th Avenue LLC, et al. by order entered on December 27, 2017, thereby relegating Galster Funding's mortgage to an unsecured third lien position.[2]  ORNTIC insured Galster Funding's mortgage in first lien position.   In order to resolve Galster Funding's claim under its title insurance policy, ORNTIC purchased the two (2) notes secured by the recorded first and second mortgages (that were reinstated when the forged satisfactions were vacated by Judge Knipel) and

---

[2] A true and correct copy of the December 27, 2017 order is annexed hereto as Exhibit A.

subordinated those liens to Galster Funding's mortgage, thereby slotting Galster Funding's mortgage in first lien position.

5.    Thereafter, to delay the sale of the Premises pursuant to the judgment of foreclosure and sale of Galster Funding's mortgage, Debtor filed for Chapter 11 on December 20, 2018.  A Liquidating Plan was approved on July 30, 2019 ("Plan"), authorizing Galster Funding to sell the Premises.  See Exhibit B.[3]    It is believed that the eventual sale of the Premises will result in a portion of Galster Funding's note and the entire ORNTIC notes being rendered unsecured in the total amount upwards of $16 million.

6.    Not one nickel of Galster Funding's $6.5 million loan proceeds disbursed on August 30, 2016 was deposited with the Debtor.  Instead, the loan proceeds were paid to various entities of Yehuda Salamon with no consideration paid to the Debtor.  The fraudulent transfers of the $6.5 million of loan proceeds to the various shell entities of Yehuda Salamon rendered the Debtor insolvent, and are classic fraudulent transfers under the New York Debtor and Creditor Law.[4]  As a result of these fraudulent transfers, the Premises was encumbered with the Galster Funding mortgage of $6.5 million and the two unpaid prior mortgages (on which were owed approximately $13 million) purchased by ORNTIC to protect Galster Funding. Debtor was left with no assets to secure these loans.

7.    Mark Frankel was appointed Plan Administrator to recoup these fraudulent transfers, in order to satisfy the Debtor's unsecured creditors in the Chapter 11.  See Exhibit B ¶ 90.  The Plan vests the Plan Administrator with the sole authority to liquidate assets, including prosecuting the Causes of Action (defined below) to maximize distributions to creditors.  See Id. ¶¶ 90(c), 92.

---

[3] A true and correct copy of the Plan and Order filed as ECF 91 confirming the Plan is annexed hereto as Exhibit B.

[4] These fraudulent transfers are the subject of the adversary proceeding pending under Case No. 19-01120-CEC, entitled Mark Frankel v. Yidel's, et al. "Adversary Proceeding").

8.      The Plan explicitly provides for the retention of jurisdiction over the dispute vests the Plan Administrator with "the exclusive authority and duty to implement the sale of the Property and prosecution of Causes of Action under this Plan and accordingly shall exercise such rights and obligations of the Debtor in accordance with the Plan." See Id. ¶ 90(c). The Plan Administrator is also "party-in-interest" for purposes of filing and prosecuting objections to claims and Causes of Action." See Id. ¶ 90(b).

9.      As provided in paragraph 92 of the Plan, all "Causes of Action" for the "benefit of the Debtor's estate" are specifically and unequivocally preserved, and vest the Plan Administer with standing and sole authority for prosecuting these claims.  Paragraph 19 of the Plan defines "Causes of Action" as follows:

> 19. "Causes of Action" shall mean any and all claims and causes of action of, and remedies granted to, the Debtor against any third party, including, without limitation, any avoidance claims or causes of action pursuant to sections 502, 506, 510, 541 through 545, 547 through 551, and/or 553 of the Bankruptcy Code and any claims pursuant to any other statutory or common law.

10.      Collectively, paragraphs 19 and 92 of the Plan specifically and unequivocally define "Causes of Action" to include the relief sought and obtained by the Plan Administrator by the March 12, 2020 and August 26, 2020 orders (ECF 125 and ECF 128), which this motion now seeks to vacate.[5]

11.      Paragraph 94 of the Plan specifically addresses pre-petition leases:

> Any and all pre-petition leases or executory contracts (a) not previously assumed or the subject of a motion to assume pending on the Confirmation Date and/or (b) not designated prior to the Confirmation Date as pre-petition leases or executory contracts to be assumed by the Proponent shall be deemed rejected by the Debtor. In the event of a rejection which results in damages a Proof of Claim for such damages must be filed by the damaged party with the Court within thirty (30) days after the Effective

---

[5] True and correct copies of the March 12, 2020 order (ECF 125) and August 26, 2020 order (ECF 128) are annexed hereto as Exhibit C and Exhibit D, respectively.

Date. All Allowed Claims arising from the rejection of any Executory Contract or unexpired lease shall be treated as an Unsecured Claim. Any Claim arising from the rejection of any Executory Contract or unexpired lease not filed with the Court within the time period provided in the preceding paragraph above shall be deemed discharged and shall not be entitled to participate in any distribution under the Plan.

12.    But for the Plan Administrator succeeding on his claims in the adversary proceeding to recover on the fraudulent transfers, it is likely that a significant portion of the unsecured claims resulting from the fraud of Yehuda Salamon will remain unpaid. [6]

13.    The Debtor had no money in its account upon its filing of this case, and the Debtor has collected no income or rents since the filing.  Additionally, during the duration of the bankruptcy case, Debtor represented that there was no lease for the ground floor commercial space of the Premises.  The Debtor's schedules also represented that there were no leases for the ground floor space. The Debtor has continuously failed to file operating reports or provide any record of income or expenses since April 2019.  The operating reports filed prior to April 2019, signed by Yehuda Salamon, represent no income and no expenses for Debtor.

14.    On December 27, 2019, the Plan Administrator filed a motion in the bankruptcy proceeding (ECF 110), therein seeking the entry of an order under sections 105, 1127, and/or 1142 of the Bankruptcy Code authorizing him to remove the occupants of the commercial space at the Premises and to manage the Premises pending a sale under the Plan ("Eviction Motion"). On January 17, 2020, Debtor opposed the Eviction Motion, and for the first

---

[6] Galster Funding holds a judgment of foreclosure and sale entered on August 20, 2018 in an action entitled Galster Funding LLC v. 4921 12th Avenue LLC; et al. in the Supreme Court of the State of New York, County of Kings, Index No.: 500818/2017 ("Galster Judgment").  The total amount due under the Galster Judgment as of the December 20, 2018 filing date was $9,480,175.00. The only other scheduled creditor is ORNTIC, as successor in interest to Beis Chasidi Gorlitz.  ORNTIC filed a $13,500,000 second mortgagee claim that is believed will be rendered wholly unsecured as a byproduct of Yehuda and David Salamon's fraud.   Based on the Galster Judgment and the ORNTIC claim, secured claims total $22,980,175.  The value of the Premises, as stated by the Debtor in its Chapter 11 schedules is $10,000,000.

Page **5** of 14

time disclosed the existence of the alleged November 1, 2016 lease between Debtor and Ultimate

LLC ("Lease")[7] as follows:

> The premises lease (with a term exceeding 20 years) has neither been assumed nor rejected, despite the language in the confirmed Chapter 11 plan, ¶ 94 which says that "[a]ny and all pre-petition leases or executory contracts (a) not previously assumed or the subject of a motion to assume pending on the Confirmation Date . . . shall be deemed rejected by the Debtor." Id Plan at 20. The lessee had no knowledge about the proceeding, nor was it listed in the bankruptcy schedule. Due process is violated by attacking the lessee now, asking for dispossession.

15.    At the January 22, 2020 hearing, the Debtor's objection to the Eviction

Motion was overruled, and the Plan Administrator was instructed to settle the order by notice of

proposed order, with additional service on Ultimate LLC.[8]

16.    Plan Administrator's Notice of Presentment of proposed order for the

Eviction Motion was filed on February 21, 2020 as ECF 118 and served on Ultimate LLC on the

same date, by mail.[9]

17.    On March 12, 2020, an order was entered authorizing the employ of a

professional third-party managing agent, and authorizing said managing agent to collect all rents

and profits due and unpaid, or that become due pending the sale of the Property under the Plan;

to take charge and enter into possession of the Property; to keep the Property insured against loss

by damage or fire; to pay the taxes, assessments, water rates, sewer rents, vault rents, salaries of

---

[7] Debtor's opposition (ECF 114-117) included a copy of the Lease, which is annexed hereto as Exhibit E.    The Lease dated November 1, 2016, allegedly entered into just sixty (60) days after the August 30, 2016 fraudulent conveyances at issue in the Adversary Proceeding, was entered into between the Debtor and Ultimate LLC for the term of thirty (30) years, commencing on November 1, 2016 and terminating on October 31, 2046.    Debtor's Opposition also annexed thereto a copy of a January 16, 2020 email exchange between Uziel Frankel and Debtor's former counsel (Karam Dahiya, Esq.), wherein Uziel Frankel, on behalf of Ultimate LLC, alleges to have "heard late yesterday evening that the landlord is in bankruptcy and that his situation may affect the lease rights of Ultimate Opportunities, LLC, the tenant." See ECF 115; January 16, 2020 email exchange between Uziel Frankel  (Ultimate LLC) and Karam Dahiya, Esq. annexed hereto as Exhibit F.

[8] See ECF 122; Transcripts of January 22, 2020 hearing (p. 18, ¶¶ 3-13) annexed hereto as Exhibit G.

[9] See ECF 121; Declaration of Mailing Certificate of Service annexed hereto as Exhibit H.

employees, supplies and other charges; to comply with all the lawful requirements of any municipal department or other authority of the municipality in which the mortgaged premises are situated; and to procure such fire, plate glass, liability and other insurance as may be reasonably necessary; to commence and prosecute all legal proceedings for the collection of rent, including actions for the removal of tenants and licensees. <u>See</u> Exhibit C

18.      On August 26, 2020, an Order Directing Vacatur of Commercial Premises was entered, therein authorizing the removal of the occupants of the Premises' commercial space, as follows:

> [B]ased on the "Bidding and Auction Procedures" annexed to the Plan as Exhibit A and incorporated in the Plan by reference in paragraph 78 of the Plan, providing for the sale of the Property "free and clear of all liens, claims, commercial leases not assumed under the Plan, and encumbrances," and upon the hearing held before this Court on January 22, 2010 2020 and August 12, 2020 (CEC), and after due deliberation and sufficient cause shown therefore, it is ORDERED, that all occupants of any portion of the commercial space at the Property, including without limitation Yehuda Salamon, Yidel's Shopping Cart, Inc., Yidel's Online Food Station, LLC., and Ultimate Opportunities, LLC., their employees, agents, members, managers, affiliates and assigns shall vacate the Property on or before September 20, 2020.[10]

19.      Despite Uziel Frankel acknowledging in a January 16, 2020 email to have received notice of this proceeding on January 15, 2020 (<u>see</u> ECF 115; Exhibit F) and despite Ultimate LLC having been served on February 21, 2020 with the notice of presentment of proposed order for the Eviction Motion (<u>see</u> ECF 121; Exhibit H) - Ultimate LLC did nothing to object to the entry of the August 26, 2020 Order, waiting nearly eight (8) months to file this motion presently before the Court.

20.      Part the basis of Ultimate LLC's motion is that the "Eviction Motion and Vacatur Order squarely violate New York Governor Andrew Cuomo's moratorium on

---

[10] <u>See</u> Exhibit D.

commercial evictions" on the basis that the "Executive Orders' prohibition encompassed all actions to exclude tenants from premises for non-payment, placing the Eviction Motion and Vacatur Order squarely at odds with the Executive Orders."[11] This argument fails on its face, as Ultimate LLC is not being evicted for non-payment of rent under the Lease.

21.    The August 26, 2020 *Order Directing Vacatur of Commercial Premises* authorizes the Plan Administrator to remove Ultimate LLC pursuant to paragraph 78 of the Plan, which directs for the Premises to be sold "free and clear of all liens, claims, commercial leases not assumed under the Plan, and encumbrances." Paragraph 94 of the Plan provides that any and all pre-petition leases not previously assumed shall be deemed rejected by the Debtor.

22.    Ultimate LLC's alleged lease was rejected. Id. Its recourse, if any, would be limited to filing a proof of claim as an unsecured creditor. Not surprisingly, Ultimate LLC has also failed to file a proof of claim.

23.    Even if the Ultimate LLC lease was a valid transaction, the November 1, 2016 lease is subject to the Galster Funding Mortgage dated August 30, 2016, and Gorlitz 2004 and 2006 mortgages.

## I.    ULTIMATE LLC IS A SHELL ACTING ON BEHALF OF YEHUDA SALAMON TO FURTHER THIS CLASSIC FRAUDULENT CONVEYANCE SCHEME

24.    The sworn testimony of Uziel Frankel (sole member of Ultimate LLC) and Yehuda Salamon (sole member of Debtor) unequivocally demonstrates how the insider relationship between them, has been used to perpetuate a fraud upon this Court.

25.    Specifically, the following facts are not in dispute:

       a.    Ultimate LLC's sole member is Uziel Frankel;[12]

---

[11] See ECF 139, ¶ 11.

[12] See Exhibit E.

b. The sole member of Lone Pine Associates, LLC ("Lone Pine") is Uziel Frankel;[13]

c. Lone Pine claimed in legal proceedings to be the "beneficial owner  of the real property at 25 Old Mill Road, Suffern, New York" ("25 Old Mill Rd"), in the action entitled Lone Pine Associates, LLC v. ISSM Protective Services, Inc. commenced by Lone Pine in the Supreme Court of the State of New York, Rockland County, under Index. No. 03447/2018. See Exhibit J, ¶ 1, 8.[14]

d. Suffern Partners, LLC ("Suffern") was then the record owner of 25 Old Mill Road;[15]

e. Yehuda Salamon claims to be a 45% owner of Suffern; and

f. Debtor's sole member is Yehuda Salamon.

26.     As demonstrated above, Suffern was the actual owner of 25 Old Mill Road, and Yehuda Salamon claimed to be 45% owner of Suffern.

27.     Uziel Frankel is the sole member of Ultimate LLC, and also the sole member of Lone Pine LLC.  Lone Pine LLC claimed to be the "beneficial owner" of property solely titled in Suffern Partners, LLC; an entity in which Yehuda Salamon claims a 45% interest. This claim was asserted in the action entitled Lone Pine Associates, LLC v. ISSM Protective Services, Inc. Uziel Frankel therefore has a history of using his companies for the "benefit" of Yehuda Salamon.

---

[13] See Chapter 11 Administrative Proof of Claim 12-1 in the amount of $311,628.42, filed on August 30, 2019 in Case No. 17-22218 (RDD), In re: RS Old Mill, LLC, annexed hereto as Exhibit I, wherein Uziel Frankel represents to be the "sole member" of Lone Pine.

[14] A true and correct copy of the Summons and Complaint filed on July 25, 2018 as NYSCEF Doc. 1 under Index No. 03447/2018 is annexed hereto as Exhibit J

[15] See Deed from RS Old Mills RD LLC to Suffern Partners, LLC dated September 5, 2017 and recorded with the Rockland County Clerk on September 14, 2017 as File No. 2017-0002939.

28.     In addition, the assumed name by which Ultimate Opportunities does business at the Premises is "Yidels US;" very similar to the "Yidel's" trade name by which Yehuda Salamon's entity Yidel's Shopping Cart, Inc., does business at the Premises.   See Exhibit L;[16] Exhibit M, para 2.[17]

29.     Any claim that the Lease signed by Uziel Frankel (on behalf of Ultimate LLC) and Yehuda Salamon (as principal of Debtor) reflects a legitimate arm's length transaction is simply false.

II.   **THE LEASE WAS OBTAINED FOR THE SOLE PURPOSE OF INSULATING DEBTOR FROM HAVING TO FORFEIT POSSESSION OF THE PREMISES**

30.     The motion reflects the coordinated efforts of Debtor and Ultimate LLC to further perpetuate the fraud on this Court.   The Debtor falsely seeks to retain long-term possession of the Premises, under the guise that Ultimate LLC is a legitimate tenant occupying the Premises pursuant to a thirty (30) year lease.[18]

31.     Ultimate LLC asserts the Debtor instructed it to make pre-petition rent payments to a third-party, and not the Debtor (in direct contrast to the representations made by Yehuda Salamon that no rent had been collected). However, Ultimate LLC failed to document the payee of the pre-petition rent was not a Yehuda Salamon entity.  At the August 12, 2020 hearing, this office was instructed to serve supplemental discovery demands on Ultimate LLC for, inter alia, copies of the front and backs of checks for the alleged pre-petition rent payments

---

[16] A true and correct copy of the State of New Jersey Department of the Treasury Filing Certificate for Ultimate LLC's alternative name designation "YIDELS US") is annexed hereto as Exhibit K.

[17] Annexed hereto as Exhibit L are true and correct copies of the Consent to Change Attorneys filed as NYSCEF Doc. Nos. 135-137, and Affirmation of Yehuda Salamon filed as NYSCEF Doc. 99 in Index No. 520434/2016, all containing sworn statements of Yehuda Salamon wherein he represents, *inter alia*, to be the "authorized representative" of Yidel's Shopping Cart, Inc., 4921 12th Avenue LLC, Yidel's Fresh Food State, LLC, Yidels Online Food State, LLC, The Shopping Cart, Inc. and Yidel's Grocery, Inc.

[18] Ultimate LLC took the trade name in New Jersey as Yidel's, which is the same name used by Yehuda Salamon in New York at the Premises. The Lease was granted by Yehuda Salamon to Ultimate LLC on November 11, 2016 shortly after the fraud perpetrated on Galster Funding on August 30, 2016.

to third-parties. This request had been previously made by e-mail and as a supplement to the response to an initial document request after receipt of copies of the face sides of the pre-petition rent checks made payable to a third-party. Despite service of the Supplemental Demands on Ultimate LLC on August 14, 2020, Ultimate LLC has failed to produce any documents demonstrating the identification of the third-party payee, the account into which the checks were deposited, copies of the reverse sides of the pre-petition rent checks, or other documentation that the entity actually paid pre-petition rent was not controlled by Yehuda Salamon.[19]  That Ultimate LLC has refused to demonstrate payment of pre-petition rent to a disinterested third-party further demonstrates Ultimate LLC is acting in concert with Yehuda Salamon to perpetrate a fraud on the Court and the creditors.

### III.    YEHUDA SALAMON ADMITS IN JUDICIAL PROCEEDINGS THAT HIS ENTITIES ARE IN POSSESSION OF THE PREMISES AFTER NOVEMBER 1, 2016.

32.    On July 24, 2020 Deborah Heller filed an Amended Complaint against Yidel's Fresh Food Station, LLC and Yidel's Shopping Cart Inc. in the action entitled <u>Heller v. Yidel's Fresh Food Station, LLC et al</u>, in the Supreme Court of the State of New York, Kings County under Index No. 511522/2020.[20] The Amended Complaint sought damages for personal injury occurring on December 29, 2017 at the Debtor's premises.

33.    The Amended Complaint alleges in relevant part as follows:

40. At all times herein mentioned, the defendant YIDEL'S SHOPPING CART INC. was a **lessee** of the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY

41. At all times herein mentioned, the defendant YIDEL'S SHOPPING CART INC. Defendant's servants, agents and/or

---

[19] A copy of the August 14, 2020 Supplemental Discovery Demands is annexed hereto as Exhibit M.

[20] A copy of the Amended Complaint filed as NYSCEF Doc. 7 is annexed hereto as Exhibit N. The initial Complaint filed in this action on June 5, 2018 as NYSCEF Doc. 1, named only Yidel's Fresh Food Station, LLC as a defendant therein.

employees **operated** the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY

42. At all times herein mentioned, the defendant YIDEL'S SHOPPING CART INC. Defendant's servants, agents and/or employees **maintained** the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY

43. At all times herein mentioned, the defendant YIDEL'S SHOPPING CART INC. Defendant's servants, agents and/or employees **managed** the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY

(Emphasis added).

34.     Yehuda Salamon is the principal of Yidel's Shopping Cart, Inc. ("YSC"). YSC's Verified Answer to the Amended Complaint filed on September 13, 2018 as NYSCEF Doc. 9, admitted the allegations of it leasing, operating, managing and maintaining the Premises as of December 29, 2017 as contained in Paragraphs "40", "41", "42", and "43" of the Amended Complaint.[21] These admissions directly contradict the claim that Ultimate LLC had a bona-fide lease for the Premises commencing November 1, 2016 and that Ultimate LLC has been in possession of the Premises since November 1, 2016.

35.     Additionally, On May 15, 2020, Erie Insurance Company commenced a separate action against Yidel's Shopping Cart, Inc., YSC Fresh Food Station, LLC, and Deborah Heller in the United State District Court for the Eastern District of New York, as Case No. 1:20-cv-02199-RRM.[22]  This claim was for a declaratory judgment arising out of insurance coverage for  Ms. Heller's accident at the Premise on December 29, 2017.

36.     The Complaint states in relevant part as follows:

11.     Heller alleges that on or about December 29, 2017, she was injured while lawfully on a premises owned and operated by YFF and/or YSC, located at 4921 12th Avenue, Brooklyn, New York (the "Premises"), solely as a result of a failure by YFF and/or YSC

---

[21] A copy of the Verified Answer filed as NYSCEF Doc ECF 1 is annexed hereto as Exhibit O.

[22] A copy of the Complaint filed as ECF 1 is annexed hereto as Exhibit P.

to maintain the Premises in a reasonably safe and suitable condition and in good repair (the "Underlying Incident").

**12.    Prior to the Underlying Incident, ERIE issued an Ultrapack Plus insurance policy to YSC (Policy No. Q97-1541360), that was effective at the relevant time (the "ERIE Policy"). . .**

**15.    After the Underlying Incident, YFF and/or YSC, through their principal, Yehuda Salomon ("Salomon"), advised ERIE of Heller's alleged accident, claim and the Underlying Action.**

\*        \*        \*

17. ERIE advised YSC of its obligation to cooperate with its investigation, settlement, and defense, and specifically sought the cooperation of Salomon in his capacity as YSC's principal.

\*        \*        \*

30.    As a direct result of Salomon's failure to cooperate in his capacity as YSC's principal, the court in the Underlying Action has precluded YSC from offering Salomon's testimony in defense of Ms. Heller's claim, materially prejudicing ERIE's ability to defend YSC in the Underlying Action.[23]

(Emphasis added).

37.    Upon information and belief Yehuda Salomon is also the sole member of YSC Fresh Food Station, LLC.  Neither YSC or Yidel's have answered the Erie complaint despite being served on May 19, 2020 and May 21, 2020, respectively.  See Exhibit Q.  The allegations that Yidel's insured the premises on December 24, 2017 is therefore admitted.

38.    Yehuda Salomon (sole member of Debtor) has therefore repeatedly conceded to Yidel's being in possession of the Premise after November 1, 2016 in other judicial proceedings.

---

[23] No Answer or response to the Complaint was filed.

39.     Based on the foregoing it is clear the Lease is not a legitimate arms-length

transaction.  Denial of Ultimate LLC's motion is therefore warranted.

Dated: New York, New York
        September 21, 2020                    **BUTLER, FITZGERALD, FIVESON**
                                              **& McCARTHY**
                                              A Professional Corporation
                                              *Attorneys for Interested Party*
                                              *Old Republic National Title Insurance Company*


                                              By:     */s/ David K. Fiveson*
                                              _____
                                                      David K. Fiveson, Esq.
                                              A Principal of the Firm
                                              9 East 45th Street, Ninth Floor
                                              New York, New York 10017
                                              (212) 615-2200

**FILED: KINGS COUNTY CLERK 01/03/2018 04:11 PM**

NYSCEF DOC. NO. 361

INDEX NO. 519469/2016

RECEIVED NYSCEF: 01/03/2018

At an IAS Term, Comm 4 of the Supreme Court of
the State of New York, held in and for the County of
Kings, at the Courthouse, at Civic Center, Brooklyn,
New York, on the 27th day of December, 2017

PRESENT:

HON. LAWRENCE KNIPEL,

                          Justice.

-------------------------------------X

BEIS CHASIDEI GORLITZ,

              Plaintiff,

      - against -

4921 12TH AVENUE LLC, YEHUDA SALAMON, ETTY
SALAMON AND GALSTER FUNDING, LLC,

             Defendants.

-------------------------------------X

                               **ORDER**

                               Index No.: 519469/16

      Plaintiff moves for summary judgment declaring the satisfactions of mortgage relating to the mortgage issued by plaintiff as nullities; deeming the mortgage issued by defendant Galster Funding LLC a nullity and removed as of record as a lien; ruling that the forbearance agreement was breached by defendants; and issuing plaintiff a deed to the property.

      Plaintiff bases its motion on the grounds that the Satisfactions of Mortgage are forged documents, because the Forbearance Agreement is a fully negotiated, enforceable contract and because a valid satisfaction of mortgage requires that the lenders signature be acknowledged/ notarized, which they were not.

      Defendant's opposition rests upon his contention that he paid back 1.8 million dollars of the underlying mortgage in cash.  Said payments are entirely uncorroborated.  Any payments defendant

1

MS #14

FILED: KINGS COUNTY CLERK 01/03/2018 04:11 PM
NYSCEF DOC. NO. 361

INDEX NO. 519469/2016
RECEIVED NYSCEF: 01/03/2018

can demonstrate are entirely consistent with the forbearance or other agreements. Based upon this bald faced claim of payment, defendant asserts a difficult to believe tale of manipulation, deceit and duplicity.

It is incredible as a matter of law that defendant would pay off the underlying mortgage with cash and not be able to proffer any corroboration of payment, whatsoever. Indeed, the uncontested affidavit of the notary, Schner Z. Grossberger, and the terms of the Forbearance Agreement (which defendant now conveniently claims to have been tricked into entering) only reinforce this court's opinion that no material issue of fact is present.

Accordingly, summary judgment is granted in plaintiff's favor, but not for the branch of the motion seeking to void the Galster mortgage. However, the Gorlitz mortgage shall have priority over the Galster mortgage. In light of the above decision, further legal memos concerning acknowledgment of the satisfactions are academic and therefore unnecessary.

Settle order on notice.

The foregoing constitutes the decision and order of this court.

ENTER,

J.S.C.

HON. LAWRENCE KNIPEL

2

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re                                                    Chapter 11

    4921 12th Avenue, LLC                          Case no.  18-47256-CEC

           Debtor.
--------------------------------------------------------x

**<u>ORDER CONFIRMING MORTGAGEE'S PLAN OF REORGANIZATION[1]</u>**

       Galster Funding LLC (the "Proponent" or the "Mortgagee") having proposed its Plan of Reorganization (the "Plan") dated May 1, 2019 for debtor 4921 12th Avenue, LLC (the "Debtor"); and the Disclosure Statement approved in connection with the Plan having been transmitted to creditors and equity security holders, and upon the Declaration in Support of Plan Confirmation of Robert Liner executed on  July 15, 2019, and upon the hearing held before this Court on July 17, 2019 (the "Confirmation Hearing"), and upon the entire record of this case, and the Court having found:  (a) that the requirements for confirmation of the Plan set forth in 11 U.S.C. 1129(a) have been satisfied at the Confirmation Hearing, and (b) that cause exists for the Court to order that the stay under Bankruptcy Rule 3020(e) shall not apply to this Order; it is

       ORDERED, that since the Debtor is a limited liability company and the Plan is a liquidating plan, paragraph 103 of the Plan providing for a discharge be, and it hereby is, deemed deleted; and it is further

       ORDERED, that paragraph 75 of the Plan is deemed amended as follows:

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Professional Fee Claims) must be filed and served on counsel for the Debtor and Proponent by no later than ~~the Confirmation Hearing~~ thirty ***five (CEC)*** days after ~~this~~ ***the Confirmation (CEC)*** Order is entered (the "Administrative Claims Bar Date") <u>and the Proponent shall serve</u>***, within 3 days of entry of the Confirmation Order, (CEC)*** <u>a notice of Administrative Claims Bar Date on all parties in interest substantially in the form annexed</u> ~~hereto~~ ***to the Confirmation Order (CEC)***. Any Person that is required to file and serve a request for payment

---

[1] All terms not defined herein shall have the same meaning as in the Plan.

of an Administrative Claim and fails to timely file and serve such request shall be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. Objections to requests for payment of Administrative Claims (except for Professional Fee Claims and Administrative Claims incurred in the ordinary course of the Debtor's business) must be filed and served on counsel for the Debtor, Proponent, and the party requesting payment of an Administrative Claim within thirty (30) days of the date such request for payment has been filed.

ORDERED, that pursuant to sections 1129 and 1141 of the Bankruptcy Code, the Plan be, and it hereby is, confirmed; and it is further

ORDERED, that in furtherance of the Plan, the Proponent and the Plan Administrator are authorized and directed to take any and all actions contemplated to be taken by them under the Plan; and it is further

ORDERED, that in accordance with Section 1141(a) of the Bankruptcy Code, the provisions of the Plan and this Confirmation Order are binding on the Proponent, the Debtor, each Creditor, and every other party-in-interest in this case and each of their respective successors and assigns (whether or not such Creditors or parties-in-interest voted to accept the Plan, whether or not they are impaired under the Plan, and whether or not any such Holder has filed, or is deemed to have filed, a proof of Claim or proof of Interest), and any other Person giving, acquiring, or receiving property under the Plan, and any lessor or lessee of property to or from the Debtor. The rights afforded in the Plan and the treatment of all Claims and Interests therein shall be in exchange for and in complete satisfaction of all Claims and Interests of any nature whatsoever, known or unknown, including, except as expressly provided in the Plan, interest accrued on or expenses incurred in connection with such Claims from and after the Petition Date, against the Debtor or its property or interests in property; and it is further

ORDERED, pursuant to Bankruptcy Code § 1146, the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the sale of the Property in accordance with the terms of the Plan, shall not be subject to any stamp, real estate transfer, documentary, registration, sales, added-value, mortgage release, mortgage recording, or similar tax; and it is further

2

ORDERED, that all entities holding Claims against or Interests in the Debtor that are treated under the Plan are hereby directed to execute, deliver, file, or record any document, and to take any action necessary to implement, consummate, and otherwise effect the Plan in accordance with their respective terms, and all such entities shall be bound by the terms and provisions of all documents executed and delivered by them in connection with the Plan; and it is further

ORDERED, in accordance with Section 1142 of the Bankruptcy Code, the Proponent and any other entity designated pursuant to the Plan, including, without limitation, the Plan Administrator, are hereby authorized, empowered, and directed to issue, execute, deliver, file, and record any document, and to take any action necessary or appropriate to implement, consummate, and otherwise effectuate the Plan in accordance with its terms, and all such entities shall be bound by the terms and provisions of all documents issued, executed, and delivered by them as necessary or appropriate to implement or effectuate the transactions contemplated by the Plan; and it is further

ORDERED, that the Debtor shall provide the Plan Administrator with (a) access to and assistance in locating any books and records of the Debtor that may reasonably be requested and (b) access to and assistance from the Debtor regarding the Debtor's books and records or factual information relevant to any Causes of Action or objections to Claims that may be brought by the Plan Administrator; and it is further

ORDERED, that the Debtor shall cooperate with any broker, auctioneer, and/or real estate professional to permit reasonable access to the Property for marketing purposes; and it is further

ORDERED, that the Proponent shall be the disbursing agent under the Plan responsible for making distributions under the Plan, and shall file a disbursement report with the Bankruptcy Court upon making such distributions, and it is further

ORDERED, that the Plan Administrator shall file, within 45 days after the date of this Order, a status report detailing the actions taken by the Debtor and the progress made toward the consummation of the Plan; and it is further

3

ORDERED, that the Plan Administrator shall file status reports with the Court every January 15th, April 15th, July 15th, and October 15th until a final decree has been entered closing the Debtor's chapter 11 case; and it is further

ORDERED, that the Plan Administrator shall pay to the United States Trustee all fees due and payable by the Debtor, if any, under and pursuant to 28 U.S.C. § 1930, plus all applicable interest thereon, until the Debtor's chapter 11 case is either dismissed, converted to chapter 7, or until a final decree is entered closing the Debtor's chapter 11 case, whichever is earlier; and it is further

ORDERED, the Proponent and any designee, its respective equity holders, directors, officers, employees, attorneys, financial advisors, investment bankers and other professionals have acted in good faith in connection with the Plan, this Chapter 11 Case, and the formulation and consummation of the Plan, and accordingly, has satisfied Section1125(e) of the Bankruptcy Code; and it is further

ORDERED, that except as otherwise expressly provided in the Plan, or any other Order of this Court, all persons or entities who have held, hold or may hold Claims against or Interests in the Debtor, along with their respective present and former employees, agents, officers, directors, principals and affiliates, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against the Proponent and/or the Debtor's assets and/or properties with respect to such Claim or Interest (other than actions brought to enforce any rights or obligations under the Plan):

a) commencing or continuing in any manner any action or other proceeding of any kind,

b) enforcing, attaching, collecting or recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree or order,

c) creating, perfecting, or enforcing, in any manner, directly or indirectly, any encumbrance of any kind,

d) asserting any right of setoff, subrogation or recoupment of any kind, or

e) pursuing any Claim released pursuant to the Plan;

and it is further

4

ORDERED, that except as otherwise provided in the Plan, such injunction shall extend to any successors of the Proponent, the Debtor, and their respective properties and interests in properties. Additionally, upon the entry of this Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present and former employees, agents, officers, directors, principals and affiliates are hereby enjoined (from taking any actions other than by or in connection with an appeal of this Confirmation Order) to interfere with the implementation or consummation of the Plan. Unless otherwise provided in the Plan, this Confirmation Order, or a separate order of the Court, all injunctions or stays arising under or entered during the Chapter 11 cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the date of this Confirmation Order shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay; provided, however, that on the Effective Date, the stay shall be replaced to the extent provided in this Confirmation Order, with an injunction set forth in the Plan and/or Sections 524 and 1141 of the Bankruptcy Code; and it is further

ORDERED, that this Court hereby retains exclusive jurisdiction over this Order, and to hear and to determine all controversies, suits and disputes, if any, as may arise in connection with the consummation of the Plan; and it is further

ORDERED, that this Order shall not be stayed under Bankruptcy Rule 3020(e).

**Dated: Brooklyn, New York**
**July 30, 2019**

5

**Carla E. Craig**
**United States Bankruptcy Judge**

311

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re                                                    Chapter 11

      4921 12th Avenue, LLC                    Case no.  18-47256

                Debtor.
------------------------------------------------------------x

## **ORDER**

      Upon the application ("Application") of Mark Frankel ("Plan Administrator"), the Plan

Administrator of the confirmed plan ("Plan") in the case of 4921 12th Avenue, LLC's (the

"Debtor"), as and for an order under sections 105, 1127 and 1142 of the Bankruptcy Code

authorizing, among other things, the Plan Administrator to replace current management of the

Property with a professional third party managing agent, and upon the hearing held before this Court

on January 22, 2020, and after due deliberation and sufficient cause appearing therefor, it is

      ORDERED, that the Application is granted; and it is further

      ORDERED, that Plan Administrator be, and hereby is, authorized to employ Alayne Real

Estate Inc., with an address at 3004 Avenue L, Brooklyn, New York 11210, as professional third-

party managing agent ("Managing Agent") acceptable to Galster Funding LLC and Old Republic

National Title Insurance; and it is further

      ORDERED, that on behalf of the Plan Administrator, the Managing Agent shall be

authorized to collect all rents and profits due and unpaid or that become due pending the sale of

the Property under the Plan; and it is further

ORDERED, that on behalf of the Plan Administrator, the Managing Agent is authorized to take charge and enter into possession of the Property; and it is further

ORDERED, that on behalf of the Plan Administrator, the Managing Agent is authorized to keep the Property insured against loss by damage or fire; to pay the taxes, assessments, water rates, sewer rents, vault rents, salaries of employees, supplies and other charges; to comply with all the lawful requirements of any municipal department or other authority of the municipality in which the mortgaged premises are situated; and to procure such fire, plate glass, liability and other insurance as may be reasonably necessary; and it is further

ORDERED, that on behalf of the Plan Administrator, the Managing Agent is authorized commence and prosecute all legal proceedings for the collection of rent, including actions for the removal of tenants and licensees; and it is further

ORDERED, that the tenants and occupants shall attorn to the Managing Agent on behalf of the Plan Administrator; and it is further

ORDERED, that pursuant to the provisions of the General Obligations Law section 7-105, anybody holding any deposits or advances or rental as security under any lease or license agreement affecting space in the Property shall turn same over to the Managing Agent within five (5) days; and thereupon the Managing Agent shall hold such security as required under the General Obligations Law; and it is further

ORDERED, that the Debtor or anybody in possession, turn over to the Managing Agent all rents collected relating to the Property; and it is further

ORDERED, that anybody in possession of same shall turn over to the Managing Agent all property belonging to the Debtor including cash on hand, books and records, rent lists, orders,

2

unexpired and expired leases, agreements, correspondence, notices and registration statements relating to rental space or facilities at the Property; and it is further

ORDERED, that the Debtor, the Property tenants, licensees or other persons in possession are enjoined and restrained from collecting the rents, license fees and other charges of the Property and from interfering in any manner with the Property or its possession; and from transferring, removing or in any way disturbing any of the occupants or employees; and that all tenants, occupants; employees and licensees of the premises and other persons liable for the rents be and hereby are enjoined and restrained from paying any rent or license fees or other charges for such premises to the Debtor, its agents servants or attorneys; and it is further

ORDERED, that the Plan Administrator may apply to this Court for further or other instructions or powers necessary to enable the Plan Administrator and the Managing Agent to implement the Plan.

**Dated: Brooklyn, New York**
**March 12, 2020**

3

_Carla E. Craig_
**Carla E. Craig**
**United States Bankruptcy Judge**

314

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re                                                    Chapter 11

     4921 12th Avenue, LLC                        Case no.  18-47256-CEC

              Debtor.
-------------------------------------------------------x

<u>ORDER</u> ~~GRANTING MOTION TO EVICT~~
***DIRECTING VACATUR OF COMMERCIAL PREMISES (CEC)***

       Upon the motion of Mark Frankel as plan administrator ("Plan Administrator") of the confirmed Chapter 11 plan ("Plan," docket no. 51) for the entry of an order under sections 105, 1127 and 1142 of the Bankruptcy Code authorizing the Plan Administrator to remove the occupants of the commercial space at the Debtor's property at 4921 12th Avenue, Brooklyn, New York ("Property") based on the "Bidding and Auction Procedures" annexed to the Plan as Exhibit A and incorporated in the Plan by reference in paragraph 78 of the Plan, providing for the sale of the Property "free and clear of all liens, claims, commercial leases not assumed under the Plan, and encumbrances," and upon the hearing held before this Court on January 22, ~~2010~~ ***2020 and August 12, 2020 (CEC)***, and after due deliberation and sufficient cause shown therefore, it is

       ORDERED, that all occupants of any portion of the commercial space at the Property, including without limitation Yehuda Salamon, Yidel's Shopping Cart, Inc., Yidel's Online Food Station, LLC., and Ultimate Opportunities, LLC., their employees, agents, members, managers, affiliates and assigns shall vacate the Property on or before ~~August 31~~ ***September 20 (CEC)***, 2020.

**Dated: Brooklyn, New York**
**      August 26, 2020**

                            Carla E. Craig
                   **United States Bankruptcy Judge**

**Subject:** Ultimate Oppurtunities, LLC
**From:** Admor 770 <admor770@yahoo.com>
**Date:** 1/16/2020, 8:07 PM
**To:** "karam@dahiya.law" <karam@dahiya.law>

Mr. Karam:

Having spoken with you for two minutes today over the phone you seem to be a very nice person.  I am extremely
upset having heard late yesterday evening that the landlord is in bankruptcy and that his situation may affect the lease rights of
Ultimate Oppurtunities, LLC, the tenant.   Please notify the court ASAP that the tenant was never notified by anyone as to the Landlord's bankruptcy and submit any of the objections that are necessary.   I am today busy and trying to find a lawyer to represent the tenant's interest at the Bankruptcy Court.

As of today I did not retain any lawyer.

(The name of tenant is as is.  The typo in Oppurtunities is the way the company was filed.)

Thank you sincerely,

Uziel Frankel
(646) 832-8575

──Attachments:────────────────────────────────────────────

   Lease of Nov 1-2016.pdf                                                12.5 MB

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

IN RE: 4921 12TH AVENUE LLC

CASE NO: 18-47256

**DECLARATION OF MAILING
CERTIFICATE OF SERVICE**

Chapter: 11

On 2/21/2020, I did cause a copy of the following documents, described below,

Notice of Adjournment

Notice of Presentment of Order Appointing Managing Agent

Notice of Presentment of Writ of Assistance

Notice of Presentment of Order Authorizing Borrowing

to be served for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

I caused these documents to be served by utilizing the services of BK Attorney Services, LLC d/b/a certificateofservice.com, an Approved Bankruptcy Notice Provider authorized by the United States Courts Administrative Office, pursuant to Fed.R. Bankr.P. 9001(9) and 2002(g)(4).  A copy of the declaration of service is attached hereto and incorporated as if fully set forth herein.

Parties who are participants in the Courts Electronic Noticing System ("NEF"), if any, were denoted as having been served electronically with the documents described herein per the ECF/PACER system.

DATED: 2/21/2020

/s/ Mark Frankel
Mark Frankel  1989
Backenroth Frankel & Krinsky, LLP
800 Thrid Avenue
New York, NY  10022-0000
212 593 1100

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

IN RE: 4921 12TH AVENUE LLC

CASE NO: 18-47256

**CERTIFICATE OF SERVICE**
**DECLARATION OF MAILING**

Chapter: 11

On 2/21/2020, a copy of the following documents, described below,

Notice of Adjournment

Notice of Presentment of Order Appointing Managing Agent

Notice of Presentment of Writ of Assistance

Notice of Presentment of Order Authorizing Borrowing

were deposited for delivery by the United States Postal Service, via First Class United States Mail, postage prepaid, with sufficient postage thereon to the parties listed on the mailing matrix exhibit, a copy of which is attached hereto and incorporated as if fully set forth herein.

The undersigned does hereby declare under penalty of perjury of the laws of the United States that I have served the above referenced document (s) on the mailing list attached hereto in the manner shown and prepared the Declaration of Certificate of Service and that it is true and correct to the best of my knowledge, information, and belief.

DATED: 2/21/2020

Jay S. Jump
BK Attorney Services, LLC
d/b/a certificateofservice.com, for
Mark Frankel
Backenroth Frankel & Krinsky, LLP
800 Thrid Avenue
New York, NY  10022-0000

318

Case 1-18-47256-cec    Doc 121    Filed 02/24/20    Entered 02/24/20 09:57:49

PARTIES DESIGNATED AS "EXCLUDE" WERE NOT SERVED VIA USPS FIRST CLASS MAIL
PARTIES WITH A '+' AND DESIGNATED AS "CM/ECF E-SERVICE" RECEIVED ELECTRONIC NOTICE THROUGH THE CM/ECF SYSTEM

| | | |
|---|---|---|
| CASE INFO | | |
| LABEL MATRIX FOR LOCAL NOTICING | DEBTOR | CULHANE MEADOWS PLLC |
| 02071 | 4921 12TH AVENUE LLC | 100 PARK AVENUE |
| CASE 1-18-47256-CEC | 4921 12TH AVENUE | 16TH FLOOR |
| EASTERN DISTRICT OF NEW YORK | BROOKLYN NY 11219-3040 | NEW YORK NY 10017-5538 |
| BROOKLYN | | |
| FRI FEB 21 11-52-57 EST 2020 | | |
| | | |
| OLD REPUBLIC NATIONAL TITLE INSURANCE | 271 C CADMAN PLAZA EAST SUITE 1595 | BEIS CHASIDEI GORLITZ |
| COMPAN | BROOKLYN NY 11201-1800 | CO BERKMAN HENOCH ET AL |
| 521 5TH AVENUE | | 100 GARDEN CITY PLAZA |
| 23RD FLOOR | | GARDEN CITY NY 11530-3203 |
| NEW YORK NY 10175-2399 | | |
| | | |
| BEIS CHASIDEI GORLITZ | BUTLER FITZGERALD FIVESON  MCCARTHY PC | GALSTER FUNDING LLC |
| CO HERRICK FEINSTEIN LLP | 9 EAST 45TH STREET NINTH FLOOR | 9 EAST 45TH ST 9TH FLOOR |
| 2 PARK AVENUE | NEW YORK NEW YORK 10017-8456 | NEW YORK NY 10017-8456 |
| NEW YORK NY 10016-5702 | | |
| | | |
| GALSTER FUNDING LLC | GALSTER FUNDING LLC | GALSTER FUNDING LLC |
| 9 EAST 45TH STREET NINTH FLOOR | CO BACKENROTH FRANKEL  KRINKSY LLP | CO HARRY ZUBLI ESQ |
| NEW YORK NY 10017-2425 | 800 3RD AVE FL 11 | 1010 NORTHERN BOULEVARD SUITE 310 |
| | NEW YORK NY 10022-7651 | GREAT NECK NY 11021-5329 |
| | | |
| INTERNAL REVENUE SERVICE | OFFICE OF THE UNITED STATES TRUSTEE | OLD REPUBLIC NATIONAL TITLE INSURANCE |
| PO BOX 7346 | EASTERN DISTRICT OF NY BROOKLYN OFFICE | COMPAN |
| PHILADELPHIA PA 19101-7346 | US FEDERAL OFFICE BUILDING | CO BUTLER FITZGERALD FIVESON |
| | 201 VARICK STREET SUITE 1006 | MCCARTHY PC |
| | NEW YORK NY 10014-4811 | 9 EAST 45TH STREET 9TH FLOOR |
| | | NEW YORK NEW YORK 10017-8456 |
| | | |
| OLD REPUBLIC NATIONAL TITLE INSURANCE | YIDELS ONLINE FOOD STATION LLC | ALLA KACHAN |
| COMPAN | ECOMMERCE EXPAND LLC | 3099 CONEY ISLAND AVENUE |
| A FLORIDA CORPORATION | CO DAHIYA LAW OFFICES LLC | 3RD FLOOR |
| CO BUTLER FITZGERALD FIVESON  MCCARTHY | 75 MAIDEN LANE SUITE 506 | BROOKLYN NY 11235-6305 |
| NINE EAST 45TH STREET NINTH FLOOR | NEW YORK NY 10038-4631 | |
| NEW YORK NY 10017-2425 | | |
| | | |
| J TED DONOVAN | JOSEPH Y BALISOK | KARAMVIR DAHIYA |
| GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP | BALISOK  KAUFMAN PLLC | DAHIYA LAW OFFICES LLC |
| 1501 BROADWAY | 251 TROY AVENUE | 75 MAIDEN LANE |
| 22ND FLOOR | BROOKLYN NY 11213-3601 | SUITE 506 |
| NEW YORK NY 10036-5600 | | NEW YORK NY 10038-4631 |
| | | |
| ULTIMATE OPPORTUNITIES LLC | | |
| 110 CHESTNUT RIDGE ROAD | | |
| MONTVALE NJ 07645 | | |

FILED: ROCKLAND COUNTY CLERK 07/25/2018 12:05 PM

NYSCEF DOC. NO. 1

INDEX NO. 034447/2018

RECEIVED NYSCEF: 07/25/2018

**Supreme Court of the State of New York**
**County of Queens**

_____

LONE PINE ASSOCIATES, LLC,

                            Plaintiff,

- against -

ISSM PROTECTIVE SERVICES INC.,

                            Defendant.

_____

Index No.
Date Purchased: July 25, 2018
Plaintiff designates Rockland
County as the place of trial

The basis of the venue is
Plaintiff's place of business

**Summons**

Plaintiff does business at:
25 Old Mill Road
Suffern, NY
County of Rockland

To: The Above-Named Defendant(s)

    **You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, If the complaint is not served with this summons, to serve a notice of appearance, on Levine & Associates, P.C., Plaintiff's Attorneys, within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty days after the service is complete if the summons is not personally delivered to you within the State of New York); and in case of your failure to appear of answer, judgment will be taken against you by default for the relief demanded in the complaint.

_Dated:_ July 25, 2018

                        LEVINE & ASSOCIATES, P.C.
                        _Attorneys for Plaintiff_
                        15 Barclay Road
                        Scarsdale, New York 10583
                        Telephone (914) 600-4288
                        Facsimile (914) 725-4778

_Defendant's addresses:_

33 Mountain Avenue
Monsey, NY 10952

FILED: ROCKLAND COUNTY CLERK 07/25/2018 12:05 PM
NYSCEF DOC. NO. 1

INDEX NO. 034447/2018
RECEIVED NYSCEF: 07/25/2018

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

LONE PINE ASSOCIATES, LLC                     :   Index No.

                              Plaintiff,      :   COMPLAINT

            - against -                       :

ISSM PROTECTIVE SERVICES INC.,                :

                              Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

       Plaintiff, by and through its attorneys, Levine & Associates, P.C., complaining of the Defendant, respectfully sets forth as follows, upon information and belief:

### SUMMARY OF COMPLAINT

       1. Plaintiff is the beneficial owner and occupant of certain premises located at 25 Old Mill Road, Suffern, New York [the "Premises"]. Plaintiff has been conducting business from its offices in the Premises for many months at this point, has substantial inventory stored thereupon, and requires access to the Premises in order to meet potential customers and show them the inventory. Defendant is a security guard service hired by the record owner of the Premises. Defendant claims to be owed money from the record owner of the Premises, has filed a lien against the Premises for a part of those funds, and has announced that it would not permit Plaintiff (or anyone else) to enter the premises until Defendant was paid by the record owner of the Premises. Plaintiff has no knowledge as to the veracity of Defendant's monetary claim, however Plaintiff has now been physically prevented by Defendant from entering the Premises and conducting its business.

FILED: ROCKLAND COUNTY CLERK 07/25/2018 12:05 PM

NYSCEF DOC. NO. 1

INDEX NO. 034447/2018

RECEIVED NYSCEF: 07/25/2018

2. The inability to access its offices and inventory, to meet with potential buyers and exhibit the inventory, and to access its computers and files, is causing irreparable injury to Plaintiff. Despite notice of the same, Defendant continues to physically prevent Plaintiff from accessing its offices and inventory.

3. The actions of Defendant are illegal and give rise to several causes of action for monetary and injunctive relief. Specifically, those causes of action sound in wrongful ejectment, unlawful detainer, fraud, trespass, and conversion. Plaintiff brings this action to obtain (i) permanent injunctive relief prohibiting Defendant from denying or impeding Plaintiff's unfettered access to the Premises, (ii) an order discharging Defendant's purported "mechanic's lien" on the Premises on the grounds that a security services are not lienable as a matter of law, (iii) a money Judgment for treble damages, pursuant to RPAPL §853, as a result of the Defendant's disseizure, ejectment, and putting Plaintiff out of the Premises in an unlawful manner, and, thereafter, keeping Plaintiff out of the Premises by force, unlawful means, and putting Plaintiff in fear of personal violence; (iv) a money Judgment for property damage to Plaintiff's inventory, (v) punitive damages; and (vi) prejudgment interest.

## THE PARTIES

4. At all times relevant to this Complaint, Plaintiff was, and still is, a domestic limited liability company, organized and existing under, and by virtue of, the laws of the State of New York and conducting business in Rockland County, New York.

5. At all times relevant to this Complaint, Defendant was, and still is, a domestic corporation, duly organized and existing under, and by virtue of, the laws of the State of New York, and conducting business in Rockland County (among other places).

FILED: ROCKLAND COUNTY CLERK 07/25/2018 12:05 PM    INDEX NO. 034447/2018
NYSCEF DOC. NO. 1                                   RECEIVED NYSCEF: 07/25/2018

## JURISDICTION AND VENUE

6.  This court has jurisdiction over the parties because they are each a domestic corporation.

7.  Venue is proper in this Court because both parties conduct business in Rockland County and the events which form the basis for this Complaint took place in Rockland County.

## RELEVANT FACTS

8.  Plaintiff is the beneficial owner of the real property located at 25 Old Mill Road, Suffern, New York [the "Premises"].

9.  Plaintiff has been conducting business from its offices in the Premises for many months, has substantial inventory stored thereupon, and requires access to the Premises in order to meet potential customers and show them the inventory.

10.  Defendant is a security guard service hired by Suffern Partners LLC ("Suffern") the record owner of the Premises to provide a security guard at a kiosk at the entry to the Premises for security purposes.

11.  Apparently (and unbeknownst to Plaintiff) Suffern failed to pay Defendant, at least in part, for its services.  On December 18, 2017, Defendant filed a Notice Under Mechanic's Lien Law (2017-40553 in the Rockland County Clerk's Office) [the "12/2017 Mechanic's Lien"], alleging that it was employed by Suffern in September of 2017, that it performed $57,380.67 of work, and that it received payment of all but $29,144.62 of that sum.

12.  Defendant thereafter continued to perform security services at the Premises and now claims that it is owed funds well in excess of the amount stated on the 12/2017 Mechanic's Lien.

13.  In early July of 2018, Defendant advised Plaintiff that it would not permit Plaintiff to enter into the Premises, nor access its offices or storage space therein, until Defendant was paid in

FILED: ROCKLAND COUNTY CLERK 07/25/2018 12:05 PM
NYSCEF DOC. NO. 1

INDEX NO. 034447/2018
RECEIVED NYSCEF: 07/25/2018

full for the services it had previously rendered.  Defendant Asserted that it was permitted to deny such access by virtue of the existence of its purported Mechanic's Lien.

14.   Since that time, Defendant has physically prevented Plaintiff from entering the Building and/or accessing Plaintiff's inventory located therein.

15.   As a result, Plaintiff has been unable to bring potential business partners, inventory purchasers, or other guests into the premises, nor to sell or remove any of its inventory from the Premises.  In short, Plaintiff's business has been virtually shut down as a result of Defendant's actions.

## AS AND FOR A FIRST CAUSE OF ACTION:
### [Lien Law § 19 – Order Summarily Discharging Lien]

16.   Plaintiff repeats, reiterates and realleges, and hereby incorporates, each and every allegation heretofore set forth herein, with the same force and effect as though more fully set forth herein at length.

17.  Section 19(6) of the New York Lien Law of the State of New York provides that a lien may be summarily discharged by the Court, at the request of any interested party, where "it appears from the face of the notice of lien that the claimant has no valid lien by reason of the character of the labor or materials furnished and for which a lien is claimed …"

18.  Section 3 of New York's Lien Law provides, in relevant part, that "a … contractor, subcontractor, [or] laborer … who performs labor … *for the improvement of real property* with the consent or at the request of the owner thereof … shall have a lien for the principal and interest, of the value, or the agreed price, of such labor … upon the real property improved or to be improved and upon such improvement … " (emphasis added).

19.  Security guard services are, as a matter of New York law, not for "the improvement of real property," and, therefore, are not properly the subject matter of a mechanic's lien.

FILED: ROCKLAND COUNTY CLERK 07/25/2018 12:05 PM

NYSCEF DOC. NO. 1

INDEX NO. 034447/2018

RECEIVED NYSCEF: 07/25/2018

20.  As such, and pursuant to §19(6) of the Lien Law, Plaintiff is entitled to an Order by the Court summarily discharging the 12/2017 Mechanics Lien filed by Defendant and directing the Rockland County Clerk to discharge the same as of record.

## AS AND FOR A SECOND CAUSE OF ACTION:
### [RPAPL § 853 – Treble Damages For Wrongful Eviction]

21.  Plaintiff repeats, reiterates and realleges, and hereby incorporates, each and every allegation heretofore set forth herein, with the same force and effect as though more fully set forth herein at length.

22.  Section 853 of New York's Real Property Actions and Proceedings Law ("RPAPL") provides that: "If a person is disseized, ejected, or put out of real property in a forcible or unlawful manner, or, after he has been put out, is held and kept out by force or by putting him in fear of personal violence or by unlawful means, he is entitled to recover treble damages in an action therefor against the wrong-doer."

23.  Defendant, with no legal authority to do so, has, via the use or threat of physical force, put the Plaintiff out of the Premises and has kept Plaintiff from the Premises by force, by putting Plaintiff in fear of personal violence, and by unlawful means.

24.  Specifically, Defendant has manned a kiosk at the entrance to the Premises and has stationed an armed guard therein who has refused to permit Plaintiff access to the Premises via the threatened use of force.  Since Plaintiff held a right of possession prior to being ousted from (i.e., barred from entry onto) the Premises, Plaintiff, as a matter of New York law, has the right to recover triple its damages as a result.

25.  As a result of the wrongful eviction of Plaintiff from the Premises by Defendant, and Defendant's refusal to permit Plaintiff to conduct its business, and access or remove its inventory, in the Premises, Plaintiff has suffered, and will continue to suffer, damages in an amount not

FILED: ROCKLAND COUNTY CLERK 07/25/2018 12:05 PM

NYSCEF DOC. NO. 1

INDEX NO. 034447/2018

RECEIVED NYSCEF: 07/25/2018

capable of precise calculation, but which amount, unless Plaintiff is immediately permitted to return to its offices, conduct business, and remove its inventory, is expected to exceed the sum of $22,000,000.00.

26. As a result, Plaintiff is entitled to an award of compensatory damages in an amount of at least $22,000,000, trebled to $66,000,000, together with pre-Judgment interest and additional punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION:
### [Conversion]

21. Plaintiff repeats, reiterates and realleges, and hereby incorporates, each and every allegation heretofore set forth herein, with the same force and effect as though more fully set forth herein at length.

27. Plaintiff had (and retains) the possessory right and interest in its inventory located in the Premises.

28. Defendant has exercised dominion over Plaintiff's inventory and interfered with it, in derogation of Plaintiff's rights.

29. As such, Defendant has converted Plaintiff's property.

30. As a result of the conversion of Plaintiff's property by Defendant, Plaintiff has suffered damages in an amount not presently capable of precise calculation, but which amount, unless Plaintiff is immediately permitted to return to its offices, conduct business, and remove its inventory, is believed to exceed the sum of $22,000,000.00.

## AS AND FOR A FOURTH CAUSE OF ACTION:
### [Permanent Injunction]

FILED: ROCKLAND COUNTY CLERK 07/25/2018 12:05 PM

NYSCEF DOC. NO. 1

INDEX NO. 034447/2018

RECEIVED NYSCEF: 07/25/2018

31.  Plaintiff repeats, reiterates and realleges, and hereby incorporates, each and every allegation heretofore set forth herein, with the same force and effect as though more fully set forth herein at length.

32.  Unless Defendant is directed to cease and desist from interfering with Plaintiff's ability to enter and remain on the Premises, and conduct its business, Plaintiff will be irreparably injured in that its business will be entirely destroyed.

33.  As such, Plaintiff is entitled to a permanent injunction prohibiting Defendant from interfering in any way with Plaintiff's right to access the Premises and conduct its business thereupon.

**WHEREFORE**, Plaintiff respectfully demands Judgment against Defendant as follows:

Upon the First Cause of Action, an Order by the Court summarily discharging the 12/2017 Mechanics Lien filed by Defendant and directing the Rockland County Clerk to discharge the same as of record;

Upon the Second Cause of Action, (i) a compensatory monetary judgment in an amount to be proven at trial, but which amount is expected to exceed the sum of $22,000,000, trebled to the sum of $66,000,000.00; (ii) a punitive damage award in such amount as the trier of fact deems appropriate; and (iii) prejudgment interest on the trebled compensatory damage award.

Upon the Third Cause of Action, a compensatory monetary judgment in an amount to be proven at trial, but which amount is expected to exceed the sum of $22,000,000;

FILED: ROCKLAND COUNTY CLERK 07/25/2018 12:05 PM

NYSCEF DOC. NO. 1

INDEX NO. 034447/2018

RECEIVED NYSCEF: 07/25/2018

Upon the Fourth Cause of Action, a permanent injunction prohibiting Defendant from interfering in any way with Plaintiff's right to access the Premises, its offices thereupon, and its inventory, and conduct its business thereupon; and

Upon all Causes of action, the costs and taxable disbursements of this action, including reasonable attorney's fees, together with such other, further and different relief as is just, proper and equitable.

Dated: July 24, 2018

LEVINE & ASSOCIATES, P.C.

By: _____
        Michael Levine

15 Barclay Road
Scarsdale, NY 10583
Telephone (914) 600-4288
Facsimile (914) 725-4778
e-mail: ml@LevLaw.org

*Attorneys for Plaintiff*

STATE OF NEW JERSEY
DEPARTMENT OF THE TREASURY
FILING CERTIFICATE (CERTIFIED COPY)

Corporation Name:        ULTIMATE OPPURTUNITIES LLC
Business Id:             0450125258
Certificate Number:      6000122999


I, THE TREASURER OF THE STATE OF NEW JERSEY, DO HEREBY CERTIFY, THAT THE ABOVE
NAMED BUSINESS DID FILE AND RECORD IN THIS DEPARTMENT AN ALTERNATE NAME FILING ON
December 9, 2016 AND THAT THE ATTACHED IS A TRUE COPY OF THIS DOCUMENT AS THE SAME IS
TAKEN FROM AND COMPARED WITH THE ORIGINAL(S) FILED IN THIS OFFICE AND NOW REMAINING ON
FILE AND OF RECORD.


IN TESTIMONY WHEREOF, I HAVE HEREUNTO SET MY
HAND AND AFFIXED MY OFFICIAL SEAL AT
TRENTON, THIS
July 07, 2020 A.D.



ELIZABETH MAHER MUOIO
STATE TREASURER

VERIFY THIS CERTIFICATE ONLINE AT
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

329

| Mail to: | PO Box 308<br>Trenton, NJ 08646 | **STATE OF NEW JERSEY**<br>**DIVISION OF REVENUE** | Overnight to: | 33 West State St.<br>5th Floor<br>Trenton, NJ 08608-1214 |

*FEE REQUIRED*

## REGISTRATION OF ALTERNATE NAME

## C-150G

Complete the following applicable information, and sign in the space provided. Please note that once filed, the information contained in the filed form is considered public. **Refer to the instructions on page 26 for filing fees and field-by-field requirements.** Remember to remit the appropriate fee amount. Use attachments if more space is required for any field.

**Check Appropriate Statute:**

☐ Title 14A:2-2.1 (2) New Jersey Business Corporation Act     ☒ Title 42:2C-4 Limited Liability Company

☐ Title 15A:2-2-3 (b) New Jersey Nonprofit Corporation Act     ☐ Title 42:2A-6 Limited Partnership

Pursuant to the provisions of the appropriate statute, checked above, of the New Jersey Statutes, the undersigned corporation/business entity hereby applies for the registration of an Alternate Name in New Jersey for a period of five (5) years, and for that purpose submits the following application:

1.  Name of Corporation/Business:   ULTIMATE OPPURTUNITIES LLC

2.  NJ 10-digit ID number:   0450125258

3.  Set forth state of Original Incorporation/Formation:   NJ

4.  Date of Incorporation/Formation:   December 9, 2016

    Date of Authorization (Foreign):

5.  Alternate Name to be used:   YIDELS US

6.  State the purpose or activity to be conducted using the Alternate Name:   SALES

7.  The Business intends to use the Alternate Name in this State.

8.  The Business has not previously used the Alternate Name in this State in violation of this Statute, or, if it has, the month and year in which it commenced such use is: N/A

FILED DEC 9 2016 STATE TREASURER

0450125258

Signature requirements:

For Corporations    Chairman of the Board , President, Vice-President
For Limited Partnerships    General Partner
For all Other Business Types    Authorized Representative

SIGNATURE

**Authorized Representative**
TITLE:

Zalmen Grossberg
NAME (please type):

12/9/16
DATE:

### THE PURPOSE OF THIS FORM IS TO SIMPLIFY THE FILING REQUIREMENTS. IT DOES NOT REPLACE THE NEED FOR COMPETENT LEGAL ADVICE.

STATE OF NEW JERSEY
DEPARTMENT OF THE TREASURY
FILING CERTIFICATE (CERTIFIED COPY)

Corporation Name:     ULTIMATE OPPURTUNITIES LLC
Business Id:     0450125258
Certificate Number:     6000123000

   I, THE TREASURER OF THE STATE OF NEW JERSEY, DO HEREBY CERTIFY, THAT THE ABOVE
NAMED BUSINESS DID FILE AND RECORD IN THIS DEPARTMENT AN ORIGINAL CERTIFICATE ON
December 9, 2016 AND THAT THE ATTACHED IS A TRUE COPY OF THIS DOCUMENT AS THE SAME IS
TAKEN FROM AND COMPARED WITH THE ORIGINAL(S) FILED IN THIS OFFICE AND NOW REMAINING ON
FILE AND OF RECORD.

                   IN TESTIMONY WHEREOF, I HAVE HEREUNTO SET MY
                   HAND AND AFFIXED MY OFFICIAL SEAL AT
                   TRENTON, THIS
                   July 07, 2020 A.D.



ELIZABETH MAHER MUOIO
STATE TREASURER

VERIFY THIS CERTIFICATE ONLINE AT
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

331

FILED: KINGS COUNTY CLERK 01/19/2017 04:29 PM

INDEX NO. 520434/2016
NYSCEF DOC. NO. 97
RECEIVED NYSCEF: 01/19/2017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GALSTER FUNDING, LLC,

                        Index No.  520434/16

                 Plaintiff,

            -against-               **CONSENT TO CHANGE
ATTORNEY**

YEHUDA SALAMON, ETTY SALAMON,
YIDEL'S SHOPPING CART, INC., 4921 12th
AVENUE LLC, YIDELS FRESH FOOD
STATION, LLC, YIDELS ONLINE FOOD
STATION, LLC, THE SHOPPING CART, INC.,
YIDEL'S GROCERY, INC., and SIGNATURE
BANK,

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

       **IT IS HEREBY CONSENTED THAT**, Robinson Brog Leinwand Greene Genovese &
Gluck PC be substituted in the above-entitled action in place and stead of Condon & Associates
as attorneys for the Defendants YEHUDA SALAMON, ETTY SALAMON, YIDEL'S
SHOPPING CART, INC., 4921 12th AVENUE LLC, YIDELS FRESH FOOD STATION, LLC,
YIDELS ONLINE FOOD STATION, LLC, THE SHOPPING CART, INC. and YIDEL'S
GROCERY, INC as of the date hereof and demand that all papers in this action be served upon
the undersigned at the office and post office address stated below.

       This stipulation may be executed in any number of counterparts and when taken together
shall constitute one original document and PDF and/or facsimile signatures may be deemed
original.

Dated: New York, New York
        January 18, 2017

{00835888.DOC;1 }

1

CONDON & ASSOCIATES, PLLC

*Brian K. Condon*

Brian K. Condon, Esq.
55 Old Turnpike Road, Suite 502
Nanuet, New York 10954
(845) 627-8500
*Outgoing Attorneys for*
*Defendants Yehuda Salamon, Etty*
*Salamon, Yidel's Shopping Cart, Inc. ,*
*4921 12th Avenue LLC, Yidels Fresh Food*
*Station, LLC, Yidels Online Food Station,*
*LLC, The Shopping Cart, Inc. and Yidel's*
*Grocery, Inc..*

ROBINSON BROG LEINWAND
GREENE GENOVESE & GLUCK PC

*Sheldon Eisenberger*

Sheldon Eisenberger, Esq.
875 Third Avenue, 9th Floor
New York, NY 10022
Tel: (212) 603-6300
*Incoming Attorneys for*
*Defendants Yehuda Salamon, Etty*
*Salamon, Yidel's Shopping Cart, Inc. ,*
*4921 12th Avenue LLC, Yidels Fresh Food*
*Station, LLC, Yidels Online Food Station,*
*LLC, The Shopping Cart, Inc. and Yidel's*
*Grocery, Inc..*

**Consented and Agreed To:**

By: _____

Yehuda Salamon, individually and as authorized representative of
*Etty Salamon, Yidel's Shopping Cart, Inc. , 4921 12th Avenue LLC, Yidels Fresh Food*
*Station, LLC, Yidels Online Food Station, LLC, The Shopping Cart, Inc. and Yidel's*
*Grocery, Inc..*

ACKNOWLEDGMENT

STATE OF NEW YORK,
COUNTY OF NEW YORK

On January 3__, 2017, before me, the undersigned notary public, personally appeared Yehuda
Salamon, personally known to me or proved to me on the basis of satisfactory evidence to be the
individual whose name is subscribed to in the within instrument, and acknowledged to me that he
executed the same in his individual and representative capacity, and that by his signature on the
instrument, the individual executed the instrument.

_____
Notary Public

Frank J. Claps
Notary Public, State of New York
No. 24-4803025
Qualified in Richmond County
Commission Expires June 30, 20__

{00835888.DOC;1 }

2

FILED: KINGS COUNTY CLERK 02/22/2017 11:15 AM

INDEX NO. 520434/2016

NYSCEF DOC. NO. 136

RECEIVED NYSCEF: 02/22/2017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GALSTER FUNDING, LLC,

Index No. 520434/16

Plaintiff,

-against-

**CONSENT TO CHANGE
ATTORNEY**

YEHUDA SALAMON, ETTY SALAMON,
YIDEL'S SHOPPING CART, INC., 4921 12th
AVENUE LLC, YIDELS FRESH FOOD
STATION, LLC, YIDELS ONLINE FOOD
STATION, LLC, THE SHOPPING CART, INC.,
YIDEL'S GROCERY, INC., and SIGNATURE
BANK,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IT IS HEREBY CONSENTED THAT, BERG & DAVID, PLLC

is substituted as attorneys for defendants Yehuda Salamon, Etty Salamon, Yidel's Shopping Cart,

Inc., 4921 12th Avenue LLC, Yidels Fresh Food Station, LLC, Yidels Online Food Station, LLC,

The Shopping Cart, Inc. and Yidel's Grocery, Inc. (the "Salamon Defendants"), in place and in stead

of Robinson Brog Leinwand Greene Genovese & Gluck PC. This Consent to Change Attorney may

be executed in any number of counterparts and when taken together shall constitute one original

document, and email and facsimile signatures shall be deemed originals.

Dated: February 15, 2017

Robinson Brog Leinwand Greene
Genovese & Gluck P.C.
Outgoing Attorneys for the Salamon Defendants

By: Sheldon Eisenberger
875 Third Avenue, 9th Floor
New York, New York 10022
(212) 603-6300

BERG & DAVID, PLLC

Incoming Attorneys for the Salamon Defendants

By: Madeline Greenblatt, ESQ.

{00841528.DOC;1 }

334

FILED: KINGS COUNTY CLERK 02/22/2017 11:15 AM

NYSCEF DOC. NO. 136

INDEX NO. 520434/2016

RECEIVED NYSCEF: 02/22/2017

AGREED AND ACCEPTED:

_____

Yehuda Salamon, individually and on behalf of
Yidel's Shopping Cart, Inc., 4921 12th Avenue
LLC, Yidels Fresh Food Station, LLC, Yidels
Online Food Station, LLC, The Shopping Cart,
Inc. and Yidel's Grocery, Inc.

AGREED AND ACCEPTED:

_____

Etty Salamon

ACKNOWLEDGMENT

On February 21, 2017, before me, the undersigned notary public, personally appeared Yehuda
Salamon, personally known to me or proved to me on the basis of satisfactory evidence to be the
individual whose name is subscribed to in the within instrument, and acknowledged to me that he
executed the same in his capacity, and that by his signature on the instrument, the individual
executed the instrument.

_____
Notary Public

NICKY LEGAKIS
NOTARY PUBLIC-STATE OF NEW YORK
No. 01LE6178684  Richmond
Qualified in Kings County
My Commission Expires 12/10/2019

ACKNOWLEDGMENT

On February 21, 2017, before me, the undersigned notary public, personally appeared Etty Salamon,
personally known to me or proved to me on the basis of satisfactory evidence to be the individual
whose name is subscribed to in the within instrument, and acknowledged to me that she executed the
same in her capacity, and that by her signature on the instrument, the individual executed the
instrument.

_____
Notary Public

NICKY LEGAKIS
NOTARY PUBLIC-STATE OF NEW YORK
No. 01LE6178684  Richmond
Qualified in Kings County
My Commission Expires 12/10/2019

{00841528.DOC;1 }

FILED: KINGS COUNTY CLERK 02/23/2017 11:35 PM

INDEX NO. 520434/2016
NYSCEF DOC. NO. 137                                              RECEIVED NYSCEF: 02/23/2017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

---------------------------------------------------------------------X

GALSTER FUNDING LLC,

                    Plaintiff,

    - against -

YEHUDA SALAMON, ETTY SALOMON, YIDEL'S SHOPPING
CART, INC., 4921 12TH AVENUE LLC, YIDEL'S FRESH FOOD
STATION LLC, YIDEL'S ONLINE FOOD STATION, LLC, THE
SHOPPING CART, INC., YIDEL'S GROCERY INC., and
SIGANTURE BANK,

                    Defendants.

---------------------------------------------------------------------X

**CONSENT TO**
**CHANGE**
**ATTORNEY**

Index No.:
520434/2016

      IT IS HEREBY CONSENTED that Berg & David, PLLC is substituted as attorneys of

record for Defendants YEHUDA SALAMON, ETTY SALOMON, YIDEL'S SHOPPING CART,

INC., 4921 12TH AVENUE LLC, YIDEL'S FRESH FOOD STATION LLC, YIDEL'S ONLINE

FOOD STATION, LLC, THE SHOPPING CART, INC., YIDEL'S GROCERY INC.,

("Defendants") in this action in place and stead of the undersigned attorney as of the date hereof.

Dated: Brooklyn, New York
      February 23, 2017

BERG & DAVID, PLLC

*Madeline Greenblatt*
_____
By: Madeline Greenblatt, Esq.
*Outgoing Attorneys*
266 Broadway, Suite 503
Brooklyn, New York 11211

LEVINE & ASSOCIATES, PC

_____
By: Michael Levine, Esq.
*Incoming Attorney*
15 Barclay Road
Scarsdale, New York 10583

By: _____
    Yehuda Salomon, individually and as authorized representative of
    YEHUDA SALAMON, ETTY SALOMON, YIDEL'S SHOPPING CART, INC., 4921
    12TH AVENUE LLC, YIDEL'S FRESH FOOD STATION LLC, YIDEL'S ONLINE
    FOOD STATION, LLC, THE SHOPPING CART, INC., YIDEL'S GROCERY INC.

FILED: KINGS COUNTY CLERK 01/19/2017 04:29 PM

INDEX NO. 520434/2016
NYSCEF DOC. NO. 97
RECEIVED NYSCEF: 01/19/2017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GALSTER FUNDING, LLC,

Index No. 520434/16

Plaintiff,

-against-

**CONSENT TO CHANGE
ATTORNEY**

YEHUDA SALAMON, ETTY SALAMON,
YIDEL'S SHOPPING CART, INC., 4921 12th
AVENUE LLC, YIDELS FRESH FOOD
STATION, LLC, YIDELS ONLINE FOOD
STATION, LLC, THE SHOPPING CART, INC.,
YIDEL'S GROCERY, INC., and SIGNATURE
BANK,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**IT IS HEREBY CONSENTED THAT**, Robinson Brog Leinwand Greene Genovese &
Gluck PC be substituted in the above-entitled action in place and stead of Condon & Associates
as attorneys for the Defendants YEHUDA SALAMON, ETTY SALAMON, YIDEL'S
SHOPPING CART, INC., 4921 12th AVENUE LLC, YIDELS FRESH FOOD STATION, LLC,
YIDELS ONLINE FOOD STATION, LLC, THE SHOPPING CART, INC. and YIDEL'S
GROCERY, INC as of the date hereof and demand that all papers in this action be served upon
the undersigned at the office and post office address stated below.

This stipulation may be executed in any number of counterparts and when taken together
shall constitute one original document and PDF and/or facsimile signatures may be deemed
original.

Dated: New York, New York
January 18, 2017

{00835888.DOC;1 }

1

| | |
|---|---|
| In re: 4921 12th Avenue LLC | Bankruptcy Case No.: 1−18−47256−cec |
| -----------------------------------------------------------------------X | |
| Mark Frankel as Plan Administrator for 4921 12th Avenue LLC, | Adversary Proceeding No.: 1−19−01120−cec |
| Plaintiff, | |
| −against− | |
| | Assigned to: |
| Yehuda I Salamon | Judge Carla E. Craig |
| David Salamon | |
| Yidel's Shopping Cart, Inc. | |
| E−Commerce Expand, LLC | |
| Yidel's Online Food Station, LLC | |
| Yidel's Shopping Cart, Inc. d/b/a Riverstone Group | |
| Riverstone, USA, LLC | |
| John Doe No. 1 through John Doe No. 10, the last ten names being fictitious and unknown to Plaintiff, persons or parties intended being persons, corporations or others, being the current and former tenants or occupants of the Debtor's real property located at 4917-4921 12th Avenue, Brooklyn, New York | |
| Ultimate Oppurtunities, LLC a/k/a Ultimate Opportunities, LLC | |
| Defendant(s) | |
| -----------------------------------------------------------------------X | |

## PLAINTIFF'S SUPPLEMENTAL DISCOVERY REQUESTS

PLEASE TAKE NOTICE that Plaintiff, Mark Frankel as Plan Administrator for 4921 12th Avenue, LLC ("Plaintiff"), by and through its undersigned counsel,  hereby demands that Defendant, Ultimate Oppurtunities, LLC a/k/a Ultimate Opportunities, LLC ("Defendant") produce for inspection and copying at the offices listed in the signature block below, all documents which are responsive to the requests that are contained herein.

PLEASE TAKE FURTHER NOTICE that Plaintiff hereby further demands that Defendant answer under oath the following interrogatories in the manner prescribed by Rule 33 and Local Rule 33.3.

## DEFINITIONS

The Uniform Definitions set forth in Local Rule 26.3 of the Local Rules of the U.S. District Courts for the Southern and Eastern Districts of New York shall be used to interpret

these document demands and interrogatories and are hereby incorporated by reference. In addition, as used in these document requests and interrogatories:

1.      "You," "your" or "yourself" refers to all parties to the proceeding, their subsidiaries, assigns, predecessors, and successors, their present and former directors, officers, agents, consultants, and employees, and all other persons acting or purporting to act on behalf of, or who are subject to the direction of control of, any of the foregoing.

2.      "Document" or "documents" means all written, printed, typed or other graphic matter however produced, reproduced, or stored; all mechanical or electronic sound recording or transcripts thereof in your possession, custody, or control, or known to you, whether or not prepared by you. "Document" or "documents" also includes all copies which are not identical with the original.

3.      "Document" or "documents" includes, but is not limited to, all accounts, accounting journals, addenda, advertising material, agreements, analyses, bids, bills, blueprints, books, bulletins, calendars, canceled checks, cashbook, charts, checkbooks, check stubs, chronicle, computer  software, contracts, contract memoranda, memoranda of conversations or communications, correspondence, delivery tickets, diagrams, diaries, drawings, estimates, facsimile sheets, financial statements, flow sheets, forms, graphs, index, index sheets, internal communication, inter-office directives, invoices, job cost records, journals, ledgers, letters, lists, logbooks, magnetic tapes, manuals, maps, memoranda, microcards, microfilms, minutes, notes, orders, outlines, papers, photographs, plans, price lists, printouts, proposals, purchase orders, quotations, records, renderings, reports, requests, requisitions, schedules, sketches, statements, studies, summaries, tapes, telegrams, telephone message slips, time sheets, transcripts, transmittals, travel and expense accounts, vellums, videotapes, vouchers, work orders, and work sheets.

4.      "Communication" or "communications" means all oral, visual or other sensory means of transmitting information other than through a "document" or "documents", and including, but not limited to, face to face conversations and telephonic and other electronic or mechanical means of transmitting information, messages or statements.

5.      Identify (with respect to persons): When referring to a person, to "identify" means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

6.      Identify (with respect to documents): When referring to documents, to "identify" means to give, to the extent known, the (i) type of document, (ii) general subject matter, (iii) date of the document, and (iv) author(s), addressee(s) and recipient(s), or, alternatively to produce such document(s) for inspection if not called for in the Document Request.

7.      Identify (with respect to communications): A request to "identify" a communication means: (i) to state whether it was written or oral, and if written, to identify each document comprising or evidencing such communication; (ii) to state the date and place of such communication; (iii) to identify each individual participating therein and each individual who was present at the place or places of such communication; (iv) to state what was said by each participant in the course of such communication, or if now known, the substance of such communication.

8.      Person: The term "person" is defined as any natural person or any business, legal or governmental entity, corporation or association.

9.    All/Each: The terms "all" and "each" shall be construed as all and each.

10.    And/Or: The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of this discovery request all responses that might otherwise be construed to be outside of its scope.

11.    Number: The use of the singular form of any words includes the plural and vice versa.

12.    Unless otherwise specified, "Premises" as used herein refers that portion of the real property known as 4917-4921 12th Avenue, Brooklyn, New York (Borough of Brooklyn, Block 5641, Lots 1501 & 1502 ("Premises").

## **INSTRUCTIONS**

13.    Identify the exact documents that are being produced in response to each of the numbered paragraphs.

14.    If any documents herein requested were formerly in your possession, custody or control and have been lost or destroyed, you are requested to submit in lieu of each document a written statement which:

A.    Describes in detail the nature of the document and its content;

B.    Identifies the person who prepared or authored the document and if applicable, the person to whom the document was sent;

C.    Specifies the date on which the document was prepared or transmitted; and

D.    Specifies, if possible, the date on which the document was lost or destroyed and, if destroyed, the conditions of, or reasons for, such destruction and the persons requesting and performing the destruction.

15.    If you consider any document sought or information sought in any document, to be privileged or otherwise exempt from disclosure, then you are directed to identify each document by category of documents, date, addressee, author, title and general subject

matter and the contents of which have been withheld from discovery or production on that account. In addition, you are directed to identify those persons who have said documents or who have received copies thereof, the contents of which have been withheld from discovery or production on that account. In addition, you must state with specificity the ground(s) on which each such document is considered privileged or otherwise exempt from disclosure.

16.     If you (1) fail to serve a written response to a request for inspection, (2) fail, in response to a request for inspection to respond, that inspection will be permitted as requested, or (3) fail to permit inspection as requested, an application may be made for an order to compel disclosure or to dismiss the proceeding as well as an order requiring you to pay the reasonable expenses, including attorneys' fees, incurred in making the application.

17.     The request for production of documents is continuing and any document you obtain or locate subsequent to production which would have been produced had it been available or its existence known at the time, is to be supplied herewith.

## **DOCUMENT DEMANDS**

1.     All organizational documents for Defendant, including but not limited to Articles of Organization, Certificates of Organization, and any amendment or restatement thereto.

2.     All documents and communications relating to Defendant's payment of rent that relates to the Premises, including the production of all communications, checks (front and back), and documentation regarding the payment of rent to date for your possession of the Premises.

3.     All bank, debit card, credit card, or online service account statements reflecting any payment of rent by or on behalf of Defendant regarding the payment of rent for the Premises.

4.     All documents signed and/or provided by or on behalf of Defendant to open any bank accounts on behalf of Defendant.

5.     All documents signed and/or provided by or on behalf of Yidels US to open any bank accounts on behalf of Yidels US.

6.     All federal and state corporate tax returns Defendant has filed for tax years 2016 to present.

## **INTERROGATORIES**

7.     Identify the relationship between Defendant and Yehuda Salamon.

8.     Identify the relationship between Uziel Frankel and Yehuda Salamon.

9.     Identify the current and prior principals of Defendant.

10.     Identify the current and prior members of Defendant.

11.     Identify Zalmen Grossberg's relationship to Defendant.

12.     Identify Nachman Wasserlauf's relationship to Defendant.

13.     Identify Nachman Wasserlauf's relationship to Yehuda Salamon.

14.     Identify Nachman Wasserlauf's relationship to 4921 12th Avenue LLC.

15.     Identify the current and prior directors, officers, parents, and subsidiaries of Defendant.

16.     Identify all persons and entities that opened a bank account on behalf of Yidels US.

17.     Identify all persons and entities that opened a bank account on behalf of Defendant.

18.     Identity the address where all rent payment checks were sent and/or delivered.

19.    Identify the payees on any checks made by or on behalf of Defendant for the payment of rent for the Premises

20.    Identify when Defendant received notice of 4921 12th Avenue LLC's bankruptcy proceeding.

PLEASE TAKE FURTHER NOTICE, that this is a continuing demand and that if any Defendant obtains any of the information demanded herein subsequent to the service of these demands, then said information is to be furnished to the undersigned attorneys whenever obtained. The undersigned attorneys will object at the time of trial to the offering into evidence of any information or documents that has been demanded herein, and not produced.

PLEASE TAKE FURTHER NOTICE, that if any of the documents or records requested herein are electronically filed, stored, or recorded, Plaintiff requests production of the program and data bases used to affect the storage of said records, or files.

PLEASE TAKE FURTHER NOTICE, that if any document described by this request will not be produced, the reasons for the lack of production must be provided for each such document in a sworn reply to this demand.

Dated: New York, New York
      August 14, 2020

                **BUTLER, FITZGERALD, FIVESON**
                 **& McCARTHY**
                A Professional Corporation
                *Attorneys for Plaintiff, Mark Frankel*
                *Plan Administrator for 4921 12th Avenue, LLC*

                By:  */s/ David K. Fiveson*
                    David K. Fiveson, Esq.
                A Principal of the Firm
                9 East 45th Street, Ninth Floor
                New York, New York 10017
                (212) 615-2200

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
—————————————————————————

ERIE INSURANCE COMPANY,

                                    Plaintiff,                    **COMPLAINT**

           vs.
                                                                  Civil Action No. _____

YIDEL'S SHOPPING CART, INC., YSC FRESH
FOOD STATION, LLC, and
DEBORAH HELLER,

                                    Defendants.
—————————————————————————

          Plaintiff, ERIE INSURANCE COMPANY, by and through its attorneys,

HURWITZ & FINE, P.C., as and for its Complaint herein, alleges, upon information and belief,

as follows:

          1.        At all times hereinafter mentioned, Plaintiff, ERIE INSURANCE

COMPANY ("ERIE"), was and is an insurance company authorized to conduct insurance

business in the State of New York, which is organized under the laws of and with a principal

place of business within the Commonwealth of Pennsylvania.

          2.        Upon information and belief, Defendant, YIDEL'S SHOPPING CART,

INC. ("YSC"), was and is a domestic corporation organized under the laws of the State of

New York, with a principal place of business in Kings County, New York.

          3.        Upon information and belief, Defendant, YIDEL'S FRESH FOOD

STATION, LLC ("YFF"), was and is a domestic corporation organized under the laws of the

State of New York, with a principal place of business in Kings County, New York.

          4.        Upon information and belief, Defendant, DEBORAH HELLER

("Heller"), was and is a resident and domiciliary of the County of Kings and the State of

New York.

1

345

5.      This action seeks declaratory relief regarding the rights and obligations of the parties herein under the terms of the relevant insurance policy issued to YSC by ERIE following an accident involving Heller while she was lawfully on a premises owned and operated by YSC.

6.      In summary, YFF does not qualify as an insured or additional insured under the terms of the relevant insurance policy issued to YSC by ERIE and is thus not entitled to insurance coverage thereunder. Additionally, YSC has failed to cooperate with ERIE in its investigation, defense and/or settlement negotiations such that YSC is not entitled to coverage under the terms of the relevant insurance policy it was issued by ERIE.

7.      Heller is nominally named herein so that complete relief may be afforded to all interested parties.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter under 28 USC § 1332 in that it arises between citizens of different states/countries, and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, insofar as the value of the right being protected and/or the injury being averred exceeds $75,000.00.

9.      Venue is proper in this district under 28 USC § 1391(a)(2), (b)(1) and (b)(2) as all defendants are domiciled within this district and Heller's alleged accident occurred within this district.

## THE UNDERLYING INCIDENT

10.      On June 5, 2018, Heller filed a summons and complaint against YSC Fresh Food Station, LLC in New York State Supreme Court, County of Kings, styled *Deborah Heller v. Yidel's Fresh Food Station, LLC*, and bearing Index. No. 511522/2018 (the "Underlying Action"). On July 24, 2018, Heller amended her complaint to add YSC as a

defendant. The amended complaint in the Underlying Action is incorporated by reference herein.

11.     Heller alleges that on or about December 29, 2017, she was injured while lawfully on a premises owned and operated by YFF and/or YSC, located at 4921 12th Avenue, Brooklyn, New York (the "Premises"), solely as a result of a failure by YFF and/or YSC to maintain the Premises in a reasonably safe and suitable condition and in good repair (the "Underlying Incident").

**THE ERIE POLICY**

12.     Prior to the Underlying Incident, ERIE issued an Ultrapack Plus insurance policy to YSC (Policy No. Q97-1541360), that was effective at the relevant time (the "ERIE Policy"). A copy of the ERIE Policy is incorporated herein by reference as if fully set forth below.

13.     The ERIE Policy provides in pertinent part:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

***

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.  **Insuring Agreement**
    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no

3

duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

\*\*\*

**SECTION II – WHO IS AN INSURED**

1.  If you are designated in the Declarations as:

\*\*\*

d.  An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

\*\*\*

2.  Each of the following is also an insured:

\*\*\*

b.  Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

c.  Any person or organization having proper temporary custody of your property if you die, but only:
    1)  With respect to liability arising out of the maintenance or use of that property; and
    2)  Until your legal representative has been appointed.

\*\*\*

3.  Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a.  Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b.  Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c.  Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

4

348

\*\*\*

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

\*\*\*

2. **Duties In The Event Of Occurrence, Offense, Claim or Suit**

\*\*\*

   c.  You and any other involved insured must:

   1)  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";
   2)  Authorize us to obtain records and other information;
   3)  Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and
   4)  Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

14.    YFF does not qualify as an insured under the ERIE Policy.

### TENDER AND NON-COOPERATION

15.    After the Underlying Incident, YFF and/or YSC, through their principal, Yehuda Salamon ("Salamon"), advised ERIE of Heller's alleged accident, claim and the Underlying Action.

16.    ERIE accepted YSC's tender, assigning the defense of YSC in the Underlying Action to Milber Makris Plousadis Seiden, LLP ("Assigned Counsel") on or about August 14, 2018. However, ERIE disclaimed coverage with respect to YFF because YFF does not qualify as an insured under the ERIE Policy.

17.    ERIE advised YSC of its obligation to cooperate with its investigation, settlement, and defense, and specifically sought the cooperation of Salamon in his capacity as YSC's principal.

18.    ERIE acted diligently in seeking to bring about Salamon's cooperation with, among other things, attendance at depositions and otherwise coordinating defense and investigation of the Underlying Incident and/or Underlying Action.

5

The

19.     ERIE engaged a private investigator to assist in locating Salamon and securing Salmon's cooperation.

20.     ERIE, its private investigator, and/or Assigned Counsel have made numerous written requests to Salamon for the production various items that have gone unanswered, including but not limited to:

- the names of all workers who worked at YSC and YFF on the date of loss;
- the payroll records for all YSC and YFF workers on the date of loss;
- any agreements or documentation that YSC or YFF has in place with OTP Management;
- the names of all OTP Management employees/representatives who worked at YSC on the date of loss;
- the payroll records for all OTP Management employees/representatives who worked at YSC on the date of loss; copies of all W-2's and 1099's for YSC and YFF;
- the lease agreements to the Premises; and
- any and all deeds to the Premises.

21.     ERIE, its private investigator, and/or Assigned Counsel made numerous efforts to reach Salamon by telephone at his home and work without success, leaving numerous messages regarding the production of the aforementioned requested items and requesting further discussion of litigation strategy in the Underlying Action.

22.     ERIE, its private investigator, and/or Assigned Counsel additionally made several attempts to reach Salamon by email without success.

23.     ERIE, its private investigator, and/or Assigned Counsel also sought, without success, Salamon's cooperation in coordinating a teleconference with a worker in the store, Mr. DeJesus, who was potentially in close proximity to Heller at the time of the Underlying Incident.

24.     ERIE, its private investigator, and/or Assigned Counsel made several visits to Salamon's home address and/or the Premises in an effort to speak with Salamon about these matters without success.

25.    ERIE, its private investigator, and/or Assigned Counsel spoke with workers at the Premises, left notes under Salamon's office door at the Premises and left messages with those workers once informed that Salamon was away and unavailable. ERIE also sought verification of and/or updated contact information for Mr. Salamon, and these workers refused to provide information regarding Salamon's cellular telephone number.

26.    ERIE's actions in seeking Salamon's cooperation were reasonably calculated to obtain Salamon's cooperation.

27.    Salamon was advised by letter, dated January 31, 2020, that he was court ordered to appear at a deposition on February 27, 2020.

28.    To date, Salamon has failed to cooperate with ERIE as outlined above, among other failures, and, in fact, has engaged in willful and avowed obstruction of ERIE's ability to investigate, defend or potentially settle the Underlying Incident and/or Underlying Action.

29.    Salamon failed to appear at a court-ordered deposition on February 27, 2020.

30.    As a direct result of Salamon's failure to cooperate in his capacity as YSC's principal, the court in the Underlying Action has precluded YSC from offering Salamon's testimony in defense of Ms. Heller's claim, materially prejudicing ERIE's ability to defend YSC in the Underlying Action.

31.    Due to Salamon's failure to cooperate, YSC breached the ERIE Policy's conditions, and ERIE disclaimed coverage on that ground.

**AS AND FOR ERIE'S**
**FIRST CAUSE OF ACTION**

32.    ERIE reasserts and realleges each and every allegation contained within paragraphs "1" through "31" as if fully set forth herein.

33.     The ERIE Policy was issued to YSC as its named insured.

34.     The ERIE Policy does not list YFF as a named or additional insured, and YFF does not otherwise qualify as an insured therein.

35.     Thus, ERIE disclaimed coverage to YFF under the ERIE Policy for the Underlying Incident, including claims arising therefrom, and/or the Underlying Action.

36.     Therefore, ERIE is entitled to a declaration that it has no obligation to defend or indemnify YSC for the Underlying Incident, including claims arising therefrom, and the Underlying Action.

37.     ERIE has no adequate remedy at law.

**AS AND FOR ERIE'S
SECOND CAUSE OF ACTION**

38.     ERIE reasserts and realleges each and every allegation contained within paragraphs "1" through  "37" as if fully set forth herein.

39.     The ERIE Policy requires insureds to cooperate with ERIE in investigating, defending or settling any incident, claim or suit, including appearing for depositions to provide testimony about such incidents.

40.     In connection with YSC's obligation to cooperate, ERIE diligently sought to secure, among other things, Salamon's attendance at depositions.

41.     Despite court order, YSC's principal, Salamon, failed and refused to appear for his deposition.

42.     ERIE acted diligently in seeking to obtain Salamon's testimony, and ERIE's efforts were reasonably calculated to obtain this testimony.

43.     Salamon's failure and refusal to appear for his deposition in his capacity as YSC's principal amounts to willful and avowed obstruction of ERIE's ability to investigate, defend and settle claims arising from the Underlying Incident and/or the Underlying Action.

8

44.     YSC's failure to acknowledge, participate and/or respond to the efforts of its attorneys assigned as defense counsel has obstructed and prejudiced ERIE's ability to investigate and defend against the Underlying Action.

45.     By virtue of its refusal to acknowledge, participate or respond to any of the efforts undertaken by its appointed defense counsel, or ERIE, YSC breached the Policy conditions and is not entitled to coverage for the Underlying Incident or Underlying Action.

46.     ERIE is entitled to a declaration that it has no obligation to defend or indemnify YSC for the Underlying Incident, including claims arising therefrom, and the Underlying Action.

47.     Additionally, ERIE is entitled to a declaration that it may withdraw from the defense that it is currently providing YSC in the Underlying Action.

48.     ERIE has no adequate remedy at law.

**WHEREFORE**, defendant, ERIE INSURANCE COMPANY, respectfully requests judgment:

(1)     declaring that YIDEL'S FRESH FOOD STATION, LLC, does not qualify as an insured or additional insured under the terms of the ERIE Policy and is not entitled to coverage for the Underlying Incident, including claims arising therefrom, and/or Underlying Action.;

(2)     declaring that YIDEL'S SHOPPING CART, INC., has failed to adhere to its contractual obligations to cooperate with ERIE in breach of the ERIE Policy's conditions and is not entitled to coverage for the Underlying Incident, including claims arising therefrom, and/or Underlying Action;

(3)     declaring that ERIE INSURANCE COMPANY has no obligation to defend or indemnify YIDEL'S FRESH FOOD STATION, LLC and/or YIDEL'S SHOPPING

CART, INC., in connection with the Underlying Action styled *Deborah Heller v. Yidel's Fresh Food Station, LLC*, and bearing Index. No. 511522/2018;

(4)    declaring that ERIE INSURANCE COMPANY may withdraw from the defense of YIDEL'S SHOPPING CART, INC., in the Underlying Action styled *Deborah Heller v. Yidel's Fresh Food Station, LLC*, and bearing Index. No. 511522/2018; and

(5)    granting such other and further relief as may be just, equitable and proper, together with the costs and disbursements of this action.

DATED:    Buffalo, New York
          May 15, 2020

                                        HURWITZ & FINE, P.C.

                                        By_____
                                            Dan D. Kohane, Esq.
                                        *Attorneys for Plaintiff,*
                                        *ERIE INSURANCE COMPANY*
                                        1300 Liberty Building
                                        424 Main Street
                                        Buffalo, New York 14202
                                        (716) 849-8900
                                        ddk@hurwitzfine.com

**DEMOVSKY LAWYER SERVICE**
Premier Nationwide Document Retrieval and Process Service Company
800-443-1058

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

Erie Insurance Company,

        Plaintiff(s),

      v.

Yidel's Shopping Cart, Inc.,
YSC Fresh Food Station, LLC, and
Deborah Heller,

        Defendant(s).

-------------------------------------------------------------X

Civil Action No. 20cv2199

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK  }
         S.S.
COUNTY OF NEW YORK}

      **TIMOTHY BOTTI**, being duly sworn, deposes and says that he is over eighteen years of age, is employed by the attorney service, DLS, INC., and is not a party to this action.

      That on the 21st day of May, 2020, at approximately the time of 1:10 pm, deponent served a true copy of the **SUMMONS IN A CIVIL ACTION AND COMPLAINT** upon **YSC FRESH FOOD STATION, LLC** at 4921 12th Avenue, Brooklyn, NY 11219, by personally delivering and leaving the same with **ISRAEL ROSENBERG**, who informed deponent that he holds the position of Manager with that company and is authorized by appointment to receive service at that address.

      **ISRAEL ROSENBERG** is a white male, approximately 38 years of age, stands approximately 5 feet 10 inches tall, weighs approximately 175 pounds with short reddish brown hair and dark eyes with a full beard and wearing glasses and a yarmulke.

**TIMOTHY BOTTI, #0843358**
Sworn to before me this
8th day of June, 2020

_____
NOTARY PUBLIC

JONATHAN RIPPS
**NOTARY PUBLIC**, STATE OF NEW YORK
Registration No. 01RI6109718
Qualified in New York County
My Commission Expires May 17, 2024

D.L.S., Inc.
401 Broadway
Ste. 510
New York, NY 10013
212-925-1220
www.dlsnational.com

## AFFIDAVIT OF SERVICE THROUGH THE SECRETARY OF STATE

UNITED STATES DISTRICT COURT                        Purchased/Filed: May 15, 2020
FOR THE EASTERN DISTRICT OF NEW YORK                Index #   1:20-cv-02199-RRM-
                                                              VMS

_____

*Erie Insurance Company*                                              Plaintiff

against

*Yidel's Shopping Cart, Inc., et al.*                                 Defendant

_____

STATE OF NEW YORK
COUNTY OF ALBANY          SS.:

_____ Felix Correa _____ , being duly sworn, deposes and says: deponent is over

the age of eighteen (18) years; that on _____ May 19, 2020 _____ , at ___ 9:30 AM ___ , at the office of the

Secretary of State of the State of New York in the City of Albany, New York deponent served the annexed

Summons in a Civil Action and Complaint

on

_____ Yidel's Shopping Cart, Inc. _____ , the

Defendant in this action, by delivering to and leaving with _____ Sue Zouky _____ ,

AUTHORIZED AGENT in the Office of the Secretary of State, of the State of New York, personally at the Office of

the Secretary of State of the State of New York, 99 Washington Avenue, Albany, NY, 2 true copies thereof and that

at the time of making such service, deponent paid said Secretary of State a fee 40 dollars; That said service was

made pursuant to Section 306 Business Corporation Law. Deponent further says that deponent knew the person

so served as aforesaid to be the agent in the Office of the Secretary of State of the State of New York, duly

authorized to accept such service on behalf of said defendant

Description of the person served:  Approx. Age: __55-60__    Approx. Wt: __125lbs__    Approx. Ht: __5'1__

Color of skin: __White__    Hair color: __Red/Blonde__  Sex: __Female__   Other: _____

Sworn to before me on this

__19th__ day of May 2020

_____                        _____
        SCOTT SCHUSTER                                          Felix Correa
NOTARY PUBLIC, STATE OF NEW YORK                         **Attny's File No.**
    NO. 01SC6306636
QUALIFIED IN ALBANY COUNTY
COMMISSION EXPIRES JULY 28, 2022                        Invoice•Work Order # S1839425

*SERVICO. INC.. P.O. BOX 871. ALBANY. NY 12201*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re                                                                    Chapter 11

      4921 12th Avenue, LLC                              Case no.  18-47256

                        Debtor.
------------------------------------------------------------x

## OBJECTION TO RECONSIDERATION MOTION

      Mark Frankel, as Plan Administrator ("Plan Administrator") of the confirmed plan

("Plan" Exhibit G) in the case of 4921 12th Avenue, LLC (the "Debtor"), as and for his

Objection to the motion interposed by Ultimate Opportunities to reconsider the August 26, 2020

order of this Court directing the occupants of the commercial space at the Debtor's property at

4917 12th Avenue, Brooklyn, New York 11219 (the "Property") to vacate the Property ("Vacate

Order"), respectfully represents as follows:

(a) **The alleged Ultimate Opportunities lease is the latest chapter in a long history of misconduct arising from the Galster loan,**

(b) **The lease appears bogus since (i) the rent is one third of the rent under the Salamon affiliate lease it replaced, (ii) it was executed when U. Frankel and Salamon were involved in a in a bankruptcy scheme in the Southern District of New York, and (iii) in a Kings County Supreme Court case in 2018, Yidel's Shopping Cart Inc. admitted that it held  the lease to the Property,**

(c) **Since it failed to timely object to the Vacate Motion, Ultimate Opportunities has no right to reconsideration,**

(d) **Even if there was a legitimate Ultimate Opportunities lease, it was rejected by the Plan, not the Vacate Order,**

(e) **The Covid Executive Orders do not apply, but even if they did, the Court denied the Plan Administrator's demand for enforcement by a Writ of Assistance, and**

(f) **The Vacate Order implements the Plan's lease and sale provisions -- eviction under the New York landlord tenant law is irrelevant**.

## BACKGROUND

1.    On December 20, 2018, the Debtor filed a Chapter 11 petition under Title 11 of the United States Code, 11 U.S.C. 101 <u>et</u> <u>seq</u>. (the "Bankruptcy Code").

2.    The Debtor owns the real property at 4917 12th Avenue, Brooklyn, New York 11219 (the "Property") pictured below:



3.    The value of the Property, as stated by the Debtor in its Chapter 11 schedules was $10,000,000.  But no potential purchaser has made the Plan Administrator an offer to purchase in that ballpark.

2

4.      Galster Funding LLC (the "Galster Mortgagee") holds a judgment of foreclosure and sale entered on August 20, 2018 in an action entitled *Galster Funding LLC v. 4921 12th Avenue LLC; et al.* in the Supreme Court of the State of New York, County of Kings, Index No.: 500818/2017 (the "Galster Judgment").  The total amount due under the Galster Judgment as of the December 20, 2018 filing date was:

| | |
|---|---|
| Judgment Amount: | $8,929,916 |
| Interest from 5/31/18 to 08/20/18 @24% per judgment: | 350,973 |
| Interest from 8/21/18 to 12/20/18 @9% per judgment: | 193,931 |
| Costs and Disbursements with interest per judgment: | 1,855 |
| Attorneys' fees per judgment: | 3,500 |
| TOTAL: | $9,480,175 |

5.      The only other scheduled creditor is Beis Chasidi Gorlitz (the "BCG Mortgagee").  BCG filed a $13,500,000 mortgage lien claim.

6.      Based on the Galster Judgment and the BCG Mortgage claim, secured claims totaled $22,980,175.

7.      The Debtor filed nothing in this case to explain the origin of its financial problems nor any contemplated bankruptcy solution to those problems.  Absent any creditors except the two mortgagees, therefore, it appears that the Debtor filed this Chapter 11 on the eve of the foreclosure sale simply to delay the sale.

**(a)      The alleged Ultimate Opportunities lease is the latest chapter in a long history of misconduct arising from the Galster loan**

8.      The case has a long and unusual backstory.

9.      On or about August 30, 2016, the Galster Mortgagee loaned the Debtor $6,500,000, secured by a mortgage on the Property ("Mortgage," Exhibit A).

3

10.     As part of its loan application, the Debtor represented that the loan would be repaid by the Property income, including $26,250 of monthly rent under a January 2016 lease (Exhibit B) between the Debtor and Yidel's Fresh Food Station, an affiliate of the Debtor.

11.     Section 7 of the Mortgage provides that except for the residential apartments, Debtor shall make no leases or cancel or modify any leases without the consent of Galster.

12.     When the Galster loan was made in August 2016, there were two mortgages of record against the Property held by the BCG Mortgagee, one for $1,200,000 and the other for $1,300,000 (the "BCG Mortgages").

13.     At the Galster Loan closing, the Debtor presented two (2) satisfactions of mortgages (the "Satisfactions") purportedly evidencing the satisfaction of the BCG Mortgages.

14.     Believing that its mortgage would have first priority, the Galster Mortgagee closed and disbursed the loan proceeds.

15.     Two months later, in a November 3, 2016 , the BCG Mortgagee commenced a Kings Supreme Court action.  BCG produced an affidavit from the notary public on the Satisfactions attesting that the Satisfactions were forged and/or fraudulent.  BCG sought a declaration that the Satisfactions were void, that the BCG Mortgages remained valid liens, and that the Galster Mortgage was void.  The same day, the Supreme Court enjoined the Debtor and Yehuda Salamon, its principal, from dissipating assets.

16.     When the Galster Mortgagee discovered the BCG action, it filed a Supreme Court case to enjoin disbursement of the amounts remaining of its $6,500,000 loan.

4

360

17.    The Debtor did not oppose either of the injunction applications.  Instead, the Debtor essentially admitted that the Satisfactions were bogus and offered to vacate them.

18.    The requested injunctions were entered, the Debtor stopped paying the Galster mortgage, the Galster Mortgagee accelerated its loan, and the Galster Mortgagee commenced its foreclosure action.

19.    In the BCG case, BCG filed an affirmation alleging a pattern of Debtor misconduct including attempts to defraud BCG, the IRS, the Charities Bureau of the New York State Attorney General's office and the New York State Department of Taxation and Finance.

20.    The Debtor then sought to stay the Galster foreclosure arguing that the fraud allegations in the BCG case must be determined first.  The ploy failed.  The Supreme Court denied the Debtor's motion and appointed Gregory Laspina receiver by order signed on July 11, 2017.  Mr. Laspina, however, never took possession.

21.    Later, the Supreme Court, by decision and order dated March 7, 2019, extinguished the bogus satisfactions as demanded by BCG.

22.    Galster had title insurance.  Old Republic, Galster's title insurance carrier, honored its obligation to represent Galster and Butler Fitzgerald was retained for that purpose.  Old Republic also acquired the BCG obligation and agreed to subordinate the BCG Mortgages to the Galster mortgage.

23.    The Foreclosure Judgment was entered on August 20, 2018, and the sale scheduled for December 20, 2018.

5

24.      By then, the Debtor had violated the Supreme Court injunction and disbursed the Galster loan proceeds.  Old Republic followed the money.  $2,500,000 passed through several bank accounts to an entity named RS Old Mill LLC ("Old Mill"), also controlled by Yehuda Salamon.  Old Mill used the money to make a down payment on an $18 million purchase of real property then owned by Novartis drug company in Rockland County.  When it needed more time to close on the Novartis purchase, Old Mill filed a Chapter 11 petition in White Plains.  The Debtor was not named as a creditor in the Old Mill case.

25.      Without the White Plains Bankruptcy Court's approval, Old Mill then transferred its rights under the Novartis contract to another entity.  That entity then flipped the Novartis sale contract to yet another entity named Suffern Partners.  On September 6, 2017, the Novartis property was sold to Suffern for $30,000,000, at a $12,000,000 profit for Old Mill.

26.      Almost a year later, Salamon hired Michael Levine and Goldberg Weprin as new lawyers for Old Mill.  Levine filed a White Plains Bankruptcy Court complaint ("Complaint") for Salamon alleging that the Debtor's $12,000,000 profit on the Novartis flip to Suffern had been stolen.  When the White Plains Bankruptcy Court discovered that the Debtor assigned the Novartis contract without Bankruptcy Court authority, the Court appointed Salvatore LaMonica as trustee.

27.      Uziel Frankel ("U. Frankel") is Ultimate Opportunities' principal.  His fingerprints are all over the Old Mill case.  After the Old Mill trustee signed a settlement agreement with Suffern, a new bar date was set to determine whether the settlement proceeds would pay all of Old Mill's creditors.

6

28.    U. Frankel promptly executed a proof of claim in the Old Mill case on behalf of Lone Pine Associates, LLC (Exhibit C) to get a share of the settlement proceeds.  On page 31 of the proof of claim, One Pine's address is at the Old Mill property where Mr. Salamon maintained Old Mill's offices.

29.    The narrative to the proof of claim asserts that Old Milll through Salamon, hired U. Frankel through Lone Pine as to develop the Old Mill property, and that Lone Pine incurred "developmental expenses for the tenanting" of the Old Mill property. , and "But for the malfeasance of the parties identified as defendants" in Salmon's Complaint," Lone Pine "would have been able to continue in such activity to the benefit the estate and all creditors."

30.    The lead defendant in the complaint is Suffern Partners, the entity to whom the Old Mill property was flipped for $30,000,000.

31.    But in a lawsuit filed in the Supreme Court of Rockland County six months earlier (Exhibits D), Lone Pine asserted that "the principal of Lone Pine" is a 65% shareholder of Suffern," it is the "beneficial owner and occupant" of the Old Mill property and that it "run[s] the entire Premises on a day-to-day basis," and that Mr. Salamon "is Lone Pine management, the management company of the Novartis site."

32.    In summary, filed documents in the Southern District of New York Bankruptcy Court and the Rockland County Supreme Court show that Mr. Salamon and Mr. U. Frankel interchangeably claimed to be owners/managers of Old Mill, Lone Pine and Suffern to fit the narrative of whatever legal dispute they are fighting.

33.    It is not a case of one hand not knowing what the other was doing. Michael Levine was counsel to the Debtor in the Old Mill case and counsel to Lone Pine in the

7

363

Rockland County Supreme Court. Michael Levine also filed the Debtor's bankruptcy in this court.

34.     U. Frankel's denial of actual knowledge of this case is not credible since he was simultaneously working hand in glove with Mr. Salamon and Michael Levine on the Old Mill property in Bankruptcy in Westshester and in the Rockland County Lone Pine litigation when the lease was purportedly signed, and it was Mr. Salamon who controlled the timing of the Ultimate Opportunities disclosure in this case, *not* Ultimate Opportunities.

35.     Since Mr. Salamon and Mr. U. Frankel interchangeably claim to be the Debtor's commercial tenant when it is convenient to do so, this case is similar to the Old Mill case where they interchangeably claim to control Lone Pine and the Old Mill Property.

**(b)     Ultimate Opportunities lease appears bogus since (i) the rent is one third of the rent of the Salamon's affiliate lease it replaced, (ii) it was executed when U. Frankel and Salamon were involved in an illegal scheme in a bankruptcy case in the Southern District of New York, and (iii) in a Kings County Supreme Court case in 2018, Yidel's Shopping Cart Inc. admitted that it held  the lease to the Property**

36.     When Mr. Salamon sought a mortgage from Galster, he produced a January 2016 five year lease to Yidels Fresh Food Station (Exhibit B) for $26,000 per month.

37.     But when he filed this Chapter 11 case, he denied the existence of any commercial lease under penalty perjury at the 341 meeting in the Debtor's Schedules. He did not change his story until almost six months post-confirmation, days before the return date of the Plan Administrator's motion herein to remove the occupants of the commercial space. Suddenly, he asserted the existence of a 30 year lease to Ultimate Opportunities for $9,000 per month, allegedly signed on November 1, 2016, two months after the August 30, 2016 Galster loan

8

closing.  No one has tried to explain why it is believable that the Debtor would abandon a five

year $26,000 per month lease for a 30 Year $9,000 per month lease that would destroy the

Property value during a hot real estate market.

38.    As in the Old Mill case, there are even telltale State Court lawsuits, that

suggests that the Ultimate Opportunities lease is a sham (Exhibit E).  Pleadings in those cases

indicate that Salamon, *not* U. Frankel, reported a December 2017 slip and fall case at the

Property to Erie Insurance Company.  And in the slip and fall case, defendant Yidel's Shopping

Cart Inc.'s answer to the complaint admitted paragraphs 40 through 43 of the complaint that

Yidel's was "lessee of the premises" at 4921 12th Avenue, "operated the premises," "maintained

the premises," and "managed the premises."

39.    Moreover, there are notices posted in the Property (Exhibit F) indicating

that the store operates under licenses granted to Yidel's.  No notices name Ultimate

Opportunities.  It is likely, therefore, that Ultimate Opportunities never occupied the Property.

Consistent therewith, U. Frankel's affidavit supporting reconsideration is silent on these issues.

He proffered no records to show that the alleged rent he paid ended up in the Debtor's coffers, no

records show that Ultimate Opportunities took possession of the Property, no tax returns, no

operating licenses, no permits, no record of hiring employees, purchasing merchandise or

maintaining books and records.

40.    Indeed, neither Salamon nor U. Frankel has explained why the Debtor

would give up a five year $26,000 per month lease for a 30 year $9,000 per month lease.

41.    Part of the explanation may lie in the Old Mill case.  The Lone Pine

agreement between Salamon and U. Frankel (attached to the Lone Pine proof of claim Exhibit C)

9

was entered into in November 2016, the same month as the Ultimate Opportunities lease and the same month that Salamon was fighting in Kings County Supreme Court to avoid a restraining order enjoining disbursement of the Galster loan proceeds.  The Lone Pine agreement at page 32 of 61 of the filed proof of claim specifically references Old Mill's agreement to acquire the Old Mill property with a $2,500,000 downpayment – the same $2,500,000 that Salamon stole from Galster in violation of the Supreme Court restraining order.  The proximity in time indicates related transactions.

42.     In summary, the Ultimate Opportunities lease appears to be part of pattern of fraudulent conduct that includes, (a) the Galster Loan where Salamon forged satisfactions to borrow $6,500,000 in the Debtor's name, which funds were immediately hidden and disbursed to Old Mill, (b) and the Old Mill case, where U. Frankel and Salamon traded off the ownership of Lone Pine and Suffern as part of an unauthorized sale of an $18,000,000 property for $30,000,000, of which the $12,000,000 profit remains unaccounted for.

43.     Either way, the Debtor paid nothing towards debt service on its mortgages after closing the Galster Mortgage, yet it had no money in its account upon filing this case and reported no income during the case.  At the first meeting of creditors Mr. Salamon could not answer a single question about the tenancies, despite repeated attempts by the United State Trustee and Galster's counsel. The Debtor's schedules reflect no leases for the ground floor space.

44.     For several months, the Debtor filed operating reports for this case.  The reports, signed by Yehuda Salamon, show no income and no expenses. The Debtor stopped filing operating reports and provided no record of income or expenses since April 2019.

10

45.    Galster filed and confirmed a liquidating Chapter 11 Plan by order dated July 31, 2019.  Although the Debtor disclosed no leases, the Plan contains boilerplate language at paragraph 94 rejecting any leases that had not been assumed, which would include the alleged Ultimate Opportunities lease.  Similarly, the sale procedures incorporated by reference in the Plan provide for the sale of the Property free and clear of all commercial leases.

46.    The Plan Administrator retained Rosewood Realty, one of the leading Brooklyn real estate brokers with extensive of knowledge of the Property neighborhood, to sell the Property.  Although there was no lease, Yidel's continues to operate the store as it has since 2005.  Rosewood reported to the undersigned that Mr. Salamon is well known in the community, and fearing Mr. Salamon would refuse to vacate, potential purchasers were unwilling to make a fair market bid.

47.    The Plan Administrator filed his motion on December 27, 2019 authorizing the Plan Administrator to remove the occupants from the commercial space to facilitate a sale.

48.    The hearing date of the motion was January 22, 2020.

49.    On January 17, 2020, Yehuda Salamon filed an objection and disclosed for the first time the existence of the alleged Ultimate Opportunities lease, together with an alleged email from U. Frankel disclaiming knowledge of the bankruptcy, as an exhibit.  Since Mr. Salamon had no stake in the outcome, and since there were no other objections, the Court granted the motion.

11

50.     The Plan Administer suggested that the order displacing the occupants be proposed by notice of presentment instead of by submission in the unlikely event that Ultimate Opportunities was a legitimate tenant.  The Notice of Presentment was duly filed and served.

51.     Ultimate Opportunities filed no objection.

52.     By the March 9 presentment date, however, the pandemic was underway and the Court did not enter the warrant of eviction out of concern for U.S. Marshals who would be required to execute the Plan Administrator's proposed Writ of Assistance.  Ultimately, on August 28, 2020, the Court entered the order ("Vacate Order") directing the commercial space occupants to vacate by September 20, 2020, but again refused to enter a Writ of Assistance given the persistence of the pandemic, and the fact that there is no closing scheduled requiring the Plan Administrator to deliver the Property vacant.

53.     Incidentally, following the entry of the Vacate Order, the Plan Administrator informed Galster that the Plan Administrator would entertain offers to purchase the Property conditioned delivery of the Property vacant.  Galster's principals contacted several potential purchasers, and several prospects have expressed interest.  A draft contract is circulating for a $7,200,000 sale, a copy of which is attached as exhibit H.  The sale would be all cash with a quick closing ten (10) days after the Property is vacant.

12

## OBJECTION

**(c)**    **Ultimate Opportunities' has no right to move to reconsider since it failed to timely object to the Motion**

54.    The law on a motion to reconsider under Federal Rules 59 and 60 is well settled and unchanged since this Court's holding in *In re Hassan*, 527 B.R. 97, 100-101 (Bankr. E.D.N.Y. 2015):

> The Second Circuit has held that "[t]he major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.1992) (internal quotations and citation omitted). Under the "clear error" standard, relief is "appropriate only when a court overlooks 'controlling decisions or factual matters that were put before it on the underlying motion' and which, if examined, might reasonably have led to a different result." *Corines v. Am. Physicians Ins. Trust,* 769 F.Supp.2d 584, 593–94 (S.D.N.Y.2011) (quoting *Eisemann v. Greene,* 204 F.3d 393, 395 n. 2 (2d Cir.2000)). "[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). "A motion for reconsideration is neither an occasion for repeating old arguments previously rejected nor an occasion for making new arguments that could have been previously advanced." *Associated Press v. U.S. Dep't of Def.,* 395 F.Supp.2d 17, 19 (S.D.N.Y.2005).
>
> "A motion for reconsideration is 'an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.' " *Corines,* 769 F.Supp.2d at 593–94 (quoting *In re Initial Public Offering Sec. Litig.,* 399 F.Supp.2d 298, 300 (S.D.N.Y.2005), *aff'd sub nom. Tenney v. Credit Suisse First Boston Corp.,* Nos. 05 Civ. 3430, 05 Civ. 4759, and 05 Civ. 4760, 2006 WL 1423785, at *1 (2d Cir.2006)). *See also Schonberger v. Serchuk,* 742 F.Supp. 108, 119 (S.D.N.Y.1990) (motions made pursuant to Rule 59(e) must adhere to stringent standards to prevent "wasteful repetition of arguments already briefed, considered and decided"). "The determination of whether a motion for reconsideration should be granted is within the sound discretion of the court." *In re Richmond,* 516 B.R. 229, 234 (Bankr.E.D.N.Y.2014)

13

55.     Here, as indicated by the email annexed to Mr. Salamon's objection, Ultimate Opportunities cannot deny knowledge of the Vacate Motion on January 17, 2020, five days before the January 22, 2020 hearing.  But Ultimate Opportunities did nothing to preserve its rights before the hearing.  Nor, after seven weeks of additional notice did Ultimate Opportunities object before the March 9, 2020 presentment date.  Ultimate Opportunities filed no written opposition until this motion for reconsideration.

56.     Having failed to file a timely objection, Ultimate Opportunities has no right to seek reconsideration:  "'A motion for reconsideration is neither an occasion for repeating old arguments previously rejected nor an occasion for making new arguments that could have been previously advanced." *Associated Press v. U.S. Dep't of Def.,* 395 F.Supp.2d 17, 19 (S.D.N.Y.2005).'" *Id.*

57.     "Manifest injustice does not exist" when a party "could have easily avoided the outcome, but instead elected not to act until after a final order had been entered." *In re King,* No. 05-51441, 2005 WL 4030049, at *5 (Bankr. S.D. Ohio July 15, 2005).  The failure "to object is not excused by [a] motion to reconsider." *In re Urban Broad. Corp.,* 304 B.R. 263, 271 (E.D. Va. 2004). An interested party may not "sit idly by, not participate in any manner in the formulation and adoption of a plan in reorganization and thereafter ... raise a challenge to the plan for the first time" in a motion for reconsideration. *In re Ruti-Sweetwater, Inc.,* 836 F.2d 1263, 1266-67 (10th Cir. 1988).

58.     *In re Ruti-Sweetwater* is particularly relevant because the Vacate Order terminated no rights that Ultimate Opportunities may have had under its alleged lease.  Those rights were rejected by the Plan.  The relief granted by the vacate order merely implements the

14

Plan's lease rejection and sale provisions. But Ultimate Opportunities never moved to reconsider the confirmation order to avoid that result. And now it is too late since over six months has passed since the July 31, 2020 confirmation order.

59.    In summary, as matter of law Ultimate Opportunities is not entitled to reconsideration because it failed to object when it had the chance, and as a practical matter, any objection would have been futile absent a companion motion to reconsider the Plan confirmation order, but it is too late for that now.

**(d)    Even if there was a legitimate Ultimate Opportunities lease, it was rejected by the Plan, not the Vacate Order**

60.    Against this background, on the last day before the Vacate Order become "final" and not subject to appeal, Ultimate Opportunities moved for reconsideration arguing that (a) but for its former counsel's failure to present evidence of the alleged Ultimate Opportunities lease, the Court would have known that "a lease exists" and that "recent rent has been paid," and (b) that relief should have been sought by adversary proceeding.

61.    Ultimate Opportunities former counsel's failure to object is not grounds for reconsideration, nor has Ultimate Opportunities cited any law to support the argument. And even if the Ultimate Opportunities lease is legitimate, it was rejected by the Plan. Although Ultimate Opportunities attached an exhibit showing monthly $9,000 deposits into a bank account, the funds do not appear to have been paid to the Debtor until *after the Court granted the Plan Administrator's motion on January 22, 2020*, when funds were deposited with the Plan Administrator.

15

62.     Section 1142 of the Bankruptcy Code states:  "The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan."

63.     Ultimate Opportunities cited no authority for its argument that an adversary proceeding is required to obtain an order under section 1142 of the Bankruptcy Code directing Ultimate Opportunities to "deliver" the "property" it alleges to occupy, the sale of which is "necessary for the consummation of the plan."

64.     A week after the time expired to make a reconsideration motion, two (2) business days ago, Ultimate Opportunities filed a "Supplement" disclaiming the original reconsideration motion, and demanding a hearing on no notice.

65.     But like the reconsideration motion, the Supplement disregards the inconvenient truth that even if Ultimate Opportunities' implausible lease proves to be legitimate, it was rejected by the Plan.  And no motion has been made to reconsider or vacate the Plan confirmation order.

66.     The Plan Administrator did not move to evict based on a breach of a lease. The Plan Administrator moved to enforce the lease rejection and sale provisions of the Plan.

67.     Ultimate Opportunities' reliance on the authorities it cites is therefore misplaced.

16

**(e)       The Covid Executive Orders do not apply, but even if they did, the Court denied the Plan Administrator's demand for enforcement by a Writ of Assistance**

68.       Ultimate Opportunities argues that the Vacate Order violated New York State Executive Orders 202.28, 202.48 and 202.57.  But far from violating those orders, the Bankruptcy Court acted in accordance with them, even though they don't apply.

69.       Executive Order No. 202.28 dated March 7, 2020, as extended, suspended the "initiation of a proceeding or enforcement of either an eviction of any residential or commercial tenant, for the nonpayment of rent."  Assuming for the sake of argument that notwithstanding the Supremacy Clause in the United States Constitution, the Executive Order trumps Federal law, the Plan Administrator initiated his motion in December 2019, long before March 7, 2020.  And although rent was unpaid, the motion was made irrespective of payment based on lease rejection under the Plan, and that the sale of the Property necessitated that the Property be free and clear of any commercial leases.

70.       Although the Executive Orders therefore do not apply to this case, the Court did *not* grant the Plan Administrator's demand for entry of a writ of assistance when it was presented for signature on March 9, 2020.  Similarly, the Vacate Order as ultimately entered five months still later contains no writ of assistance.  For the sake of the health and safety of first responders, the Court denied the Plan Administrator a writ of assistance, even though there is no prohibition on enforcement in this case.

17

**(f)    The Vacate Order implements the Plan's lease and sale provisions -- eviction under the New York Real Property and Procedures Law is irrelevant to this case**

71.    Just as Ultimate Opportunities tries to mislead the Court with its Executive Order argument, Ultimate Opportunities tries to mislead the Court by characterizing the relief sought and granted as eviction, rather than plan implementation.

72.    Admittedly, the Plan Administrator argued for 'eviction' in the colloquial sense, but even a cursory reading of the Vacate Application indicates that the actual relief sought was plan enforcement by writ of assistance by the US Marshal -- not lease termination under New York law for non-payment or a lease default.  The Plan already rejected commercial leases.

73.    Any ambiguity in the Plan Administrator's motion was resolved by the preamble to the Vacate Order wherein the relief granted was specifically "based on the "Bidding and Auction Procedures" annexed to the Plan as Exhibit A and incorporated in the Plan by reference in paragraph 78, providing for the sale of the Property "free and clear of all liens, claims, commercial leases not assumed under the Plan, and encumbrances. . . "

74.    Nonetheless, Ultimate Opportunities mistakenly relies on case law that does not even hold that the Bankruptcy Court lacks jurisdiction over eviction cases.  The cited cases merely support the unremarkable principle that Bankruptcy judges have the option to defer to State Courts on eviction cases arising under the New York law.  *In re Riverside Nursing Home*, 144 B.R. 951, 954 (S.D.N.Y. 1992) (following removal to Bankruptcy Court of pending eviction case, District Court adopted opinion of Bankruptcy Court and remanded case to State Supreme Court on equitable grounds); *In re Taub*, 417 B.R. 186, 188 (Bankr. E.D.N.Y. 2009) (Bankruptcy Court permissively abstained from hearing claims arising under the New York Rent

18

374

Stabilization Law of 1969 in favor of determination by New York City Civil Court's Housing

Part).  The citation to *In re Purdue Pharm. L.P.*, No. 19-23649-RDD, 2020 WL 4596869

(S.D.N.Y. Aug. 11, 2020) is hard to understand.  In *Purdue*, the District Court affirmed a

nationwide injunction against opioid related claims against the *Purdue* debtors under section 105

of the Bankruptcy Code, but found that criminal drug trafficking proceedings arising under

Tennessee Code Section 29-38-105(a) are not core bankruptcy proceedings.

       75.    By the same token, there is no basis for Ultimate Opportunities argument

that the Bankruptcy Court lacked jurisdiction under *Wellness Int'l Network, Ltd. v. Sharif*, 575

U.S. 665, 135 S. Ct. 1932, 191 L. Ed. 2d 911 (2015) to enter the Vacate Order.  *Wellness* limits

Bankruptcy Court jurisdiction over "Stern" type claims, absent consent to jurisdiction.  Ultimate

Opportunities cited no example of a case applying *Wellness* to a comparable bankruptcy case.

Either way, *Wellness* does not apply here because the Vacate Motion resolved the limited issue

of whether the Court would enforce implementation of the Plan and Confirmation order.  There

was no determination as to lease validity because the Lease, if it is real, was rejected by the

Confirmation Order in July 2019.  Moreover, by belatedly appearing on August 20, 2020 without

challenging the Bankruptcy Court's adjudicative authority, Ultimate Opportunities impliedly

consented to jurisdiction.  *Id.* at 1948.

       76.    Ultimate Opportunities next tries to argue that it was unfair under the

abatement doctrine for the Plan Administrator's to seek by motion to vacate the Property under

the Plan, while simultaneously seeking damages for occupying the Property for no consideration

in an adversary proceeding.  But Ultimate Opportunities cited no authority for the argument

except an unreported decision from 1979 unavailable on Westlaw, (and thus inaccessible to the undersigned on such short notice).

77.    To the point, when the Plan Administrator moved to vacate the Property, the adversary proceeding had not been commenced because Salamon had not yet revealed the existence of Ultimate Opportunities.  He did not drop that that bombshell until five days before the return date, following which the Plan Administrator sued Ultimate Opportunities in a separate action based upon its alleged use and occupancy of the Property.

78.    Ignoring the Vacate Order and the relief granted therein, Ultimate Opportunities' reliance on *res judicata* case law is similarly misplaced.  Again, the motion did not seek, and the Vacate Order did not grant, an eviction judgment under New York law.

79.    Once again, therefore, the cited case law is immaterial.  *Sure-Snap Corp. v. State St. Bank & Tr. Co.*, 948 F.2d 869, 876 (2d Cir. 1991), *D&K Properties Crystal Lake v. Mut. Life Ins. Co. of New York*, No. 95 C 4974, 1996 WL 224517, at *1 (N.D. Ill. May 1, 1996), *aff'd sub nom. D & K Properties Crystal Lake v. Mut. Life Ins. Co. of New York*, 112 F.3d 257 (7th Cir. 1997) and *In re Porter*, 382 B.R. 29 (Bankr. D. Vt. 2008) all stand for the unremarkable *res judicata* principle that failure to disclose a cause of action in bankruptcy schedules bars subsequent prosecution of that claim post-confirmation.

80.    And *In re Am. Preferred Prescription, Inc.*, 266 B.R. 273, 280 (E.D.N.Y. 2000) cited by Ultimate Opportunities holds that under section 1144 of the Code, a plan confirmation order may not be vacated more than 180 days after it was entered except under Rule 60(b) where there is a fraud on the court, which incidentally is why Ultimate Opportunities has no basis to seek relief reconsideration herein, since it lease, if it is real, was rejected on July

20

31, 2019, but Ultimate Opportunities never moved for reconsideration of the rejection of its alleged rights.

## <u>CONCLUSION</u>

81.    The Ultimate Opportunities lease is riddled with badges of fraud.  The Lone Pine pleadings show that Salamon and U. Frankel are business partners who, at the time of the alleged lease, were simultaneously investing $2,500,000 stolen from Galster at the closing of the Galster Mortgage.  The lease itself reflects a $19,000 rent reduction from Mr. Salamon's $26,000 per month lease to $9,000 per month under Mr. U. Frankel's lease.  No records show that any of the alleged rent ended up in the Debtor's coffers.  No records show that Ultimate Opportunities ever took possession of the Property, obtained operating licenses or permits, hired employees, purchased merchandise, maintained books and records for the store or filed tax returns.

82.    But pleadings filed by Yidel's in Kings County Supreme Court admit that Yidel's held the lease, managed the Property, and operated the store, as do regulatory notices posted in the store.

83.    No amount of misleading legal argument can change the reality that (a) the Plan rejected any rights Ultimate Opportunities may have had under its tainted lease, and (b) Ultimate Opportunities failure to object to the Plan Administrator's motion extinguished any rights it may have had to challenge the relief granted in the Vacate Order.

WHEREFORE, the Plan Administrator respectfully requests that the Court deny

Ultimate Opporutnities' motion for reconsideration, and grant such other relief as may be just

and proper.

Dated:  New York, New York
        September 21, 2020

                                                 **BACKENROTH FRANKEL & KRINSKY, LLP**
                                                 Attorneys for the Plan Administrator

                                               By:     s/Mark A. Frankel
                                                        800 Third Avenue
                                                        New York, New York 10022
                                                        (212) 593-1100

22

378

# Exhibit A



**NYC DEPARTMENT OF FINANCE OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2016090900203001003E0EC0

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 28 |
|---|---|

Document ID: **2016090900203001**   Document Date: 08-30-2016   Preparation Date: 09-27-2016
Document Type: MORTGAGE
Document Page Count: 27

**PRESENTER:**
LANDMARK ABSTRACT AGENCY LLC
207 ROCKAWAY TURNPIKE
LAWRENCE, NY 11559
212-805-8120
LAA-2205

**RETURN TO:**
STARK, AMRON & LINER, LLP
SEVEN PENN PLAZA
SUITE 600
NEW YORK, NY 10001

**PROPERTY DATA**

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| BROOKLYN | 5641 | 1501 | Entire Lot | C1 | 4917 12TH AVENUE |

Property Type: COMMERCIAL CONDO UNIT(S)

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| BROOKLYN | 5641 | 1502 | Entire Lot | R1 | 4917 12TH AVENUE |

Property Type: BULK SALE OF CONDOMINIUMS

**CROSS REFERENCE DATA**

CRFN_____ or DocumentID_____ or _____Year_____Reel____Page_____ or File Number_____

**PARTIES**

**MORTGAGOR/BORROWER:**
4921 12TH AVENUE LLC
1152 53RD STREET
BROOKLYN, NY 11219

**MORTGAGEE/LENDER:**
GLASTER FUNDING LLC
80 MAIDEN LANE, C/O SMRC MANEGEMENT, SUITE 2204
NEW YORK, NY 10038

**FEES AND TAXES**

| Mortgage : | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 6,500,000.00 | | $ 0.00 |
| Taxable Mortgage Amount: | $ | 6,500,000.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | | $ 0.00 |
| TAXES: County (Basic): | $ | 32,500.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 73,125.00 | | $ 0.00 |
| Spec (Additional): | $ | 16,250.00 | | |
| TASF: | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** | |
| MTA: | $ | 19,500.00 | **OF THE CITY REGISTER OF THE** | |
| NYCTA: | $ | 40,625.00 | **CITY OF NEW YORK** | |
| Additional MRT: | $ | 0.00 | Recorded/Filed   09-28-2016 12:46 | |
| TOTAL: | $ | 182,000.00 | City Register File No.(CRFN): | |
| Recording Fee: | $ | 175.00 | **2016000339747** | |
| Affidavit Fee: | $ | 0.00 | | |

*Annette M Hill*
*City Register Official Signature*

**4921 12th AVENUE LLC**

- to -

**GALSTER FUNDING LLC**

**MORTGAGE**

Premises: **Condominium Units C-1 and R-1 in The 4917 12th Avenue Condominium, 4917 12th Avenue, Brooklyn, New York**

The within premises lie in
Block 5641, Lots 1501 and 1502
in Kings County

**Record and Return To:**
STARK, AMRON & LINER, LLP
SEVEN PENN PLAZA, SUITE 600
NEW YORK, NEW YORK  10001
ATTENTION:  ROBERT F. LINER, ESQ.

# TABLE OF CONTENTS

DEFINITIONS. ................................................................................................2

1. PAYMENT OF DEBT..........................................................................4
2. WARRANTY OF TITLE. ......................................................................4
3. INSURANCE AND CASUALTY...........................................................4
4. TAXES. ...............................................................................................5
5. TAX ESCROW. ...................................................................................5
6. CONDEMNATION. .............................................................................6
7. TENANCIES; RENTS. .........................................................................6
8. MAINTENANCE OF PROPERTY.........................................................7
9. DUE ON SALE. ...................................................................................7
10. ESTOPPELS. .......................................................................................8
11. NOTICES.............................................................................................8
12. MULTIPLE PARCELS. ........................................................................8
13. TAX ON LOAN DOCUMENTS............................................................8
14. REVENUE STAMPS. ...........................................................................9
15. INSPECTION. ......................................................................................9
16. BOOKS & RECORDS. .........................................................................9
17. RECORDED INSTRUMENTS...............................................................9
18. EVENTS OF DEFAULT......................................................................10
19. REMEDIES. .......................................................................................12
20. LATE PAYMENTS.............................................................................12
21. RECEIVER. ........................................................................................12
22. NO WAIVER.......................................................................................12
23. JOINT AND SEVERAL LIABILITY. ...................................................13
24. GOVERNING LAW.............................................................................13
25. SECURITY AGREEMENT. ..................................................................13
26. POWER AND AUTHORITY. ................................................................13
27. MORTGAGEE'S RIGHT TO DEFEND................................................13
28. UNENFORCEABLE PROVISIONS.......................................................14
29. DUPLICATE ORIGINALS...................................................................14

30.   AUTHORIZATION. .................................................................................................14
31.   SINGULAR AND PLURAL. ....................................................................................14
32.   NO ORAL MODIFICATIONS. ................................................................................15
33.   PREPAYMENT. .......................................................................................................15
34.   PAYMENT AFTER ACCELERATION. ..................................................................15
35.   DEFAULT AFTER MATURITY. ............................................................................15
36.   WAIVER OF COUNTERCLAIMS. .........................................................................15
37.   USURY SAVINGS CLAUSE. ..................................................................................16
38.   COMPLIANCE WITH LIEN LAW. ........................................................................16
40.   ENVIRONMENTAL COMPLIANCE. ....................................................................16
41.   POWER OF SALE. ...................................................................................................16
42.   PARTIAL PAYMENTS. ...........................................................................................17
43.   VIOLATIONS. ..........................................................................................................17
44.   NO MORTGAGEE LIABILITY. .............................................................................17
45.   NOTICE TO MORTGAGEE. ...................................................................................17
46.   SEPARATENESS COVENANTS. ...........................................................................18
47.   RIGHT OF MORTGAGEE TO SELL DEBT. .........................................................19
48.   WAIVER OF AUTOMATIC STAY. .......................................................................20
49.   MAXIMUM INDEBTEDNESS. ..............................................................................20
50.   HEADINGS. ..............................................................................................................21
51.   BROKERAGE COMMISSIONS. .............................................................................21

## MORTGAGE

**THIS MORTGAGE**, made as of the 30th day of August, 2016, between **4921 12th AVENUE LLC**, a New York limited liability company, with offices at 1152 53rd Street, Brooklyn, New York 11219 (the "Mortgagor") and **GALSTER FUNDING LLC**, with offices c/o SMRC Management, 80 Maiden Lane, Suite 2204, New York, New York 10038 (the "Mortgagee").

**WITNESSETH**, that to secure the payment of an indebtedness in the sum of **Six Million Five Hundred Thousand and 00/100 ($6,500,000.00) Dollars**, lawful money of the United States, to be paid according to a certain Mortgage Note bearing even date herewith (the "Note"), together with any additional sums due under the terms of the Note and this Mortgage (the "Debt"), the Mortgagor hereby mortgages to the Mortgagee the Premises (as hereinafter defined) and the Improvements (as hereinafter defined) together with:

(A)     all right, title and interest of the Mortgagor in and to the land lying in the streets and roads in front of and adjoining the Premises;

(B)     (a)     all appurtenances to the Mortgaged Property, as hereinafter defined;

        (b)     the Equipment (as hereinafter defined), and the right, title and interest of the Mortgagor in and to any of the Equipment which may be subject to any security agreements (as defined in subdivision (A)(73) of Section 9-102 of the Uniform Commercial Code of New York), superior in lien to the lien of this Mortgage;

        (c)     all awards or payments, including interest thereon, which may be made with respect to the Mortgaged Property, whether from the exercise of the right of eminent domain (including any transfer made in lieu of the exercise of said right) or for any other injury to or decrease in the value of the Mortgaged Property;

        (d)     the Leases (as hereinafter defined) and the right to receive and apply the Rents (as hereinafter defined) to the payment of the Debt;

        (e)     all proceeds of and any unearned premiums on the Policies (as hereinafter defined), including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof in reduction of the Debt, for damage to the Mortgaged Property;

384

(f)   all licenses, permits, franchise agreements, construction agreements, management contracts, service and supply contracts and any other agreements of any kind or nature now or hereafter obtained or entered into by the Mortgagor in connection with the Mortgaged Property; and

(g)   the right, in the name and on behalf of the Mortgagor, to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to commence any action or proceeding to protect the interest of the Mortgagee in the Mortgaged Property.

The Premises, the Improvements and the Equipment together with the property, rights and interests stated in Paragraphs (A) and (B) above are herein collectively called the "Mortgaged Property".

**DEFINITIONS.**   The following definitions shall be used throughout this Mortgage and the other Loan Documents (unless a specific contrary definition is provided in any of the Loan Documents in which case that definition will apply for purposes of the applicable document only):

"Business Day" shall have the meaning ascribed thereto in the Mortgage Note.

"Debit Date" shall have the meaning ascribed thereto in the Mortgage Note.

"Debt" shall mean the principal amount of the loan secured hereby, in the original principal sum of **Six Million Five Hundred Thousand and 00/100 ($6,500,000.00) Dollars,** accrued interest thereon at the applicable interest rate or, if applicable, the Default Rate, late charges, and all other sums of any kind or nature whatsoever due pursuant to the Mortgage Note and this Mortgage.

"Default Rate" shall mean the interest rate of twenty-four (24%) percent per annum or the maximum rate allowed to be charged by law, whichever is lower.

"Escrow Fund" shall mean the account held by Mortgagee for sums collected in escrow from Mortgagor which funds shall be disbursed by the Mortgagee when due and payable.

"Equipment" shall mean all machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature whatsoever owned by the Mortgagor or in which the Mortgagor has or shall have an interest, now or hereafter located upon the Mortgaged Property or appurtenances thereto and usable in connection with the Mortgaged Property.

"Event of Default" shall have the meaning ascribed thereto in paragraph 18 of this Mortgage.

"Guarantor" shall mean Yehuda Salamon

"Guaranty" shall mean that certain Guaranty of even date herewith made by the Guarantor in favor of the Mortgagee.

"Improvements" shall mean the buildings and improvements now or hereafter located on the Premises.

"Installments" shall mean the monthly payments of principal and/or interest due hereunder, together with the monthly deposits to the Escrow Fund.

"Leases" shall mean all leases and other agreements affecting the use or occupancy of the Mortgaged Property now or hereafter entered into.

"Loan Documents" shall mean the Mortgage Note, the Mortgage and any other document executed in connection herewith.

"Mortgage" shall mean this Mortgage.

"Mortgaged Property" shall have the meaning ascribed thereto in the recitals to this Mortgage.

"Mortgagee" shall mean **GALSTER FUNDING LLC.**

"Mortgagor" shall mean **4921 12th AVENUE LLC**.

"Policies" shall mean all fire, flood and other hazard insurance policies required by Mortgagee pursuant to paragraph 3 of this Mortgage.

"Premises" shall mean **Condominium Units C-1 and R-1 in The 4917 12th Avenue Condominium, 4917 12th Avenue, Brooklyn, New York**, as

T:\19000 FILES\19362\LOANDOCS

3

described on the annexed Schedule A.

"Rents" shall mean the sum payable to Mortgagor for occupancy of the Mortgaged Property, whether pursuant to the Leases or otherwise.

"Sanctioned Party" shall mean a person who appears on the list promulgated by the United States office of Foreign Assets Control.

"Taxes" shall mean taxes, assessments, water rents, sewer rents and other charges including vault charges and license fee for the use of vaults, chutes and similar areas adjoining the Premises.

"Work" shall mean repairs, replacement or rebuilding of the Mortgaged Property.

And the Mortgagor covenants and warrants with the Mortgagee that:

1. **PAYMENT OF DEBT.**

The Mortgagor will pay the Debt as hereinabove provided.

2. **WARRANTY OF TITLE.**

The Mortgagor warrants the title to the Mortgaged Property.

3. **INSURANCE AND CASUALTY.**

The Mortgagor will keep the Mortgaged Property insured against loss or damage by fire with extended coverage, flood insurance and such other hazards as the Mortgagee shall from time to time require in amounts approved by the Mortgagee and shall pay the premiums for such insurance as same become due and payable. All Policies shall be issued by an insurer acceptable to the Mortgagee and shall contain the standard New York mortgagee clause endorsement naming the Mortgagee as loss payee and additional insured. The Mortgagor will assign and deliver the Policies to the Mortgagee. Not later than thirty (30) days prior to the expiration date of each of the Policies the Mortgagor will deliver to the Mortgagee satisfactory evidence of the renewal of each of the Policies. Sums paid to the Mortgagee by any insurer may be retained and applied by the Mortgagee toward payment of the Debt in such priority and proportions as the Mortgagee in its discretion shall deem proper or, at the discretion of the Mortgagee, the same may be paid, either in whole or in part, to the Mortgagor for such purposes as the Mortgagee shall designate. If the Mortgagee shall receive and retain such insurance money, the lien of this Mortgage shall be reduced only by the amount thereof received after expenses of collection and retained by the Mortgagee and actually applied by the Mortgagee in reduction of the Debt. The provisions of Subsection 4 of Section 254 of the Real

Property Law of New York covering the insurance of buildings against loss by fire shall not apply to this Mortgage. The Mortgagee shall be entitled, in the event of other insurance and contribution between the insurers, to receive from the insurance moneys to be paid such an amount as would have been payable under the policy or policies held for the benefit of the Mortgagee in case there had been no contribution.

4.  **TAXES.**

The Mortgagor will pay Taxes now or hereafter levied or assessed against the Mortgaged Property as same become due and payable. The Mortgagor will deliver to the Mortgagee, upon request, evidence satisfactory to the Mortgagee that the Taxes are not delinquent.

5.  **TAX ESCROW.**

A.   The Mortgagor, in addition to the payments of interest and principal payable pursuant to the Note and this Mortgage, will pay to the Mortgagee on each payment date deposits to the Escrow Fund equal to 105% of the amount which would be sufficient to pay the Taxes payable, or estimated by the Mortgagee to be payable, during the ensuing twelve (12) months from the date of calculation, divided by the number of Installments due during the period ending one (1) month prior to the date any such Taxes are payable. The deposits to the Escrow Fund and the payments of interest or principal or both payable pursuant to the Note and this Mortgage shall be added together and shall be paid as an aggregate sum by the Mortgagor to the Mortgagee. The Mortgagee will apply the Escrow Fund to payments required to be made by the Mortgagor pursuant to Paragraph 4 hereof. If the amount of the Escrow Fund shall exceed the amounts due pursuant to Paragraph 4 hereof, the Mortgagee shall in its discretion: (a) return any excess to the Mortgagor; (b) credit such excess against the Debt in such priority and proportions as the Mortgagee in its discretion shall deem proper; or (c) credit such excess against future payments to be made to the Escrow Fund. In allocating such excess the Mortgagee may deal with the person shown on the records of the Mortgagee to be the owner of the Mortgaged Property. If the Escrow Fund is not sufficient to pay the Taxes, the Mortgagor shall pay to the Mortgagee, upon request, an amount which the Mortgagee shall estimate as sufficient to make up the deficiency, in default whereof, or after the occurrence of any other Event of Default (as hereinafter defined) hereunder, the Mortgagee may apply any sums in its hands to the payment of the following items in any order in its uncontrolled discretion:

(i)    Taxes;
(ii)   Interest on the principal;
(iii)  Amortization of the principal;
(iv)   Late charges payable pursuant to the provisions hereof.

T:\19000 FILES\19362\LOANDOCS

5

388

Until expended or applied as above provided, any amounts in the Escrow Fund shall constitute additional collateral security for the Debt and shall not bear interest.

B.      Notwithstanding "A" above, Mortgagee shall waive the provisions of Paragraph 5A, provided Mortgagor provides Mortgagee with written proof of the payment of Taxes within ten (10) days of their respective due dates.  In the event of a default hereunder, Mortgagee reserves the right to impose the provisions of Paragraph 5A in its sole discretion

6.      **CONDEMNATION.**

Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise, the Debt shall not be reduced until any award or payment therefor shall have been actually received after expenses of collection and applied by the Mortgagee to the discharge of the Debt and the Mortgagee shall not be limited to the interest paid on the award by the condemning authority, but shall be entitled to receive out of the award interest on the principal at the rate herein provided.  The Mortgagee may apply any such award or payment to the discharge of the Debt whether or not then due and payable.  If the Mortgaged Property is sold, through foreclosure or otherwise, prior to the receipt by the Mortgagee of such award or payment, the Mortgagee shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive said award or payment or a portion thereof sufficient to pay the Debt, whichever is less.

7.      **TENANCIES; RENTS.**

The Mortgagee has the right to enter the Mortgaged Property for the purpose of enforcing its interests as set forth herein.   Nevertheless, subject to the terms of this Paragraph 7, the Mortgagee waives the right to enter the Mortgaged Property for the purpose of collecting the Rents and grants the Mortgagor a revocable license to collect the Rents.  The Mortgagor shall hold the Rents, or an amount sufficient to discharge all current sums due on the Debt, in trust for use in the payment of the Debt.  The license of the Mortgagor to collect the Rents may be revoked by the Mortgagee upon any default by the Mortgagor under the terms of the Note or this Mortgage by giving notice of such revocation to the Mortgagor.  Following such notice the Mortgagee may enter upon the Mortgaged Property, collect, retain and apply the Rents toward payment of the Debt in such priority and proportions as the Mortgagee in its discretion shall deem proper.

The Mortgagor shall not, without the consent of the Mortgagee, make or suffer to be made any Leases or cancel or modify any Leases or accept prepayments of installments of Rents for a period of more than one (1) month in advance or further assign the whole or any part of the Rents; provided, however, that Mortgagor shall be permitted to execute, amend and terminate residential leases in the ordinary course.  Except as aforesaid, no Lease covering all or any part of the Mortgaged Property shall be valid or effective

T: 19000 FILES\19362\LOANDOCS

without the prior written approval of the Mortgagee. The Mortgagee shall have all of the rights against lessees of the Mortgaged Property as set forth in Section 291-f of the Real Property Law of New York. With respect to any Lease, the Mortgagor will: (a) fulfill or perform each and every provision thereof on its part to be fulfilled or performed; (b) promptly send to the Mortgagee copies of all notices of default which it shall send or receive thereunder; and (c) enforce all of the terms, covenants and conditions contained in the Leases upon the lessee's part to be performed, short of termination thereof. In addition to the rights which the Mortgagee may have hereunder, in the event of any default under this Mortgage, the Mortgagee, at its option, may require the Mortgagor to pay monthly in advance to the Mortgagee, or to any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Mortgaged Property as may be in the possession of the Mortgagor. Upon default in any such payment the Mortgagor will vacate and surrender possession of the Mortgaged Property to the Mortgagee or to such receiver and in default thereof the Mortgagor may be evicted by summary proceedings or otherwise.

Until the Debt has been repaid in full, the Mortgagor agrees to deposit all security deposits heretofore or hereafter made by tenants under the Leases affecting the Mortgaged Property in a lease security account with a financial institution satisfactory to the Mortgagee and to keep such security deposits in said account until the same are disbursed pursuant to the terms of the Leases.

## 8. **MAINTENANCE OF PROPERTY.**

The Mortgagor will cause the Mortgaged Property to be maintained in good condition and repair. The Improvements and the Equipment shall not be removed, demolished or altered (except for normal replacement of the Equipment) without the consent of the Mortgagee. The Mortgagor shall promptly comply with all laws, orders and ordinances affecting the Mortgaged Property or the use thereof and shall promptly repair, replace or rebuild any part of the Mortgaged Property which may be destroyed by any casualty or become damaged, worn or dilapidated or which may be affected by any proceeding of the character referred to in Paragraph 6 hereof and shall complete and pay for any structure at any time in the process of construction or repair on the Premises. If such casualty shall be covered by the Policies, the Mortgagor's obligation to do the Work shall be contingent upon the Mortgagee's paying to the Mortgagor the proceeds of the Policies, or such portion thereof as shall be necessary, upon completion of the Work to the Mortgagee's satisfaction.

## 9. **DUE ON SALE.**

The Mortgagor shall not, without the prior written consent of the Mortgagee, (a) permit the Mortgaged Property or any part thereof or any interest therein to be sold, transferred, conveyed or further encumbered to any other person or entity, or (b) sell, transfer, convey or encumber the Mortgaged Property or any part thereof or any interest

therein, which shall include but not be limited to (i) where the Mortgagor is a corporation, the sale, transfer, pledge or encumbrance of any direct or indirect interest in the stock of the corporation or the dilution of the present stockholding or corporate control by issuance of new or treasury stock or by conversion of any non-voting stock or other securities to voting stock, or (ii) where the Mortgagor is a partnership, the sale, transfer, pledge or encumbrance of any direct or indirect partnership interests in the Mortgagor, or the withdrawal, resignation or retirement of the general partner, or (iii) where the Mortgagor is a limited liability company, the sale, transfer, pledge or encumbrance of any of the interests in the Mortgagor.

### 10.   **ESTOPPELS.**

After request by the Mortgagee, the Mortgagor, within ten (10) days and at its expense, will furnish to the Mortgagee a statement, duly acknowledged and certified, setting forth the amount of the Debt, the rate of interest thereon, the date Installments were last paid, the offsets or defenses thereto, if any, that the Note and this Mortgage are valid, legal and binding and have not been modified or, if modified, giving particulars of such modification and that no Event of Default or event which after notice or lapse of time or both, would become an Event of Default exists, or if such event does exist, specify the particulars thereof.

### 11.   **NOTICES.**

Any notice, demand, statement, request or consent made hereunder shall be in writing and will be deemed given when addressed to the address, as set forth above, of the party to whom such notice is to be given, or to such other address as the Mortgagor or the Mortgagee, as the case may be, shall designate in writing in the manner hereinabove set forth and sent by registered or certified mail, return receipt requested, or by recognized overnight courier.

### 12.   **MULTIPLE PARCELS.**

If this Mortgage is foreclosed, the Mortgaged Property or any interest therein may, at the discretion of the Mortgagee, be sold in one or more parcels and in any order or manner.

### 13.   **TAX ON LOAN DOCUMENTS.**

If any law or ordinance is enacted or adopted which imposes a tax, either directly or indirectly, on the Note, this Mortgage, the Debt, or any of the other Loan Documents, the Mortgagor will pay such tax with interest and penalties thereon, if any. In the event that the Mortgagee shall be advised by counsel chosen by it that the payment of such tax or interest and penalties by the Mortgagor would be unlawful, taxable to the Mortgagee or unenforceable or would provide the basis for a defense of usury, then and in that event the

T:\9000 FILES\9362\LOANDOCS

8

Mortgagee shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

### 14.   **REVENUE STAMPS.**

If at any time the United States of America, any state thereof or any subdivision of any such state shall require revenue or other stamps to be affixed to the Note, this Mortgage, or any of the other Loan Documents, or shall impose any other tax or charge on the same, the Mortgagor will pay for the same with interest and penalties thereon, if any.

### 15.   **INSPECTION.**

The Mortgagee and its agents will have the right to enter and inspect the Mortgaged Property at all reasonable times.

### 16.   **BOOKS & RECORDS.**

A.   The Mortgagor will keep adequate books and records of account in accordance with generally accepted accounting practices consistently applied and will furnish the Mortgagee with annual accounting statements and balance sheets within ninety (90) days after the end of each calendar year and quarterly accounting statements within thirty (30) days of the end of each calendar quarter, in form satisfactory to the Mortgagee, which shall disclose in reasonable detail all earnings and expenses with respect to the operation of the Mortgaged Property, the Mortgagor and each Guarantor, certified by independent certified public accountants of recognized standing satisfactory to the Mortgagee. In addition, the Mortgagor will submit to the Mortgagee, on or before March 1st of each year, and at any other time within ten (10) days of Mortgagee's request, a certified statement setting forth the name of each tenant at the Mortgaged Property, the term of their respective leases, the space occupied, the rent payable and the security deposited therewith, together with, if requested, full and complete copies of each lease. The Mortgagor will also submit to the Mortgagee copies of any operating statements or the like when the Mortgagor is required to submit such information to any administrative or regulatory authority or agency having jurisdiction. In addition to but not in lieu of any other remedies available to the Mortgagee, upon the Mortgagor's failure to supply to the Mortgagee the records and/or other information required by this Paragraph 16, after thirty (30) days' notice of same, and until such records and/or information are furnished, interest payable hereunder shall be at the rate of twenty-four (24%) percent per annum or the maximum rate allowed to be charged by law, whichever is lower.

### 17.   **RECORDED INSTRUMENTS.**

The Mortgagor will observe and perform each and every term to be observed or performed by the Mortgagor pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Mortgaged Property.

T:\19000 FILES\19362\LOANDOCS

9

## 18.   **EVENTS OF DEFAULT.**

The Debt will become due at the option of the Mortgagee upon any one or more of the following events (each an "Event of Default"):

(a)   if any Installment is not paid within ten (10) days after the same is due or if the Debt is not paid in full on the Maturity Date;

(b)   if any of the Taxes are not paid when the same are due and payable;

(c)   if the Policies are not kept in full force and effect or if the Policies are not assigned and delivered to the Mortgagee upon request;

(d)   if the Mortgagor shall violate the provisions of paragraph 9 of this Agreement;

(e)   if the Mortgagor does not furnish a statement, in the manner provided herein, of the amount of the Debt and the offsets or defenses thereto, if any;

(f)   if without the consent of the Mortgagee any Improvement or the Equipment (except for normal replacement of the Equipment) is removed, demolished or altered or if the Mortgaged Property is not kept in good condition and repair;

(g)   if any Leases are made, cancelled or modified or if any of the Rents are prepaid for a period of more than one (1) month in advance or if any of the Rents are assigned without the consent of the Mortgagee, except as otherwise provided in Paragraph 7 hereof;

(h)   if any representation or warranty of the Mortgagor or of any Guarantor, made herein or in any guaranty executed in connection with the making of the Mortgage Note or this Mortgage or in any certificate, report, financial statement or other instrument furnished in connection with the making of the loan secured hereby, the Mortgage Note or this Mortgage or any such guaranty, shall prove false or misleading in any material respect;

(i)   if the Mortgagor or any Guarantor shall make an assignment for the benefit of creditors;

(j)   if a receiver, liquidator or trustee of the Mortgagor or of any Guarantor shall be appointed or if the Mortgagor or any Guarantor shall be adjudicated a bankrupt or insolvent or if any petition for bankruptcy, reorganization or arrangement

T:\19000 FILES\19362\LOANDOCS

10

pursuant to the Federal Bankruptcy Code or any similar federal or state statute shall be filed by or against the Mortgagor or any Guarantor or if any proceeding for the dissolution or liquidation of the Mortgagor or of any Guarantor shall be instituted and, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by the Mortgagor or such Guarantor, upon the same not being discharged, stayed or dismissed within ninety (90) days;

(k)     if the Mortgagor does not reimburse the Mortgagee upon demand for all expenses incurred in remedying any default of the Mortgagor hereunder or in appearing in, defending or bringing any action or proceeding to protect the Mortgagee's interest in the Mortgaged Property, including reasonable attorneys' fees, with interest as provided herein;

(l)     if for fifteen (15) days after notice from the Mortgagee the Mortgagor shall continue to be in default under any other covenant of the Mortgagor hereunder;

(m)     if, after a default thereunder, the Mortgagee elects to enforce its rights under the Note or any instrument which may be held by the Mortgagee as additional security for the Debt;

(n)     if the Mortgagor shall be in default under any other mortgage covering any part of the Mortgaged Property whether it is superior or inferior in lien to this Mortgage;

(o)     if the Mortgaged Property becomes subject to (i) any tax lien which is superior to the lien of this Mortgage, other than a lien for local real estate taxes and assessments not due and payable, or (ii) any mechanic's, materialman's or other lien and such lien shall remain undischarged for sixty (60) days;

(p)     if the Mortgagor fails to promptly cure any violations of laws or ordinances affecting or which may be interpreted to affect the Mortgaged Property, subject to the terms of Section 43;

(q)     if the Mortgagor shall convey or lease any air development rights with respect to the Mortgaged Property, inasmuch as the Mortgagor agrees that such sale or lease would conclusively impair the Mortgagee's security; or

(r)     if the Mortgaged Property is encumbered by any mortgage lien other than the lien of this Mortgage.

Upon the occurrence of any one of the foregoing Events of Default, the Mortgagor will pay, from the date of such Event of Default, interest at the Default Rate.

T:\19000 FILES\19362\LOANDOCS

11

394

### 19.  **REMEDIES.**

If the Mortgagor fails to make any payment or to do any act as herein provided, the Mortgagee may, but without any obligation to do so and without notice to or demand on the Mortgagor and without releasing the Mortgagor from any obligation hereunder, make or do the same in such manner and to such extent as the Mortgagee may deem necessary to protect the security hereof, the Mortgagee being authorized to enter upon the Mortgaged Property for such purposes, or appear in, defend or bring any action or proceeding to protect its interests in the Mortgaged Property or to foreclose this Mortgage or collect the Debt.  The cost and expense thereof (including attorneys' fees), with interest as provided in this paragraph, shall be due from Mortgagor upon demand made by the Mortgagee.  All such costs and expenses incurred by the Mortgagee in remedying such default or in appearing in, defending or bringing any such action or proceeding shall be paid with interest at the Default Rate for the period after notice from the Mortgagee that such cost or expense was incurred to the date of payment to the Mortgagee.  All such costs and expenses incurred by the Mortgagee pursuant to the terms hereof, with interest, shall be deemed to be secured by this Mortgage.

### 20.  **LATE PAYMENTS.**

If any Installment is not paid within ten (10) days after the date on which it is due, the Mortgagor shall pay to the Mortgagee, upon demand, an amount equal to five (5%) percent of such unpaid Installment to defray the expense incurred by the Mortgagee in handling and processing such delinquent payment and such amount shall be deemed to be secured by this Mortgage.

### 21.  **RECEIVER.**

In any action to foreclose this Mortgage the Mortgagee shall be entitled to the appointment of a receiver without notice, and without regard to the adequacy of the security.

### 22.  **NO WAIVER.**

The failure of the Mortgagee to insist upon strict performance of any term of the Note, this Mortgage or any of the other Loan Documents shall not be deemed to be a waiver of any term of the Note, this Mortgage or any of the other Loan Documents.  The Mortgagor shall not be relieved of the Mortgagor's obligations hereunder by reason of (a) the failure of the Mortgagee to comply with any request of the Mortgagor or any Guarantor to take any action to foreclose this Mortgage or otherwise enforce any of the provisions hereof or of the Note, (b) the release, regardless of consideration, of the whole or any part of the Mortgaged Property, or (c) any agreement or stipulation by the Mortgagee extending the time of payment or otherwise modifying or supplementing the terms of the Note or this Mortgage.  The Mortgagee may resort for the payment of the

F:\19000 FILES\19362\LOANDOCS

Debt to any other security held by the Mortgagee in such order and manner as the Mortgagee, in its discretion, may elect. The Mortgagee may take action to recover the Debt or any portion thereof or to enforce any covenant hereof without prejudice to the right of the Mortgagee thereafter to foreclose this Mortgage. The rights of the Mortgagee under this Mortgage shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of the Mortgagee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.

### 23.   JOINT AND SEVERAL LIABILITY.

If the Mortgagor consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several.

### 24.   GOVERNING LAW.

The terms of the Note, this Mortgage and the other Loan Documents shall be construed by the laws of the State of New York, except as herein expressly provided to the contrary.

### 25.   SECURITY AGREEMENT.

This Mortgage is both a real property mortgage and a security agreement. The Mortgaged Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of the Mortgagor in the Mortgaged Property, and the Mortgagor hereby grants the Mortgagee a security interest in all personal property and all other rights, tangible and intangible, contained within the Mortgaged Property.

The Mortgagor will, at the request of the Mortgagee, deliver to the Mortgagee any and all further instruments which the Mortgagee shall require in order to further secure and perfect the lien of this Mortgage. The Mortgagee is authorized and empowered to file financing statements, as required by the Uniform Commercial Code, to perfect its lien against the foregoing types of personal property without first obtaining the signature of the Mortgagor on the financing statements.

### 26.   POWER AND AUTHORITY.

The Mortgagor (and the undersigned representative of the Mortgagor, if any) has full power, authority and legal right to execute this Mortgage and to keep and observe all of the terms of the Note and this Mortgage on the Mortgagor's part to be performed.

### 27.   MORTGAGEE'S RIGHT TO DEFEND.

The Mortgagee has the right to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to bring any action or proceeding, in

T:\19000 FILES\19362\LOANDOCS

13

396

the name and on behalf of the Mortgagor, which Mortgagee, in its discretion, feels should be brought to protect its interests in the Mortgaged Property.

### 28.   UNENFORCEABLE PROVISIONS.

If any term, covenant or condition of the Note, this Mortgage or any of the other Loan Documents is held to be invalid, illegal or unenforceable in any respect, the Note, this Mortgage and/or the other Loan Documents shall be construed without such provision.

### 29.   DUPLICATE ORIGINALS.

This Mortgage and the other Loan Documents may be executed in any number of duplicate originals and each such duplicate original shall be deemed to constitute but one and the same instrument.

### 30.   AUTHORIZATION.

If the Mortgagor is a corporation, the execution and delivery of this Mortgage has been duly authorized by the board of directors of the Mortgagor and there is no requirement under its certificate of incorporation or its by-laws for consent of shareholders to this transaction; or if the Mortgagor is a partnership, the execution and delivery of this Mortgage has been duly authorized by the partners of the Mortgagor pursuant to its partnership agreement; or if the Mortgagor is a limited liability company, the execution and delivery of this Mortgage has been duly authorized in accordance with its operating agreement.

### 31.   SINGULAR AND PLURAL.

Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Mortgage shall be used interchangeably in singular or plural form. The word "Mortgagor" shall mean "each Mortgagor and/or any subsequent owner or owners of the Mortgaged Property or any part thereof or interest therein". The word "Mortgagee" shall mean "the Mortgagee or any subsequent holder of the Note". The word "Note" shall mean "the Note or any other evidence of indebtedness secured by this Mortgage". The word "person" shall include an individual, corporation, partnership, limited liability company, trust, unincorporated association, government, governmental authority or other entity. The words "Mortgaged Property" shall include any portion of the Mortgaged Property or interest therein. The word "Debt" shall mean the principal with interest thereon and all other sums due pursuant to the Note and secured by this Mortgage. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms and the singular form of nouns and pronouns shall include the plural and vice versa.

T:\19000 FILES\19362\LOANDOCS

## 32.   NO ORAL MODIFICATIONS.

Neither the Note, this Mortgage nor any of the other Loan Documents may be changed orally, but only in writing by the person to be charged.

## 33.   PREPAYMENT.

(A)   Privileges, if any, to pay all or any part of the Debt, except as may be contained herein, are hereby terminated with the same force and effect as if they had never been granted.

(B)   Upon giving not less than five (5) days prior written notice to the Mortgagee of its intention to do so the Mortgagor shall have the right to prepay the Debt in full or, provided that no Event of Default shall have occurred and be continuing, in multiples of Ten Thousand and 00/100 ($10,000.00) Dollars with interest computed to the last day of the month in which any prepayment is made, without penalty. Notwithstanding the foregoing, in the event that an assignment of this Mortgage is requested, additional time may be required.

## 34.   PAYMENT AFTER ACCELERATION.

If following the occurrence of any default under the Note or this Mortgage and an exercise by the Mortgagee of its option to declare the Debt immediately due and payable, the Mortgagor shall tender payment of an amount sufficient to satisfy the entire Debt at any time prior to a foreclosure sale of the Mortgaged Property, such tender by the Mortgagor shall be deemed to be a voluntary prepayment of principal and the Mortgagor shall, in addition to the entire Debt, also pay to the Mortgagee the applicable prepayment charge, if any, as set forth in Paragraph 33 of this Mortgage.

## 35.   DEFAULT AFTER MATURITY.

The Mortgagor hereby agrees that upon its failure to pay the Debt on the maturity date the Mortgagor will pay to the Mortgagee interest on the then unpaid principal at the Default Rate from the maturity date and until the actual receipt and collection of the Debt by the Mortgagee. This charge shall be added to the principal and shall be deemed to be part of the Debt. This paragraph, however, shall not be construed as an agreement or privilege to extend this Mortgage, nor as a waiver of any other right or remedy accruing to the Mortgagee by reason of any such default.

## 36.   WAIVER OF COUNTERCLAIMS.

The Mortgagor hereby waives the right to assert a counterclaim other than a compulsory counterclaim in any action or proceeding brought against it by the Mortgagee and waives trial by jury in any action or proceeding brought by either party hereto against the other or in any counterclaim asserted by the Mortgagee against the Mortgagor on any

matters whatsoever arising out of or in any way connected with the Note, this Mortgage or the Debt.

### 37. USURY SAVINGS CLAUSE.

This Mortgage is subject to the express condition that at no time shall the Mortgagor be obligated or required to pay interest on the principal balance due hereunder at a rate which could subject the Mortgagee to either civil or criminal liability as a result of being in excess of the maximum interest rate which the Mortgagor is permitted by law to contract or agree to pay. If by the terms of this Mortgage the Mortgagor is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of such maximum rate, the rate of interest under this Mortgage and/or the Note shall be deemed to be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments toward the reduction of principal and not to the interest due hereunder.

### 38. COMPLIANCE WITH LIEN LAW.

The Mortgagor covenants that the Mortgagor will, in compliance with Section 13 of the Lien Law, receive the advances secured hereby and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

### 40. ENVIRONMENTAL COMPLIANCE.

The Mortgagor hereby represents and warrants to the Mortgagee that the Mortgaged Property and the use thereof are and have been in full compliance with all federal, state and local laws, ordinances, rules and regulations regarding hazardous and toxic materials. The Mortgagor hereby indemnifies and holds the Mortgagee free of and harmless from and against any and all claims, demands, damages or liabilities the Mortgagee may incur as a result of the failure of the Mortgaged Property to be or to have been in full compliance with all federal, state and local laws, ordinances, rules and regulations regarding hazardous and toxic materials.

### 41. POWER OF SALE.

The Mortgagee may, either with or without entry or taking possession of the Mortgaged Property as provided in this Mortgage or otherwise, personally or by its agents or attorneys, and without prejudice to the right to bring an action for foreclosure of this Mortgage, sell the Mortgaged Property or any part thereof pursuant to any procedures provided by applicable law, including, without limitation, the procedures set forth in Article 14 of the New York Real Property Actions and Proceedings Law (and any amendments or substitute statutes in regard thereto), and all estate, right, title, interest, claim and demand therein, and right of redemption thereof, at one or more sales as an

T:\19000 FILES\19362\LOANDOC'S

399

entity or in parcels, and at such time and place upon such terms and after such notice thereof as may be required or permitted by applicable law.

### 42. **PARTIAL PAYMENTS.**

The Mortgagee shall have the right (but not the obligation) to apply partial payments on account of principal, interest, tax escrow installments or tax arrears as it shall determine in its sole discretion.

### 43. **VIOLATIONS.**

The Mortgagor covenants and agrees to cure and remove at Mortgagor's sole cost and expense, all fire, building, health, safety and/or any other violations attached to or referenced in that certain report on Title No. LAA2205 dated August 23, 2016 prepared by Landmark Abstract Agency, LLC, as agent for Old Republic National Title Insurance Company (the "Violations"), as updated from time to time through the date hereof and to provide Mortgagee with evidence satisfactory to Mortgagee in Mortgagee's sole discretion of the cure and removal of same no later than February ___, 2017.

### 44. **NO MORTGAGEE LIABILITY.**

The Mortgagor is advised and agrees that the Mortgagee has entered into this Mortgage on the express condition that any obligation hereunder of Mortgagee shall be enforceable only against Mortgagee's interest in this Mortgage, and that no trustee, officer, director, beneficiary or shareholder of Mortgagee shall be personally liable for any matter in connection with, or arising out of this Mortgage. The foregoing shall not be deemed in any way to impose any obligations on Mortgagee except as expressly provided herein.

### 45. **NOTICE TO MORTGAGEE.**

The Mortgagor shall give prompt notice to the Mortgagee of (a) a default under this Mortgage, (b) any notice given or any other action taken or, to the Mortgagor's knowledge, intended to be taken by (i) a tenant under any Lease, (ii) a holder of any indebtedness of the Mortgagor or (iii) any other person or entity, if such notice is given or such other action is taken with respect to (x) a claimed default under such Lease, (y) a default under this Mortgage, and (c) any proceedings instituted by or against the Mortgagor in any federal or state court or by any governmental department, agency or instrumentality, or any such proceedings threatened against the Mortgagor in any federal or state court or by any governmental department, agency or instrumentality, affecting the Mortgaged Property or any portion thereof or which, if adversely determined, would have a material adverse effect upon the Mortgagor's business, assets or condition, financial or other, or upon the lien of this Mortgage. Any notice so given shall specify the nature and period of existence of such event or condition and what action Mortgagor or any of such

T:\19000 FILES\19362\LOANDOCS

17

400

Guarantors is taking or causing to be taken and proposes to take or cause to be taken with respect thereto and shall include a copy of any documents relevant thereto.

### 46. **SEPARATENESS COVENANTS.**

The Mortgagor represents, warrants and covenants as follows:

(a)    The Mortgagor does not own and will not own any asset or property other than (i) the Mortgaged Property, and (ii) incidental personal property necessary for the ownership or operation of the Mortgaged Property.

(b)    The Mortgagor will not engage in any business other than the ownership, management and operation of the Mortgaged Property and the Mortgagor will conduct and operate its business as same is presently conducted and operated.

(c)    The Mortgagor will not enter into any contract or agreement with any affiliate of the Mortgagor, any constituent party of the Mortgagor, any of the Guarantors or any affiliate of any of the Guarantors, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available to a third party.

(d)    The Mortgagor has not incurred and will not incur any indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than the Debt and trade and operational debt incurred in the ordinary course of business with trade creditors and in amounts as are normal and reasonable under the circumstances.

(e)    The Mortgagor has not made and will not make any loans or advances to any third party (including any affiliate or constituent party, any of the Guarantors or any affiliate of any constituent party of any of the Guarantors).

(f)    The Mortgagor is and will remain solvent and the Mortgagor will pay its debts and liabilities (including employment and overhead expenses) from its assets as the same shall become due, subject to any applicable grace and cure periods.

(g)    The Mortgagor has done or caused to be done and will do all things necessary to observe corporate, partnership or limited liability company formalities and preserve its existence, and the Mortgagor will not, nor will the Mortgagor permit any constituent party or any of the Guarantors to, amend, modify or otherwise change the partnership agreement, articles of incorporation and bylaws, articles of organization, operating agreement, trust or other organizational documents of the Mortgagor or such constituent party or any of the Guarantors in a manner which would adversely affect the Mortgagor's existence as a single purpose entity.

f:\19000 FILES\19362\LOANDOCS

(h)     The Mortgagor will maintain books and records and bank accounts separate from those of its affiliates and any constituent party and the Mortgagor will file its own tax returns.

(i)     The Mortgagor will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any affiliate of the Mortgagor, any Mortgagor, any of the Guarantors or any affiliate of any constituent party of any of the Guarantors), and shall maintain and utilize separate stationery, invoices and checks.

(j)     The Mortgagor will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(k)     Neither the Mortgagor nor any constituent party will seek the dissolution or winding up, in whole or in part, of the Mortgagor.

(l)     The Mortgagor will not commingle the funds and other assets of the Mortgagor with those of any affiliate or constituent party or any of the Guarantors, or any other person.

(m)     The Mortgagor has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party, any of the Guarantors, or any affiliate of any constituent party of any of the Guarantors, or any other person.

(n)     The Mortgagor does not and will not hold itself out to be responsible for the debts or obligations of any other person.

(o)     The Mortgagor shall not, without the unanimous consent of its board of directors, (i) file, or consent to the filing of, any bankruptcy or insolvency petition or otherwise institute insolvency proceedings, (ii) dissolve, liquidate, consolidate, merge, or sell all or substantially all of its assets, or (iii) engage in any other business activity.

## 47.     <u>RIGHT OF MORTGAGEE TO SELL DEBT.</u>

The Mortgagee reserves the right at any time to sell, transfer, convey, pledge or encumber the Debt, or any part thereof or interest therein, to any third party, at the Mortgagor's reasonable cost and expense.  The Mortgagor shall be required to execute any and all severance or splitter agreements, wrap-around mortgages, underlying mortgages, mortgage modification agreements, participation agreements, substitute notes,

substitute mortgages and/or other documents as the Mortgagee shall reasonably request in order to effectuate such sale, transfer, conveyance, pledge, encumbrance or securitization.

### 48.   WAIVER OF AUTOMATIC STAY.

The Mortgagor agrees that, in the event that the Mortgagor, any of the Guarantors or any of the persons or parties constituting the Mortgagor or any of the Guarantors shall (i) file with any bankruptcy court of competent jurisdiction or be the subject of any petition under Title 11 of the U.S. Code, as amended ("Bankruptcy Code") , (ii) be the subject of any order for relief issued under the Bankruptcy Code, (iii) file or be the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, (iv) have sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator, or liquidator, or (v) be the subject of any order, judgment, or decree entered by any court of competent jurisdiction approving a petition filed against such party for any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or relief for debtors, Mortgagee shall thereupon be entitled and Mortgagor irrevocably consents to immediate and unconditional relief from any automatic stay imposed by Section 362 of the Bankruptcy Code, or otherwise, on or against the exercise of the rights and remedies otherwise available to Mortgagee as provided for herein, other loan documents delivered in connection herewith and as otherwise provided by law; and Mortgagor (a) hereby irrevocably waives any right to object to such relief and acknowledges that no reorganization in bankruptcy is feasible; (b) waives its exclusive right pursuant to Section 1121(b) of the Bankruptcy Code to file a plan of reorganization and irrevocably consents to Mortgagee filing a plan immediately upon the entry of an order for relief if an involuntary petition is filed against Mortgagor or upon the filing of a voluntary petition by such Mortgagor; and (c) in the event that Mortgagee shall move pursuant to Section 1121(d) of the Bankruptcy Code for an order reducing the 120-day exclusive period, Mortgagor shall not object to any such motion.  In addition, any plan reorganization under Chapter 11, 12 or 13 of the Bankruptcy Court shall provide for the payment of interest of the amount of the Debt.

### 49.   MAXIMUM INDEBTEDNESS.

Notwithstanding anything contained to the contrary the maximum amount of principal indebtedness secured by this Mortgage at the time of execution hereof or which under any contingency may become secured by this Mortgage at any time hereafter is **Six Million Five Hundred Thousand and 00/100 ($6,500,000.00) Dollars.**

## 50.    HEADINGS.

Section headings in this Mortgage are for convenience only and are not to be considered a part hereof and shall not amend or otherwise affect any of the terms hereof.

## 51.    BROKERAGE COMMISSIONS.

The Mortgagor hereby agrees to indemnify the Mortgagee and hold the Mortgagee harmless from and against any actual, out-of-pocket loss, cost or expense of any kind or nature whatsoever (including, without limitation, reasonable legal fees and expenses) incurred by the Mortgagee arising out of any and all claims or suits for compensation, commissions or otherwise that may be asserted or made by any broker, person or entity claiming to have dealt with or to have been employed by the Mortgagor or the Mortgagor's representative, in connection with the loan secured hereby.

## 52.    ASSIGNMENT OF MORTGAGE.

Provided the Mortgagor is not in default under the terms and conditions of the Note or this Mortgage, upon payment in full of the Debt (by wire transfer of immediately available funds), the Mortgagee will assign the Mortgage to the Mortgagor or its designee, at no additional cost other than: a) reasonable legal fees incurred in connection therewith; and b) a reasonable assignment fee.  However, the Mortgagee shall have no responsibility or liability in the event any of the original Notes are lost and shall, upon request if necessary, provide a lost note affidavit.

T:\19000 FILES\19362\LOANDOCS

21

404

**IN WITNESS WHEREOF**, this Mortgage has been duly executed by the Mortgagor as of the date first above written.

**4921 12th AVENUE LLC**

By: _____

Yehuda Salamon, Sole Member

STATE OF NEW YORK )
                                       )ss.:
COUNTY OF NEW YORK )


On the 30th day of August, 2016, before me, the undersigned, personally appeared Yehuda Salamon, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____

Notary Public


IRA NEWMAN
NOTARY PUBLIC, State of New York
No. 01NE6238352
Qualified in Kings County
Commission Expires April 4, 2018

T:\19000 FILES\19362\LOANDOCS

## SCHEDULE A

The Condominium Units Nos. C1 & R1 (hereinafter called "the Unit") known as Units No. C1 & R1 in the buildings (hereinafter referred to as the "Buildings") known as The 4917 12th Avenue Condominium and by the Street Number 4917 12th Avenue, Brooklyn, New York, Borough of Brooklyn and State of New York, said Unit being designated and described as Units No. C1 & R1 in a certain Declaration dated July 29, 2014 made by the Grantor pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as "Condominium Act"), establishing a plan for condominium ownership of the Buildings and the land (hereinafter referred to as the "Land") upon which the Buildings are situate (which Land is more particularly described below), which declaration was recorded in the Kings County Office of the Register of the City of New York on September 12, 2014, in CRFN No. 2014000302884 (which declaration and amendments, if any, thereto are hereinafter collectively referred to as the "Declaration"). This Unit is also designated as Tax Lot Nos. 1501 and 1502.

TOGETHER with an undivided 100% percent interest in the common elements (as such term is defined in the Declaration).

The land upon which the Building containing the Units are erected is described as follows:

All that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York bounded and described as follows:

BEGINNING at a point on the southeasterly side of 12th Avenue, distant 12.31 feet northeasterly from the corner formed by the intersection of the southeasterly side of 12th Avenue with the northeasterly side of 50th Street;

RUNNING THENCE southeasterly parallel with 50th Street, 100 feet;

THENCE northeasterly parallel with 12th Avenue, 40 feet;

THENCE northwesterly parallel with 50th Street, 100 feet to the southeasterly side of 12th Avenue;

THENCE southwesterly along the southeasterly side of 12th Avenue, 20 feet to the point or place of BEGINNING.

**Premises:  Condominium Units C-1 and R-1 in The 4917 12th Avenue Condominium, 4917 12th Avenue, Brooklyn, New York**

T:\19000 FILES\19362\LOANDOCS

23

406

**Mortgagor:**   **4921 12th AVENUE LLC**

**Mortgagee:**   **GALSTER FUNDING LLC**

**Block:**       5641
**Lots:**        1501 and 1502

**Street Address:**   **Condominium Units C-1 and R-1 in The 4917 12th Avenue Condominium, 4917 12th Avenue, Brooklyn, New York**

## Check One Box Only

1.    [   ]    The attached mortgage covers real property principally improved or to be improved by one or more structures containing in the aggregate not more than six residential dwelling units, each having their own separate cooking facilities.

2.    [ x ]    The attached mortgage does not cover real property improved as described above.

**4921 12th AVENUE LLC**

By: _____

Yehuda Salamon, Sole Member

T:\19000 FILES\19362\LOANDOCS

24

407

# Exhibit B

## COMMERCIAL TRIPLE NET LEASE

### Parties

This Commercial Lease Agreement ("Lease") is entered into between Yidel's Fresh Food Station, LLC ("Lessee") and 4921 12th Avenue, LLC ("Lessor").

### Premises

Lessor rents to Lessee, and Lessee rents from Lessor approximately 8,800 sq. ft. of the property and advertising and billboard air rights, situated at 4921 12th Avenue, Brooklyn, New York 11219, County of Kings, State of New York, also described as Lot 1501 and Block 5641 ("the Premises"), of which Lessor is the owner, subject to the terms and conditions in this Agreement.

### Term

The term of this Lease ("Term") and the rental associated with said agreement will begin on January 1, 2016 ("Commencement Date") and end on January 1, 2021, unless sooner terminated as herein set forth or unless extended in accordance with the provisions hereof.

### Definitions

Adjacent Facilities - all sidewalks, grounds, areas, vaults, chutes, sidewalk hoists, railings, gutters, water and sewer connections, streets, alleys and curbs, parking areas, malls or passageways in front of, adjacent to or appurtenant to the Premises.

Requirements - all present and future laws, statutes, rules, orders, ordinances, regulations or other requirements (including without limitation Environmental Laws) of any governmental, public or quasi-public authority now existing or hereafter created, and of any and all of their departments and bureaus, and of any applicable fire rating bureau or other body exercising similar functions, and all covenants or restrictions applicable to or affecting the Premises or any Adjacent Facilities.

The words "herein," "hereof," "hereunder" and words of similar import refer to this Lease as a whole and not to any particular Section or Subsection thereof unless the context shall otherwise require.

### Use

Lessee shall use and occupy the premise for the purpose of: Retail storefront operation.

-1-

Lessee shall have the right at its own expense to contest, by appropriate proceedings diligently conducted in good faith, any allegation by public authorities that Lessee, the Premises or any Improvements are in violation of any Requirements or any certificate of occupancy affecting the Premises, but only so long as:

(a) Neither the Premises nor any part thereof would by reason of such contest be, in Lessor's sole judgment, in danger of being forfeited or lost;

(b) Lessor shall not in its sole judgment be in danger of being subject to criminal liability or penalty by reason of such contest; and

(c) Lessee shall have indemnified and shall continue to indemnify Lessor with a surety bond, or other means satisfactory to Lessor in its sole discretion, in an amount sufficient to pay any fines, penalties or other charges that may or might be assessed against or become a charge on the Premises if such contest is unsuccessful.

Any such contest may be made in the name of Lessor or Lessee or both, as Lessee shall determine; and Lessor agrees to cooperate reasonably with Lessee in any such contest but without expense to Lessor. Lessee shall pay all costs and expenses (including, but not limited to, Lessor's attorneys' fees) incurred by Lessor in connection therewith. If Lessee upon the conclusion of any contests or proceedings shall fail to pay any fines, penalties or other charges thereby determined to be due, or if prior thereto Lessor, in the exercise of its sole judgment, shall determine that either condition (a) or (b) of this Section is no longer satisfied, Lessor may apply all or any part of any security provided under this Section to the payment, removal and discharge of such amounts and any costs, expenses (including, but not limited to, Lessor's attorneys' fees) and other liabilities accruing in such proceedings, and shall refund to Lessee the balance of any security not so applied, if any. Lessee shall promptly pay to Lessor any deficiency resulting from such application, with the amount of such deficiency to be due as Additional Rent due on the next rent day after any such deficiency is determined, with interest thereon at the rate of Prime plus three percent (3%) per annum from the date of such determination.

Lessee shall not suffer or permit the Premises or any portion thereof to be used in any manner as might tend to impair Lessor's title to the Building or Land or any portion thereof, or in such manner as might make possible a claim or claims of adverse usage or adverse possession or of implied dedication of the Building or Land or any portion thereof for public use.

Notwithstanding the forgoing, Lessee shall not use the premises for the purposes of storing, manufacturing or selling any explosives, flammables or other inherently dangerous substance, chemical, thing or device.

**Net Rent – Rent Absolute**

-2-

Lessor and Lessee agree (a) that this is a triple net lease, (b) that Lessee accordingly shall be responsible for all obligations which are normally imposed on the owner of real estate with respect to the Premises which may accrue during the Term including, without limitation, responsibility for the payment of all real estate taxes, special assessments, insurance premiums and repair, replacement and maintenance costs and expenses in connection therewith (except as otherwise expressly set forth herein), and (c) that the Rent and all payments to be made to Lessor hereunder are to be net to Lessor, without deductions or offsets of any kind or nature whatsoever. In no event shall there be any abatement or reduction in the Rent except as may be otherwise specifically provided in this Lease.

Except as otherwise specifically provided herein, damage to or destruction of any portion or all of the Building or other Improvements located upon the Premises, by fire, the elements or any other cause whatsoever, whether with or without fault on the part of Lessee, shall not terminate this Lease or entitle Lessee to surrender the Premises or entitle Lessee to any abatement of or reduction in the Rent payable, or otherwise affect the respective obligations of the parties hereto, any present or future law to the contrary notwithstanding. If the use of the Premises for any purpose should, at any time during the Term, be prohibited by law or ordinance or other governmental regulation, or prevented by injunction, or if there is any eviction by title paramount, this Lease shall not, except as otherwise specifically provided herein, be thereby terminated nor shall Lessee be entitled by reason thereof to surrender the Premises, or to any abatement or reduction in Rent, nor shall the respective obligations of the parties hereto be otherwise affected unless such eviction is due to the act of Lessor or any person or persons claiming any interest in the demised premises by or under Lessor.

This Lease is made upon the foregoing and following covenants, agreements and conditions, all of which Lessee agrees to perform irrespective of whether the particular provision is in the form of a covenant, an agreement, a condition, a direction or any other form.

### Payment of Rent

Lessee will pay to Lessor an annual fixed rental of Three Hundred Fifteen Thousand and 00/100 ($315,000.00) Dollars for the first year payable in equal installments of Twenty Six Thousand, Two Hundred Fifteen and 00/100 ($26,250.00) Dollars in advance of the first day of each month, the first such payment on the Rent Commencement Date and subsequent monthly payments on the first (1st) day of each succeeding month during the Term, except when that day falls on a weekend or a legal holiday, in which case rent is due on the next business day.  Payment shall be made to the person and at the address the Lessor shall designate in writing.  Rental is to be paid in cash, money order, cashier's check and/or certified check, or, at the option of the Lessor, in any other fashion.  The annual fixed rent shall increase by 3% for each year of the lease, including any exercised options.

Commencing on the Commencement Date, Lessee also covenants and agrees to pay as

"Additional Rent" prior to the respective due dates thereof all Impositions, as defined in the Section entitled Impositions contained herein, insurance premiums, charges, costs, expenses, and payments required to be paid by Lessee in accordance with any of the provisions of this Lease.

All amounts payable by Lessee under this Section shall collectively comprise the rent due and payable under this Lease ("Rent").

## Late Charges

Any installment of Rent or any part thereof which is not made within five (5) days from when due shall result in the imposition of a late charge of $100.00  In the event of non-payment of any Late Charge, Lessor shall have, in addition to all other rights and remedies, all rights and remedies provided for in this Lease and by law in the case of non-payment of Rent. No failure by Lessor to insist upon strict performance by Lessee of its obligations to pay Late Charges shall constitute a waiver by Lessor of its rights to enforce the provisions of this Section in any instance thereafter, nor shall acceptance of Late Charges be deemed to extend the time for payment of Rent or any part thereof under this Lease.

The provisions for Late Charges stated herein shall not limit or affect Lessor's other remedies against Lessee under this Lease or under law, including, but not limited to, Lessor's right to charge Lessee for all costs and expenses (including, but not limited to, Lessor's attorneys' fees) incurred in connection with the collection of Rent and Late Charges from Lessee.

## Utilities/Common Charges

All applications and connections for necessary utility services on the demised premises shall be made in the name of Lessee only, and Lessee shall be solely liable for utility charges as they become due, including those for sewer, water, gas, electricity, and telephone services. In addition, Lessee shall be responsible for the payment of common charges which currently is approx. $1,150 a month and is subject to upward modifications as per the management company.

## Security Deposit

Lessee will pay to Lessor the sum of Fifty Two Thousand, Five Hundred and 00/100 ($52,500.00) Dollars as security deposit for the performance of Lessee's obligations under this lease, including without limitation the surrender of possession of the premises to Lessor as herein provided.  It is expressly understood that the Security Deposit shall not be considered an advance payment of rental or a measure of Lessor's damages in case of default by Lessee. Unless otherwise provided by mandatory non-waivable law or regulation, Lessor may commingle the Security Deposit with Lessor's other funds. Lessor may, from time to time, without prejudice to any other remedy, use the Security Deposit to the extent necessary to make good any arrearage of rent or to satisfy any other covenant, obligation or default of Lessee hereunder. Following any such application of the Security Deposit, Lessee shall pay to Lessor on demand the amount so

-4-

applied in order to restore the Security Deposit to its original amount.  If Lessor transfers Lessor's interest in the premises during the term of this Lease, Lessor may assign the Security Deposit to the transferee and thereafter shall have no further liability for the return of such Security Deposit.

## Impositions

Lessee covenants and agrees to pay, before any fine, penalty, interest or cost may be added thereto for non-payment thereof, all taxes, assessments, water and sewer rates and charges, excises, levies, license and permit fees, and other governmental charges, and charges for public and private utilities and services (and, in the event of any non-payment in violation of the foregoing covenants, all fines, penalties, interest and costs with respect to any of the foregoing), general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature that at any time during the Term may be assessed, levied, confirmed, imposed upon or grow or become due and payable out of or in respect of, or charged with respect to or become a lien on, the Land or the Building or the Premises or any Adjacent Facility or any personal property, equipment or other facility used in the operation of the Premises, or the rent or income received therefrom, or any use or occupancy thereof, or this transaction, or the Rent or other sums payable hereunder (except as otherwise provided in this Section) or under any  sublease or license or other similar agreement with respect to use or occupancy of any part of the Premises, or under any document to which Lessee is a party creating or transferring an interest or estate in the Premises (all of which items are herein called "Impositions"). Each Imposition shall be paid not later than the due date thereof, but if by law any Imposition may, at the option of the taxpayer, be paid in installments, Lessee may pay such Imposition in installments as the same becomes due. Lessee shall not be required to pay any Imposition upon or against the Premises or any part thereof or the Improvements so long as Lessee shall, to the extent permitted by law, in good faith and with due diligence, contest the same or the validity thereof by appropriate legal proceedings which shall have the effect of preventing the collection of the Imposition so contested; provided that, pending any such legal proceedings Lessee shall give Lessor such security as may be demanded by Lessor in Lessor's reasonable discretion to insure payment of the amount of the Imposition, and all interest and penalties thereon. In the event that Lessee at any time institutes suit to recover any Imposition or charge paid by Lessee under protest in Lessor's name, Lessee shall have the right, at its sole expense, to institute and prosecute such suit or suits in Lessor's name, in which event Lessee covenants and agrees to indemnify Lessor and save Lessor harmless from and against all costs, expenses (including, but not limited to, Lessor's attorneys' fees), charges or liabilities in connection with any such suit.

Nothing herein contained shall require Lessee to pay any inheritance, estate, succession, transfer or gift taxes or state or federal income taxes of Lessor, except that if at any time during the Term the method of taxation then prevailing shall be altered so that any new tax, assessment, levy, imposition or charge or any part thereof shall be imposed upon Lessor in place of any Imposition as heretofore defined and shall be measured by or be based in whole or in part upon the Premises

or the rents or other income therefrom, then all such new taxes, assessments, levies, impositions or charges or part thereof, to the extent that they are so measured or based, shall constitute Impositions for purposes hereof, and Lessee shall pay and discharge the same as herein provided with respect to Impositions.

Any Imposition that relates in part to a period extending beyond the Term (including any Imposition that has been converted into installment payments as provided in this Section, as to which the period over which such installments are payable shall be deemed to be the period to which such Imposition relates) shall be apportioned between Lessor and Lessee at the expiration of the Term, except that Lessee shall not be entitled to receive the funds representing such apportionment unless and until any then-existing Defaults are cured. Without limiting the generality of the foregoing, Lessee shall pay to Lessor prior to the expiration of the Term Lessee's estimated prorated share of any general real estate taxes becoming due and payable after the expiration of the Term, as estimated by Lessor based upon one hundred ten percent (110%) of the then most recent ascertainable tax bills.

Lessee shall furnish to Lessor within ten (10) days after the due date of any Imposition payable by Lessee official receipts of the proper taxing authority or other proof satisfactory to Lessor evidencing payment thereof.

The certificate, advice or bill indicating the non-payment of any Imposition, issued by the appropriate official designated by law to make or issue the same or to receive payment of such Imposition, shall be prima facie evidence that the Imposition is due and unpaid at the time of issuance of such certificate, advice or bill.

Lessor shall, at its option, have the right at all times during the Term to pay any Impositions not paid by Lessee, and the amounts so paid, including expenses, shall be so much Additional Rent due at the next rent day after any such payment, with interest thereon at the rate of Prime, plus three percent (3%) per annum from the date of payment thereof.

## Default

Each of the following shall be an "Event of Default":

1.    If Lessee shall fail to pay rent when due, the Lessor, at his option, may terminate all rights of the Lessee herein after not less than five (5) days written notice of such default given in a manner required by law unless Lessee rectifies or cures the default within the said time.

2.    If Lessee shall fail to pay any other payment of money, costs or expenses to be paid by Lessee under this Lease, when due, and the continuance of such failure for a period of ten (10) days after written notice from Lessor specifying such failure:

3.     In the event of a default made by Lessee in any of the other covenants or conditions to be kept, observed and performed by Lessee. Lessee shall have thirty (30) days after receipt of written notice thereof to cure such default. In the event that the Lessee shall fail to cure any default within the time allowed under this paragraph, Lessor may declare the term of this Lease ended and terminated by giving Lessee written notice of such intention, and if possession of the premises is not surrendered. Lessor may reenter said premises. Lessor shall have, in addition to the remedy above provided, any other right or remedy available to Lessor on account of any Lessee default, either in law or equity. Lessor shall use reasonable efforts to mitigate its damages.

4.     The filing or execution or occurrence of any of the following will be considered a Default on the part of Lessee:

(a)    A petition in bankruptcy by or against Lessee;

(b)    A petition against or answer by Lessee seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution or other relief of the same or different kind under any provision of any bankruptcy laws;

(c)    Adjudication of Lessee as a bankrupt or insolvent;

(d)    An assignment by Lessee for the benefit of creditors;

(e)    A petition against or proceeding by Lessee for, or the appointment of, a trustee, receiver, guardian, conservator or liquidator of Lessee with respect to the Premises or with respect to all or substantially all of Lessee's property; or

(f)    A petition against or proceeding by or against Lessee for its dissolution or liquidation or the taking of possession of Lessee's property by any governmental authority in connection with dissolution or liquidation.

Where in the case of a petition filed against Lessee under (a), (b), (e) or (f) above, such petition is not dismissed within ninety (90) days after the filing thereof;

(g)    Entry of an order, judgment or decree by any court of competent jurisdiction granting any prayer or demand contained in any petition under (a), (b), (e) or (f) above, which order, judgment or decree is not reversed or vacated within ninety (90) days after it is entered;

(h)    Vacation or abandonment of the Premises; or

(i)    Taking by any person of Lessee's interest in this Lease upon execution, attachment or other process of law or equity.

-7-

In the event of Default on the part of Lessee, Lessor, at its option, without further notice or demand to Lessee, may, in addition to all other rights and remedies provided in this Lease, at law or in equity: (a) terminate this Lease and Lessee's right of possession of the Premises, and recover all damages to which Lessor is entitled at law, specifically including, without limitation, the excess of the aggregate Fixed Rent and Additional Rent that would have accrued for the balance of the Term over the then current fair market rental value of the Premises for the balance of the Term, together with all of Lessor's expenses of re-leasing (including repairs, alterations, improvements, additions, decorations, legal fees and brokerage commissions) or (b) terminate Lessee's right of possession of the Premises without terminating this Lease. In all events, Lessor may re-lease the Premises, or any part thereof for the account of Lessee, for such rent and term and upon such terms and conditions as are acceptable to Lessor. If Lessor shall have elected to pursue its right to terminate Lessee's right of possession of the Premises without terminating the Lease, then Lessor shall have the further right and remedy to subsequently rescind such election and terminate the Lease. For purposes of any such re-leasing, Lessor is authorized to decorate, repair, alter and improve the Premises to the extent deemed necessary by Lessor, in its reasonable discretion, all at Lessee's expense. If Lessor fails to re-lease the Premises, or if the Premises are re-leased and a sufficient sum is not realized therefrom after payment of all Lessor's expenses of re-leasing (including without limitation repairs, alterations, improvements, additions, decorations, legal fees and brokerage commissions) to satisfy the payment, when due, of Fixed Rent and Additional Rent reserved under this Lease for any monthly period, then Lessee shall pay Lessor a sum equal to the amount of Fixed Rent and Additional Rent due under this Lease for each such monthly period, or if the Premises have been re-leased, Lessee shall pay any such deficiency on the rent day applicable to such month. Nothing in the foregoing sentence, however, shall be deemed to mean that Lessor can only collect damages from Lessee hereunder in monthly installments, it being expressly acknowledged by Lessee that Lessor shall always have the right to collect, in a lump sum, from Lessee, damages equal to the excess of the aggregate Fixed Rent and Additional Rent that would have accrued for the balance of the Term over the then current fair market rental value of the Premises for the balance of the Term. Lessee agrees that Lessor may file suit to recover any sums due to Lessor hereunder at any time or from time to time and that such suit or recovery of any amount due Lessor hereunder shall not be any defense to any subsequent action brought for any amount not theretofore reduced to judgment in favor of Lessor. In the event Lessor elects to terminate Lessee's right of possession only, without terminating this Lease, Lessor may, at Lessor's option, enter into the Premises, remove Lessee's signs, Lessee's property, and other evidences of tenancy, and take and hold possession thereof; provided, however, that such entry and possession shall not terminate this Lease or release Lessee, in whole or in part, from Lessee's obligation to pay the Fixed Rent and Additional Rent reserved hereunder for the full Term or from any other obligation of Lessee under this Lease. Any and all property which may be removed from the Premises by the Lessor pursuant to the authority of the Lease or of law, to which the Lessee is or may be entitled, may be handled, removed or stored by the Lessor at the risk, cost and expense of the Lessee, and the Lessor shall in no event be responsible for the value, preservation or safekeeping thereof. Lessee shall pay to the Lessor, upon demand, any and all reasonable expenses incurred in such removal and all

-8-

Case 1:18-44 2256-egg   Doc 1631   Filed 09/21/20   Entered 09/21/20 12:58:45

Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 417 of 552 PageID #: 695

storage charges against such property so long as the same shall be in the Lessor's possession or under the Lessor's control.

In the event Lessor exercises any remedy provided under this Section, all deposits theretofore made by Lessee with utility companies or under this Lease, all unearned insurance premiums and all rights of Lessee under all insurance policies required under this Lease, any claims for refund of any Imposition, any pending insurance claims or condemnation awards, and all fuel and supplies on the Premises shall be deemed to be and are hereby assigned to and transferred to Lessor, to be applied in payment of Lessee's liability under this Lease.

No waiver of any default of Lessee hereunder shall be implied from any omission to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the express waiver and that only for the time and to the extent therein stated. One or more waivers by Lessor or Lessee shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition.

### Lessor's Failure to Deliver Possession

If Lessor is unable to deliver possession of the premises to Lessee for any reason not within Lessor's control, including but not limited to partial or complete destruction of the premises, Lessee will have the right to terminate this Agreement upon proper notice as required by law. In such event, Lessor's liability to Lessee will be limited to the return of all sums previously paid by Lessee to Lessor. Lessee agrees to hold Lessor and Lessor's agents harmless for loss or damage for any reason not within Lessor's control. In any case, Lessor's liability to Lessee will be limited to the return of all sums previously paid by Lessee to Lessor.

### Condemnation

If any legally constituted authority condemns the premises or such part thereof which shall make the premises unsuitable for leasing, this Lease shall cease when the public authority takes possession, and Lessor and Lessee shall account for rental as of that date.  In such an event any award, compensation or damages paid as a consequence of any legal proceedings ("Award") shall be paid to and be the sole property of Lessor whether such Award shall be made as compensation for diminution of the value of the leasehold or the fee of the Building or Land or otherwise and
Lessee hereby assigns to Lessor all of Lessee's right, title and interest in and to any such Award.

### Eminent Domain

If the premises or any part thereof or any estate therein, or any other part of the building materially affecting Lessee's use of the premise, shall be taken by eminent domain, this lease shall terminate on the date when title vests pursuant to such taking. The rent shall be apportioned

as of the termination date, and any rent paid for and period beyond that date shall be repaid to Lessee. Lessee shall not be entitled to any part of the Award for such taking or any payment in lieu thereof.

## Assignment of Agreement and Subletting

Lessee shall have the right without Lessor's consent, to assign this Lease to a corporation with which Lessee may merge or consolidate, to any subsidiary of Lessee, to any corporation under common control with Lessee, or to a purchaser of substantially all of Lessee's assets provided that (a) the net worth of such assignee after such merger, reorganization or consolidation shall be no less than that of Lessee immediately prior to such merger, reorganization or consolidation, (b) Lessee is not at such time in Default hereunder, and (c) such successor shall execute an instrument in writing fully assuming all of the obligations and liabilities imposed upon Lessee hereunder and deliver the same to Lessor; whereupon Lessee shall be discharged from any further liability hereunder.

Except as set forth above, Lessee will not sublet any part of the premises or assign this Agreement without the prior written consent of Lessor.  Any such assignment or subletting without consent shall be void and, at the option of the Lessor, may terminate this lease.

No assignment or transfer of this Lease by Lessee consented to by Lessor shall be effective, unless the assignee or transferee shall, at the time of such assignment or transfer, assume all the terms, covenants and conditions of this Lease thereafter to be performed by Lessee and shall agree to be bound thereby. Notwithstanding such assignment or transfer or the acceptance by Lessor from such assignee of any rent or other monies or other performance of the obligations of Lessee hereunder, Lessee shall remain liable and obligated as a principal (and not as a surety or guarantor) to perform all the terms, conditions and covenants, including the payment of rental and other monies, herein provided to be performed by Lessee.

## Violation of Laws

Lessee, guests and invitees of either Lessee or guests will not use the premises in such a manner that violates any law, ordinance, statutes or requirement of any municipal, state or federal authority now in force, or which may hereafter be in force, pertaining to the premises, occasioned by or affecting the use thereof by Lessee.

Lessor shall comply with all laws, orders, ordinances, statutes or requirements now or hereafter affecting the premises.

-10-

## Insurance

Lessee, at its sole cost and expense, shall maintain at all times during the term of this Lease policies of insurance as follows:

(a)    Insurance against loss or damage to the Building and all other Improvements by fire and such other hazards as may be covered by the form of "all-risk" coverage then customarily in use, in such amount as Lessor may determine to be sufficient to cover one hundred percent (100%) of the full replacement value from time to time of the Building and all other Improvements, the proceeds of which shall be payable to Lessor.

(b)    Comprehensive general public liability insurance against claims for bodily injury, death, and property damage occurring in or about the Premises or Adjacent Facilities, to afford protection in such limits as shall be reasonably requested by Lessor from time to time, but in any event not less than One Million Dollars ($1,000,000.00) in respect to each person, and not less than One Million Dollars ($1,000,000.00) in respect to any one occurrence causing injury or death, and not less than One Million Dollars ($1,000,000.00) in respect to property damage.

(c)    Contractual liability endorsement if available, insuring Lessee's contractual liability to indemnify Lessor and others as provided in the Section entitled Lessor's Additional Rights and Remedies.

(d)    Boiler and machinery insurance inclusive of coverage for all steam boilers, pressure vessels, and other such apparatus, including piping, with such limits as Lessor may require from time to time.

(e)    Worker's compensation and employer's liability insurance to the extent of the minimum required statutory limits.

(f)    Such other insurance, including business interruption insurance, in such amounts as may from time to time be reasonably required by Lessor against other insurable hazards that are at the time commonly insured against in the case of premises similarly situated.

All policies of insurance shall be written by companies reasonably satisfactory to Lessor and any mortgagee of Lessor and licensed to do business in the State of New Jersey, and shall name as insured Lessor and such other persons or entities as Lessor may designate, as their interests may appear, and shall provide that losses shall be paid to such insureds as their interests may appear. At the request of Lessor, a mortgagee clause shall be included in such policies covering Lessor's mortgage. The originals of such policies shall be delivered to Lessor, together with receipts or other evidence that the premiums thereon have been paid for at least one (1) year. Each policy of insurance shall bear an endorsement that such policy shall not be cancelled or modified without at least thirty (30) days prior written notice to Lessor and mortgagee, if any. Certificates

-11-

evidencing renewals of each policy of insurance shall be delivered to Lessor at least twenty (20) days prior to the expiration dates of the respective policies.

Lessee shall perform and satisfy all requirements of the companies writing any insurance policies referred to in this Lease so that at all times companies of good standing satisfactory to Lessor shall be willing to write such insurance.

Whenever (a) any loss, cost, damage or expense resulting from fire or other casualty or occurrence is incurred by either of the parties to this Lease, or anyone claiming by, through or under it, in connection with the Premises, and (b) such party is then covered in whole or in part by insurance with respect to such loss, cost, damage or expense, then the party so insured hereby releases the other party from any liability it may have on account of such loss, cost, damage or expense to the extent of any amount recovered by reason of such insurance and waives any right of subrogation which might otherwise exist in or accrue to any person on account thereof, provided that such release of liability and waiver of the right of subrogation shall not be operative in any case when the effect thereof is to invalidate such insurance coverage or increase the cost thereof (provided that in the case of increased cost the other party shall have the right, within thirty (30) days following written notice, to pay such increased cost, thereupon keeping such release and waiver in full force and effect).

In case any action or proceeding shall be commenced against Lessor growing out of any loss, cost, damage or expense under this Section, Lessor may give written notice of the same to Lessee and thereafter Lessee shall assume and discharge all obligation to defend the same and save and keep Lessor harmless from all costs, expenses (including, but not limited to, Lessor's attorneys' fees), liabilities, judgments and executions in any manner growing out of, pertaining to or connected therewith.

In case Lessee shall at any time fail, neglect or refuse to procure or renew any insurance hereinabove provided, then Lessor shall have the right, but not the obligation, to procure or renew such insurance and any amounts paid therefore by Lessor shall be so much Additional Rent due at the next rent day after any such payment, with interest thereon at the rate of Prime plus three percent (3%) per annum from the date of payment thereof.

## Property Damage And Destruction

If the Premises or any part thereof are damaged or destroyed by any casualty or any other cause of any kind or nature, ordinary or extraordinary, foreseen or unforeseen, insured or uninsured, Lessee shall give Lessor immediate notice thereof, and Lessee shall promptly repair, restore or rehabilitate the Premises at Lessee's own expense, to an extent that, upon the completion of such repairs, restoration or rehabilitation, the value and rental value of the Building and other Improvements shall be substantially equal to the value and rental value of the Building and other Improvements immediately prior to the happening of such casualty; provided, however, that if

-12-

Lessee has met its obligations to maintain insurance as required herein and such insurance proceeds are made available by any mortgagee of Lessor for such repair, restoration or rehabilitation, then Lessor shall provide such funds for such repair, restoration or rehabilitation. Rent shall not abate during the period of such repair, restoration or rehabilitation regardless of whether the Improvements are unusable by Lessee because of such damage or destruction.

If any excavation or other building operation shall be made upon the Premises or any adjoining property by Lessee, Lessee agrees to assume all obligations of both the owner and the occupant of the Premises with respect to shoring and lateral support and to do all things necessary or desirable to preserve and protect the Premises.

Lessee shall not sign any petition, consent or other instrument in writing whereby any party shall hereafter directly or indirectly acquire the right to use or occupy any portion of any street, driveway or alley that abuts the Premises, or the space above or under the surface thereof, without Lessor joining in such instrument or consenting in writing to the execution thereof, which consent may be withheld in Lessor's sole discretion.

### Hazardous Material

Lessee hereby indemnifies and holds Lessor and Lessor's officers, directors, shareholders, managers, members, agents and employees harmless from and against, and shall reimburse Lessor and Lessor's officers, directors, shareholders, managers, members, agents and employees for, any and all "Losses" (as hereinafter defined) arising from, out of or as a consequence, directly or indirectly, of the release or presence of any Hazardous Materials on the Premises which first occurs during the Term of this Lease, whether foreseeable or unforeseeable, and whether or not known to Lessee, it being understood and agreed that the foregoing indemnity includes, but is not limited to, all costs of removal, remediation of any kind, detoxification, clean up and disposal of such Hazardous Materials and the preparation of any closure or other required plans, all costs of determining whether the Premises is in compliance and causing the Premises to be in compliance with all applicable Environmental Laws, all costs and fees associated with claims for damages to persons, property, or natural resources, and Lessor's reasonable attorneys' fees and consultants' fees and court costs in respect thereto whether or not litigation or administrative proceedings shall occur, including all costs and expenses incurred or suffered by Lessor by reason of any violation of any applicable Environmental Law which occurs, or has occurred, upon the Premises during the Term of this Lease, or by reason of the imposition of any governmental lien for the recovery of environmental clean-up costs expended by reason of such violation, it being expressly understood and agreed that to the extent Lessor and Lessor's officers, directors, shareholders, managers, members, agents and employees, or any of them are strictly liable under any applicable statute or regulation pertaining to the protection of the environment, this indemnity shall likewise be without regard to fault on the part of Lessee with respect to the violation of law which results in such liability. "Losses" shall mean any and all

-13-

421

loss, claim, liability, damages, injuries to person, property or natural resources, cost, expense, action or cause of action.

Lessee hereby covenants and agrees that all obligations of Lessee under this Section shall survive any termination of the Lease, it being further understood and agreed that the rights of Lessor under this Section shall be in addition to any other rights and remedies under this Lease or at law or in equity.

Any amount due to Lessor under this Section not paid by Lessee within ten (10) days after written demand therefor from Lessor shall bear interest at Prime plus three percent (3%) per annum.

Lessee shall comply with all Environmental Laws throughout the Term

## Alterations and Repairs by Lessee

Lessee shall not replace, alter or repair the Premises or any part thereof or any equipment or appurtenance thereto if the cost thereof exceeds in the aggregate Fifty Thousand and No/100 Dollars ($50,000.00) (any such action being hereinafter referred to as a "Capital Improvement"), unless Lessee shall comply with the following requirements, which shall be applicable to all Capital Improvements:

(a) Lessee shall, before the commencement of the work, obtain Lessor's prior consent to the proposed Capital Improvement and shall at least ten (10) days prior to the commencement of the work furnish the Lessor with the following:

(1)    Complete plans and specifications for the work prepared by a licensed architect approved by Lessor, which plans and specifications shall also meet with Lessor's approval, together with the approval thereof by any governmental board, bureau or body then exercising jurisdiction over the Premises, which plans and specifications shall be and become Lessor's sole and absolute property in the event that this Lease shall be terminated for any reason;

(2)    A fixed-sum contract in assignable form made with a reputable and responsible contractor satisfactory to Lessor, providing for the erection, completion and terms of payment for all work, labor and materials necessary to perform the work within the fixed price provided for in such contract;

(3)    An assignment to Lessor of such contract, duly executed and acknowledged by Lessee, to be effective upon any termination of this Lease or upon Lessor's re-entry upon the Premises following an Event of Default prior to complete performance of such contract, such assignment also to include the benefits of all payments made on account of such contract, including payments made prior to the effective date of such assignment; and

-14-

(4)      A surety company completion bond, in form and from an insurer satisfactory to Lessor, issued by an insurer licensed to do business in the State in which the Premises are located, guaranteeing the full completion of the work and payment therefor within a reasonable time, free and clear of all mechanics' or similar liens, encumbrances, chattel mortgages, conditional bills of sale and other charges, in accordance with the plans and specifications approved by Lessor, or other security satisfactory to Lessor, in Lessor's sole discretion.

(b)      Lessee shall (1) at its expense carry or cause to be carried the necessary worker's compensation insurance and cause the insurance policies required under the Section entitled Insurance to be endorsed to cover the additional risk during the course of the work, and (2) procure all necessary permits from all governmental agencies and departments having jurisdiction in connection with such work. Lessee shall deliver evidence of compliance with the foregoing requirements to Lessor prior to the commencement of the work. Whenever requested by Lessor during the period of work, Lessee shall cause the architect in charge of the work (or if there is no architect in charge, the general contractor performing the work) to report in writing to Lessor as to whether the work is being done promptly and in a good and workmanlike manner, and in substantial compliance with the plans and specifications for the work. Lessee shall also deliver to Lessor copies of any and all interim or progress certificates or other reports submitted by Lessee's architect, engineer or contractor.

(c)      The Capital Improvements shall be made promptly, in a first-class and workmanlike manner, in compliance with all Requirements and shall not lessen the value of the Premises. Title to any Building, Improvements, fixtures, (other than Trade Fixtures), additions, alterations, restorations, repairs and replacements constructed, made or installed by Lessee, whether or not resulting from any Capital Improvement and including, but not limited to, any repairs, restoration and other work required to be done pursuant to the provisions of other Sections of this Lease, shall be and become Lessor's sole property at the end of the Term without the necessity of Lessee's execution and delivery of any instrument transferring title thereto. Notwithstanding the foregoing, Lessee covenants and agrees upon Lessor's request to execute, acknowledge and deliver to Lessor any instrument reasonably requested by Lessor to confirm such title, and if Lessee shall fail or refuse to execute, and deliver any such instrument, Lessor is hereby irrevocably appointed Lessee's attorney-in-fact to execute, acknowledge and deliver such instrument in Lessee's name.

## Lessor's Right to Access

In the event of an emergency, to make repairs or improvements or to show the premises to prospective buyers or Lessees or for purposes of inspection to determine Lessee's compliance with this Lease or to conduct an annual inspection or to address a safety or maintenance problem, for the purposes of inspecting the same, Lessor or Lessor's agents may enter the premises at reasonable hours, provided Lessor shall not thereby unreasonably interfere with Lessee's

-15-

business on the premises. Except in cases of emergency, Lessee's abandonment of the premises, court order or where it is impractical to do so, Lessor shall give Lessee twenty four (24) hours notice before entering.

If Lessee shall at any time fail to make any payment or perform any act to be made or performed by Lessee under this Lease beyond any applicable notice and cure periods, Lessor may at its option (but shall not be required to) make any payment or perform any such act, and for such purpose, Lessor may enter upon the Premises and take all such action thereon as may be necessary therefor and any amounts paid by Lessor in connection therewith shall be deemed Additional Rent due on the next rent day after such payment together with interest thereon at Prime plus three percent (3%) per annum from the date of payment thereof.

## Lessee's Maintenance

Lessee shall, at its sole expense, keep the Premises in good repair and in a clean condition and fully comply at all times with all Requirements and shall keep the Premises and Adjacent Facilities safe and secure and in full conformance with the Requirements, including, but not limited to, the lawful and valid requirements of any municipality in which such Premises may be situated and of all other public authorities, and shall make, at Lessee's own expense, all additions, improvements, alterations and repairs on the Premises and on and to the Improvements, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unseen, required by any lawful authorities or to keep the Premises in good repair or which may be made necessary by the act or neglect of any person or corporation (public or private), including supporting the streets and alleys adjoining the Premises, and, to the fullest extent permitted by law, Lessee shall keep Lessor harmless and indemnified at all times against any loss, damage, cost or expense by reason of the failure so to do in any respect or by reason of any accident, loss or damage resulting to persons or property from any use which may be made of such Premises or of any Improvements or by reason of or growing out of any act or thing done or omitted to be done upon such Premises or in any Improvements; and Lessee agrees that it shall save, hold and keep Lessor and the Premises free and clear of and from any and all claims, demands, penalties, liabilities, judgments, costs and expenses (including, but not limited to, attorneys' fees), arising out of any loss or damage which may be sustained by adjoining property or adjoining owners or other persons or property in connection with the remodeling, altering, erection, or repairing of the Improvements, except to the extent occasioned by the acts of Lessor, its agents, employees or contractors. Lessee shall not commit or suffer, and shall use all reasonable precautions to prevent, waste, damage or injury to all of the foregoing. Notwithstanding anything contained herein to the contrary, Lessor shall keep in good order and repair the roof, foundation and structural walls of the Premises and Lessee shall have no repair or maintenance obligations with respect to the foregoing except to the extent occasioned by the acts of Lessee, its agents, employees or contractors.

-16-

Lessee shall also at its own cost and expense keep the Premises fully and adequately furnished and equipped throughout the Term with all equipment, fixtures and articles of personal property necessary for the operation of the Premises for the purposes herein permitted, and shall make all necessary replacements, renewals, alterations and additions required to maintain all portions of the Premises in first-class rent able condition.

Lessee shall also at its own cost and expense keep the Premises and (if not so maintained by any other party having legal responsibility for such) all Adjacent Facilities clean and reasonably free from dirt, snow, ice, rubbish, obstructions and encumbrances.

Lessee shall also at its own cost and expense promptly comply (subject to its right to contest under the Section entitled Use) with any and all Requirements applicable to or affecting the Premises or the Improvements or any Adjacent Facilities, irrespective of the nature of the work required to be done, extraordinary as well as ordinary, whether or not the same involve or require any structural changes or additions in or to the Premises or the Improvements and irrespective of whether or not such changes or additions be required on account of any particular use to which the Premises or the Improvements or any part thereof may be put.

Lessor shall not be required to furnish any services or facilities whatsoever to the Premises. Lessee hereby assumes full and sole responsibility for the condition, operation, repair, alteration, improvement, replacement, maintenance and management of the Premises, except for the roof, foundation and structural walls of the Premises as aforesaid. Lessor shall not be responsible for any loss or damage to any property of Lessee.

## Liens

Lessee shall not do any act which shall in any way encumber the title of Lessor in and to the Premises, nor shall Lessee create or permit to be created, and shall promptly discharge, any such lien (including, but not limited to, any mechanic's, contractor's, subcontractor's or material man's lien or any lien, encumbrance or charge arising out of any Imposition, conditional sale, title retention agreement, chattel mortgage, security agreement, financing statement or otherwise) upon the Premises or any part thereof or the income therefrom or any personal property used in connection with the operation of the Premises, and Lessee shall not suffer any other matter or thing whereby the estate, rights and interest of Lessor in the Premises or any part thereof might be impaired.

If Lessee shall fail to cause any such lien to be discharged of record, then Lessor, after five (5) days notice of its intention to do so, shall have the right, but not the obligation, in addition to any other right or remedy, to discharge such lien either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit or bonding proceedings, and in any such event Lessor shall be entitled if it so elects to compel the prosecution of an action for foreclosure of such lien by the lienor and to pay the amount of judgment in favor of the lien owner with

-17-

interest, costs and allowances. Any amount so paid by Lessor and all costs and expenses (including reasonable attorneys' fees) incurred by Lessor in connection therewith shall constitute Additional Rent payable by Lessee under this Lease, due from Lessee to Lessor at the next rent day after any such payment, with interest thereon at Prime plus three percent (3%) per annum from the date of payment thereof.

This Lease shall constitute notice that Lessor shall not be liable for any work performed or to be performed, or any materials furnished or to be furnished, at the Premises for Lessee upon credit, and that no mechanic's or other lien for such work or materials shall attach to or affect the estate or interest of Lessor in and to the Premises, unless specifically ordered by Lessor in writing.

Lessee shall have no power to do any act or make any contract that may create or be the foundation for any lien, mortgage or other encumbrance upon the estate of Lessor, or any other interest of Lessor in the Premises, the Building or the other Improvements or any part thereof.

### Surrender of Possession

Lessee shall on the last day of the Term or upon any sooner termination thereof, whether by lapse of time or by reason of Lessee's Default or otherwise, surrender and deliver to Lessor the Premises and all Improvements in clean, wholesome, good and safe order and condition and in good repair, ordinary wear and tear excepted, and if Lessee shall thereafter remain in possession thereof, it shall be deemed guilty of forcible detainer of the Premises and shall be subject to all the conditions and provisions contained herein and to ejection and removal, forcibly and otherwise, with or without process of law.

Upon the termination of this Lease by lapse of time, Lessee may remove furniture, trade fixtures and other personal property belonging to Lessee that are incident to the business of Lessee (as distinguished from personal property used in the operation of the Premises); such furniture, trade fixtures and other personal property belonging to Lessee and incident to the business of Lessee are hereinafter referred to as "Trade Fixtures". Lessee shall repair any injury or damage to the Premises or the Improvements that may result from such removal. If Lessee does not remove such Trade Fixtures from the Premises prior to the end of the Term, however ended, Lessor may, at its option, remove the same and deliver the same to any other place of business of Lessee or warehouse the same, and Lessee shall pay the cost of such removal (including the repair of any injury or damage to the Premises or the Improvements resulting from such removal), delivery and warehousing to Lessor on demand, or Lessor may treat such Trade Fixtures as having been conveyed to Lessor with this Lease as a bill of sale, without further payment or credit by Lessor or Lessee.

Any holding over by Lessee of the Premises after the expiration of this Lease shall operate and be construed to be a tenancy from month to month only, at one hundred fifty percent (150%) of the monthly installments of Fixed Rent, plus Additional Rent and other sums otherwise payable

hereunder for the Term. Nothing contained in this Section shall be construed to give Lessee the right to hold over after the expiration of this Lease, and Lessor may exercise any and all remedies at law or in equity to recover possession of the Premises and may seek damages in the event of such a hold over tenancy.

## Signs

Unless expressly waived in writing. Lessor shall have the right, exercisable without notice, without any liability to Lessee for damage or injury to person, property or business, without being deemed an eviction or disturbance in any manner of Lessee's use or possession of the Premises and without relieving Lessee from its Obligation to pay Rent when due or from any other obligation under this Lease, during the last three (3) months of the Term to install, affix and maintain "For Rent" or "For Sale" signs on the exterior of the Premises.

## Subordination

This Lease shall be subject and subordinate at all times to the lien of all mortgages and trust deeds in any amount or amounts whatsoever now or hereafter placed on or against the Building or the Premises or on or against Lessor's interest or estate therein, all without the necessity of having further instruments executed on the part of Lessee to effectuate such subordination; provided that in the event of a foreclosure of any such mortgage or trust deed or any other action or proceeding for the enforcement thereof, or of any sale thereunder, this Lease will not be barred, terminated, cut off or foreclosed nor will the rights and possession of Lessee hereunder be disturbed if there shall exist no Event of Default with respect to the payment of Rent or any other Event of Default hereunder. Lessee shall attorn to the purchaser at any such foreclosure, sale or other action or proceeding or, if requested, enter into a new lease for the balance of the Term then remaining upon the same terms and provisions as are in this Lease contained. Lessee agrees to execute and deliver upon demand such further instruments evidencing such subordination of this Lease to the lien of any such mortgages or trust deeds as may be required by Lessor.

Notwithstanding the foregoing, Lessee shall from time to time on request from Lessor execute and deliver any documents or instruments that may be required by any lender to effectuate such subordination. If Lessee fails to execute and deliver any documents or instruments, Lessee irrevocably constitutes and appoints Lessor as Lessee's attorney in fact to execute and deliver such documents or instruments.

## Agents and Authority to Receive Legal Papers

Any notice, which either party may or is required to give, may be given by mailing the same, by certified mail, to Lessee at the premises. The Lessor, any person managing the premises and

-19-

427

anyone designated by the Lessor as agent are authorized to accept service of process and receive other notices and demands, which may be delivered to:

4921 12ᵗʰ Avenue, LLC
1152 53ʳᵈ Street
Brooklyn, New York 11219

## Brokerage Fees, Commissions

Lessee represents that Lessee was not shown the premises by any real estate broker or agent and that Lessee has not otherwise engaged in, any activity which could form the basis for a claim for real estate commission, brokerage fee, finder's fee or other similar charge, in connection with this Lease.

## Estoppel Certificate

At any time and from time to time but on not less than ten (10) days prior written request by either party hereto, the other party shall execute, acknowledge and deliver to the requesting party, promptly upon request, a certificate certifying (a) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect, as modified, and stating the date and nature of each modification), (b) the date, if any, to which Fixed Rent and other sums payable hereunder have been paid, (c) that no notice has been received by such party of any Default which has not been cured, except as to Defaults specified in the certificate, and (d) such other matters as may be reasonably requested by the requesting party. Any such certificate may be relied upon by any prospective purchaser, mortgagee or beneficiary under any trust deed of the Premises or any part thereof and by any collateral assignee of this Lease.

## Indemnification of Lessor

To the fullest extent permitted by Law, Lessee agrees to indemnify and save Lessor and its respective agents and employees harmless from and against all liabilities, claims, suits, fines, penalties, damages, losses, fees, costs and expenses (including, but not limited to, Lessor's attorneys' fees) that may be imposed upon, incurred by or asserted against Lessor by reason of:

(a)     Any work or thing to be done in, on or about the Premises or any part thereof other than Lessor's Work;

(b)     Any use, occupation, condition, operation of the Premises or any part thereof or of any Adjacent Facility or any occurrence on any of the same;

(c)     Any action or omission on the part of Lessee or any Sub Lessee or any of its or their agents, contractors, servants, employees, licensees or invitees;

(d)     Any accident, injury (including death) or damage, regardless of the cause thereof, to any person or property occurring in, on or about the Premises or any part thereof or any Adjacent Facility; and/or

(e)     Any failure on Lessee's part to perform or comply with any of the covenants, agreements, terms or conditions in this Lease or in any sublease, license, concession or other agreement entered into by Lessee.

The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Lessee agrees to pay, and to indemnify Lessor against, all costs and expenses (including, but not limited to, Lessor's reasonable attorneys' fees) incurred by or imposed upon Lessor by or in connection with any litigation to which Lessor becomes or is made a party without fault in its part, whether commenced by or against Lessee, or that may be incurred by Lessor in enforcing any of the covenants and agreements of this Lease (with or without the institution of any action or proceeding relating to the Premises or this Lease) or in obtaining possession of the Premises after an Event of Default or upon expiration or earlier termination of this Lease.

Lessor may, but shall not be obligated to, cure any Default by Lessee hereunder. All sums expended and all costs and expenses (including, but not limited to, reasonable attorneys' fees) incurred by Lessor pursuant to the provisions of this Lease or on account of any Default by Lessee under this Lease shall bear interest thereon from the respective dates when expended or incurred by Lessor at Prime plus three per cent (3%) per annum until repaid by Lessee to Lessor, and all such sums together with such interest shall become Additional Rent under this Lease, payable by Lessee to Lessor on the next rent date after such expenditure.

All Rent and other amounts payable by Lessee under this Lease shall be and are hereby declared to be a valid and first lien upon Lessee's interest in the Premises and upon the rents, issues and profits in any manner arising or growing out of the same, and upon Lessee's interest in this Lease.

In the event of any breach or threatened breach by Lessee of any of the covenants, agreements, terms or conditions contained in this Lease, Lessor shall be entitled to enjoin such breach or threatened breach and shall have the right to invoke any right and remedy allowed at law or in equity or by statute or otherwise as though re-entry, summary proceedings and other remedies were not provided for in this Lease.

No receipt of monies by Lessor from Lessee after termination of this Lease or after the giving of any notice of termination of this Lease shall reinstate, continue or extend the Term or affect any

-21-

notice theretofore given to Lessee, or operate as a waiver of Lessor's right to enforce the payment of Rent and any other payments or charges herein reserved and agreed to be paid by Lessee then or thereafter falling due, or operate as a waiver of Lessor's right to recover possession of the Premises, it being agreed that after the service of notice to terminate this Lease or the commencement of suit or summary proceedings, or after final order or judgment for the possession of the Premises, Lessor may demand, receive and collect any monies due or thereafter falling due without in any manner affecting such notice, proceeding, order, suit or judgment, all such monies collected being deemed payments on account of the use and occupation of the Premises or at Lessor's election on account of Lessee's liability hereunder.

Lessor's granting of any consent under this Lease, or Lessor's failure to object to any action taken by Lessee without Lessor's consent required under this Lease, shall not be deemed a waiver by Lessor of its rights to require such consent for any further similar act by Lessee. No waiver by Lessor of any other breach of the covenants of this Lease shall be construed, taken or held to be a waiver of any other breach or to be a waiver, acquiescence in or consent to any further or succeeding breach of the same covenant. None of Lessee's covenants under this Lease, and no breach thereof, shall be waived, altered or modified except by a written instrument executed by Lessor.

No remedy conferred upon or reserved to Lessor under this Lease or under law shall be considered exclusive of any other remedy, but such remedies shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise, and every power and remedy given by this Lease to Lessor may be exercised from time to time and as often as occasion may arise or as may be deemed expedient, without precluding Lessor's simultaneous or later exercise of any or all other rights or remedies. No delay or omission of Lessor to exercise any right or power arising from any Default or Event of Default shall impair any such right to power or shall be construed to be a waiver of any such Default or Event of Default or acquiescence therein.

## Peaceable Enjoyment

Lessor covenants that if and so long as Lessee shall faithfully perform the covenants and agreements of this Lease, Lessee shall and may (subject to the exceptions, reservations, terms and conditions of this Lease) peaceably and quietly have, hold and enjoy the Premises for the Term free of any interference by Lessor or anyone claiming through or by Lessor except those to which this Lease is expressly made subject and subordinate.

## Paragraph Headings

The headings of particular paragraphs and subparagraphs are inserted only for convenience and are not part of this Agreement and are not to act as a limitation on the scope of the particular paragraph to which the heading refers.

-22-

## Court Costs and Attorney's Fees

In any action or legal proceeding to enforce any part of this Agreement, the prevailing party shall recover reasonable attorneys' fees and court costs.

Lessee agrees that, in the event Lessee shall have any claim against Lessor under this Lease arising out of the subject matter of this Lease, Lessee's sole recourse shall be against Lessor's interest in the Premises, for the satisfaction of any claim, judgment or decree requiring the payment of money by Lessor as a result of a breach hereof or otherwise in connection with this Lease, and no other property or assets of Lessor, its successor or assigns, shall be subject to the levy, execution or other enforcement procedure for the satisfaction of any such claim, judgment, injunction or decree.

## Prevailing Law

This Lease shall be construed and enforced in accordance with the laws of the State of New York.

## Binding on Successors

All covenants, agreements, conditions and undertakings contained in this Lease shall extend and inure to and be binding upon Lessor's successors and assigns and Lessee's permitted successors and assigns as if such successors and assigns were in each case specifically named, and shall be construed as covenants running with the land. Wherever reference is made in this Lease to either party, it shall be held to include and apply to such successors and assigns. The provisions of this Section shall not be construed to grant or to confer any greater rights of assignment upon Lessee than are provided in the Section entitled Assignment of Agreement and Subletting.

## Time is of the Essence

Time is of the essence with respect to every provision of this Lease.

## Entire Agreement

This document and any Attachments constitutes the entire Agreement between the parties, and no promises or representations, other than those contained here and those implied by law, have been made by Lessor or Lessee. Any modifications to this Agreement must be in writing and signed by Lessor and Lessee.

-23-

## Severability

The provisions of this Lease are severable and in the event any provision, clause, sentence, section or part thereof is held to be invalid, illegal, unconstitutional, inapplicable or unenforceable to any person or circumstances, such invalidity, illegality, unconstitutionality, inapplicability or unenforceability shall not affect or impair any of the remaining provisions, sentences, clauses, sections, parts of the lease or their application to Tenant or other persons or circumstances. It is understood and agreed that the terms, conditions and covenants of this Lease would have been made by both parties if such invalid, illegal, unconstitutional, inapplicable or unenforceable provision, sentence, clause, section or part had not been included therein. To the extent that any portion of this agreement found to be invalid, illegal, unconstitutional, inapplicable or unenforceable may be valid by striking of certain words or phrases, such words or phrases shall be deemed to be stricken and the remainder of the provisions and the remainder of the other portions of this Lease agreement shall remain in full force and effect. It is further agreed that this Lease may be executed in counterparts, each of which when considered together shall constitute the original contract.

YIDEL'S FRESH FOOD STATION, LLC

Lessor/Agent's signature: _____ Dated: _____

4921 12th AVENUE LLC

Lessee: By: _____ Dated: Jan 1, 2016

-24-

# Exhibit C

| **UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK** | **CHAPTER 11 ADMINISTRATIVE PROOF OF CLAIM** |
|---|---|

Name of Debtor: **RS OLD MILL, LLC**
**Case No.: 17-22218 (RDD)**

Note: This form should only be used by claimants asserting a Chapter 11 Administrative Claim that arose against RS OLD MILL, LLC on or after February 13, 2017 through and including June 5, 2019.

Name of Creditor
(The person or entity to whom the debtor owes money or property)

Lone Pine Associates, LLC

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your administrative expense claim. Attach copy of statement giving particulars.

Name and Addresses Where Notices Should be Sent:
Law Offices of Douglas T. Tabachnik, PC
63 West Main Street, Suite C, Freehold, NJ 07728
Telephone: 732-780-2760
Email Address (if any): dtabachnik@dttlaw.com

Check here if this claim ☐ replaces or ☐ amends a previously filed administrative expense claim.

Claim Number (if known) _____

Dated _____

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:

1. BASIS FOR CLAIM:
   ☐ Goods sold      ☒ Services performed      ☐ Personal Injury/Wrongful Death      ☐ Wages (Dates): _____
   ☐ Money loaned      ☐ Taxes      ☐ Retiree Benefits as Defined in 11 U.S.C. § 1114(a)(1114(a)      ☐ Other(Specify): _____

2. DATE DEBT WAS INCURRED (IF KNOWN):

3. DESCRIPTION OF CLAIM (IF KNOWN):
   See Exhibit A

4. IS ANY PORTION OF THE CLAIM SECURED (IF KNOWN)? no  IF SO, DESCRIBE SECURITY:

5. TOTAL AMOUNT OF CLAIM:      $ 311,628.42

6. CREDITS AND SETOFFS. The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.

7. SUPPORTING DOCUMENTS. Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. Do not send original documents. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8. TIME-STAMPED COPY: To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

Date:
8/29/19

Sign and print the name and title, if any, of the creditor or other person authorized to file this Claim (attach copy of power of attorney, if any).

*Uziel Frankel For Lone Pine Associates Member*

Uziel Frankel, Sole Member

434

## EXHIBIT A TO ADMINISTRATIVE PROOF OF CLAIM

Exhibit A to Proof of Claim of Lone Pine Associates, LLC. (the "Claimant") against RS Old Mill, LLC (the "Debtor").

In response to items set forth in the Administrative Proof of Claim (the "Admin Proof of Claim") filed in Chapter 7 Case No. 17-22218, the Claimant hereby incorporates by reference the following responses and attached documents:

IN RESPONSE TO ITEM 3 of the Proof of Claim, the obligations underlying these administrative claim were incurred between February 13, 2017 June 5, 2019 pursuant to respective agreements for development and agency dated November 30, 2016 between the debtor and Enbee TRST Holdings LLC, a copy of which is annexed hereto as **Exhibit A**. Please see the attached calculation of interest, fees and expenses. These agreements were assigned to the Claimant on September 8, 2017 annexed hereto as **Exhibit B**. (hereinafter the "Agreements"). Pursuant to the Agreements which the Debtor retained the Claimant and the Claimant did provide and incur on the Debtor's behalf developmental expenses for the tenanting of the Debtor's real property. But for the malfeasance of the parties identified as defendants in a certain adversary complaint filed by the Debtor at docket no. 75 (the "Complaint"), the Claimant would have been able to continue in such activity to the benefit the estate and all creditors. The Claimant necessarily expended sums detailed in the attached Schedule A in furtherance of its duties under the Agreements. But for the actions described in the complaint, the value of such efforts were to be fully realized.

IN RESPONSE TO ITEM 7 of the Proof of Claim, See the response to Item 7 above and the following list of the documents (the "Supporting Documents") that evidence the obligations of the Debtor to the Claimant. A true and correct copy of each is attached hereto and incorporated by reference herein:

1. See attached Agreement between the Debtor and Claimant's predecessor Enbee TRST Holdings, LLC, dated November 30, 2016;

2. See Attached Agency Agreement Between Enbee TRST Holdings and the Debtor dated November 30, 2016;

3. See Attached Assignment of Agreement between Enbee TRST Holding, LLC and Lone Pine Associates, LLC, dated September 8, 2017;

4. In addition to the foregoing, see the attached summary of expenditures incurred o the Debtor's behalf incurred for the purpose, annexed hereto as **Exhibit C**.

B.  Reservations of Rights

The Claimant reserves its right to amend and/or replace this Proof of Claim and to file further pleadings and documents from time to time as permitted by law, should it deem it

435

appropriate, including, without limitation, to claim all amounts due in respect of any prepetition or post-petition (1) professional fees and/or expenses (ii) charges, (iii) interest, and (iv) damages of any kind whatsoever that may be determined during the course of the further proceedings in this case. This administrative Chapter 11 claim is limited to expenses and charges necessarily incurred postpetition and pre-conversion of this chapter 7 case, between the dates of February 13, 2017 and June 5, 2019. It does not include damages and charges that may be deemed prepetition in nature and which will be separately accounted for in a Prepetition proof of claim.

To the extent any of the Agreements are considered an executory contract or unexpired lease, Claimant reserves all rights respecting executory contracts and/or unexpired leases under applicable bankruptcy and non-bankruptcy law, including without limitation the right to (i) object to the assumption, assumption and assignment, or rejection of any such contract, (ii) amend this Proof of Claim or its Exhibits to reflect the Debtor's rejection or assumption of any contract (or to reflect a similar rejection or assumption by any relevant debtor affiliate), and (iii) assert cure claims and be assured of future performance in connection with the assumption or assumption and assignment of any contract.

The descriptions of the Agreements referenced herein are provided for reference purposes only and are not intended as, and shall not be construed as, an interpretation by Claimant of the relevant provisions of the Agreements.

This Chapter 11 administrative Proof of Claim is filed under the compulsion of the bar date established in this chapter 7 case and is filed to protect the Claimant from forfeiture of claims by reason of said bar date. Filing of this Proof of Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant, (c) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimant to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimant to have final orders in non-core matters entered only after de novo review by a District Court judge, (f) a waiver of the right of Claimant to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver of any past, present or future event of default, (h) a waiver or limitation of any rights of Claimant, including, without limitation, a waiver of rights, claims, actions, defenses, setoffs or recoupments to which Claimant is or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimant, or (i) an admission by Claimant that any property held by Debtor (or any debtor affiliate) is property of the estate. In addition, Claimant reserves its rights to an administrative expense priority claim for any amounts and awards as may be appropriate pursuant to, *inter alia,* Sections 503, 507 or other applicable provisions of the Bankruptcy Code.

In executing and filing this Proof of Claim, Claimant does not waive any obligation owing

436

to it, any right to any security held by it or for its benefit, any right to claim specific assets, or any other right or rights of action that it has or may have against the Debtor or any other person, including without limitation, rights against, officers, directors, or Managing Members, as the case may be.

3

# EXHIBIT A

# AGREEMENT

THIS AGREEMENT (this "Agreement"), dated as of 30th day of November 2016 (the "Effective Date"), is made and entered into between RS OLD MILL, LLC, a New York limited liability company whose address is to be located at 25 Old Mill Road, Suffern, NY 10901 ("Owner"), and ENBEE TRST HOLDINGS LLC, a New York limited liability corporation whose address is 5308 13th Avenue, Suite 164, Brooklyn, NY 11219 ("Developer") .

## RECITALS

A.    Owner is in contract to acquire a certain real property in the County of Rockland, State of New York as more particularly described on Exhibit A attached hereto (the "Property").

B.    Owner will acquire the property for the purchase price of $18,000,000.00 with a total down payment of $2,500,000.00

C.    Property consists of approximately 162 acres with structures consisting of 585,000 sqft.

D.    Owner desires to utilize the property to its maximum potential and therefore engages the services of the Developer to develop the Property to its maximum potential, specifically by attracting tenants and acquiring opportunities that can specifically utilize cGMP facility and to maintain and transition the current boiler and different water systems to a single system and certain property management services such as overseeing property manager , snow removal and others as needed and assigned. (the "Project"). Both parties agree that the assessed value of the property was $200,000,000.00 or its replacement value of $400,000,000.00 (the "Value") and the scope of this agreement is to raise the current value to above values or higher.

E.    Owner wishes to engage Developer to procure tenants, marketing, manage the planning, financing, and development for the Project as set forth in this Agreement, and Developer wishes to accept such engagement, upon all of the terms and subject to the conditions hereinafter set forth.

## TERMS

NOW, THEREFORE, in consideration of the foregoing premises, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and Developer hereby covenant, stipulate, and agree as follows:

1    Engagement of Developer. Owner hereby engages Developer and authorizes Developer, subject to the terms and conditions hereof, to provide services relating to the management of the planning, tenancy, procurement of tenants in new fields, capital raise, obtaining grants, subsidies or TIFF's if applicable, conducting and arranging walkthrough's, redeveloping the property to reach its maximum property value listed above, and development of the Project set forth in Exhibit B hereto (the "Services"). Developer hereby accepts such engagement and agrees to perform the Services. Developer shall cause the Services to be

1

439

performed using reasonable skill and care and shall use reasonable efforts to cause the Project to be completed in an efficient, orderly and economical manner, consistent with and subject to the terms and conditions of this Agreement. Owner agrees to permit the Developer the full right to assign this contract to a third party, however, with the understanding that Developer accepts full responsibility and liability in the event the third party, if there be one assigned, fails to perform any terms of this agreement. Despite the survival of this Agreement to any assignee of Developer, said responsibility and liability on the part of Developer shall terminate in full after twelve (12) months following notice to Owner of such assignment.

2.  <u>Certain Definitions</u>.

"<u>Costs for the Project</u>" shall mean any and all of the costs incurred in the Project, after Phase II is approved including professional fees (including but not limited to legal, architectural and engineering), governmental, permit, and indirect utility related fees, associated with the preparation of the property for tenant showings, costs associated with becoming a life science center. Any costs incurred by the Developer during any stages prior to Phase III, is the cost of doing business for the Developer and Owner shall not be responsible for it. Owner shall only be responsible for all costs from the inception of the project, once the developer completes an approved Phase III stage. This clause is not applicable to the compensation due at the completion of each stage such shall be deemed fully earned.

"<u>Losses</u>" means all damages, awards, judgments, assessments, fines, sanctions, penalties, taxes, all interest thereon, all costs and expenses of investigating any claim, action, lawsuit, arbitration or other proceeding and any appeal therefrom, all actual reasonable attorneys', accountants' and expert witness' fees incurred in connection therewith, whether or not such claim, action, lawsuit, arbitration or proceeding is ultimately defeated and any and all amounts paid incident to any compromise or settlement of any such claim, action, lawsuit, arbitration or proceeding.

"<u>Person</u>" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization.

"<u>Usable land</u>" means one that has frontage and access to roads, visible, one that you can subdivide and is buildable, of which a minimum of 10 acres should have full frontage to roads.

3.  <u>Compensation of Developer</u>. In consideration of Developer's Services, Owner shall structure compensation to Developer in three stages. Developer will procure tenants that fit Owner's stabilization strategy. All prospective tenants will have to be approved by Owner to proceed to Phase I in writing by Owner. (Exhibit C)

**Phase I.**
Constitute as follows;
Travel, tradeshows, initial meetings with potential tenants, NDA's and subsequent walk throughs and work with brokers.

440

**For Tenant related categories** (That adds a minimum of additional $5,000,000.00 value to "Property" at sole discretion of owner )

    a) Developer shall begin his duties 30 days from the execution of this agreement and no later than 30 days from the day of closing, whichever is later.

    b) Developer shall arrange:
- initial meeting with potential tenants, NDAs and subsequent walk throughs.
- take any and all necessary steps to generally attract potentials tenants that best fit with the business model of owner and maximize the property value.

The business model and objective of owner is to create as part of Governor's initiative for Biotech in New York to become a center for life science and research and to allow biotech companies access to create their products to commercialization and utilize bioflex pod technology.

    c) **Owner must approve or disapprove in writing any and all potential tenants within 10 days of receipt of all pertinent tenant information. Such approval by owner acts as an acknowledgement of a $5,000,000.00 value. Owner will grant permission at its discretion only after making a reasonable inquiry into the tenants' relevant facts, after which it will be determined whether the tenant shall be considered to move forward to Phase I. Developer may supply the Owner with all pertinent information about the tenant, however in no way does the Developer have any grounds to approve the tenant. That rights rests solely with the Owner.**

    d) Upon approval by Owner for potential tenant, as defined in para. 3., Developer is deemed to have fully earned his commission in the amount of $40,000.00 for each tenant so approved herein ("Incentive 1") Developer should have completed Phase I.

    e) Developer shall earn an additional commission upon approval by owner of a total of eight (8) tenant related or non-tenant related Phase I of which 2 must be potential tenant related entities. Upon approval:

        -Developer shall receive 52 acres of undeveloped land in the Property with a minimum of 40 acres of "usable land".

        - If owner cannot deliver full 40 acres of "usable land" due to subdivision of acreage, then Developer shall accept 36 or 44 acres of usable land. For purpose of this agreement all parties agree that the current value of an acre is at $200,000.00. Both parties agree to reimburse the other for the loss or surplus in acreage at the rate of $200,000.00/ acre.

    f) Should the developer choose to buy an additional, up to 20 acres, for the purposes of subdivision of the original 52 acres , Owner shall grant the right of first refusal to Developer to buy with the cost per acre valued at the full appraised value as determined by a national reputable appraisal value.

g) In the event that the property is sold or encumbered or condemned or lost to fire and/or any natural disasters, or destroyed or lost due to a final court disposition, and/or where the Owner can not deliver the requisite acreage, the Owner hereby agrees to reimburse Developer for the $8,000,000.00 which equals 40 acres at the rate of $200,000.00/ acre.

### For non-tenant categories
a) Approval requirement same as for tenant category (Approval to Phase I shall suffice and be deemed approved with no Phase II needed)
b) Redevelopment / Capital source- Developer shall be reimbursed $8,000.00.
c) Short term leases and/or month to month, shall be reimbursed a flat on0065c time sum of $6,000.00
a) Advisor/Management upon approval $8,000.00 Get a term sheet and/or commitment letter or LOI

### Phase II.
Constitutes as follows;
LOIs, MOUs, Commitment Letters, Completed RFP's, corporate and/or board approvals from prospective tenants to proceed to contract.

### For tenant categories

a) Owner must approve in writing for the Developer to proceed to Phase II.
b) Developer shall furnish LOI's, MOU's or commitment letters and any other relevant documents requested by Owner.
c) Owner shall review the paperwork within 10 days.
d) Upon approval from Owner in writing, Developer is deemed to have earned additional commission in the amount of $65,000.00 herein ("Incentive 2").

Upon approval by Owner, of eight approved Phase I and/or Phase II 'which consist of a combination of tenant and non-tenant categories listed below, a $500,000.00 payment is earned:
1) with a minimum of 3 Phase I in the tenant categories
2) and or a tenant or joint venture event with a minimum of 60,000 sqft. or more leased or used space in the property in approved Phase I stage.

### Phase III.

### For tenant categories

4

442

a) Developer shall present an executed lease to owner with the lease term no less than five (5) years.

Upon completion of Phase III, Developer is entitled to 5 % commission herein ("Main Commission") which is due and owing at the commencement date of the lease . Said commission shall be calculated from the total net amount of the complete lease term.

In the event, Developer has earned his 5%, Main commission, then any previous payments of tenant and non-tenant Phase I and II payments shall be deducted from the main commission.

**For Capital Raise**

a) Approval required from Owner
b) Must obtain a signed Capital Raise agreement, capital agreement, any form of agreement for the purpose of raising capital for redevelopment or tenant improvement.
c) Upon approval 0.9% from the net amount is earned only if said agreement is consummated and/or funded.

Tenant categories

Tenant categories and their relevant commission rates are attached hereto as Exhibit D. It is agreed upon by both parties that in the event Developer brings a tenant that is not in the category list provided in Exhibit D. Owner at his discretion may approve such tenant with the same approval process as listed tenant categories. Upon approval by Owner, Developer shall be entitled to a commission of no less than 3%, but the Phase I and Phase II commission structure shall stay the same as the listed categories. (except for short term rentals as defined above), unless agreed to in writing by both parties hereto.

Other Developer responsibility:

-Developer must commence work within 30 days of closing/acquisition of the property.
-Developer must have completed 8 approved Phase I in tenant and non tenant categories within 9 months from closing. Failure of the Developer to have 8 such approvals within 9 months will cause a 50% loss of the commission. Failure of the Developer to have 8 such approvals within 12 months will result in total loss of the commission.

5

4. <u>Term</u>. This Agreement shall commence on the date of execution of this Agreement. Duties of Developer shall commence 30 days after execution of this agreement and/or no later than 30 days of closing.

5. <u>Termination by Owner with Cause.</u>

(a) Owner shall have the right to terminate this Agreement for Cause (defined below) by giving five (5) days written notice to Developer or its assignee, of such termination at any time, without prejudice to its other rights or remedies under this Agreement, at law or in equity, and take possession of all work performed hereunder by Developer and perform the Services by whatever method Owner may deem expedient effective upon such termination.

(b) For purposes of this Agreement, the term "<u>Cause</u>" shall mean the occurrence of any one or more of the following:

(c) a material breach by Developer of this Agreement or any other agreement, a breach of which has a material adverse effect on the Project, which Developer and/or its assignee has not cured within thirty (30) days following Developer's receipt of written notice from Owner stating the particular action(s) or inaction(s) that constitute such breach.

(d) Failure by the Developer to pay his obligations to subcontractors or other vendors for the property that Developer contracted or procured that triggered title encumbrances or title defects which did not exist on the date of this Agreement. Developer has 60 days to cure his nonpayment upon receipt of notice of lien or a collection notice. In the event, Developer fails to cure nonpayment of any fees that may cause title to be affected; Owner shall discharge such obligations of the developer. Upon Developer's failure to cure his nonpayment and or Owner's payment for such obligation, forces **Developer to forfeit all of his Main Commission**.

(e) In the event this Agreement is terminated for Cause pursuant to Section 5(a), Owner shall not be required to pay Developer (i) any unpaid portion of the Developer Fee Nothing in this Section shall prevent Owner from seeking monetary damages from Developer in the event Developer is terminated for Cause.

6. <u>Termination by Owner without Cause.</u>

(a) Upon two hundred seventy (270) days prior written notice to Developer, Owner may terminate this Agreement at any time without Cause.

7. <u>Termination by Developer</u>. Developer may terminate this Agreement in the event of an Owner Default. The following shall constitute an "Owner Default": (i) failure of Owner to

6

444

pay to Developer any amount becoming due and payable hereunder, within sixty (60) days after written notice from Developer of such failure; and (ii) failure of Owner to comply with any material provision of this Agreement, and the continuation of such failure for twenty one (21) days after written notice thereof from Developer to Owner; provided, however, that if the time required to cure and remedy such default shall exceed twenty one (21) days, Owner shall not be in default hereunder if Owner commences to cure such failure as soon as reasonably practicable in view of all circumstances and thereafter diligently prosecutes such curative efforts to completion. In addition to the right to terminate this Agreement, upon the occurrence of any Owner Default (after any applicable notice and cure periods), Developer may, at any time while such Owner Default continues, exercise any other remedies that may be provided at law or in equity.

8.  Books and Records. As set forth in Exhibit B, it is contemplated that Developer will, as part of the Services, review and approve or disapprove of all invoices submitted by architects, engineers, contractors and suppliers. Developer will maintain good records of all such invoices together will all other financial records that Developer receives in connection with the Project except Developer's proprietary information or under Confidentiality or Non-Disclosure Agreements. Developer shall keep all records at 25 Old Mill Road, Suffern NY 10901. Developer shall make available all such records to Owner, upon Owner's request. Developer shall cooperate with Owner and provide any information reasonably requested by Owner and any other reasonable assistance with respect to the on-going preparation and maintenance of Owner's books and records, which shall be available for periodic examination by representatives of Owner during Developer's normal business hours upon reasonable prior notice, for a reasonable period thereafter.

9.  Indemnification. Owner shall indemnify, defend, protect and hold harmless Developer, and each of its shareholders, directors, officers, managers, employees, agents, attorneys, and representatives (collectively, the "Indemnified Parties) to the fullest extent permitted by applicable law from and against any and all Losses which may be incurred or suffered by any Indemnified Party and which may arise out of, result from or in any way relate to any claim, action, lawsuit or proceeding by any Person other than Owner, to which an Indemnified Party may become subject by reason of the fact that Developer was serving as an agent of Owner, or is or was serving at the request of Owner in connection with provision of the Services under this Agreement, except for such Losses as are determined to have resulted from the Indemnified Party's gross negligence, fraud, bad faith or willful misconduct. Upon the occurrence of an event giving rise to any indemnification obligation hereunder, the Indemnified Party shall promptly notify the Owner and provide the Owner with copies of any documents reflecting the claim for which such indemnification is sought. The Indemnified Party shall cooperate with the Owner in the defense of any claim on the condition the Owner shall reimburse the Indemnified Party for any out-of-pocket costs and expenses incurred in connection therewith. The Owner, in its sole discretion, shall be entitled to settle, compromise, discharge or otherwise completely contest any claim or occurrence for which indemnification hereunder is sought, provided that the terms of any settlement, compromise or discharge do not impose any additional liability or potential liability on the Indemnified Party. If the Owner fails to do so, the Indemnified Party is entitled to engage such attorneys and other persons to defend against the claim, as it may choose. The Owner shall pay the reasonable charges and expenses of such attorneys and other persons on a current basis within thirty (30) days of submission of invoices

445

or bills. The indemnification obligations set forth herein, shall indefinitely survive the termination of this Agreement.

10.   Limitation of Liability.  Notwithstanding anything to the contrary contained in this Agreement, Developer is not liable to Owner for any damage or destruction of the Property, or any action or failure to act of an architect, engineer or other third-party contractors or any subcontractor working on the Project, unless such action or failure to act is a result of Developer's gross negligence or willful misconduct.  Each party hereby waives its right to consequential and punitive damages.

11.   No Personal Liability.  In no event shall any member, shareholder, manager, director, officer, employee, representative, attorney, or agent of a party hereto or their respective Affiliates have any personal liability for the performance of such party's obligations under this Agreement.

12.   Insurance.  Owner shall carry commercial general liability insurance, on an occurrence form, adequate to protect the interest of the parties hereto, and shall be the primary liability insurance for all claims or liabilities arising from, or incidental to this Agreement. General liability risks and key exposures to be covered shall include, but not be limited to, the Property and Developer's Services in connection with the Property, blanket contractual, personal injury, and completed operations.  The limits of each policy shall not be less than $1,000,000 per occurrence for bodily injury, personal injury and property damage and subject to a $2,000,000 annual aggregate.  Owner shall also carry builder's risk insurance and a PPL policy in an amount at least equal to the replacement cost of the improvements being constructed for the Project. Owner waives and releases all claims against Developer. Any damages should be covered by Owner's insurance. In addition, owner shall carry insurance for the "Automatic Storage Retrieval System" (ASRS) located on owner's premises in an amount no less than $7,000,000.00.

13.   Cumulative Remedies.   The rights and remedies of either party under this Agreement with respect to the occurrence of a Consultant Default or Owner Default (as applicable) are cumulative with, and in addition to, any other right or remedy available to such party at law, in equity, or both.

14.   Miscellaneous. Owner is responsible to maintain the security and an alarm system for the Property.  Owner or his agent is responsible to hire the necessary security personnel at its own expense. Developer shall have no responsibility or liability for failure of maintenance of the security and alarm system.

(a)   Governing Law.  This Agreement shall be governed by the laws of the State of New York, without regard for its conflicts of law provisions.  The parties hereby consent to the exclusive jurisdiction of, and venue in, the state and federal trial courts located in

(b)   Attorneys' Fees.  In the event of any dispute arising in connection with this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and court costs from the non-prevailing party, in addition to any other relief granted by a court of competent jurisdiction.

8

446

(c) _Assignment_. Developer should have the right to assign pursuant to paragraph 1 of this agreement. Owner can assign with written consent of Developer.

(d) _Notices_. All notices and other communications under this Agreement shall be in writing and shall be deemed duly given one day after sent by a reputable national overnight courier service to the address set forth below, or five (5) days after mailing if sent by first class, postage prepaid to the address sent below, personally delivered or when sent by e-mail.

If to Owner (after closing):

RS OLD MILL LLC
25 Old Mill Road
Suffern, NY 10901

If to Developer:

ENBEE TRST HOLDINGS LLC
5308 13th Avenue
Suite 164
Brooklyn, NY 11219

Each party may change its foregoing notice addresses at any time by notice given in accordance with this Section 14(d).

(e) _Severability_. If any provision of this Agreement or the application thereof to any person or circumstances shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforceable to the greatest extend permitted by law.

(f) _Burden; Benefit._ This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their successors and permitted assigns.

(g) _Entire Agreement_. This Agreement, together with any certificates, documents, instruments and writings that are delivered pursuant hereto, constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof. The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

h) _Force Majeure_. In discharging its duties as set forth in this Agreement, Developer shall be held to a standard of reasonableness and shall not be liable to Owner for matters outside its control, including but not limited to acts of God, civil riot, war, strikes, labor unrest or shortage of material.

9

(i)     Amendment; Extension; Waiver.    No amendment, modification, waiver, replacement, termination or cancellation of any provision of this Agreement will be valid, unless the same is in writing and signed by the parties hereto.  Each waiver of a right hereunder does not extend beyond the specific event or circumstance giving rise to the right.  No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence.  Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor does any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

(j)     Counterparts.    This Agreement may be executed in counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.   This Agreement may be executed and delivered in counterpart signature pages executed and delivered via facsimile, e-mail or otherwise, and any such counterpart executed and delivered via facsimile, e-mail or otherwise shall be deemed an original for all intents and purposes.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

**OWNER:**

RS OLD MILL LLC

By: _____

**DEVELOPER:**

ENBEE TRST HOLDINGS LLC

By: _____

10

448

## EXHIBIT B
### Services

The specific services to be performed by Developer with respect to the Project shall include the following:

(a)    using reasonable commercial efforts to develop Project financial proformas, complete architect, engineer, and contractor selection and contract negotiation, and present to Owner for Owner's execution the agreements with architects, engineers and contractors;

(b)    recommending and administrating value engineering changes as Developer believes are necessary and desirable, upon Owner's prior approval; administrating the preparation of plans, specifications, construction documents, and shop drawings for the Project and consulting with Owner and the general contractor with respect to Project design and development; Transition from Jones Lang Lassale (JLL)'s backup systems for boiler system and water treatment and deaderator system . Need to hire former employees for proper maintenance and maintain safe operation of the current systems. Need to shut down current system for safety purposes to avoid hazardous conditions.

(c)    Recommending and obtaining potential lenders and loan terms for the Project; generally arranging for additional capital for the project and tenant improvement.  Obtaining all applicable grants or subsidies available for this Project.

(d)    Arranging additional capital, specifically for tenant improvement, developing new structures and utilizing the additional equity value in property. Developer hereby agrees that upon signing of this agreement, developer should immediately improve conference rooms and offices to attract tenants within a specific industry, namely pharmaceuticals, to raise the value of the property to its Value. Developer can also attract other tenants that can require GMP facility , upon Owner's approval. Preferences shall be given to Pharmacurtical companies as it fits the business model of the Owner and raises the value of the property to its Value.

(e)    negotiating the construction contract for the Project; Obtaining necessary expediting services, engineering services , surveyors , permits , meeting with town officials

(f)    hire professionals in the pharmaceutical field, leisure and entertainment fields , ASRS robotics systems and other relevant fields to attract all applicable trade shows and  seminars for the purpose of creating life science centers so to make use of ASRS in the premises.

(g)     recommending, administrating, and coordinating the performance of architects, engineers and contractors with respect to the Project, upon Owner's prior approval, including (i) administering, processing, and approving change requests for submission to Owner and change orders, (ii) observing and reporting upon completion of punch lists items and (iii) using best efforts to cause the Project to be completed in accordance with the timing to be developed by Owner, Developer, and the general contractor;

(h)     using commercially reasonable efforts to obtain all development, construction and zoning consents, permits, approvals and variances necessary for the Project;

(i)     reviewing and approving, or disapproving, all invoices submitted by all architects, engineers, contractors, and suppliers and, submitting to Owner all such approved invoices together with other information as may be required. Supervising the collection and review of all documentation relating to the Project;

(j)     observing and reviewing all activities for completion as specified in approved drawings and specifications, and using reasonable efforts to assure that all critical work designated as such in such specifications shall not be covered without first being inspected by Owner and Developer for compliance with such drawings and specifications; and

(k)     holding periodic coordination meetings with all architectural and engineering contractors, Owner, and the general contractor.

Exclusions from Services.

(a)     Developer is not a licensed architect, engineer or design professional and will not perform design services. The recommendations and advice of the Developer concerning design alternatives shall be subject to the review and approval of Owner and the Owner's professional consultants.

(b)     Developer shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the construction of the Project, as these will solely be contractors' rights and responsibilities.

(c)     Developer shall not be responsible for the security of the property such as obtaining necessary insurance policy and hiring security personnel.

450

## EXHIBIT C

### APPROVAL TO PHASE I

Pursuant to the agreement dated November 30, 2016, by and between RS OLD MILL LLC herein ("Owner") and Lone Pine Associates LLC herein ("Developer"). The Owner upon diligent review of all relevant facts provided by the Developer and upon his own inquiry into the matter, hereby deems all stages necessary to proceed to Phase 1 of the ("Company"), to be completed to Owner's satisfaction and therefore grants approval / permission to proceed to Phase I.
""

Owner:
RS OLD MILL LLC

By:

_____

Yehuda Salamon
Date: _____

### PHASE I APPROVAL

Pursuant to the agreement dated November 30, 2016, by and between Party 1 herein ("Owner") and Party 2 herein ("Developer"). The Owner upon diligent review of all relevant facts and documents provided by the Developer and upon his own inquiry into the matter, hereby confirms that Phase 1 is hereby completed and approved for the _____ ("Company"). Developer may proceed to Phase II.

Owner:
RS OLD MILL LLC

By:

_____

Yehuda Salamon
Date: _____

## PHASE II APPROVAL

Pursuant to the agreement dated November 30, 2016, by and between Party 1 herein ("Owner")
and Party 2 herein ("Developer"). The Owner upon diligent review of all relevant facts and
documents provided by the Developer and upon his own inquiry into the matter, hereby confirms
that Phase 2 is hereby completed and approved for the _____ ("Company").
Developer may proceed to Phase III.

Owner:
RS OLD MILL LLC

By: _____

Yehuda Salamon
Date: _____

## PHASE III APPROVAL

Pursuant to the agreement dated November 30, 2016, by and between Party 1 herein ("Owner")
and Party 2 herein ("Developer"). The Owner upon diligent review of all relevant facts,
documents and an executed lease provided by the Developer and upon his own inquiry into the
matter, hereby confirms that Phase 3 is hereby completed and approved for the _____
("Company").

Owner:
RS OLD MILL LLC

By: _____

Yehuda Salamon
Date: _____

452

**EXHIBIT D**
**List of Tenant Categories**

Tenant categories
1. Warehousing/3PL
2. Leisure/Entert.
3. Pharma – Manuf.
4. Data Centers

Additional categories have to be approved by owner for developer to engage in Phase I.

Compensation for above
1. Approved Phase I $40,000.00
2. Approved Phase II $65,000.00
3. Approved Phase III 5% of net amount of full term lease

Expenditures of Phase I and II by owner will be reimbursed from Phase III

## ASSIGNMENT
## OF
## CONTRACT

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are acknowledged, the undersigned ENBEE TRST HOLDINGS LLC ("Assignor") with and address at 5308 13th Ave, Suite 164, Brooklyn, NY 11219 hereby assigns to Lone Pine Associates, LLC ("Assignee"), whose address shall be at 25 Old Mill Road, Suffern NY 10901, all of Assignor's right, title and interest in the Contract dated November 30, 2016, between RS OLD MILL LLC, as Owner and ENBEE TRST HOLDINGS LLC as Developer.

Assignor represents and warrants to Assignee that (1) Exhibit A attached to this Assignment is a true and complete copy of the Agreements; and (2) that said Agreements has not been modified in any way.

By accepting this Assignment, Assignee assumes all rights and agrees to perform all of the obligations of the Assignor's under the Agreements, and to indemnify Assignor against any loss, claim, damage or expense Assignor may incur by reason of Assignee's failure to perform the assumed obligations on a timely basis.

Dated: September 8th, 2017

ENBEE TRST HOLDING LLC

By: _____ Uziel M Frankel _____
          UZIEL M FRANKEL

LONE PINE ASSOCIATES LLC

By: _____ Uziel M Frankel _____
          UZIEL M FRANKEL

# EXHIBIT C

| LONE PINE ASSOCIATES LLC | | | | |
|---|---|---|---|---|
| SUMMARY OF OUT-OF POCKET EXPENSES | | | | |
| | | | | |
| **DESCRIPTION** | **EXHIBIT** | **TOTAL** | **PRE 2/12/2017** | **POST 2/12/2017** |
| PAYROLL, PAYROLL TAXES, ETC | D-1 | $ 56,430.52 | $ 1,978.99 | $ 54,451.53 |
| ADVERTISING - AMEX CHARGES | D-2 | $ 17,657.58 | $ - | $ 17,657.58 |
| UTILITIES, PHONE | D-3 | $ 22,197.89 | $ - | $ 22,197.89 |
| BEACAN CAPITAL - DIRECT PAYMENTS & RELATED AMEX CHARGES | D-4 | $ 147,010.13 | $ - | $ 147,010.13 |
| RESEARCH, ADVERTISING, MARKETING, EMAILING, LINKEDIN | D-5 | $ 46,311.29 | $ - | $ 46,311.29 |
| OTHER | D-6 | $ 24,000.00 | $ - | $ 24,000.00 |
| TOTALS | | $ 313,607.41 | $ 1,978.99 | $ 311,628.42 |

*EXHIBIT D*

456

# Exhibit D

Supreme Court of the State of New York
County of Queens

| | |
|---|---|
| | Index No. |
| | Date Purchased: July 25, 2018 |
| | Plaintiff designates Rockland |
| LONE PINE ASSOCIATES, LLC, | County as the place of trial |
| Plaintiff, | |
| | The basis of the venue is |
| | Plaintiff's place of business |
| - against - | |
| | **Summons** |
| ISSM PROTECTIVE SERVICES INC., | |
| Defendant. | Plaintiff does business at: |
| | 25 Old Mill Road |
| | Suffern, NY |
| | County of Rockland |

To: The Above-Named Defendant(s)

    **You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on Levine & Associates, P.C., Plaintiff's Attorneys, within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty days after the service is complete if the summons is not personally delivered to you within the State of New York); and in case of your failure to appear of answer, judgment will be taken against you by default for the relief demanded in the complaint.

*Dated:* July 25, 2018

                          LEVINE & ASSOCIATES, P.C.
                          *Attorneys for Plaintiff*
                          15 Barclay Road
                          Scarsdale, New York 10583
                          Telephone (914) 600-4288
                          Facsimile  (914) 725-4778

*Defendant's addresses:*

33 Mountain Avenue
Monsey, NY 10952

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

LONE PINE ASSOCIATES, LLC                    :   Index No.

                                  Plaintiff,  :   COMPLAINT

            - against -                       :

ISSM PROTECTIVE SERVICES INC.,                :

                                  Defendant.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff, by and through its attorneys, Levine & Associates, P.C., complaining of the
Defendant, respectfully sets forth as follows, upon information and belief:

## SUMMARY OF COMPLAINT

1. Plaintiff is the beneficial owner and occupant of certain premises located at 25 Old Mill
Road, Suffern, New York [the "Premises"]. Plaintiff has been conducting business from its offices
in the Premises for many months at this point, has substantial inventory stored thereupon, and
requires access to the Premises in order to meet potential customers and show them the inventory.
Defendant is a security guard service hired by the record owner of the Premises. Defendant claims
to be owed money from the record owner of the Premises, has filed a lien against the Premises for
a part of those funds, and has announced that it would not permit Plaintiff (or anyone else) to enter
the premises until Defendant was paid by the record owner of the Premises. Plaintiff has no
knowledge as to the veracity of Defendant's monetary claim, however Plaintiff has now been
physically prevented by Defendant from entering the Premises and conducting its business.

FILED: ROCKLAND COUNTY CLERK 07/25/2018 03:05 PM INDEX NO. 033447/2018
NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 07/25/2018

2.   The inability to access its offices and inventory, to meet with potential buyers and exhibit the inventory, and to access its computers and files, is causing irreparable injury to Plaintiff. Despite notice of the same, Defendant continues to physically prevent Plaintiff from accessing its offices and inventory.

3.   The actions of Defendant are illegal and give rise to several causes of action for monetary and injunctive relief.  Specifically, those causes of action sound in wrongful ejectment, unlawful detainer, fraud, trespass, and conversion.   Plaintiff brings this action to obtain (i) permanent injunctive relief prohibiting Defendant from denying or impeding Plaintiff's unfettered access to the Premises, (ii) an order discharging Defendant's purported "mechanic's lien" on the Premises on the grounds that a security services are not lienable as a matter of law, (iii) a money Judgment for treble damages, pursuant to RPAPL §853, as a result of the Defendant's disseizure, ejectment, and putting Plaintiff out of the Premises in an unlawful manner, and, thereafter, keeping Plaintiff out of the Premises by force, unlawful means, and putting Plaintiff in fear of personal violence; (iv) a money Judgment for property damage to Plaintiff's inventory, (v) punitive damages; and (vi) prejudgment interest.

## THE PARTIES

4.   At all times relevant to this Complaint, Plaintiff was, and still is, a domestic limited liability company, organized and existing under, and by virtue of, the laws of the State of New York and conducting business in Rockland County, New York.

5.   At all times relevant to this Complaint, Defendant was, and still is, a domestic corporation, duly organized and existing under, and by virtue of, the laws of the State of New York, and conducting business in Rockland County (among other places).

Case 7:18-cv-06655-reg  Doc 1-2  Filed 09/23/20  Entered 09/23/20 11:25:08  Page 461 of 552  PageID #: 739

## JURISDICTION AND VENUE

6. This court has jurisdiction over the parties because they are each a domestic corporation.

7. Venue is proper in this Court because both parties conduct business in Rockland County and the events which form the basis for this Complaint took place in Rockland County.

## RELEVANT FACTS

8. Plaintiff is the beneficial owner of the real property located at 25 Old Mill Road, Suffern, New York [the "Premises"].

9. Plaintiff has been conducting business from its offices in the Premises for many months, has substantial inventory stored thereupon, and requires access to the Premises in order to meet potential customers and show them the inventory.

10. Defendant is a security guard service hired by Suffern Partners LLC ("Suffern") the record owner of the Premises to provide a security guard at a kiosk at the entry to the Premises for security purposes.

11. Apparently (and unbeknownst to Plaintiff) Suffern failed to pay Defendant, at least in part, for its services. On December 18, 2017, Defendant filed a Notice Under Mechanic's Lien Law (2017-40553 in the Rockland County Clerk's Office) [the "12/2017 Mechanic's Lien"], alleging that it was employed by Suffern in September of 2017, that it performed $57,380.67 of work, and that it received payment of all but $29,144.62 of that sum.

12. Defendant thereafter continued to perform security services at the Premises and now claims that it is owed funds well in excess of the amount stated on the 12/2017 Mechanic's Lien.

13. In early July of 2018, Defendant advised Plaintiff that it would not permit Plaintiff to enter into the Premises, nor access its offices or storage space therein, until Defendant was paid in

461

full for the services it had previously rendered. Defendant Asserted that it was permitted to deny such access by virtue of the existence of its purported Mechanic's Lien.

14.     Since that time, Defendant has physically prevented Plaintiff from entering the Building and/or accessing Plaintiff's inventory located therein.

15.     As a result, Plaintiff has been unable to bring potential business partners, inventory purchasers, or other guests into the premises, nor to sell or remove any of its inventory from the Premises. In short, Plaintiff's business has been virtually shut down as a result of Defendant's actions.

### AS AND FOR A FIRST CAUSE OF ACTION:
#### [Lien Law § 19 – Order Summarily Discharging Lien]

16.     Plaintiff repeats, reiterates and realleges, and hereby incorporates, each and every allegation heretofore set forth herein, with the same force and effect as though more fully set forth herein at length.

17.     Section 19(6) of the New York Lien Law of the State of New York provides that a lien may be summarily discharged by the Court, at the request of any interested party, where "it appears from the face of the notice of lien that the claimant has no valid lien by reason of the character of the labor or materials furnished and for which a lien is claimed ..."

18.     Section 3 of New York's Lien Law provides, in relevant part, that "a ... contractor, subcontractor, [or] laborer ... who performs labor ... *for the improvement of real property* with the consent or at the request of the owner thereof ... shall have a lien for the principal and interest, of the value, or the agreed price, of such labor ... upon the real property improved or to be improved and upon such improvement ... " (emphasis added).

19.     Security guard services are, as a matter of New York law, not for "the improvement of real property," and, therefore, are not properly the subject matter of a mechanic's lien.

462

20. As such, and pursuant to §19(6) of the Lien Law, Plaintiff is entitled to an Order by the Court summarily discharging the 12/2017 Mechanics Lien filed by Defendant and directing the Rockland County Clerk to discharge the same as of record.

### AS AND FOR A SECOND CAUSE OF ACTION:
### [RPAPL § 853 – Treble Damages For Wrongful Eviction]

21. Plaintiff repeats, reiterates and realleges, and hereby incorporates, each and every allegation heretofore set forth herein, with the same force and effect as though more fully set forth herein at length.

22. Section 853 of New York's Real Property Actions and Proceedings Law ("RPAPL") provides that: "If a person is disseized, ejected, or put out of real property in a forcible or unlawful manner, or, after he has been put out, is held and kept out by force or by putting him in fear of personal violence or by unlawful means, he is entitled to recover treble damages in an action therefor against the wrong-doer."

23. Defendant, with no legal authority to do so, has, via the use or threat of physical force, put the Plaintiff out of the Premises and has kept Plaintiff from the Premises by force, by putting Plaintiff in fear of personal violence, and by unlawful means.

24. Specifically, Defendant has manned a kiosk at the entrance to the Premises and has stationed an armed guard therein who has refused to permit Plaintiff access to the Premises via the threatened use of force. Since Plaintiff held a right of possession prior to being ousted from (i.e., barred from entry onto) the Premises, Plaintiff, as a matter of New York law, has the right to recover triple its damages as a result.

25. As a result of the wrongful eviction of Plaintiff from the Premises by Defendant, and Defendant's refusal to permit Plaintiff to conduct its business, and access or remove its inventory, in the Premises, Plaintiff has suffered, and will continue to suffer, damages in an amount not

capable of precise calculation, but which amount, unless Plaintiff is immediately permitted to return to its offices, conduct business, and remove its inventory, is expected to exceed the sum of $22,000,000.00.

26. As a result, Plaintiff is entitled to an award of compensatory damages in an amount of at least $22,000,000, trebled to $66,000,000, together with pre-Judgment interest and additional punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION:
### [Conversion]

21. Plaintiff repeats, reiterates and realleges, and hereby incorporates, each and every allegation heretofore set forth herein, with the same force and effect as though more fully set forth herein at length.

27. Plaintiff had (and retains) the possessory right and interest in its inventory located in the Premises.

28. Defendant has exercised dominion over Plaintiff's inventory and interfered with it, in derogation of Plaintiff's rights.

29. As such, Defendant has converted Plaintiff's property.

30. As a result of the conversion of Plaintiff's property by Defendant, Plaintiff has suffered damages in an amount not presently capable of precise calculation, but which amount, unless Plaintiff is immediately permitted to return to its offices, conduct business, and remove its inventory, is believed to exceed the sum of $22,000,000.00.

## AS AND FOR A FOURTH CAUSE OF ACTION:
### [Permanent Injunction]

464

31. Plaintiff repeats, reiterates and realleges, and hereby incorporates, each and every allegation heretofore set forth herein, with the same force and effect as though more fully set forth herein at length.

32. Unless Defendant is directed to cease and desist from interfering with Plaintiff's ability to enter and remain on the Premises, and conduct its business, Plaintiff will be irreparably injured in that its business will be entirely destroyed.

33. As such, Plaintiff is entitled to a permanent injunction prohibiting Defendant from interfering in any way with Plaintiff's right to access the Premises and conduct its business thereupon.

WHEREFORE, Plaintiff respectfully demands Judgment against Defendant as follows:

Upon the First Cause of Action, an Order by the Court summarily discharging the 12/2017 Mechanics Lien filed by Defendant and directing the Rockland County Clerk to discharge the same as of record;

Upon the Second Cause of Action, (i) a compensatory monetary judgment in an amount to be proven at trial, but which amount is expected to exceed the sum of $22,000,000, trebled to the sum of $66,000,000.00; (ii) a punitive damage award in such amount as the trier of fact deems appropriate; and (iii) prejudgment interest on the trebled compensatory damage award.

Upon the Third Cause of Action, a compensatory monetary judgment in an amount to be proven at trial, but which amount is expected to exceed the sum of $22,000,000;

465

Case 11-44722-cgm Doc 14-82 Filed 09/23/20 Entered 09/23/20 11:25:38 Page 466 of 552 PageID #: 744

Upon the Fourth Cause of Action, a permanent injunction prohibiting Defendant from interfering in any way with Plaintiff's right to access the Premises, its offices thereupon, and its inventory, and conduct its business thereupon; and

Upon all Causes of action, the costs and taxable disbursements of this action, including reasonable attorney's fees, together with such other, further and different relief as is just, proper and equitable.

Dated: July 24, 2018

LEVINE & ASSOCIATES, P.C.

By: _____
Michael Levine

15 Barclay Road
Scarsdale, NY 10583
Telephone (914) 600-4288
Facsimile (914) 725-4778
e-mail: ml@LevLaw.org

*Attorneys for Plaintiff*

Case 11-18447-reg   Doc 14682   Filed 09/31/20   Entered 09/31/20 10:58:45   Case 11-18447-reg   Document 17 Filed 01/070   Page 467 of 552   PageID #: 745

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND

------------------------------------------- X

LONE PINE ASSOCIATES, LLC                  :   Index No. 034447/2018

                              Plaintiff,    :   AFFIRMATION IN SUPPORT
                                                OF PLAINTIFF'S MOTION
                 - against -                :   FOR INTERLOCUTORY RELIEF

ISSM PROTECTIVE SERVICES INC.,             :

                              Defendant.    :

------------------------------------------- X

     **PETER MARCINEK**, being duly affirmed, hereby deposes and states, under the penalty of perjury:

     1. I am an agent of Plaintiff Lone Pine Associates, LLC ("LPA"), and, as such, am fully familiar with all of the facts and circumstances as are hereinafter set forth. I affirm, rather than swear, for religious reasons.

     2. I previously submitted an Affirmation in support of Plaintiff's motion for interlocutory relief. I submit this supplemental affirmation because I was advised by counsel that an attorney purporting to represent Suffern Partners ("Suffern") claimed (before Judge Eisenpress) that Suffern was not aware of Lone Pine's occupancy of the property located at 25 Old Mill Road, Suffern, New York [the "Premises"]. That is totally false. Not only is the principal of Lone Pine a 65% shareholder of Suffern, but, from day one, I have been interacting with other agents of Suffern who were completely aware of the fact that (i) LPA was occupying the Premises and operating its business from there (part of which business included attempts to locate additional tenants and/or joint venturers for the Premises). (ii) LPA was storing large quantities of inventory

for its mail-order business and shipping the same from the Premises, (iii) LPA had built (at its own expense) an office for its business operations in the Premises, (iv) LPA was paying for maintenance of the Premises; and (v) LPA was in charge of the day-to-day operations of the Premises.

3. Annexed hereto and labeled Exhibit "1" are pictures of the office that LPA built in the Premises for its business operations. Those pictures depict the office layout, the new furniture we purchase and placed therein, the custom wall paint, and the carpet we installed. In all, it cost us almost $100,000 to construct, furnish and finish these offices.

4. Annexed hereto and labeled Exhibit "2" are copies of some of the recent telephone bills for the Premises. These telephone services were obtained by LPA, billed to LPA, and paid by LPA. Those phones are used not only for LPA's business, but also for the management of the Premises and our attempts to locate tenants and/or joint venturers for the premises.

5. Annexed hereto and labeled Exhibit "3" are copies of electric bills from Orange and Rockland County Electric Company for the Premises. LPA arranged for this service, however we had to put it in the name of Suffern Partners because it is the record owner of the Premises. Nonetheless, these bills are all paid by LPA.

6. In fact, because LPA is a 65% owner of Suffern, we (LPA) run the entire Premises on a day-to-day basis, attempt to locate and solicit other tenants and/or joint venturers for the Premises, and entirely maintain the Premises. We are completely in charge of all day-to-day maintenance and operations (boilers, lights, and all items necessary to keep the building operational), not only for the LPA offices but for the entire Premises. We pay basically all of the bills (whether in the name of LPA or Suffern) for the maintenance of the property, including the hourly fees of Kevin DeClerk, whom we hired as an independent contractor to keep all machinery in good condition, take care of any maintenance, prevent any water lines from freezing during the

2

winter and, in general, making sure that the Premises are operational so that LPA can conduct its business there, show the Premises to other potential tenants and/or joint venturers, and store and ship its inventory.[1]

7.   Annexed hereto and labeled Exhibit "4" are invoices from Trust Security for the installation of a video security system at the Premises. This installation and service was arranged by LPA and paid by LPA.

8.   Indeed, even the services of Defendant ISSM were alleged by Suffern (through its management company, Bridgewater) to have been arranged by, and the responsibility of, LPA. Annexed hereto and labeled Exhibit "5" is an e-mail from a representative of that entity to ISSM, wherein it is alleged that: "the contract I signed [with ISSM] I was instructed to do so by Mr. Salamon who is Lone Pine management, the management company of the Novartis site. Since you have not received payment, we cannot force you to provide your services. CC is Mr. Salamon who is in charge of payments. Please respond to Mr. Salamon to discuss further action."

9.   Finally, annexed hereto and labeled Exhibit "6" are photographs of some of our inventory at the Premises. Significantly, the first picture depicts an agent of Suffern viewing and holding some of that inventory.

s/ Peter Marcinek
Peter Marcinek

Duly Affirmed before me this
30th day of July, 2018

s/ Michael Levine

---

[1] The Affidavit of Kevin DeClerk is being submitted simultaneously with this one.

3

Exhibit E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

---

DEBORAH HELLER,

INDEX NO. 511522/2018

Plaintiff,

**AMENDED VERIFIED
COMPLAINT**

-against-

YIDEL'S FRESH FOOD STATION, LLC and YIDEL'S
SHOPPING CART INC.,

Defendants.

---

Plaintiff, by her attorneys, HILL & MOIN LLP, as and for her Verified Complaint,
respectfully alleges, upon information and belief:

1. The plaintiff, DEBORAH HELLER, at all times herein mentioned was and still is a
resident of the County of Kings and the State of New York.

2. The defendant YIDEL'S FRESH FOOD STATION, LLC, at all times herein mentioned,
was and still is a corporation organized and existing under the laws of the State of New York, with
its principal place of business situated in the County of Kings and the State of New York.

3. The defendant YIDEL'S FRESH FOOD STATION, LLC, at all times herein mentioned
was and still is a foreign corporation duly licensed and authorized to do business in the State of
New York.

4. The defendant, YIDEL'S FRESH FOOD STATION, LLC, at all times herein mentioned
conducted and carried on business in the County of Kings and the State of New York.

5. The defendant, YIDEL'S FRESH FOOD STATION, LLC, at all times herein mentioned
was and still is a partnership doing business in the County of Kings and the State of New York.

6. The defendant, YIDEL'S FRESH FOOD STATION, LLC, at all times herein mentioned
was and still is a limited liability partnership doing business in the County of Kings and the State of
New York.

Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 472 of 552 PageID #: 750

7.  The defendant, YIDEL'S FRESH FOOD STATION, LLC, at all times herein mentioned was and still is a limited liability corporation doing business in the County of Kings and the State of New York.

8.  The defendant, YIDEL'S FRESH FOOD STATION, LLC, at all times herein mentioned was and still is a sole proprietorship doing business in the County of Kings and the State of New York.

9.  At all times herein mentioned, defendant YIDEL'S FRESH FOOD STATION, LLC transacted business within the State of New York.

10.  At all times herein mentioned, defendant YIDEL'S FRESH FOOD STATION, LLC derived substantial revenue from goods used or consumed or services rendered in the State of New York.

11.  At all times herein mentioned, defendant YIDEL'S FRESH FOOD STATION, LLC expected or should reasonably have expected its acts to have consequences in the State of New York.

12.  At all times herein mentioned, defendant YIDEL'S FRESH FOOD STATION, LLC derived substantial revenue from interstate or international commerce.

13.  The defendant YIDEL'S SHOPPING CART INC. at all times herein mentioned, was and still is a corporation organized and existing under the laws of the State of New York, with its principal place of business situated in the County of Kings and the State of New York.

14.  The defendant YIDEL'S SHOPPING CART INC., at all times herein mentioned was and still is a foreign corporation duly licensed and authorized to do business in the State of New York.

15.  The defendant, YIDEL'S SHOPPING CART INC., at all times herein mentioned conducted and carried on business in the County of Kings and the State of New York.

16.  The defendant, YIDEL'S SHOPPING CART INC., at all times herein mentioned was

2

Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 473 of 552 PageID #: 751

and still is a partnership doing business in the County of Kings and the State of New York.

17. The defendant, YIDEL'S SHOPPING CART INC., at all times herein mentioned was and still is a limited liability partnership doing business in the County of Kings and the State of New York.

18. The defendant, YIDEL'S SHOPPING CART INC., at all times herein mentioned was and still is a limited liability corporation doing business in the County of Kings and the State of New York.

19. The defendant, YIDEL'S SHOPPING CART INC., at all times herein mentioned was and still is a sole proprietorship doing business in the County of Kings and the State of New York.

20. At all times herein mentioned, defendant YIDEL'S SHOPPING CART INC. transacted business within the State of New York.

21. At all times herein mentioned, defendant YIDEL'S SHOPPING CART INC. derived substantial revenue from goods used or consumed or services rendered in the State of New York.

22. At all times herein mentioned, defendant YIDEL'S SHOPPING CART INC. expected or should reasonably have expected its acts to have consequences in the State of New York.

23. At all times herein mentioned, defendant YIDEL'S SHOPPING CART INC. derived substantial revenue from interstate or international commerce.

24. At all times herein mentioned, DEBORAH HELLER was lawfully upon defendant's premises.

25. At all times herein mentioned, the defendant YIDEL'S FRESH FOOD STATION, LLC owned the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

26. At all times herein mentioned, the defendant YIDEL'S FRESH FOOD STATION, LLC was one of the owners of the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

27. At all times herein mentioned, the defendant YIDEL'S FRESH FOOD STATION, LLC

3

Case 1:20-cv-04927-AMD Document 11 Filed 11/13/20 Page 474 of 552 PageID #: 752

was a lessee of the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

28. At all times herein mentioned, the defendant YIDEL'S FRESH FOOD STATION, LLC, defendant's servants, agents and/or employees operated the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

29. At all times herein mentioned, the defendant YIDEL'S FRESH FOOD STATION, LLC, defendant's servants, agents and/or employees maintained the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

30. At all times herein mentioned, the defendant YIDEL'S FRESH FOOD STATION, LLC, defendant's servants, agents and/or employees managed the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

31. At all times herein mentioned, the defendant YIDEL'S FRESH FOOD STATION, LLC, defendant's servants, agents and/or employees controlled the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

32. At all times herein mentioned, the defendant YIDEL'S FRESH FOOD STATION, LLC, defendant's servants, agents and/or employees supervised the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

33. On or before December 29, 2017, the defendant YIDEL'S FRESH FOOD STATION, LLC, defendant's servants, agents and/or employees repaired the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

34. On or before December 29, 2017, the defendant YIDEL'S FRESH FOOD STATION, LLC, defendant's servants, agents and/or employees inspected the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

35. On or before December 29, 2017, the defendant YIDEL'S FRESH FOOD STATION, LLC, defendant's servants, agents and/or employees constructed the premises located at Yidel's

4

Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 475 of 552 PageID #: 753

Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

36. On or before December 29, 2017, the defendant YIDEL'S FRESH FOOD STATION, LLC, defendant's servants, agents and/or employees designed the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

37. At all times herein mentioned, it was the duty of the defendant YIDEL'S FRESH FOOD STATION, LLC, defendant's servants, agents and/or employees to maintain said premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY, in a reasonably safe and suitable condition and in good repair.

38. At all times herein mentioned, the defendant YIDEL'S SHOPPING CART INC. owned the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

39. At all times herein mentioned, the defendant YIDEL'S SHOPPING CART INC. was one of the owners of the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

40. At all times herein mentioned, the defendant YIDEL'S SHOPPING CART INC. was a lessee of the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

41. At all times herein mentioned, the defendant YIDEL'S SHOPPING CART INC., defendant's servants, agents and/or employees operated the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

42. At all times herein mentioned, the defendant YIDEL'S SHOPPING CART INC., defendant's servants, agents and/or employees maintained the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

43. At all times herein mentioned, the defendant YIDEL'S SHOPPING CART INC., defendant's servants, agents and/or employees managed the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

44. At all times herein mentioned, the defendant YIDEL'S SHOPPING CART INC.,

Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 476 of 552 PageID #: 754

defendant's servants, agents and/or employees controlled the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

45. At all times herein mentioned, the defendant YIDEL'S SHOPPING CART INC., defendant's servants, agents and/or employees supervised the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

46. On or before December 29, 2017, the defendant YIDEL'S SHOPPING CART INC., defendant's servants, agents and/or employees repaired the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

47. On or before December 29, 2017, the defendant YIDEL'S SHOPPING CART INC., defendant's servants, agents and/or employees inspected the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

48. On or before December 29, 2017, the defendant YIDEL'S SHOPPING CART INC., defendant's servants, agents and/or employees constructed the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

49. On or before December 29, 2017, the defendant YIDEL'S SHOPPING CART INC., defendant's servants, agents and/or employees designed the premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY.

50. At all times herein mentioned, it was the duty of the defendant YIDEL'S SHOPPING CART INC., defendant's servants, agents and/or employees to maintain said premises located at Yidel's Fresh Food Station, 4921 12th Avenue, Brooklyn, NY, in a reasonably safe and suitable condition and in good repair.

51. Solely as a result of the defendants' negligence, carelessness and recklessness, DEBORAH HELLER was caused to suffer severe and serious personal injuries to mind and body, and further, that DEBORAH HELLER was subjected to great physical pain and mental anguish.

Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 477 of 552 PageID #: 755

52. By reason of the foregoing, DEBORAH HELLER was severely injured and damaged, sustained severe nervous shock and mental anguish, great physical pain and emotional upset, some of which injuries are believed to be permanent in nature and duration, and DEBORAH HELLER will be permanently caused to suffer pain, inconvenience and other effects of such injuries; DEBORAH HELLER incurred and in the future will necessarily incur further hospital and/or medical expenses in an effort to be cured of said injuries; and DEBORAH HELLER will be unable to pursue DEBORAH HELLER's usual duties with the same degree of efficiency as prior to this accident, all to DEBORAH HELLER's great damage.

53. This action falls within one or more of the exceptions set forth in Section 1602 of the Civil Practice Law and Rules.

54. Due to defendants' negligence, plaintiff is entitled to damages.

**WHEREFORE**, the plaintiff demands judgment awarding damages, in an amount exceeding the monetary jurisdictional limits of all lower courts which would otherwise have jurisdiction, together with interest and the costs and disbursements of this action, and such other and further relief as to this Court seems just and proper.

Dated: New York, New York
    July 23, 2018

By: Elliot Pasik, Esq.
HILL & MOIN LLP
Attorneys for Plaintiff
2 Wall Street
Suite 301
New York, New York   10005
(212) 668-6000

7

Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 478 of 552 PageID #: 756

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

_____

                                              INDEX NO. 511522/2018

DEBORAH HELLER,

                          Plaintiff,

                                              **ATTORNEY'S**
                -against-                     **VERIFICATION**

YIDEL'S FRESH FOOD STATION, LLC and YIDEL'S
SHOPPING CART INC.,

                          Defendants.

_____


        Melisande Hill, an attorney duly admitted to practice law in the State of New York, makes
the following affirmation under the penalty of perjury:

        I am an associate of the firm of HILL & MOIN LLP, the attorneys of record for the
plaintiff.

        I have read the foregoing Amended Complaint and know the contents thereof; the same is
true to my own knowledge except as to the matters therein stated to be alleged on information and
belief and that as to those matters, I believe them to be true.

        The grounds of affirmant's belief as to all matters not stated upon affirmant's knowledge
are correspondence had with the said plaintiff, information contained in the said plaintiff's file,
which is in affirmant's possession, and other pertinent data relating thereto.


Dated: New York, New York
       July 23, 2018

                                _____
                                      ELLIOT PASIK

Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 479 of 552 PageID #: 757

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

Index No. 511522/2018

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEBORAH HELLER,

Plaintiff,

-against-

YIDEL'S FRESH FOOD STATION, LLC and YIDEL'S SHOPPING CART INC.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**SUPPLEMENTAL SUMMONS and AMENDED VERIFIED COMPLAINT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**HILL & MOIN LLP**
Attorneys for Plaintiff
2 Wall Street
Suite 301
New York, New York 10005
(212) 668-6000

Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 480 of 552 PageID #: 758

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
---------------------------------------------------------------------X
DEBORAH HELLER,                                      Index No.: 511522/2018

                          Plaintiff,

          -against-                                  **VERIFIED ANSWER TO
                                                     AMENDED VERIFIED
YIDEL'S FRESH FOOD STATION, LLC and YIDEL'S          COMPLAINT**
SHOPPING CART INC.,

                          Defendants.
---------------------------------------------------------------------X

      Defendant, YIDEL'S SHOPPING CART INC. ("YIDEL"), by its attorneys, MILBER

MAKRIS PLOUSADIS & SEIDEN, LLP, as and for their Verified Answer to Plaintiff's Amended

Verified Complaint, allege, upon information and belief, as follows:

      1.    Deny knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in Paragraphs "1", "2", "3", "4", "5", "6", "7", "8", "9", "10", "11" and "12"

of the Amended Verified Complaint.

      2.    Defendant, YIDEL, admits the allegations contained in Paragraph "13" of the

Amended Verified Complaint.

      3.    Deny each and every allegation set forth in Paragraph "14" of the Amended

Verified Complaint.

      4.    Defendant, YIDEL, admits the allegations contained in Paragraph "15" of the

Amended Verified Complaint.

      5.    Deny each and every allegation set forth in Paragraphs "16", "17", "18" and "19"

of the Amended Verified Complaint.

      6.    Defendant, YIDEL, admits the allegations contained in Paragraph "20" of the

Amended Verified Complaint.

NYSCEF DOC. NO. 9

7.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraphs "21", "22" and "23" of the Amended Verified Complaint.

8.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph "24" of the Amended Verified Complaint, and respectfully refer all questions of law to this Honorable Court for its ultimate determination.

9.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraphs "25", "26", "27", "28" ,"29", "30", "31", "32", "33", "34", "35", "36" and "37" of the Amended Verified Complaint.

10.     Deny each and every allegation set forth in Paragraphs "38" and "39" of the Amended Verified Complaint.

11.     Defendant, YIDEL, admits the allegations contained in Paragraphs "40", "41", "42" and "43" of the Amended Verified Complaint.

12.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraphs "44" and "45" of the Amended Verified Complaint.

13.     Deny each and every allegation set forth in Paragraph "46" of the Amended Verified Complaint.

14.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph "47" of the Amended Verified Complaint.

15.     Deny each and every allegation set forth in Paragraphs "48" and "49" of the Amended Verified Complaint.

16.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph "50" of the Amended Verified Complaint.

2

Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 482 of 552 PageID #: 760

17.     Deny each and every allegation set forth in Paragraphs "51" and "52" of the Amended Verified Complaint.

18.     Deny each and every allegation set forth in Paragraph "53" of the Amended Verified Complaint. and respectfully refer all questions of law to this Honorable Court for its ultimate determination.

19.     Deny each and every allegation set forth in Paragraph "54" of the Amended Verified Complaint.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

20.     If Plaintiff sustained any damages as alleged, which damages are expressly denied, then all such damages will have been caused or brought about in whole or in part by the affirmative wrongdoing, fault, negligence and failure of due care (hereinafter "culpable conduct") of Plaintiff, and any recovery should be thereby diminished in the proportion to which Plaintiff's culpable conduct bears to the conduct which caused the alleged damages pursuant to CPLR Section 1411.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

21.     If it should be found that the answering Defendant is liable to the Plaintiff in the amount of 50% or less of the total liability assigned to all persons liable, the liability of the answering Defendant to Plaintiff for non-economic loss shall not exceed the answering Defendant's equitable shares determined in accordance with the relative culpability of each person causing or contributing to the total liability for non-economic loss in accordance with Article 16 of the CPLR.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

22.     The liability of the answering Defendant, if any, to Plaintiff for non-economic loss is limited to its equitable share, determined in accordance with the relative culpability of all persons

3

482

Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 483 of 552 PageID #: 761

or entities contributing to the total liability for non-economic loss, including the named parties and others over whom Plaintiff could have obtained personal jurisdiction with due diligence.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

23.     Any recovery for past or future costs or expenses incurred or to be incurred by the Plaintiff for medical care, dental care, custodial care, or rehabilitative services, loss of earnings or other economic loss which has been, or will, with reasonable certainty, be replaced or indemnified in whole or in part from a collateral source will result in a reduction of Plaintiff's award in accordance with CPLR Section 4545.

### AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

24.     The injuries and damages allegedly sustained by Plaintiff were not caused by any negligence, carelessness, culpable conduct or breach of duty on the part of the answering Defendant, its servants, agents or employees, but were caused by reason of the carelessness, negligence culpable conduct and/or breach of duty of third parties, their servants, agents or employees over whom the answering Defendant had no control.  If Plaintiff sustained damages as alleged in the Amended Verified Complaint, those damages are as a result, in whole or in part, of the conduct of others over whom the answering Defendant exercised no influence or control.

### AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

25.     If Plaintiff sustained any personal injuries or damages as alleged in the Amended Verified Complaint, such injuries or damages were caused, aggravated or contributed to by Plaintiff's failure to take reasonable efforts to mitigate damages, and any award made to Plaintiff must be reduced in such proportion and to the extent that the injuries complained of were caused, aggravated or contributed to by said failure to mitigate damages.

4

**AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE**

26.     The action is barred by Plaintiff's express assumption of the risk for the activity Plaintiff was doing at the time of the occurrence.

**AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE**

27.     The action is barred by Plaintiff's implied assumption of the risk for the activity Plaintiff was doing at the time of the occurrence in that said risks and dangers were open, obvious and apparent and known to Plaintiff.

**AS AND FOR A NINTH AFFIRMATIVE DEFENSE**

28.     The Amended Verified Complaint fails to state a cause of action against the answering Defendant and/or fails to name the necessary parties.

**AS AND FOR AN TENTH AFFIRMATIVE DEFENSE**

29.     Plaintiff's injuries, if any, were sustained as a result of intervening causes which were out of the control of the answering Defendant and not the result of the conduct, acts or omissions of these answering defendants.  By virtue of said intervening causes, Plaintiff's injuries were not proximately caused by the answering Defendant and therefore, the claim against the answering Defendant should be dismissed.

**AS AND FOR A ELEVENTH AFFIRMATIVE DEFENSE**

30.     In the event that any person or entity liable or claimed to be liable for the injury alleged in this action has been given or may hereafter be given a release or covenant not to sue, these answering defendants will be entitled to protection under New York General Obligations Law Section 15-108 and the corresponding reduction of any damages which may be determined to be due against the answering Defendant.

5

484

Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 485 of 552 PageID #: 763

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE

31.     This answering Defendant cannot be held liable for the injuries as alleged in the Amended Verified Complaint, as this answering Defendant had no actual and/or constructive notice of the conditions as alleged within the Amended Verified Complaint, did not create or contribute to same and/or any such conditions were trivial in nature.

## AS AND FOR AN THIRTEENTH AFFIRMATIVE DEFENSE

32.     The answering Defendant alleges that Plaintiff's injuries, if any, were proximately caused by an unforeseeable, unanticipated, independent, intervening, and/or superseding event beyond the control, and unrelated to any conduct of the answering Defendant.

## AS AND FOR A FOURTEENTH AFFIRMATIVE DEFENSE

33.     The answering Defendant asserts that this case falls within the limited liability provisions of Section 1601 of the Civil Practice Law and Rules, and that said answering Defendant's liability, if any, shall be limited to the equitable share of the total liability.

## AS AND FOR A FIFTEENTH AFFIRMATIVE DEFENSE

34.     All claims raised and all causes of action asserted in the Amended Verified Complaint against the answering Defendant are barred by laches or waiver, and Plaintiff is equitably estopped from asserting such claims or causes of action against the Defendant.

## AS AND FOR A FIRST CROSS-CLAIM AGAINST DEFENDANT, YIDEL'S FRESH FOOD STATION, LLC

35.     If Plaintiff sustained any damages in the manner set forth in the Amended Verified Complaint through any carelessness, recklessness, or negligence other than her own, such damages were sustained by reason of the sole activity and primary carelessness, recklessness or affirmative acts of omission or commission by Co-Defendant YIDEL'S FRESH FOOD STATION, LLC, its

6

Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 486 of 552 PageID #: 764

agents, servants, or employees, without any active or affirmative negligence on the part of the answering Defendant contributing thereto.

36.     By reason of the foregoing, Co-Defendant YIDEL'S FRESH FOOD STATION, LLC, will be liable to the answering Defendant, under the doctrines of apportionment, contribution, and common-law indemnification for the full amount of any verdict and judgment, or for a proportionate share thereof, that Plaintiff may recover against the answering Defendant, including, but not limited to, the costs of investigation and attorneys' fees and disbursements incurred in the defense of this action and the prosecution of this cross-claim.

## AS AND FOR A SECOND-CROSS CLAIM AGAINST DEFENDANT, YIDEL'S FRESH FOOD STATION, INC.

37.     In the event that Plaintiff recovers judgment against the defendants herein, the answering Defendant demands that any judgment be divided among the defendants in accordance with the degree of culpability of each herein, and further demand that the answering Defendant be granted indemnification in accordance with any applicable contracts, agreements, warranties, express or implied, or by reason of the active and primary negligence, recklessness, and/or breach of contract of Co-Defendant YIDEL'S FRESH FOOD STATION, INC.

**WHEREFORE**, Defendant, YIDEL'S SHOPPING CART INC., demands judgment:

(A)     Dismissing the Amended Verified Complaint;

(B)     Awarding judgment Defendant YIDEL'S SHOPPING CART INC.'s cross-claims;

(C)     Awarding the costs and disbursements of this actin; and

(D)     Awarding such other and further relief as this Court may deem just and proper.

7

Case 1:20-cv-04927-AMD   Document 11   Filed 11/13/20   Page 487 of 552 PageID #: 765

Dated:  Woodbury, New York
         September 11, 2018

                                  MILBER MAKRIS PLOUSADIS
                                  & SEIDEN, LLP

            By: _____
                            John P. Grisafi Esq.
                          Attorneys for Defendant
                          YIDEL'S SHOPPING CART INC.
                          1000 Woodbury Road, Suite 402
                          Woodbury, New York 11797
                          (516) 712-4000
                          File No.:  388-16037

TO:

Elliot Pasik, Esq.
HILL & MOIN LLP
Attorneys for Plaintiff
2 Wall Street, Suite 301
New York, New York 10005
(212) 668-6000

8

## VERIFICATION

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NASSAU           )

JOHN P. GRISAFI, being duly sworn, deposes and says that he is a Member of MILBER MAKRIS PLOUSADIS & SEIDEN, LLP, counsel for Defendant YIDEL'S SHOPPING CART, INC., in the within action, and makes this verification pursuant to CPLR §3020(d)(3). Defendant is not within the county wherein deponent has his office. Deponent has read the foregoing *VERIFIED ANSWER TO PLAINTIFF'S AMENDED VERIFIED COMPLAINT* and knows the contents thereof; that the same is true on the basis of information and belief, based upon books and records in the possession of the deponent and conversations with Defendant.

JOHN P. GRISAFI

Sworn to before me this
11th day of September, 2018

NOTARY PUBLIC

ELIZABETH MAIELLO
NOTARY PUBLIC, State of New York
No. 4853004
Qualified in Nassau County
Commission Expires Feb. 18, 20___

9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ERIE INSURANCE COMPANY,

                  Plaintiff,

    vs.

YIDEL'S SHOPPING CART, INC., YSC FRESH
FOOD STATION, LLC, and
DEBORAH HELLER,

                  Defendants.

**COMPLAINT**

Civil Action No. _____

---

        Plaintiff, ERIE INSURANCE COMPANY, by and through its attorneys, HURWITZ & FINE, P.C., as and for its Complaint herein, alleges, upon information and belief, as follows:

        1.    At all times hereinafter mentioned, Plaintiff, ERIE INSURANCE COMPANY ("ERIE"), was and is an insurance company authorized to conduct insurance business in the State of New York, which is organized under the laws of and with a principal place of business within the Commonwealth of Pennsylvania.

        2.    Upon information and belief, Defendant, YIDEL'S SHOPPING CART, INC. ("YSC"), was and is a domestic corporation organized under the laws of the State of New York, with a principal place of business in Kings County, New York.

        3.    Upon information and belief, Defendant, YIDEL'S FRESH FOOD STATION, LLC ("YFF"), was and is a domestic corporation organized under the laws of the State of New York, with a principal place of business in Kings County, New York.

        4.    Upon information and belief, Defendant, DEBORAH HELLER ("Heller"), was and is a resident and domiciliary of the County of Kings and the State of New York.

1

489

5.    This action seeks declaratory relief regarding the rights and obligations of the parties herein under the terms of the relevant insurance policy issued to YSC by ERIE following an accident involving Heller while she was lawfully on a premises owned and operated by YSC.

6.    In summary, YFF does not qualify as an insured or additional insured under the terms of the relevant insurance policy issued to YSC by ERIE and is thus not entitled to insurance coverage thereunder. Additionally, YSC has failed to cooperate with ERIE in its investigation, defense and/or settlement negotiations such that YSC is not entitled to coverage under the terms of the relevant insurance policy it was issued by ERIE.

7.    Heller is nominally named herein so that complete relief may be afforded to all interested parties.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this matter under 28 USC § 1332 in that it arises between citizens of different states/countries, and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, insofar as the value of the right being protected and/or the injury being averred exceeds $75,000.00.

9.    Venue is proper in this district under 28 USC § 1391(a)(2), (b)(1) and (b)(2) as all defendants are domiciled within this district and Heller's alleged accident occurred within this district.

## THE UNDERLYING INCIDENT

10.    On June 5, 2018, Heller filed a summons and complaint against YSC Fresh Food Station, LLC in New York State Supreme Court, County of Kings, styled *Deborah Heller v. Yidel's Fresh Food Station, LLC*, and bearing Index. No. 511522/2018 (the "Underlying Action"). On July 24, 2018, Heller amended her complaint to add YSC as a

Case 1:18-cv-02356-greg Doc 465 Filed 09/31/20 Entered 09/31/20 10:08:45
Case 1:20-cv-04927-AMD Document 11 Filed 11/13/20 Page 491 of 552 PageID #: 769
Case 1:20-cv-04923-AMD Document 1 Filed 11/13/20 Page 3 of 10 PageID #: 9

defendant. The amended complaint in the Underlying Action is incorporated by reference herein.

11.    Heller alleges that on or about December 29, 2017, she was injured while lawfully on a premises owned and operated by YFF and/or YSC, located at 4921 12th Avenue, Brooklyn, New York (the "Premises"), solely as a result of a failure by YFF and/or YSC to maintain the Premises in a reasonably safe and suitable condition and in good repair (the "Underlying Incident").

## THE ERIE POLICY

12.    Prior to the Underlying Incident, ERIE issued an Ultrapack Plus insurance policy to YSC (Policy No. Q97-1541360), that was effective at the relevant time (the "ERIE Policy"). A copy of the ERIE Policy is incorporated herein by reference as if fully set forth below.

13.    The ERIE Policy provides in pertinent part:

### COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

***

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.  **Insuring Agreement**
    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no

3

duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

***

## SECTION II – WHO IS AN INSURED

1.  If you are designated in the Declarations as:

    ***

    d.  An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

    ***

2.  Each of the following is also an insured:

    ***

    b.  Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

    c.  Any person or organization having proper temporary custody of your property if you die, but only:

        1)  With respect to liability arising out of the maintenance or use of that property; and

        2)  Until your legal representative has been appointed.

    ***

3.  Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

    a.  Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

    b.  Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

    c.  Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

    No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

4

Case 1:20-cv-04927-AMD Document 11 Filed 11/13/20 Page 5 of 10 PageID #:

***
## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

***

2. **Duties In The Event Of Occurrence, Offense, Claim or Suit**

***

    c.   You and any other involved insured must:

       1)  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

       2)  Authorize us to obtain records and other information;

       3)  Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

       4)  Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

14.     YFF does not qualify as an insured under the ERIE Policy.

## **TENDER AND NON-COOPERATION**

15.     After the Underlying Incident, YFF and/or YSC, through their principal, Yehuda Salamon ("Salamon"), advised ERIE of Heller's alleged accident, claim and the Underlying Action.

16.     ERIE accepted YSC's tender, assigning the defense of YSC in the Underlying Action to Milber Makris Plousadis Seiden, LLP ("Assigned Counsel") on or about August 14, 2018. However, ERIE disclaimed coverage with respect to YFF because YFF does not qualify as an insured under the ERIE Policy.

17.     ERIE advised YSC of its obligation to cooperate with its investigation, settlement, and defense, and specifically sought the cooperation of Salamon in his capacity as YSC's principal.

18.     ERIE acted diligently in seeking to bring about Salamon's cooperation with, among other things, attendance at depositions and otherwise coordinating defense and investigation of the Underlying Incident and/or Underlying Action.

5

19.     ERIE engaged a private investigator to assist in locating Salamon and securing Salmon's cooperation.

20.     ERIE, its private investigator, and/or Assigned Counsel have made numerous written requests to Salamon for the production various items that have gone unanswered, including but not limited to:

- the names of all workers who worked at YSC  and YFF on the date of loss;
- the payroll records for all YSC and YFF workers on the date of loss;
- any agreements or documentation that YSC or YFF has in place with OTP Management;
- the names of all OTP Management employees/representatives who worked at YSC on the date of loss;
- the payroll records for all OTP Management employees/representatives who worked at YSC on the date of loss; copies of all W-2's and 1099's for YSC and YFF;
- the lease agreements to the Premises; and
- any and all deeds to the Premises.

21.     ERIE, its private investigator, and/or Assigned Counsel made numerous efforts to reach Salamon by telephone at his home and work without success, leaving numerous messages regarding the production of the aforementioned requested items and requesting further discussion of litigation strategy in the Underlying Action.

22.     ERIE, its private investigator, and/or Assigned Counsel additionally made several attempts to reach Salamon by email without success.

23.     ERIE, its private investigator, and/or Assigned Counsel also sought, without success, Salamon's cooperation in coordinating a teleconference with a worker in the store, Mr. DeJesus, who was potentially in close proximity to Heller at the time of the Underlying Incident.

24.     ERIE, its private investigator, and/or Assigned Counsel made several visits to Salamon's home address and/or the Premises in an effort to speak with Salamon about these matters without success.

25.     ERIE, its private investigator, and/or Assigned Counsel spoke with workers at the Premises, left notes under Salamon's office door at the Premises and left messages with those workers once informed that Salamon was away and unavailable. ERIE also sought verification of and/or updated contact information for Mr. Salamon, and these workers refused to provide information regarding Salamon's cellular telephone number.

26.     ERIE's actions in seeking Salamon's cooperation were reasonably calculated to obtain Salamon's cooperation.

27.     Salamon was advised by letter, dated January 31, 2020, that he was court ordered to appear at a deposition on February 27, 2020.

28.     To date, Salamon has failed to cooperate with ERIE as outlined above, among other failures, and, in fact, has engaged in willful and avowed obstruction of ERIE's ability to investigate, defend or potentially settle the Underlying Incident and/or Underlying Action.

29.     Salamon failed to appear at a court-ordered deposition on February 27, 2020.

30.     As a direct result of Salamon's failure to cooperate in his capacity as YSC's principal, the court in the Underlying Action has precluded YSC from offering Salamon's testimony in defense of Ms. Heller's claim, materially prejudicing ERIE's ability to defend YSC in the Underlying Action.

31.     Due to Salamon's failure to cooperate, YSC breached the ERIE Policy's conditions, and ERIE disclaimed coverage on that ground.

### AS AND FOR ERIE'S
### FIRST CAUSE OF ACTION

32.     ERIE reasserts and realleges each and every allegation contained within paragraphs "1" through "31" as if fully set forth herein.

33.     The ERIE Policy was issued to YSC as its named insured.

34.     The ERIE Policy does not list YFF as a named or additional insured, and YFF does not otherwise qualify as an insured therein.

35.     Thus, ERIE disclaimed coverage to YFF under the ERIE Policy for the Underlying Incident, including claims arising therefrom, and/or the Underlying Action.

36.     Therefore, ERIE is entitled to a declaration that it has no obligation to defend or indemnify YSC for the Underlying Incident, including claims arising therefrom, and the Underlying Action.

37.     ERIE has no adequate remedy at law.

**AS AND FOR ERIE'S
SECOND CAUSE OF ACTION**

38.     ERIE reasserts and realleges each and every allegation contained within paragraphs "1" through "37" as if fully set forth herein.

39.     The ERIE Policy requires insureds to cooperate with ERIE in investigating, defending or settling any incident, claim or suit, including appearing for depositions to provide testimony about such incidents.

40.     In connection with YSC's obligation to cooperate, ERIE diligently sought to secure, among other things, Salamon's attendance at depositions.

41.     Despite court order, YSC's principal, Salamon, failed and refused to appear for his deposition.

42.     ERIE acted diligently in seeking to obtain Salamon's testimony, and ERIE's efforts were reasonably calculated to obtain this testimony.

43.     Salamon's failure and refusal to appear for his deposition in his capacity as YSC's principal amounts to willful and avowed obstruction of ERIE's ability to investigate, defend and settle claims arising from the Underlying Incident and/or the Underlying Action.

Case 1:18-cv-02356-Greg Doc 14-52 Filed 09/23/20 Entered 09/23/20 10:58:45
Case 1:20-cv-04927-AMD  Document 11  Filed 11/13/20  Page 497 of 552 PageID #: 775
Case 1:20-cv-02235-AMM-VMS  Document 11  Filed 08/15/20  Page 3 of 16 PageID #: 9

44.    YSC's failure to acknowledge, participate and/or respond to the efforts of its attorneys assigned as defense counsel has obstructed and prejudiced ERIE's ability to investigate and defend against the Underlying Action.

45.    By virtue of its refusal to acknowledge, participate or respond to any of the efforts undertaken by its appointed defense counsel, or ERIE, YSC breached the Policy conditions and is not entitled to coverage for the Underlying Incident or Underlying Action.

46.    ERIE is entitled to a declaration that it has no obligation to defend or indemnify YSC for the Underlying Incident, including claims arising therefrom, and the Underlying Action.

47.    Additionally, ERIE is entitled to a declaration that it may withdraw from the defense that it is currently providing YSC in the Underlying Action.

48.    ERIE has no adequate remedy at law.

**WHEREFORE**, defendant, ERIE INSURANCE COMPANY, respectfully requests judgment:

(1)    declaring that YIDEL'S FRESH FOOD STATION, LLC, does not qualify as an insured or additional insured under the terms of the ERIE Policy and is not entitled to coverage for the Underlying Incident, including claims arising therefrom, and/or Underlying Action.;

(2)    declaring that YIDEL'S SHOPPING CART, INC., has failed to adhere to its contractual obligations to cooperate with ERIE in breach of the ERIE Policy's conditions and is not entitled to coverage for the Underlying Incident, including claims arising therefrom, and/or Underlying Action;

(3)    declaring that ERIE INSURANCE COMPANY has no obligation to defend or indemnify YIDEL'S FRESH FOOD STATION, LLC and/or YIDEL'S SHOPPING

9

CART, INC., in connection with the Underlying Action styled *Deborah Heller v. Yidel's Fresh Food Station, LLC*, and bearing Index. No. 511522/2018;

      (4)    declaring that ERIE INSURANCE COMPANY may withdraw from the defense of YIDEL'S SHOPPING CART, INC., in the Underlying Action styled *Deborah Heller v. Yidel's Fresh Food Station, LLC*, and bearing Index. No. 511522/2018; and

      (5)    granting such other and further relief as may be just, equitable and proper, together with the costs and disbursements of this action.

DATED:      Buffalo, New York
              May 15, 2020

                    HURWITZ & FINE, P.C.

By_____
                    Dan D. Kohane, Esq.
                  *Attorneys for Plaintiff,*
                  *ERIE INSURANCE COMPANY*
                  1300 Liberty Building
                  424 Main Street
                  Buffalo, New York 14202
                  (716) 849-8900
                  ddk@hurwitzfine.com

# Exhibit F





# Exhibit G

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x

In re                                                                      Chapter 11

      4921 12th Avenue, LLC                          Case no.  18-47256

                   Debtor.
----------------------------------------------------------x

# **PLAN OF REORGANIZATION**

Mark A. Frankel
BACKENROTH FRANKEL & KRINSKY, LLP
800 Third Avenue
New York, New York 10022
Telephone: (212) 593-1100
Facsimile: (212) 644-0544

ATTORNEYS FOR THE PROPONENT

## INTRODUCTION

Galster Funding LLC ("Proponent"), proposes this Plan of Reorganization for 4921 12th Avenue, LLC (the "Debtor"). UPON CONFIRMATION, THIS PLAN SHALL BE A BINDING OBLIGATION BETWEEN AND AMONG THE DEBTOR AND EACH OF THE DEBTOR'S CREDITORS (AS SUCH TERMS ARE DEFINED BELOW).

## DEFINITIONS

1.      "Administrative Expense" Any cost or expense of administration of the Bankruptcy Case entitled to priority under section 507(a)(1) and allowed under section 503(b) of the Bankruptcy Code, and any fees or charges assessed against the Debtor's Estate under Chapter 123, Title 28, United States Code.

2.      "Administrative Claims Bar Date" shall mean the last day to file requests for payment of Administrative Claims (except for Professional Fee Claims), which requests shall be filed and served on counsel for the Debtor and Proponent no later than the Confirmation Hearing, other than those Administrative Claims expressly excluded therefrom pursuant to prior order of the Bankruptcy Court.

3.      "Administrative Expense Claim" shall mean claim for payment of an Administrative Expense.

4.      "Allowed Amount" shall mean the amount of an "Allowed Claim."

5.      "Allowance Date" shall mean the date which a Disputed Claim becomes an Allowed Claim by Final Order.

2

6.      "Allowed Claim" shall mean a Claim: (a) to the extent that a Proof of Claim is filed timely or, with leave of the Court late filed as to which (i) no party in interest files an objection or (ii) which is allowed by a Final Order; or (b) which is listed on the Proponent's schedules or any amendments thereto but which is not listed therein as disputed, unliquidated or contingent.

7.      "Allowed Secured Claim" shall mean a Secured Claim to the extent it is an Allowed Claim.

8.      "Allowed Unsecured Claim" shall mean an Unsecured Claim to the extent it is an Allowed Claim.

9.      "Assets" shall mean any and all of the respective real or personal property of any nature of the Debtor, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, accounts, chattel paper, Cash, deposit accounts, reserves, deposits, contractual rights, intellectual property rights, claims, Causes of Action and any other general intangibles of Debtor, of any nature whatsoever, including, without limitation, the property of the estate pursuant to section 541 of the Bankruptcy Code.

10.      "Avoidance Actions" shall mean all claims and causes of action which the Debtor has or had the power to assert pursuant to any or all of sections 510, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code.

11.      "Bankruptcy Case" shall mean this Chapter 11 bankruptcy case.

12.     "Bankruptcy Code" shall mean Title 11 of the United States Code (11.

U.S.C. § 101 et. seq.

13.     "Bankruptcy Court" shall mean the Court as defined below.

14.     "Bankruptcy Rule(s)" shall mean the Federal Rules of Bankruptcy

Procedure as applicable to cases under the Bankruptcy Code, together with all amendments and

modifications made from time to time thereto.

15.     "Bar Date" shall mean April 4, 2019.

16.     "BCG" and "BCG Mortgagee" means Beis Chasidi Gorlitz.

17.     "BCG Mortgages" means those certain mortgages on the Property

pertaining to the notes in the original principal amounts of $1,200,000 and $1,300,000 made by

the Debtor in favor of BCG, and subsequently assigned Old Republic.

18.     "Cash" shall mean all cash and cash equivalents which evidence

immediately available funds in United States dollars.

19.     "Causes of Action" shall mean any and all claims and causes of action of,

and remedies granted to, the Debtor against any third party, including, without limitation, any

avoidance claims or causes of action pursuant to sections 502, 506, 510, 541 through 545, 547

through 551, and/or 553 of the Bankruptcy Code and any claims pursuant to any other statutory

or common law.

20.     "Claim" shall mean a right to payment as set forth in § 101(5) of the

Bankruptcy Code.

21.     "Claimant" shall mean the holder of a Claim.

4

506

22.      "Confirmation Date" shall mean the date of the entry of the Confirmation Order.

23.      "Confirmation Hearing" shall mean the hearing pursuant to the Bankruptcy Code Section 1128 before the Bankruptcy Court regarding the proposed confirmation of the Plan.

24.      "Confirmation Order" shall mean the order of the Court confirming the Plan.

25.      "Court" shall mean the United States Bankruptcy Court for the EASTERN District of New York.

26.      "Creditor" shall mean any entity that holds a Claim against the Debtor.

27.      "Debtor" shall mean 4921 12th Avenue, LLC.

28.      "Disbursing Agent" shall mean the Proponent.

29.      "Disclosure Statement" shall mean the disclosure statement filed by the Proponent with respect to this Plan.

30.      "Disputed Claim" shall mean the whole or any portion of any claim against a Proponent to which an objection is timely filed as to which a Final Order has not been entered allowing or disallowing such Claim or any portion thereof.

31.      "Effective Date" "Effective Date" shall mean the first business day after the closing of the sale of the Property.

32.      "Estate" shall mean the estate of the Debtor created upon the commencement of the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

5

33.     "Executory Contracts" shall mean "executory contracts" and "unexpired leases" as such terms are used within Section 365 of the Bankruptcy Code.

34.     "Final Order" shall mean an order of the Court that has not been reversed, modified, amended or stayed, and as to which the time to appeal or to seek review or certiorari thereof has expired, and as to which no appeal, review or rehearing is pending.

35.     "Galster Judgment" means the Galster Funding LLC judgment of foreclosure and sale dated March 28, 2018 in the Supreme Court of Kings County, Index no. 519469/2016.

36.     "Galster" and "Galster Mortgagee" shall mean Galster Funding LLC.

37.     "Interest" shall mean an existing ownership interest in the Debtor.

38.     "Interest Holder" shall mean a holder and owner of an existing Interest in the Debtor.

39.     "Legal Rate" shall mean the applicable interest rate as set forth in 28 U.S.C. §1961 as of the Petition Date.

40.     "Lien" shall mean a charge against or interest in property to secure payment of a debt or performance of an obligation.

41.     "Petition Date" shall mean December 20, 2018.

42.     "Plan" shall mean this Plan of Reorganization, and any and all modifications and/or amendments hereto.

43.     "Plan Administrator" shall mean Mark Frankel.

6

44.     "Plan Administrator Fund" shall mean $30,000 to be set aside from the Property Sale Proceeds, and then from the proceeds of Causes of Action to the extent necessary to pay fees and expenses of the Plan Administrator.

45.     "Professional(s)" shall mean any entity or person employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, or 1103 of the Bankruptcy Code and to be compensated for services rendered pursuant to sections 327, 328, 329, 330 and/or 331 of the Bankruptcy Code.

46.     "Professional Fee Claim" shall mean those fees and expenses claimed by a Professional pursuant to sections 330, 331 and/or 503 of the Bankruptcy Code.

47.     "Professional Fee Claim Bar Date" shall mean the last day for a Professional to file a Professional Fee Claim, which shall be no later than thirty (30) days after the Confirmation Date.

48.     "Property" shall mean the real property at 4917 12th Avenue, Brooklyn, New York 11219.

49.     "Property Sale Proceeds" shall mean the proceeds of sale of the Property, less all charges to be incurred in connection with the marketing, negotiation, documentation, execution, and closing of the sale of the Property, including, without limitation, any fees and expenses paid to retain an auctioneer, real estate broker, and/or special real estate counsel.

50.     "Proponent" shall mean Galster Funding LLC.

51.     "Purchaser" shall mean the purchaser of the Property pursuant to the Plan.

52.     "Reorganized Debtor" shall mean the Debtor on and after the Effective Date.

53.     "Secured Claim" shall mean a Claim secured by a Lien on property included within the Debtor's Estate.

54.     "Secured Creditor" shall mean the owner or holder of a Secured Claim.

55.     "Unsecured Claim" shall mean a claim for which the Claimant does not hold (a) a valid, perfected and enforceable Lien, security interest or other interest in or encumbrance against Debtor or the Debtor's Estate; or (b) a right to setoff to secure the payment of such Claim.  An Unsecured Claim includes, but is not limited to, a Claim for damages resulting from rejection of any Executory Contract pursuant to Section 365 of the Bankruptcy Code and does not include administrative of priority claims.

56.     "Unsecured Creditor" shall mean the owner or holder of an Unsecured Claim.

## CLAIMS CLASSIFICATION AND TREATMENT

### Class 1

57.     **Classification** –  New York City real estate tax, water, sewer and other liens.   Claims total approximately $0.00.

58.     **Treatment** – Payment in full in Cash of Allowed Amount on the Effective Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

59.     **Voting** --   Unimpaired and deemed to have accepted the Plan

8

#### Class 2

60.  **Classification** – Galster Funding LLC  Claim totals approximately $9,480,175 as of the filing date.

61.  **Treatment** – Payment of available Cash up to Allowed Amount of Class 2 Claim, after payment of Administrative Expenses, priority tax Claims, Class 1 Claims and Class 4 Claims.  If the Property Sale Proceeds are insufficient to pay the Claim in full, the deficiency amount shall be treated as a Class 5 Claim.

**Voting** –  Impaired and entitled to vote to accept or reject the Plan.

#### Class 3

62.  **Classification** – Old Republic.  Claim totals approximately $13,500,000 as of the filing date.

63.  **Treatment** – Payment of available Cash up to Allowed Amount of the Class 3 Claim, after payment of Administrative Expenses, priority tax Claims, Class 1 Claims, Class 2 Claims and Class 4 Claims.  If the Property Sale Proceeds are insufficient to pay the Claim in full, the deficiency amount shall be treated as a Class 5 Claim.

64.  **Voting** –  Impaired and entitled to vote to accept or reject the Plan.

#### Class 4

65.  **Classification** –  Priority Claims under Sections 507(a)(2), (3), (4), (5), (6), and (7) of the Bankruptcy Code.  Claims total approximately $0.

9

66.  **Treatment** – Payment in full in Cash of Allowed Amount on the Effective Date, plus interest at the applicable statutory rate as it accrues from the Petition Date through the date of payment.

67.  **Voting** -- Unimpaired and deemed to have accepted the Plan

### Class 5

68.  **Classification** –  General Unsecured Claims.  Claims total approximately $12,480,175

69.  **Treatment** – Payment of available Cash up to Allowed Amount of Class 5 Claims, after payment of Administrative Expenses, priority tax Claims, Class 1, 2, 3, and 4 Claims.

70.  **Voting** – Impaired and entitled to vote to accept or reject the Plan.

### Class 6

71.  **Classification** – Interests .

72.  **Treatment** – Payment of available Cash after payment of Administrative Expenses, priority tax Claims, Class 1, 2, 3, 4 and 5 Claims.

73.  **Voting** – Impaired and entitled to vote to accept or reject the Plan.

### ADMINISTRATIVE EXPENSES

74.  Allowed Administrative Expenses shall be paid in full, in cash on the Effective Date, or the date such Administrative Expense becomes Allowed or as soon as practicable thereafter, except to the extent that the holder of an Allowed Administrative Expense

10

agrees to a different treatment; provided, however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtor shall be paid in full or performed by the Debtor in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.  As of the Confirmation Date, unpaid Chapter 11 professional fees will total an amount to be determined for Debtor's counsel subject to Bankruptcy Court approval.

75.     Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Professional Fee Claims) must be filed and served on counsel for the Debtor and Proponent by no later than the Confirmation Hearing (the "Administrative Claims Bar Date"). Any Person that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such request shall be forever barred, estopped, and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. Objections to requests for payment of Administrative Claims (except for Professional Fee Claims and Administrative Claims incurred in the ordinary course of the Debtor's business) must be filed and served on counsel for the Debtor, Proponent, and the party requesting payment of an Administrative Claim within thirty (30) days of the date such request for payment has been filed.

76.     Unless otherwise ordered by the Bankruptcy Court, and subject to notice and a hearing under section 330 of the Bankruptcy Code, requests for payment of Professional Fee Claims incurred through the Confirmation Date must be filed and served no later than thirty (30) days after the Confirmation Date (the "Professional Fee Claims Bar Date"). The day prior to the Confirmation Date, each Professional shall provide counsel for the Debtor and counsel to the

11

Proponent with a written estimate of the total amount of compensation and expenses for which such Professional expects to seek final compensation and reimbursement pursuant to section 330 of the Bankruptcy Code. Such estimates shall include estimated sums for the preparation and prosecution of any application for final compensation.

77.     The Debtor shall pay from Cash in the Estate all fees payable due as of the Effective Date pursuant to section 1930 of title 28 of the United Sates Code. Thereafter, the Debtor shall pay from Cash in the Estate all United States Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus interest due under 31 U.S.C. § 3717, on all disbursements, including plan payments and disbursements in and outside of the ordinary course of business, until the earliest of the entry of a final decree closing the Chapter 11 Case, dismissal of the Chapter 11 Case, or conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

## MEANS FOR IMPLEMENTATION

78.     **Source of Funds** – Payments under the Plan will be paid either from the Property Sale Proceeds or Cash to be contributed by Galster if Galster or its designee is Purchaser of the Property by credit bid.  The sale of the Property shall be implemented pursuant to the Bidding and Auction Procedures annexed as Exhibit "A" to the Plan. Prior to or on the Effective Date, the Property shall be sold to Purchaser free and clear of all Liens, Claims, and encumbrances, with any such Liens, Claims, and encumbrances to attach to the Property Sale Proceeds, and disbursed in accordance with the provisions of this Plan. Galster and BCG shall each have the right, but not the obligation, to provide for an assignment of its mortgage and an assumption by the Purchaser in connection with the sale of the Property under the Plan. In the event the Property Sale Proceeds are not sufficient to pay all Claims in full with interest from the

12

514

Petition Date, the proceeds of the prosecution of the Causes of Action by the Plan Administrator

shall be an additional potential source of Cash to be distributed under the Plan, net of payment of

Plan Administrator fees and expenses.  Such net proceeds of Causes of Action proceeds will first

be used for unpaid Plan Administrator fees and expenses, then in the event Galster or its

designee is Purchaser by credit bid, to reimburse Galster for Cash paid to fund the Plan, and then

paid to Creditors in the order of priority provided for in the Plan.

79.    **Sale Approval** -- As part of the sale under the Plan, and in order to ensure

consummation of the Plan, the Plan requires that  a post-confirmation sale order be entered

containing the following findings of fact and conclusions of law: (a) that the terms and

conditions of the sale are fair and reasonable, (b) that the Debtor's sale, and the purchaser's

purchase, of the Property pursuant to the Plan, is non-collusive, fair and reasonable and was

conducted openly and in good faith, (c) that the transfer of the Property to the purchaser

represents an arm's-length transaction and was negotiated in good faith between the parties, (d)

that the purchaser, as transferee of the Property, is a good faith purchaser under Bankruptcy

Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e)

the sale of the Property to the purchaser was not controlled by an agreement among potential

purchasers, (f) that no cause of action exists against the Purchaser or with respect to the sale of

the Property to the Purchaser under Bankruptcy Code § 363(n), and (g) that any claims under

Bankruptcy Code § 363(n) or any other claims as against the Purchaser are hereby released,

waived and discharged.

80.    **Release of Liens** -- Except as otherwise provided for in the Plan and in

connection with the assumption and assignment of the Galster mortgage and the BCG mortgage,

13

515

on the Effective Date, (a) each holder of a Secured Claim, shall on the Effective Date (x) turn

over and release to the Proponent any and all Collateral that secures or purportedly secures such

Claim, as they pertain to the properties currently owned by the Debtor or such Lien shall

automatically, and without further action by the Debtor or the Proponent, be deemed released,

and (y) execute such documents and instruments as the Proponent requests to evidence such

Claim holder's release of such property or Lien.

        81.    **Stamp Tax** -- Pursuant to Bankruptcy Code § 1146(c), (a) the issuance,

transfer or exchange of any securities, instruments or documents, (b) the creation of any other

Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease

or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant

to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds,

bills of sale or assignments executed in connection with the purchase of the Property by the

Purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or

sale of any real or personal property of the Debtor pursuant to, in implementation of, or as

contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness

by such means, and the making, delivery or recording of any deed or other instrument of transfer

under, in furtherance of, or in connection with, the Plan, including, without limitation, the

Confirmation Order, shall not be subject any applicable document recording tax, stamp tax,

conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or

governmental assessment including without limitation New York City Real Property Transfer

Tax and New York State Documentary Tax.

82. **Execution of Documents** -- Pursuant to section 1142 of the Bankruptcy Code, upon the Effective Date, the Plan Administrator, the Disbursing Agent, the Debtor and any necessary party thereto, are directed to execute, release, and deliver all documents reasonably necessary to consummate the transactions contemplated by the terms and conditions of the Plan. The Proponent shall be authorized to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

83. **Recording Documents** -- Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transaction contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and the Confirmation Order.

84. **Property Turnover at Closing**. The Debtor shall turnover possession of the Property at closing together with all files and records pertaining to construction documents, Department of Buildings building permits, violations, architectural plans, leases, repair invoices, and tenant correspondence. If the Debtor fails to turnover possession, Proponent shall be entitled to submit a writ of assistance for Bankruptcy Court approval to obtain the assistance of the United States Marshal to remove the Debtor and its affiliates from the Property and effectuate turnover of the Property and all related files and records pertaining to construction documents,

15

Department of Buildings building permits, violations, architectural plans, leases, repair invoices, and tenant correspondence.

85.     **Property Marketing**. The Plan Administrator shall retain Aaron Jungreis Rosewood Realty Group to market the Property.  The Debtor shall cooperate with any broker, auctioneer, and/or real estate professional to permit reasonable access to the Property for marketing purposes.

86.     **Corporate Action**. Upon the entry of the Confirmation Order, all matters provided under the Plan involving the corporate structure of the Debtor shall be deemed authorized and approved without any requirement of further action by the Debtor, the Debtor's members, or the Debtor's boards of directors, managers, and/or managing members.

87.     **Manner of Payment**. Any payment of Cash made under the Plan may be made either by check drawn on a domestic bank, by wire transfer, or by automated clearing house transfer from a domestic bank, at the option of the Proponent.

88.     **Vesting of Property**. On the Effective Date, title to and possession of any and all property of the estate, real or personal, shall be re-vested in the Reorganized Debtor free and clear of all liens, claims, interests and encumbrances of any kind, subject to and except as otherwise provided in this Plan and the Confirmation Order.

## MANAGEMENT OF THE DEBTOR

89.     Post-confirmation management will remain unchanged, provided however, that the Plan shall be implemented by the Plan Administrator.

16

90.     The Plan Administrator shall be appointed on the Confirmation Date and the Plan Administrator, on behalf of the Debtor, shall take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan.

**(a)** Following the Confirmation Date, the Plan Administrator shall be responsible for the filing of all post-Confirmation reports required during such periods with the U.S. Trustee and payment of all post-Confirmation fees charged or assessed against the Estate under 28 U.S.C. § 1930 during such periods.

**(b)** The Plan Administrator shall be deemed a "party-in-interest" for purposes of filing and prosecuting objections to claims and Causes of Action.

**(c)** The Plan Administrator shall have the exclusive authority and duty to implement the sale of the Property and prosecution of Causes of Action under this Plan and accordingly shall exercise such rights and obligations of the Debtor in accordance with the Plan.

**(d)** The Plan Administrator and his professionals shall be compensated from the Plan Administrator Fund at a rate of $400 per hour. The Plan Administrator has agreed to retain Backenroth Frankel & Krinsky, LLP, as his bankruptcy counsel at a rate of $500 per hour, and may retain special litigation counsel at their customary rates. Professionals retained by the Plan Administrator shall not be required to file a fee application. The payment of the fees and expenses of the Plan Administrator and the Plan Administrator's retained professionals shall be made first from the Plan Administrator Fund, and then from the proceeds of Causes of Action.

**(e)** The Plan Administrator shall be authorized to obtain and pay for out of the Plan Administrator Fund all reasonably necessary insurance coverage for himself, his agents, representatives, employees, or other independent contractors, if necessary.

**(f)** The Plan Administrator may resign by giving not less than thirty (30) days' prior written notice to the Disbursing Agent. Such resignation shall become effective upon the Bankruptcy Court approval of a successor Plan Administrator.

**(g)** Upon the request of any party in interest, the Bankruptcy Court may remove the Plan Administrator for cause. For purposes of this paragraph, "cause" shall mean (I) an act of fraud, embezzlement or theft in connection with the Plan Administrator's duties or in the course of its engagement in such capacity, (ii) the intentional wrongful damage to the property of the Debtor, or (iii) gross neglect by the Plan Administrator of his duties under the Plan. Unless the Bankruptcy Court orders immediate removal, the Plan Administrator shall continue to serve until a successor Plan Administrator is appointed, and such appointment becomes effective, in accordance with the Plan.

17

**(h)** In the event of a vacancy by reason of the death, incapacity or immediate removal of the Plan Administrator or prospective vacancy by reason of resignation or removal, the Disbursing Agent shall appoint a successor Plan Administrator, which appointment shall be effective upon the approval of the Bankruptcy Court on not less than twenty (20) days' notice to parties who have filed a notice of appearance with the Bankruptcy Court during the chapter 11 case pursuant to Bankruptcy Rule 2002 and to all creditors of the Debtor, unless the Bankruptcy Court authorizes otherwise. Every successor Plan Administrator appointed hereunder shall execute, acknowledge, and file with the Bankruptcy Court an instrument accepting such appointment subject to the terms and provisions of the Plan. The successor Plan Administrator, without any further act, shall become vested with all the rights, powers, and duties of the Plan Administrator, provided, however, that no Plan Administrator shall be liable for the acts or omissions of any prior or later Plan Administrator.

**(i)** Unless otherwise ordered by the Bankruptcy Court, the death, resignation, or removal of the Plan Administrator shall not operate to terminate any agency or employment created by the Plan or invalidates any action theretofore taken by the Plan Administrator.

**(j)** The Plan Administrator shall have the right at any time to seek and rely upon instructions from the Bankruptcy Court concerning his duties under the Plan or any other document executed in connection therewith, and the Plan Administrator shall be entitled to rely upon such instructions in acting or failing to act and shall not be liable for any act taken or not taken in reliance thereon. In the absence of actual knowledge to the contrary, any person dealing with the Plan Administrator shall be entitled to rely on the authority of the Plan Administrator to act on behalf of the Debtor's estate and the Debtor, and shall have no obligation to inquire into the existence of such authority.

**(k)** After the Effective Date, the Plan Administrator shall maintain books and records but shall not be responsible for preparing and filing tax forms and returns as are required to be filed under applicable law.  The Interest Holder shall bear sole responsibility for filing tax forms and returns required under applicable law.

**(l)** The Plan Administrator shall turnover to the Interest Holder all books, records, and files that shall have been delivered to or created by the Plan Administrator as needed for the filing of tax forms and returns, and when such books, records, and files are no longer required.

**(m)** The Plan Administrator's duties shall cease upon the closing of this Case.

91.     Neither the Proponent, Plan Administrator, Disbursing Agent, nor any of their employees, advisors, attorneys, accountants, financial consultants, contractors, agents, and their successors and assigns, shall have or incur any liability to any Holder of a Claim or Interest,

or to any other entity, for any act or omission in connection with, related to, or arising out of, the pursuit of confirmation consummation, or other administration of the Plan or the property to be distributed or otherwise dealt with under the Plan, except for gross negligence or willful misconduct, and in all respects the Proponent, Plan Administrator, Disbursing Agent and each of their employees, advisors, attorneys, accountants, financial consultants, contractors, and agents shall be entitled to rely upon the advice of counsel with respect to its duties and responsibilities under the Plan. No current Holder of a Claim or Interest, representative thereof, shall have or pursue any claim or cause of action against the Proponent, Plan Administrator, or Disbursing Agent for making payments in accordance with the Plan, or for implementing the provisions of the Plan. Neither the Proponent, Plan Administrator, Disbursing Agent shall not be liable for obligations relating to Allowed Claims to the extent that Allowed Claims are not paid in full, other than as a result of the Disbursing Agent's gross negligence or willful misconduct.

## PRESERVATION OF CLAIMS

92.     All Causes of Action, including rights pursuant to Sections 502, 544, 545 and 546 of the Bankruptcy Code, all preference claims pursuant to Section 547 of the Bankruptcy Code, all fraudulent transfer claim pursuant to Section 548 of the Bankruptcy Code, and all claims relating to post-petition transactions under Section 549 of the Bankruptcy Code shall be preserved for the benefit of the Debtor's estate, provided, however, that the Plan Administrator shall have sole authority for prosecuting any such claims.

## DISTRIBUTIONS TO CREDITORS

93.     The Proponent shall be disbursing agent under the Plan without a bond. The Plan Administrator shall have the sole and exclusive right to file objections to claims in the

19

event grounds exist to object to particular claims. Claims objections must be filed no later than 60 days after the Effective Date.  On the initial distribution date and on each distribution date as may thereafter be necessary, the Proponent shall maintain an undetermined claims distribution reserve for the holders of undetermined claims as of such date in a sum not less than the amount required to pay each such undetermined claim if such claim was allowed in full.  To the extent that an undetermined claim becomes an Allowed Claim, the distributions reserved for such Allowed Claim, shall be released from the undetermined claims distribution reserve and paid to the holder of such Allowed Claim.  After all the amounts of all undetermined claims have been fixed, the balance of the undetermined claims distribution reserve shall thereafter be paid in accordance with the Plan.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

94.     Any and all pre-petition leases or executory contracts (a) not previously assumed or the subject of a motion to assume pending on the Confirmation Date and/or (b) not designated prior to the Confirmation Date as pre-petition leases or executory contracts to be assumed by the Proponent shall be deemed rejected by the Debtor.  In the event of a rejection which results in damages a Proof of Claim for such damages must be filed by the damaged party with the Court within thirty (30) days after the Effective Date.  All Allowed Claims arising from the rejection of any Executory Contract or unexpired lease shall be treated as an Unsecured Claim.  Any Claim arising from the rejection of any Executory Contract or unexpired lease not filed with the Court within the time period provided in the preceding paragraph above shall be deemed discharged and shall not be entitled to participate in any distribution under the Plan.

## RETENTION OF JURISDICTION

95.     Retention of Jurisdiction.  The Court shall have jurisdiction over all matters arising under, arising in, or relating to the Debtor's Bankruptcy Case including, but not limited to, proceedings: (a) to consider any modification of the Plan under section 1127 of the Bankruptcy Code; (b) to hear and determine all Claims, controversies, suits and disputes against the Debtor to the full extent permitted under 18 U.S.C. §1334 and 28 U.S.C. §157; (c) to hear, determine and enforce all Claims  and causes of action which may exist on behalf of the Debtor or the Debtor's estate, including, but not limited to, any right of the Debtor or the Debtor's Estate to recover assets pursuant to the provisions of the Bankruptcy Code; (d) to hear and determine all requests for compensation and/or reimbursement of expenses which may be made; (e) to value assets of the Estate; (f) To enforce the Confirmation Order, the final decree, and all injunctions therein; (g) to enter an order concluding and terminating the Bankruptcy Case; (h) to correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or the Confirmation Order; (i) to determine all questions and disputes regarding title to the assets of the Debtor; (j) to re-examine Claims which may have been allowed for purposes of voting, and (k) to determine objections which may be filed to any Claims.

## GENERAL PROVISIONS

96.     Headings.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the meaning of the Plan.

97.     Disputed Claims.  The Proponent shall hold in escrow the distribution that would be due on account of any Disputed Claim.  No Disputed Claims shall be paid, nor shall

21

distributions be made to a creditor holding a Disputed Claim, until such Claim becomes an Allowed Claim.

98.    Calculation of Time Periods.  Bankruptcy Rule 9006 is incorporated herein for purposes of calculating the dates set forth herein.

99.    Other Actions.  Nothing contained herein shall prevent the Proponent, Debtor, Interest Holders, or Creditors from taking such actions as may be necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan.

100.    Modification of Plan.  The Proponent may seek amendments or modifications to the Plan in accordance with section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date, the Proponent may seek to remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan

## INJUNCTION AND PROPERTY OF THE ESTATE

101.    Exculpation. Each of Proponent Disbursing Agent and Plan Administrator, its agents (acting in such capacity), and any professional person employed by Proponent Disbursing Agent and Plan Administrator shall not incur any liability to any Person and/or Entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, confirmation, or consummation of this Plan, the Disclosure Statement, or any other contract, instrument, release, or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Chapter 11 Case or this Plan; provided, however, that the foregoing exculpation from liability will not apply

22

to actions or omissions taken in bad faith or as a result of gross negligence or willful misconduct. Nothing in this Plan shall limit the liability of any professionals to their respective clients for malpractice pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

102.    Confirmation Injunction. Other than such liabilities and obligations otherwise assumed or provided hereunder, and as set forth in the Confirmation Order (a) the rights afforded herein and the treatment of all Claims and Interests herein, shall be in exchange for and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtor or any of its Assets and properties, (b) on the Effective Date, all such Claims against the Debtor shall be satisfied and released in full, and (c) all Persons shall be precluded from asserting and shall be permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) against the Debtor, its Assets or property, based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

103.    Discharge. On the Effective Date, except as otherwise expressly provided in this Plan or the Confirmation Order, the Confirmation of this Plan shall as of the Effective Date: (i) discharge the Debtor, the Reorganized Debtor and any of its Assets from all Claims, demands, liabilities and other debts that arose on or before the Effective Date, including, without limitation, all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (A) a proof of claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (B) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code, (C) a Claim based on such debt is or has been disallowed by order of the

23

Bankruptcy Court, or (D) the holder of a Claim based on such debt has accepted this Plan; and (ii) preclude all Entities from asserting against the Debtor, the Reorganized Debtor or any of its Assets any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections 524 and 1141 of the Bankruptcy Code. The discharge provided in this provision shall void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim. The Debtor shall be discharged from any Claims and agreements related to debts that arose on or before the Effective Date and such debts, Claims and agreements are deemed restructured and new as set forth in the Plan.

## **CLOSING THE CASE**

104.    Upon substantial consummation, the Debtor or the Proponent may move for a final decree to close the Bankruptcy Case and to request such other orders as may be just.

Dated:  New York, New York
        April 30, 2019

                                Galster Funding LLC
                                Plan Proponent

                        By:     s/Robert Liner _____

                                BACKENROTH FRANKEL & KRINSKY, LLP
                                Attorneys for Proponent


                        By:     s/Mark Frankel _____
                                800 Third Avenue
                                Floor 11
                                New York, New York 10022
                                (212) 593-1100

24

## EXHIBIT A to Plan

## BIDDING AND AUCTION PROCEDURES

These Terms and Conditions of Sale are promulgated in connection with the auction sale (the "Sale") of the real property located at 4917 12th Avenue, Brooklyn, New York 11219 (the "Property").

Time and Place of Sale:  The Sale will be held on _____, 2019 at ____ __ m. at the offices of Backenroth Frankel & Krinsky, LLP, 800 Third Avenue New York, New York 10022.

Sale Pursuant to Chapter 11 Plan:  The Seller of the Property is 4921 12th Avenue, LLC (the "Debtor").  The sale shall be conducted pursuant to Bankruptcy Code section 363 and the Chapter 11 Plan of Reorganization (the "Plan") proposed by Galster Funding LLC, the Plan proponent ("Proponent").

Sale free and Clear of Liens:  The Sale of the Property shall be conducted pursuant to the Proponent's Plan of Reorganization free and clear of liens, claims, commercial leases not assumed under the Plan, and encumbrances, with any such liens, claims and encumbrances to attach to the sale proceeds, and disbursed under the Plan.

Qualification to Bid:   In order to be qualified to bid on the Property, within seven days prior to the commencement of the Sale, each prospective bidder (except the Proponent's nominee) must deliver to the Proponent (a) a bank check in the amount of Five Hundred Thousand Dollars ($500,000) (the "Qualifying Deposit") payable to "Backenroth Frankel & Krinsky, LLC, as Attorneys" (b) evidence reasonably demonstrating such bidder's ability to consummate a sale on the terms proposed, and (c) a written offer to purchase substantially in the form annexed hereto. No later than one business day before the Sale, each bidder will be notified by the Proponent as to whether the Proponent deems such bidder qualified to bid at the Sale.

Bidding: Bidding shall be conducted openly at the Sale.  The opening bid shall be three million, two hundred fifty thousand dollars ($3,250,000).  Minimum bidding increments shall be Fifty Thousand Dollars ($50,000.00).  Proponent or its designee may credit bid its full claim.

Successful Bidder Additional Deposit: At the Sale, once a bidder is determined to have made the highest or best bid for the Property at the Sale (the "Successful Bidder"), bidding shall be deemed closed and no additional bids will be considered.  Within one business day after the Successful Bidder is determined, the Successful Bidder (except for the Proponent's nominee) shall be required to increase the Qualifying Deposit to an amount equal to ten percent of the winning bid, which amount shall serve as a good faith deposit against payment of the Purchase

Price.  At the conclusion of the Sale, the Proponent's counsel will return the Qualifying Deposits to all other bidders.

<u>Hearing to Approve Sale</u>:  A hearing will be conducted by the Bankruptcy Court on approval of the sale and on any issue that may exist as to which competing bid is higher or better,  before the honorable Carla E. Craig on the ___ day of _____, 2019 _____, at the United States Bankruptcy Court 271 Cadman Plaza East, Brooklyn, New York.

<u>Sale Approval Order</u>:  the sale approval order ("Sale Order") shall approve the Sale, and in connection therewith, the Sale Order shall contain the following findings of fact and conclusions of law: (a) that the Terms and Conditions of the Sale are fair and reasonable, (b) that the Sale and the Purchaser's purchase, of the Property pursuant to the Plan, is non-collusive, fair and reasonable and was conducted openly and in good faith, (c) that the transfer of the Property to the Purchaser represents an arm's-length transaction and was negotiated in good faith between the parties, (d) that the Purchaser, as transferee of the Property, is a good faith Purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e) the sale of the Property to the Purchaser was not controlled by an agreement among potential purchasers, (f) that no cause of action exists against the Purchaser or with respect to the sale of the Property to the Purchaser under Bankruptcy Code § 363(n), and (g) that any claims under Bankruptcy Code § 363(n) or any other claims as against the Purchaser are hereby released, waived and discharged.

<u>Closing</u>:  The Successful Bidder must pay the balance of the Purchase Price for the Property (the difference between the amount of the successful bid and the Qualifying Deposit) to the Proponent, by bank check, or wire transfer at the closing of title to the Property (the "Closing"). The Successful Bidder must close title to the Property at a date that is no more than fifteen (15) days after the Order by the Bankruptcy Court is entered, TIME BEING OF THE ESSENCE as to the Successful Bidder, although such date may be extended solely by the Proponent.

<u>Transfer Tax</u>:  Under the Plan, pursuant to section 1146(c) Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the Purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject any applicable document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, or other similar tax or governmental assessment including without limitation New York State Documentary Tax.

2

Damages for Failure to Close:  Time is of the Essence as Against the Successful Bidder and the failure of the Successful Bidder to either timely pay the additional Qualifying Deposit or timely close for any reason whatsoever (except as otherwise provided below) including its failure to pay the balance of the Purchase Price on the Closing Date, will result in the Proponent retaining the deposit as liquidated damages and the termination of the Successful Bidder's right to acquire the Property under these Terms and Conditions of Sale.  The Successful Bidder shall be obligated to close title to the Property and there is no contingency of any kind or nature that will permit the Successful Bidder to cancel or avoid its obligation under these Terms and Conditions of Sale other than the Debtor's inability to deliver a bargain and sale deed to the Property.  Expenses incurred by the Successful Bidder, or any competing bidder relating to any due diligence, such as obtaining title reports or environmental inspections, shall be the sole responsibility of such bidder, and under no circumstances shall the Proponent or the Proponent's professionals be responsible for, or pay, such expenses.

Backup Bidder:  In the event that the Successful Bidder for the Property fails to tender the payment of the balance of the Purchase Price on the Closing Date, or otherwise perform any of its obligations under these Terms and Conditions of Sale, the Proponent, at its sole option, shall be authorized to sell the Property to the Second Highest Bidder without any further notice without giving credit for the Deposit forfeited by the Successful Bidder, and upon such other terms and conditions as the Proponent deems appropriate.  Should the Second Highest Bidder fail to close on the Property, within such time as the parties may agree but not to exceed thirty (30) days after notice from the Proponent to the Second Highest Bidder, the Proponent shall be authorized to sell the Property to the next highest or best bidder, without the necessity of any further notice.  All bidders will be bound by these Terms and Conditions of Sale, including, without limitation, those items set forth in the paragraphs above, except that the Second Highest Bidder must close within thirty (30) days of notification that his bid is accepted.  TIME IS OF THE ESSENCE.

No Representations:  the Proponent, the Proponent's professional, the Debtor, and the Debtor's professionals have not made and do not make any representations as to the physical condition, rents, leases, expenses, operations, value of the land or buildings thereon, or any other matter or thing affecting or related to the Property or the Sale, which might be pertinent to the purchase of the Property, including, without limitation, (i) the current or future real estate tax liability, assessment or valuation of the Property; (ii) the potential qualification of the Property for any and all benefits conferred by or available under federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated; (iii) the compliance or non-compliance of the Property, in its current or any future state, with applicable present or future zoning ordinances or other land use law or regulation, or the ability to obtain a change in the zoning or use, or a variance in respect to the Property; (iv) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Property from any source, including, but not limited to, any state, city or federal government or institutional lender; (v) the current or future use of the

3

Property; (vi) the present and future condition and operating state of any and all machinery or equipment on the Property and the present or future structural and physical condition of any building thereon or its suitability for rehabilitation or renovation; (vii) the ownership or state of title of any personal property on the Property; (viii) the presence or absence of any laws, ordinances, rule or regulations issued by any governmental authority, agency or board and any violations thereof; (ix) any present or future issues concerning subdivision or non-subdivision of the Property; or (x) the compliance or non-compliance with environmental laws and the presence or absence of underground fuel storage tanks, any asbestos or other hazardous materials anywhere on the Property.  Each bidder shall be deemed to have agreed and acknowledged that no such representations have been made.  the Proponent is not liable or bound in any manner by expressed or implied warranties, guaranties, promises, statements, representations or information pertaining to the Property, made or furnished by the Proponent or Debtor or any real estate broker agent, employee, servant or other person or professional representing or purporting to represent the Proponent or Debtor unless such warranties, guaranties, promises, statements, representations or information are expressly and specifically set forth in writing by the Proponent.  For the avoidance of doubt, neither the Debtor nor the Debtor's professionals are authorized to provide any such warranties, guaranties, promises, statements, representations or information.

As Is Sale: The Property is being sold free and clear of all liens, claims, commercial leases not assumed under the Plan and encumbrances, with any such liens, claims and encumbrances to attach to the net proceeds of sale after deduction of any expenses of sale.  Furthermore, the Property is being sold "AS IS", "WHERE IS" "WITH ALL FAULTS", without any representations, covenants, guarantees or warranties of any kind or nature whatsoever and subject to, among other things, (a) any state of facts that an accurate survey may show; (b) any covenants, restrictions and easements of record; (c) any state of facts a physical inspection may show; (d) any building or zoning ordinances or other applicable municipal regulations and violations thereof; and (e) environmental conditions, including, without limitation, the Property's compliance (or lack of compliance) with environmental laws and the presence or absence of underground fuel storage tanks, any hazardous materials or asbestos anywhere on the Property.  By delivering their respective Qualifying Deposits, each bidder is deemed to have acknowledged that it has had the opportunity to review and inspect the Property, the state of title thereof and laws, rules and regulations applicable thereto, and will rely solely thereon and on its own independent investigations and inspections of the Property in making its bid.  Neither the Proponent nor any of its representatives make any representations or warrantees with respect to the permissible uses of the Property, including but not limited to, the zoning of the Property.  All bidders are deemed to have acknowledged that they have conducted their own due diligence in connection with the Property, and are not relying on any information provided by the Debtor, Proponent or their professionals.

Deed:  The Debtor, or the Proponent acting on the Debtor's behalf, shall convey the Property by delivery of a bargain and sale deed without covenants against grantor's acts.

4

530

Broker:  Except Aaron Jungreis and Rosewood Realty Group, neither the Debtor nor the Proponent nor their professionals are liable or responsible for the payment of fees of any broker.

Conduct of Sale: These Terms and Conditions of Sale will be read into the record, or specifically incorporated by reference, at the Sale of the Property.  By making a bid for the Property, all bidders will be required to acknowledge these Terms and Conditions of Sale and agree to be bound by them.

Failure to Close:  If the Debtor, or the Proponent on the Debtor's behalf, is unable to deliver title to the Property in accordance with these Terms and Conditions of Sale for any reason whatsoever or in the event that the Bankruptcy Court refuses to approve the sale of the Property pursuant, the Proponent's only obligation will be to refund the Deposit, together with interest earned thereon, if any, to the Successful Bidder, and upon such refund, the Successful Bidder will have no claim or recourse against the Proponent, the Debtor or their professionals.

Right to Withdraw Sale:  The Proponent reserves its right to withdraw the Property from the Sale, either prior or subsequent to the Sale, for any reasonable reason, as the Proponent deems necessary or appropriate.

Breakup Fee: None

Proponent's Designee:  Notwithstanding anything to the contrary herein, the Proponent shall be entitled to name a designee or designees who shall be deemed qualified to bid without posting a Qualifying Deposit or complying with the other requirements otherwise necessary to bid, and, if the Successful Bidder and Purchaser, shall be entitled to purchase the Property subject to some or all of the Proponent's mortgage.

Bankruptcy Court Jurisdiction:  The Bankruptcy Court shall determine any disputes concerning the Sale of the Property.  By participating in the Sale, all bidders consent to the jurisdiction of the Bankruptcy Court to determine such disputes under the Debtor's pending case.

5

CONTRACT dated as of the ____ day of _____, 2019 (this "Contract") , between 4921 12th Avenue, LLC, (the "Seller" or "Debtor") and _____ having an address at _____  _____ ("Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

1. Sale of Property

Paragraph 1.01. Seller shall sell or cause to be sold to Purchaser, and Purchaser shall purchase, at the price and upon the terms and conditions set forth in this Contract: the real property located at 4917 12th Avenue, Brooklyn, New York 11219 (the "Property").  The sale of the Property includes (a) all of its appurtenances, including any estate, right, title, interest, property, claim and demand of Seller in and to all streets, alleys, rights-of-way, sidewalks, easements, any adjoining gores or strips of land and utility lines or agreements, including, without limitation, all development rights and "air rights"; (b) all improvements, buildings and structures located on or at the Property and the facilities located thereon, and any apparatus, equipment, appliances and fixtures incorporated therein and used exclusively in connection with the operation and occupancy thereof; (c)  all plans, specifications, budgets, schedules, surveys, drawings, reports and governmental applications, permits, approvals and licenses issued by any federal, state or local governmental authority or agency pertaining to the ownership, operation, maintenance, development, construction or use of the Property, including, without limitation, the building plans approved by the City of New York,  Department of Buildings on June 26, 2014 (collectively, the "Plans and Permits"); and (d) all of its rights and licenses in and to use the Plans and Permits.

Paragraph 1.02.   Purchaser acknowledges that the Sale shall be conducted pursuant to the Chapter 11 plan ("Plan") confirmation order confirming the Plan proposed by Galster Funding LLC (the "Plan Proponent" or Mortgagee) in the Debtor's bankruptcy case in the United States Bankruptcy Court for the Eastern District of New York (hereinafter the "Bankruptcy Court"), Case No. 18-47256.  The "Bidding and Auction Procedures" (hereinafter the "Bidding Procedures") annexed to the Plan are deemed annexed to this Contract.

Paragraph 1.03. Purchaser acknowledges that this sale is further subject to and governed by (1) the Orders of the Bankruptcy Court including the Plan confirmation order, (2) the provisions of the United States Bankruptcy Code (hereinafter the "Code"), and (3) the laws of the State of New York, to the extent they do not conflict with (1) and (2), above.

2. Purchase Price, Acceptable Funds

Paragraph 2.01. The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Property is (                ) Dollars or such other bid by the Purchaser approved by the Bankruptcy Court, payable as follows:

(A) on the signing of this Contract, by Purchaser's check payable to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to Bidding Procedures as defined in Article 3 hereof (the "Down Payment").

(B) THIS CONTRACT IS "ALL CASH" AS KNOWN IN THE COMMON PARLANCE.  PURCHASER'S OBLIGATIONS UNDER THIS CONTRACT ARE NOT CONDITIONED UPON PURCHASER'S ABILITY TO SECURE FINANCING OF ANY KIND OR NATURE.

(C) The balance at Closing (as hereinafter defined) in accordance with Section 2.02 hereof (the "Cash Balance")

Paragraph 2.02. All monies payable under this Contract, unless otherwise specified herein, shall be paid by (a) certified checks of Purchaser drawn on any federally insured bank, savings bank, trust company or savings and loan association having a banking office in the City of New York; (b) official bank checks drawn by any such banking institution, payable to the order of Seller (or as Seller shall direct) and bearing no endorsements; or (c) wire transfer of immediately available federal funds.  Attorney's Escrow Checks of Purchaser payable to the order of Seller (or as Seller directs) up to the amount of $1,000.00 in the aggregate shall be acceptable for sums other than the Purchase Price payable to Seller at Closing.

3. Escrow of Down Payment

Paragraph 3.01. (a) The Down Payment shall be paid by check or checks drawn to the order of and delivered to Backenroth Frankel & Krinsky LLP ("Escrowee").  The Escrowee shall hold the Down Payment in escrow in a non-interest-bearing IOLA Account until the Closing or sooner termination of this Contract and shall pay over or apply the Down Payment in accordance with the terms of this section.  At the Closing, the Down Payment shall be paid by Escrowee in accordance with Bidding Procedures.  If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within 10 business days after the giving of such notice, Escrowee is hereby authorized to make such payment.  If Escrowee does receive such written objection within such 10-day period or if for any other reason Escrowee in good

2

faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this Contract or pursuant to an order of the Bankruptcy Court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest, if any, thereon, with the clerk of the Bankruptcy Court. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this Contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this Contractor involving gross negligence on the part of the Escrowee.

(c) Escrowee or any member of its firm shall be permitted to act as counsel for Galster Funding LLC (the "Proponent" or the "Mortgagee") in any dispute as to the disbursement of the Down Payment or any other dispute between the parties whether or not Escrowee is in possession of the Down Payment and continues to act as Escrowee.

(d) Escrowee acknowledges receipt of the Down Payment by certified, bank check subject to collection or wire transmission and Escrowee's agreement to these provisions by signing in the place indicated on the signature page of this contact.

4. The Closing

Paragraph 4.01. The conveyance of title to the Property by the Seller to Purchaser, and payment of the Cash Balance by Purchaser shall take place 15 days following the entry of an Order approving the Contract and the transaction embodied therein if that is a business day, and if not, the following business day (the "Closing"). The Closing is to be held at the office of the Escrowee, or such other location as designated by the Proponent within the Southern District of New York. Purchaser will have a one time right to adjourn the Closing for up to five Business Days from the original date (such adjourned date, "Purchaser's Mandatory Closing Date"). Time is of the essence with respect to Purchaser's obligations to close title in accordance with this Contract on or before Purchaser's Mandatory Closing Date.

5.   Acknowledgments and Representations of Purchaser

Purchaser acknowledges and represents that:

3

Paragraph 5.01. Purchaser has inspected the Property, made all appropriate inquiries into the previous ownership and uses of the Property, is fully familiar with the physical condition and state of repair thereof, and shall accept the Property "as is" and in their present condition, including, without limitation, the environmental conditions as reflected in the Terms of Sale annexed hereto, without any reduction of the Purchase Price for any change in such condition by any reason thereof subsequent to the date of this Contract.  The Terms of Sale set forth conditions which Purchaser agrees to accept, including any covenant, easement, and/or deed restriction, and any other future obligation relating thereto.

Paragraph 5.02. Before entering into this Contract, Purchaser has made such examination of the Property, the physical condition and state of repair thereof including the environmental conditions. Purchaser acknowledges that it is an experienced real estate owner/operator and is relying solely on its own expertise and investigations and inspections in entering into this Contract and has not been induced by and has not relied upon any representations, warranties, or statements, whether express or implied, made by Seller or any agent, employee, or other representative of Seller or by any other person representing or purporting to represent Seller or Proponent, which are not expressly set forth in this Contract, whether or not any such representations, warranties or statements were made in writing or orally.

Paragraph 5.03. In the event of any default by the Purchaser in the terms of this Contract, the damages which are due to the Seller, by reason of said default, shall be deemed liquidated in the amount of the Down Payment, as Seller's sole remedy, it being agreed that Seller's damages in case of such default might be impossible to ascertain with mathematical precision and that the Down Payment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

Paragraph 5.04. Purchaser represents that (a) it has the legal power, right and authority to enter into this Agreement and to consummate the transactions contemplated hereby and that all requisite action has been taken by Purchaser in connection with the entering into this Contract and the consummation of the transactions contemplated hereby;  (b) this Contract and all documents required hereby to be executed by Purchaser are and will be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms (c) Purchaser, and all direct or indirect beneficial owners of Purchaser, are in compliance with all applicable laws, statutes, rules and regulations of any federal, state or local governmental authority in the United States of America, including the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) (the "Order") and other similar requirements contained in the rules and regulations of the Office of Foreign Asset Control, Department of the Treasury ("OFAC") and in any related enabling legislation or other Executive Orders (collectively, the "Orders"). Neither Purchaser nor any of the direct or indirect beneficial owners of Purchaser  (i) is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "Lists") or is owned or controlled by, or acts for or on behalf

4

535

of, any Person on the Lists or who has been determined by competent authority to be subject to the prohibitions contained in the Orders; (ii) has been arrested for money laundering or for predicate crimes to money laundering, convicted or pled nolo contendere to charges involving money laundering or predicate crimes to money laundering; or (iii) has been determined by competent authority to be subject to the prohibitions contained in the Orders; (iv) is owned or controlled by, nor acts for or on behalf of, any natural person or entity (a "Person") on the Lists or any other Person who has been determined by competent authority to be subject to the prohibitions contained in the Orders; (v) will transfer or permit the transfer of any interest in Purchaser or such parties to any Person who is, or whose beneficial owners are, listed on the Lists; or (vi) will assign this Agreement or any interest herein, to any Person who is listed on the Lists or who is engaged in illegal activities.

6.  Destruction, Damage or Condemnation

Paragraph 6.01. The provisions of Section 5-1311 of the General Obligations Law shall not apply to the sale and purchase provided for in this Contract and Purchaser agrees to close title to the Property regardless of any destruction, damage or condemnation that occurs after the execution and delivery of this Contract.

7.  Seller's Closing Obligations

At the closing, Seller, or the Plan Proponent on the Seller's behalf, shall execute and/or deliver or cause to be executed and/or delivered to Purchaser the following:

Paragraph 7.01. A bargain and sale deed without covenants against grantor's acts, executed by the Debtor, or the Plan Proponent on the Debtor's behalf, in proper form for recording so as to convey to Purchaser the fee title to the Property, subject to recorded encumbrances and the other conditions of this Contract.

Paragraph 7.02. All required New York City and State transfer tax returns executed by the Debtor, or the Plan Proponent on the Debtor's behalf, to be issued at the Closing and delivered to the representative of Purchaser's title company for delivery to the appropriate public officers promptly after the Closing.

Paragraph 7.03. The right to possession of the Property in condition required by this Contract, subject to the provisions hereinabove and to the provisions of the Code and the laws of the State of New York governing the rights to possession upon the conveyance of the deed subject to any Order of the Bankruptcy Court and the Bidding Procedures.  Seller shall not be obligated to bring any motion or proceeding for the purpose of obtaining possession of any part of the Property, or to remove any tenant or occupant therefrom after delivery of the Deed.

Paragraph 7.04. An assignment of all of Seller's right, title and interest in and to the Plans and Permits in the form attached hereto as Exhibit A executed by Seller, or the Plan Proponent on the Seller's behalf.

Paragraph 7.05.  Any other documents required by this Contract or by law to be delivered by Seller to consummate this transaction.

8.   Purchaser's Closing Obligations

At the Closing, Purchaser shall execute and/or deliver:

Paragraph 8.01.  The Cash Balance to the Mortgagee.

Paragraph 8.02.  All required New York City and State transfer tax returns, and cause all such returns to be issued at the Closing and delivered to the representative of Purchaser's title company for delivery to the appropriate public officers promptly after the Closing.  Purchaser will pay any and all applicable transfer taxes and recording fees.

Paragraph 8.03.  Any other documents required by this Contract or by law or reasonably required by Seller to be executed and/or delivered by Purchaser to consummate this transaction.

9.   Apportionments

Paragraph 9.01. The parties specifically acknowledge that there shall be no apportionments made as of the date of Closing, whether for taxes, water or sewer charges, emergency repair liens, assessments, rents, fuel, or any other matters relating hereto.

10.   Objections to Sale

Paragraph 10.01. This Contract shall automatically terminate if the Court rejects the Sale or if Seller shall be unable to cause title to the Property to be conveyed to Purchaser at the Closing Date or any adjournments thereof in accordance with the provisions of this Contract and the Bidding Procedures.  Purchaser nevertheless may elect either (i) to accept such title as Seller may be able to convey, but without any abatement of or other credit to the Purchase Price or liability on the part of Seller; or (ii) to terminate this Contract. The sole liability of Seller shall be to refund the Down Payment and interest thereon, if any, to the Purchaser and this Contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability. Neither Seller nor Mortgagee shall be required to bring any action or proceeding or to incur any expense to cure any title defect or to enable Seller otherwise to comply with the provisions of this Contract, except as may otherwise be provided in this Contract.

Paragraph 10.02. Purchaser shall take title to the Property "as is" and subject to: any state of facts an accurate survey may show; encroachments, covenants, easements, and restrictions of

6

record, if any; violations, fines, penalties, zoning regulations, and ordinances of the City of New York.  Purchaser is aware of and agrees to the Terms of Sale which are attached to this Contract and which are incorporated in this Contract by this reference as though fully set forth herein at length.

11.  Notices

Paragraph 11.01. All notices under this Contract shall be in writing and shall be delivered personally, by nationally recognized overnight courier, addressed to Mortgagee's Attorney, on behalf of the Seller, at the address set forth below, and to Purchaser addressed to Purchaser's Attorney at the address set forth below.

Mortgagee's attorneys, Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, New York, New York 10022.

Purchaser's Attorney:

12.  Limitations on Survival of Representations, Warranties, Covenants and other Obligations

Paragraph 12.01. Except as otherwise expressly set forth in this Contract, no representations, warranties, covenants or other obligations of Seller or Plan Proponent and/or Purchaser set forth herein shall survive the Closing except as specifically provided to survive, and no action based thereon shall be commenced after the Closing except as to such representations specifically provided to survive.

Paragraph 12.02. The delivery of the deed by the Seller and the acceptance thereof by Purchaser shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations, if any, of Seller which are expressly stated in this Contract to survive.

13.  Assignment of Contract

Paragraph 13.01.  Purchaser shall not assign this Contract or its rights hereunder without the prior written consent of the Proponent, whose consent will not be unreasonably withheld or delayed. Additionally, Purchaser may assign its rights under this Contract, but only immediately before the Closing and only simultaneously with the payment of the Cash Balance, to any wholly owned subsidiary of Purchaser, or to any entity in which Purchaser, or its principals, has an equity interest of at least fifty-one (51%) percent and control of management (a "Controlled Entity"), upon appropriate proof of same delivered to Proponent.  Any purported assignment without Proponent's consent or that is not to a Controlled Entity with proof of such relationship

7

given to Proponent shall be void.  Any sale, transfer or assignment of any interests in Purchaser will be deemed an assignment of this Contract and is subject to the same conditions as an assignment of this Contract. Nevertheless, an assignment of Purchaser's rights under this Contract, if and when consented to by Proponent, shall not be effective unless and until an executed counterpart of the instrument of assignment and of an assumption agreement by the assignee shall have been delivered to Proponent.

Paragraph 13.02.  Seller shall assign pending tax certiorari actions, if any, to Purchaser without any representations or warranties, and without any further obligation of Seller, except to execute such documents as may be necessary to effectuate such assignment.

14.  Miscellaneous Provisions

Paragraph 14.01 THE PROVISIONS OF THE BIDDING PROCEDURES AND THE ORDERS OF THE COURT ARE A PART OF THIS CONTRACT. ANY CONFLICT WITH SUCH IN THIS CONTRACT WILL NOT BE DEEMED TO AMEND OR ALTER SAID PROCEDURES OR ORDERS.

Paragraph 14.02. Subject to the provisions of Paragraph 14.01, this Contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated hereby, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended, discharged, or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in such instrument.

Paragraph 14.03.  This Contract shall be governed by, and construed in accordance with, the Code and the Orders of the Bankruptcy Court and, where it does not conflict with the Code or any Order of the Bankruptcy Court or the Bidding Procedures, the laws of the State of New York. The Bankruptcy Court shall have the exclusive jurisdiction to determine any disputes concerning the sale of the Property or any other matters under this Contract.

Paragraph 14.04. The captions in this Contract are inserted for convenience or reference only and in no way define, describe, or limit the scope or intent of this Contract or any of the provisions hereof.

Paragraph 14.05. This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

Paragraph 14.06. This Contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser, together with all amounts required to be paid pursuant to 2.0l (A) hereto.  This Contract may be executed in counterparts each of which will constitute an original and all of which, when taken together, will constitute one and the same agreement.  A

signed counterpart of this Contract delivered by electronic transmission will be treated as an original.

Paragraph 14.07. As used in this Contract, the masculine shall include the feminine and neuter, the singular shall include the plural, and the plural shall include the singular, as the context may require.

Paragraph 14.08. Subject to Paragraph 14.01, if the provisions of any schedule or rider to this Contract are inconsistent with the provisions of this Contract, the provisions of such schedule or rider shall prevail.

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the date first above written.

4921 12th Avenue, LLC, Seller                    Purchaser:


By: _____          By: _____
    Name:                                              Name:
    Title:                                               Title:
Backenroth Frankel & Krinsky, LLP, Escrowee:


By: _____
    Name:
    Title:

Exhibit G

CONTRACT dated as of the _____ day of ~~_____, 2019~~September, 2020 (this "Contract") , between ~~4921 12th Avenue, LLC~~MARK FRANKEL, AS PLAN ADMINISTRATOR OF THE BANKRUPTCY CASE IN RE 4921 12TH AVENUE, LLC (the "Debtor") IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF NEW YORK, (the "Seller" ~~or "Debtor"~~) and _____ having an address at _____ _____ ("Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

1.   ~~1.~~ Sale of Property

~~_____~~Paragraph 1.01. Seller shall sell or cause to be sold to Purchaser, and Purchaser shall purchase, at the price and upon the terms and conditions set forth in this Contract: the real property located at ~~4917 12th Avenue, Brooklyn, New York 11219~~4917 12th Avenue, units C1 and R-1, Brooklyn, New York 11219 (the "Property"). The sale of the Property includes (a) all of its appurtenances, including any estate, right, title, interest, property, claim and demand of Seller in and to all streets, alleys, rights-of-way, sidewalks, easements, any adjoining gores or strips of land and utility lines or agreements, including, without limitation, all development rights and "air rights"; (b) all improvements, buildings and structures located on or at the Property and the facilities located thereon, and any apparatus, equipment, appliances and fixtures incorporated therein and used exclusively in connection with the operation and occupancy thereof; (c) all plans, specifications, budgets, schedules, surveys, drawings, reports and governmental applications, permits, approvals and licenses issued by any federal, state or local governmental authority or agency pertaining to the ownership, operation, maintenance, development, construction or use of the Property, including, without limitation, the building plans approved by the City of New York, Department of Buildings on June 26, 2014 (collectively, the "Plans and Permits"); and (d) all of its rights and licenses in and to use the Plans and Permits.

~~_____~~Paragraph 1.02.  Purchaser acknowledges that the Sale shall be conducted pursuant to the Chapter 11 plan ("Plan") confirmation order confirming the Plan proposed by Galster Funding LLC (the "~~Plan Proponent" or~~ Mortgagee") in the Debtor's bankruptcy case in the United States Bankruptcy Court for the Eastern District of New York (hereinafter the "Bankruptcy Court"), Case No. 18-47256.  The "Bidding and Auction Procedures" (hereinafter the "Bidding Procedures") annexed to the Plan are deemed annexed to this Contract.

Paragraph 1.03. Purchaser acknowledges that this sale is further subject to and governed by (1) the Orders of the Bankruptcy Court including the Plan confirmation order, (2) the provisions of the United States Bankruptcy Code (hereinafter the "Code"), and (3) the laws of the State of New York, to the extent they do not conflict with (1) and (2), above.

2. Purchase Price, Acceptable Funds



~~————~~Paragraph 2.01. The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Property is ~~(———————) Dollars or such other bid by the Purchaser approved by the Bankruptcy Court~~Seven Million Two Hundred Thousand and 00/100 ($7,200,000.00) Dollars, payable as follows:

~~————————(A)~~(A) the sum of Seven Hundred Twenty Thousand and 00/100 ($720,000.00) Dollars on the signing of this Contract, by Purchaser's check payable to the Escrowee (as hereinafter defined), subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to Bidding Procedures as defined in Article 3 hereof (the "Down Payment").

(B) THIS CONTRACT IS "ALL CASH" AS KNOWN IN THE COMMON PARLANCE. PURCHASER'S OBLIGATIONS UNDER THIS CONTRACT ARE NOT CONDITIONED UPON PURCHASER'S ABILITY TO SECURE FINANCING OF ANY KIND OR NATURE.

(C) The balance at Closing (as hereinafter defined) in accordance with Section 2.02 hereof (the "Cash Balance")

Paragraph 2.02. All monies payable under this Contract, unless otherwise specified herein, shall be paid by (a) certified checks of Purchaser drawn on any federally insured bank, savings bank, trust company or savings and loan association having a banking office in the City of New York; (b) official bank checks drawn by any such banking institution, payable to the order of Seller (or as Seller shall direct) and bearing no endorsements; or (c) wire transfer of immediately available federal funds. Attorney's Escrow Checks of Purchaser payable to the order of Seller (or as Seller directs) up to the amount of $1,000.00 in the aggregate shall be acceptable for sums other than the Purchase Price payable to Seller at Closing.

3. Escrow of Down Payment

Paragraph 3.01. (a) The Down Payment shall be paid by check or checks drawn to the order of and delivered to Backenroth Frankel & Krinsky LLP ("Escrowee"). The Escrowee shall hold the Down Payment in escrow in a non-interest-bearing IOLA Account until the Closing or sooner termination of this Contract and shall pay over or apply the Down Payment in accordance with the terms of this section. At the Closing, the Down Payment shall be paid by Escrowee in accordance with Bidding Procedures. If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within 10 business days after the giving of such notice, Escrowee is hereby authorized to make such payment. If Escrowee does receive such written objection within such 10-day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this Contract or pursuant to an order of the Bankruptcy Court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest, if any, thereon, with the clerk of the Bankruptcy Court. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that

Escrowee shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this Contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this Contractor involving gross negligence on the part of the Escrowee.

(c) Escrowee or any member of its firm shall be permitted to act as counsel for ~~Galster Funding LLC (the "Proponent" or the "Mortgagee")~~ in any dispute as to the disbursement of the Down Payment or any other dispute between the parties whether or not Escrowee is in possession of the Down Payment and continues to act as Escrowee.

(d) Escrowee acknowledges receipt of the Down Payment by certified, bank check subject to collection or wire transmission and Escrowee's agreement to these provisions by signing in the place indicated on the signature page of this contact.

4. The Closing

~~————~~Paragraph 4.01. The conveyance of title to the Property by the Seller to Purchaser, and payment of the Cash Balance by Purchaser shall take place ~~15~~ten (10) days following the ~~entry of an Order approving~~date that the ~~Contract and~~ current commercial tenant of the ~~transaction embodied therein~~Property (the "Tenant") shall vacate the Property, if that is a business day, and if not, the following business day (the "Closing"). The Closing is to be held at the office of the Escrowee, or such other location as designated by the ~~Proponent~~Seller within the Southern District of New York. Purchaser will have a one (1) time right to adjourn the Closing for up to ~~five Business Days~~twenty (20) days from the original date (such adjourned date, "Purchaser's Mandatory Closing Date").~~.~~  Time is of the essence with respect to Purchaser's obligations to close title in accordance with this Contract on or before Purchaser's Mandatory Closing Date.

5.   Acknowledgments and Representations of Purchaser

Purchaser acknowledges and represents that:

Paragraph 5.01. Purchaser has inspected the Property, made all appropriate inquiries into the previous ownership and uses of the Property, is fully familiar with the physical condition and state of repair thereof, and shall accept the Property "as is" and in their present condition, including, without limitation, the environmental conditions as reflected in the Terms of Sale annexed hereto, without any reduction of the Purchase Price for any change in such condition by any reason thereof subsequent to the date of this Contract.  The Terms of Sale set forth conditions which Purchaser agrees to accept, including any covenant, easement, and/or deed restriction, and any other future obligation relating thereto. Purchaser specifically acknowledges that Seller shall not be obligated to obtain any letter stating that all common charges have been paid, and Purchaser shall take title subject to any and all unpaid common charges, without reduction in the Purchase Price.

Paragraph 5.02. Before entering into this Contract, Purchaser has made such examination of the Property, the physical condition and state of repair thereof including the environmental conditions.

Purchaser acknowledges that it is an experienced real estate owner/operator and is relying solely on its own expertise and investigations and inspections in entering into this Contract and has not been induced by and has not relied upon any representations, warranties, or statements, whether express or implied, made by Seller or any agent, employee, or other representative of Seller or by any other person representing or purporting to represent Seller or ~~Proponent~~Mortgagee, which are not expressly set forth in this Contract, whether or not any such representations, warranties or statements were made in writing or orally.

Paragraph 5.03. In the event of any default by the Purchaser in the terms of this Contract, the damages which are due to the Seller, by reason of said default, shall be deemed liquidated in the amount of the Down Payment, as Seller's sole remedy, it being agreed that Seller's damages in case of such default might be impossible to ascertain with mathematical precision and that the Down Payment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

Paragraph 5.04. Purchaser represents that (a) it has the legal power, right and authority to enter into this Agreement and to consummate the transactions contemplated hereby and that all requisite action has been taken by Purchaser in connection with the entering into this Contract and the consummation of the transactions contemplated hereby; (b) this Contract and all documents required hereby to be executed by Purchaser are and will be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms (c) Purchaser, and all direct or indirect beneficial owners of Purchaser, are in compliance with all applicable laws, statutes, rules and regulations of any federal, state or local governmental authority in the United States of America, including the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) (the "Order") and other similar requirements contained in the rules and regulations of the Office of Foreign Asset Control, Department of the Treasury ("OFAC") and in any related enabling legislation or other Executive Orders (collectively, the "Orders"). Neither Purchaser nor any of the direct or indirect beneficial owners of Purchaser  (i) is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "Lists") or is owned or controlled by, or acts for or on behalf of, any Person on the Lists or who has been determined by competent authority to be subject to the prohibitions contained in the Orders; (ii) has been arrested for money laundering or for predicate crimes to money laundering, convicted or pled nolo contendere to charges involving money laundering or predicate crimes to money laundering; or (iii) has been determined by competent authority to be subject to the prohibitions contained in the Orders; (iv) is owned or controlled by, nor acts for or on behalf of, any natural person or entity (a "Person") on the Lists or any other Person who has been determined by competent authority to be subject to the prohibitions contained in the Orders; (v) will transfer or permit the transfer of any interest in Purchaser or such parties to any Person who is, or whose beneficial owners are, listed on the Lists; or (vi) will assign this Agreement or any interest herein, to any Person who is listed on the Lists or who is engaged in illegal activities.

6. Destruction, Damage or Condemnation

Paragraph 6.01. The provisions of Section 5-1311 of the General Obligations Law shall not apply to the sale and purchase provided for in this Contract and Purchaser agrees to close title to the Property regardless of any destruction, damage or condemnation that occurs after the execution and delivery of this Contract.

7.  Seller's Closing Obligations

At the closing, Seller, or the Plan Proponent on the Seller's behalf, shall execute and/or deliver or cause to be executed and/or delivered to Purchaser the following:

Paragraph 7.01. A bargain and sale deed without covenants against grantor's acts, executed by the Debtor, or the Plan Proponent on the Debtor's behalfSeller, in proper form for recording so as to convey to Purchaser the fee title to the Property, subject to recorded encumbrances and the other conditions of this Contract.

Paragraph 7.02. All required New York City and State transfer tax returns executed by the Debtor, or the Plan Proponent on the Debtor's behalfSeller, to be issued at the Closing and delivered to the representative of Purchaser's title company for delivery to the appropriate public officers promptly after the Closing.

Paragraph 7.03. The right to possession of the Property in condition required by this Contract, subject to the provisions hereinabove and to the provisions of the Code and the laws of the State of New York governing the rights to possession upon the conveyance of the deed subject to any Order of the Bankruptcy Court and the Bidding Procedures.  Seller shall not be obligated to bring any motion or proceeding for the purpose of obtaining possession of any part of the Property, or to remove any tenant or occupant therefrom after delivery of the Deed.

Paragraph 7.04. An assignment of all of Seller's right, title and interest in and to the Plans and Permits in the form attached hereto as Exhibit A executed by Seller, or the Plan Proponent on the Seller's behalf.

Paragraph 7.05.  Any other documents required by this Contract or by law to be delivered by Seller to consummate this transaction.

8.  Purchaser's Closing Obligations

At the Closing, Purchaser shall execute and/or deliver:

Paragraph 8.01.  The Cash Balance to the Mortgagee.

Paragraph 8.02.  All required New York City and State transfer tax returns, and cause all such returns to be issued at the Closing and delivered to the representative of Purchaser's title company for delivery to the appropriate public officers promptly after the Closing.  Purchaser will pay any and all applicable transfer taxes and recording fees.

Paragraph 8.03.  Any other documents required by this Contract or by law or reasonably required by Seller to be executed and/or delivered by Purchaser to consummate this transaction.

9.  Apportionments

Paragraph 9.01. The parties specifically acknowledge that there shall be no apportionments made as of the date of Closing, whether for taxes, water or sewer charges, emergency repair liens, assessments, rents, fuel, unpaid common charges or any other matters relating hereto.

10.  Objections to Sale

Paragraph 10.01. This Contract shall automatically terminate if the Court rejects the Sale or if Seller shall be unable to cause title to the Property to be conveyed to Purchaser at the Closing Date or any adjournments thereof in accordance with the provisions of this Contract and the Bidding Procedures. Purchaser nevertheless may elect either (i) to accept such title as Seller may be able to convey, but without any abatement of or other credit to the Purchase Price or liability on the part of Seller; or (ii) to terminate this Contract. The sole liability of Seller shall be to refund the Down Payment and interest thereon, if any, to the Purchaser and this Contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability.  Neither Seller nor Mortgagee shall be required to bring any action or proceeding or to incur any expense to cure any title defect or to enable Seller otherwise to comply with the provisions of this Contract, except as may otherwise be provided in this Contract.

~~Paragraph 10.02.~~Paragraph 10.02.  In the event that, in accordance with the Bidding Procedures, if a bid in excess of the Purchase Price is received and approved by the Court (a "Higher Accepted Bid"), from a Purchaser who is ready, willing, and able to purchase the Property, the differenced between the Higher Accepted Bid and the Purchase Price shall be paid fifty (50%) percent to Mortgagee and fifty (50%) percent to Purchaser, and this Contract shall be deemed terminated.  The provisions of Paragraph 10.01 shall apply thereto.

Paragraph 10.03. Purchaser shall take title to the Property "as is" and subject to: any state of facts an accurate survey may show; encroachments, covenants, easements, and restrictions of record, if any; violations, fines, penalties, zoning regulations, and ordinances of the City of New York.  Purchaser is aware of and agrees to the Terms of Sale which are attached to this Contract and which are incorporated in this Contract by this reference as though fully set forth herein at length.

11.  Notices

Paragraph 11.01. All notices under this Contract shall be in writing and shall be delivered personally, by nationally recognized overnight courier, addressed to ~~Mortgagee's Attorney, on behalf of the~~ Seller, at the address set forth below, and to Purchaser addressed to Purchaser's Attorney at the address set forth below.

~~Mortgagee's~~Seller's attorneys, Backenroth Frankel & Krinsky, LLP, 800 Third Avenue, New York, New York 10022, with a copy to Robert F. Liner, Esq. Stark Amron & Liner, LLP, 1225 Franklin Avenue, Garden City, New York  11530.

Purchaser's Attorney:~~_~~... _____

12.  Limitations on Survival of Representations, Warranties, Covenants and other Obligations

Paragraph 12.01. Except as otherwise expressly set forth in this Contract, no representations, warranties, covenants or other obligations of Seller ~~or Plan Proponent~~ and/or Purchaser set forth herein shall survive the Closing except as specifically provided to survive, and no action based thereon shall be commenced after the Closing except as to such representations specifically provided to survive.

Paragraph 12.02. The delivery of the deed by the Seller and the acceptance thereof by Purchaser shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations, if any, of Seller which are expressly stated in this Contract to survive.

13.  Assignment of Contract

Paragraph 13.01.  Purchaser shall not assign this Contract or its rights hereunder without the prior written consent of the ~~Proponent~~Mortgagee, whose consent will not be unreasonably withheld or delayed. Additionally, Purchaser may assign its rights under this Contract, but only immediately before the Closing and only simultaneously with the payment of the Cash Balance, to any wholly owned subsidiary of Purchaser, or to any entity in which Purchaser, or its principals, has an equity interest of at least fifty-one (51%) percent and control of management (a "Controlled Entity"), upon appropriate proof of same delivered to ~~Proponent~~Mortgagee.  Any purported assignment without ~~Proponent's~~Mortgagee's consent or that is not to a Controlled Entity with proof of such relationship given to ~~Proponent~~Mortgagee shall be void.  Any sale, transfer or assignment of any interests in Purchaser will be deemed an assignment of this Contract and is subject to the same conditions as an assignment of this Contract. Nevertheless, an assignment of Purchaser's rights under this Contract, if and when consented to by ~~Proponent~~Mortgagee, shall not be effective unless and until an executed counterpart of the instrument of assignment and of an assumption agreement by the assignee shall have been delivered to ~~Proponent~~Seller.

Paragraph 13.02.  Seller shall assign pending tax certiorari actions, if any, to Purchaser without any representations or warranties, and without any further obligation of Seller, except to execute such documents as may be necessary to effectuate such assignment.

14.  Miscellaneous Provisions

Paragraph 14.01 THE PROVISIONS OF THE BIDDING PROCEDURES AND THE ORDERS OF THE COURT ARE A PART OF THIS CONTRACT. ANY CONFLICT WITH SUCH IN THIS CONTRACT WILL NOT BE DEEMED TO AMEND OR ALTER SAID PROCEDURES OR ORDERS.

Paragraph 14.02. Subject to the provisions of Paragraph 14.01, this Contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated hereby, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended, discharged, or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in such instrument.

Paragraph 14.03.  This Contract shall be governed by, and construed in accordance with, the Code and the Orders of the Bankruptcy Court and, where it does not conflict with the Code or any Order of the Bankruptcy Court or the Bidding Procedures, the laws of the State of New York. The Bankruptcy Court shall have the exclusive jurisdiction to determine any disputes concerning the sale of the Property or any other matters under this Contract.

Paragraph 14.04. The captions in this Contract are inserted for convenience or reference only and in no way define, describe, or limit the scope or intent of this Contract or any of the provisions hereof.

Paragraph 14.05. This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

Paragraph 14.06. This Contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser, together with all amounts required to be paid pursuant to 2.0l (A) hereto.  This Contract may be executed in counterparts each of which will constitute an original and all of which, when taken together, will constitute one and the same agreement.  A signed counterpart of this Contract delivered by electronic transmission will be treated as an original.

Paragraph 14.07. As used in this Contract, the masculine shall include the feminine and neuter, the singular shall include the plural, and the plural shall include the singular, as the context may require.

Paragraph 14.08. Subject to Paragraph 14.01, if the provisions of any schedule or rider to this Contract are inconsistent with the provisions of this Contract, the provisions of such schedule or rider shall prevail.

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the date first above written.

4921 12th Avenue, LLC, Seller                    Purchaser:

                                                 _____

By: _____             By: _____
    _____ Name:                                     Name:
    _____ Title:                                    Title:

_____
MARK    FRANKEL,    AS    PLAN
ADMINISTRATOR OF THE BANKRUPTCY
CASE IN RE 4921 12TH AVENUE, LLC

Backenroth Frankel & Krinsky, LLP, Escrowee:


By: _____
    Name:
    Title:

| Information to identify the case: | |
|---|---|
| Debtor | |
| **4921 12th Avenue LLC** | EIN  **20−0581630** |
| Name | |
| United States Bankruptcy Court  **Eastern District of New York** | Date case filed for chapter  **11    12/20/18** |
| Case number:  **1−18−47256−reg** | |

## NOTICE TO PARTIES CONCERNING APPEAL (ECF CASE)

A Notice of Appeal was filed on October 13, 2020, in the above case by Schuyler G. Carroll on behalf of Ultimate Opportunities, LLC, regarding Order Directing Vacatur of Commercial Premises & Order Denying Motion for Reconsideration dated August 28, 2020 & September 29, 2020, document number 128 & 148.

Effective December 1, 2014, Part VIII of the Federal Rules of Bankruptcy Procedure governing bankruptcy appeals was substantially revised in order to align those rules with the Federal Rules of Appellate Procedure and updated to include electronic transmission, filing, and service.

This notice must be read together with the Federal Rules of Civil Procedure (FRCP), the Federal Rules of Bankruptcy Procedure (FRBP), the Local Rules of the Eastern District of New York, and this Court's Local Rules and Procedures.

1.  **Service of Notice:** The appellant must provide the Clerk with the email address of each party to be served; to the extent that there are parties to the appeal who are not equipped to receive email noticification, the appellant must provide the Clerk with the address for all parties to be served.

2.  **Appellant's Designation:** Appellant's designation of record on appeal and statement of issues to be presented on appeal are due within fourteen (14) days from the date of the filing of the Notice of Appeal. The designation must include a list of items to be included in the record on appeal. A copy of the designation and statement shall be served by the appellant on the appellee. A certificate of service must be filed with the bankruptcy court as proof that proper service was made.

3.  **Appellee's Designation:** Within fourteen (14) days after service of the appellant's designation and statement, the appellee may file with the bankruptcy court and serve on the appellant a designation of additional items to be included in the record on appeal.

4.  **Transcripts:** If the record designated by any party includes a transcript of any proceeding or a part thereof, the party shall, immediately after filing the designation, call one of the court approved transcription service agencies to request a copy of a transcript. The written request for the transcript shall be filed with the bankruptcy court. The party requesting the transcript is responsible for the cost of transcription. Designated transcripts must be provided to this office in PDF format.

5.  **ECF Registration (*Attorneys Only*):** Documents must be filed electronically relative to this matter, both in the Bankruptcy Court and, once the record has been transmitted, in the District Court. For information on ECF registration in the Bankruptcy Court, please visit: www.nyeb.uscourts.gov/electronic−filing−procedures; in the District Court, visit: https://www.nyed.uscourts.gov/cmecf.

6.  **Transmittal of Record on Appeal:** Generally the record on appeal will be transmitted thirty (30) days from the date of the filing with the Court of the Notice of Appeal.

Dated: October 14, 2020                                                FOR THE COURT

                                                                        By: Amy Tenneriello
                                                                        _____
                                                                        Deputy Clerk

**BLntcparties.jsp** [Notice to Parties 04/17/17]

# Notice Recipients

District/Off: 0207−1                    User: atennerie                    Date Created: 10/14/2020
Case: 1−18−47256−reg              Form ID: 772                        Total: 7

**Recipients submitted to the BNC (Bankruptcy Noticing Center) without an address:**
op         Mark Frankel as Plan Adminstrator for 4921 12th Avenue LLC

                                                        TOTAL: 1

**Recipients of Notice of Electronic Filing:**
aty        David K. Fiveson     dfiveson@bffmlaw.com
aty        Joseph Y. Balisok     bankrutcy@lawbalisok.com
aty        Mark A. Frankel     mfrankel@bfklaw.com
aty        Schuyler G. Carroll     SCarroll@loeb.com

                                                          TOTAL: 4

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
db        4921 12th Avenue LLC     4921 12th Avenue     Brooklyn, NY 11219
           Office of the United States Trustee     Eastern District of NY (Brooklyn Office)     U.S. Federal Office
           Building     201 Varick Street, Suite 1006     New York, NY 10014

                                                            TOTAL: 2